Steve W. Berman (*Pro Hac Vice*)
Robert F. Lopez (*Pro Hac Vice*)
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
toml@hbsslaw.com

Bruce L. Simon (96241)
Daniel L. Warshaw (185365)
William J. Newsom (267643)
PEARSON SIMON WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswplaw.com
dwarshaw@pswplaw.com
wnewsom@pswplaw.com

*Counsel for Select Plaintiffs and*
*Co-Lead Counsel for the Proposed Classes*

[*Additional Counsel Listed on*
*Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>CARRIER IQ, INC.,<br>CONSUMER PRIVACY LITIGATION. | No. 12-md-2330-EMC<br><br>FIRST CONSOLIDATED AMENDED COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION ......................................................................................................2

III.    PARTIES .................................................................................................................3

IV.     FACTUAL BACKGROUND ..................................................................................6

        A.      Revelations and Deep Concerns Regarding Carrier IQ Software ...............6

        B.      Carrier IQ as Deployed ............................................................................10

                1.      Carrier IQ Software Is Installed on Millions of Phones ...............10

                2.      Carrier IQ Software Intercepts and Transmits Private Information ............12

                3.      Further Comments on CIQ Software .............................................15

        C.      Plaintiffs' Mobile Devices Bear the Carrier IQ Software, and Their
                Communications Have Been Intercepted Without Authorization ............16

V.      CLASS ALLEGATIONS ......................................................................................20

VI.     CLAIMS FOR RELIEF ........................................................................................23

VII.    PRAYER FOR RELIEF ........................................................................................45

VIII.   JURY TRIAL DEMANDED ................................................................................46

1       For their complaint against the defendants, plaintiffs allege as follows:

2                          **I.       INTRODUCTION**

3       1.      This proposed class-action lawsuit concerns Carrier IQ software, which resides on

4   millions of mobile devices.  Carrier IQ software intercepts private messages and captures

5   confidential and sensitive information before sending it off the mobile devices on which it is

6   installed.  This software is already installed on mobile devices when consumers purchase them, and

7   consumers do not know it.  Nor are consumers given the option turn off the software, to delete it, or

8   opt-out of its functions.  Instead, the software runs clandestinely on their devices, even as it

9   intercepts and processes private data and taxes the devices' battery power, processor functions, and

10  system memory.

11      2.      Though its author and mobile device manufacturers describe Carrier IQ software as

12  a benign diagnostic and service-enhancement tool, Carrier IQ software intercepts and processes

13  data that includes: URLs[1] containing HTTP and HTTPS query strings[2] embedded with information

14  such as search terms, user names, passwords, and geo-location information; geo-location

15  information apart from that transmitted in URLs; text messages; telephone numbers dialed and

16  received; other keystrokes; and application purchases and uses.

---

[1] "In computing, a uniform resource locator (URL) is a specific character string that constitutes a reference to an Internet resource."  *See* http://en.wikipedia.org/wiki/Url (last accessed August 23, 2012).

[2] "In the World Wide Web, a query string is the part of a Uniform Resource Locator (URL) that contains data to be passed to web applications such as CGI programs. . . .  When a web page is requested via the Hypertext Transfer Protocol [HTTP], the server locates a file in its file system based on the requested URL." *See* http://en.wikipedia.org/wiki/Query_string (last accessed August 23, 2012).

"The Hypertext Transfer Protocol (HTTP) is an application protocol for distributed, collaborative, hypermedia information systems.  HTTP is the foundation of data communication for the World Wide Web."  *See* http://en.wikipedia.org/wiki/Hypertext_Transfer_Protocol (last accessed August 23, 2012).  "Hypertext Transfer Protocol Secure (HTTPS) is a widely used communications protocol for secure communication over a computer network, with especially wide deployment on the Internet. Technically, it is not a protocol in itself; rather, it is the result of simply layering the Hypertext Transfer Protocol (HTTP) on top of the SSL/TLS protocol, thus adding the security capabilities of SSL/TLS to standard HTTP communications." *See* http://en.wikipedia.org/wiki/Https (last accessed August 23, 2012).

3.      As explained more fully below, this data also is or has been transmitted off mobile devices without the knowledge or authorization of consumers.  In fact, in some installations, this information is or has been transmitted to Google, the author of the Android mobile operating system, and probably to application vendors and developers, too, as part of device or application crash reports.  And in these installations especially, grave security vulnerabilities have been created as well.

4.      Plaintiffs' rights to privacy and security in their confidential, private, and sensitive communications have been seriously infringed, in violation of federal and state law.  Furthermore, plaintiffs and members of the proposed classes have suffered economic harm; they would not have purchased their mobile devices had they known that these devices bore hidden Carrier IQ software that intercepts private and confidential information.

5.      Plaintiffs, on behalf of themselves and similarly situated mobile device owners, bring this suit under the Federal Wiretap Act, the Stored Communications Act, the Computer Fraud and Abuse Act, state privacy statutes, state consumer protection acts, the Magnuson-Moss Warranty Act, and state warranty laws in order to redress the harm that defendants have caused them.

## II.      JURISDICTION

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 in that plaintiffs allege violations of federal law, including the Federal Wiretap Act as amended by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*; the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*; and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*  The Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over the defendants in this action by way of the fact that defendants are licensed to do business in the state of California or otherwise conduct business in the state of California.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as unlawful practices are alleged to have been committed in this federal judicial district and defendants reside

1    or regularly conduct business in this district.  Furthermore, the Judicial Panel on Multidistrict

2    Litigation has, by order dated April 16, 2012, transferred all related cases in this matter to this

3    Court for coordinated or consolidated pre-trial proceedings.

4                                    **III.      PARTIES**

5            9.      Plaintiff Patrick Kenny resides in Cave Creek, Arizona.

6            10.     Plaintiff Daniel Pipkin resides in Port Hueneme, California.

7            11.     Plaintiff Jennifer Patrick resides in Sacramento, California.

8            12.     Plaintiff Dao Phong resides in San Francisco, California.

9            13.     Plaintiff Ryan McKeen resides in East Granby, Connecticut.

10           14.     Plaintiff Leron Levy resides in Miami, Florida.

11           15.     Plaintiff Matthew Hiles resides in Davenport, Iowa.

12           16.     Plaintiff Luke Szulczewski resides in Lansing, Illinois.

13           17.     Plaintiff Michael Allan resides in Liberty, Kentucky.

14           18.     Plaintiff Gary Cribbs resides in Laurel, Maryland.

15           19.     Plaintiff Shawn Grisham resides in Iuka, Mississippi.

16           20.     Plaintiff Bobby Cline resides in Seabrook, New Hampshire, but at pertinent times to

17   this matter, he resided in Oakland County, Michigan.

18           21.     Plaintiff Mark Laning resides in Carrollton, Texas.

19           22.     Plaintiff Clarissa Portales resides in Dallas, Texas.

20           23.     Plaintiff Douglas White resides in Houston, Texas.

21           24.     Plaintiff Eric Thomas resides in New Braunfels, Texas.

22           25.     Plaintiff Brian Sandstrom resides in San Francisco, California, but at pertinent times

23   to this matter, he resided in Seattle, Washington.

24           26.     Plaintiff Colleen Fischer resides in Janesville, Wisconsin.

25           27.     Defendant Carrier IQ, Inc. ("Carrier IQ" or "CIQ") is a Delaware corporation,

26   headquartered in Mountain View, California, with additional offices in Chicago, Boston, London

27   (UK) and Kuala Lumpur (Malaysia).  Carrier IQ is the author and vendor of the Carrier IQ

28   software at issue in this complaint.  Furthermore, as discussed herein, Carrier IQ remains heavily

involved with the software post-sale, including with respect to its installation, operation, and data collection and transmittals.  Through late 2011, Carrier IQ's website, http://www.carrieriq.com, bore a running tally of the number of devices on which its software had been deployed which, as of November 30, 2011, indicated over 141 million cellular devices.

28.     Defendant HTC America, Inc. ("HTC America") is a Washington corporation with its principal place of business in Bellevue, Washington.  HTC America builds and sells mobile devices throughout the United States that are based on the Android mobile operating system ("Android OS").

29.     Defendant HTC Corporation ("HTC") is a Taiwan corporation and mobile device manufacturer located in Taoyuan, Taiwan.  It also is the parent to defendant HTC America, Inc. HTC builds and sells mobile devices throughout the United States that are based on the Android OS.

30.     HTC and HTC America are collectively referred to as "HTC."  Upon information and belief, all of the HTC mobile device models referenced herein bear or bore Carrier IQ software at all relevant times.  It is not yet known if any, or how many, other HTC mobile device models bear or bore Carrier IQ software.

31.     Defendant Huawei Device USA, Inc. ("Huawei") is a Texas corporation with its principal place of business in Plano, Texas.  Huawei builds and sells mobile devices throughout the United States that are based on the Android OS.  Upon information and belief, all of the Huawei mobile device models referenced herein bear or bore Carrier IQ software at all relevant times.  It is not yet known if any, or how many, other Huawei mobile device models bear or bore Carrier IQ software.

32.     Defendant LG Electronics MobileComm U.S.A., Inc. ("LG MobileComm") is a California corporation with its principal place of business in San Diego, California.  LG MobileComm builds and sells mobile devices throughout the United States that are based on the Android OS.

1    33.    Defendant LG Electronics, Inc. ("LG Electronics") is a Korea corporation with its

2    principal place of business in Seoul, Korea.  LG Electronics builds and sells mobile devices

3    throughout the United States that are based on the Android OS.

4    34.    LG MobileComm and LG Electronics are collectively referred to as "LG."  Upon

5    information and belief, all of the LG mobile device models referenced herein bear or bore Carrier

6    IQ software at all relevant times.  It is not yet known if any, or how many, other LG mobile device

7    models bear or bore Carrier IQ software.

8    35.    Defendant Motorola Mobility LLC ("Motorola") is a Delaware limited liability

9    company with its principal place of business in Libertyville, IL.  Motorola was formerly known as

10    Motorola Mobility, Inc.  Motorola builds and sells mobile devices throughout the United States that

11    are based on the Android OS.  Upon information and belief, all of the Motorola mobile device

12    models referenced herein bear or bore Carrier IQ software at all relevant times.  It is not yet known

13    if any, or how many, other Motorola mobile device models bear or bore Carrier IQ software.

14    36.    Defendant Pantech Wireless, Inc. ("Pantech") is a Georgia corporation with its

15    principal place of business in Atlanta, Georgia.  Pantech builds and sells mobile devices throughout

16    the United States that are based on the Android OS.  Upon information and belief, all of the

17    Pantech mobile device models referenced herein bear or bore Carrier IQ software at all relevant

18    times.  It is not yet known if any, or how many, other Pantech mobile device models bear or bore

19    Carrier IQ software.

20    37.    Defendant Samsung Telecommunications America, Inc. ("STA") is a Delaware

21    corporation with its principal place of business in Richardson, Texas.  STA builds and sells mobile

22    devices throughout the United States that are based on the Android OS.

23    38.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a Korea company with its

24    principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.

25    SEC has offices within the United States and California and sells its products throughout the

26    United States.  SEC builds and sells mobile devices throughout the United States that are based on

27    the Android OS.

28

39.     STA and SEC are collectively referred to as "Samsung."  Upon information and belief, all of the Samsung mobile device models referenced herein bear or bore Carrier IQ software at all relevant times.  It is not yet known if any, or how many, other Samsung mobile device models bear or bore Carrier IQ software.

40.     Collectively, HTC, Huawei, LG, Motorola, Pantech, and Samsung are referred to as the "Device Manufacturers."

## IV.     FACTUAL BACKGROUND

**A.     Revelations and Deep Concerns Regarding Carrier IQ Software**

41.     In late November 2011, news broke widely that a software product known as Carrier IQ, ostensibly a network diagnostics tool, was installed on, and gathering data from, millions of mobile devices, all without the knowledge of the vast majority of consumers.  Indeed, at that time, the Carrier IQ website included a rolling tally shown that its software was installed on over 140,000,000 mobile devices worldwide.  Consumers had no knowledge that their mobile devices bore this software because it was deeply hidden in their devices, had no notice that it was operating in the background, and had no way to remove the software or even to opt-out of its functions.

42.     Earlier in November 2011, an independent security and privacy researcher, Trevor Eckhart, had published on his website, http://www.androidsecuritytest.com, the results of work he had done to understand Carrier IQ software once he discovered it running on his HTC mobile device, which is powered by the Android operating system.  (Mr. Eckhart also credited a member of the Android developer community, k0nane, for k0nane's earlier detective work on Samsung devices bearing Carrier IQ software.)  Mr. Eckhart's work included study of training and other descriptive materials available publicly on Carrier IQ's website and elsewhere, examination of evidence of the software hidden deeply on his device, and examination of records of software activities left on the debug log—part of the Android OS logging system—of his device.  Regular users could not have examined evidence of Carrier IQ's workings and activities on their devices even if they knew that the software was there; such examination requires rooting a device, which not only requires technical skill, but voids warranties as well.

43.     Carrier IQ reacted strongly to Mr. Eckhart's publication of his work, as evidenced by the cease-and-desist demand letter that it sent him on or about November 16, 2011.  In this letter, a copy of which is attached as Exhibit A, Carrier IQ took extreme exception to the characterizations made about its product on Mr. Eckhart's website, and it accused him of copyright infringement for using its publicly available materials to illustrate his findings.  It threatened to sue him if he did not take down these materials from his website, and indeed, if he did not remove all references to Carrier IQ from his website.  It even provided him with text that it demanded he release to the press under his own name, whereby he would apologize and retract his characterizations of the software and its functions—including the characterization that Carrier IQ is rootkit software, *i.e.*, stealthy software designed to hide its processes from normal means of detection and to enable continued privileged access to a computer device.

44.     Mr. Eckhart undertook a two-pronged response to Carrier IQ's letter.  One response was to contact the Electronic Frontier Foundation ("EFF") for legal assistance in responding to Carrier IQ's threats.  Another response was to redouble his efforts to understand Carrier IQ software and to demonstrate that the installation on his own device was doing far more than was necessary for network diagnostics.  For example, one of the statements that Carrier IQ demanded he make was to retract his observation that the software was, in Carrier IQ's words, "recording keystrokes."

45.     By letter dated November 21, 2012, EFF counsel responded to Carrier IQ on Mr. Eckhart's behalf.  A copy of that letter is attached as Exhibit B.  Citing the fair use doctrine and other pertinent law and facts, counsel rebutted Carrier IQ's claims, stated that Mr. Eckhart was declining to accede to its demands, and demanded that Carrier IQ withdraw in writing its allegations regarding Mr. Eckhart and his work.

46.     On November 23, 2012, Carrier IQ's CEO wrote a letter to EFF counsel by which Carrier IQ withdrew the threats it had made to Mr. Eckhart and stated that it was "deeply sorry for any concern or trouble" that its previous letter may have caused him.  A copy of this letter is attached as Exhibit C.

47.     A few days later, Mr. Eckhart published Part 2 of his work regarding Carrier IQ software both via his website and also via a 17 minute video released on November 28, 2012, on YouTube.[3]  These publications expanded on his previous observations regarding Carrier IQ and its workings, and Mr. Eckhart graphically showed that indeed, Carrier IQ was intercepting much data, including keystrokes.  He also showed that on his installation, data gathered as part of Carrier IQ processes, including HTTPS strings, such as those created in HTTPS Google searches or HTTPS log-ins to PayPal, and text messages, were being copied in unencrypted, human-readable text to his device log.

48.     Following publication of Carrier IQ Part 2, the mainstream press joined the technical press in reporting on Carrier IQ and the revelations about its widespread, hidden deployment and workings.  Within hours and in the coming days, consumers and members of Congress expressed deep concern about the privacy and security violations surrounding Carrier IQ. Among their comments:

a.       I have to say . . . this is insanity!! If companies were trying to obtain knowledge about "the user's experience¬" they wouldnt [sic] need to know every single word that is typed into SMS or the Web, rather just that we are using text messages or the web. They have gone TOO FAR by going into peoples personal data, without consent [sic]! There must be a way to prosecute!¬! We as users didnt [sic] AGREE to this , and we should be able to get rid of it! It is a VIOLATION OF PRIVACY and action needs to be taken!

b.       By reporting the private numbers called by an end user, CIQ has not only violated the privacy of the user but of the call recipient. Pretend you are a patient with a socially embarrasing [sic] condition and your doctor calls you on his HTC or Samsung... they know you were called. This is actually a violation of HIPPA. You never signed a consent for disclosure of any medical information. If he or she replied with a text, they now know what your condition is and what treatment has been discussed. Does that make you feel warm and fuzzy? This is a major lawsuit...

c.       All I want is a phone that can be with me for medical emergencies. Why do they have to data mine everything I do without my permission? The most frightening part of this is that they have disabled the security when you go to an https site. Not a problem for me since the phone is just a phone in my useage [sic], but it is serious for those who

---

[3] http://www.youtube.com/watch?v=T17XQI_AYNo (last accessed August 23, 2012).  As of mid-August 2012, the video had been viewed almost 2.1 million times.

have bought into using their phone for everything from banking to websurfing to scanning tags in stores for more information on a product.

d.       The Carrier I.Q. statement about using the app to get informaton [sic] on how the product works sounds like total crap - to me is [sic] is spying on customers so that the information can be used in sales of products current and possibly in the future. No one has a right to know what sites you visit. And I think it is a real violation of trust to have the app installed and not making consumers aware of it and what it does, and how to shut the damned thing off. I don't like anyone tracking my movements because I don't trust their reasons for doing it will always be legitimate and in my personal interest.

e.       Isn't this wireless tapping in it's [sic] most malicious form inasmuch the usuer [sic] is not aware that he is being hacked by Current IQ? Common [sic] people this has to end. We are all sheep being led to the slaughter sublimely and the purpetrators [sic] are reaping $ millions from our letting them get away with it. It's time to kick these companies off of our phones or have the ability to disable all these wireless tapping programs embedded surruptitiously [sic] on our phones and computers.

f.       I'm pretty sure there is some form of legal ramifications involved with this.... this is DEFINITELY an invasion of privacy for those who did not approve the app on their phones. Super shady business going on here.

'Why is this not opt-in and why is it so hard to fully remove?" Eckhart wrote at the end of the video.'

Why exactly ----- ? ? ? ? This is creepy.

g.       Carrier IQ showed *their* colors when the first thing they tried to do was silence the security researcher who uncovered their software by filing a SLAPP lawsuit against him (since withdrawn after a stinging rebuke from the EFF). This company should be prosecuted for violation of US anti-wiretap laws. And carriers should drop them like the poisonous hot potato they are.

h.       Even without this IQ spyware, mobile phones are effectively tracking devices. But this latest discovery is ten times worse. This has to be highly illegal. Remember how British Telecom at first issues denials that their Phorm [sic] product was tracking web users, but then it was judged to be illegal. We need class-action law suits [sic] prosecute the phone manufacturers and the makers of this rootkit.

49.       Lawmakers expressed deep concerns, too.  On November 30, 2011, Sen. Al Franken sent a letter to Carrier IQ seeking answers to serious questions regarding the deployment, functions, and workings of its software.  On December 1, 2011, he followed up by sending letters to mobile device manufacturers HTC, Motorola, and Samsung, and to wireless carriers AT&T,

1    Sprint, and T-Mobile as well, seeking answers to the same sort of questions he had put to Carrier

2    IQ itself.

3         50.     Also on December 1, 2012, consumers filed the first proposed class-action suits

4    against Carrier IQ and mobile device manufacturers.  Many more would follow, until about 70

5    were filed all around the country.

6    **B.    Carrier IQ as Deployed**

7         **1.    Carrier IQ Software Is Installed on Millions of Phones**

8         51.     The Device Manufacturers have installed Carrier IQ software on millions of mobile

9    devices, without consumers' knowledge, and without offering ways to delete the software or to opt-

10   out of its functions, including those complained-of herein.

11        52.     The responses by mobile device manufacturers to Sen. Franken's late-November

12   and early-December 2011 letters confirmed how widespread the deployment of Carrier IQ software

13   is on some of the nation's most popular mobile devices.

14        53.     According to AT&T's December 14, 2011 letter to Sen. Franken, "CIQ software

15   (including versions integrated on the device and downloaded with AT&T's MTS application [the

16   latter being a voluntary application download]) is resident on about 1% of the devices on AT&T's

17   wireless network, or approximately 900,000 devices, with about 575,000 of those collecting and

18   reporting wireless and service performance information to AT&T."  AT&T also stated that the

19   software was "integrated and active on eleven AT&T wireless consumer devices: Pantech Pursuit

20   II, Pantech Breeze 3, Pantech P5000 (Link 2), Pantech Pocket, Sierra Wireless Shockwave, LG

21   Thrill, ZTE Avail, ZTE Z331, SEMC Xperia Play, Motorola Atrix 2, and Motorola Bravo."  AT&T

22   indicated further that the software "also is embedded on the HTC Vivid, LG Nitro and Samsung

23   Skyrocket devices, but has not been activated due to the potential for the software agent to interfere

24   with the performance of those devices."

25        54.     Sprint indicated in its December 13, 2011 response to Sen. Franken that "[t]o the

26   best of [its] knowledge, there are approximately 26 million active Sprint devices that have Carrier

27   IQ software installed."  It indicated that  it "'tasks' (queries information about) a fraction of those

28   devices at any one time (a maximum of 1.3 million) for diagnostic needs" and a subset of those,

"approximately 30,000 devices," for "research specific problems . . . ." It stated that the software is installed "on a variety of Sprint devices, including mobile handsets and tablets.  Various Sprint-offered devices manufactured by the following manufacturers have Carrier IQ software installed: Audiovox, Franklin, HTC, Huawei, Kyocera, LG, Motorola, Novatel, Palmone, Samsung, Sanyo, and Sierra Wireless."

55.     According to press reports and certain plaintiffs, Sprint began removing Carrier IQ software from mobile devices used on its network via over-the-air updates beginning in January 2012.  Plaintiffs presently do not know if the software has been removed from all mobile devices operating on the Sprint network, nor do plaintiffs know if Sprint has re-deployed any Carrier IQ software on any devices operating on its network.

56.     T-Mobile responded to Sen. Franken on December 20, 2011, and indicated that as of that date, "approximately 450,000 T-Mobile customers use devices that contain Carrier IQ's diagnostic software."  It stated that it "currently uses Carrier IQ's diagnostic software on the following devices: HTC Amaze 4G, Samsung Galaxy S II, Samsung Exhibit II 4G, T-Mobile MyTouch by LG, T-Mobile MyTouch Q by LG, LG DoublePlay, BlackBerry 9900, BlackBerry 9360, [and the] BlackBerry 9810."

57.     As for HTC, it advised in its letter to Sen. Franken dated December 14, 2012, that "based on figures from wireless service providers, approximately 6.3 million HTC devices using the Carrier IQ software are active devices."  It stated that "[t]he Carrier IQ software was first integrated on the Hero, which became available to customers through Sprint on October 2009. Other HTC devices that use the integrated Carrier IQ software and the date of their availability in the U.S. market [include]: Snap (Sprint—June 2009), Touch Pro 2 (Sprint)—September 2009, Hero (Sprint)—October 2009, Evo 4G (Sprint)—June 2010, Evo Shift 4G (Sprint)—January 2011, Evo 3D (Sprint)—June 2011, Evo Design (Sprint)—October 2011, Amaze 4G (T-Mobile)—October 2011, [and the] Vivid (AT&T)—November 2011."

58.     Samsung, in its September 14, 2011 letter to Sen. Franken wrote that "STA [Samsung Telecommunications America, LLC] has sold to carriers (and their distributors and agents) serving the U.S. market approximately 25 million total cell phones that were pre-installed

with Carrier IQ software."  It indicated that Carrier IQ software was installed on the "following cell phones"—Sprint: "SPH-Z400, SPH-M800, SPH-M220, SPH-M540, SPH-M630, SPH-M320, SPH-M810, SPH-M550, SPH-M240, SPH-M560, SPH-M330, SPH-M850, SPH-I350, SPH-M900, SPH-M350, SPH-M360, SPH-M570, SPH-D700, SPH-M910, SPH-M920, SPH-P100, SPH-M260, SPH-M380, SPH-M820, SPH-M580, SPH-D600, SPH-M930, [and the] SPH-D710"; T-Mobile: "T989 [and the] T679"; Cricket: "SCH-R500, SCH-R631, SCH-R261, SCH-R380"; and AT&T: "SGH-i727."

59.     To-date, plaintiffs have been unable to obtain a copy of Motorola's response to Sen. Franken's December 1, 2011 letter, but press reports dated December 21, 2011 indicate that Motorola stated by letter that it had installed Carrier IQ software on four models: the Admiral, Titanium, Bravo and Atrix 2 "at the request of its carrier partners, AT&T and Sprint."  According to a press report, Motorola also stated that "'[a]t the end of the third-quarter of 2011, [it had] sold a total of approximately 145,000 units of these models to [its] wireless carrier partners.'"

60.     It is believed, and therefore alleged, that Carrier IQ software is or was previously installed on other mobile devices sold in the American market.

### 2.     Carrier IQ Software Intercepts and Transmits Private Information

61.     Carrier IQ software is dynamic.  As for defendant Carrier IQ's involvement with the software, it does not end with authoring and selling code.  Carrier IQ assists with installation and operation of the software on mobile devices, including by way of providing tools, including reference software, that allows the software to gather information, including personal, private, confidential, and sensitive data, from the mobile devices on which it is installed.  Also, as part of its business model, Carrier IQ can and does cause uploads of data collected on mobile devices either to its own servers or directly to the servers of its customers.

62.     The software itself operates in the background on affected mobile devices.  The typical user has no idea that it is running, nor can he or she turn it off, even as it stealthily infringes on his or her privacy and taxes the device's battery power, processor functions, and system memory.  Also, unless they have advanced skills and are willing to root their devices and void their

1    warranties, users cannot delete the software.  Nor are device owners given the choice of opting in

2    or out of its functionality.

3        63.    Though touted by defendants as a benign and simple service-improvement tool,

4    researchers including Mr. Eckhart have demonstrated, and Carrier IQ admits, that Carrier IQ

5    software intercepts and processes data on mobile devices including: URLs, even those containing

6    HTTP and HTTPS query strings embedded with information such as search terms, user names,

7    passwords, and geo-location information; geo-location information apart from that transmitted in

8    URLs; text messages; telephone numbers dialed and received; other keystrokes; and application

9    purchases and uses; geo-location information; telephone numbers dialed and attached to calls

10   received; dialer keypad presses; and application purchases and uses.  The software sees and

11   intercepts this data as part of its calls on the operating system for so-called "metrics."  According to

12   Carrier IQ, most of this information, with the exception of text message content and other types of

13   keystrokes, is stored in the device's RAM space on a rolling basis as a function of the software.[4]

14       64.    Further, Carrier IQ software can capture and transmit device-specific identifiers,

15   such that the foregoing information can be mated with a specific device.

16       65.    The software also is designed to intercept and see text message content.  Carrier IQ

17   claims that it has no use for such content and that it is merely looking for certain codes that might

18   be carried along with the any message; nonetheless, the software is designed to intercept and see all

19   such content, without the knowledge or authorization of consumers.  (Carrier IQ states that

20   manufacturers have some control over exactly how much text message content is sent to its

21   software.)  This text-message related functionality of the software has led to dire consequences

22   beyond the privacy breach that is occurring at the outset, when the software intercepts and sees

23   message content, as Mr. Eckhart discussed in Part 2 of his analysis and in his 17 minute video.

24

25   _____

26   [4] Among Carrier IQ's products is one called IQ Experience Insight Manager.  According to an online information, CIQ touts as a feature of its Insight Experience Manager the ability to "[v]iew application and device feature usage, such as camera, music, messaging, browser and TV," among many other features and attributes."  A copy of this information sheet is attached as Exhibit D.  It is unknown whether this product was installed on any of the plaintiffs' or prospective class members' devices at any time.

27

28

66.     "Profiles" are another aspect of the Carrier IQ software experience.  Via profiles, CIQ customers, typically wireless carriers but sometimes device manufacturers, specify which data they want from among that assembled pursuant to the above-referenced metrics.  At designated times, or as requested, the profile-specified data is transmitted from the mobile device to the requester.

67.     The consequences of this software's interception and capture of so much data can be quite serious.  In addition to the interceptions, capture, and transmittal of personal, private, confidential, and sensitive data, which has nothing to do with network diagnostics or improvement, and to which consumers never assented—why, for example, would CIQ customers need to know user search terms, or user names and passwords on banking websites, even when transmitted via the supposedly safe and secure HTTPS protocol?—deployment of Carrier IQ software has led directly to other grave breaches of privacy.

68.     First, due to a purported programming error, AT&T admits that Carrier IQ software transmitted text message content to it.  This admission, of course, underscores that Carrier IQ software is intercepting and capturing that information in the first instance.  While both AT&T and Carrier IQ state that these transmittals were inadvertent; that they were made in encrypted form and never decoded at the receiver end; and that they were made only in limited circumstances, nonetheless, users' private text messages were intercepted and then transmitted off of their mobile devices without their knowledge and consent.

69.     Worse yet, with some deployments, including those on HTC mobile devices and, on information and belief, possibly on certain other devices as well, a copy of data and content intercepted for Carrier IQ software purposes was also sent in unencrypted, human-readable form to the debug logs of affected devices.  The capture of this information in human-readable form, via so-called verbose logging, is starkly shown in Mr. Eckhart's YouTube video.

70.     Once there, this data and content—material including URLs embedded with HTTP/S query strings carrying web search terms, user names and passwords, and geo-location information; text message content; telephone numbers; other keystrokes; and data related to application purchases and uses—lies vulnerable to anyone with access to these debug logs,

including those with malicious intent.  Such information should not be captured in these logs, yet as a direct consequence of the deployment of Carrier IQ software, logging of such personal, private, confidential, and sensitive information is occurring or has occurred on a massive scale.  (It is, after all, a copy of information intercepted for Carrier IQ purposes that is being sent to the affected devices' logs.)  Carrier IQ points the finger at the handset manufacturers, in particular at HTC, as the cause of this logging.  But others have theorized that the switch for this sort of logging actually came from reference porting software that Carrier IQ provides to manufacturers.

71.     Still worse, because device and application crash reports call on information stored in device logs, it is believed and therefore alleged that this personal, private, confidential, and sensitive information, including information captured in HTTP/S strings such as web search terms, user names and passwords, and geo-location; text message content; telephone numbers; other keystrokes; and data related to application purchase uses is or was sent regularly to Google, the author of the Android operating system, and to third-party application developers and vendors, as part of crash reports.  Again, these actions were the direct result of the deployment of Carrier IQ software on these devices, which was carried out jointly by Carrier IQ and Device Manufacturers.

72.     Finally, as Mr. Eckhart showed in his video, such activity is taking place on mobile devices bearing Carrier IQ software even if the consumer is no longer a customer of a wireless carrier.  So long as the software remains on the mobile device, it is functioning and transmitted as stated above (save for functions only relatable to cellular telephone service), even when the consumer is using the device solely on his or her home Wi-Fi network.  Mobile device owners were unaware of this functionality of their CIQ software-bearing devices, and it is one more reason why they would not have purchased these devices had they known they were bearing CIQ software that operated in the manners alleged.

### 3.     Further Comments on CIQ Software

73.     In a December 8, 2011 online Computerworld article by Jaikumar Vijayan entitled "Google's Schmidt calls Carrier IQ software a keylogger," the Executive Chairman of Google, Eric Schmidt, was quoted as saying at an "Internet freedom conference" in the Netherlands "that Carrier IQ's software is a keylogger that 'actually does keep your keystrokes.'"  Mr. Schmidt also was

1    quoted as stating: "We certainly don't work with them and we certainly don't support it."  In

2    addition, he was quoted as saying, "'Android is an open platform, so it's possible for people to

3    build software that's actually not very good for you, and this appears to be one.'"  Google, of

4    course, is the Android operating system's creator.

5          74.     Android developer Tim Schofield researched the presence of the CIQ software on

6    multiple Android smartphone platforms.  He has noted that in addition to the privacy issues, the

7    embedded CIQ software necessarily degrades the performance of any device on which it is

8    installed.  The CIQ software is always operating and cannot be turned off.  It necessarily uses

9    system resources, thus slowing performance and decreasing battery life.  As a result, because of the

10   CIQ software, in addition to having their private communications intercepted, plaintiffs and

11   prospective class members are not getting the optimal performance of the mobile devices that they

12   purchased, and which are marketed, in part, based on their speed, performance, and battery life.

13   **C.     Plaintiffs' Mobile Devices Bear the Carrier IQ Software, and Their Communications
           Have Been Intercepted Without Authorization**

14

15         75.     Plaintiff Kenny currently owns a Samsung Galaxy S 4G mobile device purchased in

16   2011.  He formerly owned and used an HTC Touch mobile device ("HTC Touch" is the name of

17   that device, to the best of his recollection).  Upon information and belief, Mr. Kenny's devices

18   came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Kenny has used his

19   mobile devices for web browsing and text messaging, including accessing, inputting, and

20   transmitting personal, private, confidential, and sensitive information.  Mr. Kenny would not have

21   purchased his mobile device had he known that Carrier IQ software was installed on his device and

22   operating as alleged herein.

23         76.     Plaintiff Pipkin currently owns, and formerly used, a Samsung Galaxy S2 4G LTE

24   mobile device purchased in 2011.  Upon information and belief, Mr. Pipkin's mobile device came

25   with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Pipkin has used his mobile

26   device for web browsing and text messaging, including accessing, inputting, and transmitting

27   personal, private, confidential, and sensitive information.  Mr. Pipkin would not have purchased his

28

mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

77. Plaintiff Patrick currently owns, and formerly used, a Motorola Bravo mobile device purchased in 2010. Upon information and belief, Ms. Patrick's mobile device came with Carrier IQ software pre-installed. In addition to phone calls, Ms. Patrick has used her mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Patrick would not have purchased her mobile device had she known that Carrier IQ software was installed on her device and operating as alleged herein.

78. Plaintiff Phong currently owns an HTC EVO mobile device purchased in 2010. Upon information and belief, Ms. Phong's mobile device came with Carrier IQ software pre-installed. In addition to phone calls, Ms. Phong has used her mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Phong would not have purchased her mobile device had she known that Carrier IQ software was installed on her device and operating as alleged herein.

79. Plaintiff McKeen currently owns a Samsung Epic Touch 4G mobile device purchased in 2011. Upon information and belief, Mr. McKeen's mobile device came with Carrier IQ software pre-installed. In addition to phone calls, Mr. McKeen has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. McKeen would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

80. Plaintiff Levy currently owns a Samsung Moment mobile device purchased in 2010. Upon information and belief, Mr. Levy's came with Carrier IQ software pre-installed. In addition to phone calls, Mr. Levy has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Levy would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

81.     Plaintiff Hiles currently owns, and formerly used, an LG Marquee mobile device purchased in 2011.  Upon information and belief, Mr. Hiles' mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Hiles used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Hiles would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

82.     Plaintiff Szulczewski currently owns an HTC EVO 4G mobile device purchased in 2010.  Upon information and belief, Mr. Szulczewski's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Szulczewski has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Szulczewski would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

83.     Plaintiff Allan currently owns, and formerly used, an HTC EVO 4G mobile device purchased in 2011.  Upon information and belief, Mr. Allan's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Allan has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Allan would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

84.     Plaintiff Cribbs currently owns a Samsung Galaxy S2 Skyrocket mobile device purchased in 2010.  Upon information and belief, Mr. Cribbs' mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Cribbs has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Cribbs would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

85.     Plaintiff Grisham currently owns a Samsung Epic 4G mobile device purchased in 2011.  Upon information and belief, Mr. Grisham's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Grisham has used his mobile device for web browsing

and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Grisham would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

86.     Plaintiff Cline currently owns an LG LS670 Optimus S mobile device purchased in 2011.  Upon information and belief, Mr. Cline's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Cline has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Cline would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

87.     Plaintiff Laning currently owns a Pantech P5000 mobile device purchased in 2011.  Upon information and belief, Mr. Laning's phone came with Carrier IQ software pre-installed, and he was notified that it was installed by Pantech.  In addition to mobile device calls, Mr. Laning has used his mobile device for text messaging.  Mr. Laning would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

88.     Plaintiff Portales currently owns and HTC EVO phone purchased in 2010.  Upon information and belief, Ms. Portales's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Ms. Portales has used her mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Ms. Portales would not have purchased her mobile device had she known that Carrier IQ software was installed on her device and operating as alleged herein.

89.     Plaintiff White currently owns a Huawei Ascend II m865 mobile device purchased in October 2011.  Upon information and belief, Mr. White's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. White has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. White would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

90.     Plaintiff Thomas currently owns a Samsung Replenish mobile device purchased in 2010.  Upon information and belief, Mr. Thomas's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Thomas has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Thomas would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

91.     Plaintiff Sandstrom currently owns an HTC EVO mobile device purchased in 2010.  Upon information and belief, Mr. Sandstrom's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Sandstrom has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Mr. Sandstrom would not have purchased his mobile device had he known that Carrier IQ software was installed on his device and operating as alleged herein.

92.     Plaintiff Fischer currently owns, and formerly used, an LG LS670 Optimus S mobile device purchased in 2011.  Upon information and belief, Ms. Fischer's mobile device came with Carrier IQ software pre-installed.  In addition to phone calls, Mr. Fischer has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information.  Ms. Fischer would not have purchased her mobile device had she known that Carrier IQ software was installed on her device and operating as alleged herein.

## V.     CLASS ALLEGATIONS

93.     With respect to their claims under the Federal Wiretap Act (Count I), the federal Stored Communications Act (Count II), and the federal Computer Fraud and Abuse Act (Count III), plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a proposed class consisting of:

> All persons in the United States who own or owned HTC, Huawei, LG, Motorola, Pantech, and Samsung mobile devices on which Carrier IQ software is or was installed or embedded.

Excluded from the proposed class are defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; and the

1     district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

2     family members.

3          94.     In addition, plaintiffs ask that the Court certify appropriate classes comprised of

4     consumers residing in the states listed in Counts IV, V, VI, and VII below.  In order to aid the

5     Court with manageability, plaintiffs anticipate proposing subclasses based on the similarity of laws

6     from among those states listed with respect to Counts IV, V, VI, and VII.

7          95.     **Numerosity**: The exact number of the members of the proposed class is unknown

8     and is not available to the plaintiffs at this time, but individual joinder in this case is impracticable.

9     Based on defendant CIQ's representation that its software is installed on over 140 million devices

10    and the representations of the Device Manufacturers and wireless carriers as to the number of

11    mobile devices bearing Carrier IQ software, the number of class and sub-class members well could

12    reach into the millions.

13         96.     **Commonality:** Numerous questions of law and fact are common to the claims of

14    the plaintiffs and members of the proposed class.  These include:

15         a.      Whether Carrier IQ software installed on plaintiffs' and proposed class members'

16    communication devices has intercepted and captured plaintiffs' and proposed class members' URL

17    inputs, including HTTP and HTTPS query strings; SMS text message content; other keystrokes;

18    telephone numbers (whether those of others the consumer calls, those of persons who call the

19    consumer, or of the consumer himself or herself); geo-location information; application purchase

20    and use data; and other information, all without the device owners' knowledge or consent, and

21    whether it continues to do so.

22         b.      Whether plaintiffs' and proposed class members' URL inputs, including HTTP and

23    HTTPS query strings; SMS text message content; other keystrokes; telephone numbers (whether

24    those of others the consumer calls, those of persons who call the consumer, or of the consumer

25    himself or herself); geo-location information; application purchase and use data; and other

26    information has been sent to the debug logs of their mobile devices, all without the device owners'

27    knowledge or consent, and whether all or any such information has been transmitted of the phone

28    to Google or third-party application developers and vendors, or to anyone else.

1    c.      Whether CIQ has violated the Federal Wiretap Act, the Stored Communications

2  Act, or the Computer Fraud and Abuse Act by way of the acts and omissions set forth in this

3  complaint.

4    d.      Whether the Device Manufacturers have violated the Federal Wiretap Act.

5    e.      Whether CIQ and the Device Manufacturers have violated state privacy and anti-

6  eavesdropping statutes by way of the acts and omissions set forth in this complaint.

7    f.      Whether CIQ and the Device Manufacturers have violated state consumer protection

8  acts by way of the acts and omissions set forth in this complaint.

9    g.      Whether the Device Manufacturers have violated the Magnuson-Moss Warranty Act

10  by way of the acts and omissions set forth in this complaint.

11    h.      Whether the Device Manufacturers have breached their implied warranties of

12  merchantability by way of the acts and omissions set forth in this complaint.

13    i.      Whether CIQ and the Device Manufacturers have unlawfully profited from their

14  conduct, and whether they must disgorge or restore profits, or make refunds or partial refunds, to

15  the plaintiffs and members of the proposed classes.

16    j.      Whether plaintiffs and members of the prospective classes would have purchased

17  their mobile devices if they had known that Carrier IQ software was installed on them.

18    k.      Whether plaintiffs and members of the proposed classes are entitled to statutory and

19  other damages, compensatory damages, civil penalties, punitive or multiple damages, restitution,

20  declaratory relief, injunctive relief, or other equitable relief.

21    97.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the

22  proposed classes.  The factual and legal bases of defendants' liability to plaintiffs and other

23  members of the proposed classes are the same and resulted in injury to plaintiffs and all of the other

24  members of the proposed classes.

25    98.    **Adequate representation:** Plaintiffs will represent and protect the interests of the

26  proposed classes both fairly and adequately.  They have retained counsel competent and

27  experienced in complex class-action litigation.  Plaintiffs have no interests that are antagonistic to

28

FIRST CONSOLIDATED AMENDED COMPLAINT
010285-11  548290 V1
12-MD-2330-EMC

those of the proposed classes, and their interests do not conflict with the interests of the proposed class members they seek to represent.

99.     **Predominance and Superiority:** This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex factual and legal controversies present in this controversy.  Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.  Further, uniformity of decisions will be assured.

## VI.     CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE FEDERAL WIRETAP ACT

(Against Carrier IQ and the Device Manufacturers)

100.     Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

101.     Plaintiffs bring this claim on their own behalf and on behalf of a proposed nationwide class of owners of affected devices.

102.     Defendants Carrier IQ and the Device Manufacturers, by way of the Carrier IQ software and their own implementing or ancillary software, have intentionally intercepted, endeavored to intercept, or procured others to intercept or endeavor to intercept, wire and/or electronic communications as described herein, all without the knowledge, consent or authorization of plaintiffs or the prospective class, in violation of 18 U.S.C. § 2511(1).  *See* 18 U.S.C. § 2511(1)(a).

103.     Defendants Carrier IQ and the Device Manufacturers, by way of the Carrier IQ software and their own implementing or ancillary software, have intentionally disclosed, or endeavored to disclose, to other persons the contents of wire and/or electronic communications, knowing or having reason to know that the information was obtained through the interception of

wire or electronic communications, as described in 18 U.S.C. § 2511(1)(c).  Accordingly, these defendants have violated 18 U.S.C. § 2511(1).

104.    As a result of these violations of law, plaintiffs and the prospective class have suffered harm and injury, including the interception and transmission of private and personal, confidential, and sensitive communications and data and the degraded performance level of their devices (including diminished battery power and life, as well as diminished performance due to taxation of the devices' processors and memory caused by the constant operation of the Carrier IQ software).

105.    Accordingly, defendants Carrier IQ and the Device Manufacturers are subject to civil suit, and plaintiffs are entitled to appropriate relief, including that set forth in 18 U.S.C. § 2520(b).  18 U.S.C. § 2520(a).  Such appropriate relief includes "preliminary or other equitable or declaratory relief as may be appropriate"; "damages" as described in the statute; and "a reasonable attorney's fee and other litigation costs reasonably incurred."  18 U.S.C. § 2520(b).  As for damages, "the court may assess as damages whichever is the greater of—(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000."  18 U.S.C. § 2520(c)(2).

106.    Plaintiffs, on their own behalf and on behalf of the proposed class, seek all such appropriate relief, including, but not limited to, statutory damages as set forth above.

## COUNT II
## VIOLATION OF THE STORED COMMUNICATIONS ACT

(Against Carrier IQ)

107.    Plaintiffs repeat and re-make every allegation above as if set forth here in full.

108.    Plaintiffs bring this claim on their own behalf and on behalf of a proposed nationwide class of owners of affected devices.

109.    The Stored Communications Act, 18 U.S.C. § 2701 ("SCA"), prohibits persons from accessing without authorization facilities through which electronic communication services are provided.  In addition, it prohibits persons from exceeding their authorization to access such

facilities.  Plaintiffs' mobile devices, which provide electronic communication services, constitute facilities within the meaning of the statute.

110.    Defendant Carrier IQ intentionally accessed without authorization, or intentionally accessed in a manner exceeding their authorization so to access, the mobile devices, i.e., the facilities of plaintiffs and the prospective class.   More specifically, Carrier IQ, without authorization, or in excess of authorizations, accessed data including URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and application purchases and uses.

111.    18 U.S.C. § 2707 provides a private cause of action for violations of the SCA.  18 U.S.C. § 2707(a).  Potential relief includes equitable or declaratory relief, damages, or both.  18 U.S.C. § 2707(b).  Where a party is entitled to damages, the statute provides that he or she shall recover no less than $1,000.00.  18 U.S.C. § 2707(c).  Also, "[i]f the violation is willful or intentional, the court may assess punitive damages.  In the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court."  *Id.*

112.    Plaintiffs and members of the prospective class have suffered damages due to defendants' actions as stated herein.  They have suffered diminution-of-value damages in that they received mobile phones that were insecure with respect to their private, sensitive, and confidential communications.  Further, those plaintiffs and members of the prospective class whose phones are logging data such as URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and application purchases and uses, have been exposed by Carrier IQ to serious security vulnerabilities, which also diminish the value of their mobile devices.  Also, as a result of defendant Carrier IQ's accessing of their devices, either without, or with exceeded, authorizations, plaintiffs and the prospective class have suffered diminished battery power and life,

and they have seen the performance of their phones suffer due to the software at issue running constantly in the background. These factors, too, lead to diminution of value of the mobile devices at issue; moreover, they are quantifiable in and of themselves at trial.

113. Accordingly, plaintiffs and members of the class are entitled to damages of not less than $1,000.00 each, as well as appropriate equitable or declaratory relief, including equitable relief aimed at the cessation of defendant Carrier IQ's intrusions as well as, at the least, fixes to the software on their mobile devices that are causing their personal, private, confidential, and sensitive information to be logged and sent off-device, including to third-parties such as Google and application developers and that are likewise causing such information to be available and vulnerable to third-parties with malicious intent. Defendant Carrier IQ's actions also are willful and intentional, which entitles plaintiffs and the prospective class to punitive damages. And finally, plaintiffs and the prospective class are entitled to recover their costs and reasonable attorneys' fees. 18 U.S.C. § 2707(b)-(c).

## COUNT III
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

(Against Carrier IQ)

114. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

115. Plaintiffs bring this claim on their own behalf and on behalf of a proposed nationwide class of owners of affected devices.

116. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), provides in essence that whoever intentionally accesses a computer without authorization, or who exceeds authorized access, and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication, shall be punished by fines, imprisonment, or both. 18 U.S.C. § 1030(g) provides for private civil causes of action under the CFAA. The CFAA provides for the recovery of "compensatory damages and injunctive relief or other equitable relief." *Id.*

117. Mobile devices bearing Carrier IQ software are "computers" within the meaning of the CFAA, 18 U.S.C. § 1030(e)(1), because they are high-speed data processing devices that

1    perform logical, arithmetical, or storage functions.  They also are "protected computers" pursuant

2    to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce or communication.

3          118.   Defendant Carrier IQ has violated the CFAA by intentionally accessing without

4    authorization, or intentionally accessed in a manner exceeding their authorization so to access,

5    protected computers, i.e., the mobile devices, of plaintiffs and the prospective class.  More

6    specifically, Carrier IQ, without authorization, or in excess of authorizations, has obtained

7    information from these protected computers in the form of URLs containing HTTP and HTTPS

8    query strings embedded with information such as search terms, user names, passwords, and geo-

9    location information; geo-location information apart from that transmitted in URLs; text messages;

10    telephone numbers dialed and received; other keystrokes; and application purchases and uses.

11          119.   Defendant Carrier IQ also has violated the CFAA by knowingly causing the

12    transmission of programs (including the Carrier IQ software or porting layer software),

13    information, codes (including codes meant to cause the Carrier IQ to transmit data off of plaintiffs'

14    mobile devices), or commands (including commands meant to cause the Carrier IQ to transmit data

15    off of plaintiffs' mobile devices) to plaintiffs' mobile devices, thereby intentionally causing

16    damage to plaintiffs' devices in that defendant Carrier IQ knew that its activities would cause

17    diminished battery power and life, as well as diminishments to the performance of these devices.

18    Further, Carrier IQ's intentional access of plaintiffs' mobile devices, without authorization, has

19    caused damage and loss as described in the preceding sentence, but also, plaintiffs and the

20    prospective class have incurred losses as a result of these activities, in that they have incurred

21    reasonable costs by way of the diminution of value of their mobile devices bearing Carrier IQ

22    software.

23          120.   As a result of defendant Carrier IQ's conduct, Carrier IQ caused "loss to 1 or more

24    persons during any 1-year period . . . aggregating [to] at least $5,000."  Accordingly, plaintiffs and

25    the prospective may maintain this civil action against defendant Carrier IQ.  18 U.S.C. § 1030(g).

26

27

28

**COUNT IV**
**VIOLATION OF STATE WIRETAP AND PRIVACY ACTS**

(Against Carrier IQ and the Device Manufacturers)

(On Behalf of Residents of the States of Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming and On Behalf of All U.S. Residents Under Cal. Penal Code § 502)

121.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

122.    Plaintiffs bring these claims on behalf of themselves and other owners of affected devices who reside in the states of Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, and on behalf of all U.S. owners of affected devices under California Penal Code § 502.

123.    By way of their actions as stated above, which include unauthorized interceptions of SMS text messages; HTTP and HTTPS strings, including URLs, search descriptors, and such sensitive information as user names and passwords; and dialer-pad keypresses, as well as the capture of fine geo-location information traceable to individual consumers by way of unique mobile device identifiers, defendants Carrier IQ and the Device Manufacturers have violated state wiretap and privacy acts.

124.    For example, defendants have violated California's Computer Crime Law, Cal. Penal Code § 502, et seq.

125.    California Penal Code § 502 prohibits "tampering, interference, damage and unauthorized access to lawfully created computer data and computer systems."  A mobile device is a "computer system" as defined in Cal. Penal Code § 502(b)(5) because it contains electronic instructions, inputs and outputs data, and performs computerized functions including communications and data storage and retrieval.

1    126.    Defendants have violated California Penal Code § 502 by knowingly accessing,

2    copying, using, making use of, interfering, and/or altering plaintiffs' and prospective class

3    members' data such as URLs containing HTTP and HTTPS query strings embedded with

4    information such as search terms, user names, passwords, and geo-location information; geo-

5    location information apart from that transmitted in URLs; text messages; telephone numbers dialed

6    and received; other keystrokes; and application purchases and uses.  Defendants so acted on a

7    systematic and continuous basis, and without the authorization or permission of plaintiffs and

8    members of the prospective class.

9    127.    Civil actions lie for violations of California Penal Code § 502.  Cal. Penal Code §

10   502(e)(1).  Defendants' unauthorized and deliberate actions have caused damages to plaintiffs and

11   the prospective class, including by way of the consumption of battery power (indeed, following the

12   removal of Carrier IQ software from various mobile devices, users report dramatically increased

13   times between battery charges) and system memory and processing resources which demonstrably

14   affect performance of their mobile devices.  These damages are quantifiable and will be provable at

15   trial.  In addition, plaintiffs and members of the prospective class will be entitled to recover their

16   reasonable attorneys' fees pursuant to California Penal Code § 502(e)(2).

17   128.    Furthermore, plaintiffs are entitled to injunctive relief to prevent the admitted

18   interception or capture and transmittal of data such as URLs containing HTTP and HTTPS query

19   strings embedded with information such as search terms, user names, passwords, and geo-location

20   information; geo-location information apart from that transmitted in URLs; text messages;

21   telephone numbers dialed and received; other keystrokes; and information relating to application

22   purchases and uses.  They also are entitled to injunctive and other equitable relief to remedy any

23   continuing copying of the foregoing information, as well as SMS text message content, to system

24   logs, which are being transmitted off-device to Google and likely to third-party application

25   developers without authorizations, and whose logging creates extreme vulnerability to capture by

26   deliberate means.

27   129.    Damages and injunctive and other equitable relief are available to all plaintiffs and

28   members of the prospective class, wherever they may live in the United States.   Cal. Penal Code §

FIRST CONSOLIDATED AMENDED COMPLAINT
010285-11  548290 V1
12-MD-2330-EMC

502(j) ("For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.").

130.    In addition, by way of further example, defendants have violated California Penal Code § 631.  It provides in part that

> [a]ny person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable [by fine, imprisonment, or both].

Cal. Penal Code § 631(a).

131.    Defendants have violated the foregoing prohibitions by intentionally tapping into, intercepting, capturing, reading, and using URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and application purchases and uses. Defendants so acted on a systematic and continuous basis, and without the authorization or permission of plaintiffs and members of the prospective class.

132.    Also, by way of another example, on the basis of their actions as described above, which descriptions are incorporated here by this reference, defendants have violated California Penal Code § 632.7.  It provides that "[e]very person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio

telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone," is punishable by fines, imprisonment, or both.  Cal. Penal Code § 632.7(a).

133.    Defendants are liable in a civil action for violation of California Penal Code §§ 631 and 632.7 by way of California Penal Code § 637.2.  California Penal Code § 637.2 provides for the recovery of $5,000 or three times actual damages, whichever is greater.  Cal. Penal Code § 637.2(a).   In addition, plaintiffs may seek to bring an action "to enjoin and restrain any violation of this chapter, and may in the same action seek damages . . . ."  Cal. Penal Code § 637.2(a).  Because it is likely that statutory damages of $5,000 will exceed three times their actual damages, plaintiffs, on behalf of themselves and the prospective class, seek an award of $5,000 for each violation of these laws.

134.    In addition, pursuant to California Penal Code § 637.2, plaintiffs and the prospective class are entitled to injunctive relief to prevent the admitted interception or capture and transmittal of URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and information regarding application purchases and uses.  They also are entitled to injunctive and other equitable relief to remedy any continuing copying of the foregoing information to system logs, which are being transmitted off-device to Google and likely to third-party application developers without authorizations, and whose logging creates extreme vulnerability to capture by deliberate means.

135.    Also, plaintiffs and the prospective class are entitled to recover their attorney fees because by way of this lawsuit, they seek to enforce important rights affecting the public interest, and because they otherwise satisfy the statutory requirements for an award of attorney fees.  Cal. Code of Civil Proc. § 1021.5.

136.    As a result of defendants' actions as described above, which descriptions are incorporated here, plaintiffs and owners of affected devices who reside in other states are likewise entitled to similar damages, including statutory damages, and injunctive or other equitable relief, as

1  well as attorney fees and costs, under similar laws of their home states.  The statutes under which

2  they are entitled to such relief include:

3       a.     Ariz. Rev. Stat. Ann. § 12-731;

4       b.     Colo. Rev. Stat. § 18-0-309.5;

5       c.     Conn. Gen. Stat. Ann. §§ 54-41r, 52-570d;

6       d.     11 Del. Code § 2409;

7       e.     D.C. Code § 23-554;

8       f.     Fla. Stat. Ann. §§ 934.10, 934.27;

9       g.     Haw. Rev. Stat. § 803-48;

10      h.     Idaho Code § 18-6709;

11      i.     Ill. Comp. Stat. Ann. Ch. 720 § 5/14-6;

12      j.     Ind. Code Ann. § 35-33.5-5-4;

13      k.     Iowa Code Ann. §808B.8;

14      l.     Kan. Stat. § 22-2518;

15      m.     La. Rev. State. Ann. 15:1312;

16      n.     Me. Rev. Stat. ch. 15 § 711;

17      o.     Md. Cts. & Jud. Pro. Code Ann. §§ 10-410, 10-4A-08;

18      p.     Mass. Gen. Laws ch. 272 § 99;

19      q.     Mich. Stat. § 750.539h ;

20      r.     Minn. Stat. §§ 626A.02, 626A.13;

21      s.     Miss. Code Ann. § 41-29-529;

22      t.     Neb. Rev. Stat. § 86-297;

23      u.     Nev. Rev. Stat. § 200.690;

24      v.     N.H. Rev. Stat. § 570-A:11;

25      w.     N.J. Stat. Ann. §§ 2A:156A-24;

26      x.     N.M. Stat. Ann. §§ 30-12-11;

27      y.     N.C. Gen. Stat. § 15A-296;

28      z.     Ohio Rev. Code § 2933.65;

| 1  | aa. | Ore. Rev. Stat. §133.739; |
|----|-----|---------------------------|
| 2  | bb. | 18 Pa. Consol. Stat. §§ 5725, 5747; |
| 3  | cc. | R.I. Gen. Laws. § 12-5.1-13; |
| 4  | dd. | S.C. Code Laws § 17-30-135; |
| 5  | ee. | Tenn. Code Ann. §39-13-603; |
| 6  | ff. | Tex. Code Crim. Pro. Art. 18.20; |
| 7  | gg. | Utah Code Ann. §§ 77-23a-11, 77-23b-8; |
| 8  | hh. | Va. Code Ann. § 19.2-69; |
| 9  | ii. | Wash. Rev. Code §9.73.060; |
| 10 | jj. | W. Va. Code § 62-1D-12; |
| 11 | kk. | Wis. Stat. Ann. § 968.31; |
| 12 | ll. | Wyo. Stat. § 7-3-710. |

**COUNT V**
**VIOLATION OF STATE CONSUMER PROTECTION ACTS**

(Against Carrier IQ and the Device Manufacturers)

(On Behalf of Residents of the States of Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District Of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Washington, West Virginia, and Wisconsin)

137.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

138.    Plaintiffs bring these claims on behalf of themselves and other owners of affected devices who reside in the states of Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District Of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Washington, West Virginia, and Wisconsin.  By the conduct and omissions described herein, defendants Carrier IQ and the Device Manufacturers have violated state consumer protection acts.

139.     For example, in violation of California Business and Professions Code Section 17200, et seq. ("UCL"), defendants' conduct in this regard includes unlawful, unfair, and fraudulent business acts or practices.  By engaging in the acts and practices described herein, defendants have committed one or more acts of unfair competition within the meaning of the UCL.

140.     First, defendants' business acts and practices are unlawful under the UCL and similar state statutes in part because they violate the Federal Wiretap Act, the SCA, the CFAA, and California Penal Code §§ 502, 631, and 632.7.

141.     Second, defendants' business acts and practices are unfair because they caused harm and injury-in-fact to plaintiffs and prospective class members without justification.  Defendants' conduct lacks reasonable and legitimate justification in that defendants have benefited from such conduct and practices while plaintiffs and prospective class members have been misled as to the nature and integrity of defendants' goods and services and have, in fact, suffered injury regarding the privacy and confidentiality of their personal information and the use of their device resources.  Further, defendants' conduct is unfair because it offends California public policy as reflected in the right to privacy enshrined in the state constitution; California Penal Code §§ 502, 631, and 632.7; and California statutes recognizing the need for consumers to safeguard their privacy interests, including California Civil Code § 1798.80.  Defendants' business acts and practices also were unfair in that defendants knew that consumers care deeply about personal, private, confidential, and sensitive information, including data related to visited websites; search, user name, and password data; fine location data; application purchases and uses; and text-message privacy, yet they hid software on their mobile devices that intercepted that data  and transmitted most of it off of their devices.

142.     Third, defendants' acts and practices were fraudulent within the meaning of the UCL because they were likely to mislead consumers.  Defendants secretly installed Carrier IQ software on plaintiffs' and prospective class members' mobile devices; failed to disclose that the Carrier IQ software was always operating on such devices; failed to disclose that the Carrier IQ software was capable of intercepting private communications, and that it in fact did intercept such communications; and failed to disclose that the Carrier IQ software degraded the performance of

their devices by overtaxing processor power and device memory, and by depleting battery power and life. Defendants' omissions and failures to disclose were material to plaintiffs and the prospective class within the meaning of In re Tobacco II Cases, 46 Cal. 4th 298, 325 (2009).

143. In addition, HTC failed to disclose with respect to its devices that plaintiffs' and prospective class members' personal, private, confidential, and sensitive data was being logged in unencrypted form on their devices, transmitted to third-parties including Google and likely application developers and vendors, and rendered vulnerable to malicious outsiders or anyone with access to the debug logs on their devices.

144. As a result of defendants' business acts or practices, plaintiffs and class members were injured and damaged by being forced to relinquish—without informed consent or critical knowledge—the purchase prices of their mobile devices. But for these unlawful, unfair, and fraudulent business acts and practices, which hid from them the installation of Carrier IQ software on their devices and its attributes and functions as described herein, plaintiffs and prospective class members would never have purchased their mobile devices. Accordingly, each plaintiff and prospective class member is entitled to restitution in the form of a purchase price refund from Device Manufacturer of his or her mobile device. Cal. Bus. & Prof. Code § 17203.

145. In addition, or in the alternative, plaintiffs and prospective class members are entitled to injunctive relief against Carrier IQ and the Device Manufacturers to prevent the admitted interception or capture and transmittal of URLs containing HTTP and HTTPS strings that include search descriptors and sensitive information as user names and passwords; dialer-pad keypresses, as well as personalized geo-location information. Cal. Bus. & Prof. Code § 17203.

146. Also, or in the alternative, plaintiffs and prospective class members with HTC mobile devices running on the Android operating system are entitled to injunctive and other equitable relief against HTC and Carrier IQ to remedy any continuing copying of the foregoing information, as well as SMS text message content, to system logs, which are being transmitted off-device to Google and likely to third-party application developers without authorization, and whose logging creates extreme vulnerability to capture by malicious means. Cal. Bus. & Prof. Code § 17203.

147. Finally, plaintiffs and the prospective class are entitled to recover their attorney fees because by way of this lawsuit, they seek to enforce important rights affecting the public interest, and because they otherwise satisfy the statutory requirements for an award of attorney fees.  Cal. Code of Civil Procedure § 1021.5.

148. Furthermore—as a result of defendants' actions, omissions, and willful, unlawful, unfair, unconscionable, or fraudulent conduct as described above, which descriptions are incorporated here by this reference, plaintiffs and owners of affected devices who reside in other states are likewise entitled to similar damages, including multiple or exemplary or punitive damages as permitted, and injunctive or other equitable relief as described above, as well as attorney fees and costs, under the consumer protection acts of their home states.  The statutes under which they are entitled to such relief include:

a.    Ariz. Rev. Stat. § 44-1522, *et seq.*;

b.    Ark. Code § 4-88-101, *et seq.*;

c.    Colo. Rev. Stat. § 6-1-101, *et seq.*;

d.    Conn. Gen. Stat. § 42-110a, *et seq.*;

e.    6 Del. Code § 2511, *et seq.*;

f.    D.C. Code § 28-3901, *et seq.*;

g.    Fla. Stat. § 501.201, *et seq.*;

h.    O.C.G.A. § 10-1-372, *et seq.*;

i.    Haw. Rev. Stat. § 480, *et seq.*;

j.    Idaho Code § 48-601, *et seq.*;

k.    815 ILCS § 505/1, *et seq.*;

     815 ILCS § 510/1, *et seq.*;

l.    Kan. Stat. § 50-626, *et seq.*;

m.    Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

     Ky. Rev. Stat. Ann. § 365.020, *et seq.*;

n.    5 Me. Rev. Stat. § 205A, *et seq.*;

     Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

1          o.      Md. Com. Law Code § 13-101, *et seq.*;

2          p.      Mass. Ann. Laws ch. 93A, *et seq.*;

3          q.      Mich. Stat. § 445.901, *et seq.*;

4          r.      Minn. Stat. § 325F.68, *et seq.*;

5                  Minn. Stat. § 325D.45, *et seq.*;

6          s.      Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

7          t.      Neb. Rev. Stat. § 59-1601, *et seq.*;

8                  Neb. Rev. Stat. § 87-301, *et seq.*;

9          u.      Nev. Rev. Stat. § 598.0903, *et seq.*;

10         v.      N.H. Rev. Stat. § 358-A:1, *et seq.*;

11         w.      N.J. Stat. Ann. § 56:8-1, *et seq.*;

12         x.      N.M. Stat. Ann. § 57-12-1, *et seq.*;

13         y.      N.Y. Gen. Bus. Law § 349, *et seq.*;

14         z.      N.D. Cent. Code § 51-15-01, *et seq.*;

15         aa.     N.C. Gen. Stat. § 75-1.1, *et seq.*;

16         bb.     Ohio Rev. Stat. § 4165.01, *et seq.*;

17         cc.     Okla. Stat. tit. 15 § 751, *et seq.*;

18         dd.     Or. Rev. Stat. § 646.605, *et seq.*;

19         ee.     R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

20         ff.     S.C. Code Laws § 39-5-10, *et seq.*;

21         gg.     S.D. Code Laws § 37-24-1, *et seq.*;

22         hh.     Tex. Bus. & Com. Code §§ 17.41-17.63;

23         ii.     Vt. Stat. Ann. tit. 9, § 2451, *et seq.*;

24         jj.     Wash. Rev. Code 19.86.010, *et seq.*;

25         kk.     West Virginia Code §46A-6-101, *et seq.*; and

26         ll.     Wis. Stat. § 100.18, *et seq.*

27   With respect to the Georgia, Maine, Massachusetts, Texas, and West Virginia acts, which may

28   require pre-suit notice, plaintiffs include citations thereto, but they intend to amend to state those

claims formally following the notice period (absent resolution of their claims and those of prospective class members).

## COUNT VI
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

(Against the Device Manufacturers)

(On Behalf of Residents of the States of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming)

149.    Plaintiffs repeat and re-make every allegation above as if set forth here in full.

150.    Plaintiffs bring this claim on behalf of themselves and other owners of affected devices who reside in the states of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.

151.    The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

152.    The MMWA provides a cause of action for breach of warranty, including the implied warranty of merchantability, or other violations of the Act.  15 U.S.C. § 2310(d)(1).  The defendant Device Manufacturers have breached their implied warranties of merchantability— which they cannot disclaim or modify because they offered written warranties to plaintiffs with their devices, 15 U.S.C. § 2308(a)(1)—by failing to provide merchantable goods.  The mobile devices at issue are not merchantable or fit for their ordinary purposes because these devices are designed and marketed for communication purposes, including for the transmittal and receipt of confidential, private, and sensitive communication, and yet plaintiffs' and proposed class members' devices do not function accordingly.

153.    Rather, these mobile devices, because they bear Carrier IQ software, intercept confidential communications and data, including URLs containing HTTP and HTTPS query strings

1    embedded with information such as search terms, user names, passwords, and geo-location

2    information; geo-location information apart from that transmitted in URLs; text messages;

3    telephone numbers dialed and received; other keystrokes; and application purchases and uses.

4    Most of this data is then purposefully captured and transmitted off-device as a function of the

5    Carrier IQ software.

6         154.    Furthermore, with respect to HTC devices, and on information and belief, possibly

7    with respect to certain other devices, all such material is being captured in unencrypted, human-

8    readable form in device debug logs, or logs, such that it is being transmitted to Google and likely to

9    third-party application developers and vendors along with crash reports, and such that it is

10   vulnerable to other third-parties with potentially malicious intent or to anyone with access to the

11   logs.  With respect to the allegations contained in this paragraph, plaintiffs bring them only against

12   HTC at this time.

13        155.    Additionally, the Carrier IQ software that the Device Manufacturers secretly

14   installed on the mobile devices at issue depletes battery power and life.  Battery power is the

15   lifeblood of mobile devices; without it, devices cannot fulfill their ordinary purposes.  Here, battery

16   power is used for the processing and transmitting that Carrier IQ software performs on the mobile

17   devices.  Indeed, it is plausible that the precise level of discharge can be discerned via Carrier IQ

18   software itself, given its reporting capabilities.  Furthermore, operation of the Carrier IQ software

19   placed on the devices reduced the utility and lifespan of device batteries because each charge and

20   use cycle diminishes a battery's storage capacity, a consequence of which is the need for more

21   frequent discharges.

22        156.    Plaintiffs and proposed class members have suffered damages as a result of the

23   Device Manufacturers', or where qualified, HTC's, breaches of their implied warranties as set forth

24   herein.  Accordingly, this action lies under the MMWA.  15 U.S.C. § 2310(d)(1)-(2).

25        157.    In addition, the Device Manufacturers', or where qualified, HTC's, acts and

26   omissions in violation of the Act are "[u]nfair methods of competition in or affecting commerce,

27   and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful.  15

28   U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

158.     The MMWA provides for "damages and other legal and equitable" relief where there has been a breach of warranty or failure to abide by the obligations that the Act imposes.  15 U.S.C. § 2310(d)(1).  As set forth more fully in Count VII below, plaintiffs and prospective class members seek damages in the amount of full refunds for their mobile devices, based on the differential between the value of the goods as tendered to them and the value they would have had if they had been as impliedly warranted.

159.     In addition, or in the alternative, plaintiffs and the class they seek to represent ask for equitable relief in the form of order against all Device Manufacturers requiring them to conform the mobile devices here at issue to the implied warranties made with respect to them by requiring cessation of the interception, reading, capturing, logging, and transmittals of personal, private, confidential, and sensitive communications and data as alleged in this complaint.

160.     The MMWA also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of lawsuits thereunder, unless the Court in its discretion determines that such an award would be inappropriate.  15 U.S.C. § 2310(d)(2).  Plaintiffs and prospective class members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## COUNT VII
## VIOLATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY

(Against the Device Manufacturers)

(On Behalf of Residents of the States of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming)

161.     Plaintiffs repeat and re-make every allegation above as if set forth here in full.

162.     Plaintiffs bring this claim on behalf of themselves and other owners of affected devices who reside in the states of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New

1   Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota,

2   Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.

3        163.    The defendant Device Manufacturers are merchants as defined by applicable UCC

4   provisions.

5        164.    Though privity is not required under the law of the referenced states, plaintiffs and

6   the class were in privity with the Device Manufacturers in that they purchased their mobile devices

7   from actual or apparent agent of the Device Manufacturers, such as the Device Manufacturers'

8   authorized dealers.

9        165.    Further, though privity is not required under the law of the referenced states,

10  plaintiffs and the class were and are also in privity with the Device Manufacturers by virtue of the

11  contractual relationship stemming from the Device Manufacturers' written warranties provided in

12  conjunction with the purchase their mobile devices, which are enforceable by plaintiffs and the

13  class as against the Device Manufacturers, regardless of where, or from whom, the Device

14  Manufacturers' products were acquired.

15       166.    The Device Manufacturers have breached the implied warranties of merchantability

16  that they made to plaintiffs and the prospective class.  To illustrate the Device Manufacturers'

17  breaches, using California law as an example: the Device Manufacturers impliedly warranted to

18  plaintiffs and prospective class members that their mobile devices were free of defects, that they

19  were merchantable, and that they were fit for the ordinary purpose for which such goods are used.

20  *See*, *e.g.*, Cal. Com. Code § 2314 (setting forth the UCC's implied warranty of merchantability).

21  The ordinary purpose of mobile devices such as those at issue is communication, including

22  confidential and private communications via the Internet and with others, via telephone calls and

23  text messages.  In addition, an ordinary use of devices such as these is the purchase and use of

24  applications.  The Device Manufacturers impliedly represented to plaintiffs and prospective class

25  members that the mobile devices at issue were free of defects that could impinge on these ordinary

26  uses, that they were merchantable with respect to such uses, and that they were fit for all such

27  purposes.

28

167.    As alleged herein, however, the Device Manufacturers' sales of mobile devices breached the implied warranty of merchantability because the devices were defective, unmerchantable, and not fit for the ordinary purpose for which such goods are used.  More specifically, all mobile devices bearing Carrier IQ software are defective and unfit for their ordinary purposes because rather than performing as impliedly represented, these devices instead intercept URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and application purchases and uses.  These devices then store most of this information in device memory, unbeknownst to consumers, before transmitting such information, save for SMS text message content and certain other keystrokes, to Carrier IQ and/or wireless carriers and/or device manufacturers.

168.    Further, HTC's—and, on information and belief, possibly other device manufacturers'—sales of mobile devices breached the implied warranty of merchantability because for other important reasons, the devices were defective, unmerchantable, and not fit for the ordinary purpose for which these goods are used.  More specifically, HTC mobile devices bearing Carrier IQ software are defective, unmerchantable, and unfit for their ordinary purposes because they intercept URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, passwords, and geo-location information; geo-location information apart from that transmitted in URLs; text messages; telephone numbers dialed and received; other keystrokes; and application purchases and uses.  These devices then store this information in unencrypted, human-readable form in the mobile devices' debug logs, unbeknownst to consumers, before transmitting all such information, including SMS text message content, to Google and possibly third-party application developers and vendors, when the devices or applications crash. Moreover, this unencrypted, human-readable content is vulnerable to other third-parties with potentially malicious intent or to anyone with access to the logs.  Investigation continues as which other mobile devices are so affected.

169.     Additionally, the Device Manufacturers breached their implied warranties of merchantability because the Carrier IQ software secretly installed on plaintiffs' and prospective class members' mobile devices depletes battery power and life.  Battery power is the lifeblood of mobile devices; without it, devices cannot fulfill their ordinary purposes.  Here, battery power is used for the processing and transmitting that Carrier IQ software performs on the mobile devices.  Indeed, it is plausible that the precise level of discharge can be discerned via Carrier IQ software itself, given its reporting capabilities.  Furthermore, operation of the Carrier IQ software placed on the devices reduced the utility and lifespan of device batteries because each charge and use cycle diminishes a battery's storage capacity, a consequence of which is the need for more frequent discharges.

170.     The Device Manufacturers have had reasonable and adequate notice of plaintiffs' and the class's claims for breach of implied warranty of merchantability, including by way of the individual suits that preceded this Consolidated Amended Complaint, and by way of extensive reports of these breaches made to them directly, and by way of the press, and they have failed to cure.

171.     Any purported modifications or limitations of the implied warranty of merchantability, including by way of terms set forth in the Device Manufacturers' written warranties, are invalid, void, and unenforceable per the MMWA.  15 U.S.C. § 2308(a)(1).

172.     As a result of the Device Manufacturers' breaches of their implied warranties of merchantability, plaintiffs and other owners of affected devices who reside in the states of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have been injured and are entitled to the full panoply of remedies provided under Article 2 of the UCC as adopted by the various states, as well as all other applicable remedies.  These include monetary damages.  *See, e.g.*, Cal. Com. Code § 2714. Because of the defects in the mobile devices and their behavior as described herein, there was no

value to the goods as accepted.  The value of these devices had they been as warranted may be measured by their purchase prices; accordingly, damages in the sums of their purchase prices, or as otherwise measured pursuant to the damages provisions of Article 2 of the UCC, are warranted to plaintiffs and members of the proposed classes.  *See, e.g.*, Cal. Com. Code § 2714(2).

173.    The companion provisions of Article 2 of the U.C.C. for the referenced states are found as follows:

a.    Alaska Stat. § 45.02.101, *et seq.*

b.    Ark. Code § 4-1-2, *et seq.*;

c.    Cal. Com. Code § 2101, *et seq.*;

d.    Colo. Rev. Stat. § 4-3-101, *et seq.*;

e.    6 Del. Code § 2-101, *et seq.*;

f.    D.C. Code § 28:2-101, *et seq.*;

g.    Haw. Rev. Stat. § 490:2-101, *et seq.*;

h.    Ind. Code Ann. § 26-1-2-101, *et seq.*;

i.    Kan. Stat. § 84-2-101, *et seq.*;

j.    Me. Rev. Stat. § 11. 2-101, *et seq.*;

k.    Md. Com. Law Code § 2-101, *et seq.*;

l.    Mass. Gen. Laws 106:2-101, *et seq.*;

m.    Mich. Stat. § 440.2101, *et seq.*;

n.    Minn. Stat. § 336.2-101, *et seq.*;

o.    Miss. Code Ann. § 75-2-101, *et seq.*;

p.    Vernon's Mo. Rev. Stat. § 400.2-101, *et seq.*;

q.    Mont. Code Ann. § 30-2-101, *et seq.*;

r.    Neb. Rev. Stat. § UCC-2-101, *et seq.*;

s.    Nev. Rev. Stat. § 104.2101, *et seq.*;

t.    N.H. Rev. Stat. § 382-A:2-101, *et seq.*;

u.    N.J. Stat. Ann. § 12A:2-101, *et seq.*;

v.    N.M. Stat. Ann. § 55-2-101, *et seq.*;

1      w.     N.D. Cent. Code § 41-02-01, *et seq.*;

2      x.     Okla. Stat. tit. § 12A-2-101, *et seq.*;

3      y.     13 Pa. Consol. Stat. § 2101, *et seq.*;

4      a.     R.I. Gen. Laws. § 6A-2-101, *et seq.*;

5      aa.     S.C. Code Laws § 36-2-101, *et seq.*;

6      bb.     S.D. Code Laws § 57A-2-101, *et seq.*;

7      cc.     Tex. Bus. & Com. Code § 2.102, *et seq.*;

8      dd.     Utah Code Ann. § 70A-2-101, *et seq.*;

9      ee.     Va. Code Ann. § 8.2-101, *et seq.*;

10      ff.     Wash. Rev. Code § 62A.2-101, *et seq.*;

11      gg.     W. Va. Code § 46-2-101, *et seq.*;

12      hh.     Wyo. Stat. § 34.1-2-101, *et seq.*

13 As for the claims of Louisiana residents, the Civil Code of that state provides implied warranty

14 protections.

### VII.    PRAYER FOR RELIEF

16      WHEREFORE, plaintiffs respectfully request the following relief:

17      A.     That the Court certify the requested classes and sub-classes ("the classes"), and that

18 it appoint the named plaintiffs to be class representatives and interim co-lead counsel to be class

19 counsel;

20      B.     That the Court award them and the classes appropriate relief, to include damages,

21 including statutory damages, as requested herein;

22      C.     That the Court award them and the classes injunctive or other equitable or

23 declaratory relief as requested herein and as may be appropriate otherwise under applicable state or

24 federal law;

25      D.     That the Court issue such additional orders or judgments as may be necessary to

26 prevent the practices of which plaintiffs complain and to restore to any person in interest any

27 money or property which may have been acquired by means of state consumer protection act

28 violations;

1      E.      That the Court award them and the classes their costs, including expert witness costs

2  pursuant to the MMWA and as otherwise available, as well as reasonable attorney fees as available

3  under the laws cited above;

4      F.      That the Court award them and the classes such other, favorable relief as may be

5  available and appropriate under federal or state law, or at equity.

6                          **VIII.   JURY TRIAL DEMANDED**

7      Plaintiffs demand a trial by jury on all issues so triable.

8  DATED:  August 27, 2012.

9                                              HAGENS BERMAN SOBOL SHAPIRO LLP

10

11                                              By ___/s/ Steve W. Berman_____
                                                     STEVE W. BERMAN (*pro hac vice*)

12
                                                Robert F. Lopez (*pro hac vice*)
13                                              Thomas E. Loeser (202724)
                                                1918 Eighth Avenue, Suite 3300
14                                              Seattle, WA  98101
                                                (206) 623-7292
15
                                                Shana E. Scarlett
16                                              715 Hearst Avenue, Suite 202
                                                Berkeley, CA  94710
17                                              Telephone: (510) 725-3000
                                                Facsimile:  (510) 725-3001
18                                              shanas@hbsslaw.com
19
                                                PEARSON SIMON WARSHAW & PENNY, LLP
20
                                                By ___/s/ Bruce L. Simon_____
21                                                   BRUCE L. SIMON (96241)
22
                                                William J. Newsom (267643)
23                                              44 Montgomery Street, Suite 2450
                                                San Francisco, CA 94104
24                                              Telephone: (415) 433-9000
                                                Facsimile: (415) 433-9008
25                                              bsimon@pswplaw.com
                                                wnewsom@pswplaw.com
26

27

28

FIRST CONSOLIDATED AMENDED COMPLAINT
010285-11  548290 V1                                - 46 -
12-MD-2330-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clifford H. Pearson (108523)
Daniel L. Warshaw (185365)
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
cpearson@pswplaw.com
dwarshaw@pswplaw.com

*Counsel for Select Plaintiffs and*
*Co-Lead Counsel for the Proposed Classes*

J. Paul Gignac
Helen Kim
ARIAS OZZELLO & GIGNAC LLP
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile: (805) 683-7401
hkim@aogllp.com
j.paul@aogllp.com

Rosemary M. Rivas
Danielle A. Stoumbos
FINKELSTEIN THOMPSON LLP
505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704
rrivas@finkelsteinthompson.com
dstoumbos@finkelsteinthompson.com

Eric D. Holland
HOLLAND GROVES SCHNELLER STOLZE LLC
300 N. Tucker Blvd., Suite 801
Saint Louis, MO 63101
Telephone: 314-241-8111
Facsimile: 314-241-5554
eholland@hgsslaw.com

Paul R. Kiesel
KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, CA  90211
Telephone:  (310) 854-4444
Facsimile:  (310) 854-0812
kiesel@kbla.com

1

2
Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
3
BERMAN
510 Walnut Street, Suite 500
4
Philadelphia, PA  19106
Telephone:  (215) 592-1500
5
Facsimile:  (215) 592-4663
cschaffer@lfsblaw.com
6

7
*Executive Committee Members for the Proposed Class*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2012, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

Dated: August 27, 2012

/s/ Steve W. Berman
STEVE W. BERMAN
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Shpetim Ademi**
  sademi@ademilaw.com

- **Michael Benjamin Alexander**
  balexander@preisroy.com

- **Timothy L. Alger**
  talger@perkinscoie.com,mheap@perkinscoie.com,docketpa@perkinscoie.com

- **Richard Joseph Arsenault**
  rarsenault@nbalawfirm.com

- **Ellen D. Bailey**
  ebailey@eckertseamans.com

- **Heather Marie Baker**
  hmp@kirtlandpackard.com

- **Jennifer Amy Baker**
  jbaker@rdp-law.com

- **Tyler Alexander Baker**
  Tbaker@fenwick.com,swelling@fenwick.com

- **Ben Barnow**
  b.barnow@barnowlaw.com

- **Amanda J Beane**
  abeane@perkinscoie.com,amontclair@perkinscoie.com,rmrazik@perkinscoie.com

- **Norman Kenneth Beck**
  nbeck@winston.com,ECF_CH@winston.com

- **Nance Felice Becker**
  nance@chavezgertler.com,amanda@chavezgertler.com,jenna@chavezgertler.com,jennifer@chavezgertler.com

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Albert G. Bixler**
  abixler@eckertseamans.com

- **Timothy G. Blood**
  tblood@bholaw.com,efile@bholaw.com

- **Eric Bluestein**
  EBluestein@fdlaw.net

- **Thomas Kay Boardman**
  tboardman@pswplaw.com,yberry@pswplaw.com

- **Kip T. Bollin**
  kip.bollin@thompsonhine.com

- **Joseph C Bourne**
  jbourne@gustafsongluek.com

- **Paul Marett Brannon**
  PMB@BrannonLawFirm.com

- **Jonathan Stephen Burns**
  jburns@wklawyers.com

- **Warren T Burns**
  wburns@susmangodfrey.com

- **Christopher E. Carey**
  ccarey@pugh-law.com

- **David I. Cates**
  dcates@cateslaw.com

- **Judy L. Cates**
  jcates@cateslaw.com

- **Daniel H Charest**
  dcharest@susmangodfrey.com

- **Mark Andrew Chavez**
  mark@chavezgertler.com,amanda@chavezgertler.com,jenna@chavezgertler.com,jennifer@chavezgertler.com

- **James Christie**
  jwchristie@cpmy.com

- **David M. Cialkowski**
  David.Cialkowski@zimmreed.com,heidi.cuppy@zimmreed.com

- **John R. Climaco**

jrclim@climacolaw.com

**Rodger R. Cole**
rcole@fenwick.com,mmelcher@fenwick.com,vpieretti@fenwick.com

**Christopher Collins**
chrisc@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

**Jason S. Cowart**
jscowart@pomlaw.com

**Mark G. Crawford**
mcrawford@skikoscrawford.com

**Robert A. Curtis**
rcurtis@foleybezek.com,pbezek@foleybezek.com,jkassity@foleybezek.com,jkarczag@foleybezek.com,cconnors@foleybezek.com

**Patrick V. Dahlstrom**
pdahlstrom@pomlaw.com

**Bernard Daskal**
daskal@lawlynch.com

**Manuel Dobrinsky**
MDobrinsky@fdlaw.net

**Larry Daniel Drury**
ldrurylaw@aol.com

**Christopher M Ellis**
cellis@brelaw.com

**Lance Allan Etcheverry**
letcheve@skadden.com,sheryl.leung@skadden.com,wconstan@skadden.com,nberglun@skadden.com

**Ryan Mark Ferrell**
rferrell@trialnewport.com,jfrancis@trialnewport.com

**Scott J. Ferrell**
sferrell@trialnewport.com,rferrell@trialnewport.com,spara@trialnewport.com,jfrancis@trialnewport.com

**David M Finn**
judgefinn@davidfinn.com

**Kevan Fornasero**
KFornasero@perkinscoie.com,docketsflit@perkinscoie.com,callen@perkinscoie.com

**Daniel L. Germain**
R&G@LaLawyer.com

**Edward P. Gibbons**
egibbons@wwmlawyers.com

**J. Paul Gignac**
j.paul@aogllp.com

**Lionel Z. Glancy**
info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

**Marc Lawrence Godino**
mgodino@glancylaw.com,info@glancylaw.com

**Steven Lee Groves**
sgroves@allfela.com,kcotter@allfela.com

**Brian Gudmundson**
bcg@zimmreed.com,lindsey.letizia@zimmreed.com

**Daniel E Gustafson**
dgustafson@gustafsongluek.com

**James Byron Hardin**
jhardin@trialnewport.com

**Melissa Meeker Harnett**
mharnett@wccelaw.com,shouse@wccelaw.com,gscarlett@wccelaw.com,khelton@wccelaw.com

**J Thad Heartfield**
thad@jth-law.com

**Daniel C. Hedlund**
dhedlund@gustafsongluek.com

**Eric Davis Holland**
eholland@allfela.com,lhenderson@allfela.com

**Neil E. Holmen**
nholmen@wwmlawyers.com

**Frank James Janecek , Jr**
frankj@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Curtis D. Johnson , Jr**
cjohnson@johnsonandbrownlaw.com

**51**

**D. Scott Kalish**
scottkalishcollc@cs.com

**Shennan Alexandra Kavanagh**
kavanagh@roddykleinryan.com

**Christopher John Kelly**
cjkelly@mayerbrown.com,pal.docket@mayerbrown.com,msamora@mayerbrown.com

**Michael Louis Kelly**
mlk@kirtlandpackard.com

**Scott L. Keniley**
scott@k5law.com

**Paul R. Kiesel**
Kiesel@kbla.com,sharo@kbla.com,jsalgueiro@kbla.com

**Helen U Kim**
helenk@kallawgroup.com

**Gary E. Klein**
klein@roddykleinryan.com

**Andrew F. Knopf**
knopf@newsomelaw.com

**Richard Arthur Lapping**
rlapping@winston.com,docketsf@winston.com,DocketHO@winston.com,lpearce@winston.com

**Jesse Bernard Levin**
jlevin@wccelaw.com,khelton@wccelaw.com

**Thomas Eric Loeser**
toml@hbsslaw.com,rebeccah@hbsslaw.com,dawn@hbsslaw.com

**John T. Longo**
jtlongo@yahoo.com

**Robert F Lopez**
robl@hbsslaw.com

**Daniel Lee Low**
dlow@kotchen.com,jervin@kotchen.com

**Joseph H Malley**
malleylaw@gmail.com

**Gary E. Mason**
gmason@wbmllp.com,lsiegel@wbmllp.com,mdicocco@wbmllp.com

**Corey M Mather**
cmather@ademilaw.com

**Peter Charles McCabe , III**
pmccabe@winston.com

**Peter J. McNulty**
peter@mcnultylaw.com,sean@mcnultylaw.com

**Molly Roberta Melcher**
emancera@fenwick.com

**Shane M Mendenhall**
smendenhall@brelaw.com

**Catherine A. Miller**
cmiller@freebornpeters.com

**Ross Eric Morrison**
rmorrison@osheapartners.com

**Andrew Mitchell Moss**
moss@krmlegal.com

**Stephen B. Murray**
smurray@murray-lawfirm.com

**Korey Arthur Nelson**
knelson@murray-lawfirm.com,thorne@murray-lawfirm.com

**Tyler Griffin Newby**
tnewby@fenwick.com,pnichols@fenwick.com

**C. Richard Newsome**
newsome@newsomelaw.com

**Andrew Abbott Nicely**
anicely@mayerbrown.com

**Sean F. O'Shea**
soshea@osheapartners.com

**David I. Pankin**

dpankin@pankinlaw.com

**Paul O. Paradis**
pparadis@hhplawny.com,mgadze@hhplawny.com

**Archis Ashok Parasharami**
aparasharami@mayerbrown.com,wdc.docket@mayerbrown.com

**Behram Viraf Parekh**
bvp@kirtlandpackard.com,mfc@kirtlandpackard.com,ks@kirtlandpackard.com

**John R. Parker , Jr**
jparker@kcrlegal.com,asotuela@kcrlegal.com

**Clifford H. Pearson**
cpearson@pswplaw.com

**John A. Peca, Jr.**
japeca@climacolaw.com

**Eugene J. Podesta , Jr**
gpodesta@bakerdonelson.com

**Bobby Pouya**
bpouya@pswplaw.com

**Mark Punzalan**
mpunzalan@finkelsteinthompson.com,arivas@finkestienthompson.com,srenwick@finkelsteinthompson.com,bassad@finkelsteinthompson.com,rrivas@finkelsteinthompson.com,ssharif@finkelstein

**David Ratner**
dratner@morellilaw.com

**David S Ratner**
DRatner@morellilaw.com

**Rosemarie T Ring**
rose.ring@mto.com

**Rosemarie Theresa Ring , Esq**
rose.ring@mto.com,victoria.boesch@mto.com,ryan.schiedermayer@mto.com,maureen.lechwar@mto.com,jonathan.blavin@mto.com,susan.ahmadi@mto.com,steven.uhrig@mto.com,henry.weissma

**Rosemary M. Rivas**
rrivas@finkelsteinthompson.com,bassad@finkelsteinthompson.com,mpunzalan@finkelsteinthompson.com,arivas@finkelsteinthompson.com,kkumar@finkelsteinthompson.com

**Paula Michelle Roach**
proach@bholaw.com,efile@bholaw.com

**Ryan Jason Rodman**
rrodman@wwmlawyers.com

**Randy Rosenblum**
RRosenblum@fdlaw.net

**Brett Louis Rosenthal**
Brett@mcnultylaw.com,Gillian@mcnultylaw.com

**Ira P. Rothken**
ndca@techfirm.com,jared@techfirm.net

**Scott Tadashi Sakiyama**
ssakiyama@winston.com,ECF_CH@winston.com

**Eduardo Enrique Santacana**
esantacana@lchb.com

**Gregory B Scarlett**
gscarlett@wccelaw.com

**Shana E. Scarlett**
shanas@hbsslaw.com,jeanethd@hbsslaw.com,sf_filings@hbsslaw.com

**Charles E. Schaffer**
cschaffer@lfsblaw.com

**Aaron M. Sheanin**
asheanin@pswplaw.com

**Jonathan Shub**
jshub@seegerweiss.com,lgriffith@seegerweiss.com,klaukaitis@seegerweiss.com

**Ralph N. Sianni**
rsianni@stewartslaw.com,nwortman@stewartslaw.com,tschuster@stewartslaw.com

**Bruce Lee Simon**
bsimon@pswplaw.com,yberry@pswplaw.com,dwarshaw@pswplaw.com,mwilliams@pswplaw.com,jwatkins@pswplaw.com,wnewsom@pswplaw.com,cpearson@pswplaw.com,tboardman@pswpl

**Steven James Skikos**
sskikos@skikoscrawford.com

**Jared Robinson Smith**
jared@techfirm.net

**Michael W. Sobol**
msobol@lchb.com,mgordon@lchb.com

**Warren L. Soffian**
wsoffian@eckertseamans.com

**Donna F Solen**
dsolen@wbmllp.com,lsiegel@wbmllp.com,mdicocco@wbmllp.com

**Allan Steyer**
asteyer@steyerlaw.com,lrorem@steyerlaw.com

**Steven J. Stolze**
sstolze@allfela.com

**Danielle A Stoumbos**
dstoumbos@finkelsteinthompson.com

**David A. Straite**
dstraite@stewartslaw.com,nwortman@stewartslaw.com,tschuster@stewartslaw.com

**Brian R Strange**
lacounsel@earthlink.net

**Brian Russell Strange**
lacounsel@earthlink.net,gcarpenter@strangeandcarpenter.com,jhood@strangeandcarpenter.com,dholop@strangeandcarpenter.com

**Blake Anthony Strautins**
b.strautins@barnowlaw.com

**David J Syrios**
dsyrios@ademilaw.com

**Evan Tager**
etager@mayerbrown.com

**Reginald Von Terrell**
reggiet2@aol.com

**Rebecca S Tinio**
rtinio@susmangodfrey.com

**Matthew Laurence Tuccillo**
mltuccillo@pomlaw.com

**Peter M. Van Dyke**
pvd@eddf-law.com

**Daniel L. Warshaw**
dwarshaw@pswplaw.com,mwilliams@pswplaw.com

**Michael M. Weinkowitz**
mweinkowitz@lfsblaw.com

**Kevin Douglas Wilkins**
kwilkins@allfela.com

**Shawn A. Williams**
shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Cameron Wayne Wilson**
cwilson@gaebemullen.com

**Marc A. Wites**
mwites@wklawyers.com

**Gabriel Dash Zeldin**
gzeldin@steyerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Guri                    Ademi
Ademi & O'Reilly LLP
3620 East Layton Avenue
Cudahy, WI 53110

Peter           J. Bezek
Foley Bezek Behle & Curtis, LLP
15 West Carrillo Street
Santa Barbara, CA 93101-8215

Kevin           Costello
Roddy Klein & Ryan
727 Atlantic A venue
Boston, MA 02111-2810

Daniel        Dennis Dolan                    , II
Haggard Parks Haggard & Lewis
330 Alhambra Circle
1st Floor
Coral Gables, FL 33134

Marc         I. Gross
Pomerantz  Grossman Hufford Dahlstrom & Gross LLP
600 Third Avenue
20th Floor
New York, NY 10016

Andrea          S. Hirsch
```

**54**

Herman Gerel, LLP
230 Peachtreet Street, NW, Suite 2260
Atlanta, GA 30303

**Jennifer J        Johnson**
Fenwick & West LLP - San Francisco, CA
555 California St., 12th Fl.
San Francisco, CA 94104

**S.              Sheryl Leung**
Skadden Arps Slate Meagher & Flom LLP
,

**Hamilton        P. Lindley**
Goldfard Branham, LLP
2501 North Harwood Street
Suite 1801
Dallas, TX 75201

**Arthur          M Murray**
Murray Law Firm
650 Poydras Street
Ste 2150
New Orleans, LA 70130

**Eric            J. O'Bell**
Law Offices of Eric J. O'Bell, LLC
3500 North Hullen Street
Metairie, LA 70002

**Terrell         W. Oxford**
Susman Godfrey L.L.P.
2323 Bryan Street
Suite 1400
Dallas, TX 75201-2663

**Jason           S Rathod**
Whitfield Bryson & Mason LLP
1625 Massachusetts Avenue, NW
Washington, DC 20036

**Dale            Bernardo Ratner**
Dale Bernardo Ratner, Esq.
1550 Hayes Street
San Francisco, CA 94117

**Jon             D. Robinson**
Bolen, Robinson & Ellis, LLP
2nd Floor
202 South Franklin Street
Decatur, IL 62523

**Burton          Rosenblatt**
Ely Bettini Ulman et al
3200 N Central AVe #1930
Phoenix, AZ 85012

**Jay             P. Salzman**
Schoengold & Sporn, PC
19 Fulton Street, Suite 406
New York, NY 10038

**Christopher     V. Tisi**
Herman Gerel, LLP
2000 L Street, N.W.
Suite 400
Washington, DC 20036

**R.              Patrick Vance**
Jones Walker (New Orleans)
Place St. Charles
201 St. Charles Ave.
Suite 5100
New Orleans, LA 70170-5100

**Patrick         G. Warner**
David P. Meyer & Associates Co., LPA
1320 Dublin Road
Suite 100
Columbus, OH 43215

**Peter           Wasylyk**
Law Offices of Peter Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

**Jamie           E. Weiss**
Eric D. Freed Law Office
10573 West Pico Blvd., Ste. 852
Los Angeles, CA 90064

EXHIBIT A

# CEASE AND DESIST DEMAND

## Sent by Certified Mail and email

November 16, 2011

Trevor Eckhart



Dear Mr. Eckhart:

I am writing on behalf on my employer, Carrier IQ, Inc., to notify you that your unlawful copying of Carrier IQ, Inc.'s training materials on your website[1] (the "Training Materials") infringes on Carrier IQ, Inc.'s exclusive copyrights. Accordingly, you are hereby directed to

## CEASE AND DESIST ALL COPYRIGHT INFRINGEMENT.

All copyrightable aspects of the Training Materials are copyrighted under United States copyright law and Carrier IQ, Inc. is the owner of such copyright. Under United States copyright law, Carrier IQ, Inc.'s copyrights have been in effect since the date that the Training Materials were created.

It has come to our attention that you have been copying the Training Materials. We have copies of your unlawful copies to preserve as evidence. Your actions constitute copyright infringement in violation of United States copyright laws. Under 17 U.S.C. 504, the consequences of copyright infringement include statutory damages of between $750 and $30,000 per work, at the discretion of the court, and damages of up to $150,000 per work for willful infringement. If you continue to engage in copyright infringement after receiving this letter, your actions will be evidence of "willful infringement."

## CEASE AND DESIST ALL FALSE ALLEGATIONS.

In addition to infringing Carrier IQ, Inc.'s copyrights, you have made allegations on your website (see footnote 1), that are without substance, untrue, and that we regard as

---

[1] http://androidsecuritytest.com/features/logs-and-services/loggers/carrieriq/ ;
http://www.androidfilehost.com/main/.TrevE/CIQ/



**57**

# CEASE AND DESIST DEMAND

damaging to our reputation and the reputation of our customers. At this time we demand
that you remove such allegations from the web and cease and desist from making any
allegations or passing any false and unsubstantiated public comment directly or indirectly
on our company, products, services or companies who may use our technology.

**We demand that you immediately**

- cease and desist your unlawful copying of the Training Materials;
- contact all persons and entities to whom you have directly or indirectly provided
  copies of the Training Materials and inform them that such materials are
  confidential/copyright-protected materials belonging to Carrier IQ, Inc. were
  provided improperly in infringement of the rights of Carrier IQ, Inc.;
- provide Carrier IQ, Inc. with contact information for such all persons and entities;
- cease and desist from making any unsubstantiated allegations or passing any false or
  unsubstantiated public comment directly or indirectly relating to Carrier IQ, Inc., its
  products and services or companies who may use Carrier IQ, Inc. technology;
- send written retractions to all persons and entities to whom you have directly or
  indirectly distributed the unsubstantiated allegations relating to Carrier IQ, Inc.
  products or services;
- issue a public press release on the AP wire containing the following statement:
- remove all content and references to Carrier IQ, Inc. (including references to Carrier
  IQ and/or CIQ) from the website androidsecuritytest.com, any mirrors and references
  and replace your original "CarrierIQ" article with the following statement:

> "Carrier IQ, Inc. has requested that I remove my original
> article entitled "CarrierIQ" as it contained numerous
> inaccuracies and material subject to their copyright. I
> would also like to apologize to Carrier IQ, Inc. for
> misrepresenting the capabilities of their products and for
> distributing copyrighted content without permission.

> "On clarifying the actions of Carrier IQ, Inc. software, it is
> clear that while they inspect many aspects of device
> performance they are not in fact recording keystrokes or
> providing user tracking tools and have no intention of
> doing so.

> "Carrier IQ, Inc. technology does not allow their customers
> to task devices which are no longer in their service (for
> example when a subscriber of one operator moves their
> phone to another operator) and restricts each customer to its
> own subscribers.

> "The Carrier IQ, Inc. software is integrated by intent by
> device manufacturers and operators; it does not meet the
> definition of a rootkit and does not subvert the operation of
> the device as I previously claimed. Under my previous

## CEASE AND DESIST DEMAND

definition, any software loaded by an OEM that shipped
with a device would meet my criteria for rootkit."

- provide Carrier IQ, Inc. with prompt written assurance by 12.00pm EST on
  November 18th that you will comply with the foregoing.

If you do not comply with these cease and desist demands within this time period, please
be advised that Carrier IQ, Inc. will pursue all available legal remedies, including seeking
monetary damages, injunctive relief, and an order that you pay court costs and attorney's
fees. In addition, Carrier IQ, Inc. is entitled to use your failure to comply as evidence of
"willful infringement" of copyright and seek monetary damages and equitable relief for
your copyright infringement. In the event you fail to meet this demand, your liability and
exposure under such legal action could be considerable.

Before taking these steps, however, Carrier IQ, Inc. wishes to give you one opportunity to
discontinue your illegal conduct by complying with this demand by 12.00pm EST on
November 18th. Accordingly, please sign and return the attached *Agreement* by 12.00pm
EST on November 18th to

Joseph J. Dullea
c/o Jewel Rich
1200 Villa St., Suite 200
Mountain View, CA 94041

With an email copy to: ███████@carrieriq.com, cc ███████@carrieriq.com

If you or your attorney have any questions, please contact me directly.

Sincerely,
Carrier IQ, Inc.

Joseph J. Dullea
General Counsel

# CEASE AND DESIST DEMAND

Attached page:

## Copyright Infringement Settlement Agreement

I, _____, agree to immediately:

- cease and desist your unlawful copying of the Training Materials;
- contact all persons and entities to whom you have directly or indirectly provided copies of the Training Materials and inform them that such materials are confidential/copyright-protected materials belonging to Carrier IQ, Inc. were provided improperly in infringement of the rights of Carrier IQ, Inc.;
- provide Carrier IQ, Inc. with contact information for such all persons and entities;
- cease and desist from making any unsubstantiated allegations or passing any false or unsubstantiated public comment directly or indirectly relating to Carrier IQ, Inc., its products and services or companies who may use Carrier IQ, Inc. technology;
- send written retractions to all persons and entities to whom you have directly or indirectly distributed the unsubstantiated allegations relating to Carrier IQ, Inc. products or services;
- issue a public press release on the AP wire containing the following statement:
- remove all content and references to Carrier IQ, Inc. (including references to Carrier IQ and/or CIQ) from the website androidsecuritytest.com, any mirrors and references and replace your original "CarrierIQ" article with the following statement:

> "Carrier IQ, Inc. has requested that I remove my original article entitled "CarrierIQ" as it contained numerous inaccuracies and material subject to their copyright. I would also like to apologize to Carrier IQ, Inc. for misrepresenting the capabilities of their products and for distributing copyrighted content without permission.

> "On clarifying the actions of Carrier IQ, Inc. software, it is clear that while they inspect many aspects of device performance they are not in fact recording keystrokes or providing user tracking tools and have no intention of doing so.

> "Carrier IQ, Inc. technology does not allow their customers to task devices which are no longer in their service (for example when a subscriber of one operator moves their phone to another operator) and restricts each customer to its own subscribers.

> "The Carrier IQ, Inc. software is integrated by intent by device manufacturers and operators; it does not meet the

## CEASE AND DESIST DEMAND

> definition of a rootkit and does not subvert the operation of
> the device as I previously claimed. Under my previous
> definition, any software loaded by an OEM that shipped
> with a device would meet my criteria for rootkit."

in exchange for which Carrier IQ, Inc. agrees to release any claims against me for
copyright infringement with respect to the Training Materials. In the event this agreement
is breached by me, Carrier IQ, Inc. will be entitled to costs and attorney's fees in any
action brought to enforce this agreement and shall be free to pursue all rights that Carrier
IQ, Inc. had as of the date of this Agreement as if this Agreement had never been signed.


Signed: _____


Dated: _____



EXHIBIT B



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

November 21, 2011

<u>VIA EMAIL</u>

**Re: Carrier IQ's Cease-and-Desist Demand to Trevor Eckhart**

Dear Mr. Dullea:

As you know, the Electronic Frontier Foundation represents Trevor Eckhart, the security researcher who published an analysis of Carrier IQ's software at http://androidsecuritytest.com/features/logs-and-services/loggers/carrieriq, and posted copies of Carrier IQ training materials at http://www.androidfilehost.com/main/.TrevE/CIQ/ and http://www.multiupload.com/BAAKNNSM3J. Prior to Mr. Eckhart's publication, these materials were freely available to the public on a Carrier IQ website, http://dis1.water.carrieriq.com.

We have now had a chance to review your allegations against our client, and have concluded that they are entirely baseless. Mr. Eckhart used and made available these materials in order to educate consumers and security researchers about the functionality of your software, which he believes raises substantial privacy concerns. Mr. Eckhart's legitimate and truthful research is sheltered by both the fair use doctrine and the First Amendment.

<u>Copyright Issues</u>

With respect to your allegations of copyright infringement, Mr. Eckhart's analysis and publication of Carrier IQ's training materials is a classic fair use and, therefore, non-infringing. 17 U.S.C. § 107 ("the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting . . . or research, is not an infringement of copyright."). Courts generally consider four factors in a fair use analysis: 1) the purpose and character of the use, 2) the nature of the copyrighted work, 3) the amount and substantiality of the portion used, and 4) the effect of the use on the potential market for the work. *Id.*; *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 577 (1994). Each of these factors favors Mr. Eckhart.

*Purpose and character of the use.* Mr. Eckhart's copying of any Carrier IQ materials was intended not to replicate Carrier IQ's original purpose for the documents, but rather to facilitate research and critical commentary about Carrier IQ's software. It is therefore a highly transformative use. *See generally Campbell,* 510 U.S. at 579 (transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright"); *Castle Rock Ent. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 141 (2d Cir. 1998) (a transformative work "is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."); *Online Policy Group v. Diebold, Inc.,* 337 F. Supp. 2d 1195, 1201 (N.D. Cal. 2004) (finding students' publication of voting machine manufacturer's email archive to support public criticism of voting machines a transformative use).

*Nature of the copyrighted work.* The materials in question are factual rather than creative, and therefore subject to only the thinnest copyright protection. *See Harper & Row, Publrs., Inc. v. Nation Enters.,* 471 U.S. 539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").

454 Shotwell Street • San Francisco, CA 94110 USA
📞 +1 415 436 9333  📠 +1 415 436 9993  🌐 www.eff.org  ✉ information@eff.org

November 21, 2011
Page 2

*Amount and substantiality used.* Mr. Eckhart has copied no more than necessary for purposes of his research.  His analysis of Carrier IQ software was based in significant part on the training materials, which he provided to the public for the purpose of allowing others to independently verify his findings. As the Supreme Court has recognized, fair uses often involve substantial portions of an original work. *Campbell*, 510 U.S. at 588; *see also Mattel, Inc. v. Walking Mountain Prod.,* 353 F.3d 792, 803 n.8 (9th Cir. 2003) (holding that "entire verbatim reproductions are justifiable where the purpose of the work differs from the original.").

*Effect of the use on the potential market for the work.* Critical transformative uses rarely—if ever—supplant markets for the original material.  *Campbell,* 510 U.S. at 591-92*; Harper & Row,* 471 U.S. at 567-69. The training materials published by Mr. Eckhart plainly do not invade any licensing market for works that may be copyrighted by Carrier IQ.

More broadly, Mr. Eckhart published his analysis of Carrier IQ and the underlying training materials to educate the public about privacy concerns raised by your software, which is installed by default on many mobile devices, unbeknownst to most consumers. Dissemination of this information unquestionably serves the public interest. Nimmer on Copyright, § 13.05[B][4] ("the public interest is also a factor that continually informs the fair use analysis."); *see also Sony v. Universal*, 464 U.S. 417, 431-32 (1984) ("courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest."); *Mattel*, 353 F.3d at 806 ("the public benefit in allowing . . . social criticism to flourish is great."); *Online Policy Group*, 337 F. Supp. 2d at 1203 (students' publication of voting machine manufacturer's emails to inform the public about problems in voting machines served the public interest).

"False Allegations" Issues

You also claim that Mr. Eckhart published "false allegations" that are "without substance," "untrue," and that Carrier IQ considers "damaging to [its] reputation and the reputation of [its] customers." We have repeatedly asked you to specify the statements you believe are actionable.  You have failed to do so, and have instead merely repeated your broad accusations.  We believe you are not able to substantiate your allegations because Mr. Eckhart's factual findings are true. If you are able to specify any statement that you believe is false, Mr. Eckhart will be happy to provide you with the documentation of that finding.

Moreover, your client is a public figure. Under well-established Supreme Court precedent, commentary and criticism regarding Carrier IQ's professional activities receive additional protections under the First Amendment, because there is a heightened public interest in facilitating such speech.  *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).

Given that there is no basis for your legal claims, we must conclude that your threats are motivated by a desire to suppress Mr. Eckhart's research conclusions, and to prevent others from verifying those conclusions. Mr. Eckhart stands by his research and, accordingly, declines to meet your demands.  We ask that you immediately withdraw your allegations in writing.

November 21, 2011
Page 3

Nothing in this letter shall be deemed to waive any of Mr. Eckhart's rights or remedies, all of which are expressly reserved.

If you have any further concerns, please do not hesitate to contact me.

Sincerely,

Marcia Hofmann, Esq.
Senior Staff Attorney

EXHIBIT C



Ms. Marcia Hoffman
Electronic Frontier Foundation
454 Shotwell Street
San Francisco CA 94110-1914

November 23rd 2011

## FAX TRANSMISSION

Dear Ms. Hoffman,

I write to inform you that we are withdrawing our legal request to cease and desist to Trevor Eckhart as of today – November 23rd 2011.

We are deeply sorry for any concern or trouble that our letter may have caused Mr. Eckhart, and in retrospect we realize that we would have been better served by reaching out to Mr. Eckhart to establish a dialogue in the first instance.

We wanted to notify you immediately and request your help in establishing an open dialogue with Mr. Eckhart as I would like to personally apologize to Mr. Eckhart.

In addition, we would welcome the opportunity to start a discussion with you about these issues that we believe will be helpful to us, to our customers and to consumers that use mobile devices.

We sincerely appreciate your work on Mr. Eckhart's behalf and respect and share your commitment to protecting free speech in a rapidly changing technological world.

I look forward to hearing from you.

Sincerely,

Larry Lenhart, CEO
Carrier IQ Inc.

1200 Villa Street, Suite 200
Mountain View, CA 94041
www.CarrierIQ.com
office:  +1.650.625.5400
fax:     +1.650.625.5435

**67**

# EXHIBIT D



# IQ Insight Experience Manager

## Boost Revenues with Improved Mobile Customer Experience

IQ Insight Experience Manager provides a level of visibility into true customer experience, previously unavailable in the mobile industry. Based on Carrier IQ's leading Mobile Service Intelligence technology, IQ Insight Experience Manager uses data directly from the mobile phone itself to give a precise view of how users interact with both their phones and the services delivered through them, even if the phone is not communicating with the network.

With User Experience increasingly viewed as the key differentiator between mobile providers, IQ Insight enables you to align your business improvements with the things customers truly value. Identify exactly how your customers interact with services and which ones they use. See which content they consume, even offline. Identify problems in service delivery, including the inability to connect to the service at all.  This actionable intelligence enables you to focus on critical quality and customer satisfaction issues.

### No More Waiting

Traditional techniques such as focus groups have two major drawbacks: they are slow and they only sample a very small proportion of the user base. IQ Insight Experience Manager takes customer experience profiling to another level, enabling you to view experience data at any level of granularity from the entire population, to comparative groups, down to individual users, all at the touch of a button.

This data is updated in real time and aggregated in the Carrier IQ Mobile Service Intelligence Platform™ at any interval required for the application. No more waiting for groups to be convened, no laborious debriefing procedures, no errors due to inaccurate recall – just true, accurate, timely



### Benefits

- See how services and devices perform in the hands of real users
- Analyze data in real time – no more waiting for focus groups to report
- Identify changes that will improve service performance and customer experience
- Get an instant view of performance across the network and compare by geography, tower, user group and a wide range of configurable parameters
- Engage more effectively with suppliers by comparing performance across different devices and service providers
- Improve business Key Performance Indicators with integrated quantitative data

© 2009 Carrier IQ, Inc. All Rights Reserved.

## Actionable Intelligence

At Carrier IQ, we understand that you don't simply want more data. You need intelligent analytics that view data in meaningful ways to help you make better business decisions. IQ Insight does just this, providing data in either graphical or tabular form to enable you to ask questions, compare populations and understand trends within the business. IQ Insight Experience Manager lets you answer business-critical questions, including:

- How long does it take the user to start the service?
- What proportion of content is side loaded?
- How do users respond to mobile advertising?
- How do different device models compare in delivering the same service?
- How do different services compare when delivered through the same device?

IQ Insight Experience Manager goes beyond subjective or anecdotal data to give quantitative results you can weave into your existing business processes for customer satisfaction and performance improvement.

## See the Detail

User experience is affected by many factors such as geography, signal strength, phone model, service provider and network congestion. Historically, it has been difficult to understand the influence of each of these factors – there were simply too many variables to get enough data. With IQ Insight Experience Manager, it is possible to receive data from thousands to millions of users across your entire user base. Combined with Carrier IQ's unique Mobile Service Intelligence Platform and advanced analytic applications, this vast collection of data is accessible in easy-to-understand reports, cross correlations and views that put you in control. Carrier IQ's solution is completely configurable, enabling you to use standard views or to create your own custom reports in order to highlight specific points of interest.

Carrier IQ – the power of knowing.

### Features

- Built on Carrier IQ's industry leading Mobile Service Intelligence Platform
- Handle any number of users from tens to tens of millions
- Capture a vast array of experience data including screen transitions, button presses, service interactions and anomalies
- "Task" phones dynamically over the air to optimise data selection
- Analyze data in real time, including comparative and cross correlation analysis across groups, geographies, devices and services
- Quantitative experience measures taken directly from the device integrate seamlessly with existing business processes and tools
- "Zero delay" data capture, eliminates the delays inherent in other methods such as focus groups
- View application and device feature usage, such as camera, music, messaging, browser and TV

**Headquarters**
CARRIER IQ, Inc.
1200 Villa Street
Mountain View
CA 94041 USA
Phone: +1 650 625 5400
Fax: +1.650.625.5435

**Europe**
CARRIER IQ EUROPE LIMITED
50 Broadway - St-James Park
London SW1H 0RG UK
Phone: +44 7508686426

**Asia Pacific**
CARRIER IQ Reg. Office
Level 16, 1 Sentral
Jalan Stesen Sentral 5
Kuala Lumpur, Malaysia
Phone: +6 03 2092 9222

sales@carrieriq.com



Carrier IQ and the Carrier IQ logo are trademarks of Carrier IQ, Inc.