1   RODGER R. COLE (CSB No. 178865)
    rcole@fenwick.com
2   MOLLY R. MELCHER (CSB No. 272950)
    mmelcher@fenwick.com
3   FENWICK & WEST LLP
    Silicon Valley Center
4   801 California Street
    Mountain View, CA  94041
5   Telephone:  650.988.8500
    Facsimile:      650.938.5200
6

7   TYLER G. NEWBY (CSB No. 205790)
    tnewby@fenwick.com
8   JENNIFER J. JOHNSON (CSB No. 252897)
    jjjohnson@fenwick.com
9   FENWICK & WEST LLP
    555 California Street, 12th Floor
10  San Francisco, CA 94104
    Telephone:     415.875.2300
11  Facsimile:     415.281.1350

12  *Attorneys for Defendant*
    *Carrier IQ, Inc.*
13

14  [*Additional Counsel listed on Signature Page*]

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19  *In re Carrier IQ, Inc. Consumer Privacy*      Case No.: 3:12-md-02330-EMC
    *Litigation,*
20                                                 **DEFENDANTS' CONSOLIDATED
                                                   MOTION TO COMPEL ARBITRATION
21  [*This Document Relates to All Cases*]         AND TO STAY LITIGATION**

22                                                 Date:        [TBD]
                                                   Time:        [TBD]
23                                                 Place:       Courtroom 5, 17th Floor
                                                   Judge:       Edward M. Chen
24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................................... 2

        A.      Procedural Background ..................................................................................... 2

        B.      Plaintiffs' Arbitration Agreements With Their Service Providers..................... 3

        C.      The Consolidated Amended Complaint ............................................................. 7

III.    ARGUMENT ................................................................................................................ 9

        A.      Plaintiffs Accepted And Agreed To The Arbitration Agreements.................... 10

                1.      ATTM .................................................................................................. 10

                2.      Sprint ................................................................................................... 13

                3.      Cricket ................................................................................................. 16

        B.      The Arbitration Agreements Are Enforceable ................................................ 19

                1.      ATTM .................................................................................................. 20

                2.      Sprint ................................................................................................... 21

                3.      Cricket ................................................................................................. 22

        C.      Plaintiffs' Claims Are Within The Scope Of The Arbitration
                Agreements ...................................................................................................... 23

        D.      Plaintiffs Must Arbitrate Their Claims Against Carrier IQ And The
                OEM Defendants Under The Doctrine Of Equitable Estoppel ......................... 24

                1.      Legal Standard .................................................................................... 24

                2.      Plaintiffs' Claims Are "Intertwined" With Their Wireless
                        Service Agreements ............................................................................. 26

                3.      Plaintiffs' Claims Rely On Alleged Concerted And
                        Interdependent Misconduct By The Service Providers, Carrier
                        IQ And The OEM Defendants .............................................................. 32

                        a.      The Core Allegations Of The Complaint Assume Misconduct
                                By The Service Providers ......................................................... 32

                        b.      The "Provider Exception" To The Wiretap Act Will Require
                                Extensive Analysis Of The Interrelationship Among Carrier IQ,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

The OEM Defendants And The Service Providers .................................... 34

c.      Equity And Public Policy Weigh In Favor Of Enforcing The
Arbitration Agreements .............................................................. 36

E.      A Stay Pending Arbitration Is Appropriate ......................................... 37

IV.      CONCLUSION ................................................................................................. 38

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Dell Computer Corp.*,
   No. CIV A C-06-089, 2006 WL 2670969 *(*S.D. Tex. Sept. 18, 2006) .................................. 18

*Agnew v. Honda Motor Co.*,
   No. 08-cv-01433 DFH-TAB, 2009 WL 1813783
   (S.D. Ind. May 20, 2009) ................................................................................................... 31

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
   513 U.S. 265,282 (1995) ..................................................................................................... 23

*Amisil Holdings Ltd. v. Clarium Capital Mgmt.*,
   622 F. Supp. 2d 825 (N.D. Cal. 2007) .............................................................. 24, 25, 29, 30

*Arellano v. T-Mobile USA, Inc.*,
   No. C 10-05663, 2011 WL 1362165 (N.D. Cal. Apr. 11, 2011) ..................................... 14, 16

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ............................................................................................................ 24

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) .................................................................................................. passim

*Blau v. AT&T Mobility*,
   No. C 11-00541 CRB, 2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ....................................... 20

*Bourdon v. Cricket Communications, Inc.*,
   3d Jud. Dist., Salt Lake Cty., Utah, Case No. 90911758
   (March 24, 2010)................................................................................................................. 23

*Briceño v. Sprint Spectrum, L.P.*,
   911 So.2d 176, 177-78 (Fla. Ct. App. 2005)............................................................. 18, 19, 23

*Brown v. Gen. Steel Domestic Sales, LLC*,
   No. CV 08-00779 MMM, 2008 WL 2128057
   (C.D. Cal. May 19, 2008)..................................................................................................... 25

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) ............................................................................................................ 19

*Bushley v. Credit Suisse First Boston*,
   360 F.3d 1149 (9th Cir. 2004).............................................................................. 1, 21, 25, 37

*Carney v. Verizon Wireless Telecom, Inc.*,
   No. 09CV1854 DMS WVG, 2011 WL 3475368 (S.D. Cal. Aug. 9, 2011)........................... 31

*Chandler v. AT&T Wireless Servs., Inc.*,
   358 F. Supp. 2d 701 (S.D. Ill. 2005) ...................................................................... 13, 19, 23

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000)................................................................... 24

*Coneff v. AT&T Corp.*,
  673 F.3d 1155 (9th Cir. 2012)......................................................... 20, 21, 22

*Cruz v. Cingular Wireless, LLC*,
  648 F.3d 1205 (11th Cir. 2011).............................................................. 20, 21

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ......................................................... 14

*Deering v. Centurytel, Inc.*,
  No. CV-1063-BLG-RFC, 2011 WL 1842859 (D. Mont. May 16, 2011)............................. 28

*Falbe v. Dell, Inc.*,
  No. 04-C-1425, 2004 WL 1588243 (N.D. Ill. July 14, 2004)................................. 18

*Ford Motor Co. v. Ables*,
  207 Fed. Appx 443 (5th Cir. 2006) ............................................................ 30

*Freedom Calls Found. v. Bukstel*,
  No. 05-cv-5460 SJ VVP, 2006 WL 845509 (E.D.N.Y. Mar. 3, 2006) ............................ 35

*Fujian Pac. Elec. Co. v. Bechtel Power Corp.*,
  No. C 04-3126 MHP, 2004 WL 2645974 (N.D. Cal. Nov. 19, 2004) ............................. 36

*Garcia v. Stonehenge, Ltd.*,
  No. C-97-4368-VRW, 1998 WL 118177 (N.D. Cal. Mar. 2, 1998) .............................. 29

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000)....................................................................... 19, 37

*Grigson v. Creative Artists Agency L.L.C.*,
  210 F.3d 524 (5th Cir. 2000)........................................................... 36, 37

*Hansen v. KPMG, LLP*,
  No. 04-cv-10525-GLT, 2005 WL 6051705 (C.D. Cal. Mar. 29, 2005)............................ 26

*Hawkins v. KPMG LLP*,
  423 F. Supp. 2d 1038 (N.D. Cal. 2006) .......................................... 2, 25, 30, 36

*Hill v. Gateway 2000, Inc.*,
  105 F.3d 1147 (7th Cir. 1997)............................................................. 18

*Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*,
  No. 07-cv-1029, 2007 WL 4394447 (E.D. Pa. Dec. 13, 2007)................................. 35

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  No. C-10-02553 RMW, 2011 WL 2886407 (N.D. Cal. July 19, 2011)............................ 20

*In re Apple & AT&TM Antitrust Litig.*,
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) .................................................. passim

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*In re Apple iPhone 3G and 3GS "MMS" Mktg. and Sales Practices Litig.,*
    864 F. Supp. 2d 451 (E.D. La. 2012) ............................................ 32, 36

*In re Apple iPhone 3G Prod. Liab. Litig.,*
    No. 09–2045, 2011 WL 6019217 (N.D. Cal. Dec. 1, 2011) ............................ 32

*In re Apple iPhone 3G Prods. Liab. Litig.,*
    859 F. Supp. 2d 1084 (N.D. Cal. 2012) ...................................... passim

*In re FirstMerit Bank, N.A.,*
    52 S.W.3d 749 (Tex. 2001) ........................................................ 22

*In re Poly-America, L.P.,*
    262 S.W.3d 337 (Tex. 2008) ....................................................... 22

*In re State Police Litig.,*
    888 F.Supp. 1235 (D. Conn. 1995) ................................................. 26

*Jones v. Deutsche Bank AG, et al.,*
    No. C 04-05357 JW (N.D. Cal. April 26, 2007) .................................... 25

*Kaltwasser v. AT&T Mobility LLC,*
    812 F. Supp. 2d 1042 (N.D. Cal. 2011) ........................................... 20

*Kirch v. Embarq Mgmt. Co.,*
    No. 10-2047-JAR, 2011 WL 3651359 (D. Kan. Aug. 19, 2011) ........................ 27

*KPMG LLP v. Cocchi,*
    132 S. Ct. 23 (2011) ............................................................. 23

*Martinez v. Cricket Communications, Inc.,*
    3d Jud. Dist., Salt Lake Cty., Utah, Case No. 090905511
    (April 6, 2010) .................................................................. 23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) .............................................................. 24

*Morselife Found., Inc. v. Merrill Lynch Bank & Trust Co., FSB,*
    No. 09-81143-CIV, 2010 WL 2889932
    (S.D. Fla. Jul. 21, 2010) ..................................................... 25, 33

*Mundi v. Union Sec. Life Ins. Co.,*
    555 F.3d 1042 (9th Cir. 2009) ................................................ 19, 24

*Nelson v. AT&T Mobility LLC,*
    No. C10-4802 THE, 2011 WL 3651153 (N.D. Cal. Aug. 18, 2011) ..................... 20

*Noodles Dev. LP v. Latham Noodles, LLC,*
    No. CV 09-1094-PHX-NVW, 2009 WL 2710137 (D. Az. Aug. 26, 2009) .................. 33

*NS Holdings LLC Inc. v. Am. Int'l Grp., Inc.,*
    No. SACV 10-1132 DOC, 2010 WL 4718895 (C.D. Cal. Nov. 15, 2010) ................ 26

*Phillips v. Sprint PCS,*
    209 Cal. App. 4th 758 (2012) .................................................... 22

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) ................................................................. 19

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir. 1996) .................................................. 15

*Provencher v. Dell, Inc.*,
    409 F. Supp. 2d 1996 (C.D. Cal. 2006) ................................ 18

*Pullen v. Victory Woodwork, Inc.*,
    No. 07-CV-00417-WBS-GGH, 2007 WL 1847633
    (E.D. Cal. June 27, 2007) ........................................................ 31

*Sanchez v. Valencia Holding Co.*,
    201 Cal. App. 4th 74 (2011) .................................................. 22

*Sanders v. Swift Transp. Co. of Arizona, LLC*,
    843 F. Supp. 2d 1033 (N.D. Cal. 2012) ................................ 33

*Sullivan v. Lumber Liquidators, Inc.*,
    No. C-10-1447 MMC, 2010 WL 2231781 (N.D. Cal. Jun. 2, 2010) ...... 19

*United States v. Ross*,
    713 F.2d 389 (8th Cir. 1983) .................................................. 34

*ValueSelling Assoc., LLC v. Temple*,
    No. 09-CV-1493-JM, 2009 WL 3736264 (S.D. Cal. Nov. 5, 2009) ........... 24, 25

*Vernor v. Autodesk, Inc.*,
    621 F.3d 1102 (9th Cir. 2010) ................................................ 14

**STATUTES**

9 U.S.C. § 2 ........................................................................................ 19, 23

9 U.S.C. § 3 ........................................................................................ 37

18 U.S.C. § 1030(a)(2) ...................................................................... 27

18 U.S.C. § 2510(1), (12) .................................................................. 24

18 U.S.C. § 2511(2)(a)(i), (d) ........................................................... 2, 26, 34

18 U.S.C. § 2702(b)(3) ...................................................................... 27

Ariz. Rev. Stat. §§ 13-3012(9), (11)(b), (11)(c) ........................... 27, 35

Cal. Com. Code § 2314 ..................................................................... 30

Cal. Com. Code § 2324 ..................................................................... 30

Cal. Penal Code § 632.7(b)(1) ......................................................... 35

Conn. Gen. Stat. § 53a-187 .............................................................. 27

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Fla. Stat. § 934.03(2)(a) ............................................................................................... 35

720 Ill. Comp. Stat. 5/14-2(a)(1), 3(b) ................................................................... 27, 35

Mass. Gen. Laws ch. 15 § 711(D)(1)(a) ...................................................................... 35

N.C. Gen. Stat. §§ 15A-287(a), (c) ......................................................................... 27, 35

Ohio Rev. Code §§ 2933.52(B)(2), (B)(4) ............................................................... 27, 35

Tex. Bus. & Com. Code Ann. § 2.314 .......................................................................... 30

Tex. Penal Code §§ 16.02(c)(1), (c)(4) ................................................................... 27, 35

Fenwick & West LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

DFS' CONSOLIDATED MTN TO COMPEL
ARBITRATION AND STAY LITIGATION

CASE NO. 3:12-md-02330-EMC

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on a date to be set by the Court in the courtroom of The Honorable Edward M. Chen, in the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Carrier IQ, Inc., HTC America, Inc., Huawei Devices USA, Inc., LG Electronics MobileComm U.S.A, Inc., Motorola Mobility LLC, Pantech Wireless, Inc. and Samsung Telecommunications America, LLC (collectively, "Defendants") will and hereby do move this Court for an Order compelling Plaintiffs Gary Cribbs, Mark Laning, Daniel Pipkin, Patrick Kenny, Luke Szulczewski, Brian Sandstrom, Colleen Fischer, Eric Thomas, Matthew Hiles, Michael Allan, Bobby Cline, Shawn Grisham, Ryan McKeen, Clarissa Portales, Dao Phong, Leron Levy, and Douglas White to arbitrate their individual claims against Defendants and staying this action pending the arbitrations.

Plaintiffs entered into wireless service agreements with ATTM, Sprint, and Cricket requiring mandatory individual arbitration of any disputes related to or arising out of ATTM's, Sprint's and Cricket's service.  All three arbitration agreements are enforceable.  Because Plaintiffs' claims asserted in the Consolidated Amended Complaint ("CAC") are intertwined with their wireless service agreements, which require arbitration of such claims, and are based on allegations of concerted and interdependent misconduct by Plaintiffs' wireless service providers the doctrine of equitable estoppel requires Plaintiffs to arbitrate their claims against Defendants. This Court should therefore compel Plaintiffs to arbitrate their individual claims against Defendants and stay this action pending the arbitrations.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto, the Declarations of Tyler G. Newby, Chenell Cummings, Stacie Dobbs, John Throckmorton, Scott Williamson, Rick Baughman, and Stephanie Miller, the Request for Judicial Notice filed herewith, any reply papers submitted in support of this Motion, oral argument of counsel, the complete files and records in this matter, and such additional matters as the Court may consider.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2    Dated:    November 20, 2012            Respectfully Submitted,

3                                             FENWICK & WEST LLP

4

5                                 By: */s/ Rodger R. Cole*
                                       Rodger R. Cole (CSB No. 178865)

6

7                                     Attorneys for Defendant
                                     Carrier IQ, Inc.

8                                     [Additional Counsel listed on Signature
                                     Page]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

<div style="text-align:center;"><strong><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></strong></div>

**I.     INTRODUCTION**

Plaintiffs bring this action based on the core allegation that certain data was collected from their mobile phones by Carrier IQ software without their consent.  Although obscured in the Consolidated Amended Complaint ("CAC"), the original complaints and documents incorporated by reference into the CAC make clear that Plaintiffs' wireless service providers—ATTM,[1] Sprint, and Cricket (collectively, the "Service Providers)—licensed the software from Carrier IQ and directed the manufacturers of their phones—HTC, Huawei, LG, Motorola, Pantech, and Samsung—to install it on Plaintiffs' phones.  The Service Providers did this under their service agreements with Plaintiffs which allowed them to manage the performance of their networks, including through the collection and analysis of user data.  These agreements also contain provisions requiring Plaintiffs to arbitrate "all disputes" relating to or arising out of the agreements.

All of Plaintiffs' claims depend upon their contention that they did not consent to the use of Carrier IQ software on their mobile phones.  Those allegations will therefore turn on whether their service agreements grant such consent.  There is no question this "dispute" would be subject to arbitration if brought against the Service Providers, which explains why Plaintiffs have dropped them as defendants and carefully sought to excise references to them from the CAC.  But Plaintiffs cannot avoid their arbitration agreements so easily.  Under the doctrine of equitable estoppel, Plaintiffs must arbitrate their claims against Defendants.

The doctrine of equitable estoppel requires Plaintiffs to arbitrate their claims against Defendants for two independent reasons.  *First*, Plaintiffs' claims are intertwined with the terms of their service agreements with ATTM, Sprint, and Cricket.  *See In re Apple iPhone 3G Prods. Liab. Litig.,* 859 F. Supp. 2d 1084, 1095-96 (N.D. Cal. 2012) ("*In re Apple iPhone 3G*").  Plaintiffs cannot prevail on their claims if their service agreements establish consent.[2]  Because

---

[1] AT&T acquired Cingular in 2005 and renamed the company AT&T Mobility, LLC ("ATTM") in 2007.  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1744 n.1 (2011) (citation omitted).

[2] Absence of consent is just one element of Plaintiffs' various causes of action.

1   resolution of this issue would require this Court to interpret the agreements, Plaintiffs' claims

2   relate to those agreements and thus are subject to arbitration.

3          *Second*, Plaintiffs' claims are based on "substantially interdependent and concerted

4   misconduct" by Defendants and the Service Providers, who are parties to the arbitration

5   agreements.  *Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1050 (N.D. Cal. 2006).  Plaintiffs

6   allege that the manufacturers of their phones installed software developed and operated by Carrier

7   IQ that improperly collected and transmitted data off their mobile phones.  Since this alleged

8   conduct only occurred at the direction and for the benefit of Plaintiffs' Service Providers who

9   instructed the OEM Defendants to install the Carrier IQ software, specified the types of data to be

10  collected, and used such data, the conduct of Plaintiffs' wireless Service Providers is central to

11  Plaintiffs' claims.  Furthermore, a key defense under federal and state wiretap statutes will turn on

12  whether the use of Carrier IQ software on Plaintiffs' phones falls within the "provider exception,"

13  which exempts from liability interception, disclosure, or use of a communication by a "provider

14  of wire or electronic service carrier" or its "agent" that is a "necessary incident to the rendition"

15  of service by the provider.  18 U.S.C. § 2511(2)(a)(i).  Resolving that defense will require a

16  determination of whether the installation and operation of Carrier IQ software was a necessary

17  incident to the rendition of service, which is an issue only the Service Providers can address since

18  it was done at their direction and for their benefit.

19         Allowing Plaintiffs to avoid their arbitration agreements would frustrate the purpose of the

20  FAA and traditional principles of equity and fairness.  Plaintiffs agreed to arbitrate the claims in

21  this action and they cannot now avoid that agreement simply by dropping their Service Providers

22  as defendants.  Accordingly, Plaintiffs must pursue their claims against Defendants in individual

23  arbitration.

24  **II.     FACTUAL AND PROCEDURAL BACKGROUND**

25          **A.      Procedural Background**

26         In November 2011, an individual made allegations on an Internet blog that software

27  developed by Carrier IQ and installed on mobile phones at the direction of Service Providers

28  collects certain data, including SMS text messages, without user consent.  Within weeks of that

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

blog posting, over seventy class action lawsuits were filed in federal district courts around the country against Carrier IQ, Service Providers, including ATTM and Sprint, and mobile phone manufacturers.  Declaration of Tyler G. Newby in Support of Defendants' Consolidated Motion to Compel and Stay Arbitration ("Newby Decl.") ¶¶ 1-2.  Those actions were subsequently consolidated into this action by the Judicial Panel on Multidistrict Litigation.  Dkt. No. 1.  On August 27, 2012, Plaintiffs filed their CAC dropping the Service Providers and naming only Carrier IQ and the manufacturers—HTC, Huawei, LG, Motorola, Pantech, and Samsung (collectively, "OEM Defendants")—as defendants (Carrier IQ and OEM Defendants, collectively "Defendants").  Dkt. No. 107.  Plaintiffs' core allegation in the CAC remains that Carrier IQ software was used to collect and transmit data off their mobile phones to their Service Providers without their consent.

### B.  Plaintiffs' Arbitration Agreements With Their Service Providers

Each Plaintiff receives his or her wireless phone and data service through one of three Service Providers:  ATTM, Cricket and Sprint.  Before Plaintiffs could begin using their mobile devices on the Service Providers' networks to make calls, send and receive SMS messages, install and use apps or browse the Internet, they had to enter into service agreements with their respective Service Providers.  Each of these service agreements contains express arbitration provisions with broad language requiring arbitration of "all disputes" relating to Plaintiffs' relationship with the Service Provider.  Plaintiffs were notified of the arbitration provisions in various ways before and after signing up for service, including at the point of sale and in documents packaged with their phones.  *See infra* Section III.A.

ATTM's Wireless Customer Agreement with Plaintiffs Cribbs, Laning,[3] and Pipkin (collectively, the "ATTM Plaintiffs"),[4] contains the following arbitration provision:

---

[3]  Plaintiffs stated that Mark Laning—who, according to the CAC, owns a Pantech P5000 mobile device (*see* CAC ¶ 87)—was also a Sprint subscriber.  *See* Newby Decl. ¶ 4.  Sprint, however, has no record of Laning or the telephone number that he provided; moreover, Sprint does not sell and has not ever sold the Pantech P5000 phone.  *See* Declaration of Stephanie Miller ("Miller Decl.") ¶ 125.  It appears that Laning is instead an ATTM subscriber.

[4]  At this time, Motorola is not moving to compel arbitration with respect to Plaintiff Jennifer Patrick subject to further investigation.  As set forth in the CAC, Ms. Patrick claims to have owned a Motorola phone on which Carrier IQ software was allegedly installed, and she has been identified by Plaintiffs' counsel as an ATTM subscriber.  CAC ¶ 77.  Motorola does, however,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**2.2 Arbitration Agreement**

(1) [ATTM] and you agree to arbitrate *all disputes and claims* between us.  *This agreement to arbitrate is intended to be broadly interpreted.*  It includes, but is not limited to:

- *claims arising out of or relating to any aspect of the relationship between us*, whether based on contract, tort, statute, fraud, misrepresentation or any other legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); . . .  and
- claims that may arise after the termination of this Agreement.

References to "[ATTM]," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, *as well as all authorized or unauthorized users or beneficiaries of services or Devices[5] under this or prior Agreements between us*.

Declaration of Stacie Dobbs ("Dobbs Decl."), Ex. 2 at 4 (emphasis added); Declaration of John Throckmorton ("Throckmorton Decl."), Ex. 2 at 15 (emphasis added).

ATTM's Wireless Customer Agreement further instructed Plaintiffs that, by agreeing to its terms, they were expressly waiving their rights to a jury trial or to participate in class action litigation:

"*You agree that, by entering into this Agreement, you and [ATTM] are each waiving the right to a trial by jury or to participate in a class action.*  This Agreement evidences a transaction in interstate commerce and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision.  This arbitration provision shall survive termination of this Agreement."

Dobbs Decl., Ex. 2 at 4; Throckmorton Decl., Ex. 2 at 16.

Likewise, Sprint's Terms and Conditions of Service agreed to by Plaintiffs Allan, Cline, Fischer, Grisham, Hiles, Kenny, Levy, McKeen, Phong, Portales, Sandstrom, Szulczewski, and Thomas (collectively, the "Sprint Plaintiffs"), contained an express arbitration provision in bolded type that states in pertinent part:

**Instead Of Suing in Court, We Each Agree to Arbitrate Disputes**
We each agree to arbitrate all Disputes between us, on an individual basis, not on a class-wide or consolidated basis.  This agreement to arbitrate is intended to be broadly interpreted. . . .

---

intend to rely upon the ATTM arbitration clauses with respect to unnamed putative class members.  Motorola and Carrier IQ reserve the right to compel Plaintiff Patrick to arbitration at a later time.

[5] "Devices" is defined as "all phones and other devices containing a SIM assigned to" the subscriber's account.  *See* Dobbs Decl., Ex. 2 at 5; Throckmorton Decl., Ex. 2 at 17.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**We each also agree as follows:**
**(1) "Disputes" are any claims or controversies against each other related in any way to or arising out of in any way our Services or the Agreement, including, but not limited to, coverage, Devices, billing services and practices, policies, contract practices (including enforceability), service claims, privacy, or advertising, even if it arises after Services have terminated.** Disputes include claims that you bring against our employees, agents, affiliates, or other representatives or that we bring against you. It also includes but is not limited to claims related in any way to or arising out of in any way any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory.

Miller Decl., Ex. B at 14 (emphasis in original).

This arbitration provision also clearly and unambiguously provides, again in bolded type, that any arbitration proceeding is to be conducted on an individual basis only:

**(6) WE EACH AGREE THAT WE WILL ONLY PURSUE ARBITRATION ON AN INDIVIDUAL BASIS AND WILL NOT PURSUE ARBITRATION ON A CLASS-WIDE OR CONSOLIDATED BASIS. We each agree that any arbitration will be solely between you and Sprint (not brought on behalf of or together with another individual's claim). If for any reason any court or arbitrator holds that this restriction is unconscionable or unenforceable, then our agreement to arbitrate doesn't apply and the dispute must be brought in court.**

**. . .**

**No Class Actions**
**TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO PURSUE DISPUTES ON A CLASSWIDE BASIS; THAT IS, TO EITHER JOIN A CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY OR ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE IN ANY LAWSUIT, ARBITRATION, OR OTHER PROCEEDING.**

*Id.* at 8; 14-15 (emphasis in original).

Sprint's Terms and Conditions specifically called out to consumers at the outset, in bolded, capitalized letters the existence of the arbitration requirement:

**THIS CONTRACT CONTAINS A MANDATORY ARBITRATION PROVISION THAT DISALLOWS CLASS ACTIONS, A CLASS ACTION WAIVER PROVISION, AND A JURY WAIVER PROVISION.**

*Id.* at 9 (emphasis in original).

Finally, Cricket's Terms and Conditions of Service ("Cricket Terms and Conditions") agreed to by Cricket customers, including Plaintiff White, contains a clause where the parties agree to submit any claims to binding individual arbitration upon either party's election.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Declaration of Rick Baughman ("Baughman Decl."), Ex. 1 at ¶ 20.  This clause is prominently displayed with the words "PLEASE READ THIS SECTION CAREFULLY" in all capital letters. The arbitration agreement specifically provides that:

> Any past, present or future claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents, successors, or assigns of the other, arising from or relating in any way to this Agreement [the Terms & Conditions] or Services provided to you under this Agreement, including (without limitation) statutory, tort and contract Claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration.

*Id.* at ¶ 20(c).

Cricket's Terms and Conditions further highlights and signifies the importance of the arbitration agreement in the first paragraph as follows under the heading "Important Service/Product Specific Terms":

> Your Agreement with Cricket Communications, Inc. and its affiliates doing business as Cricket includes terms of your service plan (including those outlined below) and the most recent Cricket Terms and Conditions of Service - carefully read all these terms which include, among other things, a MANDATORY ARBITRATION of disputes provision.

*Id.* at ¶ 1 (emphasis in original).  Cricket's arbitration agreement also provides customers with an opportunity to opt-out:

> You may reject this arbitration clause by sending us a rejection notice ("Rejection Notice") within sixty (60) days after the date of your phone activation or our disclosure of this section to you ("Opt-Out Deadline") by going to www.mycricketdisputeresolution.com.  Any Rejection Notice received after the Opt-Out Deadline will not be valid and you must pursue your claim in arbitration or small claims court.

*Id.* at ¶ 20(b).

Cricket's arbitration agreement further provides language instructing customers, that, by agreeing to its terms, they expressly waive their rights to participate in class action litigation:

> No class claims, including class actions, class arbitrations, other representative actions, or joinder or consolidation of any Claim with a Claim of any other person or entity shall be allowable in arbitration, without the written consent of both you and us ("Class Action Waiver"). This arbitration agreement survives the termination of this Agreement or the Service relationship; provided, however, if any portion of this "Arbitration; Dispute Resolution" section cannot be enforced, that portion will be severed, and the rest of the "Arbitration; Dispute Resolution" section will continue to apply, provided that the entire "Arbitration; Dispute Resolution" section shall be null and void if the Class Action Waiver is held to be

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    invalid or unenforceable with respect to any class or representative Claim, subject

2    to any right to appeal such holding.

3    *Id.* at ¶ 20(f).

4          **C.**     **The Consolidated Amended Complaint**

5          Despite Plaintiffs' attempt to avoid any mention of the Service Providers in the CAC, the

6    central role of the Service Providers in this case is inescapable.  Plaintiffs allege that the software

7    "is installed," but do not say at whose direction.  *See* CAC ¶ 1 (Carrier IQ software "is already

8    installed on mobile devices when consumers purchase them"); *id.* at ¶ 41 (Carrier IQ software

9    "was installed on" devices).  They allege that data collected by the software is transmitted off the

10   phones, but they do not say to whom.  *See id.* at ¶ 1; ¶ 61 ("Carrier IQ can and does cause uploads

11   of data collected on mobile devices either to its own servers or directly to the servers of

12   ***customers***.") (emphasis added).  And Plaintiffs allege that the software collects data specified by

13   Carrier IQ's "customers," but they do not identify who those customers are.  *See id.* at ¶ 66 ("CIQ

14   customers, ***typically wireless carriers*** but sometimes device manufacturers, specify which data

15   they want from among that assembled pursuant to the above-referenced metrics" (emphasis

16   added)).  As alleged in Plaintiffs' prior complaints and made clear in documents incorporated by

17   reference into the CAC, the answer to all of these questions is the Service Providers.  The Service

18   Providers required the installation of Carrier IQ software of Plaintiffs' phones, and the data

19   collected by Carrier IQ software transmitted off the phone was used by the Service Providers.

20         Although the CAC tiptoes around the role of the Service Providers in this case, Plaintiffs'

21   original complaints were not so coy.  For example, Plaintiff Hiles alleged that Carrier IQ's "IQ

22   Agent records and ***transmits to cellular carriers, such as Sprint and [ATTM], data relating to***

23   ***customers' cellular phone use***.  The data is then analyzed by the carriers and used for a variety of

24   undisclosed purposes."  *See Hiles v. Carrier IQ, Inc., et al.*, No. 3:11-cv-06641-EMC, Dkt. No. 1

25   (N.D. Cal. Dec. 23, 2011) at ¶ 1 (emphasis added).  Plaintiff Allan similarly alleged that the "IQ

26   Agent records and transmits to cellular carriers, such as Sprint and [ATTM], data relating to

27   customers' cellular phone use" and that "***manufacturers alter the Android code in order to***

28   ***integrate IQ Agent at the behest of cellular carriers***."  *See Allan v. Carrier IQ, Inc., et al.*, No.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    3:11-cv-06613-EMC, Dkt. No. 1 (N.D. Cal. Dec. 22, 2011) at ¶¶ 1, 48 (emphasis added).

2    Plaintiffs Grisham and Cline also alleged that Carrier IQ's software was installed on their devices

3    and was "surreptitiously logging and transmitting extraordinarily sensitive information from

4    consumers' phones to the mobile phone carriers." *See Grisham, et al. v. Carrier IQ, Inc., et al.*,

5    No. 3:12-cv-01400-EMC, Dkt. No. 1 (N.D. Cal. Mar. 20, 2011) at ¶ 4.  Although Plaintiffs have

6    excised these allegations from the CAC in an apparent attempt to avoid their arbitration

7    agreements with the Service Providers, their original complaints admit the central role of the

8    Service Providers in this action.

9         The CAC also incorporates by reference letters to U.S. Senator Al Franken from ATTM

10   and Sprint describing their use of Carrier IQ software.[6]  *See* CAC ¶¶ 53-55; *see also* Newby

11   Decl., Ex. 1 (Dec. 14, 2011 ATTM Letter to the Hon. Al Franken), Ex. 2 (Dec. 14, 2011 Sprint

12   Letter to the Hon. Al Franken).  As Sprint's letter explained, "the Carrier IQ software tool does

13   not collect any information unless it is 'tasked' to do so by Sprint."  Newby Decl., Ex. 2 at 2.

14   Similarly, ATTM told Senator Franken that it "uses CIQ software" to collect desired information.

15   *Id.*, Ex. 1 at 1.  And as alleged in the CAC, ATTM reported that "CIQ software … is resident on

16   … approximately 900,000 devices, with about 575,000 of those collecting and ***reporting wireless***

17   ***and service performance information to AT&T***."  CAC ¶ 53 (emphasis added).  Both ATTM and

18   Sprint stated that they received and stored on their servers data collected using Carrier IQ

19   software.  Newby Decl., Ex. 1 at 4, Ex. 2 at 4.

20        Both ATTM and Sprint also stated in those letters that their use of Carrier IQ software

21   was disclosed and agreed to by their customers in privacy policies and service agreements—the

22   same agreements containing the arbitration provisions upon which this motion is based.

23   Specifically, ATTM stated that "notice is included in the [ATTM] Privacy Policy, our Wireless

24   Customer Agreement and the MTS End User Licensing Agreement (EULA) that we collect

25   network, performance, and usage information from our network and customer devices, and we

26   use that information to maintain and improve our network and their wireless experience."  Newby

27   _____
[6] The Court may consider these letters in their entirety, as they are incorporated by reference by
28   the Complaint.  *See* Request for Judicial Notice in Support of Defendants' Consolidated Motion
     to Compel Arbitration and to Stay Litigation ("RJN") at 2-3.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Decl., Ex. 1 at 5.  ATTM then referenced Section 3.6 of its Wireless Customer Agreement, which states:

> [ATTM] collects information about the approximate location of your Device in relation to our cell towers and the Global Positioning System (GPS).  We use that information*, as well as other usage and performance information also obtained from our network and your Device*, to provide you with wireless voice and data services, and to maintain and improve our network and the quality of your wireless experience. . . . .

*Id.* at 6 (emphasis added); Dobbs Decl., Ex. 2, at 6 (§ 3.6).

Likewise, in its letters to Senator Franken, Sprint pointed to similar disclosures in its Privacy Policy, which informs users, including the Sprint Plaintiffs that:

> Information we collect when we provide you with Services includes when your wireless device is turned on, how your device is functioning, device signal strength, where it is located, what device you are using, what you have purchased with your device, how you are using it, and what sites you visit.
> …
> We use your personal information to do things like …. Monitor, evaluate or improve our Services, systems, or networks.

Newby Decl., Ex. 2 at 4; Miller Decl. ¶ 130, Ex. GGG at 1-2.  This Privacy Policy is expressly referenced in the Terms and Conditions to which the Sprint Plaintiffs agreed in signing up for Sprint service.  Miller Decl. Ex. B at 13; *see also* Section III.A.2 *infra*.

In sum, Plaintiffs' original complaints and documents incorporated by reference into the CAC make clear that the Service Providers licensed Carrier IQ software from Carrier IQ and required the OEM Defendants to install it on Plaintiffs' phones, used the data collected and transmitted off the phones by that software, and did this pursuant to provisions in their service agreements with Plaintiffs which allowed them to manage the performance of their networks.

## III.  **ARGUMENT**

All of Plaintiffs' claims are based on the core allegation that Carrier IQ software collected and transmitted data off their phones without their consent.  Plaintiffs' Service Providers licensed the software from Carrier IQ and required the OEM Defendants to install it on Plaintiffs' phones pursuant to their service agreements with Plaintiffs which require arbitration of any "disputes" related to or arising out of those agreements.  Contrary to the Service Providers' position that

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Plaintiffs consented to the use of Carrier IQ software on their phones, Plaintiffs contend there was no such consent. This is a "dispute" that Plaintiffs clearly would have to arbitrate had they pursued it against the Service Providers, and they cannot avoid that obligation simply by dropping the Service Providers from the CAC. Under the doctrine of equitable estoppel, Plaintiffs must arbitrate their claims against Carrier IQ and the OEM Defendants because they are intertwined with the service agreements between Plaintiffs and their Service Providers and are based on alleged interdependent and concerted misconduct between the Defendants and the Service Providers, who are signatories to arbitration agreements that require arbitration of claims arising out of such alleged misconduct.

### A.    Plaintiffs Accepted And Agreed To The Arbitration Agreements

#### 1.    ATTM

The ATTM Plaintiffs agreed to the terms of their wireless service agreements, including the arbitration provision before activating service on their devices. Although the ATTM Plaintiffs' acquired their mobile devices through different sales channels, each received the ATTM Wireless Customer Agreement and manifested agreement to its terms before ATTM activated service on his or her mobile device.

Two ATTM Plaintiffs, Gary Cribbs and Daniel Pipkin, acquired their ATTM wireless service at ATTM retail stores. *See* Declaration of Chenell Cummings ("Cummings Decl."), ¶¶ 5, 6. Plaintiff Cribbs purchased a Samsung Galaxy S II Skyrocket SGH-i727 phone[7] from an ATTM retail store in Greenbelt, Maryland on November 7, 2011. *Id.* at ¶ 5, Ex. 2. At the time of his purchase, Cribbs reviewed ATTM's Wireless Customer Agreement (including its Terms and Conditions) on the store's electronic signature-capture device, and thereafter acknowledged his agreement to the Terms and Conditions of the Wireless Service Agreements (including the broad arbitration provision) by placing his electronic signature on the device. *Id.* at ¶ 8, Ex. 3. Plaintiff Daniel Pipkin purchased an Apple iPhone from an ATTM retail store in Oxnard, California on

---

[7] Plaintiffs concede in the CAC that Carrier IQ software "has not been activated" on Samsung Skyrocket devices, which itself is fatal to Plaintiffs' claims based on these devices. CAC ¶ 53. Samsung intends to address Plaintiffs Cribbs's and Pipkin's lack of standing to assert claims against Carrier IQ and Samsung at the appropriate stage of this litigation.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

October 14, 2011.  Cummings Decl. ¶ 12, Ex. 6.  At the time of his purchase, Pipkin reviewed

ATTM's Wireless Customer Agreement (including its Terms and Conditions) on the store's

electronic signature-capture device, and thereafter acknowledged his agreement to the Terms and

Conditions by placing his electronic signature on the device.  *Id.* at ¶ 12, Ex. 8.  Pipkin

subsequently returned the iPhone on October 28, 2011.  Pipkin then purchased a Samsung Galaxy

S II Skyrocket SGH-i727[8] phone from the same ATTM retail store in Oxnard, California on

November 8, 2011.  *Id.* at ¶¶ 12, 14, 15, Exs. 9, 10.  At the time of his new purchase, Pipkin again

accepted the ATTM Wireless Customer Agreement (including its Terms and Conditions) through

the ATTM's "Interactive Voice Response" ("IVR") process.[9]  *Id.* at ¶ 16, Ex. 9.

      To purchase a mobile device from a company-owned retail store, customers followed

prompts to scroll through the entire Wireless Customer Agreement.  Dobbs Decl. ¶ 7, Ex. 1; *see*

*also id.* at ¶ 6, Ex. 2 (containing a copy of the Wireless Customer Agreement shown to customers

in October and November 2011).  At the end of the Agreement, the signature-capture device

displayed the following text to ensure that customers knew that they were agreeing to the terms of

the Agreement that they had just reviewed:  "***I have reviewed and agree to*** the rates, terms and

conditions for the wireless products and services described in the Wireless Customer Agreements

***(including limitation of liability and arbitration provisions*)** and the Customer Service Summary,

both of which were made available to me prior to my signing."  *Id.* at ¶ 7, Ex. 3 (emphasis

added).  Upon completion of their review of the Wireless Customer Agreement, customers could

elect not to execute the Agreement (and thereby decline to purchase and activate an ATTM

mobile device) or to complete the purchase transaction by executing the Wireless Customer

Agreement.  *Id.* at ¶ 7.  During each of their transactions, Cribbs and Pipkin also received a

Customer Service Summary, which included express reminders that the agreement governing

---

[8] The CAC erroneously lists Mr. Pipkin's device as a Samsung Galaxy S2 4G LTE. CAC ¶ 76.

[9] The IVR system solicits the subscriber's electronic signature on a wireless service agreement by
asking the subscriber to push a button on his or her telephone keypad indicating that he or she
agrees to the terms of ATTM's wireless service. Cummings Decl. ¶ 17.  If the subscriber does
not indicate his or her acceptance of the terms by pressing the appropriate button, the IVR system
does not permit the electronic signature to be executed and declines the contract, thereby
preventing service from being connected.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

their relationship with ATTM contained a binding arbitration provision: "Your agreement with [ATTM] consists of:  1. The Wireless Customer Agreement … **and its arbitration clause**…." Cummings Decl., Ex. 1 at 3; Ex. 5 at 3; Ex. 9 at 3.  The Customer Service Summaries further reiterated:

> **I have reviewed and agree to** the rates, terms and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and **arbitration provisions**) and the Customer Service Summary.

*Id.* (emphasis added).  It also contained a copy of the Wireless Service Agreement (including the full text of the arbitration provisions contained therein).  Declaration of Scott Williamson ("Williamson Decl."), ¶¶ 2-3.

The third ATTM Plaintiff, Mark Laning, was made an authorized user on an ATTM account in the name of Diane Laning on November 28, 2011.  Cummings Decl. ¶¶ 9, 10, Ex. 4 at 2.  In accordance with the provisions of the Wireless Customer Agreement that Ms. Laning both reviewed and executed at the time of her activation of ATTM service, the terms of the Wireless Customer Agreement expressly applied to any and "all authorized or unauthorized users or beneficiaries of services or Devices" on her account.  *See supra* at Section II.B.

On November 28, 2011, Ms. Laning spoke by phone with an ATTM representative and ordered a Pantech Link II P5000 mobile device, renewing her ATTM contract with a two-year wireless service commitment.  *Id.* at ¶ 10, Ex. 4 at 1.[10]  The order was completed on the same day when Ms. Laning accepted and received a Terms and Conditions acceptance email.  *Id.*, Ex. 4 at 2.  The email contained a link to download her Customer Service Summary (described above). *Id.* at ¶ 11; Ex. 5 at 3.

With the shipment that contained her new mobile device, Ms. Laning received a Quick Start Guide that contained the Wireless Customer Agreement, which included the arbitration provision and set forth the steps necessary to activate the Pantech mobile device on the ATTM

---

[10] Upon renewal of her two-year wireless service commitment, Ms. Laning was advised by ATTM of her options regarding devices, and ATTM provided Ms. Laning with a price override on the Pantech mobile device.  This price override reduced the device's purchase price from $39.99 to $0.00.  *Id.* at Ex. 4 at 1.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

wireless network.  Throckmorton Decl. ¶¶ 3-4, Ex. 2 at 1.  Unless **all** of the steps were completed, service on a mobile device could not be initiated.  Step 3 of the process instructed Ms. Laning to review carefully the "paper copy of the Wireless Customer Agreement" in the Quick Start Guide, which would govern the Lanings' relationship with ATTM, and then to accept the terms of the Wireless Customer Contract if she agreed to those terms.  *Id.*

As set forth in clear and unambiguous language in the Customer Service Summary and Quick Start Guide:  "If you do not accept your service terms and conditions and do not return the equipment within 30 days, you will be billed for the full price of the phone."  Cummings Decl., Ex. 5 at 2; Throckmorton Decl., Ex. 2 at 1, 6.  There is no evidence indicating that Plaintiff Laning or Ms. Laning were ever billed the full price of the phone or returned the device to ATTM.  *See* CAC ¶ 87.  As a result, the service on their Pantech device continued pursuant to the terms of the Wireless Customer Agreement.  *See, e.g., Chandler v. AT&T Wireless Servs., Inc.*, 358 F. Supp. 2d 701, 704 (S.D. Ill. 2005) (holding that Plaintiff subscriber accepted the arbitration terms included in the AT&T Welcome Guide received in the package with the phone by accepting the phone and using the service).

Thus, each of the ATTM Plaintiffs received the ATTM Wireless Customer Agreement, including its arbitration provision, and manifested his or her agreement to its terms before service was activated on their phones.

### 2.    Sprint

Each of the Sprint Plaintiffs agreed to Sprint's Terms and Conditions of Service before they began using their mobile devices.  Like the ATTM Plaintiffs, the Sprint Plaintiffs acquired their devices through a variety of sales channels, namely: (1) at a Sprint retail store; (2) at an authorized Sprint retail location, such as Radio Shack or Best Buy; (3) through the Internet, either through Sprint's own website at sprint.com, or through the website of an Internet dealer; or (4) through Sprint's telephone sales department, known as telesales.[11]  *See* Miller Decl. ¶¶ 17, 28,

---

[11] Some of the Sprint Plaintiffs in fact went through more than one of these avenues, as they purchased multiple phones and/or lines of service from Sprint.  *See*, *e.g.*, Miller Decl., ¶¶ 42-51 (Cline); 63-76 (Szulczewski); 110-118 (Phong).

13

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    35, 42, 52, 63, 77, 82, 88, 97, 102, 110, 119.  Each sales channel presented the Sprint Terms and

2    Conditions of Service to the Sprint Plaintiffs and required their agreement to those terms before

3    activation of service.

4           At a minimum, each Plaintiff received a copy of the Terms and Conditions of Service then

5    in effect in the box of every phone they purchased that was sold for use on Sprint's wireless

6    network.  *See id.* at ¶ 15.[12]  Those Terms and Conditions stated that "[t]hese Ts&Cs are part of

7    your service agreement with us (the 'Agreement') and constitute a contract under which we

8    provide you Services under terms and conditions that you accept."  *Id*. at Ex. B at 9.[13]  The Terms

9    and Conditions additionally provided that:

10          You accept the Agreement when you do any of the following:  (a) accept the
             Agreement through any printed, oral, or electronic statement, including on the web
11          by electronically marking that you have reviewed and accepted; (b) attempt to or
             in any way use the Services; (c) pay for the Services; or (d) open any package or
12          start any program that says you are accepting the Agreement when doing so.  **If
             you don't want to accept the Agreement, don't do any of these things.**
13

14   *Id.* (emphasis in original).  There can be no question that each of the Sprint Plaintiffs used

15   Sprint's wireless services on their phones.  As a result, even without anything more, these facts

16   alone establish that each of the Sprint Plaintiffs is now bound by the Terms and Conditions of

17   Service.  *See Vernor v. Autodesk, Inc*., 621 F.3d 1102, 1104-05 (9th Cir. 2010) (enforcing

18   shrinkwrap license agreement for software); *Arellano v. T-Mobile USA, Inc*., No. C 10-05663,

19   2011 WL 1362165, at *3 (N.D. Cal. Apr. 11, 2011) (finding T-Mobile's arbitration agreement

20   valid in part because "agreements packaged with a product are enforceable") (citation omitted);

21   *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 989 (N.D. Cal. 2010) ("The weight

22   ─────────────────
     [12] The Apple iPhone is the single exception.  "When a customer purchases an Apple iPhone, a
23   hard copy of the Terms and Conditions is provided to the customer as a take away."  Miller Decl.
     ¶ 15.  None of the Sprint Plaintiffs complains about an Apple iPhone in the CAC.  *See* CAC ¶¶
24   75-92.

25   [13]  Here and throughout this brief (unless otherwise noted), Defendants quote from and cite to the
     Sprint Terms and Conditions of Service that went into effect on September 9, 2011 ("the 2011
26   version").  *See* Miller Decl. ¶ 4, Ex. B.  The 2011 version is the operative version of the Terms
     and Conditions as to all of the Sprint Plaintiffs, either because that version was already in effect at
27   the time the Plaintiffs purchased a phone, activated service, and/or otherwise agreed to the Terms
     and Conditions, or because the Plaintiffs were notified of the change and thereby made subject to
28   the new version of the Terms and Conditions.  In any event, the key provisions of the Terms and
     Conditions discussed in this brief did not materially change between the 2010 and 2011 versions.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

of authority, however, including in this district, is that shrinkwrap licenses are enforceable.");
*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1450-52 (7th Cir. 1996) (holding software license
packaged inside box to be binding where buyer did not reject the terms after opening the box and
using the software).

Further, the Sprint Plaintiffs who purchased their phones at a Sprint retail store (namely,
Plaintiffs Levy, Thomas, Sandstrom, Cline, and Kenny) were additionally informed that the
Terms and Conditions, which were available in booklet form at the store, were a part of their
agreement with Sprint and they were further encouraged to read them numerous times—through
the "service plan guide"; screens shown to them during the in-store, interactive electronic process
called "BRAVO"; as well as the Transaction Summary and computer-generated transaction
receipt (called the RMS receipt).  *See* Miller Decl. at ¶¶ 6-58.[14]  The Transaction Summary
specifically directed the customers to Sprint's website for the most recent version of the Terms
and Conditions.  *Id.* at ¶ 13.  The RMS receipt informed the customer that "You are entering into
a binding legal agreement with Sprint" that includes "the most recent General Terms and
Conditions of Service," and urged the customer to "Please ask a representative to provide you any
part of your Agreement (Plans brochure, Ts & Cs, or Coverage Map brochures) that you may be
missing."  *Id.* at ¶ 14.  Plaintiffs Levy, Thomas, Sandstrom, Cline, and Kenny each signed the
BRAVO screen, and their signature is reflected in the Transaction Summary and/or the RMS
Receipt.  *See id.* at ¶¶ 17-58.

The Sprint Plaintiffs who purchased their phones at an authorized Sprint retail location
(namely, Plaintiffs Szulczewski, Portales, and Fischer) were also informed of the Sprint Terms
and Conditions by the Subscriber Agreement as well as a service plan guide.  *See id.* at ¶¶ 59-62.
Each of those Sprint Plaintiffs signed and initialed a Subscriber Agreement at the authorized
Sprint retail store, signifying that they have received Sprint's Terms and Conditions and agree to
abide by those terms, before service was activated on their phones.  *See id.* at ¶¶ 60, 63-87.

---

[14] Plaintiff Sandstrom and a couple others (Phong and Grisham) were part of a multi-line account held by a different account holder.  These Plaintiffs are nevertheless subject to Sprint's Terms and Conditions, as those Terms and Conditions "apply to any 'phone, aircard, mobile broadband device, any other device, accessory or other product [that Sprint] sells to [a customer] or that is active on [a customer's] account with [Sprint].'"  Miller Decl. ¶ 35; Ex. B at 9.

1    Sprint Plaintiffs Allan, McKeen, Hiles, and Phong purchased their phones through the

2    Internet, and received the Sprint Terms and Conditions online, which they could scroll through at

3    their own pace. *See id.* at ¶¶ 88-118.  After being provided the opportunity to review the entire

4    Sprint agreement in the time frame they chose, Plaintiffs Allan, McKeen, Hiles and Phong each

5    clicked a box demonstrating their acceptance of the Terms and Conditions.  In fact, the sales

6    transactions could not have been completed if they had not clicked the acceptance box.  *See id.*

7    Finally, Plaintiff Grisham, who purchased his device through Sprint's telesales, was told

8    by Sprint's representatives that the Terms and Conditions were part of the customer's agreement

9    with Sprint.  The Sprint telesales representatives further informed Grisham that the full Terms and

10   Conditions were "online and a booklet copy is provided within the handset box," and that it was

11   "important that you carefully read all the terms of the agreement."  *Id.*, Ex. DDD at 4-5.  Before

12   Grisham could complete the purchase of the Sprint phone, he had to express his oral agreement to

13   his service agreement to a Sprint representative.  *See id.* at 4; Miller Decl. ¶ 119.

14   In sum, each Sprint Plaintiff was informed of and provided with the Terms and Conditions

15   numerous times, and each Sprint Plaintiff accepted the Terms and Conditions in multiple ways in

16   addition to their usage of Sprint's wireless services (though the usage alone is independently

17   sufficient).  *See Arellano*, 2011 WL 1362165, at *3 (enforcing T-Mobile's terms and conditions

18   because they were incorporated by reference into the customer agreement, packaged in the box

19   with the customer's devices and available online or by toll-free call).  Each of the Sprint Plaintiffs

20   is bound by those Terms and Conditions of Service, including the arbitration agreement.

21                     **3.     Cricket**

22   Plaintiff White, a Texas resident, agreed to the terms of Cricket's wireless service

23   agreements, including the arbitration provision, before activating service on his device.  Plaintiff

24   White purchased a Huawei Ascend II m865 mobile device in October 2011, which he activated

25   on or about October 7, 2011.  CAC ¶ 89; Baughman Decl. ¶ 6.  Pursuant to Cricket's standard

26   practices and procedures, all customers such as Plaintiff White are provided a copy of the Cricket

27   Terms and Conditions when they purchase a mobile cell phone from Cricket.  *Id.* at ¶ 5.  These

28   Terms and Conditions are packaged with the phone that is manufactured for use on Cricket's

Fenwick & West LLP
Attorneys at Law
Mountain View

1    network.  In addition, the Cricket Terms and Conditions have been available at all relevant times

2    on Cricket's website.  *See id.* at ¶ 7, Ex. 1 (containing a copy of the current Cricket Terms and

3    Conditions, effective May 2011 to the present), Ex. 2 (containing a copy of the Cricket Terms and

4    Conditions, effective August 2010 to May 2011); *see also*

5    http://www.mycricket.com/termsandconditions (last visited on November 15, 2012).

6         By "start[ing] or us[ing] the service" with Cricket, rather than returning his mobile device,

7    Plaintiff White accepted Cricket's services and the Cricket Terms and Conditions under which

8    they were offered.  *See* Baughman Decl., Ex. 1 at ¶ 1(b).  Specifically, the Cricket Terms and

9    Conditions provide in bolded, capital letters:

10        **(b) IMPORTANT: WHEN YOU START SERVICE OR USE THE SERVICE**
         **BY, FOR EXAMPLE, PLACING A CALL, SENDING A MESSAGE OR**
11       **TRANSMITTING DATA ON THE CRICKET WIRELESS SYSTEM OR**
         **ANOTHER SYSTEM THAT'S AGREED TO CARRY OUR SERVICES,**
12       **YOU INDICATE YOUR ACCEPTANCE OF THIS AGREEMENT. IN**
         **ADDITION, EACH TIME YOU PAY FOR SERVICE FROM US, YOU**
13       **CONFIRM YOUR ACCEPTANCE OF THIS AGREEMENT. IF YOU DO**
         **NOT WANT TO ACCEPT THIS AGREEMENT, DO NOT START**
14       **SERVICE OR USE THE SERVICE AND RETURN YOUR WIRELESS**
         **DEVICE, UNUSED AND WITH THE ORIGINAL RECEIPT AND ALL**
15       **PACKAGING AND ACCESSORIES, TO THE STORE WHERE**
         **PURCHASED WITHIN THE RETURN PERIOD SET BY THAT STORE**
16       **FOR A REFUND.**

17   *Id.* (emphasis in original)

18        Based on Cricket's standard business practices, Plaintiff White was provided with a hard

19   copy of the Cricket Terms and Conditions when he purchased his Huawei Ascend II m865 mobile

20   device.[15]  Plaintiff White's activation of phone service on or about October 7, 2011, as well as his

21   failure to return his wireless device unused and with the original receipt and all packaging and

22   accessories constituted acceptance of the Cricket Terms and Conditions then in effect.

23   Furthermore, according to Cricket's business records, Plaintiff White did not at any time exercise

24   his right to opt-out of Cricket's arbitration clause.  *See* Baughman Decl. ¶ 8.  Thus, by initiating

25   and using Cricket wireless service, Plaintiff White agreed to and was bound by the Cricket Terms

26   and Conditions, including its prominent arbitration clause.

27   ───────────────
     [15] Plaintiff White also was provided with and assented to the Cricket Terms and Conditions when
     he purchased and activated a wireless device with Cricket service on or about October 18, 2010.
28   *See* Baughman Decl. ¶ 5.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    Courts applying the law of Texas, where White resides, routinely have enforced terms of

2  service similar to the Cricket Terms and Conditions, often referred to as "shrinkwrap" or "accept-

3  or-return" agreements.  In *Provencher v. Dell, Inc.*, for example, the District Court for the Central

4  District of California applied Texas law to hold that a standard "approve-or-return" contract,

5  including its arbitration provision, was enforceable against a plaintiff who had purchased a

6  computer online.  409 F. Supp. 2d 1196 (C.D. Cal. 2006).  As the court summarized, "The plain

7  and clear terms of the arbitration provision and class action waiver were disclosed not only on

8  Dell's website before, during, and after [plaintiff] placed his online order for the computer, but

9  also in the sales contract and packaging slip that accompanied the computer when it was delivered

10 to him.  Although [plaintiff] had 30 days to return the computer and not accept the arbitration

11 provision and class action waiver, [plaintiff] decided to keep the computer and be bound by those

12 provisions."  *Id.* at 1205.  *See also Falbe v. Dell, Inc.,* No. 04-C-1425, 2004 WL 1588243, at *4

13 (N.D. Ill. July 14, 2004) (applying Texas law) ("it is plain that [Plaintiff's] conduct, *i.e.*, keeping

14 the computer beyond 30 days, manifested his assent to the Terms and Conditions, and created a

15 valid and enforceable agreement to arbitrate"); *Adams v. Dell Computer Corp.,* No. CIV A C-06-

16 089, 2006 WL 2670969, at *4 (S.D. Tex. Sept. 18, 2006) (enforcing Dell's arbitration provision);

17 *see generally Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149-50 (7th Cir. 1997) (compelling

18 arbitration because customers were deemed to have accepted Gateway's arbitration clause by not

19 returning the computer within 30 days and holding that "[c]ompetent adults are bound by [terms

20 enclosed in the Gateway computer packaging], read or unread"); Section III.A.2 *supra* (collecting

21 additional cases enforcing shrinkwrap agreements).

22    More specifically, courts have repeatedly found acceptance and agreement in similar

23 circumstances in the wireless context.  For example, in *Briceño v. Sprint Spectrum*, *L.P.*, where a

24 customer sued Sprint for invasion of privacy, Sprint moved to compel arbitration arguing that its

25 Terms and Conditions, customarily included in the packaging of its phones, required the parties to

26 arbitrate their dispute.  911 So.2d 176, 177-78 (Fla. Ct. App. 2005).  The court rejected the

27 argument by plaintiff that she was not provided a copy of Sprint's Terms and Conditions with her

28 original telephone and ordered the case to arbitration, noting that "it [was] undisputed that

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  [plaintiff] had access to the Terms and Conditions and its subsequent amendments via Sprint's

2  website," and that plaintiff's failure to avail herself of this information was not determinative.

3  *See id.* at 178, 180.  Similarly, in *Chandler v. AT&T Wireless Servs., Inc.*, the court enforced

4  AT&T Wireless's arbitration clause against a customer where the packages of all phones sold by

5  AT&T Wireless at the time included a welcome guide containing the Terms and Conditions for

6  wireless service—with the arbitration clause—as well as instructions for using the phone and the

7  return policy.  358 F. Supp. 2d at 702.  The court stated, "By using her phone rather than

8  canceling immediately, or no later than thirty days after her activation date, [plaintiff] accepted

9  the offered services and the terms and conditions under which they were offered.  She had a clear

10  mechanism and reasonable opportunity to reject them."  *Id.* at 704.

11       Accordingly, Plaintiff White is bound by the Cricket Terms and Conditions.

12  **B.    The Arbitration Agreements Are Enforceable**

13       Under the FAA and its strong policy in favor of arbitration, "the party resisting arbitration

14  bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree*

15  *Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000) (citation omitted); *see also Sullivan v.*

16  *Lumber Liquidators, Inc.*, No. C-10-1447 MMC, 2010 WL 2231781, at *3 (N.D. Cal. Jun. 2,

17  2010) ("the party opposing arbitration has the burden of proving the arbitration provision is

18  unconscionable").  Any challenges that go to the enforceability of the entire agreement rather than

19  the arbitration provision in particular should be determined by the arbitrator, not the court.  *See*

20  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-46 (2006); *Prima Paint Corp. v.*

21  *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).

22       To determine whether a valid, enforceable arbitration agreement exists, a district court

23  must look to state law.  *Mundi v. Union Sec. Life Ins. Co.,* 555 F.3d 1042, 1044-46 (9th Cir. 2009)

24  ("In determining whether parties have agreed to arbitrate a dispute, we apply 'general state-law

25  principles of contract interpretation, while giving due regard to the federal policy in favor of

26  arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.'").

27  Although Section 2 of the FAA permits courts to declare arbitration agreements unenforceable

28  "upon such grounds as exist at law or in equity for the revocation of any contract," the U.S.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Supreme Court has made clear that "[t]his savings clause permits agreements to arbitrate to be

2   invalidated by 'generally applicable contract defenses, such as fraud, duress, or

3   unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning

4   from the fact that an agreement to arbitrate is at issue." *Concepcion,* 131 S. Ct. at 1746 (citations

5   omitted).  None of these contract defenses applies to the arbitration agreements at issue in this

6   litigation and Plaintiffs have not raised such allegations.

         **1.   ATTM**

8        ATTM's Wireless Service Agreement provides that "[t]he law of the state of [a

9   subscriber's] billing address shall govern this Agreement except to the extent that such law is

10  preempted by or inconsistent with application of federal law."  Dobbs Decl., Ex. 2 at 15;

11  Throckmorton Decl., Ex. 2 at 32.  Here, the three ATTM Plaintiffs reside in California, Maryland

12  and Texas.  CAC ¶¶ 10, 18, 21.  As set forth above, the burden falls on Plaintiffs to prove why,

13  under the laws of California, Maryland and Texas, the ATTM Wireless Service Agreement

14  cannot be enforced with respect to the ATTM Plaintiffs.

15       Plaintiffs cannot meet their burden.  Since *Concepcion* was decided, courts have

16  uniformly held that ATTM's arbitration provision is fully enforceable.  *See, e.g., Cruz v. Cingular

17  Wireless, LLC,* 648 F.3d 1205, 1215 (11th Cir. 2011) (upholding arbitration clause because the

18  *Concepcion* court concluded that "ATTM's provision ensured that aggrieved customers who filed

19  claims would be essentially guaranteed to be made whole") (internal quotation marks omitted);

20  *Coneff v. AT&T Corp.,* 673 F.3d 1155, 1159 (9th Cir. 2012) (same); *Blau v. AT&T Mobility,* No.

21  C 11-00541 CRB, 2012 WL 10546 (N.D. Cal. Jan. 3, 2012); *In re Apple & AT&TM Antitrust

22  Litig.,* 826 F. Supp. 2d 1168, 1172-73 (N.D. Cal. 2011); *Kaltwasser v. AT&T Mobility LLC,* 812

23  F. Supp. 2d 1042 (N.D. Cal. 2011); *Nelson v. AT&T Mobility LLC,* No. C10-4802 THE, 2011 WL

24  3651153 (N.D. Cal. Aug. 18, 2011); *In re Apple & AT&T iPad Unlimited Data Plan Litig.,* No.

25  C-10-02553 RMW, 2011 WL 2886407 (N.D. Cal. July 19, 2011).

26       Consistent with this substantial list of authority, Plaintiffs Cribbs, Pipkin and Laning must

27  arbitrate their claims against ATTM under the most recent version of ATTM's arbitration

28  agreement, which is materially equivalent to the version upheld by the Supreme Court in

DFS' CONSOLIDATED MTN TO COMPEL          20          CASE NO. 3:12-md-02330-EMC
ARBITRATION AND STAY LITIGATION

*Concepcion* and the version later upheld by the Ninth Circuit in *Coneff*. *See* Newby Decl., Ex. 6 (containing a side-by-side comparison of the ATTM arbitration agreement with the agreements upheld in *Concepcion* and *Coneff*). As the *Coneff* court held, ATTM's arbitration provision is enforceable because "'the *Concepcion* Court examined this very arbitration agreement'" and upheld it as a matter of federal law. *Coneff*, 673 F.3d at 1159 (quoting *Cruz*, 648 F.3d at 1215).

As in *Coneff*, "the arbitration agreement here has a number of fee-shifting and otherwise pro-consumer provisions, identical to those in *Concepcion*," making any attempt to avoid *Concepcion*'s holding futile. *Id*. These provisions, which are likewise present in the arbitration agreement before the Court on this motion, include: the Service Providers' obligation to cover costs of arbitration, attorneys' fees available to prevailing subscriber, and arbitration venue in the vicinity of the subscriber's billing address. *See* Newby Decl., Ex. 6 at 2-4. Furthermore, Plaintiffs have offered no facts in the CAC to demonstrate that contractual defenses such as duress or unconscionability would have any application in this case. Thus, ATTM's arbitration agreement with Plaintiffs Cribbs, Pipkin and Laning must be enforced.

**2. Sprint**

As an initial matter, the Sprint Terms and Conditions provide that "[s]ubject to federal law or unless the Agreement specifically provides otherwise, this Agreement is governed solely by the laws of the state encompassing the billing address of the Device, without regard to the conflicts of law rules of that state." Miller Decl., Ex. B at 15. Here, the thirteen Sprint Plaintiffs reside in eleven different states: Arizona, California, Connecticut, Florida, Iowa, Illinois, Kentucky, Mississippi, Michigan,[16] Texas, and Wisconsin. *See* CAC ¶¶ 9-26. Therefore, here, the burden falls on Plaintiffs to prove why, under the laws of the eleven states that apply, the Sprint Terms and Conditions cannot be enforced with respect to the Sprint Plaintiffs.

California law foreshadows the conclusion that Plaintiffs will not be able to meet their burden. *First*, though Plaintiffs may try to argue that the arbitration provision involving class

[16] With respect to Plaintiff Bobby Cline, the CAC alleges that although he currently resides in New Hampshire, "at pertinent times to this matter," he resided in Michigan. CAC ¶ 20.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

waiver is unconscionable, such arguments lack merit in the wake of *Concepcion* and *Coneff*, 673 F.3d at 1157-61 (a court cannot "invalidat[e] arbitration agreements for lacking class action provisions").[17]

*Second*, and in any event, the California Court of Appeal recently affirmed a trial court's decision to enforce Sprint's arbitration provision, ruling that challenges to the limitation in "time period for bringing claims against Sprint and the amount and type of recoverable damages" went to the contract as a whole, and were issues for the arbitrator, and not the court, to resolve. *Phillips v. Sprint PCS*, 209 Cal. App. 4th 758, 773-74 (2012), reh'g denied (Oct. 17, 2012), review filed (Nov. 5, 2012). The same conclusion should apply to any challenge Plaintiffs bring here.

### 3.    Cricket

Plaintiff White is a Cricket subscriber in the state of Texas. *See* CAC ¶ 23; Baughman Decl. ¶ 5. Thus, under the choice of law provision in the Cricket Terms and Conditions, the enforceability of Cricket's arbitration agreement should be analyzed under Texas law. *See* Baughman Decl., Ex. 1 at ¶ 21(a) ("This Agreement shall be interpreted under (1) the laws of the state in which you are a subscriber, (2) applicable federal laws, and (3) applicable tariffs."). The Texas Supreme Court has explained that "since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001); *see In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) ("The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract.") (citation omitted). Thus, the burden falls on Plaintiffs to prove why, under the laws of Texas, the Cricket Terms and Conditions, including the arbitration provision, cannot be enforced with respect to Plaintiff White.

---

[17] Furthermore, a case pending before the California Supreme Court calls into question the viability of such an argument even if it is not specifically based on a class action waiver. *See Sanchez v. Valencia Holding Co.*, 201 Cal. App. 4th 74 (2011) (superseded due to grant of review), Supreme Court Case No. S199119. This Court should, at a minimum, defer any consideration of such unconscionability challenges until the highest state court has resolved this issue.

As discussed above, terms and conditions mirroring Cricket's have repeatedly been found enforceable in the wireless device context.  *See* Section III.A.3 *supra* (discussing *Briceño v. Sprint Spectrum, L.P.*, 911 So.2d at 177-78 and *Chandler v. AT&T Wireless Servs., Inc.*, 358 F. Supp. 2d at 704).  And, in fact, courts have repeatedly and routinely enforced Cricket's arbitration provision.  *See* Newby Decl., Ex. 3 (attaching a copy of *Martinez v. Cricket Communications, Inc.*, 3d Jud. Dist., Salt Lake Cty., Utah, Case No. 090905511 (April 6, 2010)); *id.* at Ex. 4 (attaching a copy of *Bourdon v. Cricket Communications, Inc.*, 3d Jud. Dist., Salt Lake Cty., Utah, Case No. 90911758 (March 24, 2010)); *see also* RJN at 2-3.  Just as in all these cases, Plaintiff White received and had access to the applicable terms and conditions—both when he purchased his phones and on the Cricket website.  *See* Baughman Decl. ¶¶ 5-7.  He also had a clear mechanism and reasonable opportunity to reject the Cricket Terms and Conditions—either by returning his phone or by opting out of the arbitration provision.  *See id.*, Ex. 1 at ¶¶ 1(b), 20(b).  Because Plaintiff White did not return the phone or opt out of the arbitration clause, he is bound by the Cricket Terms and Conditions, including the arbitration provision.

**C.**      **Plaintiffs' Claims Are Within The Scope Of The Arbitration Agreements**

Because all Plaintiffs who are subject to this motion have agreed to arbitrate on an individual basis "all disputes" relating to or arising out of their service agreements with the Service Providers, and because, as discussed below, all of the Plaintiffs' claims turn on a dispute over whether Plaintiffs consented in their service agreements to the conduct alleged in this action and whether such conduct satisfies the service provider exception in their state and federal statutory claims, Plaintiffs' claims are covered by the arbitration provisions of the service agreements and therefore must be resolved through arbitration.  *See KPMG LLP v. Cocchi*, 132 S. Ct. 23, 24 (2011) ("Agreements to arbitrate that fall [directly] within the scope and coverage of the Federal Arbitration Act . . . must be enforced in state and federal courts.").[18]

---

[18] It cannot reasonably be disputed that all of the arbitration provisions at issue are contained within contracts "evidencing a transaction involving commerce."  9 U.S.C. § 2.  The United States Supreme Court has made clear that the required nexus to interstate commerce is low, and the FAA applies to any contract that directly or indirectly affects commerce between states.  *See, e.g., Allied-Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265,282 (1995) (termite protection contract "involved commerce" because termite protection company was a multi state firm and shipped materials from outside the state).  Certainly contracts governing the use of an interstate

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Courts have consistently held that the type of "all disputes" clause in the arbitration

2   provisions at issue here is meant to be "broad and far reaching."  *Chiron Corp. v. Ortho*

3   *Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000); *see ValueSelling Assoc., LLC v.*

4   *Temple*, No. 09-CV-1493-JM, 2009 WL 3736264, at *2 (S.D. Cal. Nov. 5, 2009) ("A clause

5   providing for the arbitration of 'any claim or controversy arising out of or relating to the

6   agreement' has been held to be the paradigm of a broad clause.") (citation omitted).  And "any

7   doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

8   *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985) (claims

9   fall within the scope of broadly defined arbitration provisions if they merely "touch" the matters

10  covered by the arbitration provision).  Accordingly, Plaintiffs' claims fit squarely within the

11  scope of the arbitration agreements, which by their terms are to be construed "broadly" and apply

12  to "any" and/or "all disputes."  *See* Dobbs Decl., Ex. 2 at 4; Throckmorton Decl., Ex. 2 at 15;

13  Miller Decl., Ex. B at 8, 14; Baughman Decl., Ex. 1, ¶ 20(c).

14      **D.    Plaintiffs Must Arbitrate Their Claims Against Carrier IQ And The OEM**
15          **Defendants Under The Doctrine Of Equitable Estoppel**

16      Because Plaintiffs' claims and allegations of lack of consent are intertwined with their

17  wireless service agreements, and are based on allegations of concerted and interdependent

18  misconduct by Defendants and Plaintiffs' Service Providers who are parties to those agreements,

19  the doctrine of equitable estoppel requires Plaintiffs to arbitrate their claims against Carrier IQ

20  and the OEM Defendants.

21          **1.    Legal Standard**

22      Non-parties to an arbitration agreement may compel arbitration under the agreement

23  where contract principles entitle them to do so.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S.

24  624, 631 (2009).  Among those principles is equitable estoppel.  *See, e.g., Mundi*, 555 F.3d at

25  1045-46; *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d at 1176; *Amisil Holdings Ltd. v.*

26

27  communications service satisfy this nexus to interstate commerce.  Indeed, Plaintiffs' claims that
    use of the Carrier IQ software on their mobile devices violated the Federal Wiretap Act requires
    proof of the interception of wire or electronic communications affecting interstate commerce.  18
28  U.S.C. § 2510(1), (12).

*Clarium Capital Mgmt.,* 622 F. Supp. 2d 825, 831-841 (N.D. Cal. 2007); *ValueSelling Assocs.*, 2009 WL 3736264, at *6 ("a non-signatory [defendant] to a contract containing an arbitration provision can compel arbitration under [an equitable estoppel theory]").  Further, "arbitration is more likely to be [compelled] when the party resisting arbitration is a signatory" as Plaintiffs are here.  *Brown v. Gen. Steel Domestic Sales, LLC,* No. CV 08-00779 MMM (SHx), 2008 WL 2128057, at *6 (C.D. Cal. May 19, 2008) ("The courts clearly recognize a nonsignatory's ability to force a signatory into arbitration … when the relationship of the persons, wrongs and issues involved is a close one.") (citation omitted).

Courts applying the equitable estoppel doctrine have ordered parties to arbitrate disputes with non-parties to the agreement (also referred to as non-signatories) in at least two circumstances.  *In re Apple & AT&TM Antitrust Litig.,* 826 F. Supp. 2d at 1176 (citing *Jones v. Deutsche Bank AG, et al.,* No. C 04-05357 JW (N.D. Cal., filed April 26, 2007) (Ware, J.)).  *First,* a non-party may compel arbitration where a signatory's claims against a non-party are intertwined with a contract containing the arbitration agreement.  *See In re Apple iPhone 3G,* 859 F. Supp. 2d at 1096-97; *Hawkins,* 423 F. Supp. 2d at 1050; *see also Amisil Holdings,* 622 F. Supp. 2d at 841.

*Second,* a non-party may compel arbitration where there is a sufficiently close "relationship" between the non-signatory and a party to the agreement.  *See In re Apple iPhone 3G,* 859 F. Supp. 2d at 1096.  Such a relationship exists where there are allegations of "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  *Hawkins,* 423 F. Supp. 2d at 1050 (citation omitted).  Put another way, estoppel requires arbitration with a non-signatory where the claims against the non-signatory could not be considered without analyzing the conduct of a party to the agreement or its agents.  *See Morselife Found., Inc. v. Merrill Lynch Bank & Trust Co., FSB,* No. 09-81143-CIV, 2010 WL 2889932, at *4 (S.D. Fla. Jul. 21, 2010) (granting non-signatory's motion compel arbitration where "none of [signatory plaintiff's] allegations against [non-signatory defendant] can be considered without analyzing the alleged conduct of employees of the other signatory" and

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   where the plaintiff signatory dropped a signatory defendant from the lawsuit as a "tactical ploy"

2   to avoid arbitration).

### 2.   Plaintiffs' Claims Are "Intertwined" With Their Wireless Service Agreements

5        The first basis for equitable estoppel is present here because Plaintiffs' claims turn on

6   whether they consented in their service agreements to the collection and use of data by their

7   Service Providers.  Plaintiffs' claims are therefore intertwined with those agreements.  *See, e.g.,*

8   *Hansen v. KPMG, LLP*,  No. 04-cv-10525-GLT (MANx), 2005 WL 6051705, at *3 (C.D. Cal.

9   Mar. 29, 2005); *NS Holdings LLC Inc. v. Am. Int'l Grp., Inc.*, No. SACV 10-1132 DOC, 2010

10  WL 4718895, at *4 (C.D. Cal. Nov. 15, 2010) (finding equitable estoppel where Plaintiffs' claims

11  involve issues that are "intertwined" with the agreement containing the arbitration provision).

12       Specifically, Plaintiffs' claims for violation of federal and state wiretap statutes, the

13  Stored Communications Act, Computer Fraud and Abuse Act and state computer intrusion laws

14  are intertwined with their service agreements because Plaintiffs cannot succeed on those claims if

15  they consented to the use of Carrier IQ software by Service Providers, who licensed it from

16  Carrier IQ and required the OEM Defendants to install it.  Determining whether Plaintiffs' service

17  agreements establish such consent will necessarily require interpretation of those agreements.[19]

18       Count I of the CAC asserts a claim under the federal Wiretap Act, which provides that it

19  "shall not be unlawful under this chapter … to intercept a wire, oral, or electronic communication

20  … where one of the parties to the communication *has given prior consent to such interception*."

21  18 U.S.C. § 2511(2)(d) (emphasis added); *see also, e.g., In re State Police Litig.,* 888 F.Supp.

22  1235, 1262 (D. Conn. 1995) ("To establish a violation of Title III, therefore, *plaintiffs must prove*

23  . . . a wire, oral or electronic communication *without the callers' consent*." (emphases added)).

24  Similarly, the Stored Communications Act, Count II of the CAC, permits a provider to "divulge

25  the contents of a communication . . . with the lawful *consent* of the originator or an addressee or

---

[19] In deciding this motion, Defendants need not demonstrate, and the Court need not decide, whether Plaintiffs actually consented to the installation and use of the Carrier IQ software under the terms of their service agreements.  Rather, the point is that such consent is an issue in this litigation, and that it is bound up with the terms of Plaintiffs' agreements with their wireless Service Providers.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

intended recipient of such communication." 18 U.S.C. § 2702(b)(3) (emphasis added). Count III, which alleges violation of the Computer Fraud and Abuse Act, also requires proof of access to a protected computer "without authorization or exceed[ing] authorized access." 18 U.S.C. § 1030(a)(2). And Count IV relies on state privacy statutes, many of which are modeled on and contain the same consent provisions as the federal laws. *See, e.g.*, Ariz. Rev. Stat. § 13-3012(9), 11(b); Conn. Gen. Stat. § 53a-187; 720 Ill. Comp. Stat. 5/14-2(a)(1); N.C. Gen. Stat. § 15A-287(a); Ohio Rev. Code § 2933.52(B)(4); Tex. Penal Code § 16.02(c)(4).

Recognizing, as they must, that the absence of consent is essential to establishing liability under their claims, Plaintiffs allege throughout the CAC that Carrier IQ software was installed and used "without the knowledge or authorization of consumers." CAC ¶ 3; *see also* CAC ¶ 68 ("nonetheless, users' private text messages were intercepted and then transmitted off of their mobile devices *without their knowledge and consent*") (emphasis added)[20]; *id.* at ¶ 96(a) (identifying as a common question whether Carrier IQ software collected certain data "all *without the device owners' knowledge or consent*"); *id.* at ¶ 96(b) (same); *id.* at ¶ 102 (alleging defendants have intercepted "*without the knowledge, consent or authorization* of plaintiffs"); *id.* at ¶ 144 ("without informed consent"); *see also* CAC ¶¶ 1, 4, 41, 51, 65, 75-92, 142.

These allegations are intertwined with the terms of Plaintiffs' wireless service agreements because those agreements disclose and obtain user consent for the collection of data. Courts repeatedly have looked to service agreements, privacy policies, and applicable terms of use to determine whether users have "consented" to the collection or use of data within the meaning of the Wiretap Act and Stored Communications Act (together, the "Electronic Communications Privacy Act," or "ECPA"). *See, e.g., Kirch v. Embarq Mgmt. Co.*, No. 10-2047-JAR, 2011 WL 3651359, at *8 (D. Kan. Aug. 19, 2011) (where defendant disclosed in privacy policy that it "may use information such as the websites you visit or online searches that you conduct to deliver or facilitate the delivery of targeted advertisements" the plaintiffs "consented to monitoring by using

---

[20] Despite Plaintiffs' effort to depict a scheme to "intercept" private communications, much of the CAC merely describes the basic operation of mobile phones – they allow communication through transmission of voice and data on Service Provider networks, which necessarily requires sending data "off the device" and over Service Providers' networks.

1  [defendant's] Internet service after notice, *and that notice and consent defeats their ECPA claim*."

2  (emphasis added)); *Deering v. Centurytel, Inc.*, No. CV-1063-BLG-RFC, 2011 WL 1842859, at

3  *2-3 (D. Mont. May 16, 2011) (dismissing plaintiff's ECPA claim, holding that plaintiff

4  acquiesced his consent by using defendant's services where defendant disclosed in its privacy

5  policy that information regarding plaintiff's internet usage could be collected and used to target

6  him with advertisements).

7       As noted above, the ATTM service agreement provides that "[ATTM] collects

8  information about the approximate location of your Device," and that "other usage and

9  performance information also obtained from our network and your Device."  Dobbs Decl., Ex. 2

10  at 6 (§ 3.6).  Likewise, Sprint's privacy policy, which is referenced in its Terms and Conditions,

11  informs users that the "[i]nformation we collect when we provide you with Service includes when

12  your wireless device is turned on, how your device is functioning, device signal strength, where it

13  is located, what device you are using, what you have purchased with your device, how you are

14  using it, and what sites you visit."  Miller Decl., Ex. GGG at 1.  Sprint also informs users that

15  Sprint will use personal information to "[m]onitor, evaluate or improve our Services, systems, or

16  networks."  *Id.* at 2.  Similarly, Cricket's privacy policy, which is referenced in the Cricket Terms

17  and Conditions, informs users that it "may monitor the pattern of your communications over our

18  networks (1) to satisfy any governmental law, regulation, or order; (2) if necessary or appropriate

19  to operate our businesses; or (3) to protect our rights or property or the rights or property of

20  others."  *See* Baughman Decl., Ex. 3 at 1.  Plaintiffs dispute that these provisions in their service

21  agreements establish consent, as claimed by ATTM and Sprint in their letters to Senator Franken.

22  Because Plaintiffs' claims turn on the resolution of this dispute, which will require this Court to

23  construe the service agreements, Plaintiffs' claims are intertwined with those agreements.

24       Under similar circumstances, Chief Judge Ware recently compelled arbitration of claims

25  alleging that Apple and ATTM had violated the antitrust laws by entering a contract to sell

26  iPhones exclusively on ATTM's wireless network.  *See In re Apple & AT&TM Antitrust Litig.*,

27  826 F. Supp. 2d 1168.  In that case, the plaintiffs, purchasers of Apple iPhones, sued Apple and

28  ATTM for alleged antitrust violations.  Judge Ware granted both defendants' motions to compel

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    arbitration.  The court ruled that Apple could compel arbitration based on a theory of equitable

2    estoppel because Plaintiffs' antitrust claims would require the Court to *interpret* the wireless

3    service agreements between ATTM and its customers containing the arbitration provision.  *Id.* at

4    1178; n.22 ("Plaintiffs themselves have contended throughout this litigation that their antitrust

5    and related claims against Defendant ATTM and Defendant Apple arise from their respective

6    ATTM service contracts"); *see also Garcia v. Stonehenge, Ltd.*, No. C-97-4368-VRW, 1998 WL

7    118177, at *6 (N.D. Cal. Mar. 2, 1998) (holding that plaintiff's commercial misrepresentation

8    claim arose from the licensing and distribution agreement containing the arbitration clause

9    because the court was required to determine plaintiff's rights under the agreement to determine if

10   defendants misrepresented the nature and extent of plaintiff's rights to market and distribute the

11   products at issue).

12          The same result is required here.  Because Plaintiffs have agreed to arbitrate any claim

13   relating to their service agreements with ATTM, Sprint, and Cricket, and now assert claims

14   intertwined with those agreements, they are estopped from refusing to arbitrate against Carrier IQ

15   and the OEM Defendants.

16          Courts have compelled arbitration even in cases where the plaintiffs' claims depend on the

17   *existence*—not the interpretation—of the contract containing the arbitration agreement.  In *In re*

18   *Apple iPhone 3G*, for example, Chief Judge Ware granted Apple's motion to compel arbitration

19   where consumer plaintiffs' claims existed by virtue of the wireless service by ATTM (to which

20   Apple was not a party).  *In re Apple iPhone 3G,* 859 F. Supp. 2d at 1096-97.  There, the plaintiffs

21   brought claims against Apple and ATTM, alleging that they had overpaid to use Apple's iPhones

22   on ATTM's network due to alleged network problems and sought remedies for entering into their

23   service agreements with ATTM.  *Id.*  The ATTM service agreement contained an arbitration

24   provision, but the Apple sales contract did not.  The Court held that, based on these allegations,

25   "it necessarily follows that [p]laintiffs' allegations are 'intertwined' with their contracts with

26   Defendant ATTM, insofar as Plaintiffs only had access to the ATTM 3G network because they

27   had signed contracts with Defendant ATTM which granted them access to that network."  *Id.*  A

28   number of other courts have reached similar holdings.  *See, e.g., Amisil Holdings,* 622 F. Supp. 2d

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

at 841 (holding that plaintiffs "cannot use the Agreement as a sword and at the same time choose to ignore it as a shield" because the "claims are related to the Agreement in a way that either refers to or presumes the existence of the Agreement" such that "[a]bsent the Operating Agreement, none of [plaintiffs'] claims would lie").

Similarly, each of Plaintiffs' claims here "makes reference to or presumes the existence of" those agreements. *Id.* at 840 (citing *Hawkins*, 423 F. Supp. 2d at 1050). The gravamen of Plaintiffs' complaint is that their privacy rights were violated by the installation and use of Carrier IQ software on their phones without their consent. CAC ¶¶ 2-3. As explained above, the vast majority of Plaintiffs purchased their phones through retail channels controlled by the Service Providers and used them on their wireless networks. And, as Plaintiffs admit in prior complaints and documents incorporated by reference in the CAC, it was the Service Providers who licensed the software from Carrier IQ and directed the OEM Defendants to install it. In other words, Plaintiffs obtained and used phones containing Carrier IQ software pursuant to their service agreements with the Service Providers, and thus would have no claim against Carrier IQ or the OEM Defendants if it were not for those agreements.

Finally, Plaintiffs' claims are intertwined with their service agreements for the additional reason that Plaintiffs' Implied Warranty of Merchantability claims against the OEM Defendants rely on the terms of the service agreements. Plaintiffs allege that the OEM Defendants had impliedly warranted to Plaintiffs that their mobile devices were merchantable, citing to Cal. Com. Code § 2314. CAC ¶ 166. However, section 2324 of the California Commercial Code provides that an implied warranty that the goods shall be merchantable is found "in a ***contract for their sale if the seller is a merchant with respect to goods of that kind.***" Cal. Com. Code §2314(1) (emphasis added); *see also* Tex. Bus. & Com. Code Ann. §2.314 (same); MD. Code Com. Law § 2-314 (same). As established above, Plaintiffs purchased their mobile devices ***from the wireless Service Providers*** and the contracts that govern Plaintiffs' purchase of the mobile device are the wireless service agreements. *See, e.g., Ford Motor Co. v. Ables*, 207 Fed. Appx. 443, 447 (5th Cir. 2006) (holding that plaintiff's purchase of the vehicle was governed by the retail installment contract containing the arbitration clause and rejecting plaintiff's argument that the retail

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   installment contract was limited only to the extension of credit to purchase the vehicle because it

2   was the only document in the record evidencing the purchase of the vehicle).

3         Here, the Plaintiffs must rely on the agreements to:  (1) prove that they were the buyer(s),

4   which gives them standing to bring the claim; (2) prove the sales price to serve as a measure of

5   damages because Plaintiffs seek "full refunds for their mobile devices" (CAC ¶ 158)[21]; and (3)

6   prove the date of sale to demonstrate the date that the warranty was triggered.  Accordingly,

7   Plaintiffs' claims of implied warranty against the OEM Defendants depend upon and relate to

8   rights obtained through the wireless service agreements they signed with the Service Providers.

9   *In re Apple iPhone 3G,* 859 F. Supp. 2d at 1094-95 (holding that plaintiffs' express and implied

10  warranty claims against Apple relied on and were intertwined with ATTM's Wireless Service

11  Agreement because the alleged flaws in the iPhone necessarily required a determination of the

12  sufficiency of ATTM's 3G network infrastructure and Plaintiffs' claims relied on the WSA

13  "insofar as Plaintiffs allege[d] that they were injured and lost money … pursuant to the

14  [agreement]"); *Agnew v. Honda Motor Co.*, No. 08-cv-01433 DFH-TAB, 2009 WL 1813783, at

15  *4 (S.D. Ind. May 20, 2009) (compelling arbitration of plaintiff against car manufacturer because

16  plaintiff's "claims for breach of express and implied warranties necessarily assume that the

17  warranties were provided as part of the [signatory dealer's] sale [of the car] to Agnew" and

18  "Agnew's purchase of the auto was essential to all of the other claims").[22]

19

20

21

22

---

23  [21] Notably, the prices paid for the mobile devices were also fully intertwined with the contracts
    containing the arbitration clauses, and the wireless services provided pursuant to those contracts.
24  *See Carney v. Verizon Wireless Telecom, Inc.*, No. 09CV1854 DMS WVG, 2011 WL 3475368, at
    *2 (S.D. Cal. Aug. 9, 2011) (holding that Plaintiff's cell phone was provided "in connection with
25  the Customer Agreement" in that "Plaintiff was able to purchase the phones at a discounted price
    *because* she agreed to enter into a wireless service contract … for a specified period of time.")
26  (emphasis in original).

27  [22] *See also Pullen v. Victory Woodwork, Inc.*, No. 07-CV-00417-WBS-GGH, 2007 WL 1847633,
    at *3 (E.D. Cal. June 27, 2007) (compelling arbitration of nonsignatory plaintiff's claim against
28  signatory defendants under the theory of equitable estoppel because a claim for breach of implied
    warranty is explicitly grounded in the subcontractor contract containing the arbitration provision).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**3.     Plaintiffs' Claims Rely On Alleged Concerted And Interdependent Misconduct By The Service Providers, Carrier IQ And The OEM Defendants**

**a.     The Core Allegations Of The Complaint Assume Misconduct By The Service Providers**

Although the CAC attempts to repackage Plaintiffs' claims as being solely against Carrier IQ and the OEM Defendants, allegations that those Defendants acted in concert with Plaintiffs' Service Providers remain at the heart of Plaintiffs' claims. Indeed, because the claims in the CAC are substantively no different from the allegations in Plaintiffs' original complaints concerning the Service Providers' relationships with Carrier IQ and the OEM Defendants, merely deleting references to the Service Providers in the CAC does not remove them from the core of Plaintiffs' claims. *See In re Apple iPhone 3G and 3GS "MMS" Mktg. and Sales Practices Litig.*, 864 F. Supp. 2d 451, 462-63 (E.D. La. 2012) ("*In re Apple iPhone 3G and 3GS MMS*"). Such "cosmetic modifications" do not alter the "gravamen of their allegations." *See In re Apple iPhone 3G Prod. Liab. Litig.,* No. 09–2045, 2011 WL 6019217 at *3 (N.D. Cal. Dec. 1, 2011).

Plaintiffs' Service Providers are central to the allegations of the CAC. First, the Service Providers required the OEM Defendants to install Carrier IQ software on phones manufactured for use on their networks. *See* Section II.C *supra.* Second, the Service Providers, as the users of the Carrier IQ software, specified the types of data to be collected and were the recipients of data transmitted off the phone by the Carrier IQ software. Although the CAC addresses this in cryptic terms, stating that the Carrier IQ software sent the data "off the mobile devices" to "third parties," *e.g.,* CAC at ¶¶ 1, 71, 113, 128, 134, 143, 146, 154, 168, there can be no doubt that Plaintiffs are alleging, and in fact did allege in prior complaints, that data was sent to the Service Providers, or that the Service Providers requested that data. In its letter to Congress cited in the CAC, ATTM stated that "[ATTM] collects technical data via its version of CIQ software for network and service improvement purposes. . . . [ATTM] specifies the metrics it wants the CIQ software to collect by defining a CIQ profile for that collection; CIQ then writes code designed to collect the information necessary to satisfy [ATTM]'s profile requirements." Newby Decl., Ex. 1 at 3. Similarly, Sprint's letter stated that "Carrier IQ diagnostic software is installed on approximately

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   26 million Sprint devices.  However, the Carrier IQ software tool does not collect any information

2   unless it is 'tasked' to do so by Sprint."  *Id.* at Ex. 2 at 2.  Therefore, the collection and transmittal

3   of data off Plaintiffs' phones did not result from conduct by Carrier IQ and the OEM Defendants

4   alone.  It occurred at the direction of and in conjunction with Plaintiffs' Service Providers.

5        This is exactly the type of concerted and interdependent misconduct that courts have

6   repeatedly found obligates a signatory to an arbitration agreement to arbitrate claims covered by

7   that agreement with a non-signatory.  *See In re Apple iPhone 3G*, 859 F. Supp. 2d at 1096-97

8   (finding sufficient relationship between Apple and ATTM where plaintiffs alleged "fraudulent

9   scheme" between them and earlier versions of the complaint had alleged a joint campaign to

10  make misrepresentations, actions "in concert with each other," and a "close relationship");

11  *Sanders v. Swift Transp. Co. of Arizona, LLC*, 843 F. Supp. 2d 1033, 1037-38 (N.D. Cal. 2012)

12  (compelling arbitration under theory of equitable estoppel because plaintiff alleged that non-

13  signatory defendant and signatory defendant "acted jointly in furtherance of a common scheme"

14  to treat him as an independent contractor when they should have treated and paid him as an

15  employee); *Noodles Dev. LP v. Latham Noodles, LLC*, No. CV 09-1094-PHX-NVW, 2009 WL

16  2710137, at *3 (D. Az. Aug. 26, 2009) (finding sufficient allegations of concerted and

17  interdependent misconduct where plaintiff alleged that non-signatory defendant and signatory

18  defendants attempted to induce franchisees into breaching their respective agreements with

19  plaintiff).

20       The absence of the Service Providers is especially notable here because Plaintiffs' claims

21  cannot be considered without analyzing the conduct of the Service Providers.[23]  In *Morselife*

22  *Found.*, 2010 WL 2889932, at *4, the court found it appropriate to compel arbitration where

23  "none of [signatory plaintiffs'] allegations against [non-signatory defendant] can be considered

24  without analyzing the alleged conduct of employees of the other signatory."  Plaintiffs' claims

25  will necessarily require the Court to determine a number of issues that directly implicate

26  Plaintiffs' Service Providers, including: (1) whether Plaintiffs' service agreements establish

27

28  ---
    [23] Plaintiffs themselves allege an agency relationship between the Service Providers and the OEM
    Defendants.  CAC ¶ 164.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

consent to use of the Carrier IQ software; (2) whether, even in the absence of such consent, the use of the Carrier IQ software for the benefit of the Service Providers was permitted by law under the federal and state wiretap statutes; (3) whether the Service Providers directed the OEM Defendants to install the Carrier IQ software; (4) whether the Service Providers specified the types of data to be collected and transmitted off Plaintiffs' phones; and (5) whether the Service Providers used Carrier IQ software installed on Plaintiffs' phones to collect and transmit data off of those phones.  In short, nearly every issue of fact and law raised in the CAC is directly tied to the Service Providers and their contractual relationships with their customers, the Plaintiffs. These issues are, therefore, "disputes" that Plaintiffs agreed to arbitrate under their ATTM, Sprint, and Cricket service agreements, a conclusion that Plaintiffs cannot avoid simply by making cosmetic changes to the complaint.

> **b.**  **The "Provider Exception" To The Wiretap Act Will Require Extensive Analysis Of The Interrelationship Among Carrier IQ, The OEM Defendants And The Service Providers**

Resolution of this dispute will necessarily require a determination of whether the "provider exception" to the Wiretap Act applies to both Plaintiffs' Service Providers and the Defendants in this action.[24]  Under the federal Wiretap Act (Count I of the CAC), an interception, disclosure, or use of a communication by a "provider of wire or electronic service carrier" or its "agent" is not unlawful if it is a "necessary incident to the rendition" of service by the service provider.  18 U.S.C. § 2511(2)(a)(i).  Under this "provider exception," Service Providers and their agents have the right to monitor and collect data from their networks to ensure that they are functioning at the levels and quality of service they have committed to provide to their customers. *See, e.g., United States v. Ross*, 713 F.2d 389, 392 (8th Cir. 1983) (noting that "interception would fall within the exception in subsection 2511(2)(a)(i)" where the "installer for a telephone company" engaged in "random monitoring of the telephone conversation occurred because he was attempting to check the service quality of the . . . line.  The interception of the wire

---

[24] In deciding this motion, the Court need not decide whether the provider exception provides a complete defense.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

communication occurred in the normal course of his employment while he was engaged in an activity necessary to the rendition of the service.  His activity falls squarely within the language of the exception.").[25]  The state wiretap acts cited in Count IV of the CAC have similar provider exceptions.  *See, e.g.*, Ariz. Rev. Stat. § 13-3012(11)(c); Cal. Penal Code § 632.7(b)(1); Fla. Stat. § 934.03(2)(a); 720 Ill. Comp. Stat. 5/14-3(b); Mass. Gen. Laws ch. 15 § 711(D)(1)(a); N.C. Gen. Stat. § 15A-287(c); Ohio Rev. Code § 2933.52(B)(2); Tex. Penal Code § 16.02(c)(1).

Here, the Service Providers made commitments to improve and optimize their networks and wireless service through various measures, including through the collection and analysis of user data.  Thus, as Sprint states in its network management policy, referenced in its service agreement, "Sprint is committed to providing the best wireless broadband Internet access service experience possible for all of its customers,"[26] and in the service agreement itself, Sprint "can take any action" to "optimize or improve the overall use of our networks and Services" (Miller Decl., Ex. B at 7), which references the Sprint Privacy Policy that states it "will use your personal information to do things like …. Monitor, evaluate or improve our Services, systems, or networks."  *Id.* at ¶ 130, Ex. GGG at 1-2.

Whether the Service Providers' use of Carrier IQ software enables them to optimize and improve their networks and thus is a "necessary incident to the rendition" of "service" within the meaning of the Wiretap Act's provider exception will be a critical issue to be resolved in the action.  Indeed, under the provider exception, the Service Providers' involvement in all stages of litigation in this action will be extensive, from discovery to motion practice to trial.  The provisions of their service agreements with Plaintiffs allowing them to collect and analyze data, the reasons why they chose to install and use Carrier IQ software, and the software's relationship to and effect on the performance of their networks and service will be central issues in the case.

---

[25] *See also Freedom Calls Found. v. Bukstel*, No. 05-cv-5460 SJ VVP, 2006 WL 845509, at *27 (E.D.N.Y. Mar. 3, 2006) ("Plaintiff has the right to 'intercept'; that is, receive and review" e-mails as "monitoring is necessary to ensure that current and prospective Supporter and Client email messages are answered in a timely manner."); *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-cv-1029, 2007 WL 4394447, at *6 (E.D. Pa. Dec. 13, 2007) (service provider has "right to monitor communications received by [company] via [its] server").

[26] http://www.sprint.com/legal/open_internet_information.html?ECID=vanity:networkmanagement

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  This, in and of itself, demonstrates that Plaintiffs' claims are based on the type of alleged

2  interdependent and concerted misconduct warranting application of the equitable estoppel

3  doctrine.  *See, e.g., In re Apple iPhone 3G and 3GS MMS*, 864 F. Supp. 2d at 465-66 ("where

4  claims against the nonsignatory (i.e., Apple) require the signatory nondefendant (i.e., [ATTM])

5  to, 'in essence, become[ ] a party, with resulting loss, *inter alia*, of time and money because of its

6  required participation in the proceeding,' a plaintiff may not avoid the arbitration agreement. . . .

7  [ATTM]'s participation would be required in this case, as Plaintiffs' 'primary claims' against

8  Apple require determining [ATTM]'s obligations and performance under its contract").

9           c.       **Equity And Public Policy Weigh In Favor Of Enforcing The
                      Arbitration Agreements**
10

11         Strong public policy interests justify enforcing Plaintiffs' arbitration agreements with their

12  Service Providers under the doctrine of equitable estoppel.  Where "a signatory non-defendant is

13  charged with interdependent and concerted misconduct with a non-signatory defendant," it

14  "would be especially inequitable" to permit a signatory plaintiff to avoid arbitration.  *Grigson v.*

15  *Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).  As the Fifth Circuit stated in

16  *Grigson*, "[t]he linchpin for equitable estoppel is equity-fairness."  *Id.* at 527-28.  Here, it would

17  be unfair to allow Plaintiffs to avoid arbitration simply by dropping the Service Providers as

18  defendants, when Plaintiffs' core theory of liability depends on the propriety of the Service

19  Providers' alleged use of the Carrier IQ software.  If a signatory to an arbitration agreement could

20  avoid arbitration simply by filing suit only against a party he alleged acted "at the behest" of the

21  signatory and that developed the software allegedly used by the signatory to engage in alleged

22  misconduct, the "arbitration proceedings between the two signatories would be rendered

23  meaningless and the federal policy in favor of arbitration effectively thwarted."  *Hawkins*, 423 F.

24  Supp. 2d at 1050 (quoting *Fujian Pac. Elec. Co. v. Bechtel Power Corp.*, No. C 04-3126 MHP,

25  2004 WL 2645974, at *5 (N.D. Cal. Nov. 19, 2004)).

26         Plaintiffs' strategic attempt to avoid arbitration by not naming their Service Providers as

27  defendants (as some of the earlier non-consolidated complaints did) does not change facts already

28  admitted in prior complaints and documents incorporated by reference into the CAC alleging that

the Service Providers, OEM Defendants, and Carrier IQ acted in concert.  Indeed, the Fifth

Circuit disapproved of similar strategic attempts to avoid arbitration in *Grigson*.  There, movie

producers who entered a film distribution agreement with a studio sued a non-signatory, alleging

that the non-signatory had influenced the studio's limited distribution of the film.  *Grigson*, 210

F.3d at 525-26.  Recognizing this tactic as "a quite obvious, if not blatant, attempt to bypass the

agreement's arbitration clause," the court held that principles of equitable estoppel required the

producers to arbitrate against the non-signatories.  *Id.* at 527-28, 530.

        If this case were to proceed in court, the Service Providers would likely be subject to

extensive and burdensome third-party discovery—indeed, the same discovery as if the Service

Providers had remained defendants in this action—effectively bringing the Service Providers into

the very proceedings that they contracted to avoid.  Allowing such discovery would be unfair to

the Service Providers and impede the companies' interests in low-cost, quick, and informal

dispute resolution.  *See Concepcion*, 131 S. Ct. at 1749-51 (identifying informality, cost, speed,

and efficiency as among the reasons the parties choose bilateral arbitration).  Because Plaintiffs

have agreed to arbitrate "all disputes" relating to their service agreements with ATTM, Sprint,

and Cricket, they are estopped from refusing to arbitrate claims against Carrier IQ and the OEM

Defendants that turn on those same disputes.

### E.    A Stay Pending Arbitration Is Appropriate

        This Court should stay (rather than dismiss) the litigation pending the final resolution of

any claims in individual arbitration.  Section 3 of the FAA grants the power to enter such a stay.

9 U.S.C. § 3 (when a court determines a suit should be referred to arbitration, it "shall on

application of one of the parties stay the trial of the action until such arbitration has been had").

The Ninth Circuit has explained that a stay is preferable to a dismissal, because the latter is

immediately appealable and could therefore undermine the efficiency arbitration is meant to

provide.  *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1153 n.1 (9th Cir. 2004)

("Unnecessary delay of the arbitral process through appellate review is disfavored." (internal

quotation marks omitted)); *see also Green Tree Fin.*, 531 U.S. at 87 n.2 ("Had the District Court

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    entered a stay instead of a dismissal in this case, that order would not be appealable.").  There is

2    no reason to deviate from that preference here.

3    **IV.    <u>CONCLUSION</u>**

4            For the reasons stated above, Defendants respectfully request that the Court require

5    Plaintiffs to honor their arbitration agreements and grant Defendants' motion to compel

6    arbitration and stay this case pending the resolution of all claims in arbitration.

7

8    Dated:    November 20, 2012                    FENWICK & WEST LLP

9

10                                              By: */s/ Rodger R. Cole*
                                                    Rodger R. Cole (CSB No. 178865)
11                                                  rcole@fenwick.com
                                                    Molly R. Melcher (CSB No. 272950)
12                                                  mmelcher@fenwick.com
                                                    FENWICK & WEST LLP
13                                                  801 California Street
                                                    Mountain View, CA 94041
14                                                  Telephone:  (650) 988-8500
                                                    Facsimile:   (650) 938-5200
15
                                                    Tyler G. Newby (CSB No. 205790)
16                                                  tnewby@fenwick.com
                                                    Jennifer J. Johnson (CSB No. 252897)
17                                                  jjjohnson@fenwick.com
                                                    FENWICK & WEST LLP
18                                                  555 California Street, 12th Floor
                                                    San Francisco, CA 94104
19                                                  Telephone:  (415) 875-2300
                                                    Facsimile:   (415) 281-1350
20
                                                    *Attorneys for Defendant*
21                                                  *Carrier IQ, Inc.*

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  Dated:    November 20, 2012              MUNGER, TOLLES & OLSON, LLP

2

3                                          By: /s/ Rosemarie T. Ring
                                               Rosemarie T. Ring (SBN 220769)
4                                              Rose.Ring@mto.com
                                               Jonathan H. Blavin (SBN 230269)
5                                              Jonathan.Blavin@mto.com
                                               Bryan H. Heckenlively (SBN 279140)
6                                              Bryan.Heckenlively@mto.com
                                               MUNGER, TOLLES & OLSON, LLP
7                                              560 Mission Street
                                               Twenty-Seventh Floor
8                                              San Francisco, CA  94105-2907
                                               Telephone:  (415) 512-4000
9                                              Facsimile:   (415) 512-4077

10                                             Henry Weissmann (SBN 132418)
                                               Henry.Weissmann@mto.com
11                                             MUNGER, TOLLES & OLSON, LLP
                                               355 South Grand Avenue
12                                             Thirty-Fifth Floor
                                               Los Angeles, CA  90071-1560
13                                             Telephone:  (213) 683-9100
                                               Facsimile:   (213) 687-3702
14
                                               Attorneys for Defendant
15                                             HTC America, Inc.

16

17  Dated:    November 20, 2012              COVINGTON & BURLING LLP

18

19                                          By: /s/ Simon J. Frankel
                                               Simon J. Frankel
20                                             sfrankel@cov.com
                                               Mali B. Friedman
21                                             mfriedman@cov.com
                                               COVINGTON & BURLING LLP
22                                             1 Front Street, 35th Floor
                                               San Francisco, CA 94111
23                                             Telephone:  (415) 591-6000
                                               Facsimile:   (415) 591-6091
24
                                               Attorneys for Defendant
25                                             Huawei Devices USA, Inc.

26

27

28

1  Dated:     November 20, 2012                    SHEARMAN & STERLING LLP

2

3                                                   By: */s/ James Donato*
                                                        James Donato (SBN (146140)
4                                                       jdonato@shearman.com
                                                        SHEARMAN & STERLING LLP
5                                                       Four Embarcadero Center, Suite 3800
                                                        San Francisco, CA 94111-5994
6                                                       Telephone:  (415) 616-1100
                                                        Facsimile:   (415) 616-1199
7

8                                                       *Attorneys for Defendant*
                                                        *LG Electronics MobileComm U.S.A., Inc.*
9

10  Dated:     November 20, 2012                   WINSTON & STRAWN LLP

11

12                                                  By: */s/ Norman K. Beck*
                                                        Peter C. McCabe III
13                                                      pmccabe@winston.com
                                                        Norman K. Beck
14                                                      nbeck@winston.com
                                                        Scott T. Sakiyama
15                                                      ssakiyama@winston.com
                                                        WINSTON & STRAWN LLP
16                                                      35 W. Wacker Drive
                                                        Chicago, IL  60601-9703
17                                                      Telephone:  (312) 558-5600
                                                        Facsimile:   (312) 558-5700
18

19                                                      Richard A. Lapping (SBN: 107496)
                                                        rlapping@winston.com
20                                                      WINSTON & STRAWN LLP
                                                        101 California Street
21                                                      San Francisco, CA 94111-5894
                                                        Telephone:  (415) 591-1000
                                                        Facsimile:   (415) 591-1400
22

23                                                      *Attorneys for Defendant*
                                                        *Motorola Mobility LLC*

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

DFS' CONSOLIDATED MTN TO COMPEL              40              CASE NO. 3:12-md-02330-EMC
ARBITRATION AND STAY LITIGATION

1    Dated:    November 20, 2012                      H.C. PARK & ASSOCIATES, PLC

2

3                                                     By: */s/ Wayne M. Helge*
                                                         Wayne M. Helge
4                                                        whelge@park-law.com
                                                         H.C. PARK & ASSOCIATES, PLC
5                                                        1894 Preston White Drive
                                                         Reston, VA 20191
6                                                        Telephone:   (703) 288-5105
                                                         Facsimile:   (703) 288-5139
7
                                                         *Attorneys for Defendant*
8                                                        *Pantech Wireless, Inc.*

9

10   Dated:    November 20, 2012                      SKADDEN ARPS, SLATE, MEAGHER &
                                                      FLOM LLP & AFFILIATES
11

12                                                    By: */s/ Lance A. Etcheverry*
                                                         Lance A. Etcheverry
13                                                       lance.etcheverry@skadden.com
                                                         SKADDEN ARPS, SLATE,
14                                                       MEAGHER & FLOM LLP & Affiliates
                                                         300 South Grand Avenue, Suite 3400
15                                                       Los Angeles, California 90071
                                                         Telephone:   (213) 687-5000
16                                                       Facsimile:   (213) 687-5600

17                                                       *Attorneys for Defendant Samsung*
                                                         *Telecommunications America, LLC*
18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

## <u>ATTESTATION PURSUANT TO GENERAL ORDER 45</u>

2
          I, Rodger R. Cole, attest that concurrence in the filing of this document has been obtained

3
from the signatories indicated by a "conformed" signature (/s/) in this e-filed document.  I declare

4
under penalty of perjury under the laws of the United States of America that the foregoing is true

5
and correct.

6
          Executed this 20th day of November, 2012 in Mountain View, California.

7

8
                                                    _____
                                                          */s/ Rodger R. Cole*
                                                          Rodger R. Cole

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DFS' CONSOLIDATED MTN TO COMPEL
ARBITRATION AND STAY LITIGATION

42

CASE NO. 3:12-md-02330-EMC