UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CARRIER IQ, INC., CONSUMER PRIVACY LITIGATION. | Case No. 12-MD-2330-emc<br><br>DECLARATION OF STEPHANIE MILLER |

I, Stephanie Miller, declare as follows:

1.     I am a resident of Missouri and am over the age of eighteen (18) years of age. I hold the position of Pricing Manager for Sprint. I have been in this department since 2006 and have been a Sprint employee since 2001. I have held the position of Pricing Manager for Sprint since 2008. As the Pricing Manager, I oversee and am responsible for a variety of projects related to pricing and analysis of Sprint services and customer facing policies and processes, including the point-of-sale experience and documentation, and certain operational aspects.   I make this declaration based on my personal knowledge of the information and records available to me as they are kept in the ordinary course of business, information obtained from other employees upon whom I regularly rely in the ordinary course of business, and/or my general knowledge, information and belief of the business practices of Sprint. As the Pricing Manager, I am required to be familiar with the types of customer documents and Sprint records attached to this declaration, and I have

knowledge of the exhibits as documents and records from Sprint systems and have reviewed each exhibit related to the Sprint customers discussed below. If called as a witness, I could and would testify competently to the contents of this declaration.

2. Sprint's Terms and Conditions of Service (the 'Terms & Conditions') provide for, among other things, the mandatory arbitration of all disputes between Sprint customers and Sprint. The Terms & Conditions specifically provide for arbitration on an individual basis, and preclude arbitration on behalf of a class or on a representative basis.

3. Attached as Exhibit A is a true and correct copy of the version of Sprint's Terms & Conditions, which became effective on January 1, 2010 ("the "2010 version").

4. Attached as Exhibit B is a true and correct copy of the version of Sprint's Terms & Conditions, which became effective on September 9, 2011 (the "2011 version").

5. As set forth more fully below, Sprint goes to great lengths to inform customers of its Terms & Conditions and the obligation to arbitrate disputes.

## PURCHASES THROUGH A SPRINT RETAIL STORE

6. Customers who purchase a Sprint handset and/or wireless services at a Sprint retail store (whether initiating service for the first time or adding a new line of service) are presented with a "menu" of service options and pricing in a document referred to as the "service plan guide." The service plan thereafter chosen by the customer is incorporated by reference into the customer's "Subscriber Agreement."

7. The service plan guide states that: "Your Agreement with Sprint Solutions, Inc. and its affiliates doing business as Sprint, Sprint PCS or Nextel includes terms of your service plan (including those outlined below) and the most recent Sprint Nextel Terms and Conditions of Service ('T's and C's) - carefully read all these terms which include, among other things a MANDATORY ARBITRATION of disputes provision."

8. Beginning in 2009, during the sales process in a Sprint retail store, certain terms of service are also provided to the customer through an interactive electronic process referred to as "BRAVO." BRAVO requires a customer to click-through a series of

electronic screens that inform the customer about, among other things, the general Terms & Conditions and other terms of service, including certain Sprint policies, rate plan selection information, and price information.

9. One particular BRAVO screen shown to new customers states that (1) the customer is "entering into a binding legal agreement with Sprint;" (2) this agreement incorporates the Terms & Conditions, available at the store or online; (3) "the terms set forth in the Coverage Map brochures" are part of the agreement and "Please ask a representative to provide you any part of your Agreement (plans, brochures, Ts&Cs or Coverage Map brochures) that you may be missing;" and (4) "As set forth in the [Terms & Conditions], you agree to a mandatory arbitration provision providing that (except for matters properly brought to small claims court) any legal or equitable claim, controversy or dispute of any kind between you and Sprint and/or any of its representatives, must be resolved by final and binding arbitration." The bottom of this screen requires the customer to click a box, expressly acknowledging the terms, and provide a signature following the statement: "By signing below, you (ii) agree that you have read and agreed to all terms of this Agreement, including the terms of your service plan and the Ts&Cs."

10. Another BRAVO screen shown to all customers instructs them to carefully read the Terms & Conditions and informs them that "THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES."

11. Attached as Exhibit C are true and correct copies of exemplar screen shots that a customer must click-through to complete his transaction at a Sprint retail store.

12. At the conclusion of a transaction occurring at a Sprint retail store, a "Transaction Summary" is automatically printed and given to the customer with the purchase receipt and other Sprint collateral. Sprint retains an image of the Transaction Summary on its internal system. The Transaction Summary includes the subscriber agreement and information, highlighted terms of service, other disclosures and rate plan

terms and pricing, as shown to and accepted by the customer. The Transaction Summary expressly sets forth Sprint's return policy pursuant to which a new or existing customers adding a new line of service who is "not completely satisfied with [Sprint's] network, phones, plans or customer service," can, within 30 or 14 days—depending on the time period, "simply cancel service and return your undamaged device" and "[Sprint will] give you your money back." In addition, the Transaction Summary sets forth Sprint's return policy for existing customers who upgrade to a new device, which provides that customers can return the new undamaged device and Sprint will refund the device cost and activation fee and cancel the new agreement.

13.     The Transaction Summary also specifically refers to the "MANDATORY ARBITRATION" provision that governs all disputes. The Transaction Summary further explicitly references the entire Terms & Conditions and directs the customer to Sprint's website for the most recent copy of the Terms & Conditions. In addition to being available on Sprint's website, the Terms & Conditions are available from the Sprint retail stores in paper booklet form.

14.     In addition to the Transaction Summary, Sprint customers also receive a register receipt, referred to as the "RMS receipt," at the conclusion of their transaction. Underneath the heading "SUBSCRIBER AGREEMENT," the receipt contains language that states: "You are entering into a binding legal agreement with Sprint on behalf of yourself or your company . . . . Your Service Agreement ('Agreement') includes: . . . the most recent General Terms and Conditions of Service." The RMS receipt also states, "Please ask a representative to provide you any part of your Agreement (Plans brochure, Ts&Cs, or Coverage Map brochures) that you may be missing," and also "MANDATORY ARBITRATION: As set forth in the Ts&Cs, you agree to a mandatory arbitration provision providing that (except for matters properly brought to small claims court) any legal or equitable claim, controversy or dispute of any kind between you and Sprint and/or any of its representatives, must be resolved by final and binding arbitration." The RMS receipt also

informs a customer that "By signing below, you . . . agree that you have read and agreed to all terms of this Agreement, including the terms of your service plan and the Ts&Cs.".

15. Sprint encloses a copy of the Terms & Conditions inside the box of every phone it sells, with the exception of the Apple iPhone. When a customer purchases an Apple iPhone, a hard copy of the Terms & Conditions is provided to the customer as a take away.

16. Shortly after the conclusion of each transaction Sprint mails or emails each new customer and each existing customer who upgraded a device and/or entered into a new subscriber agreement a "Contract-Confirming Letter." The Contract-Confirming Letter includes information relating to the service plan, the date that the customer entered into the Subscriber Agreement with Sprint, and the date that the Subscriber Agreement ends. The letter also contains information about Sprint's Return & Exchange Policy: The Contract-Confirming Letter also informs customers how to contact customer care and how to access their account via Sprint.com.

**Plaintiff Leron Levy**

17. Sprint's records reflect that Plaintiff Leron Levy upgraded to the M900 Slider Phone Kit ("Moment"), manufactured by Samsung, on April 30, 2010, through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

18. A copy of the Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Levy's Moment phone contained the 2010 version of the Terms & Conditions.

19. Attached as Exhibit D is a true and correct copy of the service plan guide relating to Mr. Levy's April 30, 2010 transaction.

20. Attached as Exhibit E is a true and correct copy of the signed Transaction Summary for Mr. Levy's contract dated April 30, 2010 for the Samsung Moment phone.

The Transaction Summary states, "For the most recent copy of the Sprint Terms & Conditions, please visit sprint.com/termsandconditions or dial *2."

21.     Attached as Exhibit F is a true and correct copy of the RMS receipt that Sprint retained relating to Mr. Levy's April 30, 2010 transaction.

22.     Pursuant to Sprint's thirty (30) day return policy detailed in the Transaction Summary, Mr. Levy returned his Samsung Moment on May 26, 2010 for another Samsung Moment. A copy of the Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Ms. Levy's replacement Moment phone contained the 2010 version of the Terms & Conditions.

23.     On September 4, 2011, Sprint sent Mr. Levy an invoice which informed him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Levy was encouraged to carefully review them. Attached as Exhibit G is a true and correct copy of the September 4, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Levy. *See* Exhibit B.

24.     Sprint's records reflect that Plaintiff Leron Levy upgraded to a Galaxy SIII phone, manufactured by Samsung, on November 5, 2012, through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2011 version. *See* Exhibit B.

25.     A copy of the operative Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Levy's Galaxy SIII phone contained the operative Terms & Conditions in effect at the time of purchase.

26.     Attached as Exhibit H is a true and correct copy of the signed Transaction Summary for Mr. Levy's contract dated November 5, 2012 for the Galaxy SIII phone.

27.     Attached as Exhibit I is a true and correct copy of the RMS receipt that Sprint retained relating to Mr. Levy's November 5, 2012 transaction.

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL 12-
MD-2330-emc

**Plaintiff Eric Thomas**

28.     Sprint's records reflect that Plaintiff Eric Thomas upgraded to a Replenish phone, manufactured by Samsung, on July 7, 2011, through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

29.     Sprint's records further reflect that Mr. Thomas is a long-time Sprint customer, and that he entered into at least three other contracts with Sprint since June 4, 2007. All of Sprint's Subscriber Agreements since at least 2004 have contained a mandatory arbitration clause with class waiver.

30.     A copy of the operative Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Thomas' Replenish phone contained the 2010 version of the Terms & Conditions.

31.     Attached as Exhibit J is a true and correct copy of the service plan guide relating to Mr. Thomas' July 7, 2011 transaction.

32.     Attached as Exhibit K is a true and correct copy of the signed Transaction Summary for Mr. Thomas' contract dated July 7, 2011 for the Samsung Replenish phone. The Transaction Summary states, "A copy of the Ts&Cs is contained in your device box, and is available at sprint.com/termsandconditions or you can obtain a paper copy at a Sprint retail store."

33.     Attached as Exhibit L is a true and correct copy of the RMS receipt that Sprint retained relating to Mr. Thomas' July 7, 2011 transaction.

34.     On August 28, 2011, Sprint sent Mr. Thomas an invoice which informed him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Thomas was encouraged to carefully review them. Attached as Exhibit M is a true and correct copy of the August 28, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Thomas. *See* Exhibit B.

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL 12-
MD-2330-emc

## Plaintiff Brian Sandstrom

35.     Sprint's records reflect that Plaintiff Brian Sandstrom upgraded to an Evo phone, manufactured by HTC, on November 17, 2010 as part of a multi-line account held by Jeri Gile through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A. The Terms & Conditions apply to any "phone, aircard, mobile broadband device, any other device, accessory or other product [that Sprint] sells to [a customer] or that is active on [a customer's] account with [Sprint]." *Id.*

36.     A copy of the operative Terms & Conditions is enclosed inside the box of every HTC phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Sandstrom's HTC Evo phone contained the 2010 version of the Terms & Conditions.

37.     Attached as Exhibit N is a true and correct copy of the service plan guide relating to the November 17, 2010 transaction.

38.     Attached as Exhibit O is a true and correct copy of the signed Transaction Summary for the November 17, 2010 transaction, including Mr. Sandstrom's HTC Evo phone. The Transaction Summary states, "A copy of the Ts&Cs is contained in your device box, and is available at sprint.com/termsandconditions or you can obtain a paper copy at a Sprint retail store."

39.     Attached as Exhibit P is a true and correct copy of the RMS Receipt for the November 17, 2010 transaction, including Mr. Sandstrom's HTC Evo phone. Both the Transaction Summary and the RMS Receipt reflect the Agreement that Jeri Gile, as account holder, entered into on Mr. Sandstrom's behalf.

40.     Sprint sent a Contract-Confirming Letter related to the November 17, 2010 transaction, which included information relating to the service plan, and the start and end Dates for the Service Agreement. The letter also contained a reminder regarding the "Sprint Free Guarantee": "If for any reason you are not happy, just return your phone and deactivate service" within thirty (30) days. Attached as Exhibit Q is a true and correct copy of the Contract-Confirming Letter relating to the November 17, 2010 transaction.

41.     On August 14, 2011, Sprint sent an invoice on this account to the account holder informing customers that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which the subscribers were encouraged to carefully review them. Attached as Exhibit R is a true and correct copy of the August 14, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Sandstrom. *See* Exhibit B.

**Plaintiff Bobby Cline**

42.     Sprint's records reflect that Plaintiff Bobby Cline purchased an LS670 Android phone, manufactured by LG, on May 6, 2011, through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

43.     A copy of the operative Terms & Conditions is enclosed in the box of every LG phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Cline's LG LS670 Android phone contained a copy of the 2010 Terms & Conditions.

44.     Attached as Exhibit S is a true and correct copy of the service plan guide relating to Mr. Cline's May 6, 2011 transaction.

45.     Attached as Exhibit T is a true and correct copy of the signed Transaction Summary for Mr. Cline's May 6, 2011 transaction. The Transaction Summary states, "A copy of the Ts&Cs is contained in your device box, and is available at sprint.com/termsandconditions or you can obtain a paper copy at a Sprint retail store."

46.     Attached as Exhibit U is a true and correct copy of the RMS Receipt for Mr. Cline's May 6, 2011 transaction.

47.     Sprint sent a Contract-Confirming Letter related to Mr. Cline's May 6, 2011 transaction, which included information relating to the service plan, and the start and end dates for Mr. Cline's Service Agreement. Attached as Exhibit V is a true and correct copy of the Contract-Confirming Letter relating to Mr. Cline's May 6, 2011 transaction.

48.     Sprint's records further reflect that on August 9, 2011, Mr. Cline changed the phone number connected to his LG LS670 Android phone. During the transaction, Mr.

Cline again agreed to the Terms & Conditions, as memorialized in the Transaction Summary related to the August 9, 2011 transaction, attached as Exhibit W.

49. On September 10, 2011, Sprint sent Mr. Cline an invoice which informed him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Cline was encouraged to carefully review them. Attached as Exhibit X is a true and correct copy of the September 10, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Cline. *See* Exhibit B.

50. Sprint's records further reflect that on October 2, 2012, Mr. Cline opened a new line on his account and purchased an iPhone, manufactured by Apple, and added a phone line to his contract through telesales. During the telephone transaction, Mr. Cline interacted with a Sprint representative who is trained to inform a customer that, among other things, he is entering into a binding agreement with Sprint. The training requires the representative to ask "Do you agree to the service agreement and [length of term] year term with Sprint?" and the representative must hear an audible "Yes" from the customer before proceeding. Moreover, the training requires a Sprint representative to inform a customer about where to find the paper and electronic copies of the Terms & Conditions, including the one provided in the handset's box. According to the training, the agent advises a customer to "carefully read all terms of the agreement" and provides information related to Sprint's 30-day guarantee.

51. Attached as Exhibit Y is a true and correct copy of the transcript of Mr. Cline's October 2, 2012 telephone transaction. Mr. Cline's personal and credit card information have been redacted.

**Plaintiff Patrick Kenny**

52. Sprint's records reflect that Mr. Kenny upgraded to an SPH-D700 phone, manufactured by Samsung, on September 3, 2011, through a Sprint retail store. The operative Terms & Conditions in effect at the time of the September 3, 2011 upgrade was the 2010 version. *See* Exhibit A.

59113-0077/LEGAL25196005.1

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL  12-
MD-2330-emc

53.     A copy of the operative Terms & Conditions is enclosed in the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Kenny's Samsung SPH-D700 phone contained a copy of the 2010 Terms & Conditions.

54.     Attached as Exhibit Z is a true and correct copy of the service plan guide relating to Mr. Kenny's September 3, 2011 transaction.

55.     Attached as Exhibit AA is a true and correct copy of the signed Transaction Summary for Mr. Kenny's September 3, 2011 transaction. The Transaction Summary states, "A copy of the Ts&Cs is contained in your device box, and is available at sprint.com/termsandconditions or you can obtain a paper copy at a Sprint retail store."

56.     Attached as Exhibit BB is a true and correct copy of the RMS Receipt for Mr. Kenny's September 3, 2011 transaction.

57.     On September 11, 2011, Sprint sent Mr. Kenny an invoice which informed him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Kenny was encouraged to carefully review them. Attached as Exhibit CC is a true and correct copy of the September 11, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Kenny. *See* Exhibit B.

58.     Sprint's records further reflect that Mr. Kenny had multiple lines on his account, for which he had entered into additional contracts with Sprint, all of which contained the mandatory arbitration clause. For example, on August 8, 2010, Mr. Kenny entered into a contract for an LG Touch phone through a Sprint retail store. Attached as Exhibit DD is a true and correct copy of the Transaction Summary for the August 8, 2010 transaction, and attached as Exhibit EE is a true and correct copy of the RMS Receipt for Mr. Kenny's August 8, 2010 transaction. The September 11, 2011 invoice relates to all lines on the account, including the line affected by the August 8, 2010 transaction.

**PURCHASES THROUGH A SPRINT AUTHORIZED RETAIL LOCATION**

59.     Customers who purchase Sprint's handsets and wireless service at a Sprint authorized retailer, such as Radio Shack, are also presented with the service plan guide. The service plan guide states that "Your Agreement with Sprint Solutions, Inc. and its affiliates doing business as Sprint, Sprint PCS or Nextel includes terms of your service plan (including those outlined below) and the most recent Sprint Nextel Terms and Conditions of Service (T's and C's') - carefully read all these terms which include, among other things a MANDATORY ARBITRATION of disputes provision."

60.     During the sales transaction, the customer initials and signs a Subscriber Agreement signifying that they have received Sprint's Terms & Conditions and that they agree to adhere to their terms. The Subscriber Agreement also contains information related to Sprint's 30 day satisfaction guarantee, and it recommends that the customer "carefully review" the documents that make up the Subscriber Agreement, including the Terms & Conditions and "other important terms" related to "mandatory arbitration of disputes." The Subscriber Agreement is electronically populated by the sales representative, then printed and signed by the customer. A copy is provided to the customer, who also receives other Sprint-related information, and a copy of the Subscriber Agreement is stored by the retailer.

61.     A customer also obtains a hard-copy of the operative Terms & Conditions in the handset box. The Terms & Conditions are additionally available from the authorized national retailer in booklet form.

62.     Shortly after the conclusion of each transaction Sprint mails or emails each new customer and each existing customer who upgraded a device and/or entered into a new subscriber agreement a "Contract-Confirming Letter." The Contract-Confirming Letter includes information relating to the service plan, the date that the customer entered into the Subscriber Agreement with Sprint, and the date that the Subscriber Agreement ends. The letter also contains information about Sprint's Return & Exchange Policy: The Contract-

Confirming Letter also informs customers how to contact customer care and how to access their account via Sprint.com.

**Plaintiff Luke Szulczewski**

63.    Sprint's records reflect that Plaintiff Luke Szulczewski purchased a Moment phone, manufactured by Samsung, on January 8, 2010, through a Sprint retail store. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

64.    A copy of the operative Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Szulczewski's Samsung Moment phone contained the 2010 version of the Terms & Conditions.

65.    Attached as Exhibit FF is a true and correct copy of the service plan guide relating to Mr. Szulczewski's January 8, 2010 transaction.

66.    Attached as Exhibit GG is a true and correct copy of the signed Transaction Summary for Mr. Szulczewski's January 8, 2010 contract for the Samsung Moment phone.

67.    Attached as Exhibit HH is a true and correct copy of the RMS Receipt that Sprint retained relating to Mr. Szulczewski's January 8, 2010 transaction.

68.    Sprint sent Mr. Szulczewski a Contract-Confirming Letter which included information relating to his service plan, and the start and end dates of his Subscriber Agreement. The letter also a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit II is a true and correct copy of the Contract-Confirming Letter relating to Mr. Szulczewski's January 8, 2010 transaction.

69.    Sprint's records further reflect that Mr. Szulczewski thereafter upgraded to an Evo phone, manufactured by HTC on November 17, 2010 through a Sprint national retailer, Best Buy. The 2010 version of the Terms & Conditions remained operative at that time. *See* Exhibit A.

70.    Attached as Exhibit JJ is a true and correct copy of the signed Subscriber Agreement relating to Mr. Szulczewski's November 17, 2010 transaction.

71.     A copy of the operative Terms & Conditions is enclosed inside the box of every HTC phone sold for use on Sprint's wireless network. Thus, the box containing Mr. Szulczewski's HTC Evo phone contained the operative Terms & Conditions in effect at the time of purchase.

72.     Sprint sent Mr. Szulczewski a Contract-Confirming Letter which included information relating to his service plan, the start and end dates of his Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit KK is a true and correct copy of the Contract-Confirming Letter relating to Mr. Szulczewski's November 17, 2010 transaction.

73.     On September 11, 2011, Sprint sent Mr. Szulczewski an invoice which reminded him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Szulczewski was encouraged to carefully review them. Attached as Exhibit LL is a true and correct copy of the September 11, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Szulczewski. *See* Exhibit B.

74.     Sprint's records further reflect that on October 29, 2012, Mr. Szulczewski upgraded to a Samsung L900 through the internet at Sprint.com. When Mr. Szulczewski purchased his Samsung L900 on Sprint's website, he completed a "click-through" process where he agree to, among other things, the Terms & Conditions. Specifically, Mr. Szulczewski confirmed and acknowledged his agreement to the Subscriber Agreement and the Terms & Conditions by clicking on boxes on his computer screen. The operative Terms & Conditions in effect at that time was the 2011 version. *See* Exhibit B.

75.     During the web transaction Mr. Szulczewski viewed the entire Terms & Conditions and could scroll through that document to review. Mr. Szulczewski therefore could scroll through and review the full arbitration provision. Directly underneath the box in which the Terms & Conditions appeared was the following text: "Yes, I acknowledge that I have read, understand and agree to the Terms and Conditions of my new Service

Agreement associated with my order...." Mr. Szulczewski was required to check a box acknowledging his acceptance before he could proceed to the next screen and complete the transaction. If Mr. Szulczewski had not checked the box acknowledging the agreement, he would not have been able to complete the transaction.

76. Throughout the transaction a link to the full set of Terms & Conditions was provided at the bottom of each page.

**Plaintiff Clarissa Portales**

77. Sprint's records reflect that Plaintiff Clarissa Portales purchased an A9292 WT Bar phone, manufactured by HTC, on January 6, 2011, through a Sprint authorized retailer. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

78. Attached as Exhibit MM is a true and correct copy of the signed Subscriber Agreement relating to Ms. Portales' January 6, 2011 transaction.

79. A copy of the operative Terms & Conditions is enclosed inside the box of every HTC phone sold for use on Sprint's wireless network. Thus, the box containing Ms. Portales' HTC A9292 WT Bar phone contained the 2010 version of the Terms & Conditions.

80. On September 5, 2011, Sprint sent Ms. Portales an invoice which reminded her that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Ms. Portales was encouraged to carefully review them. Attached as Exhibit NN is a true and correct copy of the September 5, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Ms. Portales. *See* Exhibit B.

81. Sprint's records further reflect that Ms. Portales also held two additional lines with service agreements for which she would have also agreed to the applicable Terms & Conditions, including the mandatory arbitration clause.

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL 12-
MD-2330-emc

**Plaintiff Colleen Fischer**

82.    Sprint's records reflect that Plaintiff Colleen Fischer purchased an Optimus phone, manufactured by LG, on June 27, 2011 through Radio Shack. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

83.    Attached as Exhibit OO is a true and correct copy of the Subscriber Agreement relating to Ms. Fischer's June 27, 2011 transaction.

84.    A copy of the operative Terms & Conditions is enclosed inside the box of every LG phone sold for use on Sprint's wireless network. Thus, the box containing Ms. Fischer's LG Optimus phone contained the 2010 version of the Terms & Conditions.

85.    Attached as Exhibit PP is a true and correct copy of the service plan guide that Ms. Fischer would have been presented with during her June 27, 2011 transaction.

86.    Sprint sent Ms. Fischer a Contract-Confirming Letter which included information relating to her service plan, and the start and end dates of her Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit QQ is a true and correct copy the Contract-Confirming Letter relating to Ms. Fischer's June 27, 2011 transaction.

87.    On August 31, 2011, Sprint sent Ms. Fischer an invoice which reminded her that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Ms. Fischer was encouraged to carefully review them. Attached as Exhibit RR is a true and correct copy of the August 31, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Ms. Fischer. *See* Exhibit B.

**PURCHASES THROUGH THE INTERNET**

**Plaintiff Michael Allan**

88.    Sprint's records reflect that Plaintiff Michael Allan purchased an Evo phone, manufactured by HTC, through the Internet at Sprint.com on August 11, 2011. When Mr. Allan purchased his HTC Evo phone on Sprint's website, he completed a "click-through" process in which he agreed to, among other things, Sprint's Terms & Conditions.

Specifically, Mr. Allan confirmed and acknowledged his agreement to the Subscriber Agreement and the Terms & Conditions by clicking on boxes on his computer screen. The operative Terms & Conditions in effect at that time was the 2010 version. *See* Exhibit A.

89.     During the web transaction, Mr. Allan was presented with the entire Terms & Conditions and he could scroll through that document to review it. Mr. Allan therefore could scroll through and review the full arbitration provision. Directly underneath the box in which the Terms & Conditions appeared was the following text: "Yes, I acknowledge that I have read, understand and agree to the Terms and Conditions of my new Service Agreement associated with my order...." Mr. Allan was required to check a box acknowledging his assent to this statement before he could proceed to the next screen and complete the transaction. If Mr. Allan had not checked the box acknowledging his agreement, he would not have been able to complete the transaction.

90.     Throughout the transaction a link to the full set of Terms & Conditions was provided at the bottom of each page.

91.     At the conclusion of the transaction, an email receipt was sent to Mr. Allan referencing Sprint's 30-day guarantee and how to access Sprint account information online, including the Terms & Conditions.

92.     Attached as Exhibit SS are true and correct copies of screen shots of the web pages Mr. Allan would have viewed and clicked-through when he purchased his HTC Evo phone through Sprint's web sales system at Sprint.com.

93.     Attached as Exhibit TT is a true and correct copy of a sample receipt received by a customer who purchased or upgraded a handset through Sprint's web sales system at Sprint.com. Mr. Allan would have received a receipt like this one.

94.     A copy of the operative Terms & Conditions is enclosed inside the box of every HTC phone sold for use on Sprint's wireless network. Thus, the box shipped to Mr. Allan containing his HTC Evo phone contained the 2010 version of the Terms & Conditions.

95.     Sprint issued Mr. Allan's first invoice on August 15, 2011.  That invoice noted that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Allan was encouraged to carefully review them.  A true and correct copy of that invoice is attached as Exhibit UU.  The change made the 2011 version of the Terms & Conditions operative as to Mr. Allan.  *See* Exhibit B.

96.     According to Sprint's records, Mr. Allen's account was terminated on August 2, 2012 for non-payment.

**Plaintiff Ryan McKeen**

97.     Sprint's records reflect that Plaintiff Ryan McKeen purchased an Epic phone, manufactured by Samsung, on September 20, 2011 through an Internet dealer.  When Mr. McKeen purchased his Samsung Epic phone online, he would have had to complete a click-through process, in which he agreed to, among other things, Sprint's operative Terms & Conditions.  Specifically, Mr. McKeen would have been required to confirm and acknowledge his agreement to the Subscriber Agreement and the Terms & Conditions by clicking on boxes on his computer screen. The operative Terms & Conditions in effect at that time was the 2011 version.  *See* Exhibit B.

98.     During the web transaction, Mr. McKeen was presented with the entire Terms & Conditions and he could scroll through that document to review it.  Mr. McKeen therefore could scroll through and review the full arbitration provision.  Directly underneath the box in which the Terms & Conditions appeared was the following text: "Yes, I acknowledge that I have read, understand and agree to the Terms and Conditions of my new Service Agreement associated with my order...."  Mr. McKeen was required to check a box acknowledging his assent to this statement before he could proceed to the next screen and complete the transaction.  If Mr. McKeen had not checked the box acknowledging his agreement, he would not have been able to complete the transaction.

99. Attached as Exhibit VV is a true and correct copy of a screen shot of a web page that Mr. McKeen would have been presented with and required to click-through when he purchased his Samsung Epic phone through the internet dealer's sales process.

100. A copy of the operative Terms & Conditions is enclosed inside the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box shipped to Mr. McKeen containing his Samsung Epic phone contained the 2011 version of the Terms & Conditions.

101. On or about September 23, 2011, Sprint sent Mr. McKeen a Contract-Confirming Letter which included information relating to his service plan, and the start and end dates of his Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit WW is a true and correct copy of the Contract-Confirming Letter relating to Mr. McKeen's September 20, 2011 transaction.

**Plaintiff Matthew Hiles**

102. Sprint's records reflect that Plaintiff Matthew Hiles purchased a Marquee phone, manufactured by LG, through the Internet at Sprint.com on September 28, 2011. When Mr. Hiles purchased his LG Marquee phone on Sprint's website, he completed a "click-through" process in which he agreed to, among other things, Sprint's Terms & Conditions. Specifically, Mr. Hiles confirmed and acknowledged his agreement to the subscriber agreement and the Terms & Conditions by clicking on boxes on his computer screen. The operative Terms & Conditions in effect at that time were the 2011 version. *See* Exhibit B.

103. During the web transaction, Mr. Hiles was presented with the Terms & Conditions and he could scroll through that document to review it. Mr. Hiles could therefore scroll through and review the full arbitration provision. Directly underneath the box in which the Terms & Conditions appeared was the following text: "Yes, I acknowledge that I have read, understand and agree to the Terms and Conditions of my new

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL 12-
MD-2330-emc

Service Agreement associated with my order ...." Mr. Hiles was required to check a box acknowledging his assent to this statement before he could proceed to the next screen and complete the transaction. If Mr. Hiles had not checked the box acknowledging his agreement, he would not have been able to complete the transaction. At the conclusion of the transaction, an email receipt was sent to Mr. Hiles referencing Sprint's 30-day guarantee and how to access Sprint account information online, including the Terms & Conditions.

104. Throughout the transaction, a link to the full Terms & Conditions was provided at the bottom of each page.

105. Attached as Exhibit SS are true and correct copies of screen shots of the web pages Mr. Hiles would have viewed and clicked-through when he purchased his LG Marquee phone through Sprint's web sales system at Sprint.com.

106. Attached as Exhibit TT is a true and correct copy of a sample receipt received by a customer who purchased or upgraded a handset through Sprint's web sales system at Sprint.com. Mr. Hiles would have received a receipt like this one.

107. A copy of the operative Terms & Conditions is enclosed inside the box of every LG phone sold for use on Sprint's wireless network. Thus, the box shipped to Mr. Hiles containing his LG Marquee phone contained the 2011 version of the Terms & Conditions.

108. On or about September 30, 2011, Sprint sent Mr. Hiles a Contract-Confirming Letter which included information relating to his service plan, and the start and end dates of his Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit XX is a true and correct copy of the Contract-Confirming Letter sent to Mr. Hiles relating to his September 28, 2011 transaction.

109. According to Sprint's records, Mr. Hiles account was cancelled on May 7, 2012 due to non-payment.

**Plaintiff Dao Phong**

110.     Sprint's records reflect that Plaintiff Dao Phong purchased a Centro phone, manufactured by Palm, through the internet at Sprint.com on April 9, 2008. Thereafter, Mr. Phong upgraded to a Treo phone, manufactured by Palm, through Sprint's customer care department on March 27, 2009. Mr. Phong was asked to, and did, agree to Sprint's operative Terms & Conditions in connection with those purchases. The Terms & Conditions in effect at the time of both purchases was the 2008 version. A true and correct copy of the Terms & Conditions in effect during 2008 are attached as Exhibit YY.

111.     Sprint's records reflect that on July 25, 2010, Mr. Phong transferred his line of service to a different account, for which the account holder was and remains Ms. Angie Phong. Sprint's records further reflect that three days after the transfer, on July 28, 2010, Mr. Phong upgraded to an Evo phone, manufactured by HTC, through an indirect dealer, FoneArt Communications. The Terms & Conditions in effect at the time of the transaction were the 2010 version. *See* Exhibit A.

112.     A copy of the operative Terms & Conditions is enclosed inside the box of every HTC phone sold for use on Sprint's wireless network. Thus, the box shipped to Mr. Phong containing his HTC Evo phone contained the 2010 version of the Terms & Conditions.

113.     As account holder, Ms. Angie Phong would have entered into an agreement with Sprint on behalf of Mr. Phong in connection with the July 28, 2010 upgrade. Attached as Exhibit ZZ is a true and correct copy of a sample contract a customer who purchased or upgraded a handset through an indirect retailer would have signed at the time Mr. Phong upgraded to the HTC Evo phone. Ms. Angie Phong would have signed an agreement on Mr. Phong's behalf substantially similar to the sample contract.

114.     Sprint sent Ms. Angie Phong a Contract-Confirming Letter which included information relating to her service plan, and the start and end dates of her Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction

DECLARATION OF STEPHANIE MILLER
IN SUPPORT OF MOTIN TO COMPEL 12-
MD-2330-emc

guarantee. Attached as Exhibit AAA is a true and correct copy of the Contract-Confirming Letter sent to Ms. Phong relating to Mr. Phong's July 28, 2010 upgrade transaction under her account.

115. On August 15, 2011, Sprint sent Ms. Phong an invoice regarding her account, including the Mr. Phong's line, which informed her that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Ms. Phong was encouraged to carefully review them. Attached as Exhibit BBB is a true and correct copy of the August 15, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Ms. Phong. *See* Exhibit B.

116. Sprint's records further reflect that on September 30, 2012, Mr. Phong and Ms. Phong each upgraded to an iPhone 5, manufactured by Apple, through the Internet at Sprint.com. When Mr. and Ms. Phong purchased their Apple iPhone 5s on Sprint's website, they completed a "click-through" process where they agreed to, among other things, the Terms & Conditions. Specifically, Mr. and Ms. Phong confirmed and acknowledged their agreement to the Subscriber Agreement and the Terms & Conditions by clicking on boxes on their computer screen. The operative Terms & Conditions in effect at that time was the 2011 version. *See* Exhibit B.

117. During the web transaction, Mr. and Ms. Phong were presented with the Terms & Conditions and they could scroll through that document to review it. Therefore, Mr. and Ms. Phong could scroll through and review the full arbitration provision. Directly underneath the box where the Terms & Conditions appeared was the following text: "I've read and agree to the terms and conditions of my order. THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." Mr. and Ms. Phong were required to check a box acknowledging their assent to this statement before they could proceed to the next screen and complete the transaction. If Mr. and Ms. Phong had not checked the box acknowledging their agreement, they would not have been able to complete the transaction.

118.    Sprint sent Ms. Phong a Contract-Confirming Letter which included information relating to her service plan, and the start and end dates of her Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit CCC is a true and correct copy of the Contract-Confirming Letter sent to Ms. Phong relating to Mr. Phong's September 30, 2012 upgrade to an iPhone 5 under her account.

## PURCHASES THROUGH THE TELEPHONE

### Plaintiff Shawn Grisham

119.    Sprint's records reflect that on March 23, 2011, Plaintiff Shawn Grisham upgraded to an SPH-D700 Qwery phone, manufactured by Samsung, through telesales. During the telephone transaction, Mr. Grisham interacted with a Sprint representative who is trained to inform a customer that, among other things, he is entering into a binding agreement with Sprint. The training requires the representative to ask "Do you agree to the service agreement and [length of term] year term with Sprint?" and the representative must hear an audible "Yes" from the customer before proceeding. Moreover, the training requires a Sprint representative to inform a customer about where to find the paper and electronic copies of the Terms & Conditions, including the one provided in the handset's box. According to the training, the agent advises a customer to "carefully read all terms of the agreement" and provides information related to Sprint's 30-day guarantee.

120.    Attached as Exhibit DDD is a true and correct transcript of the March 23, 2011 telephone transaction in which Mr. Grisham clearly agreed to the Sprint Terms & Conditions, and the Sprint representative clearly followed the required training process described above. The transcript has been redacted to protect personal information, such as credit card number, security code, expiration date and billing address.

121.    A copy of the operative Terms & Conditions is enclosed in the box of every Samsung phone sold for use on Sprint's wireless network. Thus, the box containing Mr.

Grisham's Samsung SPH-D700 Qwerty phone contained a copy of the 2010 version of the Terms & Conditions.

122. Sprint sent a Contract-Confirming Letter to Mr. Grisham relating to his March 23, 2011 telephone transaction, which included information relating to the service plan, and the start and end dates of his Subscriber Agreement. The letter also contained a reminder regarding Sprint's 30-day satisfaction guarantee. Attached as Exhibit EEE is a true and correct copy of the Contract-Confirming Letter relating to Mr. Grisham's March 23, 2011 transaction.

123. On August 27, 2011 Sprint sent the account holder on Mr. Grisham line an invoice which informed him that Sprint was making changes to its Terms & Conditions effective September 9, 2011, and provided a link at which Mr. Grisham was encouraged to carefully review them. Attached as Exhibit FFF is a true and correct copy of the August 27, 2011 invoice. The change made the 2011 version of the Terms & Conditions operative as to Mr. Grisham. *See* Exhibit B.

124. Prior to the March 23, 2011 transaction, Mr. Grisham also previously entered into Subscriber Agreements with Sprint during transactions on December 21, 2010 and September 22, 2009, both through a Sprint authorized retailer. Each of those Subscriber Agreements included a mandatory arbitration clause.

## UNABLE TO LOCATE PLAINTIFF MARK LANING

125. Sprint has no record that Plaintiff Mark Laning was ever a Sprint customer on the line provided in this litigation, and has no record of the telephone number he has provided through his counsel. Sprint does not sell, and has never sold, the Pantech P500 phone.

## SPRINT'S PRIVACY POLICY

126. Sprint maintains a Privacy Policy. The Privacy Policy is referenced in the Terms & Conditions, which informs each customer that "Our Privacy Policy is available on

our website. To review the policy, visit www.sprint.com/legal/privacy.html. This policy may change from time to time, so review it with regularity and care."

127. A link to the Privacy Policy is also available to customers on the Sprint home page, and Sprint maintains a page of its website dedicated to privacy FAQs.

128. The Transaction Summary provided to Sprint customers at a Sprint retail store and the Subscriber Agreement provided to Sprint customers at an authorized or national retailer informs the customer that: "Your privacy is important to us. To read our Privacy Policy and learn about your privacy choices - go to sprint.com/privacy." Furthermore, each invoice sent to Sprint customers informs them: "You can access Sprint's privacy policy online at sprint.com."

129. Customers can also access the Privacy Policy on their device through the SprintZone application.

130. Attached as Exhibit GGG is a true and correct copy of Sprint's Privacy Policy, which was in effect from March 1, 2010 to October 2012.

131. In October 2012, Sprint rolled out a new Privacy Policy, a true and correct copy of which is attached as Exhibit HHH. Sprint informed customers of the changes to the Privacy Policy through a message on their October 2012 invoices, an insert in their November 2012 invoice, an email to certain customers in November, a message to customers through SprintZone on their device, a notice on the Sprint.com/privacy, Sprint Mobile Advertising and Analytics program landing page, an update to the Privacy FAQs and a banner on sprint.com that advised customers of the new Privacy Policy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: __11-19__, 2012          By __Stephanie Miller__
                                    Stephanie Miller