JOINT SUBMISSION
*In re Carrier IQ, Inc. Consumer Privacy Litigation*, Case No. 3:12-md-2330-EMC

September 6, 2013

<u>VIA ECF</u>

Honorable Edward M. Chen
United States District Court
San Francisco, CA  94102

Dear Judge Chen:

Pursuant to the Court's Order of August 23, 2013, the parties respectfully submit this joint letter brief regarding their dispute as to plaintiffs' pending discovery requests. Notwithstanding the parties' efforts to resolve this dispute without Court intervention, they have been unable to do so.  The signatures of counsel on this letter attest that the parties have reached an impasse and require the Court's assistance to resolve this matter.

**A.       Plaintiffs' Position on the Disputed Matters**

Following the Court's issuance of its order of April 1, 2013, plaintiffs, after an in-person meet-and-confer with all appearing defendants, propounded interrogatories to all but Motorola on April 22, 2013.  Defendants could have saved the parties time by accepting plaintiffs' offer to work with them on the provision of information and limited production in response to plaintiffs' outstanding discovery requests, but they insisted on formal interrogatories.  These interrogatories sought information relevant to unconscionability issues and plaintiffs' out-of-scope defenses to the pending motion to compel arbitration.  Discovery related to plaintiffs' out-of-scope defenses is the subject of this letter.[1]

The essence of these defenses is that plaintiffs' claims are not subject to arbitration because they are outside the scope of the carrier-consumer arbitration provisions which the defendants seek to invoke.  For example, if Carrier IQ software-equipped devices were (a) transmitting, or capable of transmitting, consumer content even when the devices were operating over Wi-Fi only, rather than via the carriers' networks (including when consumers no longer are customers of the carriers); or (b) logging and sending the content of text messages to Google Inc. ("Google") or various application developers, defendants cannot force plaintiffs to arbitrate claims based in part on those facts.  Arbitrating such claims was not contemplated by the parties to the arbitration agreements.

Defendants served objections and answers to plaintiffs' April 22 interrogatories on May 28, 2013.  Then, pursuant to the Court's suggestion in its April 1 order, and after continuing efforts to secure pertinent information and material from the non-party carriers and Google, plaintiffs sought follow-up production and information from the defendants, including by way of letters dated July 24 and July 26, 2013.  These letters contained plaintiffs' offer of compromise, by which they sought the production of scope-related material and information consisting of: (a) so-called Profiles (discussed below), which were called into explicit question by defendants' answers to Interrogatories 8 and 9; and (b) answers to Interrogatories 11-13.  (*See* Attachment A (plaintiffs' Apr. 22 interrogatories to defendants).)  Defendants have refused these requests.

Underpinning the plaintiffs' out-of-scope defenses is the foundational principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Communications Workers*

---

[1] Plaintiffs continue to seek information pertinent to unconscionability issues from the carriers.  The defendants have represented that they have provided plaintiffs all responsive information in their possession.  It bears underscoring, however, that *defendants* have invoked the carriers' arbitration provisions, and they could and should have worked with the carriers to get plaintiffs the discoverable information to which they are entitled.

Judge Edward M. Chen
September 6, 2013
Page 2

of Am., 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Put another way, "[a] court may order arbitration of a particular dispute *only where the court is satisfied that the parties agreed to arbitrate that dispute.*" *Granite Rock Co. v. International Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010) (emphasis added).  "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation *or applicability* of the specific arbitration clause that a party seeks to have the court enforce." *Id.* (emphasis added).  Thus, a court must determine "whether [the dispute] falls within the scope of the parties' agreement to arbitrate." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).[2]

The inquiry as to scope entails discovery given the burden placed on the plaintiffs to show that the carrier arbitration provisions are not applicable to their claims.  *See Livingston v. Assocs. Fin., Inc.*, 2001 U.S. Dist. LEXIS 8678, at *10 (N.D. Ill. June 22, 2001) ("[I]t seems axiomatic that, if the Supreme Court places a burden of proof [regarding arbitrability] on a party, then that party must be given an opportunity to pursue discovery related to the issue that it has the burden to prove.").  In fact, there is a summary judgment-like standard applicable to defendants' motion that also contemplates discovery.  *See Taleb v. AutoNation USA Corp.*, 2006 U.S. Dist. LEXIS 83044, at *6-7 (D. Ariz. Nov. 13, 2006) (noting that an arbitration agreement is put "in issue" under the FAA "only if Plaintiff can identify 'a triable issue concerning the . . . scope of the agreement'" and further noting that "the burden is properly upon the Plaintiff to produce specific facts showing that such a triable issue exists.") (citations omitted).

Moreover, the Court in its Order of April 1 stated that it did "not agree with Defendants that all [such] discovery is off limits."  Plaintiffs have targeted the follow-up discovery at issue to fall within the letter and spirit of the Court's April 1 decision.

## 1.    Follow-up regarding extra-cellular-network and out-of-contract transmittals

In their April 22 interrogatories, plaintiffs asked defendants if Carrier IQ software (as defined in the interrogatories) transmitted or caused the transmittal of consumer information or data when it is disconnected from the pertinent cellular carrier's network, "particularly over Wi-Fi or by direct connection to an Internet-capable device," for example, via connection to an "Internet-capable computer."  (Interrog. No. 8.)  They also asked if Carrier IQ software transmitted or caused the transmittal of consumer information or data when mobile devices are no longer in contract with the pertinent carrier.  (Interrog. No. 9.)

Additionally, plaintiffs asked defendants if Carrier IQ software (a defined term) saw, processed, logged, or transmitted various categories of confidential consumer content (Interrog. No. 11); which carrier contract terms it contended permitted such any activity (Interrog. No. 12); and whether Carrier IQ software had been removed from consumer devices, and if so, why (in order to determine if carriers had communicated to the defendants that the software was acting in an uncontemplated manner) (Interrog. No. 13).  These requests are relevant to plaintiffs' scope defenses, and defendants should be compelled to respond to them as requested in this letter.  *See*, *e.g.*, *Livingston*, 2001 U.S. Dist. LEXIS 8678, at *10.

### a.    Transmittals over Wi-Fi or other means

In its April 1 order, the Court ruled specifically that functionality in terms of the "means of transmittal is relevant to the matter at hand."  Yet to the question of whether Carrier IQ

---

[2] Defendants below misread *Mortensen v. Bresnan Commc'ns*, 722 F.3d 1151 (9th Cir. 2013).  *Mortensen* simply held that state laws that disproportionately affect arbitration agreements, such as Montana's "reasonable expectations" precedent, are preempted by the FAA.  *Id.* at 1160-1161.  The case questioned whether Montana's rule fell within the FAA's savings clause, *id.*, not whether the arbitration clause applied to the facts of the dispute in question, which it clearly did in that case.

Judge Edward M. Chen
September 6, 2013
Page 3

software-equipped devices could transmit user data or information over Wi-Fi or means other than the pertinent carriers' cellular network, defendants have provided contradictory, incomplete, and non-responsive answers, coupled with their objections.  For example, HTC responded that it did "not have knowledge of whether and by what means Carrier IQ software did or does send data from the HTC Plaintiffs' mobile devices to locations external to those mobile devices."  But then it added that "[b]ased on representations made by Carrier IQ, . . . HTC understands that Carrier IQ software is not designed to send data from the HTC Plaintiffs' mobile devices to locations external to the mobile devices unless the devices are connected to the Sprint network." (HTC Ans. to Interrog. No. 8.)  Beyond this sort of representation, HTC's fellow manufacturer defendants each stated, in essence, that they did not know the answer to the question.

Contrast this with Carrier IQ's response that it "lacks knowledge of the means by which IQ Agent software embedded on Plaintiffs' mobile devices, if any, transmitted data collected by the IQ Agent to Plaintiffs' wireless carriers or to servers hosted by Carrier IQ for Plaintiffs' wireless carriers."  (Carrier IQ Ans. to Interrog. No. 8.)  But then it went on to state that it "understands that the IQ Agent software installed on devices for use on Sprint's network transmitted data to a Sprint proxy server that required the transmission to take place over Sprint's cellular network.  Carrier IQ understands that Sprint's proxy was not capable of receiving transmissions from the IQ Agent over Wi-Fi or means other than Sprint's cellular network."  It concluded by answering that "to the extent Carrier IQ IQ Agent software on the Sprint Plaintiffs' devices transmitted data collected by the IQ Agent off of the Sprint Plaintiffs' devices, it is Carrier IQ's understanding[3] that the transmission was on Sprint's cellular network."  (*Id.*)  Note the discrepancy between Carrier IQ's representations in its own answer to plaintiffs' Interrogatory No. 8 and HTC's — HTC says that it understands from Carrier IQ that the devices were *incapable* of Carrier transmitting over Wi-Fi.  But Carrier IQ never made that representation.

Also, Carrier IQ responded that it "lacks knowledge of the means by which IQ Agent software embedded on [plaintiff] White's [Huawei Ascend II m865 mobile phone] transmitted data collected by the IQ Agent to servers hosted by Carrier IQ for Cricket."  Yet in a follow-up letter to plaintiffs dated June 14, 2013, Carrier IQ represented that in fact, plaintiff White's mobile device could upload via Wi-Fi "to servers hosted by Carrier IQ for Cricket."

To help obtain the most complete and accurate answers to the questions of whether plaintiffs' devices are transmitting user data and information over Wi-Fi or other means, and also whether plaintiffs' Carrier IQ software-equipped devices were or are capable of transmitting consumer data or information even when the consumers are no longer in contract with their carriers, plaintiffs have requested so-called Profiles from defendants.  These Profiles, which Carrier IQ programs for carriers at the carriers' request, provide software instructions to mobile devices on which Carrier IQ software is installed.  Based on Carrier IQ's public statements regarding Profiles and their control over modes of transmission; its statement in an August 5, 2013 letter that Profiles show whether "the IQ Agent was prohibited from transmitting data over Wi-Fi"; and references to Profiles in certain defendants' answers to plaintiffs' interrogatories, these Profiles are germane to plaintiffs' scope defense.  Defendants, however, have refused to produce them, saying variously that they have provided enough information already and, in some instances, that producing them would entail undue burden.

---

[3] In its follow-up letter to plaintiffs, Carrier IQ stated that its "understanding" was developed "through working with the Sprint Network and Engineering Team" and from the "Analytics and Optimization Group in AT&T Labs." Huawei's "belief" was purportedly based on the "CIQ Client submitted by Carrier IQ to Huawei," which it has refused to produce.  LGE claimed it is "not required to explain how or why it understands and believes" that its plaintiffs' devices could not transmit over Wi-Fi or when disconnected from the Sprint network.

Judge Edward M. Chen
September 6, 2013
Page 4

Plaintiffs respectfully ask that defendants be ordered to produce these Profiles.[4]  Carrier IQ, as the programmer of each Profile,[5] may itself possess all relevant copies.  Whereas Carrier IQ cited an approximate "40 hours" that it would take to gather all such Profiles, it seems reasonable that the manufacturer defendants could split the cost of that mere 40 hours with Carrier IQ in the event that Carrier IQ can indeed gather and produce each pertinent Profile.[6]

> **b.**     **Transmittals when consumers are out-of-contract with respect to the devices at issue**

Plaintiffs also asked whether Carrier IQ software transmits, or causes the transmittal of, user data or information via the devices at issue when consumers no longer intend to use the carriers' cellular networks because they are no longer under contract with the carriers.  (Interrog. No. 9.)  As the Court noted in its April 1 order, "Plaintiffs contend that they need . . . scope discovery — *i.e.*, discovery targeted to determine [if] the claims brought by Plaintiffs fall within the scope of the carrier arbitration provisions."  The foregoing question goes squarely to this need; and, for the reasons cited by the Court in permitting Wi-Fi-related discovery, plaintiffs urge that they be permitted this limited discovery related to their out-of-contract defense.

But citing the ground that several plaintiffs appeared still to be in contract with their carriers, or that Carrier IQ software allegedly had been disabled before certain plaintiffs' service was terminated, some defendants refused to answer this interrogatory fully.  The information provided is incomplete.  Plaintiffs own these devices, and will likely continue to use them after their cellular contracts expire.  Will they continue to transmit their owners' data thereafter?

Profiles are germane to this question, too.  As defendants Samsung and Pantech acknowledged in their answers to plaintiffs' Interrog. No. 9, "whether the Carrier IQ software transmits any data after a mobile device end user has terminated his network service with a wireless service provider is controlled by the profile set by the wireless service provider."  Yet these defendants, like the other defendants, have refused to produce the pertinent Profiles.  Defendants should be ordered to produce them.

---

[4] Profiles are well within the call of plaintiffs' outstanding discovery requests.  (*See* Mar. 21, 2013 Joint Ltr. Brief (Dkt. No. 155) at 5-6.)  Plaintiffs' outstanding discovery requests to Carrier IQ, which acted as an exemplar of discovery on these issues to all defendants, were attached as exhibits to the Mar. 21, 2013 joint letter brief.  (Dkt. No. 155.)

[5] *See* http://www.carrieriq.com/documents/understanding-carrier-iq-technology/6461/ (last visited Aug. 27, 2013) at p. 5 of linked Acrobat file ("Carrier IQ writes profiles for each Network Operator to gather the diagnostic information they require.").

[6] Plaintiffs have asked the carriers to provide declarations regarding aspects of the pertinent Profiles, and each has now agreed to provide a declaration or declarations in response.  The precise content of these forthcoming declarations is not yet known.  Moreover, in the plaintiffs' view, defendants have a present duty to produce the Profiles themselves for the reasons stated in this letter.

Defendants below indicate that producing profiles will be duplicative.  But this ignores the fact that their only responses regarding Sprint are admittedly "Carrier IQ understands that due to the configuration of Sprint's network, data could only be received from Carrier IQ software over the Sprint cellular network."  This in no way indicates whether Profiles permitted or instructed Wi-Fi or other non-cellular means of transmission, or whether, for example, the software caused data to be written to Android OS logs, which were then sent to Google or application developers.

Judge Edward M. Chen
September 6, 2013
Page 5

2.      **Transmittals of consumer information such as SMS text messages, including to uncontemplated third-party entities**

Plaintiffs also propounded interrogatories to defendants seeking information related to whether Carrier IQ software-equipped devices were processing, storing, or transmitting private user content such as SMS text messages, including to third-parties such as Google or application developers. (Interrog. Nos. 11-13.) If so, as discussed in many quarters, then plainly allegations based on such activity are outside the scope of the carrier-consumer contracts relied upon by defendants. Simply put, any such transmittals, especially to unrelated third-parties, were in no way contemplated by plaintiffs' agreements with the carriers, and defendants have not argued to the contrary. The carrier arbitration provisions at issue would not apply for this reason alone. Nonetheless, defendants have refused to produce the pertinent information that plaintiffs seek.

The Court noted in its April 1 order that "Plaintiffs have not explained why . . . the kind of data and to whom it was sent is relevant." As defendants well know, the issues addressed in the parties' last joint letter brief were many, and space was limited. But the rationale cited by the Court in allowing mode-of-transmittal discovery is equally applicable to discovery related to transmittals of consumers' private information or data, including to uncontemplated third-parties.

Defendants have cited no real reasons for disagreement with this logic; instead, they simply have relied on what they perceive to be a refusal by the Court to permit such discovery. But even if they claim that such transmittals somehow fall within the contracts, statements made by two of the three carriers corroborate plaintiffs' position. For example, in its letter of December 14, 2011, to Sen. Al Franken, Sprint stated that "the data collected using Carrier IQ software . . . unequivocally" does not go beyond "'technical diagnostics information.'" It also stated that it did not collect all but one item (URLs) from a list of 10 types of customer information or data (including SMS text messages) "through the profiles it has established with Carrier IQ." (AT&T made similar statements in its own letter to Sen. Franken.) The emphatic nature of Sprint's representations to Sen. Franken certainly support the proposition that if in fact Carrier IQ or implementing/interfacing software was capturing, and causing the transmittal of, consumer SMS text messages (especially if sent to third-parties such as Google or application developers), such behavior would fall well outside the scope of the carrier-consumer contracts and their arbitration provisions. (*See* Mot. To Compel Arb. at 23 (summarizing defendants' contention that plaintiffs' claims fall within the scope of the carrier arbitration provisions they invoke).) And again, defendants have taken no position to the contrary.

To reiterate: such transmittals may well have occurred, or might still be occurring. For example, the FTC's June 25, 2013 order regarding HTC indicates that certain programming led to the logging of consumer information, including SMS text messages, such that the information was available for transmittal to outsiders. (*See* www.ftc.gov/os/caselist/1223049/130702 htcdo.pdf (last visited Aug. 28, 2013) at 9 ("As a result of the active debug code, covered information was written to the Android system log, and was accessible to any third-party application with permission to read the system log, and in many instances, was also sent to HTC.").) Under the authorities cited above, and under the rationale of the Court's April 1 order, plaintiffs respectfully urge the Court to order all defendants to answer plaintiffs' April 22 Interrogatory Nos. 11-13, which were designed to elicit information regarding the processing,

Judge Edward M. Chen
September 6, 2013
Page 6

storage, and transmittal of material such as SMS text message contents, including to any outsiders.

**B.      Defendants' Position on the Disputed Matters**

The scope of discovery relating to a motion to compel arbitration is limited to the issues of formation, performance, and validity of the arbitration agreement. 9 U.S.C. § 4; *see also Meyer v. T-Mobile U.S.A., Inc.*, 836 F. Supp. 2d 994, 1006-07 (N.D. Cal. 2011); *Hodsdon v. DirectTV, LLC*, No. C 12-02827-JSW, 2012 WL 5464615, at *8 (N.D. Cal. Nov. 8, 2012) (denying discovery directed at the merits of the parties' underlying dispute). Discovery is not permitted under the Federal Arbitration Act unless Plaintiffs can demonstrate that it "is necessary" for the court to rule on the motion to compel arbitration. *Id.*

In its April 1 Order, this Court provided guidance regarding the types of arbitration-related discovery it would permit relating to Plaintiffs' unconscionability and scope defenses to Defendants' joint motion to compel arbitration. In particular with respect to scope, based on the arguments Plaintiffs made, the Court indicated scope discovery should be "targeted to the issue of how data is sent over Plaintiffs' mobile devices, particularly with respect to data captured by Carrier IQ software." Thereafter, Plaintiffs agreed to serve on each Defendant targeted interrogatories regarding their unconscionability and scope defenses.

Over the last nine months, Plaintiffs have issued two rounds of written discovery, and the parties have met and conferred and corresponded regarding Defendants' objections and responses. As a result, Plaintiffs have received sufficient discovery from Defendants to enable them to respond to the motion to compel arbitration. Specifically, Defendants have provided verified interrogatory responses and further information that (a) identify the arbitration rules and fees Defendants contend would apply to the arbitration of each Plaintiff's dispute; (b) confirm that Defendants have not previously litigated or arbitrated end user claims concerning the Carrier IQ software; and (c) respond to whether the Carrier IQ software on each Plaintiff's device had the capability of transmitting data to such Plaintiff's wireless carriers by means other than the carriers' network. Through this discovery, and in the motion to compel arbitration itself, Defendants have provided all the information Plaintiffs need to respond to Defendants' motion to compel arbitration.

Plaintiffs now seek more. The present dispute centers on Plaintiffs' attempt to seek, under the guise of "scope" discovery, what is clearly *merits* discovery on the type of data accessible to Plaintiffs' wireless carriers through use of the Carrier IQ software. *First*, Plaintiffs seek production of all Carrier IQ software "profiles" used on each Plaintiff's phone (Interrogatory Nos. 8-9), purportedly to ascertain whether the Carrier IQ software on each Plaintiff's device was capable of transmitting data to the carrier by means other than the carrier's network. But, as described below, profile data, which will require Defendants to dedicate specialized engineering resources to collect, will not give Plaintiffs any additional information on the means of transmission that Defendants have not already provided in their verified interrogatory responses and subsequent correspondence, rendering the production of profiles unnecessarily duplicative. *Second*, Plaintiffs seek discovery of facts that they do not even contend relate to the means of transmission, including descriptions of all data types accessible to the Carrier IQ software on each Plaintiff's phone, explanations of which provisions of Plaintiffs' wireless service agreements apply to those data types, and whether the Carrier IQ software has been removed from any Plaintiff's phone (Interrogatory Nos. 11-13).[7]  Plaintiffs' requests are

---

[7] Plaintiffs complain that Defendants "could have and should have worked with the carriers" to get information relating to unconscionability from the carriers *for Plaintiffs*. It is not Defendants' responsibility to obtain for Plaintiffs discovery that is not in Defendants' custody or control. Moreover, any difficulty Plaintiffs are having

Judge Edward M. Chen
September 6, 2013
Page 7

cumulative of information they already have and exceed the proper scope of arbitration-related discovery.

### 1.    Plaintiffs' "Out-of-Scope" Argument Ignores the Arbitration Agreements

As an initial matter, Plaintiffs' argument that they are entitled to additional discovery fails because the Court need look no further than the allegations of the Consolidated Amended Complaint ("CAC") and Plaintiffs' wireless service agreements to determine whether the claims are within or outside the scope of the arbitration agreements. Plaintiffs' agreements to arbitrate are contained within wireless service agreements that provide for the collection of network information. *See* Defendants' Mot. to Compel Arb. (Dkt. No. 129) at 38 (quoting provisions of ATTM, Sprint, and Cricket agreements). And the arbitration provisions expressly state that they apply to "any" and/or "all disputes" relating to each Plaintiff's wireless service agreement with his or her carrier. *See, e.g., id.* at 4-6 (quoting arbitration provisions from ATTM, Sprint and Cricket's wireless service agreements).[8]

Accordingly, even if Plaintiffs are correct that collecting certain types of data or collecting it by certain means was not "contemplated" under the wireless service agreement, that would not entitle them to additional discovery. The question of whether the agreement authorizes any particular collection is on its face related to the agreement and therefore within the broad scope of the "all disputes" clause. Thus, the discovery Plaintiffs seek goes only to the merits of the dispute, not whether that dispute is subject to arbitration; the requests incorrectly assume that the "all disputes" clause is, at least in certain instances, only as broad as the substantive terms of the wireless service agreement. Because Defendants moved to compel arbitration based on plaintiffs' allegations in the CAC and the pre-consolidation complaints, this Court need not look beyond the allegations in those pleadings to determine whether Plaintiffs' allegations fall outside the scope of the "all disputes" provisions in their arbitration agreements.[9] In addition to this global problem with Plaintiffs' position, their individual discovery requests are improper for additional reasons, as explained below.

### 2.    Carrier IQ Profiles are Cumulative of Information Plaintiffs Already Have on the "Means of Transmission"

Plaintiffs attempt to rely on alleged inconsistencies in Defendants' responses to Interrogatories 8 and 9 to justify their demand for the production of all software profiles used by the Carrier IQ software on each Plaintiff's device. No such inconsistencies exist. Carrier IQ has informed Plaintiffs of whether each Plaintiff's device was capable of transmitting data to the carriers' equipment by means other than the carrier's network by responding as follows:

- **Sprint:** Thirteen of the 18 Plaintiffs used devices on Sprint's network. Carrier IQ understands that due to the configuration of Sprint's network, data could only be received from Carrier IQ software over the Sprint cellular network.

- **AT&T:** Three Plaintiffs who are subject to the pending arbitration motion used

---

getting discovery from the carriers is a direct result of their efforts to avoid arbitration by expressly electing not to name the carriers as defendants in this case.

[8] The Ninth Circuit recently rejected an argument that terms in an arbitration agreement that are outside the "reasonable expectations" of the parties are invalid as preempted by the Federal Arbitration Act. *See Mortensen v. Bresnan Commc'ns*, 722 F.3d 1151 (9th Cir. 2013) (finding Montana's "reasonable expectations/fundamental rights" rule, which provided that "[a] provision that was not in the reasonable expectations of both parties when contracting is void as against public policy" was preempted by the FAA).

[9] Accordingly, Defendants respectfully submit that discovery into whether the Carrier IQ software sends data off the phone through means other than the carrier network is not necessary to respond to Defendant's motion. Defendants of course provided this information to Plaintiffs in accordance with the Court's order.

Judge Edward M. Chen
September 6, 2013
Page 8

       devices on AT&T's network.[10]  Plaintiff Laning uses a Pantech P5000 device that is
not Wi-Fi capable, and can transmit data to AT&T only on AT&T's wireless
network.  Plaintiffs Cribbs and Pipkin used Samsung devices which Carrier IQ
understands from AT&T had not been activated to collect data from Carrier IQ
software.[11]  In all events, data received by AT&T from Carrier IQ software on AT&T
devices resides with AT&T, not with Carrier IQ nor with any OEM Defendant.

- **Cricket:** The Carrier IQ software on Plaintiff White's Huawei device had the
capability of transmitting that data to the Cricket equipment hosted by Carrier IQ over
Wi-Fi; however, Carrier IQ lacks knowledge of the means by which data actually was
transmitted from Plaintiff White's Huawei device.

       Neither HTC's nor any other Defendant's response to Interrogatories 8 and 9 is at odds
with these responses.  HTC stated accurately that it lacked knowledge as to the actual means of
transmission.  However, based on Carrier IQ's representations, it understood that data sent from
the Carrier IQ software on the Plaintiffs' HTC devices – all of which were for use on Sprint's
network – to locations external to the device were required to take place on Sprint's network.
That understanding is entirely consistent with Carrier IQ's verified interrogatory responses
stating that the configuration of Sprint's network required the Carrier IQ software to send data
off the device through that network alone.  Other Defendants, such as LGEMUSA, responded
very clearly that "the CIQ software could not and would not have transmitted or caused the
transmission of any user information or data over a Wi-Fi connection" or "when a mobile device
was disconnected from Sprint's network."[12]  Similarly, Huawei stated accurately that although
Carrier IQ software installed on Plaintiff White's device did not contain specifications
suggesting that data could be transmitted via means other than an active cellular connection,
Huawei lacked actual knowledge as to the means of transmission.

       In short, 13 Plaintiffs used devices on which the Carrier IQ software was not capable of
sending data off the phone except through the carrier's network, two Plaintiffs used devices that,
according to AT&T, had not been configured to receive analytics data about the use of the
phone,[13] one Plaintiff used a device that was incapable of Wi-Fi transmission, and one Plaintiff
used a device that was capable of Wi-Fi transmission—but no Defendant has information
regarding whether any data actually was transmitted via Wi-Fi from that device.  Although
Defendants dispute Plaintiffs' argument that they cannot be compelled to arbitrate if the Carrier
IQ software was "transmitting, or ***capable of transmitting***, consumer content even when the
devices were operating over Wi-Fi only," even by Plaintiffs' logic, these responses give
Plaintiffs the information they need to respond to Defendants' motion.  The software profiles
will not provide any more information on the means of transmission than these responses, given
that a profile will not show the means by which data was, in fact, transferred from the device.  It
would only show whether it was *possible* for data to be sent over Wi-Fi—the same information
Plaintiffs already have.

     **3.**      **Requests Relating to Out-of-Contract Transmittals**

       Defendants also have answered fully Interrogatory No. 9, which seeks discovery into
whether Carrier IQ's software sends data off of Plaintiffs' devices when Plaintiffs are no longer

---

[10] Plaintiff Jennifer Patrick, a Motorola phone user on AT&T's network, is not a subject of the pending motion.

[11] Plaintiffs acknowledged as much in Paragraph 53 of the CAC.  *See* Dkt. No. 107 at ¶ 53.

[12] Plaintiffs' assertion above that "HTC's fellow manufacturer defendants each stated, in essence, that they did not
know the answer to the question or that they were not completely sure" is thus plainly untrue.

[13] As stated in Carrier IQ's responses, one Samsung phone has AT&T's "Mark the Spot" application, which is based
on a reduced functionality version of Carrier IQ's software installed.  Mark the Spot allows users to send messages
to AT&T reporting the service problems.

Judge Edward M. Chen
September 6, 2013
Page 9

in contract with their wireless carriers.  As an initial matter, to the extent that Plaintiffs' phones
were incapable of transmission off the carrier's network (as with Sprint), they are equally
incapable of transmitting information when out of contract and thus permanently disconnected
from that network.  In any event, no Plaintiff has alleged that he or she continued to use a phone
embedded with Carrier IQ software after the termination of the service agreement covering that
phone with the Plaintiff's wireless carrier.  In addition, the declarations submitted by Plaintiffs'
wireless carriers in support of Defendants' arbitration motion reveal that only one Plaintiff had
terminated service with her carrier.  And Carrier IQ's verified interrogatory response stated that
the ability of the Carrier IQ software on that Plaintiff's device to transmit diagnostic data had
been disabled months before the termination of that Plaintiff's Sprint service.[14]  In other words,
with respect to the Plaintiffs against whom arbitration is sought, there has been no data
transmitted by their phone after termination of a service agreement with a wireless carrier.

Plaintiffs point to superfluous language in Samsung and Pantech's responses to
Interrogatory No. 9 to argue that Defendants must produce profiles to answer this interrogatory
fully.  But the profiles are irrelevant to the issue before the Court:  whether the claims by the
seventeen Plaintiffs against whom Defendants have moved to compel arbitration are within the
scope of the arbitration agreements these Plaintiffs entered.  Plaintiffs' speculative argument that
they may *someday* terminate their wireless service and continue using their phones is not the
case presently before the Court and they have no present standing to pursue it.  Accordingly,
these additional and hypothetical requests are irrelevant, and Defendants should not be required
to provide further responses.

### 4.    Interrogatory Nos. 11-13

Plaintiffs' Interrogatory Nos. 11-13 seek merits discovery that is unrelated to the "means
of transmission" discovery this Court has authorized.  Nor is it relevant to whether the claims in
the CAC fall within the scope of the broad "all disputes" arbitration agreements Plaintiffs entered
with their wireless carriers.[15]  Interrogatory No. 11 seeks identification of all data that has been
accessed by the Carrier IQ software embedded on each Plaintiff's phone over several years and
the identities of parties that have received the data.  The related Interrogatory No. 12 asks
Defendants to identify each provision in the service agreements Plaintiffs entered with their
carriers permitting the collection of each type of data.  In its April 1 Order, this Court rejected
similar discovery requests, holding that Plaintiffs had failed to explain why the type of data
collected and to whom it was transmitted is relevant.  *See* Dkt. No. at 157 at 3:24-26.  Plaintiffs
still cannot offer a viable rationale for why this information is relevant to the scope or
enforceability of the arbitration agreements Plaintiffs entered with their carriers.

First, Plaintiffs assert that the transmittal of SMS text messages, particularly those sent to
any third parties, would fall outside the scope of the carrier arbitration provisions.[16]  Yet,
Plaintiffs have not cited to any provision in the service agreements to support this assertion.  Nor
could they.  Even assuming the Carrier IQ software collected Plaintiffs' text messages or other

---

[14] Sprint's arbitration agreement expressly defines disputes to include claims and controversies that arise after a
plaintiff's service has terminated.  *See* Mot. to Compel Arb. (Dkt. No. 107) at 5.

[15] Courts have consistently held that the type of "all disputes" clauses that cover disputes "relating to" Plaintiffs' use
of the wireless service in the arbitration provisions at issue here are meant to be "broad and far reaching."  *Chiron
Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000); *see ValueSelling Assoc., LLC v. Temple*,
No. 09-CV-1493-JM, 2009 WL 3736264, at *2 (S.D. Cal. Nov. 5, 2009) ("A clause providing for the arbitration of
'any claim or controversy arising out of or relating to the agreement' has been held to be the paradigm of a broad
clause.") (citation omitted); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-
26 (1985) (claims fall within scope of broadly defined arbitration provisions if they merely "touch" matters covered
by arbitration provision).

[16] Plaintiffs' assertion that "defendants take no position to the contrary" is inaccurate.

Judge Edward M. Chen
September 6, 2013
Page 10

content Plaintiffs sent and received while using their mobile phones on their carriers' network, Plaintiffs' claims about those practices would be "claims arising out of or relating to any aspect of the relationship between [Plaintiffs and AT&T]," "claims or controversies against each other related in any way to or arising out of in any way [Sprint's] Services," and a claim "arising from or relating in any way to [the Cricket Terms & Conditions] or [Cricket] services." *See* Mot. to Compel Arb. at 4-6 (quoting language from arbitration provisions in Plaintiffs' service agreements with AT&T, Sprint and Cricket).[17] This is because the CAC alleges the Carrier IQ software was installed on Plaintiffs' phones at the time of manufacture, and collected information about the Plaintiffs' use of the carriers' services, most notably including the ability to send and receive text messages over the carriers' networks. *See, e.g.*, CAC ¶¶ 1, 3, 4, 41, 51, 61, 63, 65, 68, 75-92, 96(a), 142. As explained above, no amount of discovery into the types of data collected by Carrier IQ or to whom that data was sent will affect a determination of whether Plaintiffs' *allegations* fall within these broadly worded arbitration agreements.

Second, Plaintiffs strain to recast Interrogatory No. 11 as relevant to arbitrability by characterizing it as a request for information relating to the means of transmission of data to Google and other third parties.[18] Notwithstanding the fact that this explanation finds no support in the Interrogatory itself, Defendants have already responded to Plaintiffs' "means of transmission" requests in response to Interrogatory No. 8, as explained above.

Third, Interrogatory No. 13, which seeks discovery into whether Carrier IQ's software was removed from any Plaintiff's phone and the details of such removal, is even less connected to issues of contract formation and enforceability. Plaintiffs fail to offer any explanation for why the removal of Carrier IQ software from any Plaintiff's device is relevant to the formation, performance or scope of the arbitration agreements Plaintiffs entered into with their respective wireless carriers. Instead, Plaintiffs hypothesize that such discovery may reveal communications from the carriers that Carrier IQ's software was "acting in an uncontemplated manner." But even if such communications did exist, they have no bearing on whether Plaintiffs' claims are within the scope of the broad agreements to arbitrate "all disputes" arising out of the respective carrier's services.

Defendants filed their motion to compel arbitration on November 20, 2012. Plaintiffs have had nine months to take discovery from the Defendants and third-party carriers. Defendants have provided complete, verified interrogatory responses regarding the arbitration rules for the Plaintiffs, the previous disputes involving Carrier IQ software, and the means of transmission or "scope" arguments of Plaintiffs. Plaintiffs have the information needed to oppose the motion to compel arbitration. Defendants request the Court deny Plaintiffs' request for more discovery and more delays, and set a briefing schedule in accordance with the previous stipulated schedule (Dkt. No. 125) and hearing date at the Court's convenience.

*****

The parties look forward to addressing these issues with the Court.

---

[17] Indeed, the Cricket arbitration provision applicable to Plaintiff White includes a broad delegation clause providing that "[a]ny past, present or future claim, dispute or controversy . . . including (without limitation) statutory, tort and contract Claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration." Accordingly, at least as to the claims against Huawei, the issue of whether any claims by White are subject to arbitration must itself be presented to an arbitrator, not this Court. *See Rent-A-Center v. Jackson*, 130 S. Ct. 2772 (2010).

[18] Although Plaintiffs now argue that Interrogatory Nos. 11-13 seek information relating to whether Carrier IQ software processed, stored, or transmitted private user content, such as SMS text messages, to third parties such as Google or application developers, plaintiffs have never previously asserted this argument as a basis for Interrogatory Nos. 11-13 in the numerous meet and confers between the parties relating to such interrogatories.

Judge Edward M. Chen
September 6, 2013
Page 11

Respectfully submitted,

Dated:   September 6, 2013

By:   */s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
Robert F. Lopez (*pro hac vice*)
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
toml@hbsslaw.com

By:   */s/ Daniel L. Warshaw*
Daniel L. Warshaw (SBN 185365)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104
dwarshaw@pswlaw.com

Bruce L. Simon (SBN 96241)
William J. Newsom (SBN 267643)
44 Montgomery Street, Suite 2450
PEARSON SIMON & WARSHAW, LLP
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswlaw.com
wnewsom@pswlaw.com

*Plaintiffs' Interim Co-Lead Counsel*

Judge Edward M. Chen
September 6, 2013
Page 12

By:  /s/ Rodger R. Cole
    Rodger R. Cole (CSB No. 178865)
    rcole@fenwick.com
    Molly R. Melcher (CSB No. 272950)
    mmelcher@fenwick.com
    FENWICK & WEST LLP
    801 California Street
    Mountain View, CA 94041
    Ph:   (650) 988-8500
    Fax:  (650) 938-5200

    Tyler G. Newby (CSB No. 205790)
    tnewby@fenwick.com
    Jennifer J. Johnson (CSB No. 252897)
    jjjohnson@fenwick.com
    FENWICK & WEST LLP
    555 California Street, 12th Floor
    San Francisco, CA 94104
    Ph: (415) 875-2300
    Fax:  (415) 281-1350

    *Attorneys for Defendant Carrier IQ, Inc.*

By:   /s/ Rosemarie T. Ring
    Rosemarie T. Ring (SBN 220769)
    Rose.Ring@mto.com
    Jonathan H. Blavin (SBN 230269)
    Jonathan.Blavin@mto.com
    Bryan H. Heckenlively (SBN 279140)
    Bryan.Heckenlively@mto.com
    MUNGER, TOLLES & OLSON, LLP
    560 Mission Street
    Twenty-Seventh Floor
    San Francisco, CA  94105-2907
    Phone: (415) 512-4000
    Fax: (415) 512-4077

    Henry Weissmann (SBN 132418)
    Henry.Weissmann@mto.com
    MUNGER, TOLLES & OLSON, LLP
    355 South Grand Avenue,
    Thirty-Fifth Floor
    Los Angeles, CA  90071-1560
    Telephone:  (213) 683-9100
    Facsimile:   (213) 687-3702

    *Attorneys for Defendant HTC America, Inc.*

Judge Edward M. Chen
September 6, 2013
Page 13

By:  _/s Simon J. Frankel_____
Simon J. Frankel
sfrankel@cov.com
Mali B. Friedman
mfriedman@cov.com
COVINGTON & BURLING LLP
1 Front St., 35th Floor
San Francisco, CA 94111
Phone:  (415) 591-6000
Fax: (415) 591-6091

*Attorneys for Defendant Huawei Devices USA, Inc.*

By:  _/s/ James Donato_____
James Donato (SBN (146140)
jdonato@shearman.com
SHEARMAN & STERLING LLP
Four Embarcadero Center, Suite 3800
San Francisco, CA 94111-5994
Phone:  (415) 616-1100
Fax:(415) 616-1199

*Attorneys for Defendant LG Electronics MobileComm U.S.A., Inc.*

By:  _/s/ Norman K. Beck_____
Peter C. McCabe III
pmccabe@winston.com
Norman K. Beck
nbeck@winston.com
Scott T. Sakiyama
ssakiyama@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601-9703
Phone: (312) 558-5600
Fax:     (312) 558-5700

Krista M. Enns (SBN 206430)
kenns@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894
Telephone: (415) 591-1000
Facsimile:  (415) 591-1400

*Attorneys for Defendant Motorola Mobility LLC*

Judge Edward M. Chen
September 6, 2013
Page 14

By: ___/s/ Wayne M. Helge_____
     Wayne M. Helge
     whelge@park-law.com
     H.C. Park & Associates, PLC
     1894 Preston White Drive
     Reston, VA 20191
     Phone: (703) 288-5105
     Fax: (703) 288-5139

     *Attorneys for Defendant Pantech Wireless, Inc.*

By: ___/s/ Lance A. Etcheverry_____
     Lance A. Etcheverry
     lance.etcheverry@skadden.com
     300 South Grand Avenue, Suite 3400
     Los Angeles, California 90071
     Phone:    (213) 687-5000
     Fax:(213) 687-5600

     *Attorneys for Defendant Samsung*
     *Telecommunications America, LLC*

## ATTESTATION

       I, William J. Newsom, am the ECF user whose identification and password are being used to file the instant document. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all counsel whose electronic signatures appear above provided their authority and concurrence to file this document.

By:___/s/ William J. Newsom_____
     William J. Newsom (SBN 267643)
     44 Montgomery Street, Suite 2450
     PEARSON SIMON & WARSHAW, LLP
     San Francisco, CA 94104
     Telephone: (415) 433-9000
     Facsimile: (415) 433-9008
     wnewsom@pswlaw.com