UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CARRIER IQ, INC., CONSUMER PRIVACY LITIGATION | Case No. 12-md-02330 EMC (NC)<br><br>**ORDER RE: JOINT DISCOVERY LETTER BRIEFS**<br><br>Re: Dkt. Nos. 172, 173 |

Pending before the Court are two joint discovery letter briefs, Dkt. Nos. 172 and 173, referred for resolution to the undersigned Magistrate Judge by Judge Chen. Dkt. No. 175. The letter briefs present a dispute regarding certain interrogatories propounded by plaintiffs to defendants, Dkt. No. 172, and a related dispute concerning plaintiffs' subpoena to third party Google, Dkt. No. 173. Plaintiffs contend that the discovery they seek is relevant and necessary to develop their defenses to the pending motion to compel arbitration. The Court finds that the discovery requests at issue are targeted to enable plaintiffs to meet their burden of proving that their claims are not within the scope of the carrier-consumer arbitration provisions defendants seek to invoke. The limited discovery will assist in creating a better record on the motion to compel arbitration. Accordingly, as set forth in detail below, the Court orders defendants to respond to plaintiffs' discovery requests, and orders plaintiffs to continue meeting and conferring with Google in an effort to reduce the potential burden on Google in responding to the subpoena.

//

# I. BACKGROUND

Plaintiffs bring this proposed class action on behalf of themselves and similarly situated mobile device owners, against Carrier IQ, the author and vendor of Carrier IQ software, as well as several device manufacturers of mobile devices that allegedly bore the Carrier IQ software -- HTC, Huawei, LG, Motorola, Pantech, and Samsung. *See* Dkt. No. 107. Plaintiffs allege that Carrier IQ software resides without consumers' knowledge on millions of mobile devices and captures confidential and sensitive information before sending it off the mobile devices on which it is installed. *Id.* Plaintiffs allege claims under the Federal Wiretap Act, the Stored Communications Act, the Computer Fraud and Abuse Act, state privacy statutes, state consumer protection acts, the Magnuson-Moss Warranty Act, and state warranty laws. *Id.* On November 20, 2012, defendants filed a motion to compel arbitration of plaintiffs' claims on the basis that plaintiffs' wireless service agreements with the carriers, to which defendants are not parties, contain provisions requiring plaintiffs to arbitrate "all disputes" relating to or arising out of the agreements. Dkt. No. 129.

On March 21, 2013, the parties submitted a joint letter brief to Judge Chen presenting a dispute regarding the permissible arbitration-related discovery. Dkt. No. 155. On April 1, 2013, Judge Chen issued an order regarding the joint letter brief, directing the parties to meet and confer and providing guidance. Dkt. No. 157. Among other issues, the order addressed plaintiffs' requests for discovery related to their out-of-scope defense to arbitration:

> Plaintiffs contend that they need not only unconscionability discovery but also scope discovery -- *i.e.*, discovery targeted to determine the claims brought by Plaintiffs fall within the scope of the carrier arbitration provisions. Plaintiffs' theory seems to be that, if a transmission takes place by a means other than over the carrier networks -- *e.g.*, over Wi-Fi instead -- then a challenge to such a transmission cannot fall within the scope of the carrier arbitration provisions. In response, Defendants argue that, to determine whether a claim falls within the scope of an arbitration provision, all that the Court has to do is look at the arbitration agreement and the claim as pled in Plaintiffs' complaint -- *i.e.*, no discovery at all is necessary. *See* Joint Letter at 7.

>     Given Plaintiffs' theory, the Court does not agree with Defendants that all discovery is off limits. However, much of the discovery identified by Plaintiffs does not appear to be targeted to the issue of how data is sent over Plaintiffs' mobile devices, particularly with respect to data captured by the Carrier IQ software. For example, Plaintiffs have not explained why "the type of data contemplated or requested by carriers" is relevant to the *means* of transmission; nor have they explained why the kind of data and to whom it was sent is relevant. Joint Letter at 5. To the extent Plaintiffs seek information about the functionality of the Carrier IQ software, *see, e.g.*, HTC RFP No. 12 (asking for "ALL DOCUMENTS . . . provided to you by CARRIER IQ, INC., RELATING to the functions, operations . . . , and capabilities of (a) CARRIER IQ SOFTWARE and (b) ALL related software or code such as porting code or porting layers, whether written by YOU or anyone else"), functionality is relevant to the matter at hand only to the extent it is informative of the means of transmission.

*Id.* at 3.

On April 22, 2013, plaintiffs served a set of interrogatories on each defendant, with the exception of Motorola, seeking information relevant to unconscionability issues and plaintiffs' out-of-scope defenses to the pending motion to compel arbitration. Dkt. No. 172 at 1. Defendants served objections and answers to these interrogatories, and provided additional information to plaintiffs through meet and confer letters. *Id.* After the parties were unable to resolve their dispute regarding the proper scope of arbitration-related discovery, they filed the current joint discovery letter brief. *Id.*

In addition, on December 7, 2012, plaintiffs served a deposition and document subpoena on Google. Dkt. Nos. 173, 173-1. The subpoena seeks information regarding Google's possible receipt of mobile device user data or content transmitted because of the presence of Carrier IQ software on the device. *Id.* Google objected to the subpoena, and after unsuccessfully meeting and conferring, plaintiffs and Google filed a joint discovery letter brief. Dkt. No. 173.

On September 10, 2013, Judge Chen issued an order referring the joint discovery letter briefs, Dkt. Nos. 172 and 173, to a Magistrate Judge "for resolution within 2-3 weeks." Dkt. No. 175. This Court held hearings on September 18 and 25 to address the discovery issues presented in these letter briefs.

//

Case No. 12-md-02330 EMC (NC)
ORDER RE: JOINT DISCOVERY
LETTER BRIEFS

3

## II. DISCUSSION

**A.  Plaintiffs' Requests for Discovery from Defendants**

Plaintiffs now seek two separate categories of discovery from defendants: (1) production of so-called "profiles" which, according to plaintiffs, are programmed by Carrier IQ at the carriers' request and provide software instructions to mobile devices on which Carrier IQ software is installed, including instructions regarding means of transmission; and (2) responses to interrogatories seeking information regarding transmittals of consumer information such as SMS text messages, to uncontemplated third parties.

### 1.  Profiles

Defendants do not dispute that the requested profiles are relevant to the means of transmission, i.e., "how data is sent over Plaintiffs' mobile devices, particularly with respect to data captured by the Carrier IQ software," Dkt. No. 157 at 3:23-24, which Judge Chen found to be a permissible subject of the arbitration-related discovery in this case. Instead, they argue that production of such profiles would be unnecessary and duplicative.

Interrogatory No. 8 propounded by plaintiffs asks defendants whether the Carrier IQ software installed on plaintiffs' mobile devices "transmit or cause the transmission of user information or data when it is disconnected from the network of the CELLULAR PROVIDER . . . , particularly over Wi-Fi or by direct connection to an Internet-capable device (e.g., via USB, Firewire, or Bluetooth connection to an Internet-capable computer)." Dkt. No. 172-1 at 5:1-10.[1]  Plaintiffs assert that in response to this interrogatory "defendants have provided contradictory, incomplete, and non-responsive answers, coupled with their objections" and thus "the Profiles will constitute the best evidence of the means of transmission, and that they will allow the plaintiffs to test the responses given by defendants."  Dkt. Nos. 172 at 3; 184 at 4.  Defendants argue that "[n]o such

---

[1] In their joint discovery letter, plaintiffs also contend that the profiles should be produced because they are responsive to Interrogatory No. 9 which asks whether Carrier IQ software transmits, or causes the transmittal of, user data or information via the devices at issue when consumers are no longer under contract with the carriers. Dkt. No. 172 at 4, 8-9.  Because the Court orders defendants to provide the requested profiles in connection with Interrogatory No. 8, it does not need to address the parties' dispute regarding Interrogatory No. 9.

Case No. 12-md-02330 EMC (NC)
ORDER RE: JOINT DISCOVERY         4
LETTER BRIEFS

inconsistencies exist," and that the profiles "would only show whether it was *possible* for data to be sent over Wi-Fi—the same information Plaintiffs already have." Dkt. No. 172 at 7-8.

While defendants attempt to reconcile their answers to Interrogatory No. 8, the Court agrees with plaintiffs that defendants' answers appear to provide incomplete and/or inconsistent information. For example, Carrier IQ responded that it "lacks knowledge of the means by which IQ Agent software embedded on Plaintiffs' mobile devices, if any, transmitted data collected by the IQ Agent to Plaintiffs' wireless carriers or to servers hosted by Carrier IQ for Plaintiffs' wireless carriers," but that "[t]o the extent the Carrier IQ IQ [sic] Agent software on the Sprint Plaintiffs' devices transmitted data collected by the IQ Agent off of the Sprint Plaintiffs' devices, it is Carrier IQ's understanding that the transmission was on Sprint's cellular network." Dkt. No. 172-2 at 7-8. By comparison, HTC responded that "HTCA does not have knowledge of whether and by what means Carrier IQ software did or does send data from the HTC Plaintiffs' mobile devices to locations external to those mobile devices. Based on representations made by Carrier IQ, however, HTCA understands that Carrier IQ software *is not designed to send data* from the HTC Plaintiffs' mobile devices to locations external to the mobile devices unless the devices are connected to the Sprint network." *Id.* at 32 (emphasis added). Defendants' portion of the joint discovery letter, however, asserts that "Carrier IQ understands that *due to the configuration of Sprint's network*, data could only be received from Carrier IQ software over the Sprint cellular network." Dkt. No. 172 at 7 (emphasis added).

Additionally, Huawei responded that it "believes the Carrier IQ software installed on the Huawei Ascend II m865 *only could transmit data with an active cellular connection*. However, Huawei lacks actual knowledge of the means by which Carrier IQ software embedded on Plaintiff White's mobile device transmitted or could transmit data collected by the Carrier IQ software to servers hosted by Carrier IQ for Cricket." Dkt. No. 172-2 at 21 (emphasis added). Carrier IQ in turn responded to the interrogatory by stating that "Carrier IQ lacks knowledge of the means by which IQ Agent software embedded on

White's mobile device transmitted data collected by the IQ Agent to servers hosted by Carrier IQ for Cricket." *Id.* at 9. According to plaintiffs, however, in a follow-up letter to plaintiffs dated June 14, 2013, Carrier IQ represented that plaintiff White's mobile device could upload via Wi-Fi "to servers hosted by Carrier IQ for Cricket." Dkt. No. 172 at 3. In their portion of the discovery letter, defendants admit that "[t]he Carrier IQ software on Plaintiff White's Huawei device had the capability of transmitting that data to the Cricket equipment hosted by Carrier IQ over Wi-Fi." *Id.* at 8.

Based on the Court's review of the discovery responses and the arguments made by counsel in connection with the present dispute, the Court is not convinced by defendants' argument that plaintiffs already have the information regarding the means of transmission that they are seeking to obtain through the profiles. The Court finds that the requested profiles are necessary to provide a more complete and clear record on the means-of-transmission issue for the purposes of the motion to compel arbitration. Defendants have not demonstrated that it would be unduly burdensome to require them to produce the profiles at issue. Dkt. No. 172 at 4. In support of this argument, Carrier IQ stated that it would require roughly 40 hours of engineering work on its part to obtain these profiles. At the hearing, counsel for defendants also argued that it might take an unquantified but significant amount of work for the other defendants to produce such profiles. Weighing the relevance of the discovery and the importance of the motion to compel arbitration at issue, against the burden of 40 hours of engineering work, the Court finds that the request for profiles is justified.

Accordingly, by **October 18, 2013**, defendants must produce the profiles that were installed or loaded on each plaintiff's mobile device. However, defendants collectively are only required to produce one copy of each pertinent profile.

**2.  Transmittals of consumer information to third parties**

Plaintiffs also contend that defendants should be ordered to provide responses to Interrogatory Nos. 11-13 which plaintiffs describe as "seeking information related to whether Carrier IQ software-equipped devices were processing, storing, or transmitting

private user content such as SMS text messages, including to third-parties such as Google or application developers." Dkt. No. 172 at 5. Specifically, Interrogatory No. 11 asks whether the Carrier IQ software transmitted any SMS text messages, URLs containing information such as search terms, user names, passwords, and geo- or GPS-based location data, media viewing history, telephone numbers, dialer keypad presses, or application purchases and uses, and further asks defendants to identify the plaintiff(s) and mobile device(s) affected, the data involved, and the recipients of such data. *See, e.g.*, Dkt. No. 172-1 at 6. Additionally, Interrogatory No. 12 asks defendants to identify the terms of the agreements whose arbitration provisions defendants invoke, that permit or address the transmission of such data. *Id.* Interrogatory No. 13 asks whether the Carrier IQ software has been removed from, or disabled on, any plaintiff's mobile device and seeks the reasons for that, including any communications explaining that the Carrier IQ software was not operating as contemplated by defendants or the carriers. *Id.* at 6-7.

In objecting to this discovery, defendants first argue that the Court need look no further than the allegations of the Consolidated Amended Complaint and plaintiffs' wireless service agreements to determine whether the claims are within or outside the scope of the arbitration agreements. Dkt. No. 172 at 7. This argument, however, was rejected by Judge Chen in his April 1 order where he disagreed with defendants' position "that all discovery is off limits." Dkt. No. 157 at 3:21-22. As explained in that order, means-of-transmission discovery is permissible because it is targeted to determine whether the claims brought by plaintiffs fall within the scope of the carrier arbitration provisions. *Id.* at 3. While Judge Chen also noted that plaintiffs had not explained why the kind of data captured by the Carrier IQ software and to whom it was sent is relevant, he did not rule that such discovery was necessarily precluded. *Id.* In their filings and arguments presented to this Court in connection with the joint discovery letter briefs referred by Judge Chen, plaintiffs have articulated why this information is relevant to their defenses to the motion to compel arbitration.

//

Plaintiffs' theory is that transmittals of consumers' private information or data, especially to uncontemplated third parties, would be outside the scope of the carrier-consumer contracts relied upon by defendants, and thus the rationale for allowing means-of-transmission discovery is equally applicable. Dkt. No. 172 at 1-2, 5. Plaintiffs premise their theory on the foundational principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communic'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted). Plaintiffs further note that "[a] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or *applicability* of the specific arbitration clause that a party seeks to have the court enforce." *Id.* (emphasis added) (citations omitted). Thus, a court must determine "whether [the dispute] falls within the scope of the parties' agreement to arbitrate." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Defendants argue that all of plaintiffs' claims "fall within the scope of the broad 'all disputes' arbitration agreements Plaintiffs entered into with their wireless carriers." Dkt. No. 172 at 7, 9. In response, plaintiffs argue that because defendants are not parties to the arbitration provisions they seek to invoke, there is a legitimate dispute as to whether the conduct of a certain party to a lawsuit, which is not a signatory to the arbitration clause, is within the scope of the arbitration agreement. Dkt. No. 184 at 3 (citing *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 846-47 (9th Cir. 2013)). In their motion to compel arbitration, defendants assert that, under the doctrine of equitable estoppel, plaintiffs must arbitrate their claims against defendants because the claims are intertwined with the wireless service agreements between plaintiffs and the carriers and are based on alleged interdependent and concerted misconduct between the defendants and the carriers. Dkt. No. 129 at 20, 34-47. Defendants argue that the carriers are central to the allegations of the

complaint because the carriers specified the types of data to be collected and were the recipients of data transmitted off the mobile devices by the Carrier IQ software. *Id.* at 42. Defendants further argue that, whether the carriers' use of Carrier IQ software enables them to optimize and improve their networks and thus is a "necessary incident to the rendition" of "service" within the meaning of the Wiretap Act's provider exception will be a critical issue to be resolved in the action. *Id.* at 44-45. On the other hand, plaintiffs contend that, if certain data was never requested by the carriers but was nonetheless collected and transmitted by defendants (through operation of their devices and software), or was transmitted to uncontemplated third parties, the present dispute may be outside the scope of the carrier-consumer contracts. Dkt. No. 184 at 6.

This Court does not express any opinion on the merits of the pending motion to compel arbitration, the pertinent legal standard, or any arguments made by the parties related to those merits. In light of the parties' arguments, however, the Court finds that the discovery requests at issue are targeted to enable plaintiffs to discover information necessary to respond to defendants' arguments in support of arbitration and to allow plaintiffs to meet their burden in demonstrating that their claims are not contemplated by the carrier arbitration provisions. *See Green Tree Fin'l Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) ("party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration").

Accordingly, by **October 18, 2013**, each defendant must provide supplemental narrative responses to plaintiffs' Interrogatory Nos. 11-13 which identify on a yearly basis for the class period the categories of data transmitted (e.g. SMS text messages, URLs, user names, passwords, etc.), the identities of those to whom this information was transmitted, which categories of information were received by them, and an estimate as to the frequency of the transmission by category.

With regard to Interrogatory No. 13, each defendant is required to answer the interrogatory only if, and to the extent: (i) it is in possession or control of communications regarding any removal or disablement of Carrier IQ software from or on any plaintiffs'

mobile device; and (ii) any such communication advises or explains that the Carrier IQ software was removed or disabled, or was requested to be removed or disabled, because it: (a) purportedly was not operating as contemplated or agreed between any of the plaintiffs' cellular providers (i.e., ATTM, Cricket, or Sprint) and the answering defendant, or (b) purportedly was not operating as contemplated by the terms and conditions of service or other any other agreement(s) in place between any plaintiff and his or her cellular provider.

**B.    Plaintiffs' Requests for Discovery from Third Party Google**

In lieu of Google's full compliance with the subpoena, plaintiffs offered "to accept a simple declaration (or declarations) from Google: (1) stating whether it is aware of having received mobile device user data or content . . . , whether by way of crash, de-bugging, or other reports related to the Android mobile operating system or any application, that it believes or suspects was transmitted because of the presence of Carrier IQ software on the device; and (2) if any such data or content was received, setting forth limited pertinent information regarding that data or content." Dkt. No. 173 at 1.

As an initial matter, Google objects on the basis that plaintiffs have not been diligent in pursuing this discovery. Dkt. No. 173 at 3-4. The Court finds that plaintiffs have made an adequate showing that they were diligent and that the delay in pursuing the discovery from Google was primarily due to plaintiffs' attempts to obtain the discovery from defendants and to reach a compromise resolution with Google. *Id.* at 1, 6.

Google's primary objection to plaintiffs' subpoena is that Judge Chen's April 1 order already "determined that the *only* discovery needed to determine whether the claims are arbitrable is discovery concerning the *means* by which the user's phone transmits the data at issue." *Id.* at 4. As explained above, the Court does not agree with this interpretation of the April 1 order. Plaintiffs' discovery requests to Google are related to their out-of-scope defense to the pending motion to compel arbitration and are thus permissible.

Because Google is not a party to this litigation, however, the Court also considers the burden involved in complying with the subpoena, and must modify or quash the subpoena if compliance will subject Google to undue burden. *See* Fed. R. Civ. P. 45(c)(3). In the joint

letter brief, Google argues that compliance with plaintiffs' requests would be burdensome because, according to a "conservative estimate," "it would take two to three weeks of full-time work by a qualified engineer simply to search through archives of bug reports, crash reports, and the like to locate any that were generated by Carrier IQ software." Dkt. No. 173 at 5. Google further argues that this would be "the first step in the process—collecting the universe of data to review" and that subsequent analysis of that data would be needed to answer plaintiffs' substantive questions. *Id.* at 5-6. At the hearing on the joint discovery brief, Google stated that it has treated the crash report data as "radioactive" and segregated it in a separate storage. Google further estimated that the size of the stored data is 197 GB and that it would take approximately 3 weeks of engineering time to restore the data so that it can be searched to identify data transmitted because of the Carrier IQ software. Despite meeting and conferring with Google over the course of many months, plaintiffs stated that the first time they learned that the data had been so segregated by Google was the day before the September 25 hearing.

In light of this new information provided by Google, the Court finds that plaintiffs and Google have not adequately met and conferred to determine the feasibility and potential burden of the compromise declaration proposed by plaintiffs as stated in the joint discovery letter brief or the sampling of data suggested by plaintiffs at the hearing. For this reason, the Court orders plaintiffs and Google to meet and confer by **October 4,** with the assistance of their technical experts, to determine if there is a compromise solution that is not unduly burdensome, and file a joint discovery letter by **October 9**, informing the Court of the outcome of the meet and confer process. Furthermore, as acknowledged by plaintiffs, it is possible that defendants' responses to plaintiffs' discovery requests might obviate or limit the need for discovery from Google. Accordingly, by **October 25**, Google and plaintiffs must meet and confer and file a joint discovery letter brief informing the Court that the dispute between them has been resolved, or setting forth what discovery is still needed and why, considering the discovery responses received from defendants.

Any party may object to this nondispositive pretrial order within 14 days of the filing

1 | date of this order.  *See* Civ. L.R. 72-2.
2 |     IT IS SO ORDERED.
3 |     Date: September 27, 2013

_____
Nathanael M. Cousins
United States Magistrate Judge