UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE                                            No. C-12-md-2330 EMC

CARRIER IQ, INC. CONSUMER
PRIVACY LITIGATION.                              **ORDER DENYING DEFENDANTS'
                                                 MOTION TO COMPEL ARBITRATION**

                                                 **(Docket No. 129)**

_____/

        Plaintiffs (eighteen individuals from thirteen different states) have filed a consolidated

amended class action complaint ("CAC" or "complaint") against the following Defendants:

(1)     Carrier IQ, Inc. ("CIQ");

(2)     HTC America, Inc. and HTC Corporation (collectively, "HTC");

(3)     Huawei Device USA, Inc.;

(4)     LG Electronics MobileComm U.S.A., Inc. and LG Electronics, Inc. (collectively, "LG");

(5)     Motorola Mobility LLC;

(6)     Pantech Wireless, Inc.; and

(7)     Samsung Telecommunications America, Inc. and Samsung Electronics Co., Ltd.

        (collectively, "Samsung").

All defendants, except for CIQ, are manufacturers of mobile devices (collectively, "Device

Defendants" or "OEM Defendants").  Plaintiffs have asserted claims against Defendants pursuant to

both federal and state law.  Essentially, Plaintiffs' claims are for (1) unauthorized interception and

transmittal of their private information and (2) breach of the implied warranty of merchantability.

United States District Court

For the Northern District of California

Currently pending before the Court is a motion to compel arbitration, which has been brought by all Defendants except Motorola.[1] For purposes of this order, the Court shall hereinafter refer to the moving defendants as "Defendants," even though Motorola is not a party to the motion.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** the motion to compel arbitration.

## I. FACTUAL & PROCEDURAL BACKGROUND

A. Complaint

As indicated above, Plaintiffs' claims against Defendants are, in essence, for (1) unauthorized interception and transmittal of their private information and (2) breach of the implied warranty of merchantability. The primary factual allegations underlying Plaintiffs' claims are as follows.

CIQ is the author and vendor of certain software which has the capability of intercepting and processing data on mobile devices. *See* CAC ¶ 63. The CIQ software is "ostensibly a network diagnostics tool." CAC ¶¶ 27, 41, 63.

Defendants maintain, and Plaintiffs do not materially dispute, that (1) three wireless carriers – namely, ATTM, Sprint, and Cricket – licensed the CIQ software from CIQ and that (2) the wireless carriers instructed the Device Defendants to install the software on the mobile devices they manufactured – which the wireless carriers or their agents would then sell to consumers in conjunction with the provision of wireless service. As a result, the CIQ software has been installed on millions of mobile devices, but without the knowledge of the vast majority of consumers. *See* CAC ¶ 41. In fact, "[t]he typical user has no idea that [the software] is running, nor can he or she turn it off." CAC ¶ 62.

"Though touted . . . as a benign and simple service-improvement tool," the CIQ software has been used to intercept private information on mobile devices (*e.g.*, user names, passwords, geo-

---

[1] In the opening motion, Defendants state: "At this time, Motorola is not moving to compel arbitration with respect to Plaintiff Jennifer Patrick subject to further investigation. . . . Motorola does, however, intend to rely upon the ATTM arbitration clauses with respect to unnamed putative class members. Motorola and Carrier IQ reserve the right to compel Plaintiff Patrick to arbitration at a later time." Mot. at 3-4 n.4.

**United States District Court**
For the Northern District of California

1    location information, text messages, application purchases and uses) and transmit the same to others.

2    *See* CAC ¶¶ 63-65.  On the face of the CAC, it is not entirely clear who those others are.  That is, it

3    is not clear whether Plaintiffs are suing Defendants based on interception for and transmittal to the

4    wireless carriers themselves or whether the alleged misconduct by Defendants consists of

5    interception for and transmittal to others – in particular, CIQ itself, the device manufacturers,

6    Google, and application vendors or developers.  *See, e.g.*, CAC ¶¶ 3, 61, 66 (alleging that

7    "information is or has been transmitted to Google . . . and probably to application vendors and

8    developers, too, as part of device or application crash reports"; that information has been sent to

9    CIQ's servers or the servers of its customers; and that information is sometimes sent to device

10   manufacturers which "specify which data they want from among that assembled pursuant to

11   [specific] metrics").

12        The Court asked Plaintiffs, at the hearing, to provide clarification.  In response, Plaintiffs

13   explained that they are *not* claiming any misconduct on the part of Defendants because of

14   interception for/transmittal to the wireless carriers (*i.e.*, the wire carriers were essentially using the

15   CIQ software for benign purposes only, namely, as a network diagnostics tool).  Rather, Plaintiffs

16   were bringing suit because, *e.g.*, CIQ and the Device Defendants were using the CIQ software to

17   intercept private information for their own purposes (*i.e.*, not on behalf of the wireless carriers) and

18   because this private information was being transmitted to Google and/or application vendors or

19   developers as a result of device or application crash reports.

20        Aside from privacy issues, Plaintiffs maintain that the CIQ software is problematic because it

21           necessarily degrades the performance of any device on which it is
             installed.  The CIQ software is always operating and cannot be turned
22           off.  It necessarily uses system resources, thus slowing performance
             and decreasing battery life.  As a result, because of the CIQ software,
23           in addition to having their private communications intercepted,
             plaintiffs and prospective class members are not getting the optimal
24           performance of the mobile devices that they purchased, and which are
             marketed, in part, based on their speed, performance, and battery life.
25

26   CAC ¶ 74.

27        Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following class

28   claims:

(1)     Violation of the Federal Wiretap Act, as amended by the Electronic Communications Privacy Act (against CIQ and the Device Defendants).

(2)     Violation of the Stored Communications Act (against CIQ only).

(3)     Violation of the Computer Fraud and Abuse Act (against CIQ only).

(4)     Violation of state wiretap and privacy acts (against CIQ and the Device Defendants).[2]

(5)     Violation of state consumer protection acts (against CIQ and the Device Defendants).

(6)     Violation of the Magnuson-Moss Warranty Act (against the Device Defendants only).

(7)     Violation of the implied warranty of merchantability under state law (against the Device Defendants only).

B.      Arbitration Agreements

        In the pending motion, Defendants ask that all of the above claims be compelled to arbitration.  Defendants admit that they have no agreements themselves with Plaintiffs which contain an arbitration clause.  However, Defendants point out that there are arbitration provisions in the agreements the wireless carriers (ATTM, Sprint, and Cricket) have with their own customers.  According to Defendants, although Defendants are not signatories to these customer agreements, they have are entitled to invoke the benefit of the arbitration provisions based on an equitable estoppel theory.  Below is the basic agreement to arbitrate for each wireless carrier.

        1.      ATTM

        ATTM's Wireless Customer Agreement § 2.2 provides that "AT&T and you agree to arbitrate **all disputes and claims** between us."  Dobbs Decl., Ex. 2 (ATTM Agreement § 2.2).

        The ATTM Agreement further provides that the arbitration agreement "is intended to be broadly interpreted [and] includes . . . claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory."  Dobbs Decl., Ex. 2 (ATTM Agreement § 2.2).

---

        [2] For all state-based claims, Plaintiffs have implicated multiple states – and not simply the states where Plaintiffs were residing during the relevant period.

United States District Court
For the Northern District of California

2.    Sprint

Sprint's Terms and Conditions of Service ("Ts&Cs") provide that "[w]e each agree to arbitrate all Disputes between us."  Miller Decl., Ex. B (Sprint 2011 Ts&Cs at 14).  "Disputes" is defined to mean "any claims or controversies against each other related in any way to or arising out of in any way our Services or the Agreement, including, but not limited to, coverage, Devices, billing services and practices, policies, contract practices (including enforceability), service claims, privacy, or advertising."  Miller Decl., Ex. B (Sprint 2011 Ts&Cs at 14).  "Disputes" also include "claims related in any way to or arising out of in any way any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory."  Miller Decl., Ex. B (Sprint 2011 Ts&Cs at 14).  "The agreement to arbitrate is intended to be broadly interpreted."  Miller Decl., Ex. B (Sprint 2011 Ts&Cs at 14).

3.    Cricket

Cricket's Ts&Cs provide that

> [a]ny past, present or future claim, dispute or controversy . . . by either you or us against the other . . . arising from or relating in any *way* to this Agreement or Services provided to you under this Agreement, including (without limitation) statutory, tort and contract Claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by your or us, by binding arbitration.

Baughman Decl., Ex. 1 (Cricket Ts&Cs § 20(c)).

## II.    DISCUSSION

Plaintiffs have offered two main arguments in opposition to the motion to compel arbitration: (1) because Defendants' equitable estoppel theory is not viable given the circumstances in this case and (2) because, even if the theory were viable, Plaintiffs never agreed to arbitration in the first place (formation) and the arbitration agreements are unconscionable.  The Court need not address Plaintiffs' second argument because, even assuming in Defendants' favor that there are no formation or conscionability problems, the Court concludes that Defendants cannot prevail on their equitable estoppel theory.

A.      Legal Standard

"[A]n agreement to arbitrate is a matter of contract: 'it is a way to resolve those disputes . . . that the parties have agreed to submit to arbitration.'"  *Chiron Corp. v. Ortho Diag. Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Because the wireless carrier customer agreements are contracts involving interstate commerce, the agreements are subject to the Federal Arbitration Act ("FAA").  *See id.*; *see also Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (stating that, "[w]ith limited exceptions, the Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce").  Under the FAA, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

For purposes of this opinion, the Court assumes that the arbitration agreements at issue are valid, irrevocable, and enforceable.  The only question is *who* can compel arbitration – in other words, may Defendants compel arbitration as against the Plaintiffs even though Defendants are not signatories to the wireless carrier customer agreements containing the arbitration provisions they seek to enforce.

While generally, as a matter of federal law, doubts concerning the scope of arbitration should be resolved in favor of arbitration, where the issue is whether a particular party is bound by the arbitration agreement, the federal policy favoring arbitration does not apply.  *See Rajagopalan v. Noteworld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (stating that the liberal federal policy regarding scope of arbitration does not apply to the question "whether a particular *party* is bound by the arbitration agreement").

> Generally, the contractual right to compel arbitration "may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration."  *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993).  Accordingly, "[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement."

1   *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013).  *Cf. BG Group PLC v.*

2   *Republic of Arg.*, No. 12-138, 2014 U.S. LEXIS 1785, at *17 (Mar. 5, 2014) (noting that "courts

3   presume that the parties intend courts, not arbitrators, to decide what we have called disputes about

4   'arbitrability'" which "include questions such as 'whether the parties are bound by a given

5   arbitration clause'").

6          As to the specific question here – *i.e.*, whether a non-signatory may enforce the arbitration

7   agreements – the parties largely agree that the materials to be considered consists of the allegations

8   in the operative complaint, along with the wireless carrier customer agreements themselves.  *See,*

9   *e.g.*, *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084, 1096-97 (N.D. Cal. 2012)

10  (looking at the allegations in the complaint to determine whether plaintiffs had adequately alleged a

11  basis for equitable estoppel).  Although Defendants stated at the hearing that the Court should also

12  consider the declarations submitted by both parties, those declarations largely focus on formation

13  and conscionability issues, not the issue of equitable estoppel.

14         To the extent either party contends that this Court should apply a summary-judgment-type

15  standard in evaluating the pending motion,[3] the Court questions whether that standard is entirely

16  appropriate, especially because courts have generally employed that standard in deciding whether or

17  not there was an agreement to arbitrate in the first place.  That would be relevant to, *e.g.*, formation

18  but not equitable estoppel.  *See, e.g.*, *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d

19  1136, 1141 (9th Cir. 1991) (indicating agreement with Third Circuit that, where there is a doubt as to

20  whether an agreement to arbitrate exists, the matter should be submitted to a jury and "'[o]nly when

21  there is no genuine issue of fact concerning the formation of the agreement should the court decide

22  as a matter of law that the parties did or did not enter into such an agreement'"); *Concat LP v.*

23  *Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (Illston, J.) (indicating that, where a

24  motion to compel arbitration "is opposed on the ground that no agreement to arbitrate was made," a

25  court should apply a standard similar to the Rule 56 summary judgment standard – *i.e.*, the court

26

27         [3] *Cf. Xinhua Holdings Ltd. v. Electronic Recyclers Int'l, Inc.*, No. 1:13-CV-1409 AWI SKO,
     2013 WL 6844270, at *5 (E.D. Cal. Dec. 26, 2013) (stating that, for purposes of deciding a motion
28   to compel arbitration, a court may consider documents outside the pleadings)

1   should give to the opposing party the benefit of all reasonable doubts and inferences that may arise

2   and "[o]nly when there is no genuine issue of material fact concerning the formation of an

3   arbitration agreement should a court decide as a matter of law that the parties did or did not enter

4   into such an agreement"). Even if a summary-judgment-type standard were applicable, Defendants

5   have the burden of establishing equitable estoppel, *see Just Film, Inc. v. Merch. Servs.*, No. C 10-

6   1993 CW, 2011 U.S. Dist. LEXIS 96613, at *24 (N.D. Cal. Aug. 29, 2011) (stating such in the

7   context of arbitration and equitable estoppel), and, in light of that burden, allegations and facts must

8   be resolved and construed in Plaintiffs' favor.

9   B.   Equitable Estoppel

10       Generally, one who is not signatory to an agreement has no right to enforce it.

11           [A]s a general matter, a contractual right to arbitration "may not be
12           invoked by one who is not a party to the agreement and does not
             otherwise possess the right to compel arbitration." *Britton v. Co-op*
             *Banking Group*, 4 F.3d 742, 744 (9th Cir. 1993). However, there are
13           legal theories, such as agency and estoppel, in which non-signatories
             to an arbitration agreement may compel or be compelled to arbitration.
14           *See Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229-34 (9th Cir. 2013);
             *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *DMS*
15           *Services, Inc. v. Superior Ct.*, 205 Cal. App. 4th 1345, 1353, 140 Cal.
             Rptr. 3d 896 (2012).

16

17   *Xinhua,* 2013 WL 6844270, at *5. Here, Defendants do not rely on agency or third-party beneficiary

18   theories to compel arbitration pursuant to the agreements to which they are not signatories. Instead,

19   they assert solely equitable estoppel as the ground for their ability to enforce arbitration.

20       Equitable estoppel is a doctrine that "precludes a party from claiming the benefits of a

21   contract while simultaneously attempting to avoid the burdens that contract imposes." *Murphy v.*

22   *DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013). Federal courts recognized that the doctrine of

23   equitable estoppel could have applicability in the arbitration context. For example, in *Mundi v.*

24   *Union Security Life Insurance Co.*, 555 F.3d 1042 (9th Cir. 2009), the Ninth Circuit noted:

25           We have examined two types of equitable estoppel in the arbitration
             context. In the first, a nonsignatory may be held to an arbitration
26           clause "where the nonsignatory 'knowingly exploits the agreement
             containing the arbitration clause despite having never signed the
27           agreement.'" Under the second, a signatory may be required to
             arbitrate a claim brought by a nonsignatory "because of the close
28           relationship between the entities involved, as well as the relationship

8

United States District Court
For the Northern District of California

> of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations."

*Id.* at 1046.  Notably, while the Ninth Circuit acknowledged that equitable estoppel could apply in the arbitration context, it cautioned that, "in light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated in these two lines of cases." *Id.*

After the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624 (2009), it is clear that state law, and not federal law, determines the applicability of equitable estoppel in the arbitration context.[4]  *See Kramer*, 705 F.3d at 1128.  And in two post-*Carlisle* cases, the Ninth Circuit has emphasized that the doctrine of equitable estoppel is a narrow one and should not be expanded, regardless of what underlying state law applies.  *See, e.g.*, *Murphy*, 724 F.3d at 1229 (in California case, stating that, "[b]ecause generally only signatories to an arbitration agreement are obligated to submit to binding arbitration, equitable estoppel of third parties in this context is narrowly confined"); *Rajagopalan*, 718 F.3d at 847 (in Washington case, stating that "[w]e have never previously allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff, and we decline to expand the doctrine here").  Defendants have failed to point to any case law, federal or state, indicating to the contrary.  Accordingly, the Court heeds the approach taken by the Ninth Circuit – *i.e.*, it shall consider whether equitable estoppel is appropriate under the narrow framework that has been recognized by the courts.

The chart below reflects the relevant state laws the narrow circumstances under which a nonsignatory to an agreement containing an arbitration clause can compel a signatory to the agreement to arbitration under an equitable estoppel theory.

---

[4] Plaintiffs contend Defendants waived any argument that state, as opposed to federal, law on equitable estoppel applies.  However, any such waiver by Defendants of state law makes no material difference because federal is substantially similar to state law.  *See Kramer*, 705 F.3d at 1130 n.5 (nothing that, although Ninth Circuit in *Mundi* cited federal equitable estoppel cases, the court applied the same substantive law on equitable estoppel that a California court would have applied).

United States District Court

For the Northern District of California

| A nonsignatory to an agreement containing an arbitration clause can compel a signatory to the agreement to arbitrate: | | | |
|---|---|---|---|
| 1 | Only under traditional equitable estoppel principles. | IL | *Peach v. CIM Ins. Corp.*, 816 N.E.2d 668, 674 (Ill. Ct. App. 2004). |
| | | MS | *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 492 (Miss. 2005) (stating that, "*[a]bsent* allegations of substantially interdependent and concerted misconduct between a non-signatory and a signatory who have a close legal relationship," traditional equitable estoppel law should apply) (emphasis added) |
| 2 | Only when the signatory seeks to enforce benefits under the agreement containing the arbitration clause. | None[5] | |

_____

[5] Plaintiffs contend that Arizona and Wisconsin belong in this category.  While Plaintiffs' position is not without any merit, the Court has – out of an abundance of caution – placed these states in other categories that are more favorable to Defendants.  Even with this "benefit," the Court concludes that Defendants still cannot establish equitable estoppel as appropriate in the case at bar.

| | A nonsignatory to an agreement containing an arbitration clause can compel a signatory to the agreement to arbitrate: | | | |
|---|---|---|---|
| **3** | Only when the signatory relies on the terms of the agreement in asserting its claims against the nonsignatory or when the signatory's claims against the nonsignatory are intertwined with the agreement. | AZ | *Schoneberger v. Oelze*, 96 P.2d 1078, 1081 n.5 (Az. Ct. App. 2004) (favorably citing *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000), where the Fourth Circuit stated that, where claims against a nonsignatory are intimately founded in and intertwined with a contract containing an arbitration clause, the signatory is estopped from refusing to arbitrate those claims). |
| | | WA | *Rajagopalan v. Noteworld, LLC*, 718 F.3d 844, 847-48 (9th Cir. 2013) (where plaintiffs sued under both federal and Washington state law, applying the "intertwined claims" test in deciding whether the nonsignatory could compel the signatory to arbitrate). |
| **4** | Only when the signatory to the agreement raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the other signatories to the agreement. | MS | *Qualcomm Inc. v. Am. Wireless License Grp., LLC*, 980 So. 2d 261, 269 (Miss. 2007) (citing *B.C. Rogers* for the proposition that "a non-signatory may be able to enforce an arbitration agreement against a signatory where the non-signatory has a close legal relationship with a signatory of the agreement"). |

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11

**United States District Court**
For the Northern District of California

| A nonsignatory to an agreement containing an arbitration clause can compel a signatory to the agreement to arbitrate: | | | |
|---|---|---|---|
| 5 | In *either* situation (3) or (4) above.<br><br>(This test has often been referred to as the *MS Dealer* test or the *Grigson* test. *See MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir. 2000).) | CA | *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013) (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)). |
| | | CT[6] | *Res. Servs., LLC v. Bridgeport Hous. Auth.*, No. HHDCV106020108S, 2011 Conn. Super. LEXIS 1487, at *21 (Conn. Super. Ct. June 13, 2011) |
| | | FL | *Marshall-Amaya & Anton v. Arnold-Dobal*, 76 So. 3d 998, 1004 (Fla. Ct. App. 2011). |
| | | IA | *Wells Enterprises, Inc. v. Olympic Ice Cream*, 903 F. Supp. 2d 740, 798 (N.D. Ohio 2012) (predicting how the Iowa Supreme Court would rule). |
| | | KY | *Household Fin. Corp. II v. King*, No. 2009-CA-001472-MR, 2010 Ky. App. Unpub. LEXIS 780, at *10-11 (Ky. Ct. App. Oct. 8, 2010). |
| | | MD | *Griggs v. Evans*, 43 A.3d 1081, 1093 (Md. Ct. Spc. App. 2012); *see also Westbard Apts., LLC v. Westwood Joint Venture, LLC*, 181 Md. App. 37, 51-52 (2007). |
| | | MI | *City of Detroit Police & Fire Retirement System v. Gsc Cdo Fund*, No. 289185, 2010 Mich. App. LEXIS 843, at *15 (Mich. Ct. App. May 11, 2010). |
| | | WI | *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 869 (E.D. Wisc. 2006) (pre-*Carlisle* decision). |
| 6 | Only if *both* (3) and (4) are applicable.<br><br>(This is the federal test applied by the Ninth Circuit before the Supreme Court decided *Carlisle* in May 2009. *See, e.g.*, *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009).) | CT | *Kuryla v. Coady*, No. AANCV126009961, 2013 Conn. Super. LEXIS 647, at *30 (Conn. Super. Ct. Mar. 22, 2013). |
| | | TX | *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191, 193-94 (Tex. 2007) (not foreclosing this test). |

---

[6] Connecticut has cases both in category (5) and category (6).

United States District Court

For the Northern District of California

C.      Unlawful Interception and Transmittal

The Court addresses first whether Defendants, as nonsignatories to the wireless carrier customer agreements, can compel Plaintiffs to arbitration pursuant to those agreements with respect to their claims for unlawful interception and transmittal.  Defendants argue they can, under each of the equitable estoppel tests identified above.  The Court does not agree.

        1.      Traditional Equitable Estoppel

Where a traditional equitable estoppel test is applicable, Defendants' motion to compel arbitration clearly no merit.  Under a traditional approach,

> "[a] claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person.  The party asserting a claim of estoppel must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable."

*Peach v. CIM Ins. Corp.*, 816 N.E.2d 668, 674 (Ill. App. Ct. 2004); *see also B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 492 (Miss. 2005) (stating that "equitable estoppel exists where there is a (1) belief and reliance on some representation; (2) a change of position as a result thereof; and (3) detriment or prejudice caused by the change of position").

Here, when Plaintiffs entered into the wireless carrier customer agreements which contained the arbitration clauses,[7] they did not make any statements or take any actions *vis-a-vis Defendants specifically* which Defendants could then have reasonably relied on to their detriment – *i.e.*, that Plaintiffs would arbitrate any claim they had against Defendants.  *See Peach*, 816 N.E.2d at 674.  Indeed, Plaintiffs did not even know about the existence of CIQ and its software, so, at the very least, they could not have made any representations to CIQ itself.

Furthermore, each of the arbitration agreements refers to a customer making an agreement with the *wireless carrier* (*i.e.*, ATTM, Sprint, or Cricket) and *not* any other person or entity.  *See, e.g.*, Dobbs Decl., Ex. 2 (ATTM Agreement at 1) (providing that "'AT&T' or 'we,' 'us' or 'our' refers to AT&T Mobility LLC"); Miller, Ex. B (Sprint 2011 Ts&Cs at 3) (providing that "'we,' 'us,'

---

[7] As noted above, the Court assumes for purposes of this order that there are no problems with formation and conscionability.

United States District Court

For the Northern District of California

1   'our,' 'Nextel,' and 'Sprint' mean Sprint Solutions, Inc."); Baughman Decl., Ex. 1 (Cricket Ts&Cs §

2   1(a)) (indicating that the terms "'us,' 'we,' 'our' or 'Cricket'" all refer to Cricket Communications,

3   Inc.).

4          The Court notes that although Defendants appeared briefly to address traditional equitable

5   estoppel in their reply papers, *see* Reply at 8 (arguing that Defendants detrimentally relied on the

6   arbitration clauses because they did not require end users to assent to a separate arbitration

7   agreement), Defendants conceded at the hearing they were not asserting traditional equitable

8   estoppel herein.

9          2.      "Rely" or "Intertwined" Test

10          The "rely"/"intertwined" test has been framed slightly differently depending on the state.

11   For example, in California, a nonsignatory can compel a signatory to arbitration "'when [the]

12   signatory must rely on the terms of the written agreement in asserting its claims against the

13   nonsignatory or the claims are intimately founded in and intertwined with the underlying contract.'"

14   *Murphy*, 724 F.3d at 1229.   In Florida, a nonsignatory can compel a signatory to arbitration "when

15   the signatory . . . 'must rely on the terms of the written agreement in asserting [its] claims' against

16   the nonsignatory.   When each of a signatory's claims against a nonsignatory 'makes reference to' or

17   'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[]

18   directly to the [written] agreement,' and arbitration is appropriate." *Marshall-Amaya & Anton v.*

19   *Arnold-Dobal*, 76 So. 3d 998, 1004 (Fla. Ct. App. 2011).   But regardless of the slight differences in

20   framing, the fundamental policy underlying equitable estoppel is not in dispute – specifically, "a

21   plaintiff may not, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed

22   by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's

23   applicability because the defendant is a non-signatory." *Murphy*, 724 F.3d at 1229 (internal

24   quotation marks omitted).

25          The doctrine of equitable estoppel is thus predicated on the unfairness of allowing a party to

26   rely on part of a contract in asserting a claim while, at the same time, disavowing another part of the

27   same contract.   Yet, Defendants do not contend that, in asserting their claims herein, Plaintiffs must

28   rely – as a legal matter – on the terms of the wireless carrier customer agreements.   The legal claims

1  against Defendants are not in any legal way founded upon and do not arise out of the contracts with

2  the wireless carriers.  Instead, they are based on statutory rights not dependent upon the terms of

3  those contracts.  Equitable estoppel does not apply in such circumstances.  *See Murphy*, 724 F.3d at

4  1231 n.7 (indicating that "equitable estoppel is particularly inappropriate where plaintiffs seek the

5  protection of consumer protection laws against misconduct that is unrelated to any contract except to

6  the extent that a customer service agreement is an artifact of the consumer-provider relationship

7  itself").

8          Defendants contend, nevertheless, that the unlawful interception/transmission claims rely on

9  or are "intertwined" with the agreements because, to prevail on the claims, Plaintiffs must show that

10  they did not consent to the interception/transmittal, whereas the wireless carrier customer

11  agreements contain provisions which, at the very least, arguably indicate their consent.  For

12  example, Sprint's Ts&Cs provide:

13          Information that we automatically collect.  We automatically
          receive certain types of information whenever you use our Services.
14          *We may collect information about your device, your computer, and
          online activities.*  For example, we collect your device's and
15          computer's IP address, the date and time of your access and the type of
          browser you use.  We also collect information about your device's and
16          computer's operating system, your location, and the Web site from
          which you came and then went, and Web sites you visit on your
17          device.  We may link information we automatically collect with
          personal information, such as information you give us at registration or
18          check out.

19          Information we collect when we provide you with Services
          includes when your wireless device is turned on, how your device is
20          functioning, device signal strength, where it is located, what device
          you are using, what you have purchased with your device, how you are
21          using it, and what sites you visit.

22          We may use systems or tools to follow your use of our Services,
          including using cookies, web beacons and other tracking mechanisms.
23          For example, we allow collection by analytic service provider(s) of
          site click-stream and cookie data to help us track aggregate and
24          individual use of our Services.  We sometimes use cookies to enable
          features on our sites, like the ability to save your shopping cart or set
25          preferences. . . .

26                  . . . .

27          We may use your personal information for a variety of
          purposes, including providing you with Services.  We use your
28          personal information to do things like:

United States District Court

For the Northern District of California

. . . .

1.      *Monitor, evaluate or improve our Services, systems, or networks.*

Miller Decl., Ex. GGG (Sprint Privacy Policy at 1-2).

As noted above, even if Plaintiffs have the burden of proving lack of consent or authority as part of their statutory claims, they are not invoking the wireless carrier customer agreements to establish their case; rather, it is *Defendants* who are invoking the agreements to disprove Plaintiffs' factual assertions.  *See Ehlen Floor Covering, Inc. v. Lamb*, No. 2:07-cv-666-FtM-29DNF, 2010 U.S. Dist. LEXIS 84120, at *8 (M.D. Fla. July 14, 2010) (stating that "[a]n issue raised as a defense . . . is not attributable to the non-party in determining whether the non-party may be compelled to arbitrate"); *see also Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S. Ct. 2847, 2863 (2010) (stating that "[t]he mere fact that Local [the union] raised the formation date dispute as a defense to Granite Rock's suit does not make that dispute attributable to Granite Rock in the waiver or estoppel sense the Court of Appeals suggested, much less establish that Granite Rock agreed to arbitrate it by suing to enforce the CBA as to other matters").  Defendants have cited no case where *defendant's* reliance on a contract justifies the application of equitable estoppel against the *plaintiff* who does not rely on the contract.  A contrary holding would be divorced from the basic principle underlying the equitable doctrine.  *See Murphy*, 724 F.3d at 1229 (noting that equitable estoppel "reflects the policy that a plaintiff may not, 'on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory'").

Furthermore, as made clear at the hearing, Plaintiffs are not suing Defendants for any conduct on the part of Defendants related to interception/transmittal to *the wireless carriers*. That being the case, the fact that the wireless carrier customer agreements contain provisions which allow *the wireless carriers* (or even others acting on their behalf) to collect certain information from their customers is irrelevant.  Plaintiffs are charging misconduct by Defendants because the CIQ software was intercepting for and transmitting to persons or entities *other* than the wireless carriers.

**United States District Court**
For the Northern District of California

1    To the extent Defendants contend the "rely" or "intertwined" test can be met where an

2    agreement is simply referred in the complaint or the existence of the agreement is presumed, the

3    Court does not agree.  While some cases use language of "refer to" or "presume the existence of,"

4    that language must be taken in context.  Defendants have not pointed to any case where the mere

5    reference to an agreement (containing an arbitration clause) is adequate to demonstrate reliance.

6    *See, e.g.*, *Amisil Holdings Ltd. v. Clarium Cap. Mgmt., LLC*, 622 F. Supp. 2d 825, 841 (N.D. Cal.

7    2007) (a pre-*Carlisle* case, stating that "each of the claims are related to the Agreement in a way that

8    either refers to or presumes the existence of the Agreement" because "[a]bsent the Operating

9    Agreement, *none of these claims would lie*"; adding that "Amisil cannot use the Agreement *as a*

10   *sword* and at the same time choose to ignore it as a shield") (emphasis added).

11   Indeed, in *Murphy*, the Ninth Circuit (applying California law) expressly rejected an

12   argument similar to that made by Defendants here.  In *Murphy*, the plaintiffs sued Best Buy for

13   making misrepresentations to customers at the point of sale that they were actually buying, rather

14   than just leasing, certain DirecTV service equipment (*e.g.*, receivers and digital video recorders).

15   Best Buy did not have any agreement with the plaintiffs containing an arbitration clause, but there

16   was an arbitration clause in the customer agreements that plaintiffs had with DirecTV.  Best Buy, as

17   a nonsignatory to the customer agreements, tried to compel the plaintiff-signatories to arbitration on

18   the basis of equitable estoppel.  The Ninth Circuit rejected Best Buy's contention that the plaintiffs'

19   fraud claims relied on or were intertwined with the DirecTV customer agreements.

20           Even if Best Buy is correct that Plaintiffs' [fraud] claims on
         some abstract level require the existence of the Customer Agreement,

21       the law is clear that this is not enough for equitable estoppel.  In
         California, equitable estoppel is inapplicable where a plaintiff's

22       "allegations reveal no claim of any violation of any duty, obligation,
         term or condition imposed by the [customer] agreements."  Applying

23       this principle in *Kramer*, we held that Toyota could not compel
         arbitration of a consumer class action on the basis of arbitration

24       clauses contained in the Purchase Agreements customers entered into
         with their dealerships.  We expressly rejected Toyota's argument that

25       the plaintiffs' claims were necessarily intertwined with the Purchase
         Agreements merely because the lawsuit was predicated on the bare

26       fact that a vehicle purchase occurred.  Rather, we held that the
         plaintiffs' causes of action, which, as here, largely arose under

27       California consumer protection law, were not sufficiently intertwined
         with the Purchase Agreements to trigger equitable estoppel.  Likewise,

28       here, the Customer Agreement proves at most the existence of a

United States District Court
For the Northern District of California

1   transaction; Plaintiffs' claims do not depend on the Agreement's
2   terms.

3   *Murphy*, 724 F.3d at 1230-31. *See also Kramer*, 705 F.3d at 1129 (stating that "'[e]quitable estoppel
4 applies only if the plaintiffs' claims against the nonsignatory are dependent upon, or inextricably
5 bound up with, the obligations imposed by the contract plaintiff has signed with the signatory
6 defendant'" and that "'[m]erely 'mak[ing] reference to' an agreement with an arbitration clause is
7 not enough"); *Apple iPhone 3G*, 859 F. Supp. 2d at 1095 (indicating that a "but-for" connection
8 between the agreement and the challenged conduct is not enough). Moreover, in *Murphy*, the Ninth
9 Circuit indicated that "equitable estoppel is particularly inappropriate where plaintiffs seek the
10 protection of consumer protection laws against misconduct that is unrelated to any contract except to
11 the extent that a customer service agreement is an artifact of the consumer-provider relationship
12 itself." *Murphy*, 724 F.3d at 1231 n.7. *See also Rajagopalan*, 718 F.3d at 847 (noting that plaintiff
13 "does not contend that [defendant] or any other party breached the terms of the contract[;] [i]nstead,
14 [plaintiff] has 'statutory claims that are separate from the [] contract itself'"); *Kramer*, 705 F.3d at
15 1130-32 (rejecting claim that plaintiffs relied on dealer purchase agreement in asserting claim
16 against Toyota). Hence, the fact that the installation of the CIQ software might not have occurred
17 absent a service agreement between the wireless carriers and Plaintiffs does not satisfy the test of
18 reliance or intertwining anymore than did the DirecTV contract in *Murphy* or the dealer purchase
19 agreement in *Kramer*. The wireless carrier customer agreement is merely "an artifact of the
20 consumer-provider relationship itself." *Murphy*, 724 F.3d at 1231 n.7.

21     Finally, the Court notes that in applying the "intertwining" test, some courts have expressly
22 required the claim be "'*intimately founded in and* intertwined with' the underlying agreement"
23 before equitable estoppel can apply. *Kramer*, 705 F.3d at 1128 (emphasis added). Notably, the two
24 main cases on which Defendants rely meet this criteria. In *In re Apple & AT&TM Antitrust Litig.*,
25 826 F. Supp. 2d 1168 (N.D. Cal. 2011), plaintiffs alleged that ATTM and Apple agreed, without
26 plaintiffs' knowledge or consent, to make ATTM the exclusive provider of voice and data services
27 for the iPhone for five years (instead of just two). When the nonsignatory Apple invoked equitable
28 estoppel to get the benefit of an arbitration agreement in an ATTM contract, the court noted that, "as

18

1   to the intertwining of the claims, Plaintiffs themselves have contended throughout this litigation that

2   their antitrust and related claims against . . . ATTM and . . . Apple *arise from* their respective ATTM

3   contracts." *Id.* at 1178 (emphasis added).  In *Apple iPhone 3G*, plaintiffs' "core allegation [was] that

4   the ATTM 3G network could not accommodate iPhone 3G users, and that Plaintiffs were deceived

5   into paying higher rates for service which could not be delivered on the 3G network." *Apple iPhone*

6   *3G*, 859 F. Supp. 2d at 1096.  When the nonsignatory Apple invoked equitable estoppel to get the

7   benefit of an arbitration agreement in an ATTM contract, the court noted that plaintiffs' false

8   advertising claims against Apple "*arise from* their service agreements with ATTM." *Id.* (emphasis

9   added).

10          As noted above, the unlawful interception/transmittal claims herein against the non-carrier

11   defendants herein did not arise from the wireless carrier customer agreements.  Rather, they arise

12   from alleged statutory violations (not breaches of contract) by CIQ and Defendants for conduct

13   separate and distinct from the interception and transmission of information to wireless carriers.

14   Defendants have failed to establish the "rely" and "intertwined" test applies under any of the

15   applicable state laws.

16          3.      "Interdependent Misconduct" Test

17          Similar to above, the "interdependent misconduct" test, is framed variously from state to

18   state.  For example, a Connecticut state court has held that "equitable estoppel allows a nonsignatory

19   to compel arbitration . . . when the signatory to the contract containing an arbitration clause raises

20   allegations of substantially interdependent and concerted misconduct by both the nonsignatory and

21   one or more of the signatories to the contract." *Res. Servs., LLC v. Bridgeport Hous. Auth.*, No.

22   HHDCV106020108S, 2011 Conn. Super. LEXIS 1487, at *21 (Conn. Super. Ct. June 13, 2011)

23   (internal quotation marks omitted).  In California, a nonsignatory can compel a signatory to arbitrate

24   "'when the signatory alleges substantially interdependent and concerted misconduct by the

25   nonsignatory and another signatory and the 'allegations of interdependent misconduct [are] founded

26   in or intimately connected with the obligations of the underlying agreement.'" *Kramer*, 705 F.3d at

27   1129.

28

For the unlawful interception/transmittal claims, Defendants argue that equitable estoppel is applicable under the "interdependent misconduct" test because Plaintiffs (signatories to the wireless carrier customer agreements) have raised allegations of substantially interdependent and concerted misconduct by Defendants (nonsignatories) and the wireless carriers (signatories). According to Defendants, "allegations that [CIQ and the Device] Defendants acted in concert with Plaintiffs' Service Providers remain at the heart of Plaintiffs' claims." Mot. at 32. The Service Providers required the Device Defendants to install the CIQ software on the mobile devices, specified the types of data to be collected, and were the recipients of data transmitted off the mobile devices. *See* Mot. at 32.

Defendants acknowledge that, in the CAC, Plaintiffs have not sued the wireless carriers but argue that Plaintiffs should not be able to avoid arbitration simply by taking the tactical strategy of not naming the wireless carriers with whom they would clearly be required to arbitrate. *See* Mot. at 36-37. *See, e.g., Morselife Found., Inc. v. Merrill Lynch Bank & Trust Co., FSB*, No. 09-81143-CIV, 2010 U.S. Dist. LEXIS 83096, at *8, 10-11 (S.D. Fla. July 21, 2010) (agreeing that, by dropping Merrill Lynch as the party defendant and filing an amended complaint solely against Merrill Lynch Bank & Trust Co., "Plaintiff is engaging in a tactical ploy to avoid MorseLife's binding agreement to arbitrate 'all controversies' with Merrill Lynch"; adding that allegedly tortious acts of Merrill Lynch Bank & Trust Co. were inextricably interwoven with the conduct of employees of Merrill Lynch); *see also Wells Enters., Inc. v. Olympic Ice Cream*, 903 F. Supp. 2d 740, 798 (N.D. Ohio 2012) (predicting that the Iowa Supreme Court would recognize equitable estoppel "when the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided"). Defendants also point out that, in at least some of the member cases, the plaintiffs did originally sue wireless carriers.[8] *See, e.g., Silvera v. Carrier IQ, Inc.*, No. C-11-5821 EMC (Docket No. 1) (AT&T, Inc. and Sprint Communications Co., L.P.); *Medine v. Carrier IQ, Inc.*, No. C-11-6178 EMC (Docket No. 1) (AT&T Inc.); *Pacilli v.*

---

[8] However, none of the *named* Plaintiffs appear to have sued any wireless carrier. And at least the current CAC does not name any wireless carrier as a defendant.

United States District Court

For the Northern District of California

1   *Carrier IQ, Inc.*, No. C-12-2137 EMC (Docket No. 1) (AT&T Inc., Sprint Nextel Corp., T-Mobile

2   USA, Inc.); *Howell v. Carrier IQ, Inc.*, No. C-12-2314 EMC (Docket No. 1) (AT&T, Inc.);

3   *Kacmarcik v. Carrier IQ, Inc.*, No. C-12-2315 EMC (Docket No. 1) (Sprint Nextel Corp.); *Eakins v.*

4   *Carrier IQ., Inc.*, No. C-12-2537 EMC (Docket No. 1) (Sprint Communications Co., L.P.); *Siegel v.*

5   *Carrier IQ, Inc.*, No. C-12-2543 EMC (Docket No. 1) (Sprint-Nextel Corp.); *Cassine v. Carrier IQ,*

6   *Inc.*, No. C-12-1890 EMC (Docket No. 1) (Sprint Nextel Corp. and AT&T, Inc.).

7          The problem here is that Plaintiffs' unlawful interception/transmission claims asserted herein

8   are not predicated on allegations that Defendants colluded or otherwise acted in concert with the

9   wireless carriers.  Plaintiffs' claims are based on interception for and transmittal to persons or

10  entities *other* than the wireless carriers, whether it is CIQ itself, the OEM Defendants, Google, or

11  application vendors or developers.  At the hearing, Plaintiffs emphasized that private information

12  was being collected *beyond* the scope of what the wireless carriers wanted – such information was

13  not needed in order for the wireless carriers to maintain service to their customers and diagnose

14  problems in providing service.  Thus, even under a broad understanding of the "interdependent

15  misconduct" test,[9] that test is not satisfied as a factual matter here.

16         Moreover, at least some state courts that have adopted the "interdependent misconduct" test

17  have clarified that the interdependent misconduct between the parties alone is not enough; that

18  conduct must be "'founded in or intimately connected with the obligations of the underlying

19  agreement.'"  *Murphy*, 724 F.3d at 1229 (discussing California law).  In other words, "'[m]ere

20  allegations of collusive behavior between signatories and nonsignatories to a contract are not enough

21  to compel arbitration between parties who have not agreed to arbitrate.'"  *Id.* at 1231 (quoting

22  *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 92 Cal. Rptr. 3d 534, 545 (2009)).  It is not so much

23  the collusive behavior between the parties as it is "the relationship of the *claims*" that is key.  *Id.* at

24  _____

25         [9] At the hearing, Defendants suggested Iowa is one such state.  In *Wells Enterprises, Inc. v. Olympic Ice Cream*, 903 F. Supp. 2d 740 (N.D. Ohio 2012), a federal court in Iowa predicted that

26  the Iowa Supreme Court would recognize "two situations in which alternative estoppel may arise," one of which was "when the relationship between the signatory and nonsignatory defendants is

27  sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."  *Id.* at 798 (internal

28  quotation marks omitted).  Defendants have not demonstrated this test is materially different from that applied in other states.

United States District Court
For the Northern District of California

1231 (emphasis in original). "Even where a plaintiff alleges collusion, '[t]he *sine qua non* for allowing a nonsignatory to enforce an arbitration clause based on equitable estoppel is that the claims the plaintiff asserts against the nonsignatory are dependent on or inextricably bound up with the contractual obligations of the agreement containing the arbitration clause.'" *Id.* at 1232. This application of the "interdependent misconduct" test is faithful to the underlying rationale of the equitable estoppel doctrine discussed above. For the reasons discussed above in conjunction with the "rely"/"intertwined" test, there is no interdependence between Plaintiffs' statutory claims and the terms of the carriers' agreements.

Thus, Defendants have failed to establish the applicability of the interdependent misconduct.

### 4. Remaining Tests for Equitable Estoppel

Because Defendants cannot meet either the "intertwined" or "interdependent misconduct" test, the Court finds that Defendants are also incapable of meeting the various other tests under applicable state laws. As noted above, the remaining tests either require that the nonsignatory moving to compel arbitration meet *both* the "rely"/"intertwined" and "interdependent misconduct" tests or at least one of those tests. A *fortiori*, since neither element is satisfied in this case, equitable estoppel cannot be established under those state laws.

### D. Implied Warranty

Plaintiffs' implied warranty claims are asserted against the Device Defendants only and consist of two different theories:

(1) The mobile devices are designed and marketed for communication purposes, including for the transmittal and receipt of private information, but Plaintiffs' devices are not performing as impliedly represented because they are intercepting and transmitting private information unbeknownst to them. *See, e.g.*, CAC ¶¶ 152, 167.

(2) The mobile devices cannot fulfill their ordinary purposes because the CIQ software installed on them depletes the devices of their battery power and life. *See, e.g.*, CAC ¶¶ 155, 169.

In their papers, the Device Defendants base their invocation of arbitration solely on the "rely" or "intertwined" test. *See* Mot. at 30; Reply at 4. Accordingly, for those states that do not

1    allow for equitable estoppel based on the "rely" or "intertwined" test alone, there is no basis for

2    compelling arbitration of those claims.

3         Even as to those states that allow for equitable estoppel based on the "rely" or "intertwined"

4    test alone, Defendants may not compel arbitration here.  According to the Device Defendants, the

5    implied warranty claims against them are intertwined with the wireless carrier customer agreements

6    (containing the arbitration clause) because an implied warranty of merchantability arises from a

7    contract for sale, *see, e.g.*, Cal. Comm. Code § 2314(1) (providing that "a warranty that the goods

8    shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to

9    goods of that kind"), and here the only contracts for sale of the mobile devices are the wireless

10   carrier customer agreements.  *See* Mot. at 30 (asserting that "Plaintiffs purchased their mobile

11   devices *from the wireless Service Providers* and the contracts that govern Plaintiffs' purchase of the

12   mobile device are the wireless service agreements").  The Device Defendants also argue that

13   Plaintiffs must rely on the wireless carrier customer agreements in order to prove, *e.g.*, that they

14   bought the bought the devices in the first place (which gives Plaintiffs standing) and that their

15   damages are the sales prices for the devices.

16        But the Device Defendants fail to take into account the allegations in the CAC.  Plaintiffs'

17   implied warranty claims are not based on the wireless carrier customer agreements (indeed,

18   Plaintiffs note in their opposition that the wireless carriers disclaimed any warranties in the

19   agreements) but rather on written warranties provided by the Device Defendants themselves "in

20   conjunction with the purchase [of] their mobile devices."  CAC ¶ 165.  The Device Defendants do

21   not challenge that they extended warranties themselves independent of the wireless carriers.[10]

22

23        [10] The Court also notes that Plaintiffs would not have to rely on the wireless carrier customer

24   agreements to provide the contractual basis for their claim because they may rely on a contract for
     sale *other* than the wireless carrier customer agreements – for example, a contract for sale between
     the Device Defendants and another person or entity in the distribution chain before the mobile

25   devices get to the end consumer (with the end consumer being the intended third-party beneficiary).
     *Cf. Sheeskin v. Giant Food, Inc.*, 318 A.2d 874, 886 (Md. Ct. Spc. App. 1974) (stating that, "[w]hile

26   privity between the bottler and the ultimate consumer is not required, a 'sale' or 'contract for sale' is
     required in order to make the warranty implied by § 2-314 applicable[;] [t]hus, there must be a sale

27   or contract for sale from the bottler to some individual in the distributive chain in order for the
     implied warranties to arise in favor of the ultimate consumer").  While Plaintiffs have not expressly

28   alleged that they are third-party beneficiaries of such a contract for sale, such a theory may fairly be
     implied; moreover, express allegations to that effect could easily be added to the operative

United States District Court
For the Northern District of California

1    While the Device Defendants suggest that Plaintiffs still have to rely on the wireless carrier

2    customer agreements to establish, *e.g.*, the fact that they purchased the mobile devices, *Murphy*

3    establishes that the mere fact that a contract proves the existence of a transaction is not enough to

4    establish equitable estoppel; there must be dependence on the contract's terms which is lacking here.

5    *See Murphy*, 724 F.3d at 1231; *Kramer*, 705 F.3d at 1131-32 (stating that, "[i]n order for Toyota's

6    equitable estoppel argument to succeed, Plaintiffs' claims themselves must intimately rely on the

7    existence of the Purchase Agreements, not merely reference them"); *see also Apple iPhone 3G*, 859

8    F. Supp. 2d at 1095 (stating that "but-for" connection was not sufficient to compel plaintiffs to

9    arbitrate).

10    Accordingly, the Court concludes that there is no basis for equitable estoppel to apply to

11    Plaintiffs' claims for breach of the implied warranty of merchantability.

12    ### III.    CONCLUSION

13    For the foregoing reasons, the Court rejects Defendants' contention that they are entitled to

14    invoke the arbitration provisions in the wireless customer agreements.  Equitable estoppel being

15    inapplicable, Defendants' motion to compel arbitration is therefore denied.

16    This order disposes of Docket No. 129.

17

18    IT IS SO ORDERED.

19

20    Dated:  March 28, 2014

21    _____
      EDWARD M. CHEN
22    United States District Judge

23

24

25

26

27    complaint.  In any event, regardless of whether Plaintiffs ultimately state such a claim on the merits,
      a matter that may be tested at another juncture, their implied warranty claim does not rely on the
28    carrier agreements and thus arbitration may not be compelled.