Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Bruce L. Simon (96241)
Daniel L. Warshaw (185365)
William J. Newsom (267643)
PEARSON SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
dwarshaw@pswlaw.com
wnewsom@pswlaw.com

*Counsel for Select Plaintiffs and*
*Co-Lead Counsel for the Proposed Classes*

[*Additional Counsel Listed on*
*Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE<br><br>CARRIER IQ, INC.,<br>CONSUMER PRIVACY LITIGATION. | No. 12-md-2330-EMC<br><br>SECOND CONSOLIDATED<br>AMENDED COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION ....................................................................................................2

III.    PARTIES ...............................................................................................................3

IV.     FACTUAL BACKGROUND ...............................................................................11

        A.      Revelations and Deep Concerns Regarding Carrier IQ Software ...........11

        B.      Carrier IQ Software as Deployed .............................................................16

                1.      The enormous number of affected devices....................................16

                2.      Carrier IQ Software's interception and transmittal of private
                        communications and content ..........................................................18

                3.      The FTC's investigation of, and actions against, HTC involving Carrier IQ
                        Software...........................................................................................24

                4.      Further Comments on Carrier IQ Software ....................................29

V.      CLASS ALLEGATIONS .....................................................................................30

VI.     CLAIMS FOR RELIEF .......................................................................................32

VII.    PRAYER FOR RELIEF .....................................................................................129

VIII.   JURY TRIAL DEMANDED ..............................................................................131

For their complaint against the defendants, plaintiffs allege as follows:

## I.    INTRODUCTION

1.      This proposed class-action lawsuit concerns Carrier IQ Software, which is, or has been, installed on millions of Americans' mobile devices. "Carrier IQ Software" is an overarching term for Carrier IQ's "IQ Agent" and another software component, called the "CIQ Interface," that is installed with the IQ Agent in the software's most popular deployment. Though the defendants in this suit describe the Carrier IQ Software as a benign tool installed at the behest of wireless carriers to help them provide better service, the defendants have intentionally designed and deployed it to do far more than gather data regarding signal strength or dropped calls. Far from designing the software to collect bland metrics alone, they have designed and deployed it such that it also intercepts private communications, content, and data, including: URLs[1] containing HTTP and HTTPS query strings[2] embedded with Internet search terms (that might, for example, reveal consumers' medical conditions, sexual orientation, religion, or a host of other personal information), user names, passwords, and granular geo-location information; granular geo-location information apart from that transmitted in URLs; SMS text message content; and application purchases and uses. In fact, due to the design choices intentionally effected by the defendants, the

---

[1] "In computing, a uniform resource locator (URL) is a specific character string that constitutes a reference to a [web] resource." *See* http://en.wikipedia.org/wiki/Uniform_resource_locator (last accessed June 23, 2014).

[2] "In the World Wide Web, a query string is the part of a uniform resource locator (URL) that contains data to be passed to web applications such as CGI programs. When a web page is requested via the Hypertext Transfer Protocol [HTTP], the server locates a file in its file system based on the requested URL." *See* http://en.wikipedia.org/wiki/Query_string (last accessed June 23, 2014).

"The Hypertext Transfer Protocol (HTTP) is an application protocol for distributed, collaborative, hypermedia information systems. HTTP is the foundation of data communication for the World Wide Web." *See* http://en.wikipedia.org/wiki/Hypertext_Transfer_Protocol (last accessed June 23, 2014).

"Hypertext Transfer Protocol Secure (HTTPS) is a communications protocol for secure communication over a computer network, with especially wide deployment on the Internet. Technically, it is not a protocol in and of itself; rather, it is the result of simply layering the Hypertext Transfer Protocol (HTTP) on top of the SSL/TLS protocol, thus adding the security capabilities of SSL/TLS to standard HTTP communications." *See* http://en.wikipedia.org/wiki/Https (last accessed June 23, 2014).

Carrier IQ Software intercepts confidential and private content that the wireless carriers say they never wanted or requested, such that interceptions of such data was not done on their behalf.

2.     Also, as explained more fully below, communications, content, and data intercepted by the Carrier IQ Software have been transmitted off mobile devices without the knowledge of consumers. In fact, in at least one deployment, some of this material, including SMS text message content, has been transmitted without consumers' knowledge to Google, the author of the Android mobile operating system; to one of the defendant device manufacturers; and probably to application vendors and developers as part of device or application crash reports. That deployment caught the attention of the Federal Trade Commission ("FTC"), which took action against the manufacturer involved.

3.     Plaintiffs' rights to privacy and security in their confidential, private, and sensitive communications have been infringed, in violation of federal and state law. Furthermore, plaintiffs and members of the proposed class have suffered economic harm; they would not have purchased their mobile devices had they known that these devices bore hidden battery-, processor-, and memory-taxing software that intercepts private and confidential communications and enables them to be sent to unintended recipients.

4.     Plaintiffs, on behalf of themselves and similarly situated mobile device owners, bring this suit under the Federal Wiretap Act, state privacy statutes, state consumer protection acts, the Magnuson-Moss Warranty Act, and state warranty laws for the maximum relief available to them and the proposed class.

## II.    JURISDICTION

5.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because plaintiffs allege violations of federal law, including the Federal Wiretap Act as amended by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*, and the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. The Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

6.     This Court has personal jurisdiction over the defendants in this action because defendants are licensed to do business in the state of California or otherwise conduct business in California.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as unlawful acts are alleged to have been committed in this federal judicial district and defendants reside or regularly conduct business here. Furthermore, the Judicial Panel on Multidistrict Litigation, by order dated April 16, 2012, transferred all related cases in this matter to this Court for coordinated or consolidated pre-trial proceedings.

## III.     PARTIES

**The plaintiffs**

8.     Plaintiff Patrick Kenny resides in Cave Creek, Arizona. Plaintiff Kenny purchased a Samsung Galaxy S 4G mobile device in 2011. He formerly owned and used an HTC Touch mobile device ("HTC Touch" is the name of that device, to the best of his recollection). Upon information and belief, Mr. Kenny's devices came with the Carrier IQ Software and related implementing or porting software pre-installed. In addition to using his devices to make phone calls, Mr. Kenny used them for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Kenny would not have purchased his mobile devices had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his devices, and taxing his devices' battery, processor, and memory, as alleged herein.

9.     Plaintiff Daniel Pipkin resides in Port Hueneme, California. Plaintiff Pipkin purchased a Samsung Galaxy SII 4G LTE mobile device in 2011. Upon information and belief, Mr. Pipkin's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Pipkin has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Pipkin would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was

installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

10.     Plaintiff Jennifer Patrick resides in Sacramento, California. Plaintiff Patrick purchased a Motorola Bravo mobile device in 2010. Upon information and belief, Ms. Patrick's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using her device to make phone calls, Ms. Patrick has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Patrick would not have purchased her mobile device had she known that the Carrier IQ Software and related implementing or porting software was installed and operating on her device, and taxing her device's battery, processor, and memory, as alleged herein.

11.     Plaintiff Dao Phong resides in San Francisco, California. Plaintiff Phong purchased an HTC EVO mobile device in 2010. Upon information and belief, Ms. Phong's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using her device to make phone calls, Ms. Phong has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Phong would not have purchased her mobile device had she known that the Carrier IQ Software and related implementing or porting software was installed and operating on her device, and taxing her device's battery, processor, and memory, as alleged herein.

12.     Plaintiff Ryan McKeen resides in East Granby, Connecticut. Plaintiff McKeen purchased a Samsung Epic Touch 4G mobile device in 2011. Upon information and belief, Mr. McKeen's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. McKeen has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. McKeen would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

13.     Plaintiff Leron Levy resides in Miami, Florida. Plaintiff Levy purchased a Samsung Moment mobile device in 2010. Upon information and belief, Mr. Levy's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Levy has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Levy would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

14.     Plaintiff Matthew Hiles resides in Davenport, Iowa. Plaintiff Hiles purchased an LG Marquee mobile device in 2011. Upon information and belief, Mr. Hiles' mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Hiles used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Hiles would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

15.     Plaintiff Luke Szulczewski resides in Lansing, Illinois. Plaintiff Szulczewski purchased an HTC EVO 4G mobile device in 2010. Upon information and belief, Mr. Szulczewski's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Szulczewski has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Szulczewski would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

16.     Plaintiff Michael Allan resides in Liberty, Kentucky. Plaintiff Allan purchased an HTC EVO 4G mobile device in 2011. Upon information and belief, Mr. Allan's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition

to using his device to make phone calls, Mr. Allan has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Allan would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

17.     Plaintiff Gary Cribbs resides in Laurel, Maryland. Plaintiff Cribbs purchased a Samsung Galaxy S2 Skyrocket mobile device in 2010. Upon information and belief, Mr. Cribbs' mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Cribbs has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Cribbs would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

18.     Plaintiff Shawn Grisham resides in Iuka, Mississippi. Plaintiff Grisham purchased a Samsung Epic 4G mobile device in 2011. Upon information and belief, Mr. Grisham's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Grisham has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Grisham would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein

19.     Plaintiff Bobby Cline resides in Seabrook, New Hampshire, but at pertinent times to this matter, he resided in Oakland County, Michigan. Plaintiff Cline purchased an LG LS670 Optimus S mobile device in 2011. Upon information and belief, Mr. Cline's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Cline has used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive

information. Mr. Cline would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

20.     Plaintiff Mark Laning resides in Carrollton, Texas. Plaintiff Laning purchased a Pantech P5000 mobile device in 2011. Upon information and belief, Mr. Laning's phone came with the Carrier IQ Software and implementing or porting software pre-installed, and he was notified that it was installed by Pantech. In addition to using his device to make phone calls, Mr. Laning has used it for text messaging. Mr. Laning would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

21.     Plaintiff Clarissa Portales resides in Dallas, Texas. Plaintiff Portales purchased an HTC EVO phone in 2010. Upon information and belief, Ms. Portales's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using her device to make phone calls, Ms. Portales used it for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Portales would not have purchased her mobile device had she known that the Carrier IQ Software and related implementing or porting software was installed and operating on her device, and taxing her device's battery, processor, and memory, as alleged herein.

22.     Plaintiff Douglas White resides in Houston, Texas. Plaintiff White purchased a Huawei Ascend II m865 mobile device in October 2011. Upon information and belief, Mr. White's mobile device came with the Carrier IQ Software and implementing or porting software, pre-installed. In addition to using his device to make phone calls Mr. White has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. White would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

23.     Plaintiff Eric Thomas resides in New Braunfels, Texas. Plaintiff Thomas purchased a Samsung Replenish mobile device in 2010. Upon information and belief, Mr. Thomas's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Thomas has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Thomas would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

24.     Plaintiff Brian Sandstrom resides in San Francisco, California, but at pertinent times to this matter, he resided in Seattle, Washington. Plaintiff Sandstrom purchased an HTC EVO mobile device in 2010. Upon information and belief, Mr. Sandstrom's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using his device to make phone calls, Mr. Sandstrom has used his mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Mr. Sandstrom would not have purchased his mobile device had he known that the Carrier IQ Software and related implementing or porting software was installed and operating on his device, and taxing his device's battery, processor, and memory, as alleged herein.

25.     Plaintiff Colleen Fischer resides in Janesville, Wisconsin. Plaintiff Fischer purchased an LG LS670 Optimus S mobile device in 2011. Upon information and belief, Ms. Fischer's mobile device came with the Carrier IQ Software and implementing or porting software pre-installed. In addition to using her device to make phone calls, Ms. Fischer has used her mobile device for web browsing and text messaging, including accessing, inputting, and transmitting personal, private, confidential, and sensitive information. Ms. Fischer would not have purchased her mobile device had she known that the Carrier IQ Software and related implementing or porting software was installed and operating on her device, and taxing her device's battery, processor, and memory, as alleged herein.

**The defendants**

26.     Defendant Carrier IQ, Inc. ("Carrier IQ" or "CIQ") is a Delaware corporation headquartered in Mountain View, California, with additional present or former offices in Chicago, Boston, London (U.K.), and Kuala Lumpur (Malaysia). Carrier IQ is the designer, author, programmer, and vendor of the IQ Agent and of the guide or template for the related implementing or porting software known as the CIQ Interface. Furthermore, as discussed herein, Carrier IQ remains heavily involved with Carrier IQ Software after a sale or license, including with respect to its installation on mobile devices, which it works with the defendant manufacturers to effect, and with the software's activation, operation, and data collection and transmittals.

27.     Defendant HTC America, Inc. ("HTC America") is a Washington corporation with its principal place of business in Bellevue, Washington. HTC America builds and sells mobile devices throughout the United States that are based on the Android mobile operating system ("Android OS").

28.     Defendant HTC Corporation ("HTC Corp.") is a Taiwanese corporation and mobile device manufacturer located in Taoyuan, Taiwan. It also is the parent to defendant HTC America, Inc. HTC Corp. builds and sells mobile devices throughout the United States that are based on the Android OS.

29.     HTC America and HTC Corp. are collectively referred to as "HTC." HTC is the author and programmer of the CIQ Interface software used on HTC mobile devices referred to herein. Upon information and belief, HTC installed the Carrier IQ Software and CIQ Interface software on all the HTC mobile device models referenced herein. It is not yet known if any, or how many, other HTC mobile device models bear or bore the software at issue.

30.     Defendant Huawei Device USA, Inc. ("Huawei") is a Texas corporation with its principal place of business in Plano, Texas. Huawei builds and sells mobile devices throughout the United States that are based on the Android OS. Upon information and belief, CIQ Interface software was deployed on the Huawei devices at issue, and that Huawei was the author and programmer of that software. Also, upon information and belief, Huawei installed the Carrier IQ Software and CIQ Interface software on all the Huawei mobile device models referenced herein. It

1    is not yet known if any, or how many, other Huawei mobile device models bear or bore the

2    software at issue.

3         31.     Defendant LG Electronics MobileComm U.S.A., Inc. ("LG MobileComm") is a

4    California corporation with its principal place of business in San Diego, California. LG

5    MobileComm builds and sells mobile devices throughout the United States that are based on the

6    Android OS.

7         32.     Defendant LG Electronics, Inc. ("LG Electronics") is a South Korean corporation

8    with its principal place of business in Seoul, South Korea. LG Electronics builds and sells mobile

9    devices throughout the United States that are based on the Android OS.

10        33.     LG MobileComm and LG Electronics are collectively referred to as "LG." Upon

11   information and belief, CIQ Interface software was deployed on the LG devices at issue, and that

12   LG was the author and programmer of that software. Also, upon information and belief, LG

13   installed the Carrier IQ Software and CIQ Interface software on all the LG mobile device models

14   referenced herein. It is not yet known if any, or how many, other LG mobile device models bear or

15   bore the software at issue.

16        34.     Defendant Motorola Mobility LLC ("Motorola") is a Delaware limited liability

17   company with its principal place of business in Libertyville, Illinois. Motorola was formerly known

18   as Motorola Mobility, Inc. Motorola builds and sells mobile devices throughout the United States

19   that are based on the Android OS. Upon information and belief, CIQ Interface software was

20   deployed on the Motorola devices at issue, and that Motorola was the author and programmer of

21   that software. Also, upon information and belief, Motorola installed the Carrier IQ Software and

22   CIQ Interface software on all the Motorola mobile device models referenced herein. It is not yet

23   known if any, or how many, other Motorola mobile device models bear or bore the software at

24   issue.

25        35.     Defendant Pantech Wireless, Inc. ("Pantech") is a Georgia corporation with its

26   principal place of business in Atlanta, Georgia. Pantech builds and sells mobile devices throughout

27   the United States that are based on the Android OS. Upon information and belief, it is more likely

28   than not that CIQ Interface software was deployed on the Pantech devices at issue, and that

1    Pantech was the author and programmer of that software. Also, upon information and belief,

2    Pantech installed the Carrier IQ Software and CIQ Interface software on all the Pantech mobile

3    device models referenced herein. It is not yet known if any, or how many, other Pantech mobile

4    device models bear or bore the software at issue.

5            36.    Defendant Samsung Telecommunications America, Inc. ("STA") is a Delaware

6    corporation with its principal place of business in Richardson, Texas. STA builds and sells mobile

7    devices throughout the United States that are based on the Android OS.

8            37.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with

9    its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.

10   SEC has offices within the United States and California and sells its products throughout the

11   United States. SEC builds and sells mobile devices throughout the United States that are based on

12   the Android OS.

13           38.    STA and SEC are collectively referred to as "Samsung." Upon information and

14   belief, CIQ Interface software was deployed on the Samsung devices at issue, and that Samsung

15   was the author and programmer of that software. Also, upon information and belief, Samsung

16   installed the Carrier IQ Software and CIQ Interface software on all the Samsung mobile device

17   models referenced herein. It is not yet known if any, or how many, other Samsung mobile device

18   models bear or bore the software at issue.

19           39.    Collectively, HTC, Huawei, LG, Motorola, Pantech, and Samsung are referred to as

20   the "Device Manufacturers."

21                           **IV.    FACTUAL BACKGROUND**

22   **A.    Revelations and Deep Concerns Regarding Carrier IQ Software**

23           40.    In late November 2011 news broke widely that a software product known as Carrier

24   IQ, ostensibly a network diagnostics tool, was installed on, and intercepting communications,

25   content, and data on, millions of mobile devices, all without the knowledge of the vast majority of

26   consumers. At that time, the Carrier IQ website, http://www.carrieriq.com, included a rolling tally

27   showing that its software was installed on over 141,000,000 mobile devices worldwide. Consumers

28   did not know that their mobile devices bore this software because it was deeply hidden; they had

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

- 11 -

1    no notice that it was operating in the background, and they had no way to remove the software or to

2    opt-out of its functions.

3        41.    Earlier in November 2011, an independent security and privacy researcher, Trevor

4    Eckhart, had published on his website, http://www.androidsecuritytest.com, the results of work he

5    had done to understand the Carrier IQ Software once he discovered it running on his Android OS

6    HTC mobile device. (Mr. Eckhart also credited a member of the Android developer community,

7    k0nane, for k0nane's earlier detective work on Samsung devices bearing Carrier IQ Software.) Mr.

8    Eckhart's work included studying training materials and other descriptive materials available

9    publicly on Carrier IQ's website and elsewhere, examination of evidence of the software hidden

10   deeply on his device, and examination of records of software activities left on the system log, or

11   so-called logcat log - part of the Android OS logging system - of his device. Regular users could

12   not have examined evidence of Carrier IQ's workings and activities on their devices even if they

13   knew that the software was there; such examination requires technical skill much greater than that

14   possessed by most consumers, or it requires rooting a device, which not only requires great

15   technical skill, but voids warranties as well.

16       42.    Carrier IQ reacted strongly to Mr. Eckhart's publication of his work, as evidenced

17   by the cease-and-desist demand letter it sent him on or about November 16, 2011. In this letter, a

18   copy of which is attached as Exhibit A, Carrier IQ took extreme exception to the characterizations

19   made about its product on Mr. Eckhart's website, and it accused him of copyright infringement for

20   using its publicly available materials to illustrate his findings. It threatened to sue him if he did not

21   take down these materials from his website, and indeed, if he did not remove all references to

22   Carrier IQ from it. Carrier IQ even provided him with text that it demanded he release to the press

23   under his own name, whereby he would apologize and retract his characterizations of the software

24   and its functions—including the characterization that Carrier IQ is rootkit software, *i.e.*, stealthy

25   software designed to hide its processes from normal means of detection and to enable continued

26   privileged access to a computer device.

27       43.    Mr. Eckhart undertook a two-pronged response to Carrier IQ's letter. One response

28   was to contact the Electronic Frontier Foundation ("EFF") for legal assistance in responding to

Carrier IQ's threats. Another response was to redouble his efforts to understand the Carrier IQ Software and to demonstrate that the installation on his own device was doing far more than was necessary for network diagnostics. For example, one of the statements that Carrier IQ demanded he make was to retract his observation that the software was, in Carrier IQ's words, "recording keystrokes."

44.     By letter dated November 21, 2011, EFF counsel responded to Carrier IQ on Mr. Eckhart's behalf. A copy of that letter is attached as Exhibit B. Citing the fair use doctrine and other pertinent law and facts, counsel rebutted Carrier IQ's claims, stated that Mr. Eckhart was declining to accede to its demands, and demanded that Carrier IQ withdraw in writing its allegations regarding Mr. Eckhart and his work.

45.     On November 23, 2011, Carrier IQ's CEO wrote a letter to EFF counsel by which Carrier IQ withdrew the threats it had made to Mr. Eckhart and stated that it was "deeply sorry for any concern or trouble" that its previous letter may have caused him. A copy of this letter is attached as Exhibit C.

46.     A few days later, Mr. Eckhart published Part 2 of his work regarding Carrier IQ Software, both via his website and also via a 17 minute video released on November 28, 2011, on YouTube.[3]  In these follow-up publications, Mr. Eckhart expanded on his previous observations regarding Carrier IQ and its workings, and he demonstrated visually that indeed, Carrier IQ was intercepting communications and a significant amount of data and content, including keystrokes. He showed that the software was intercepting incoming SMS text messages. He also showed that the software was intercepting outgoing web queries and search terms, including those that should have been encrypted, given that they were sent via the HTTPS protocol. Worse, even when Mr. Eckhart was using his phone solely over Wi-Fi, rather than on a cellular network, he showed that Carrier IQ Software was intercepting keystrokes and content, including outgoing SMS text messages and HTTPS transmittals (carrying search terms), in unencrypted, human-readable form. He also showed that on his installation, the data and content intercepted as part of Carrier IQ

---

[3] http://www.youtube.com/watch?v=T17XQI_AYNo (last accessed June 23, 2014). As of the date of this filing, the video had been viewed over 2.177 million times.

1    processes, including (a) HTTPS strings (carrying search terms), such as those created in HTTPS

2    Google searches or HTTPS log-ins to PayPal, and (b) the content of SMS text messages, were

3    being copied in unencrypted, human-readable text to his device's Android system log(s) (which

4    sometimes are referred to as logcat logs).

5            47.     Following publication of Part 2 of Mr. Eckhart's report, the mainstream press joined

6    the technical press in reporting on Carrier IQ Software and the revelations about its widespread,

7    hidden deployment and workings. Within hours and in the following days, consumers expressed

8    deep concern about the privacy and security violations surrounding Carrier IQ. Among their

9    comments:

10           a.      I have to say . . . this is insanity!! If companies were trying to obtain
     knowledge about "the user's experience¬" they wouldnt [sic] need to know every
11   single word that is typed into SMS or the Web, rather just that we are using text
     messages or the web. They have gone TOO FAR by going into peoples personal
12   data, without concent [sic]! There must be a way to prosecute!¬! We as users didnt
     [sic] AGREE to this , and we should be able to get rid of it! It is a VIOLATION OF
13   PRIVACY and action needs to be taken!

14           b.      By reporting the private numbers called by an end user, CIQ has not only
     violated the privacy of the user but of the call recipient. Pretend you are a patient
15   with a socially embarrasing [sic] condition and your doctor calls you on his HTC or
     Samsung... they know you were called. This is actually a violation of HIPPA. You
16   never signed a consent for disclosure of any medical information. If he or she
     replied with a text, they now know what your condition is and what treatment has
17   been discussed. Does that make you feel warm and fuzzy? This is a major lawsuit...

18           c.      All I want is a phone that can be with me for medical emergencies. Why do
     they have to data mine everything I do without my permission? The most
19   frightening part of this is that they have disabled the security when you go to an
     https site. Not a problem for me since the phone is just a phone in my useage [sic],
20   but it is serious for those who have bought into using their phone for everything
     from banking to websurfing to scanning tags in stores for more information on a
21   product.

22           d.      The Carrier I.Q. statement about using the app to get informaton [sic] on
     how the product works sounds like total crap - to me is [sic] is spying on customers
23   so that the information can be used in sales of products current and possibly in the
     future. No one has a right to know what sites you visit. And I think it is a real
24   violation of trust to have the app installed and not making consumers aware of it and
     what it does, and how to shut the damned thing off. I don't like anyone tracking my
25   movements because I don't trust their reasons for doing it will always be legitimate
     and in my personal interest.
26
             e.      Isn't this wireless tapping in it's [sic] most malicious form inasmuch the
27   usuer [sic] is not aware that he is being hacked by Current IQ? Common [sic]
     people this has to end. We are all sheep being led to the slaughter sublimely and the
28   purpetrators [sic] are reaping $ millions from our letting them get away with it. It's

time to kick these companies off of our phones or have the ability to disable all these wireless tapping programs embedded surruptiously [sic] on our phones and computers.

f.      I'm pretty sure there is some form of legal ramifications involved with this.... this is DEFINITELY an invasion of privacy for those who did not approve the app on their phones. Super shady business going on here.

'Why is this not opt-in and why is it so hard to fully remove?" Eckhart wrote at the end of the video.'

Why exactly ----- ? ? ? ? This is creepy.

g.      Carrier IQ showed *their* colors when the first thing they tried to do was silence the security researcher who uncovered their software by filing a SLAPP lawsuit against him (since withdrawn after a stinging rebuke from the EFF). This company should be prosecuted for violation of US anti-wiretap laws. And carriers should drop them like the poisonous hot potato they are.

h.      Even without this IQ spyware, mobile phones are effectively tracking devices. But this latest discovery is ten times worse. This has to be highly illegal. Remember how British Telecom at first issues denials that their Phorm [sic] product was tracking web users, but then it was judged to be illegal. We need class-action law suits [sic] prosecute the phone manufacturers and the makers of this rootkit.

48.      Lawmakers expressed deep concerns, too. On November 30, 2011, U.S. Sen. Al Franken sent a letter to Carrier IQ, seeking answers to serious questions regarding the deployment, functions, and workings of its software. On December 1, 2011, Sen. Franken followed up by sending letters to mobile device manufacturers HTC, Motorola, and Samsung, and to wireless carriers AT&T, Sprint, and T-Mobile as well, seeking answers to the same sort of questions he had put to Carrier IQ.

49.      Once this security flaw was identified, the Department of Homeland Security ("DHS") also issued a directive on July 23, 2013, instructing police, fire, EMS, and security personnel to install an application that could "detect and remove the malicious software." Roll Call Release, Threats to Mobile Devices Using the Android Operating System http://info.publicintelligence.net/DHS-FBI-AndroidThreats.pdf (last visited June 22, 2014). DHS noted that the Carrier IQ software was a rootkit that "[l]ogs the user's locations, keystrokes, and passwords without the user's knowledge." *Id.*

50.     Shortly thereafter, consumers filed the first proposed class-action suits against Carrier IQ and mobile device manufacturers. Many more would follow, until about 70 were filed all around the country.

**B.     Carrier IQ Software as Deployed**

**1.     The enormous number of affected devices**

51.     The Device Manufacturers, in conjunction with Carrier IQ, have installed the Carrier IQ Software on millions of mobile devices, without consumers' knowledge, and without offering ways to delete the software or to opt-out of its functions, including those complained of herein.

52.     The responses by mobile device manufacturers to Sen. Franken's late-November and early-December 2011 letters confirmed how widespread the deployment of Carrier IQ Software is, or was at relevant times, on some of the nation's most popular mobile devices.

53.     According to AT&T's December 14, 2011 letter to Sen. Franken, "CIQ software (including versions integrated on the device and downloaded with AT&T's MTS application [the latter being a voluntary application download]) is resident on about 1% of the devices on AT&T's wireless network, or approximately 900,000 devices, with about 575,000 of those collecting and reporting wireless and service performance information to AT&T." AT&T also stated that the software was "integrated and active on eleven AT&T wireless consumer devices: Pantech Pursuit II, Pantech Breeze 3, Pantech P5000 (Link 2), Pantech Pocket, Sierra Wireless Shockwave, LG Thrill, ZTE Avail, ZTE Z331, SEMC Xperia Play, Motorola Atrix 2, and Motorola Bravo." AT&T indicated further that the software "also is embedded on the HTC Vivid, LG Nitro and Samsung Skyrocket devices, but has not been activated due to the potential for the software agent to interfere with the performance of those devices." (Discovery will help the plaintiffs to understand this latter statement as to the behavior of the embedded but purportedly not "activated" software on the referenced devices.)

54.     Sprint indicated in its December 13, 2011 response to Sen. Franken that "[t]o the best of [its] knowledge, there are approximately 26 million active Sprint devices that have Carrier IQ Software installed." It indicated that it "'tasks' (queries information about) a fraction of those

devices at any one time (a maximum of 1.3 million) for diagnostic needs" and a subset of those, "approximately 30,000 devices," for "research specific problems . . . ." It stated that the software is installed "on a variety of Sprint devices, including mobile handsets and tablets. Various Sprint-offered devices manufactured by the following manufacturers have Carrier IQ Software installed: Audiovox, Franklin, HTC, Huawei, Kyocera, LG, Motorola, Novatel, Palmone, Samsung, Sanyo, and Sierra Wireless."

55.     According to press reports and certain plaintiffs, Sprint began removing the Carrier IQ Software from mobile devices used on its network via over-the-air (*i.e.*, over the cellular network) updates beginning in January 2012. Plaintiffs presently do not know if the software has been removed from all affected mobile devices operating on the Sprint network (though it is likely that the software still resides on some consumers' devices, including those belonging to consumers who were no longer Sprint customers, and who therefore were unable to connect to Sprint's cellular network, at the time of the over-the-air updates), nor do plaintiffs know if Sprint has re-deployed any Carrier IQ Software on any devices operating on its network. Furthermore, it is not presently known with certainty if the reported removal effected removal of the CIQ Interface software or only the IQ Agent software.

56.     T-Mobile responded to Sen. Franken on December 20, 2011, and indicated that as of that date, "approximately 450,000 T-Mobile customers use devices that contain Carrier IQ's diagnostic software." It stated that it "currently uses Carrier IQ's diagnostic software on the following devices: HTC Amaze 4G, Samsung Galaxy S II, Samsung Exhibit II 4G, T-Mobile MyTouch by LG, T-Mobile MyTouch Q by LG, LG DoublePlay, BlackBerry 9900, BlackBerry 9360, [and the] BlackBerry 9810."

57.     As for HTC, it advised in its letter to Sen. Franken dated December 14, 2011, that "based on figures from wireless service providers, approximately 6.3 million HTC devices using the Carrier IQ Software are active devices." It stated that "[t]he Carrier IQ Software was first integrated on the Hero, which became available to customers through Sprint on October 2009. Other HTC devices that use the integrated Carrier IQ Software and the date of their availability in the U.S. market [include]: Snap (Sprint)—June 2009, Touch Pro 2 (Sprint)—September 2009,

Hero (Sprint)—October 2009, Evo 4G (Sprint)—June 2010, Evo Shift 4G (Sprint)—January 2011, Evo 3D (Sprint)—June 2011, Evo Design (Sprint)—October 2011, Amaze 4G (T-Mobile)—October 2011, [and the] Vivid (AT&T)—November 2011."

58.     Samsung, in its September 14, 2011 letter to Sen. Franken wrote that "STA [Samsung Telecommunications America, LLC] has sold to carriers (and their distributors and agents) serving the U.S. market approximately 25 million total cell phones that were pre-installed with Carrier IQ Software." It indicated that Carrier IQ Software was installed on the "following cell phones"—Sprint: "SPH-Z400, SPH-M800, SPH-M220, SPH-M540, SPH-M630, SPH-M320, SPH-M810, SPH-M550, SPH-M240, SPH-M560, SPH-M330, SPH-M850, SPH-I350, SPH-M900, SPH-M350, SPH-M360, SPH-M570, SPH-D700, SPH-M910, SPH-M920, SPH-P100, SPH-M260, SPH-M380, SPH-M820, SPH-M580, SPH-D600, SPH-M930, [and the] SPH-D710"; T-Mobile: "T989 [and the] T679"; Cricket: "SCH-R500, SCH-R631, SCH-R261, SCH-R380"; and AT&T: "SGH-i727."

59.     To date, plaintiffs have been unable to obtain a copy of Motorola's response to Sen. Franken's December 1, 2011 letter, but press reports dated December 21, 2011 indicate that Motorola stated by letter that it had installed the Carrier IQ Software on four models: the Admiral, Titanium, Bravo and Atrix 2 "at the request of its carrier partners, AT&T and Sprint." According to a press report, Motorola also stated that "'[a]t the end of the third-quarter of 2011, [it had] sold a total of approximately 145,000 units of these models to [its] wireless carrier partners.'"

60.     It is believed, and therefore alleged, that the Carrier IQ Software is or was previously installed on other mobile devices sold in the American market. Discovery should reveal these other makes and models of affected devices.

### 2.     Carrier IQ Software's interception and transmittal of private communications and content

61.     The defendants - Carrier IQ and the Device Manufacturers - designed, authored, programmed, and installed the Carrier IQ Software on millions of consumers' mobile devices. They also are the cause of its workings as complained of by the plaintiffs. Though the defendants contend that all of the plaintiffs' complaints are properly directed to the wireless carriers, in fact,

the carriers say they never asked for or sought the private communications and content that the Carrier IQ Software nevertheless intercepted and transmitted.

62.     Carrier IQ designed, authored, programmed, and caused the installation and activation of the Carrier IQ Software, including the so-called IQ Agent, on the devices at issue in this case. Carrier IQ also designed, authored, and provided guides to the Device Manufacturers for designing, authoring, programming, installing, and activating the CIQ Interface in deployments done by way of the so-called "embedded" method of installation. (*See*, *e.g.*, http://www.carrieriq.com /documents/understanding-carrier-iq-technology/6461/ (linked document at 6) (last accessed June 22, 2014).) Additionally, as part of its business model and as a function of the way its software is programmed, Carrier IQ can and does cause uploads of data collected on mobile devices either to its own servers or directly to the servers of its customers. . (*E.g.*, *id.* (linked document at 11-13).)

63.     The CIQ Interface is a wrapping or porting layer of code designed to see, recognize, and intercept a host of data and content, including SMS text message content and URLs containing search terms, user names, and passwords, among the other content described herein, and to send that material down to the IQ Agent for further processing and possible transmittals. (*E.g.*, *id.* (linked document at 6).) Once the Device Manufacturers design and program the CIQ Interface with Carrier IQ's aid, the Device Manufacturers install it, as well as the IQ Agent - collectively, "the Carrier IQ Software" - on affected devices. (*See*, *e.g.*, *id.*) Thus installed, the Carrier IQ Software is able to, and does, intercept not only benign network diagnostic data, but also personal, private, confidential, and sensitive communications and content from the mobile devices on which it is installed. The defendants, having designed, authored, programmed, and installed both components of the Carrier IQ Software, knew and intended what it would do.

64.     The Carrier IQ Software operates in the background on affected mobile devices. The typical user has no idea that it is running, nor can he or she turn it off, even as it stealthily infringes on his or her privacy and taxes the device's battery power, processor functions, and system memory. (*See*, *e.g.*, "What is Carrier IQ? Why Should We Care?" (http://forum.xda-developers.com/showpost.php?p=11763089) (discussing "drain on batter life and performance")

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

(last accessed June 22, 2014).) Also, unless they have advanced skills and are willing to root their devices and void their warranties, users cannot delete the software (and even those who have that skillset may be unable to remove it completely). Nor are device owners given the choice of opting in or out of the software's functionality.

65.    Though touted by defendants as a benign and simple service-improvement tool, researchers including Mr. Eckhart have demonstrated (including in his 17 minute YouTube video), and Carrier IQ admits, that the Carrier IQ Software intercepts data on mobile devices, including: URLs, including those containing HTTP and HTTPS query strings embedded with information such as search terms (which could reveal a consumer's health conditions, sexual orientation, or other private information), user names, passwords, and granular, GPS-based geo-location information (*even when a search is being conducted over Wi-Fi, rather than a mobile carrier's cellular network*); granular, GPS-based geo-location information apart from that transmitted in URLs; SMS text messages; telephone numbers dialed and attached to calls received; other dialer keypad presses/keystrokes; and application purchases and uses, among other content. (*See*, *e.g.*, http://www.theverge.com/2011/12/5/2609662/carrier-iq-interview (last accessed June 21, 2014) (December 5, 2011 interview with Carrier IQ's then V.P. of Marketing, Andrew Coward) ("Q. So we spent a while discussing SMS. What about HTTPS? We'd imagine that carriers might know which webpages you're going to, since they're providing your internet connection, but HTTPS is potentially a step beyond that. Sometimes you'll find website usernames, passwords and geolocation embedded in an HTTPS URL, things that we wouldn't normally expect our carrier to be looking at. A. It's a good question, *and it's important to highlight that kind of information is available*.") (emphasis added).) The software intercepts these communications and content as part of its calls on the operating system for so-called "metrics." According to Carrier IQ, most of this information, with the exception of text message content and certain other types of keystrokes, is intentionally stored in the device's RAM space on a rolling basis as a function of the software.[4]

---

[4] Among Carrier IQ's products is one called IQ Experience Insight Manager. According to an online information sheet, CIQ touts as a feature of its Insight Experience Manager the ability to "[v]iew application and device feature usage, such as camera, music, messaging, browser and TV," among many other features and attributes. A copy of this information sheet is attached as Exhibit

66.     Further, the Carrier IQ Software can and does capture and transmit device-specific identifiers, such that the foregoing information can be mated with a specific device. (*See*, *e.g.*, http://www.carrieriq.com/documents/understanding-carrier-iq-technology/6461/ (linked document at 3).)

67.     The software also is designed to intercept text message content. Carrier IQ, as the designer and author of the IQ Agent and of the guide for the CIQ Interface, acknowledges this, but claims that that it is merely looking for certain codes that might be carried along with any message. Even if that were true, the Carrier IQ software is intentionally designed to intercept all such content, unbeknownst to consumers. (*See*, *e.g.*, http://www.theregister.co.uk/2011/12/02/carrier_iq_interview/?page=2 (last accessed June 20, 2014) (December 2, 2011 interview with Andrew Coward, in which he states, in part: "With the SMS [text message] one, there are control messages that come to us through SMS. . . . So we look at SMS messages that come in . . . ."); *see also* http://www.theverge.com/2011/12/5/2609662/carrier-iq-interview (December 5, 2011 interview with Andrew Coward) ("Q. Do you feel that's happening now, that users have a good understanding of what information is being collected? A. Well, given the press over the past week, it suggests not . . . .").) The Device Manufacturers also know this; they intentionally designed and programmed the IQ Agent so that it would intercept this content. Thus, the defendants intentionally intercept these electronic communications. Further, this functionality of the Carrier IQ Software - its ability to intercept a wealth of data and private content - is what enabled text and other content to be logged in the affected devices' system logs, as Mr. Eckhart discussed in Part 2 of his analysis and in his 17 minute YouTube video. Without their interception by the Carrier IQ software, text message and other content could not have been logged and sent off the devices to Google, HTC, and perhaps application developers and other third-parties.

68.     "Profiles" are another aspect of the Carrier IQ Software experience. Via Profiles, CIQ customers, typically wireless carriers but sometimes device manufacturers, specify which data they want from that assembled pursuant to the above-referenced metrics. At designated times, or as

---

D. It is unknown presently whether this product was installed on any of the prospective class members' devices.

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

requested, the Profile-specified data is transmitted from the mobile device to the requester. But it is important to note that the plaintiffs' wireless carriers deny ever seeking information such as Internet search terms or text message or other private communications and content, whether by way of Profiles or otherwise. So the defendants may not point to the carriers as the cause of the interception or transmittal of such communications and content.

69.     The consequences of the Carrier IQ Software's interception of so much data can be quite serious. In addition to the interceptions, capture, and transmittal of personal, private, confidential, and sensitive data, which has nothing to do with network diagnostics or improvement, deployment of the Carrier IQ Software has led directly to other grave breaches of privacy.

70.     First, due to a purported programming error, AT&T admits that the Carrier IQ Software transmitted text message content to it. This admission, of course, underscores that the Carrier IQ Software is intercepting and capturing that information in the manner specified in the first instance. While both AT&T and Carrier IQ state that these transmittals were inadvertent; that they were made in encrypted form and never decoded at the receiver end; and that they were made only in limited circumstances, nonetheless, users' private text messages were intercepted and then transmitted off their mobile devices without their knowledge and consent.

71.     Worse yet, with some deployments, including those on HTC mobile devices and possibly on certain other devices as well, a copy of data and content intercepted for Carrier IQ Software purposes was also sent in unencrypted, human-readable form to the system logs (sometimes called the logcat logs) of affected devices. The capture of this information in human-readable form, via so-called verbose logging, is starkly shown in Mr. Eckhart's YouTube video.

72.     Once there, as recognized by the FTC in its action against HTC, such data and content - SMS text messages; material including URLs embedded with HTTP/HTTPS query strings carrying web search terms, user names and passwords, and geo-location information; telephone numbers; other keystrokes; and data related to application purchases and uses - lies vulnerable to anyone with access to these logs, including those with malicious intent. Such information should not be captured in these logs, yet as a direct consequence of the deployment of the Carrier IQ Software, logging of such personal, private, confidential, and sensitive information

1    has occurred on a massive scale. (It is, after all, a copy of information intercepted for Carrier IQ

2    Software purposes that is being sent to the affected devices' logs.) Carrier IQ points the finger at

3    the handset manufacturers, in particular at HTC, as the cause of this logging. But others have

4    theorized that the switch for this sort of logging actually came from the CIQ Interface-related

5    guides that Carrier IQ provides to device manufacturers.

6           73.     Still worse, because device and application crash reports call on information stored

7    in device logs, plaintiffs have confirmed via arbitration-related discovery in this matter that

8    personal, private, confidential, and sensitive communications in the form of complete text

9    messages, and possibly personal, private, confidential, and sensitive information captured in

10   HTTP/HTTPS strings such as web search terms, user names, and passwords; granular geo-location

11   data; telephone numbers; other keystrokes; and data related to application purchase uses, was

12   transmitted to Google, the author of the Android OS, as part of, or along with, crash reports.

13   Additionally, HTC has acknowledged the receipt of such content by way of its Tell HTC tool,

14   which draws on content stored in the device logs. And further, such content may have gone to

15   application developers who draw on device logs as a means of diagnosing application crashes (or

16   for other purposes), including via widely available software tools such as ACRA. (*See, e.g.*,

17   https://github.com/ACRA/acra; https://github.com/ACRA/acralyzer/wiki/usermanual (last accessed

18   June 22, 2014).)  Again, these actions were the direct result of the deployment of the Carrier IQ

19   Software on these devices, which was carried out jointly by Carrier IQ and the Device

20   Manufacturers.

21          74.     Finally, as Mr. Eckhart showed in his video, such activity is taking place on mobile

22   devices bearing the Carrier IQ Software even if the consumer is no longer a customer of a wireless

23   carrier. So long as the software remains on the mobile device, it is functioning and transmitting as

24   stated above (save for functions only relatable to cellular telephone service), even when the

25   consumer is using the device solely on his or her home Wi-Fi network. Indeed, Mr. Eckhart

26   showed a search query, including the search term, intercepted by the software (and logged to the

27   device logcat log). Mobile device owners were unaware of this functionality of their Carrier IQ

28   Software-bearing devices, and it is one more reason why they would not have purchased these

devices had they known they were bearing the Carrier IQ Software that operated in the manners alleged.

### 3. The FTC's investigation of, and actions against, HTC involving Carrier IQ Software

75.     After the filing of the First Consolidated Amended Complaint in this matter, the FTC began an investigation of HTC America, Inc. with regard to the Carrier IQ Software and related privacy and security flaws in the mobile devices sold by HTC.

76.     On February 22, 2013, HTC reached an Agreement Containing Consent Order with the FTC concerning serious security flaws HTC introduced to its Android and Windows Mobile smartphones. After public comment, the FTC issued a Final Decision and Order on July 2, 2013 (although the Final Decision and Order itself is dated June 25, 2013). In its press release on July 2, 2013, the FTC stated that HTC America, Inc. "failed to take reasonable steps to secure the software it developed for its smartphones and tablet computers, introducing security flaws that placed sensitive information about millions of consumers at risk. ("FTC Approves Final Order Settling Charges Against HTC America, Inc.," http://www.ftc.gov/news-events/press-releases/2013/07/ftc-approves-final-order-settling-charges-against-htc-america-inc (last visited June 22, 2014).)  The settlement agreement required HTC to "develop and release software patches to fix vulnerabilities in millions of the company's devices." (*Id.*) Further, the settlement agreement required HTC to establish a comprehensive security program designed to address security risks during the development of HTC devices and to undergo independent security assessments every other year for the next 20 years." (*Id.*) Last, HTC was prohibited from "making any false or misleading statements about the security and privacy of consumers' data on HTC devices."

77.     In the Final Complaint, issued on June 25, 2013 in connection with the Final Decision and Order, the FTC alleged as follows:

**INSECURE COMMUNICATIONS MECHANISMS**

13. HTC failed to use readily-available and documented secure communications mechanisms in implementing logging applications on its devices, placing sensitive information at risk. Logging applications collect information that can be used, for example, to diagnose device or network problems. Because of the sensitivity of the information, as described below, communications with logging applications should

be secure to ensure that only designated applications can access the information. Secure communications mechanisms -- such as the Android inter-process communication mechanisms expressly described in the Android developer guides, or secure UNIX sockets – could have been used to ensure that only HTC-designated applications could access the sensitive information collected by the logging application. Instead of using one of these well-known, secure alternatives, HTC implemented communication mechanisms (e.g., INET sockets) that could not be restricted in a similar manner. Moreover, HTC failed to implement other, additional security measures (e.g., data encryption) that could have secured these communications mechanisms. Because the communications mechanisms were insecure, any third-party application that could connect to the internet could communicate with the logging applications on HTC devices and access a variety of sensitive information and sensitive device functionality, as described below.

    a.    HTC Loggers. Beginning in May 2010, HTC installed its customer support and trouble-shooting tool HTC Loggers on approximately 12.5 million Android-based mobile devices. Because HTC Loggers could collect sensitive information from various device logs, it was supposed to have been accessible only to HTC and certain network operators, and only after the user had consented to its use by manually entering a special code into the mobile device. Moreover, the Android permission-based security model normally requires a third-party application to obtain the user's consent before accessing the device logs. Because HTC used an insecure communications mechanism, however, both of these intended protections were undermined, and any third-party application on the user's device that could connect to the internet could exploit the vulnerability to communicate with HTC Loggers without authorization and command it to collect and transmit information from the device logs. This information could include, but was not limited to, contents of text messages; last known location and a limited history of GPS and network locations; a user's personal phone number, phone numbers of contacts, and phone numbers of those who send text messages to the user; dialed digits; web browsing and media viewing history; International Mobile Equipment Identity ("IMEI") or Mobile Equipment Identifier ("MEID"); and registered accounts such as Gmail and Microsoft Exchange account user names.

    b.    **Carrier IQ**. Beginning in 2009, HTC embedded Carrier IQ diagnostics software on approximately 10.3 million Android-based mobile devices and 330,000 Windows Mobile-based mobile devices** at the direction of network operators Sprint and AT&T, who used Carrier IQ to collect a variety of information, described in subparagraph (i) below, from user devices to analyze network and device problems. **In order to embed the Carrier IQ software on its mobile devices, HTC developed a "CIQ Interface" that would pass the necessary information to the Carrier IQ software.** The information collected by the Carrier IQ software was supposed to have been accessible only to the network operators, but **because HTC used an insecure communications mechanism, any third-party application on the user's device that could connect to the internet could**

**exploit the vulnerability to communicate with the CIQ Interface, allowing it to**:

      i.    **Intercept the sensitive information being collected by the Carrier IQ software.** This information could include, but was not limited to, **GPS-based location information; web browsing and media viewing history; the size and number of all text messages; the content of each incoming text message; the names of applications on the user's device; the numeric keys pressed by the user; and any other usage and device information specified for collection by certain network operators; and**

      ii.    **In the case of HTC's Android-based devices, perform potentially malicious actions, including, but not limited to, sending text messages without permission**. As described in Paragraph 11, malware could exploit this vulnerability to perpetrate toll fraud. Moreover, in this case, the sent text messages would not appear in the user's outbox, making it impossible for the user to verify that unauthorized text messages had been sent from the device.

**DEBUG CODE**

14. During the development of an application, developers may activate "debug code" in order to help test whether the application is functioning as intended. **When developing its CIQ Interface for its Android-based devices, HTC activated debug code in order to test whether the CIQ Interface properly sent all of the information specified by the network operator. The debug code accomplished this by writing the information to a particular device log known as the Android system log, which could then be reviewed.** However, **HTC failed to deactivate the debug code before its devices shipped for sale to consumers**. **As a result** of the active debug code, **all information that the CIQ Interface sent to the Carrier IQ software from a consumer's device, including the information specified in Paragraph 13(b)(i), was also written to the Android system log on the device.** This information was supposed to have been accessible only to the network operators, never written to the system log. **Because it ended up in the system log, this sensitive information was**:

      a.    **Accessible to any third-party application with permission to read the system log**. Although users may provide third-party applications with permission to read the system log for certain purposes -- for example, to trouble-shoot application crashes -- those applications never should have had access to all the **sensitive information, such as the contents of incoming text messages, that the Carrier IQ software was collecting**.

      b.    **Sent to HTC**. The **information in the system log is sent to HTC when a user chooses to send HTC an error report through its "Tell HTC" error reporting tool**, described in Paragraph 20. Accordingly, **in some cases, HTC also received this sensitive information, including users' GPS-based location information.**

15. HTC could have detected its failure to deactivate the debug code in its CIQ Interface had it had adequate processes and tools in place for reviewing and testing the security of its software code.

(FTC Complaint, dated June 25, 2013, http://www.ftc.gov/sites/default/files/documents/cases/2013/07/130702 htccmpt.pdf (emphasis added) (last visited June 22, 2013) .)

78. The FTC also noted that "HTC could have implemented readily-available, low-cost measures to address these vulnerabilities – for example, adding a few lines of permission check code when programming its pre-installed applications, or implementing its logging applications with secure communications mechanisms. *Consumers had little, if any, reason to know their information was at risk because of the vulnerabilities introduced by HTC.*" *Id.* (emphasis added).

79. In the Complaint accompanying the Final Decision and Order, the FTC leveled three Counts against HTC, as follows:

HTC'S UNFAIR SECURITY PRACTICES
(Count 1)
21. As set forth in Paragraph 7-18, HTC failed to employ reasonable and appropriate security practices in the design and customization of the software on its mobile devices. HTC's practices caused, or are likely to cause, substantial injury to consumers that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers. This practice was, and is, an unfair act or practice.

HTC'S DECEPTIVE ANDROID USER MANUALS
(Count 2)
22. As described in Paragraph 19, HTC has represented, expressly or by implication, that, through the Android permission-based security model, a user of an HTC Android-based mobile device would be notified when a third-party application required access to the user's personal information or to certain functions or settings of the user's device before the user completes installation of the third-party application.

23. In truth and in fact, in many instances, a user of an HTC Android-based mobile device would not be notified when a third-party application required access to the user's personal information or to certain functions or settings of the user's device before the user completes installation of the third-party application. Due to the security vulnerabilities described in Paragraphs 8-15, third-party applications could access a variety of sensitive information and sensitive device functionality on HTC Android-based mobile devices without notifying or obtaining consent from the user before installation. Therefore, the representation set forth in Paragraph 22 constitutes a false or misleading representation.

HTC'S DECEPTIVE TELL HTC USER INTERFACE
(Count 3)

24. As described in Paragraph 20, HTC has represented, expressly or by implication, that, if a user does not check the button marked "Add location data" when submitting an error report through the Tell HTC application, location data would not be sent to HTC with the user's error report.

25. In truth and in fact, in some instances, if a user did not check the button marked "Add location data" when submitting an error report through the Tell HTC application, location data was nevertheless sent to HTC with the user's error report. Due to the security vulnerability described in Paragraph 14, in some instances, HTC collected the user's GPS-based location information through the Tell HTC error reporting tool even when the user had not checked the button marked "Add location data" in the Tell HTC user interface. Therefore, the representation set forth in Paragraph 24 constitutes a false or misleading representation.

26. The acts and practices of respondent as alleged in this complaint **constitute unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).**

(FTC Complaint, dated June 25, 2013,  http://www.ftc.gov/sites/default/files /documents/cases/2013/07/130702 htccmpt.pdf (emphasis added) (last visited June 22, 2013) .)

80.     In summary, the FTC found that the IQ Agent had been embedded by HTC into 10.3 million of its mobile devices running on the Android OS, and another 330,000 devices running Windows Mobile. To do this, HTC designed and installed CIQ Interface software, including a debug code that permitted HTC to test whether the IQ Agent was intercepting the information for which it was designed. This information included "GPS-based location information; web browsing and media viewing history; the size and number of all text messages; the content of each incoming text message; the names of applications on the user's device; the numeric keys pressed by the user; and any other usage and device information specified for collection by certain network operators."

81.     While the FTC's investigation and findings focused in part on the security flaws caused by HTC's failure to implement basic security measures, the findings regarding what could be and what was intercepted by the IQ Agent are crucial, and include highly sensitive information. Not only does this reveal the information actually intercepted, but it reveals that the IQ Agent *was designed to intercept the content of text messages, keypresses, location information, web browsing*

*history, and other personal information*. Furthermore, as HTC implemented a debug code to test the IQ Agent's capabilities with regard to intercepting and collecting this highly sensitive information, HTC must have known of the IQ Agent's capabilities.

82.     In its Complaint, the FTC stated succinctly that "HTC's practices caused, or are likely to cause, substantial injury to consumers that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers. This practice was, and is, an unfair act or practice."

### 4.     Further comments on Carrier IQ Software

83.     Others have decried the actions of Carrier IQ and the Device Manufacturers and investigated the functionality of the Carrier IQ Software.

84.     For example, in a December 8, 2011 online Computerworld article by Jaikumar Vijayan entitled "Google's Schmidt calls Carrier IQ software a keylogger," the Executive Chairman of Google, Eric Schmidt, was quoted as saying at an "Internet freedom conference" in the Netherlands "that Carrier IQ's software is a keylogger that 'actually does keep your keystrokes.'" Mr. Schmidt also was quoted as stating, "We certainly don't work with them and we certainly don't support it." In addition, he was quoted as saying, "'Android is an open platform, so it's possible for people to build software that's actually not very good for you, and this appears to be one.'" Google, of course, is the owner and publisher of the Android OS.

85.     Android developer Tim Schofield researched the presence of the Carrier IQ Software on multiple Android smartphone platforms. He has noted that in addition to the privacy issues, the embedded Carrier IQ Software necessarily degrades the performance of any device on which it is installed. (http://www.youtube.com/watch?v=legx3K_Ul_I at 9:44 (last accessed June 22, 2014).) The Carrier IQ Software is always operating and cannot be turned off. It necessarily uses system resources, thus slowing performance and decreasing battery life. (*Id.*) As a result, because of the Carrier IQ Software, in addition to having their private communications intercepted, plaintiffs and prospective class members are not getting the optimal performance of the mobile devices they purchased, and which are marketed, in part, based on their speed, performance, and battery life.

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

# V.   CLASS ALLEGATIONS

86.     With respect to their claims under the Federal Wiretap Act (Count I), plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a proposed class consisting of:

> All persons in the United States who owned or purchased HTC, Huawei, LG, Motorola, Pantech, and Samsung mobile devices on which Carrier IQ Software is or was embedded or preloaded.

Excluded from the proposed class are defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

87.     In addition, plaintiffs ask that the Court certify appropriate classes comprised of consumers residing in the states listed in Counts II, III, IV, and V below. In order to aid the Court with manageability, plaintiffs anticipate proposing subclasses based on the similarity of laws from among those states listed with respect to Counts II, III, IV, and V.

88.     **Numerosity**: The exact number of the members of the proposed class is unknown and is not available to the plaintiffs at this time, but individual joinder in this case is impracticable. Based on defendant Carrier IQ's representation that its software is installed on over 140 million devices and the representations of the Device Manufacturers and wireless carriers as to the number of mobile devices bearing Carrier IQ Software, the number of class and sub-class members could reach into the millions.

89.     **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed class. These include:

a.     Whether Carrier IQ Software installed on plaintiffs' and proposed class members' mobile devices has intercepted, or intercepted and transmitted, plaintiffs' and proposed class members' SMS text message content; URL or other inputs, including HTTP and HTTPS query strings containing search terms and/or user names and passwords; other keystrokes; telephone numbers (whether those of others the consumer calls, those of persons who call the consumer, or of

the consumer himself or herself); granular geo-location information; application purchase and use data; and other information, and whether it continues to do so.

b.      Whether plaintiffs' and proposed class members' SMS text message content; URL or other inputs, including HTTP and HTTPS query strings; other keystrokes; telephone numbers (whether those of others the consumer calls, those of persons who call the consumer, or of the consumer himself or herself); granular geo-location information; application purchase and use data; and other information has been sent to the device, system, or logcat logs of their mobile devices, and whether all or any such information has been transmitted off their devices to Google, HTC, or third-party application developers and vendors, or to any other person or entity.

c.      Whether CIQ has violated the Federal Wiretap Act by way of the acts and omissions set forth in this complaint.

d.      Whether the Device Manufacturers have violated the Federal Wiretap Act.

e.      Whether CIQ and the Device Manufacturers have violated state privacy statutes by way of the acts and omissions set forth in this complaint.

f.      Whether CIQ and the Device Manufacturers have violated state consumer protection laws by way of the acts and omissions set forth in this complaint.

g.      Whether the Device Manufacturers have violated the Magnuson-Moss Warranty Act by way of the acts and omissions set forth in this complaint.

h.      Whether the Device Manufacturers have breached their implied warranties of merchantability by way of the acts and omissions set forth in this complaint, entitling plaintiffs to damages.

i.      Whether CIQ and the Device Manufacturers have unlawfully profited from their conduct, and whether they must disgorge or restore profits, or make refunds or partial refunds, to the plaintiffs and members of the proposed class.

j.      Whether plaintiffs and members of the prospective class would have purchased their mobile devices if they had known that Carrier IQ Software was installed on them.

k.      Whether plaintiffs and members of the proposed class are entitled to statutory and other damages, compensatory damages, civil penalties, punitive or multiple damages, restitution,

declaratory relief, injunctive relief, or other equitable relief, and whether they are entitled to the maximum relief that they seek.

90.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed class. The factual and legal bases of defendants' liability to plaintiffs and other members of the proposed class are the same and resulted in injury to plaintiffs and all of the other members of the proposed class.

91.   **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed class, and their interests do not conflict with the interests of the proposed class members they seek to represent.

92.   **Predominance and Superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex factual and legal controversies present in this controversy. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be assured.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE FEDERAL WIRETAP ACT

(Against Carrier IQ and the Device Manufacturers)

93.   Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

94.   Plaintiffs bring this claim on their own behalf and on behalf of a proposed nationwide class of owners of affected devices.

95.     Defendants Carrier IQ and the Device Manufacturers, by way of their design, authorship, programming, knowing and intentional installation, activation, and/or other involvement with the Carrier IQ Software, as alleged herein, have intentionally intercepted, endeavored to intercept, and/or procured others to intercept or endeavor to intercept, electronic communications as described herein, in violation of 18 U.S.C. § 2511(1). *See* 18 U.S.C. § 2511(1)(a).

96.     As a result of these violations of law, plaintiffs and the prospective class have suffered harm and injury, including by way of the interception and transmission of private and personal, confidential, and sensitive communications, content, and data as alleged herein, as well as the degraded performance level of their devices (including diminished battery power and life, together with diminished performance due to taxation of the devices' processors and memory caused by the constant operation of the Carrier IQ Software).

97.     Accordingly, defendants Carrier IQ and the Device Manufacturers are subject to civil suit, and plaintiffs and the class are entitled to appropriate relief, including that set forth in 18 U.S.C. § 2520(b). 18 U.S.C. § 2520(a). Such appropriate relief includes "preliminary or other equitable or declaratory relief as may be appropriate"; "damages" as described in the statute; and "a reasonable attorney's fee and other litigation costs reasonably incurred." 18 U.S.C. § 2520(b). As for damages, "the court may assess as damages whichever is the greater of—(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(c)(2).

98.     Plaintiffs, on their own behalf and on behalf of the proposed class, seek all such appropriate relief, including, but not limited to, the maximum amount of statutory damages as set forth above.

99.     Investigation regarding disclosures, including intentional disclosures, of the communications, content, information, and data referenced herein, or the endeavoring to disclose, intentionally or otherwise, the communications, content, information, and data referenced herein, is ongoing. Such activity may be actionable hereunder.

# COUNT II
## VIOLATION OF STATE PRIVACY ACTS

(Against Carrier IQ and the Device Manufacturers)

(On Behalf of Residents of the States of Arizona, California, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, and on Behalf of All U.S. Residents Under Cal. Penal Code § 502)

100.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

101.    Plaintiffs bring these claims on behalf of themselves and other owners of affected devices who reside in the states of Arizona, California, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, and on behalf of all U.S. owners of affected devices under California Penal Code § 502.

102.    By way of their actions as stated herein, which include their design, authorship, programming, knowing and intentional installation, and activation of, and their other involvement with, the Carrier IQ Software as alleged herein, as well as by way of their interceptions of communications and content including SMS text messages; URLs and other inputs containing HTTP and HTTPS strings embedded with confidential and sensitive material such as search terms, user names, and passwords; and dialer-pad keypresses, as well as the capture of granular geo-location information traceable to individual consumers by way of unique mobile device identifiers, defendants Carrier IQ and the Device Manufacturers have violated state privacy acts as set forth herein.

103.    For example, defendants have violated California's Computer Crime Law, Cal. Penal Code §§ 502, *et seq*.

104.    California Penal Code § 502 prohibits "tampering, interference, damage and unauthorized access to lawfully created computer data and computer systems." A mobile device is

1    a "computer system" as defined in Cal. Penal Code § 502(b)(5) because it contains electronic

2    instructions, inputs and outputs data, and performs computerized functions including

3    communications and data storage and retrieval.

4         105.    Defendants have violated California Penal Code § 502 by knowingly accessing,

5    copying, using, making use of, interfering, and/or altering plaintiffs' and prospective class

6    members' data such as URLs containing HTTP and HTTPS query strings embedded with

7    information including search terms, user names, passwords, and granular geo-location information;

8    granular geo-location information apart from that transmitted in URLs; text messages; telephone

9    numbers dialed and received; other keystrokes; and application purchases and uses. Defendants so

10   acted on a systematic and continuous basis.

11        106.    Civil actions lie for violations of California Penal Code § 502. Cal. Penal Code §

12   502(e)(1). Defendants' actions have caused damages to plaintiffs and the prospective class,

13   including by way of the consumption of battery power (indeed, following the removal of Carrier IQ

14   Software from various mobile devices, users report dramatically increased times between battery

15   charges) and system memory and processing resources which demonstrably affect performance of

16   their mobile devices. These damages are quantifiable and will be provable at trial. In addition,

17   plaintiffs and members of the prospective class will be entitled to recover their reasonable

18   attorneys' fees pursuant to California Penal Code § 502(e)(2).

19        107.    Furthermore, plaintiffs and the class are entitled to injunctive relief to prevent the

20   further interception or capture and transmittal of data such as URLs containing HTTP and HTTPS

21   query strings embedded with information such as search terms, user names, passwords, and geo-

22   location information; geo-location information apart from that transmitted in URLs; text messages;

23   telephone numbers dialed and received; other keystrokes; and information relating to application

24   purchases and uses. They also are entitled to injunctive and other equitable relief to remedy any

25   continuing copying of the foregoing information, as well as SMS text message content, to system

26   logs, which are being transmitted off-device to Google, to HTC, and possibly to third-party

27   application developers without authorizations, and the logging of which creates extreme

28   vulnerability to capture by deliberate means.

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

108.     Damages and injunctive and other equitable relief are available to all plaintiffs and members of the prospective class, wherever they may live in the United States. Cal. Penal Code § 502(j) ("For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.").

109.     In addition, by intercepting communications including URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, and passwords; text messages; and other keystrokes; as well as by way of the other interceptions of communications described herein, defendants have violated California Penal Code § 632.7. That statute provides that "[e]very person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone," is punishable by fines, imprisonment, or both. Cal. Penal Code § 632.7(a).

110.     Defendants are liable in a civil action for violation of California Penal Code 632.7 by way of California Penal Code § 637.2. California Penal Code § 637.2 provides for the recovery of $5,000 or three times actual damages, whichever is greater. Cal. Penal Code § 637.2(a). In addition, plaintiffs may seek to bring an action "to enjoin and restrain any violation of this chapter, and may in the same action seek damages . . . ." Cal. Penal Code § 637.2(a). Because it is likely that statutory damages of $5,000 will exceed three times their actual damages, plaintiffs, on behalf of themselves and the prospective class, seek an award of $5,000 for each violation of these laws.

111.     In addition, pursuant to California Penal Code § 637.2, plaintiffs and the prospective class are entitled to injunctive relief to prevent the admitted interception or capture and transmittal of URLs containing HTTP and HTTPS query strings embedded with information such as search terms, user names, and passwords; text messages; telephone numbers dialed and received; and other keystrokes; and other communications as described herein. They also are entitled to

1   injunctive and other equitable relief to remedy any continuing copying of the foregoing

2   communications to device system, or logcat, logs, which have been, and in some instance possibly

3   are still being, transmitted off-device to Google, HTC, and possibly to third-party application

4   developers, and whose logging creates extreme vulnerability to capture by deliberate means.

5          112.    Also, plaintiffs and the prospective class are entitled to recover their attorneys' fees

6   because by way of this lawsuit, they seek to enforce important rights affecting the public interest,

7   and because they otherwise satisfy the statutory requirements for an award of attorneys' fees. Cal.

8   Code of Civil Proc. § 1021.5.

9          113.    As a result of defendants' actions as described above and herein, which descriptions

10   are incorporated here, plaintiffs and owners of affected devices who reside in states other than

11   California are likewise entitled to similar damages, including statutory damages, punitive damages

12   where available, and injunctive or other equitable relief, as well as attorneys' fees and costs, under

13   similar laws of their home states as follows:

14         a.    **Arizona.** Ariz. Rev. Stat. § 12-731 provides for the recovery in a civil action

15         of relief for violations of Ariz. Rev. Stat. § 13-3005(A)(1), which, in pertinent part,

16         provides that a person is guilty of a felony who, without consent, either intentionally

17         intercepts an electronic communication (*see* Ariz. Rev. Stat. § 13-3001(4)) or aids

18         or procures others to do so.

19         Defendants Carrier IQ and the Device Manufacturers, by way of their

20         programming, knowing and intentional installation, activation, and other

21         involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

22         Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

23         authorized, employed, or procured or permitted others to so do.

24         Accordingly, plaintiffs and the class are entitled under Ariz. Rev. Stat. § 12-

25         731 to "preliminary and other equitable or declaratory relief as may be appropriate,"

26         as well as damages "in an amount that is the greater of either" . . . "[s]tatutory

27         damages of one hundred dollars a day for each day of the violation" or "statutory

28         damages of ten thousand dollars." They also are entitled to punitive damages in this

case, as well as their "[r]easonable attorney fees and other reasonable costs of litigation."

b.     **Connecticut.** Conn. Gen. Stat. § 54-41r provides for the recovery in a civil action of relief for its violation. It provides in pertinent part that "[a]ny person whose wire communication [*see* Conn. Gen. Stat. § 54-41a(1), defining "wire communication" in such a manner as to encompass the communications here at issue] is intercepted, disclosed, or used in violation of [the subject chapter or sections] shall have a . . . civil cause of action against any person who intercepts, discloses or sues, or procures another person to intercept, disclose or use, such communication . . . ."

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Accordingly, plaintiffs and the class are entitled under Conn. Gen. Stat. § 54-41r to recover from the defendants "actual damages but not less than liquidated damages computed at the rate of one hundred dollars per day for each day of violation or one thousand dollars, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred."

c.     **Delaware.** 11 Del. Code § 2409 provides for the recovery in a civil action of relief for violations of 11 Del. Code § 2402(a)(1)-(3), which, in pertinent part, provides that no person shall "intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication," *see* 11 Del. Code § 2401(5), or intentionally disclose or endeavor to disclose, or intentionally use or endeavor to use, electronic communications intercepted in violation of the subject chapter.

1    Defendants Carrier IQ and the Device Manufacturers, by way of their

2    programming, knowing and intentional installation, activation, and other

3    involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

4    Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

5    authorized, employed, or procured or permitted others to so do.

6    Accordingly, plaintiffs and the class are entitled under 11 Del. Code § 2409

7    to their "actual damages, but not less than liquidated damages computed at the rate

8    of $100 dollars a day for each day of the violation or $1,000, whichever is higher;

9    "[p]unitive damages";  and a "reasonable attorney's fee and other litigation costs

10   reasonably incurred."

11   d.    **Florida.** Fla. Stat. § 934.10 provides for the recovery in a civil action of

12   relief for violations of Fla. Stat. § 934.03(1)(a), which provides in pertinent part:

13   (1) Except as otherwise specifically provided in this chapter,
14   any person who:

15   (a) Intentionally intercepts, endeavors to intercept, or
     procures any other person to intercept or endeavor to intercept any
16   wire, oral, or electronic communication;

17   (b) Intentionally uses, endeavors to use, or procures any other
     person to use or endeavor to use any electronic, mechanical, or other
18   device to intercept any oral communication when:

19   1. Such device is affixed to, or otherwise transmits a signal
20   through, a wire, cable, or other like connection used in wire
     communication; or

21
22   2. Such device transmits communications by radio or
     interferes with the transmission of such communication;

23   (c) Intentionally discloses, or endeavors to disclose, to any
24   other person the contents of any wire, oral, or electronic
     communication, knowing or having reason to know that the
25   information was obtained through the interception of a wire, oral, or
     electronic communication in violation of this subsection;

26
27   (d) Intentionally uses, or endeavors to use, the contents of any
     wire, oral, or electronic communication, knowing or having reason to
28   know that the information was obtained through the interception of a

wire, oral, or electronic communication in violation of this
subsection; or

(e) Intentionally discloses, or endeavors to disclose, to any
other person the contents of any wire, oral, or electronic
communication intercepted by means authorized by subparagraph
(2)(a)2, paragraph (2)(b), paragraph (2)(c), s. 934.07, or s.
934.09 when that person knows or has reason to know that the
information was obtained through the interception of such a
communication in connection with a criminal investigation, has
obtained or received the information in connection with a criminal
investigation, and intends to improperly obstruct, impede, or interfere
with a duly authorized criminal investigation;

shall be punished as provided in subsection (4).

*See also* Fla. Stat. § 934.02(12) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their

programming, knowing and intentional installation, activation, and other

involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

authorized, employed, or procured or permitted others to so do.

Fla. Stat. § 934.10 provides in pertinent part that:

(1) Any person whose wire, oral, or electronic
communication is intercepted, disclosed, or used in violation of ss.
934.03-934.09 shall have a civil cause of action against any person or
entity who intercepts, discloses, or uses, or procures any other person
or entity to intercept, disclose, or use, such communications and shall
be entitled to recover from any such person or entity which engaged
in that violation such relief as may be appropriate, including:

(a) Preliminary or equitable or declaratory relief as may be
appropriate;

(b) Actual damages, but not less than liquidated damages
computed at the rate of $100 a day for each day of violation or
$1,000, whichever is higher;

(c) Punitive damages; and

(d) A reasonable attorney's fee and other litigation costs
reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

e.       **Hawaii.** Haw. Rev. Stat. § 803-48 provides for the recovery in a civil action of relief for violations of Haw. Rev. Stat. § 803-42(a)(1), which, in pertinent part, provides:

> (a) Except as otherwise specifically provided in this part, any person who:
>
> (1) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
> (2) Intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any wire, oral, or electronic communication when:
>
> (A) Such a device is affixed to, or otherwise transmits a signal through, a wire, cable, or other similar connection used in wire communication; or
>
> (B) Such a device transmits communications by radio, or interferes with the transmission of such communication;
>
> (3) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this part;
>
> (4) Intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this part;
>
> (5)(A) Intentionally accesses without authorization a facility through which an electronic communication service is provided; or
>
> (B) Intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage;

(6) Intentionally discloses, or attempts to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by subsection (b)(1), (2), or (3), or section 803-44 or 803-46; and

(A) Either:

(i) Knowing or having reason to know that the information was obtained through the interception of the communication in connection with a criminal investigation; or

(ii) Having obtained or received the information in connection with a criminal investigation; and

(B) With the intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation[;]

(7) Intentionally installs or uses a pen register or a trap and trace device without first obtaining a court order; or

(8) Intentionally installs or uses a mobile tracking device without first obtaining a search warrant or other order authorizing the installation and use of such device, unless the device is installed by or with consent of the owner of the property on which the device is installed;

shall be guilty of a class C felony.

*See also* Haw. Rev. Stat. § 803-41 (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Haw. Rev. Stat. § 803-48 provides:

Any person whose wire, oral, or electronic communication is accessed, intercepted, disclosed, or used in violation of this part shall (1) have a civil cause of action against any person who accesses, intercepts, discloses, or uses, or procures any other person to access, intercept, disclose, or use the communications, and (2) be entitled to recover from any such person:

(A) The greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or (ii) statutory damages of the greater of $100 a day for each day of violation or $10,000;

(B) Punitive damages, where appropriate; and

(C) A reasonable attorney's fee and other litigation costs reasonably incurred.

The aggrieved person may also seek and be awarded such preliminary, and other equitable or declaratory relief as may be appropriate. A good faith reliance on a court order shall constitute a complete defense to any civil action brought under this part.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

f.      **Idaho.** Idaho Code § 18-6709 provides for the recovery in a civil action of relief for violations of Idaho Code § 18-6702(1)(a), (c), and (d), which, in pertinent part, provides:

(1) Except as otherwise specifically provided in this chapter, any person shall be guilty of a felony and is punishable by imprisonment in the state prison for a term not to exceed five (5) years or by a fine not to exceed five thousand dollars ($5,000), or by both fine and imprisonment if that person:

(a) Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication; or

(b) Willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

1. Such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

2. Such device transmits communications by radio or interferes with the transmission of such communication; or

(c) Willfully discloses, or endeavors to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this subsection; or

(d) Willfully uses, or endeavors to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this subsection; or

(e) Intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, intercepted by means authorized by subsection (2)(b), (c), (f) or (g) of this section or by section 18-6708, Idaho Code, if that person:

(i) Knows or has reason to know that the information was obtained through the interception of such communication in connection with a criminal investigation; and

(ii) Has obtained or received the information in connection with a criminal investigation with the intent to improperly obstruct, impede or interfere with a duly authorized criminal investigation.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Idaho Code § 18-6709 provides in pertinent part:

Any person whose wire, electronic or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses, uses, or procures any other person to intercept, disclose, or use such communications, and shall be entitled to recover from any such person:

(a) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars ($100) a day for each

day of violation or one thousand dollars ($1,000), whichever is higher;

(b) Punitive damages; and

(c) A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

g.   **Illinois.** Ill. Comp. Stat. Ch. 720 § 5/14-6 provides for the recovery in a civil action of relief for violations of Ill. Comp. Stat. Ch. 720 § 5/14-2(a)(1), which provides in pertinent part:

§ 14-2. Elements of the offense; affirmative defense.

(a) A person commits eavesdropping when he:

(1) Knowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation or intercepts, retains, or transcribes electronic communication unless he does so (A) with the consent of all of the parties to such conversation or electronic communication or (B) in accordance with Article 108A or Article 108B of the "Code of Criminal Procedure of 1963", approved August 14, 1963, as amended; or

(2) Manufactures, assembles, distributes, or possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious hearing or recording of oral conversations or the interception, retention, or transcription of electronic communications and the intended or actual use of the device is contrary to the provisions of this Article; or

(3) Uses or divulges, except as authorized by this Article or by Article 108A or 108B of the "Code of Criminal Procedure of 1963", approved August 14, 1963, as amended, any information which he knows or reasonably should know was obtained through the use of an eavesdropping device.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other

involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Ill. Comp. Stat. Ch. 720 § 5/14-6 provides in pertinent part:

> § 14-6. Civil remedies to injured parties. (1) Any or all parties to any conversation or electronic communication upon which eavesdropping is practiced contrary to this Article shall be entitled to the following remedies:
>
> (a) To an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;
>
> (b) To all actual damages against the eavesdropper or his principal or both;
>
> (c) To any punitive damages which may be awarded by the court or by a jury;
>
> (d) To all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;
>
> (e) To any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

h.      **Indiana.** Ind. Code § 35-33.5-5-4 provides for the recovery in a civil action of relief for violations of Ind. Code § 35-33.5-2-1(1)(c), which, in pertinent part, provides:

> Sec. 1. (a) A prosecuting attorney or, if the prosecuting attorney is unavailable, a chief deputy prosecuting attorney specifically authorized by the prosecuting attorney, may submit an application for a warrant or an extension to a circuit or superior court where:

(1) the county that the prosecuting attorney represents is located; and

(2) the communication subject to the warrant is anticipated to be sent or received.

The prosecuting attorney or authorized chief deputy prosecuting attorney may not delegate the responsibility of applying for a warrant or an extension to another deputy prosecuting attorney.

(b) One (1) of the following persons must serve as a coapplicant for a warrant or an extension under subsection (a):

(1) The superintendent of the state police department.

(2) The police chief of a consolidated city where the communication subject to the warrant is anticipated to be sent or received.

(3) The sheriff of the county containing a consolidated city where the communication subject to the warrant is anticipated to be sent or received.

(c) Only the state police department may install equipment used to intercept an electronic communication under this chapter.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do

Ind. Code § 35-33.5-5-4 provides in pertinent part:

Sec. 4. (a) A person whose communications are intercepted, disclosed, or used in violation of this article:

(1) has a civil cause of action against a person who intercepts, discloses, uses, or procures another person to intercept, disclose, or use a communication in violation of this article; and

(2) is entitled to recover from that person the following:

(A) The greater of:

(i) actual damages;

(ii) liquidated damages computed at a rate of one hundred dollars ($100) each day for each day of violation; or

(iii) one thousand dollars ($1,000).

(B) Court costs (including fees).

(C) Punitive damages, when determined to be appropriate by the court.

(D) Reasonable attorney's fees.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

i.      **Iowa.** Iowa Code § 808B.8 provides for the recovery in a civil action of relief for violations of Iowa Code § 808b.2(1)(a), (c), and (d), which, in pertinent part, provides:

1. Except as otherwise specifically provided in this chapter, a person who does any of the following commits a class "D" felony:

a. Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, a wire, oral, or electronic communication.

b. Willfully uses, endeavors to use, or procures any other person to use or endeavor to use an electronic, mechanical, or other device to intercept any oral communication when either of the following applies:

(1) The device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication.

(2) The device transmits communications by radio, or interferes with the transmission of radio communications.

c. Willfully discloses, or endeavors to disclose, to any other person the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained

through the interception of a wire, oral, or electronic communication in violation of this subsection.

      d. Willfully uses, or endeavors to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Iowa Code Ann. §808B.8  provides:

      1. A person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this chapter shall:

      a. Have a civil cause of action against any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use such communications.

      b. Be entitled to recover from any such person all of the following:

      (1) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, or one thousand dollars, whichever is higher.

      (2) Punitive damages upon a finding of a willful, malicious, or reckless violation of this chapter.

      (3) A reasonable attorney fee and other litigation costs reasonably incurred.

      2. A good faith reliance on a court order shall constitute a complete defense to any civil or criminal action brought under this chapter.

      3. A person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this chapter may seek an injunction, either temporary or permanent, against any person who violates this chapter.

1     Based on the allegations herein, plaintiffs and the class are entitled to

2     preliminary or equitable or declaratory relief as may be appropriate; the maximum

3     damages provided by the foregoing statute, including punitive damages; and a

4     reasonable attorney's fee and other litigation costs reasonably incurred.

5     j.     **Louisiana.** La. Rev. Stat. § 15:1312 provides for the recovery in a civil

6     action of relief for violations of La. Rev. Stat. § 15:1303(A)(1), (3)-(4), which, in

7     pertinent part, provides:

8     Except as otherwise specifically provided in this Chapter, it
      shall be unlawful for any person to:

9

10    (1) Willfully intercept, endeavor to intercept, or procure any
      other person to intercept or endeavor to intercept, any wire,
11    electronic or oral communication;

12    (2) Willfully use, endeavor to use, or procure any other
      person to use or endeavor to use, any electronic, mechanical, or other
13    device to intercept any oral communication when:

14    (a) Such device is affixed to, or otherwise transmits a signal
15    through, a wire, cable, or other like connection used in wire or
      electronic communication; or

16    (b) Such device transmits communications by radio or
17    interferes with the transmission of such communication;

18    (3) Willfully disclose, or endeavor to disclose, to any other
19    person the contents of any wire, electronic, or oral communication,
      knowing or having reason to know that the information was obtained
20    through the interception of a wire, electronic, or oral communication
      in violation of this Subsection; or
21

22    (4) Willfully use, or endeavor to use, the contents of any wire,
      electronic, or oral communication, knowing or having reason to
23    know that the information was obtained through the interception of a
      wire, electronic, or oral communication in violation of this
24    Subsection.

25    Defendants Carrier IQ and the Device Manufacturers, by way of their

26    programming, knowing and intentional installation, activation, and other

27    involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

28

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

La. Rev. State. § 15:1312 provides in pertinent part:

A. Any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of this Chapter shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and be entitled to recover from any such person:

(1) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation or one thousand dollars, whichever is greater.

(2) A reasonable attorney's fee and other litigation costs reasonably incurred.

(3) Punitive damages.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

k.      **Maine.** Me. Rev. Stat. ch. 15 § 711 provides for the recovery in a civil action of relief for violations of Me. Rev. Stat. ch. 15 § 710(1), which, in pertinent part, provides:

1. Interception, oral communications prohibited. Any person, other than an employee of a communication common carrier, a law enforcement officer, an investigative officer, another employee of the Department of Corrections authorized to exercise law enforcement powers as described in Title 34-A, section 3011 or a jail investigative officer or a jail employee acting at the direction of a jail investigative officer, carrying out practices otherwise permitted by this chapter, who intentionally or knowingly intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept any wire or oral communication is guilty of a Class C crime.

2. Editing of tape recordings in judicial proceedings prohibited. Any person who knowingly or intentionally edits, alters or tampers with any tape, transcription or other sound recording, or knows of such editing, altering or tampering, and presents that recording in any judicial proceeding or proceeding under oath,

without fully indicating the nature of the changes made and the original state of the recording, is guilty of a Class C crime.

 3. Disclosure, or use of wire or oral communications prohibited. A person is guilty of a Class C crime if he:

 A. Intentionally or knowingly discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or

 B. Intentionally or knowingly uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception.

 4. Duty to report. Any communications common carrier shall promptly report to the Attorney General any facts coming to its attention in the conduct of its business which may indicate a possible violation of this section and such carrier shall adopt reasonable rules to assure compliance with this subsection, provided such carrier shall not be liable to any person who may claim an injury arising out of any such report, if made in good faith. Any person violating this subsection shall be subject to a civil penalty not to exceed $5,000, payable to the State, to be recovered in a civil action.

 5. Possession of interception devices prohibited. A person, other than an employee of a communication common carrier, a law enforcement officer, an investigative officer, another employee of the Department of Corrections authorized to exercise law enforcement powers as described in Title 34-A, section 3011 or a jail investigative officer or a jail employee acting at the direction of a jail investigative officer, carrying out practices otherwise permitted by this chapter, who has in that person's possession any device, contrivance, machine or apparatus designed or commonly used for intercepting wire or oral communications is guilty of a Class C crime.

 6. Sale of interception devices prohibited. A person who sells, exchanges, delivers, barters, gives or furnishes or possesses with an intent to sell any device, contrivance, machine or apparatus designed or commonly used for the interception of wire or oral communications as defined in this chapter is guilty of a Class B crime. This subsection shall not include devices manufactured under written contract for sale to common carriers, law enforcement agencies and the Department of Corrections, provided that the production of any such device shall not have commenced prior to the signing of the contract by both parties.

*See also* Me. Rev. Stat. ch. 15 § 709(7) (defining "wire communication" in such a manner as to encompass electronic communications such as those here at issue).

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Me. Rev. Stat. ch. 15 § 711 provides:

> Any party to a conversation intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses such communications and shall be entitled to recover from any such persons:

> 1. Damages. Actual damages, but not less than liquidated damages, computed at the rate of $100 per day for each day of violation; and

> 2. Attorney's fee. A reasonable attorney's fee and other litigation disbursements reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

l.    **Maryland.** Md. Cts. & Jud. Pro. Code § 10-410 provides for the recovery in a civil action of relief for violations of Md. Cts. & Jud. Pro. Code § 10-402, which, in pertinent part, provides:

> (a) Except as otherwise specifically provided in this subtitle it is unlawful for any person to:

> (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

> (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained

through the interception of a wire, oral, or electronic communication in violation of this subtitle; or

(3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

*See also* Md. Cts. & Jud. Pro. Code § 10-401(5)(i) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Md. Cts. & Jud. Pro. Code §10-410 provides in pertinent part:

Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:

(1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

m.     **Massachusetts.** Mass. Gen. Laws ch. 272 § 99(Q) provides for the recovery in a civil action of relief for violations of Mass. Gen. Laws ch. § 99(C)(1), which, in pertinent part, provides:

1. Interception, oral communications prohibited.

Except as otherwise specifically provided in this section any person who—

willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment.

Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception, which is not authorized or permitted by this section, shall be prima facie evidence of a violation of this subparagraph.

Mass. Gen. Laws ch. 272 § 99(B)(1) defines "wire communication" broadly enough to encompass electronic communications as discussed herein.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Accordingly, plaintiffs and the class are entitled under Mass. Gen. Laws ch. 272 § 99(Q) to a civil remedy per the following:

Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest, and shall be entitled to recover from any such person—

1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher;

2. punitive damages; and

3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

n.      **Michigan.** Mich. Stat. § 750.539h provides for the recovery in a civil action of relief for violations of Mich. Stat. § 750.539c, which, in pertinent part, prohibits "eavesdropping." More specifically, it provides:

Sec. 539c. Any person who is present or who is not present during a private conversation and who willfully uses any device to eavesdrop upon the conversation without the consent of all parties thereto, or who knowingly aids, employs or procures another person to do the same in violation of this section, is guilty of a felony punishable by imprisonment in a state prison for not more than 2 years or by a fine of not more than $2,000.00, or both.

See also Mich. Stat. § 750.539a(2) (defining "eavesdropping" in such a manner as to encompass the communications here at issue, especially the recording or transmitting of text messages).

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have eavesdropped, and/or have aided or procured others to so do.

Mich. Stat. § 750.539h provides:

Sec. 539h. Any parties to any conversation upon which eavesdropping is practiced contrary to this act shall be entitled to the following civil remedies:

(a) An injunction by a court of record prohibiting further eavesdropping.

(b) All actual damages against the person who eavesdrops.

1        (c) Punitive damages as determined by the court or by a jury.

2        Based on the allegations herein, plaintiffs and the class are entitled to

3    preliminary or equitable or declaratory relief as may be appropriate; the maximum

4    damages provided by the foregoing statute, including punitive damages; and a

5    reasonable attorney's fee and other litigation costs reasonably incurred.

6        o.    **Minnesota.** Minn. Stat. § 626A.13 provides for the recovery in a civil action

7    of relief for violations of Minn. Stat. § 626A.02 (1)(1), (3)-(4), which, in pertinent

8    part, provides:

9            Subdivision 1. Offenses. Except as otherwise specifically
10           provided in this chapter any person who:

11               (1) intentionally intercepts, endeavors to intercept, or
         procures any other person to intercept or endeavor to intercept, any
12       wire, electronic, or oral communication;

13               (2) intentionally uses, endeavors to use, or procures any other
         person to use or endeavor to use any electronic, mechanical, or other
14       device to intercept any oral communication when:

15               (i) such device is affixed to, or otherwise transmits a signal
16       through, a wire, cable, or other like connection used in wire
         communication; or
17

18               (ii) such device transmits communications by radio, or
         interferes with the transmission of such communication;
19

20               (3) intentionally discloses, or endeavors to disclose, to any
         other person the contents of any wire, electronic, or oral
         communication, knowing or having reason to know that the
21       information was obtained through the interception of a wire,
         electronic, or oral communication in violation of this subdivision; or
22

23               (4) intentionally uses, or endeavors to use, the contents of any
         wire, electronic, or oral communication, knowing or having reason to
24       know that the information was obtained through the interception of a
         wire, electronic, or oral communication in violation of this
25       subdivision; shall be punished as provided in subdivision 4, or shall
         be subject to suit as provided in subdivision 5.
26

27       Defendants Carrier IQ and the Device Manufacturers, by way of their

28   programming, knowing and intentional installation, activation, and other

involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

authorized, employed, or procured or permitted others to so do.

Minn. Stat. § 626A.13 provides in pertinent part:

Subdivision 1. In general. Except as provided in section 2511(2)(a)(ii) of title 18 of the United States Code, a person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity that engaged in that violation relief as may be appropriate.

Subd. 2. Relief. In an action under this section, appropriate relief includes:

(1) temporary and other equitable or declaratory relief as may be appropriate;

(2) damages under subdivision 3 and punitive damages in appropriate cases; and

(3) a reasonable attorney's fee and other litigation costs reasonably incurred.

Subd. 3. Computation of damages. (a) In an action under this section, if the conduct in violation of this chapter is the private viewing of a private satellite video communication that is not scrambled or encrypted or if the communication is a radio communication that is transmitted on frequencies allocated under subpart D of part 74 of title 47 of the Code of Federal Regulations that is not scrambled or encrypted and the conduct is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain, then the court shall assess damages as follows:

(1) If the person who engaged in that conduct has not previously been enjoined under section 626A.02, subdivision 5, and has not been found liable in a prior civil action under this section, the court shall assess the greater of the sum of actual damages suffered by the plaintiff, or statutory damages of not less than $50 and not more than $500.

(2) If, on one prior occasion, the person who engaged in that conduct has been enjoined under section 626A.02, subdivision 5, or has been found liable in a civil action under this section, the court shall assess the greater of the sum of actual damages suffered by the

plaintiff, or statutory damages of not less than $100 and not more than $1,000.

(b) In any other action under this section, the court may assess as damages whichever is the greater of:

(1) the sum of three times the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(2) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

p.      **Nebraska.** Neb. Rev. Stat. § 86-297 provides for the recovery in a civil action of relief for violations of Neb. Rev. Stat. § 86-290.  In pertinent part, Neb. Rev. Stat. § 86-290 provides that

it is unlawful to:

(a) Intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, electronic, or oral communication;

(b) Intentionally use, endeavor to use, or procure any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication or (ii) such device transmits communications by radio or interferes with the transmission of such communication;

(c) Intentionally disclose or endeavor to disclose to any other person the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this subsection;

(d) Intentionally use or endeavor to use the contents of any wire, electronic, or oral communication, knowing or having reason to

know that the information was obtained through the interception of a
wire, electronic, or oral communication in violation of this
subsection . . . .

Defendants Carrier IQ and the Device Manufacturers, by way of their

programming, knowing and intentional installation, activation, and other

involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

authorized, employed, or procured or permitted others to so do.

Neb. Rev. Stat. § 86-297 provides:

(1) Any person whose wire, electronic, or oral
communication is intercepted, disclosed, or intentionally used in
violation of sections 86-271 to 86-295 and 86-298 to 86-2,103 may
in a civil action recover from the person or entity which engaged in
that violation such relief as may be appropriate.

(2) In an action under this section, appropriate relief includes:

(a) Such preliminary and other equitable or declaratory relief
as may be appropriate;

(b) Damages under subsection (3) of this section; and

(c) Reasonable attorney's fees and other litigation costs
reasonably incurred.

(3)(a) In an action under this section, if the conduct in
violation of sections 86-271 to 86-295 and 86-298 to 86-2,103 is the
private viewing of a private satellite video communication that is not
scrambled or encrypted or if the communication is a radio
communication that is transmitted on frequencies allocated for
remote pickup broadcast stations under subpart D of 47 C.F.R. part
74, as such regulations existed on January 1, 2002, that is not
scrambled or encrypted and the conduct is not for a tortious or illegal
purpose or for purposes of direct or indirect commercial advantage or
private commercial gain, then the court shall assess damages as
follows:

(i) If the person who engaged in such conduct has not
previously been enjoined under subsection (5) of section 86-290 and
has not been found liable in a prior civil action under this section, the
court shall assess the greater of the sum of actual damages suffered

by the plaintiff or statutory damages of not less than fifty dollars and not more than five hundred dollars; or

(ii) If on one prior occasion the person who engaged in such conduct has been enjoined under subsection (5) of section 86-290 or has been found liable in a civil action under this section, the court shall assess the greater of the sum of actual damages suffered by the plaintiff or statutory damages of not less than one hundred dollars and not more than one thousand dollars.

(b) In any other action under this section, the court may assess as damages whichever is the greater of:

(i) The sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(ii) Statutory damages of whichever is the greater of one hundred dollars a day for each day of violation or ten thousand dollars.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

q. **Nevada.** Nev. Rev. Stat. § 200.690 provides for the recovery in a civil action of relief for violations of Nev. Rev. Stat. § 200.620, which, in pertinent part,

1. Except as otherwise provided in NRS 179.410 to 179.515, inclusive, 209.419 and 704.195, it is unlawful for any person to intercept or attempt to intercept any wire communication unless:

(a) The interception or attempted interception is made with the prior consent of one of the parties to the communication; and

(b) An emergency situation exists and it is impractical to obtain a court order as required by NRS 179.410 to 179.515, inclusive, before the interception, in which event the interception is subject to the requirements of subsection 3. If the application for ratification is denied, any use or disclosure of the information so intercepted is unlawful, and the person who made the interception shall notify the sender and the receiver of the communication that:

(1) The communication was intercepted; and

(2) Upon application to the court, ratification of the interception was denied.

*See also* Nev. Rev. Stat. § 610 (2), which defines "wire communication" in such a manner as to include the electronic communications here at issue.

Nev. Rev. Stat. § 200.690 provides in pertinent part:

1. A person who willfully and knowingly violates NRS 200.620 to 200.650, inclusive:

(a) Shall be punished for a category D felony as provided in NRS 193.130.

(b) Is liable to a person whose wire or oral communication is intercepted without his or her consent for:

(1) Actual damages or liquidated damages of $100 per day of violation but not less than $1,000, whichever is greater;

(2) Punitive damages; and

(3) His or her costs reasonably incurred in the action, including a reasonable attorney's fee,

all of which may be recovered by civil action.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

r.       **New Hampshire.** N.H. Rev. Stat. § 570-A:11 provides for the recovery in a civil action of relief for violations of N.H. Rev. Stat. § 570-A:2, which, in pertinent part, provides:

I. A person is guilty of a class B felony if, except as otherwise specifically provided in this chapter or without the consent of all parties to the communication, the person:

(a) Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any telecommunication or oral communication;

(b) Wilfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

(1) Such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in telecommunication, or

(2) Such device transmits communications by radio, or interferes with the transmission of such communication, or

(3) Such use or endeavor to use (A) takes place on premises of any business or other commercial establishment, or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment; or

(c) Wilfully discloses, or endeavors to disclose, to any other person the contents of any telecommunication or oral communication, knowing or having reason to know that the information was obtained through the interception of a telecommunication or oral communication in violation of this paragraph; or

(d) Willfully uses, or endeavors to use, the contents of any telecommunication or oral communication, knowing or having reason to know that the information was obtained through the interception of a telecommunication or oral communication in violation of this paragraph.

*See also* N.H. Rev. Stat. § 570-A:1 (I), which defines "telecommunication" in such a manner as to include the electronic communications here at issue.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

N.H. Rev. Stat. § 570-A:11  provides:

Any person whose telecommunication or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose or use such communications, and be entitled to recover from any

such person: (a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) punitive damages; and (c) a reasonable attorney's fee and other litigation costs reasonably incurred. Good faith reliance on a court order or on a representation made by the attorney general, deputy attorney general or a county attorney shall constitute a complete defense to any civil or criminal action brought under this chapter.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

s.    **New Jersey.** N.J. Stat. Ann. § 2A:156A-24 provides for the recovery in a civil action of relief for violations of N.J. Stat. § 2A:156A-3, which, in pertinent part, provides:

Except as otherwise specifically provided in this act, any person who:

a. Purposely intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication; or

b. Purposely discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

c. Purposely uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication;

shall be guilty of a crime of the third degree. Subsections b. and c. of this section shall not apply to the contents of any wire, electronic or oral communication, or evidence derived therefrom, that has become common knowledge or public information.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

N.J. Stat. § 2A:156A-24 provides:

> Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this act shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

> a. Actual damages, but not less than liquidated damages computed at the rate of $100.00 a day for each day of violation, or $1,000.00, whichever is higher;

> b. Punitive damages; and

> c. A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

t.    **New Mexico.** N.M. Stat. § 30-12-11 provides for the recovery in a civil action of relief for violations of N.M. Stat. § 30-12-1, which, in pertinent part, provides:

> Interference with communications consists of knowingly and without lawful authority:

> A. displacing, removing, injuring or destroying any radio station, television tower, antenna or cable, telegraph or telephone line, wire, cable, pole or conduit belonging to another, or the material or property appurtenant thereto;

> B. cutting, breaking, tapping or making any connection with any telegraph or telephone line, wire, cable or instrument belonging to or in the lawful possession or control of another, without the consent of such person owning, possessing or controlling such property;

> C. reading, interrupting, taking or copying any message, communication or report intended for another by telegraph or

telephone without the consent of a sender or intended recipient thereof;

D. preventing, obstructing or delaying the sending, transmitting, conveying or delivering in this state of any message, communication or report by or through telegraph or telephone; or

E. using any apparatus to do or cause to be done any of the acts hereinbefore mentioned or to aid, agree with, comply or conspire with any person to do or permit or cause to be done any of the acts hereinbefore mentioned.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

N.M. Stat. § 30-12-11 provides in pertinent part:

A. Any person whose wire or oral communication is intercepted, disclosed or used in violation of this act shall:

(1) have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use such communications; and

(2) be entitled to recover from any such person actual damages, but not less than liquidated damages computed at the rate of one hundred dollars ($100) for each day of violation or one thousand dollars ($1,000), whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

u.      **North Carolina.** N.C. Gen. Stat. § 15A-296 provides for the recovery in a civil action of relief for violations of N.C. Gen. Stat. § 15A-287, which, in pertinent part, provides:

(a) Except as otherwise specifically provided in this Article, a person is guilty of a Class H felony if, without the consent of at least one party to the communication, the person:

(1) Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication.

(2) Willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

a. The device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communications; or

b. The device transmits communications by radio, or interferes with the transmission of such communications.

(3) Willfully discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through violation of this Article; or

(4) Willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Article.

*See also* N.C. Gen. Stat. § 15A-226(8) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

N.C. Gen. Stat. § 15A-296 provides:

(a) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this Article, has a civil cause of action against any person who intercepts, discloses, uses, or procures any other person to intercept, disclose, or use such communications, and is entitled to recover from any other person:

(1) Actual damages, but not less than liquidated damages, computed at the rate of one hundred dollars ($100.00) a day for each day of violation or one thousand dollars ($1,000), whichever is higher;

(2) Punitive damages; and

(3) A reasonable attorneys' fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

v.      **Ohio.** Ohio Rev. Code § 2933.65 provides for the recovery in a civil action of relief for violations of Ohio Rev. Code § 2933.52, which, in pertinent part, provides:

(A) No person purposely shall do any of the following:

(1) Intercept, attempt to intercept, or procure another person to intercept or attempt to intercept a wire, oral, or electronic communication;

(2) Use, attempt to use, or procure another person to use or attempt to use an interception device to intercept a wire, oral, or electronic communication, if either of the following applies:

(a) The interception device is affixed to, or otherwise transmits a signal through, a wire, cable, satellite, microwave, or other similar method of connection used in wire communications;

(b) The interception device transmits communications by radio, or interferes with the transmission of communications by radio.

(3) Use, or attempt to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the contents were obtained through the interception of a wire, oral, or electronic communication in violation of sections 2933.51 to 2933.66 of the Revised Code.

*See also* Ohio Rev. Code § 2933.51(N) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way
of their programming, knowing and intentional installation,
activation, and other involvement with the Carrier IQ Software,
consisting of the IQ Agent and CIQ Interface, have intentionally
intercepted, endeavored to intercept, and/or have aided, authorized,
employed, or procured or permitted others to so do.
Ohio Rev. Code § 2933.65 provides:

(A) A person whose wire, oral, or electronic communications
are intercepted, disclosed, or intentionally used in violation
of sections 2933.51 to 2933.66 of the Revised Code may bring a civil
action to recover from the person or entity that engaged in the
violation any relief that may be appropriate and that includes, but is
not limited to, the following:

(1) The preliminary and other equitable or declaratory relief
that is appropriate;

(2) Whichever of the following is greater:

(a) Liquidated damages computed at a rate of two hundred
dollars per day for each day of violation or liquidated damages of ten
thousand dollars, whichever is greater;

(b) The sum of actual damages suffered by the plaintiff and
the profits, if any, made as a result of the violation by the person or
entity that engaged in the violation.

(3) Punitive damages, if appropriate;

(4) Reasonable attorney's fees and other litigation expenses
that are reasonably incurred in bringing the civil action.

Based on the allegations herein, plaintiffs and the class are entitled to
preliminary or equitable or declaratory relief as may be appropriate; the maximum
damages provided by the foregoing statute, including punitive damages; and a
reasonable attorney's fee and other litigation costs reasonably incurred.

w.    **Oregon.** Ore. Rev. Stat. §133.739 provides for the recovery in a civil action
of relief for violations of Ore. Rev. Stat. § 165.543, which provides:

(1) Except as provided in ORS 133.724 or as provided
in ORS 165.540 (2)(a), any person who willfully intercepts, attempts
to intercept or procures any other person to intercept or attempt to
intercept any wire or oral communication where such person is not a
party to the communication and where none of the parties to the

communication has given prior consent to the interception, is guilty
of a Class A misdemeanor.

(2) As used in this section, the terms "intercept" and "wire or
oral communication" have the meanings provided under ORS
133.721.

Defendants Carrier IQ and the Device Manufacturers, by way of their

programming, knowing and intentional installation, activation, and other

involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ

Interface, have intentionally intercepted, endeavored to intercept, and/or have aided,

authorized, employed, or procured or permitted others to so do.

Ore. Rev. Stat. §133.739 provides:

(1) Any person whose wire, electronic or oral communication
was intercepted, disclosed or used in violation of ORS 133.724 or
133.737 shall have a civil cause of action against any person who
willfully intercepts, discloses or uses, or procures any other person to
intercept, disclose or use such communication and shall be entitled to
recover from any such person:

(a) Actual damages but not less than damages computed at
the rate of $100 a day for each day of violation or $1,000, whichever
is greater; and

(b) Punitive damages.

(2) A good faith reliance on a court order or legislative
authorization shall constitute a complete defense to any civil action
brought under this section.

(3) Nothing in ORS 41.910, 133.721 to 133.739
and 133.992 is intended to abrogate any other private civil remedy
for invasion of privacy.

(4) Except as provided in subsection (5) of this section, the
court may award reasonable attorney fees to the prevailing party in
an action under this section.

(5) The court may not award attorney fees to a prevailing
defendant under the provisions of subsection (4) of this section if the
action under this section is maintained as a class action pursuant
to ORCP 32.

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

x.      **Pennsylvania.** 18 Pa. Consol. Stat. § 5725 provides for the recovery in a civil action of relief for violations of 18 Pa. Consol. Stat. § , which, in pertinent part, provides:

> Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:
>
> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
>
> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
>
> (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

*See also* 18 Pa. Consol. Stat. § 5702 (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

18 Pa. Consol. Stat. § 5725 provides in pertinent part:

> a) Cause of action.--Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

(1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

(2) Punitive damages.

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

y.    **Rhode Island.** R.I. Gen. Laws. § 12-5.1-13 provides for the recovery in a civil action of relief for violations of R.I. Gen. Laws. § 11-35-21, which, in pertinent part, provides:

(a) Except as otherwise specifically provided in chapter 5.1 of title 12, any person: (1) who willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire, electronic, or oral communication; (2) who willfully discloses or attempts to disclose to any person the contents of any wire, electronic, or oral communication, knowing, or having reason to know that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; or (3) who willfully uses or attempts to use the contents of any wire, electronic, or oral communication, knowing, or having reason to know, that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; shall be imprisoned for not more than five (5) years.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

R.I. Gen. Laws. § 12-5.1-13 provides:

(a) Any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person who intercepts,

discloses, or uses the communications, and shall be entitled to recover from that person:

(1) Actual damages, but not less than liquidated damages, computed at the rate of one hundred dollars ($100) per day for each day of violation, or one thousand dollars ($1,000), whichever is higher;

(2) Punitive damages; and

(3) Reasonable attorneys' fees and other litigation disbursements reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

z.      **South Carolina.** S.C. Code Laws § 17-30-135 provides for the recovery in a civil action of relief for violations of S.C. Code Laws § 17-30-20, which, in pertinent part, provides:

Except as otherwise specifically provided in this chapter, a person who commits any of the following acts is guilty of a felony and, upon conviction, must be punished as provided in Section 17-30-50 of this chapter:

(1) intentionally intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept any wire, oral, or electronic communication;

(2) intentionally uses, attempts to use, or procures any other person to use or attempt to use any electronic, mechanical, or other device to intercept any oral communication when:

(a) the device is affixed to or otherwise transmits a signal through a wire, cable, or other like connection used in wire communication; or

(b) the device transmits communications by radio or interferes with the transmission of the communication;

(3) intentionally discloses or attempts to disclose to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained

through the interception of a wire, oral, or electronic communication in violation of this subsection;

(4) intentionally uses or attempts to use the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(5) intentionally discloses or attempts to disclose to any other person the contents of any wire, oral, or electronic communication intercepted by means authorized by Section 17-30-70 or Section 17-30-95 when that person knows or has reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation and the disclosure is not otherwise authorized under this chapter . . . .

*See also* S.C. Code Laws § 17-30-15(13) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

S.C. Code Laws § 17-30-135 provides in pertinent part:

(A) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this chapter has a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use the communications and is entitled to recover from the person or entity which engaged in that violation relief as may be appropriate, including:

(1) preliminary or equitable or declaratory relief as may be appropriate;

(2) actual damages, but not less than liquidated damages computed at the rate of five hundred dollars a day for each day of violation or twenty-five thousand dollars, whichever is greater, not to exceed the limits on liability provided in subsection (F)(3);

(3) punitive damages, except as may be prohibited in subsection (F)(4); and

(4) a reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

aa.      **Tennessee.** Tenn. Code Ann. §39-13-603 provides for the recovery in a civil action of relief for violations of Tenn. Code Ann. § , which, in pertinent part, provides:

> (a)(1) Except as otherwise specifically provided in §§ 39-13-601--39-13-603 and title 40, chapter 6, part 3, a person commits an offense who:
>
> (A) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> (B) Intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:
>
> (i) The device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
>
> (ii) The device transmits communications by radio, or interferes with the transmission of the communication;
>
> (C) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection (a); or
>
> (D) Intentionally uses, or endeavors to use, the contents of any wire, oral or electronic communication, knowing or having reason to know, that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection (a).

(2) A violation of subdivision (a)(1) shall be punished as provided in § 39-13-602 and shall be subject to suit as provided in § 39-13-603.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Tenn. Code Ann. § 39-13-603 provides:

a) Except as provided in § 39-13-601(b)(4), any aggrieved person whose wire, oral or electronic communication is intentionally intercepted, disclosed, or used in violation of § 39-13-601 or title 40, chapter 6, part 3 may in a civil action recover from the person or entity that engaged in that violation the following relief:

(1) The greater of:

(A) The sum of the actual damages, including any damage to personal or business reputation or relationships, suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(B) Statutory damages of one hundred dollars ($100) a day for each day of violation or ten thousand dollars ($10,000), whichever is greater;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

(b) Any person whose wire, oral, or electronic communication is or is about to be intercepted, disclosed, or used in violation of § 39-13-601 or title 40, chapter 6, part 3 may seek to enjoin and restrain the violation and may in the same action seek damages as provided by subsection (a).

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum

damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

bb.    **Texas.** Tex. Code Crim. Pro. Art. 18.20 provides for the recovery in a civil action of relief for violations of Tex. Penal Code § 16.02 , which, in pertinent part, provides:

> (a) In this section, "computer trespasser," "covert entry," "communication common carrier," "contents," "electronic communication," "electronic, mechanical, or other device," "immediate life-threatening situation," "intercept," "investigative or law enforcement officer," "member of a law enforcement unit specially trained to respond to and deal with life-threatening situations," "oral communication," "protected computer," "readily accessible to the general public," and "wire communication" have the meanings given those terms in Article 18.20, Code of Criminal Procedure.

> (b) A person commits an offense if the person:

> (1) intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication;

> (2) intentionally discloses or endeavors to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

> (3) intentionally uses or endeavors to use the contents of a wire, oral, or electronic communication if the person knows or is reckless about whether the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

> (4) knowingly or intentionally effects a covert entry for the purpose of intercepting wire, oral, or electronic communications without court order or authorization; or

> (5) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when the device:

> (A) is affixed to, or otherwise transmits a signal through a wire, cable, or other connection used in wire communications; or

1

2

> (B) transmits communications by radio or interferes with the transmission of communications by radio.

3

4

*See also* Tex. Code Crim. Pro. Art. Sec. 18.20(15) (defining "electronic communication").

5

6

7

8

9

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

10

Tex. Code Crim. Pro. Art. 18.20 provides in pertinent part:

11

12

13

14

> Sec. 16. (a) A person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this article, or in violation of Chapter 16, Penal Code, has a civil cause of action against any person who intercepts, discloses, or uses or solicits another person to intercept, disclose, or use the communication and is entitled to recover from the person:

15

16

> (1) actual damages but not less than liquidated damages computed at a rate of $100 a day for each day of violation or $1,000, whichever is higher;

17

18

> (2) punitive damages; and

19

> (3) a reasonable attorney's fee and other litigation costs reasonably incurred.

20

21

22

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

23

24

25

cc.      **Utah.** Utah Code §§ 77-23a-11 and 77-23b-8 provide for the recovery in a civil action of relief for violations of Utah Code § 77-23a-4, which, in pertinent part, provides:

26

27

> (1)(a) Except as otherwise specifically provided in this chapter, any person who violates Subsection (1)(b) is guilty of an

28

offense and is subject to punishment under Subsection (10), or when applicable, the person is subject to civil action under Subsection (11).

(b) A person commits a violation of this subsection who:

(i) intentionally or knowingly intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic, or oral communication;

(ii) intentionally or knowingly uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication, when the device is affixed to, or otherwise transmits a signal through a wire, cable, or other like connection used in wire communication or when the device transmits communications by radio, or interferes with the transmission of the communication;

(iii) intentionally or knowingly discloses or endeavors to disclose to any other person the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this section; or

(iv) intentionally or knowingly uses or endeavors to use the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this section.

*See also* Utah Code § 77-23a-3(5) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Utah Code § 77-23a-11 provides:

(1) Except under Subsections 77-23a-4 (3), (4), and (5), a person whose wire, electronic, or oral communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover relief as appropriate from the person or entity that engaged in the violation.

(2) In an action under this section appropriate relief includes:

(a) preliminary and other equitable or declaratory relief as is appropriate;

(b) damages under Subsection (3) and punitive damages in appropriate cases; and

(c) a reasonable attorney's fee and reasonably incurred litigation costs.

(3)(a) In an action under this section, if the conduct in violation of this chapter is the private viewing of a private satellite video communication that is not scrambled or encrypted, or if the communication is a radio communication that is transmitted on frequencies allocated under Subpart (D), Part 74, Rules of the Federal Communications Commission, that is not scrambled or encrypted, and the conduct is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain, the court shall assess damages as follows:

(i) if the person who engaged in the conduct has not previously been enjoined under Subsection 77-23a-4 (11) and has not been found liable in a prior civil action under this section, the court shall assess the greater of the sum of actual damages suffered by the plaintiff, or the statutory damages of not less than $50 nor more than $500;

(ii) if on one prior occasion the person who engaged in the conduct has been enjoined under Subsection 77-23a-4 (11) or has been liable in a civil action under this section, the court shall assess the greater of the sum of actual damages suffered by the plaintiff, or statutory damages of not less than $100 and not more than $1,000;

(b) in any other action under this section, the court may assess as damages whichever is the greater of:

(i) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violations; or

(ii) statutory damages of $100 a day for each day of violation, or $10,000, whichever is greater.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum

damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

dd. **Virginia.** Va. Code § 19.2-69 provides for the recovery in a civil action of relief for violations of Va. Code § 19.2-62, which, in pertinent part, provides:

> A. Except as otherwise specifically provided in this chapter any person who:

> 1. Intentionally intercepts, endeavors to intercept or procures any other person to intercept or endeavor to intercept, any wire, electronic or oral communication;

> 2. Intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical or other device to intercept any oral communication;

> 3. Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, electronic or oral communication knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

> 4. Intentionally uses, or endeavors to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; shall be guilty of a Class 6 felony.

*See also* Va. Code § 19.2-61 (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Va. Code § 19.2-69 provides in pertinent part:

> Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall (i) have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use such communications, and (ii) be entitled to recover from any such person:

1. Actual damages but not less than liquidated damages computed at the rate of $400 a day for each day of violation or $4,000, whichever is higher;

2. Punitive damages; and

3. A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

ee. **Washington.** Wash. Rev. Code § 9.73.060 provides for the recovery in a civil action of relief for violations of Wash. Rev. Code § 9.73.030, which, in pertinent part, provides:

1) Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record any:

(a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication;

(b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

(2) Notwithstanding subsection (1) of this section, wire communications or conversations (a) of an emergency nature, such as the reporting of a fire, medical emergency, crime, or disaster, or (b) which convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands, or (c) which occur anonymously or repeatedly or at an extremely inconvenient hour, or (d) which relate to communications by a hostage holder or barricaded person as

defined in RCW 70.85.100, whether or not conversation ensues, may be recorded with the consent of one party to the conversation.

(3) Where consent by all parties is needed pursuant to this chapter, consent shall be considered obtained whenever one party has announced to all other parties engaged in the communication or conversation, in any reasonably effective manner, that such communication or conversation is about to be recorded or transmitted: PROVIDED, That if the conversation is to be recorded that said announcement shall also be recorded.

(4) An employee of any regularly published newspaper, magazine, wire service, radio station, or television station acting in the course of bona fide news gathering duties on a full-time or contractual or part-time basis, shall be deemed to have consent to record and divulge communications or conversations otherwise prohibited by this chapter if the consent is expressly given or if the recording or transmitting device is readily apparent or obvious to the speakers. Withdrawal of the consent after the communication has been made shall not prohibit any such employee of a newspaper, magazine, wire service, or radio or television station from divulging the communication or conversation.

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Wash. Rev. Code §9.73.060 provides:

Any person who, directly or by means of a detective agency or any other agent, violates the provisions of this chapter shall be subject to legal action for damages, to be brought by any other person claiming that a violation of this statute has injured his or her business, his or her person, or his or her reputation. A person so injured shall be entitled to actual damages, including mental pain and suffering endured by him or her on account of violation of the provisions of this chapter, or liquidated damages computed at the rate of one hundred dollars a day for each day of violation, not to exceed one thousand dollars, and a reasonable attorney's fee and other costs of litigation.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute and a reasonable attorney's fee and other litigation costs reasonably incurred.

ff.     **West Virginia.** W. Va. Code § 62-1D-12 provides for the recovery in a civil action of relief for violations of W. Va. Code § 62-1D-3, which, in pertinent part, provides:

> a) Except as otherwise specifically provided in this article it is unlawful for any person to:
>
> (1) Intentionally intercept, attempt to intercept or procure any other person to intercept or attempt to intercept, any wire, oral or electronic communication; or
>
> (2) Intentionally disclose or intentionally attempt to disclose to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this article; and
>
> (3) Intentionally use or disclose or intentionally attempt to use or disclose the contents of any wire, oral or electronic communication or the identity of any party thereto, knowing or having reason to know that such information was obtained through the interception of a wire, oral or electronic communication in violation of this article.
>
> (b) Any person who violates subsection (a) of this section is guilty of a felony and, upon conviction thereof, shall be imprisoned in the penitentiary for not more than five years or fined not more than ten thousand dollars or both fined and imprisoned.

*See also* W. Va. Code § 62-1D-3(n) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

W. Va. Code § 62-1D-12 provides in pertinent part:

(a) Any person whose wire, oral or electronic communication is intercepted, disclosed, used or whose identity is disclosed in violation of this article shall have a civil cause of action against any person who so intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and shall be entitled to recover from any such person or persons:

(1) Actual damages, but not less than one hundred dollars for each day of violation;

(2) Punitive damages, if found to be proper; and

(3) Reasonable attorney fees and reasonable costs of litigation incurred.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

gg.     **Wisconsin.** Wis. Stat. Ann. § 968.31 provides for the recovery in a civil action of relief for violations of Wis. Stat. Ann. § 968.31, which, in pertinent part, provides:

Except as otherwise specifically provided in ss. 196.63 or 968.28 to 968.30, whoever commits any of the acts enumerated in this section is guilty of a Class H felony:

(a) Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication.

(b) Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication.

(c) Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section.

(d) Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section.

(e) Intentionally discloses the contents of any oral, electronic or wire communication obtained by authority of ss. 968.28, 968.29 and 968.30, except as therein provided. . . .

*See also* Wisc. Stat. § 968.27(4) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Wis. Stat. Ann. § 968.31 also provides in pertinent part:

2m) Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of ss. 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication, and shall be entitled to recover from any such person:

(a) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) Punitive damages; and

(c) A reasonable attorney's fee and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to preliminary or equitable or declaratory relief as may be appropriate; the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

hh.     **Wyoming.** Wyo. Stat. § 7-3-710 provides for the recovery in a civil action of relief for violations of Wyo. Stat. § 7-3-702, which, in pertinent part, provides:

a) Except as provided in subsection (b) of this section, no person shall intentionally:

(i) Intercept, attempt to intercept, or procure any other person to intercept or attempt to intercept any wire, oral or electronic communication;

(ii) Use, attempt to use, or procure any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication when:

(A) Such device is affixed to, or otherwise transmits a signal through, a wire, cable or other like connection used in wire communication; or

(B) Such device transmits communications by radio or interferes with the transmission of such communication.

(iii) Disclose or attempt to disclose to another person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this section;

(iv) Use or attempt to use the contents of any wire, oral or electronic communication knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this section . . . .

*See also* Wyo. Stat. § 7-3-701(a)(v) (defining "electronic communication").

Defendants Carrier IQ and the Device Manufacturers, by way of their programming, knowing and intentional installation, activation, and other involvement with the Carrier IQ Software, consisting of the IQ Agent and CIQ Interface, have intentionally intercepted, endeavored to intercept, and/or have aided, authorized, employed, or procured or permitted others to so do.

Wyo. Stat. § 7-3-710 provides in pertinent part:

(a) Subject to W.S. 7-3-702(b)(ii), any person whose wire, oral or electronic communication is intercepted, disclosed or used in violation of this act may recover damages against any person who intercepts, discloses, uses or procures any other person to intercept, disclose or use the communications as follows:

(i) Actual damages but not less than one thousand dollars ($1,000.00) a day for each day of violation;

(ii) Punitive damages; and

(iii) Reasonable attorney's fees and other litigation costs reasonably incurred.

Based on the allegations herein, plaintiffs and the class are entitled to the maximum damages provided by the foregoing statute, including punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

114.     Investigation regarding disclosures, including intentional disclosures, of the communications, content, information, and data referenced herein, or the endeavoring to disclose, intentionally or otherwise, the communications, content, information, and data referenced herein, is ongoing. Such activity may be actionable under all or some of the state statutes that follow.

### COUNT III
### VIOLATION OF STATE CONSUMER PROTECTION ACTS

(Against Carrier IQ and the Device Manufacturers)

(On Behalf of Residents of the States of Arkansas, California, Connecticut, Delaware, Florida, Hawaii, Kansas, Maryland, Michigan, Missouri, Nevada, New Hampshire, New Jersey, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Washington, and West Virginia)

115.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

116.     Plaintiffs bring these claims on behalf of themselves and other owners of affected devices who reside in the states of Arkansas, California, Connecticut, Delaware, Florida, Hawaii, Kansas, Maryland, Michigan, Missouri, Nevada, New Hampshire, New Jersey, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Washington, and West Virginia. By the conduct and omissions described herein, defendants Carrier IQ and the Device Manufacturers have violated state consumer protection acts.

117.     For example, in violation of California Business and Professions Code Sections 17200, *et seq.* ("UCL"), defendants' conduct in this regard includes unlawful, unfair, and fraudulent business acts or practices. By engaging in the acts and practices described herein, defendants have committed one or more acts of unfair competition within the meaning of the UCL.

118.     First, defendants' business acts and practices are unlawful under the UCL and similar state statutes in part because they violate the Federal Wiretap Act and California Penal Code §§ 502, 631, and 632.7. Additionally, HTC's conduct with respect to the logging issue described herein, per the FTC's Complaint and Final Decision and Order, violated the FTC Act, such that those business acts and practices also violated the UCL.

119.     Second, defendants' business acts and practices are unfair because they caused harm and injury-in-fact to plaintiffs and prospective class members without justification. Defendants' conduct lacks reasonable and legitimate justification in that defendants have benefited from such conduct and practices while plaintiffs and prospective class members have been misled as to the nature and integrity of defendants' goods and services and have, in fact, suffered injury regarding the privacy and confidentiality of their personal information and the use of their device resources. Further, defendants' conduct is unfair because it offends California public policy as reflected in the right to privacy enshrined in the state constitution; California Penal Code §§ 502, 631, and 632.7; and California statutes recognizing the need for consumers to safeguard their privacy interests, including California Civil Code § 1798.80. Defendants' business acts and practices also were unfair in that defendants knew that consumers care deeply about personal, private, confidential, and sensitive information, including data related to visited websites; search (including search terms), user name, and password data; fine location data, including granular GPS data; application purchases (including applications that could reveal a consumer's health conditions or sexual orientation, among other private information) and uses; and text-message privacy (including consumers' expectations that the content of their text messages would not be intercepted or sent to anyone beyond the recipient for outgoing texts or themselves for incoming texts), yet they hid software on their mobile devices that intercepted that data and transmitted most of it off of their devices.

120.     Third, defendants' acts and practices were fraudulent within the meaning of the UCL because they were likely to mislead consumers. Defendants secretly installed the Carrier IQ Software on plaintiffs' and prospective class members' mobile devices; failed to disclose that the Carrier IQ Software was always operating on such devices; failed to disclose that the Carrier IQ Software was capable of intercepting private communications, and that it in fact did intercept such communications; and failed to disclose that the Carrier IQ Software degraded the performance of their devices by overtaxing processor power and device memory, and by depleting battery power and life. Defendants' omissions and failures to disclose were material to plaintiffs and the prospective class within the meaning of *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 (2009).

121.   In addition, HTC failed to disclose with respect to its devices that plaintiffs' and prospective class members' personal, private, confidential, and sensitive data was being logged in unencrypted form on their devices, transmitted to third-parties including Google, itself via its "Tell HTC" software, and likely application developers and vendors, including via the ACRA tool available to application developers and vendors, which allowed them to access material in the devices' system logs, and rendered vulnerable to malicious outsiders or anyone with access to the debug logs on their devices.

122.   Defendants had a duty to disclose the presence and functionality of the Carrier IQ Software on the plaintiffs' and the prospective class' mobile devices. This duty was based on the fact that only defendants knew of the installation and functionality of the Carrier IQ Software on the plaintiffs' and prospective class' mobile devices, and defendants knew that the existence of the Carrier IQ Software was not known or reasonably discoverable by plaintiffs and the class. Further, defendants actively concealed discovery of the Carrier IQ Software from plaintiffs by the very design of the Carrier IQ Software and the method of installation on plaintiffs' mobile devices. Indeed, as rootkit software, Carrier IQ Software was designed to be undetectable.

123.   Defendants knew they were concealing the material facts regarding Carrier IQ Software, and the effect concealment of those facts would have, and intended to induce plaintiffs' and the class members' reliance.

124.   Plaintiffs and the class did, in fact, rely on defendants' omissions of material facts when they purchased their mobile devices. Such reliance was reasonable and justifiable under the circumstances.

125.   As a direct and proximate result of defendants' business acts or practices, plaintiffs and class members were injured and damaged by being forced to relinquish - without informed consent or critical knowledge - the purchase prices of their mobile devices. But for these unlawful, unfair, and fraudulent business acts and practices, which hid from them the installation of the Carrier IQ Software on their devices and its attributes and functions as described herein, plaintiffs and prospective class members would never have purchased their mobile devices. Accordingly,

1    each plaintiff and prospective class member is entitled to restitution in the form of a purchase price

2    refund from the Device Manufacturer of his or her mobile device. Cal. Bus. & Prof. Code § 17203.

3          126.    In addition, or in the alternative, plaintiffs and prospective class members are

4    entitled to injunctive relief against Carrier IQ and the Device Manufacturers to prevent the

5    admitted interception or capture and transmittal of URLs containing HTTP and HTTPS strings that

6    include search terms and sensitive information such as user names and passwords, dialer-pad

7    keypresses, as well as personalized geo-location information. Cal. Bus. & Prof. Code § 17203.

8          127.    Also, or in the alternative, if not already completed in response to HTC's agreement

9    with the FTC, which was entered into following the filing of the First Consolidated Amended

10   Complaint, plaintiffs and prospective class members with HTC mobile devices running on the

11   Android OS are entitled to injunctive and other equitable relief against HTC and Carrier IQ to

12   remedy any continuing copying of the foregoing information, as well as SMS text message content,

13   to system logs, which are being transmitted off-device to Google, to HTC itself via its Tell HTC

14   software, and likely to third-party application developers without authorization, and whose logging

15   creates extreme vulnerability to capture by malicious means. Cal. Bus. & Prof. Code § 17203.

16         128.    Further, defendants have violated California Civil Code section 1710(3) by

17   suppressing and/or failing to disclose facts that they were bound to disclose.

18         129.    Finally, plaintiffs and the prospective class are entitled to recover their attorneys'

19   fees because by way of this lawsuit, they seek to enforce important rights affecting the public

20   interest, and because they otherwise satisfy the statutory requirements for an award of attorneys'

21   fees. Cal. Code Civ. P. § 1021.5.

22         130.    Furthermore - as a result of defendants' actions, omissions, and willful, unlawful,

23   unfair, unconscionable, or fraudulent conduct as described above, which descriptions are

24   incorporated here by this reference, plaintiffs and owners of affected devices who reside in other

25   states are likewise entitled to similar damages, including multiple or exemplary or punitive

26   damages as permitted, and injunctive or other equitable relief as described above, as well as

27   attorneys' fees and costs, under the consumer protection acts of their home states. Accordingly,

28

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

plaintiffs allege as follows, on behalf of the plaintiffs and class members domiciled or who purchased mobile devices in each respective state:

## ARKANSAS
## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (Ark. Code Ann. § 4-88-107(a)(10).)

131.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

132.     The Arkansas Deceptive Trade Practices Act ("DTPA") prohibits "deceptive and unconscionable trade practices," which include but are not limited to a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).

133.     Defendants are "persons" within the meaning of the DTPA. Ark. Code Ann. § 4-88-102(5).

134.     The conduct of defendants as set forth herein constitutes deceptive and unconscionable trade practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. Defendants caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ Software, and their misrepresentations and omissions regarding the privacy and functionality of their mobile devices also constitute unconscionable or deceptive trade practices.

135.     Defendants' conduct was unconscionable because it affronts the sense of justice decency or reasonableness, including as established by public policy and the state and federal privacy laws enumerated herein. Defendants' unconscionable and deceptive trade practices occurred or were committed in the course, vocation or occupation of defendants' business, commerce, or trade. Defendants are each directly liable for these violations of law.

136.    Defendants engaged in a deceptive trade practice when they failed to disclose material information concerning the mobile devices which was known to defendants at the time of the sale. Defendants deliberately concealed, suppressed, or omitted information about the mobile devices' the Carrier IQ Software and its interception and transmission of private information and data, intending that consumers would rely on that omission, in order to ensure that consumers would purchase their mobile devices.

137.    The information withheld was material in that it was information that was important to consumers and likely to affect their choice of, or conduct regarding, the purchase of their mobile devices. Defendants' withholding of this information was likely to mislead consumers acting reasonably under the circumstances. The propensity of the mobile devices with the Carrier IQ Software installed to intercept and transmit private information and data was material to plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

138.    Defendants' conduct proximately caused injuries to plaintiffs and the class.

139.    Plaintiffs and the class were injured as a result of defendants' conduct in that plaintiffs overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile devices are materially different than what was bargained for, and have also suffered a diminution in value. These injuries are the direct and natural consequence of defendants' unconscionable conduct, misrepresentations and omissions.

140.    Plaintiffs are entitled to recover actual damages, as well as reasonable attorneys' fees, for defendants' unlawful conduct.

### CONNECTICUT
### VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### (Conn. Gen. Stat. § 42-110A, *et seq.*)

141.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

142.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42- 110b(a).

143.     Defendants are persons within the meaning of the CUTPA. Conn. Gen. Stat. § 42-110a(3).

144.     In the course of defendants' business, they designed and installed the Carrier IQ Software on mobile devices as described above, and then caused those mobile devices to be sold to consumers, including plaintiffs. This caused the interception and transmission of private information and data in violation of several state and federal laws, as alleged herein.

145.     Defendants' conduct was unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein.

146.     The presence and functionality of the Carrier IQ Software on the mobile devices, including the interception and transmission of private information and data, was not disclosed to plaintiffs, but was information considered material by plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

147.     Plaintiffs and the class accordingly suffered ascertainable loss caused by defendants' deceptive and unfair practices. Plaintiffs and the class overpaid for their mobile devices and did not receive the benefit of their bargain. The value of their mobile devices have diminished now that the privacy issues have come to light, and plaintiffs and the class purchased mobile devices that are not secure and private. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. The harm caused to plaintiffs and the class greatly outweighs any associated benefit.

148.     Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

149.     Pursuant to Conn. Gen. Stat. § 42-110g(c), plaintiffs will mail a copy of this complaint to Connecticut's Attorney General.

**DELAWARE**
**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT**
**(6 Del. Code § 2513, *et seq.*)**

150.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

151.    The Delaware Consumer Fraud Act prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, use or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

152.    Defendants are persons with the meaning of 6 Del. Code § 2511(7).

153.    As described herein defendants concealed, suppressed, or omitted material facts regarding the privacy and functionality of their mobile devices and the Carrier IQ Software installed on those mobile devices, including that their mobile devices, with the Carrier IQ Software installed, would intercept and transmit private information and data to third parties, and the fact that those mobile devices suffer slower performance and reduced battery life as a result of the Carrier IQ Software. Defendants intended that others rely on these misrepresentations and omissions in connection with the sale and use of their mobile devices.

154.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

155.    Defendants' conduct proximately caused injuries to plaintiffs and the class.

156.    Plaintiffs and the class were injured as a result of defendants' conduct in that plaintiffs overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile devices have suffered a diminution in value. These injuries are the direct and natural consequence of defendants' misrepresentations and omissions.

157.    Plaintiffs are entitled to recover damages, as well as punitive damages, for defendants' gross and aggravated misconduct.

**FLORIDA**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**

158.   Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

159.   The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Defendants then caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and remedy the problems inherent in the Carrier IQ Software.

160.   Defendants' conduct was thus unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein.

161.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

162.   Defendants' actions impact the public interest because plaintiffs were injured in exactly the same way as millions of others purchasing and/or using mobile devices as a result of Defendants' generalized course of unfair conduct and deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of defendants' business.

163.   Plaintiffs and the class were injured as a result of defendants' conduct.

164.   Plaintiffs overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile devices have suffered a diminution in value. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, causing slower performance and decreased battery life.

165.   Defendants' conduct proximately caused the injuries to plaintiffs and the class.

166.   Defendants are liable to plaintiffs and the class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

# HAWAII
## UNFAIR COMPETITION AND PRACTICES
### (Haw. Rev. Stat. § 480, *et seq.*)

167.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

168.    Hawaii's Revised Statute § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

169.    Defendants' conduct as set forth herein constitutes unfair methods of competition and unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480-2 because defendants' acts and practices, including (1) the design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties and causes decreased battery life and slower performance in those mobile devices, (2) defendants' failure to adequately investigate, disclose and remedy the problem, (3) defendants' sale of mobile devices containing the Carrier IQ Software directly to consumers, or to distributors and third parties, with the intent that consumers, including plaintiffs, would purchase those mobile devices, and (4) defendants' misrepresentations and omissions regarding the privacy and functionality of their mobile devices, offend established public policy, are immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein. The harm defendants have caused to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also prevented plaintiffs from making fully informed decisions about whether to purchase or use mobile devices and/or the price to be paid to purchase or use mobile devices.

170.    Had plaintiffs known the true facts about the privacy and functionality of their mobile devices, they would not have purchased or used, or paid as much for, the mobile devices.

171.    Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

172.    Plaintiffs and the class have suffered injury, including the loss of money or property, as a result of defendants' unfair methods of competition and unfair or deceptive acts or practices.

173.    In addition to damages in amounts to be proven at trial, plaintiffs and the class seek attorneys' fees, costs of suit and treble damages.

174.    Plaintiffs and the class also seek injunctive relief to enjoin defendants from continuing their unfair competition and unfair or deceptive acts or practices.

## KANSAS
## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (Kan. Stat. Ann. § 50-623, *et seq.*)

175.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

176.    Defendants are "suppliers" under § 50-624(*l*) of the Kansas Consumer Protection Act ("Kansas CPA").

177.    Plaintiffs are "consumers," as defined by § 50-624(b) of the Kansas CPA, who purchased or used one or more mobile devices.

178.    Defendants participated in deceptive acts or practices that violated the Kansas CPA, as described above and below. Defendants each are directly liable for these violations of law.

179.    Defendants engaged in deceptive acts or practices prohibited by the Kansas CPA by willfully failing to disclose or willfully concealing, suppressing, or omitting material facts about their mobile devices and the Carrier IQ Software they designed and installed on those mobile devices. Specifically, defendants failed to disclose and actively concealed the fact that the mobile devices would cause interception and transmission of private information and data. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life, which fact the defendants also failed to disclose and actively concealed. Defendants nevertheless failed to warn plaintiffs and the class about these inherent dangers despite having a duty to do so.

180.    Whether or not a mobile device (a) intercepts private information and data and (b) transmits private information and data to third parties are facts that a reasonable consumer would consider important in selecting a mobile device to purchase or use. When plaintiffs bought a mobile device for personal, family, or household purposes, they reasonably expected the mobile

1    device would (a) not intercept private information and data; and (b) not transmit private

2    information and data to third parties.

3           181.    Defendants' deceptive and unconscionable acts or practices were likely to and did in

4    fact deceive reasonable consumers, including plaintiffs, about the true privacy and functionality of

5    mobile devices as a result of defendants' violations of the Kansas CPA.

6           182.    Plaintiffs and the class suffered loss as a result of defendants' violations of the

7    Kansas CPA detailed above. Plaintiffs currently own or use, or within the class period have owned

8    or used, mobile devices that are defective and inherently lacking in privacy protections. The Carrier

9    IQ Software and the resulting interception and transmission of private information and data to third

10   parties have caused the value of mobile devices to plummet. Plaintiffs would not have purchased

11   their mobile devices, or would have paid significantly less for them, had they known of the Carrier

12   IQ Software and its functionality.

13          183.    Pursuant to § 50-634(b) of the Kansas CPA, plaintiffs seek monetary relief against

14   defendants measured as the greater of (a) actual damages in an amount to be determined at trial and

15   (b) civil penalties provided for by § 50-636 of the Kansas CPA.

16          184.    Plaintiffs risk irreparable injury as a result of defendants' deceptive and

17   unconscionable acts or practices in violation of the Kansas CPA, and these violations present a

18   continuing risk to plaintiffs, their friends, family, and acquaintances, and the general public.

19          185.    Plaintiffs and the class further seek an order enjoining defendants' deceptive and

20   unconscionable acts or practices, restitution, punitive damages, costs of court, attorneys' fees, and

21   any other just and proper relief available under the Kansas CPA.

22                                          **MARYLAND**
                     **VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
23                            **(Md. Code Com. Law § 13-101, *et seq.*)**

24          186.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

25          187.    Plaintiffs are persons within the meaning of the Maryland Consumer Protection Act

26   (the "Act") for all purposes therein.

27          188.    Defendants are persons within the meaning of the Act for all purposes therein.

28

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

- 99 -

189.    Defendants' conduct was unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair and deceptive trade practices occurred or were committed in the course, vocation or occupation of defendants' businesses. Defendants are each directly liable for these violations of law.

190.    The Unfair and Deceptive Trade Practices as alleged above and below significantly impact the public as actual or potential customers of defendants.

191.    By designing and installing the Carrier IQ Software on mobile devices, and then causing those mobile devices to be sold to plaintiffs, as well as failing to disclose and actively concealing the potential for interception and transmission of private information and data in mobile devices equipped with the IQ Agent, defendants engaged in unfair business practices prohibited by the Act.

192.    As a direct and proximate result of their unfair and deceptive business practices, and violations of the Act detailed above, defendants caused actual damages, injuries, and losses to plaintiffs and, if not stopped, will continue to harm plaintiffs. Plaintiffs currently own or use, or within the class period have owned or used, mobile devices that are defective and inherently lacking in privacy protections. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. The Carrier IQ Software and its interception and transmission of private information and data, as well as its causing slower performance and reduced battery life, have caused the value of mobile devices to plummet.

193.    Plaintiffs are entitled to all damages permitted by Md. Code Com. Law § 13-101, *et seq.*, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action. Also, the State of Maryland is entitled to statutory penalties from defendants for each violation of the Act.

**MICHIGAN**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(Mich. Comp. Laws § 445.901, *et seq.*)**

194.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

195.    The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903.

196.    Defendants engaged in unfair, unconscionable, or deceptive acts or practices prohibited by the Michigan Consumer Protection Act when they failed to reveal material facts regarding their mobile devices and the Carrier IQ Software they designed and installed on those mobile devices. Specifically, defendants failed to reveal the fact that the Carrier IQ Software installed on their mobile devices would cause interception and transmission of private information and data, as well as reduced performance and diminished battery life. Defendants nevertheless failed to warn plaintiffs and the class about these inherent defects despite having a duty to do so.

197.    Whether or not a mobile device (a) intercepts private information and data and (b) transmits private information and data to third parties are facts that a reasonable consumer would consider important in selecting a mobile device to purchase or use. When plaintiffs bought a mobile device, they reasonably expected the mobile device would (a) not intercept private information and data; and (b) not transmit private information and data to third parties.

198.    The Michigan Consumer Protection Act applies to defendants' transactions with plaintiffs because defendants' deceptive scheme was carried out in Michigan and affected plaintiffs.

199.    Defendants also failed to advise the public about what they knew about the Carrier IQ Software, which causes the mobile devices to intercept and transmit private information and data to third parties.

200.    A reasonable person would have relied on defendants' silence as to known defects in connection with their decision regarding the purchase, use and/or use of the mobile devices.

201.    As a direct and proximate result of defendants' deceptive conduct and violation of the Michigan Consumer Protection Act, plaintiffs have sustained and will continue to sustain

1   economic losses and other damages for which they are entitled to compensatory damages and

2   equitable and declaratory relief in an amount to be proven at trial. Plaintiffs overpaid for their

3   mobile devices and did not receive the benefit of their bargain, and their mobile devices have

4   suffered a diminution in value.

5                                   **MISSOURI**
                    **VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
6                        **(Mo. Rev. Stat. § 407.010, *et seq.*)**

7        202.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

8        203.    The conduct of defendants as set forth herein constitutes unfair or deceptive acts or

9   practices, including, but not limited to, design and installation of the Carrier IQ Software on mobile

10  devices as described above, which causes the mobile devices to intercept and transmit private

11  information and data to third parties. Further, the secretly installed Carrier IQ Software embedded

12  on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing

13  slower performance and decreased battery life. Defendants then caused those mobile devices to be

14  sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and

15  remedy the serious security flaws inherent in the Carrier IQ Software, and their misrepresentations

16  and omissions regarding the privacy and functionality of their mobile devices also constitute unfair

17  or deceptive practices.

18       204.    Defendants' conduct was unfair because it offends established public policy, is

19  immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers,

20  including by violation of the state and federal privacy laws enumerated herein.

21       205.    Defendants' actions as set forth above occurred in the conduct of trade or

22  commerce.

23       206.    Defendants' actions impact the public interest because plaintiffs were injured in

24  exactly the same way as millions of others purchasing and/or using mobile devices as a result of

25  defendants' generalized course of unfair conduct. All of the wrongful conduct alleged herein

26  occurred, and continues to occur, in the conduct of defendants' business.

27       207.    Plaintiffs and the class were injured as a result of defendant's conduct. Plaintiffs

28  overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile

devices have suffered a diminution in value. This diminution in value amounts to an ascertainable

loss of money.

208.    Defendants' conduct proximately caused the injuries to plaintiffs and the class.

209.    Defendants are liable to plaintiffs and the class for damages in amounts to be proven

at trial, including attorneys' fees, costs, and treble damages.

210.    Pursuant to Mo. Rev. Stat. § 407.010, plaintiffs will serve the Missouri Attorney

General with a copy of this complaint as plaintiffs seek injunctive relief

**NEVADA**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Rev. Stat. § 598.0903, *et seq.*)**

211.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

212.    Defendants are "persons" as required under the statute.

213.    Defendants' actions as set forth above occurred in the course of business.

214.    The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*,

prohibits unfair or deceptive consumer sales practices.

215.    The Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade

practice" if, in the course of his or her business or occupation, he or she does any of the following,

including, *inter alia*, "1. Knowingly fails to disclose a material fact in connection with the sale or

lease of goods or services." Nev. Rev. Stat. § 598.0923(2)

216.    In the course of defendants' business, they knowingly failed to disclose material

facts regarding their design and installation of the Carrier IQ Software on mobile devices as

described above, which causes the mobile devices to intercept and transmit private information and

data to third parties, as well as reduced battery life and slower performance. Defendants then

caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to

adequately investigate, disclose and remedy the problems inherent in the Carrier IQ Software.

217.    The information withheld was material in that it was information that was important

to consumers and likely to affect their choice of, or conduct regarding, the purchase of their mobile

devices. Defendants' withholding of this information was likely to mislead consumers acting

reasonably under the circumstances. The propensity of the mobile devices with the Carrier IQ Software installed to intercept and transmit private information and data was material to plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

218.    Plaintiffs and the class suffered ascertainable loss caused by defendants' false representations and failure to disclose material information. Plaintiffs and the class overpaid for their mobile devices and did not receive the benefit of their bargain. The value of their mobile devices has diminished now that the privacy issues have come to light, and plaintiffs and the class purchased mobile devices that are not secure and are less valuable than what was promised them.

### NEW HAMPSHIRE
### VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358A:1, *et seq.*)

219.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

220.    The New Hampshire Consumer Protection Act ("CPA") prohibits a person, in the conduct of any trade or commerce, from engaging in "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state" ." N.H. Rev. Stat. § 358-A:2.

221.    Defendants are persons within the meaning of the CPA. *See* N.H. Rev. Stat. § 358A:1(I).

222.    In the course of defendants' business, they designed and installed the Carrier IQ Software on mobile devices, caused those mobile devices to be sold to consumers, including plaintiffs, and willfully failed to disclose and actively concealed the potential for interception and transmission of private information and data in mobile devices equipped with the Carrier IQ Software as described above. Accordingly, defendants engaged in unfair and unlawful acts.

223.    Defendants' conduct was unfair because it offends established public policy, violates or offends state and federal statutory and common law, or falls within the penumbra of those laws, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein.

224.    The propensity of the mobile devices with the Carrier IQ Software installed to intercept and transmit private information and data were material to plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

225.    Defendants' unfair and deceptive acts or practices, including their failure to disclose material information, has injured plaintiffs and the class. Plaintiffs and the class overpaid for their mobile devices and did not receive the benefit of their bargain. The value of their mobile devices has diminished now that the privacy issues have come to light, and plaintiffs and the class purchased mobile devices that are not secure, and suffer reduced performance and battery life.

226.    Plaintiffs are entitled to recover the greater of actual damages or $1,000 pursuant to N.H. Rev. Stat. § 358-A:10. Plaintiffs are also entitled to treble damages because defendants acted willfully in their unfair and deceptive practices.

**NEW JERSEY**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

227.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

228.    The New Jersey Consumer Fraud Act ("CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

229.    Defendants are persons within the meaning of the CFA. N.J. Stat. Ann. § 56:8-1(d).

230.    Defendants engaged in an unlawful practice under the CFA when, in the course of defendants' business, they knowingly failed to disclose and actively concealed their design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties, as well as reduced battery life and slower performance.

231.    Defendants deliberately withheld the information about the mobile devices' the Carrier IQ Software and its interception and transmission of private information and data in order to ensure that consumers would purchase their mobile devices and to induce the consumer to enter into a transaction.

232.    Defendants' unlawful practices cause substantial injury to consumers.

233.    Defendants' design and installation of the Carrier IQ Software, and the propensity of the mobile devices with the IQ Agent installed to intercept and transmit private information and data was material to plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

234.    Plaintiffs and the class suffered ascertainable loss of money or property caused by defendants' unlawful practices. Plaintiffs and the class overpaid for their mobile devices and did not receive the benefit of their bargain. The value of their mobile devices has diminished now that the privacy issues have come to light, and plaintiffs and the class purchased mobile devices that are not safe.

235.    Plaintiffs are entitled to recover legal and/or equitable relief, treble damages, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19.

236.    Pursuant to N.J. Stat. Ann. § 56:8-20, plaintiffs will mail a copy of the complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

**OKLAHOMA**
**VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT**
**(Okla. Stat. tit. 15 § 751, *et seq.*)**

237.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

238.    The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. Defendants then caused those

1  mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately

2  investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ Software, and

3  their misrepresentations and omissions regarding the privacy and functionality of their mobile

4  devices also constitute unfair or deceptive practices.

5  239. Defendants' conduct was unfair because it offends established public policy, is

6  immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers,

7  including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair

8  and deceptive trade practices occurred or were committed in the course, vocation or occupation of

9  defendants' businesses. Defendants are each directly liable for these violations of law.

10  240. Defendants' actions as set forth above occurred in the conduct of trade or

11  commerce.

12  241. Defendants' actions impact the public interest because plaintiffs were injured in

13  exactly the same way as millions of others purchasing and/or using mobile devices as a result of

14  defendants' generalized course of unfair conduct and deception. All of the wrongful conduct

15  alleged herein occurred, and continues to occur, in the conduct of defendants' business.

16  242. Plaintiffs and the class were injured as a result of defendants' conduct. Plaintiffs

17  overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile

18  devices have suffered a diminution in value.

19  243. Defendants' conduct proximately caused the injuries to plaintiffs and the class.

20  244. Defendants are liable to plaintiffs and the class for damages in amounts to be proven

21  at trial, including attorneys' fees, costs, and treble damages.

22  245. Pursuant to Okla. Stat. tit. 15 § 751, plaintiffs will serve the Oklahoma Attorney

23  General with a copy of this complaint as plaintiffs seek injunctive relief.

24

25

26

27

28

**RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION ACT**
**(R.I. Gen. Laws § 6-13.1, *et seq.*)**

246.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

247.    Plaintiffs are persons who purchase or use goods primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6- 13.1-5.2(a).

248.    Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

249.    The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. Defendants then caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ, and their misrepresentations and omissions regarding the privacy and functionality of their mobile devices also constitute unfair or deceptive practices.

250.    Defendants' conduct was unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers,

including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair and deceptive trade practices occurred or were committed in the course, vocation or occupation of defendants' businesses. Defendants are each directly liable for these violations of law.

251.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

252.   Plaintiffs suffered ascertainable loss of money as a result of defendants' violation of the UTPCPA.

253.   Plaintiffs and the class were injured as a result of defendants' conduct in that plaintiffs overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile devices have suffered a diminution in value. These injuries are the direct and natural consequence of defendants' misrepresentations and omissions.

254.   Accordingly, plaintiffs and the class are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).

### SOUTH CAROLINA
### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
#### (S.C. Code Ann. § 39-5-10, *et seq.*)

255.   Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

256.   Defendants are "persons" under S.C. Code Ann. § 39-5-10.

257.   Defendants participated in unfair or deceptive acts or practices that violated the South Carolina Unfair Trade Practices Act (the "Act"), S.C. Code Ann. § 39-5-10, *et seq.*, as described above and below. Defendants each are directly liable for these violations of law.

258.   The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. Defendants then caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately

1   investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ Software, and

2   their misrepresentations and omissions regarding the privacy and functionality of their mobile

3   devices also constitute unfair or deceptive practices.

4   259.   Defendants' conduct was unfair because it offends established public policy, is

5   immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers,

6   including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair

7   and deceptive trade practices occurred or were committed in the course, vocation or occupation of

8   defendants' businesses. Defendants are each directly liable for these violations of law.

9   260.   Defendants knew that the Carrier IQ Software in their mobile devices was

10   defectively designed, installed, or manufactured, and caused the mobile devices to intercept and

11   transmit private information and data. Defendants nevertheless failed to warn plaintiffs about these

12   inherent defects despite having a duty to do so.

13   261.   Defendants each owed plaintiffs a duty to disclose the defective nature of mobile

14   devices, including the serious privacy violations caused by the Carrier IQ Software because they:

15   (a) Possessed exclusive knowledge of the defects rendering the mobile devices containing

16   the Carrier IQ Software inherently more susceptible to serious privacy violations than

17   similar mobile devices; and

18   (b) Made incomplete representations about the privacy and functionality of mobile devices

19   generally, and the Carrier IQ Software in particular, while purposefully withholding

20   material facts from plaintiffs that contradicted these representations.

21   262.   Mobile devices equipped with the Carrier IQ Software pose an unreasonable risk of

22   serious privacy violations to plaintiffs, their friends and family, and the public at large, because

23   they are susceptible to interception and transmission of private information and data.

24   263.   Whether or not a mobile device (a) intercepts private information and data and (b)

25   transmits private information and data to third parties are facts that a reasonable consumer would

26   consider important in selecting a mobile device to purchase or use.

27

28

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

264. When plaintiffs bought a mobile device for personal, family, or household purposes, they reasonably expected the mobile device would (a) not intercept private information and data; and (b) not transmit private information and data to third parties.

265. Defendants' unfair or deceptive trade practices were likely to and did in fact deceive reasonable consumers, including plaintiffs, about the true privacy and functionality of mobile devices.

266. As a result of their violations of the Act detailed above, defendants caused actual damage to plaintiffs and, if not stopped, will continue to harm plaintiffs. Plaintiffs currently own or use, or within the class period have owned or used, mobile devices that are defective and inherently lacking in privacy protections. The Carrier IQ Software and the resulting interceptions, transmissions, and other privacy violations have caused the value of plaintiffs' mobile devices to plummet.

267. Plaintiffs risk irreparable injury as a result of defendants' acts and omissions in violation of the Act, and these violations present a continuing risk to plaintiffs as well as to the general public.

268. Pursuant to S.C. Code Ann. § 39-5-140, plaintiffs seek monetary relief against defendants to recover for their sustained losses.

269. Plaintiffs further seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees, and any other just and proper relief available under the Act.

**SOUTH DAKOTA**
**VIOLATION OF THE SOUTH DAKOTA**
**DECEPTIVE TRADE PRACTICES ACT**
**(S.D. Codified Laws § 37-24-6)**

270. Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

271. South Dakota law makes it unlawful for any person to engage in a "deceptive act or practice," including "[k]nowingly and intentionally act, use or employ any deceptive act or practice . . . or to conceal, suppress, or omit any material fact in connection with the sale or advertisement

of any merchandise, regardless of whether any person has in face been misled, deceived, or

damaged thereby[.]" S.D. Codified Laws § 37-24-6(1).

272.    Defendants are "persons" under the statue. S.D. Codified Laws § 37-24-6(8). The

conduct of defendants as set forth herein constitutes deceptive acts or practices, including, but not

limited to, defendants knowingly concealed, suppressed, or omitted material facts regarding their

design and installation of the Carrier IQ Software on mobile devices as described above, which

causes the mobile devices to intercept and transmit private information and data to third parties.

Defendants caused their mobile devices to be sold to consumers.

273.    Plaintiffs and the class were injured as a result of defendants' conduct. Plaintiffs

overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile

devices have suffered a diminution in value.

274.    Defendants' conduct proximately caused the injuries to plaintiffs and the class.

275.    Under S.D. Codified Laws § 37-24-31, plaintiffs and the class are entitled to

recovery of their actual damages suffered as a result of defendants' acts and practices.

## TEXAS
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
### (Tex. Bus. & Com. Code §§ 17.41, et seq.)

276.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

277.    Defendants' above-described acts and omissions constitute false, misleading or

deceptive acts or practices under the Texas Deceptive Trade Practices– Consumer Protection Act,

Tex. Bus. & Com. Code § 17.41, et seq. ("Texas DTPA").

278.    By failing to disclose and actively concealing the potential for interception and

transmission of private information and data in mobile devices equipped with the Carrier IQ

Software, defendants engaged in deceptive business practices prohibited by the Texas DTPA,

including "failing to disclose information concerning goods or services which was known at the

time of the transaction if such failure to disclose such information was intended to induce the

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com. Code § 17.46(b)(24).

279.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including plaintiffs, about the true privacy and functionality of their mobile devices.

280.    In purchasing or using their mobile devices, the plaintiffs relied on the omissions of defendants with respect to the privacy and functionality of the mobile devices. Defendants knew that Carrier IQ Software was installed on their mobile devices, and knew of its functionality. Nonetheless, defendants failed to disclose that their mobile devices contain Carrier IQ Software which causes the phones to intercept and transmit private information and data from plaintiffs' mobile devices, and causes the mobile devices to suffer slower performance and reduced battery life. These facts were material to plaintiffs, as they are facts that plaintiffs would have considered important at the time of purchase. Despite knowing these material facts, defendants failed to disclose them to consumers and plaintiffs, with the intent that consumers and plaintiffs would be induced to purchase their mobile devices. Had the plaintiffs known this, they would not have purchased or used their mobile devices and/or paid as much for them.

281.    Furthermore, because defendants took advantage of the consumers' lack of knowledge regarding the Carrier IQ Software to a grossly unfair degree, defendants have also committed unconscionable acts or practices under § 17.50(a).

282.    Defendants also breached express and implied warranties to plaintiffs and the class, as set out herein, and are, therefore liable to plaintiffs and the class for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA. Defendants' actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

283.    Plaintiffs and the class sustained damages as a result of the defendants unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA. Because defendants' conduct was committed knowingly and/or intentionally, plaintiffs and the class are entitled to treble damages.

284.     For those plaintiffs and the class who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

285.     Plaintiffs and the class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

**VERMONT**
**VIOLATION OF VERMONT CONSUMER FRAUD ACT**
**(Vt. Stat. Ann. tit. 9, § 2451, *et seq.*)**

286.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

287.     The Vermont Consumer Fraud Act ("VCFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" Vt. Stat. Ann. tit. 9, § 2453(a).

288.     Defendants are sellers within the meaning of the VCFA. Vt. Stat. Ann. tit. 9, § 2451(a)(c).

289.     The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties, and causes slower performance and reduced battery life. Defendants then caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ Software, and their misrepresentations and omissions regarding the privacy and functionality of plaintiffs' mobile devices also constitute unfair or deceptive practices.

290.     Defendants' conduct was unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair and deceptive trade practices occurred or were committed in the course, vocation or occupation of defendants' businesses. Defendants are each directly liable for these violations of law. Defendants knew or should have known that their conduct violated the VCFA.

291.     Defendants engaged in a deceptive trade practice under the VCFA when they failed to disclose material information concerning the mobile devices which was known to defendants at the time of the sale. Defendants deliberately withheld the information about the mobile devices' Carrier IQ Software and its interception and transmission of private information and data in order to ensure that consumers would purchase their mobile devices and to induce the consumer to enter into a transaction.

292.     The information withheld was material in that it was information that was important to consumers and likely to affect their choice of, or conduct regarding, the purchase of their mobile devices. Defendants' withholding of this information was likely to mislead consumers acting reasonably under the circumstances. The propensity of the mobile devices with the Carrier IQ Software installed to intercept and transmit private information and data was material to plaintiffs and the class. Had plaintiffs and the class known that their mobile devices had these serious privacy defects, they would not have purchased their mobile devices.

293.     Defendants' conduct has caused or is to cause a substantial injury that is not reasonably avoided by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition.

294.     Plaintiffs and the class have suffered injury and damages as a result of defendants' false or fraudulent representations and unfair or deceptive practices in violation of Vt. Stat. Ann. tit. 9, § 2453. Plaintiffs and the class overpaid for their mobile devices and did not receive the benefit of their bargain. The value of their mobile devices has diminished now that the privacy issues have come to light, and plaintiffs and the class purchased mobile devices that are not secure and suffer from slower performance and reduced battery life.

295.     Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorneys' fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

**WASHINGTON**
**VIOLATION OF THE CONSUMER PROTECTION ACT**
**(Rev. Code Wash. Ann. § 19.86.010, *et seq.*)**

296.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

297.     The conduct of defendants as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, defendants' design and installation of the Carrier IQ Software on mobile devices as described above, which causes the mobile devices to intercept and transmit private information and data to third parties. Further, the secretly installed Carrier IQ Software embedded on plaintiffs' mobile devices taxes the resources of those mobile devices, including by causing slower performance and decreased battery life. Defendants then caused those mobile devices to be sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and remedy the serious security flaws inherent in the Carrier IQ Software, and their misrepresentations and omissions regarding the privacy and functionality of plaintiffs' mobile devices also constitute unfair or deceptive practices.

298.     Defendants' conduct was unfair because it offends established public policy, is immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers, including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair and deceptive trade practices occurred or were committed within defendants' trade or business. Defendants are each directly liable for these violations of law.

299.     Defendants' actions as set forth above occurred in the conduct of trade or commerce.

300.     Defendants' actions impact the public interest because plaintiffs were injured in exactly the same way as millions of others purchasing and/or using mobile devices as a result of defendants' generalized course of unfair conduct and deception. All of the wrongful conduct alleged herein occurred, continues to occur, and is likely to recur, in the conduct of defendants' business.

301.     Plaintiffs and the class were injured as a result of defendant's conduct. Plaintiffs overpaid for their mobile devices and did not receive the benefit of their bargain, and their mobile devices have suffered a diminution in value. Plaintiffs' injury is substantial, is not outweighed by

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

- 116 -

1    any countervailing factors, and could not have been reasonably avoided by plaintiffs, as they were

2    not aware of the Carrier IQ Software until well after they had purchased their mobile devices.

3        302.    Defendants' conduct proximately caused the injuries to plaintiffs and the class.

4        303.    Defendants are liable to plaintiffs and the class for damages in amounts to be proven

5    at trial, including attorneys' fees, costs, and treble damages.

6        304.    Pursuant to Wash. Rev. Code. Ann. § 19.86.095, plaintiffs will serve the

7    Washington Attorney General with a copy of this complaint as plaintiffs seek injunctive relief.

8
                            **WEST VIRGINIA**
          **VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**
9                      **(W. Va. Code § 46A-1-101, *et seq.*)**

10       305.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

11       306.    Defendants are "persons" under W.Va. Code § 46A-1-102(31).

12       307.    Plaintiffs are "consumers," as defined by W.Va. Code §§ 46A-1- 102(12) and 46A-

13   6-102(2), who purchased or used one or more mobile devices.

14       308.    Defendants participated in unfair or deceptive acts or practices that violated the

15   Consumer Credit and Protection Act ("CCPA"), W. Va. Code § 46A-1- 101, *et seq.*, as described

16   above and below. The CCPA prohibits "unfair or deceptive acts or practices in the conduct of any

17   trade or commerce." W. Va. Code § 46A-6- 104.

18       309.    The conduct of defendants as set forth herein constitutes unfair or deceptive acts or

19   practices, including, but not limited to, defendants' design and installation of the Carrier IQ

20   Software on mobile devices as described above, which causes the mobile devices to intercept and

21   transmit private information and data to third parties, and causes the mobile devices to suffer

22   reduced battery life and slower performance. Defendants then caused those mobile devices to be

23   sold to consumers, including plaintiffs. Defendants failed to adequately investigate, disclose and

24   remedy the serious security flaws inherent in the Carrier IQ Software, and their misrepresentations

25   and omissions regarding the privacy and functionality of their mobile devices also constitute unfair

26   or deceptive practices.

27       310.    Defendants' conduct was unfair because it offends established public policy, is

28   immoral, unethical, oppressive, and unscrupulous and caused substantial injury to consumers,

1    including by violation of the state and federal privacy laws enumerated herein. Defendants' unfair

2    and deceptive trade practices occurred or were committed within defendants' trade or business.

3    Defendants are each directly liable for these violations of law.

4         311.    Defendants knew that the mobile devices containing Carrier IQ Software were

5    defectively designed, installed, or manufactured, subjected plaintiffs and other consumers to

6    serious invasions of their privacy, and were not suitable for their intended use. Defendants

7    nevertheless failed to warn plaintiffs about these inherent dangers despite having a duty to do so.

8         312.    Defendants each owed plaintiffs a duty to disclose the defective nature of their

9    mobile devices, including the serious privacy issues presented by the presence of the Carrier IQ

10    Software on the mobile devices, because they: (a) possessed exclusive knowledge of the defects

11    rendering mobile devices inherently more prone to interception and transmission of private

12    information and data than similar mobile devices; (b) intentionally concealed the fact that the

13    mobile devices contained the Carrier IQ Software through their deceptive marketing campaign;

14    and/or (c) made incomplete representations about the privacy and functionality of mobile devices

15    generally, and the Carrier IQ Software in particular, while purposefully withholding material facts

16    from plaintiffs that contradicted these representations.

17         313.    Mobile devices equipped with the Carrier IQ Software cause and pose an

18    unreasonable risk of causing interception and transmission of private information and data,

19    including information and data sent by and/or to third parties.

20         314.    Whether or not a mobile device (a) intercepts private information and data and (b)

21    transmits private information and data to third parties are facts that a reasonable consumer would

22    consider important in selecting a mobile device to purchase or use. When plaintiffs bought a

23    mobile device for personal, family, or household purposes, they reasonably expected the mobile

24    device would (a) not intercept private information and data; and (b) not transmit private

25    information and data to third parties.

26         315.    Defendants' unfair or deceptive acts or practices were likely to deceive reasonable

27    consumers, including plaintiffs, about the true privacy and functionality of their mobile devices.

28

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

316. As a result of their violations of the CCPA detailed above, defendants caused ascertainable loss to plaintiffs and, if not stopped, will continue to harm plaintiffs. Plaintiffs currently own or use, or within the class period have owned or used, mobile devices that are defective and inherently lacking in privacy protections. The Carrier IQ Software and the resulting interceptions, transmissions, and other privacy violations have caused the value of the affected mobile devices to plummet.

317. Plaintiffs risk irreparable injury as a result of defendants' acts and omissions in violation of the CCPA, and these violations present a continuing risk to plaintiffs as well as to the general public.

318. Defendants' actions impact the public interest because plaintiffs were injured in exactly the same way as millions of others purchasing and/or using mobile devices as a result of defendants' generalized course of unfair conduct and deception. All of the wrongful conduct alleged herein occurred, continues to occur, and is likely to recur, in the conduct of defendants' business.

319. Pursuant to W. Va. Code § 46A-1-106, plaintiffs seek monetary relief against defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the CCPA for each plaintiff and each member of the class they seek to represent.

320. Plaintiffs further seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under W. Va. Code § 46A-5-101, *et seq.*, and any other just and proper relief available under the CCPA.

**COUNT IV**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

(Against the Device Manufacturers)

(On Behalf of Residents of the States of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming)

321.   Plaintiffs repeat and reallege every allegation above as if set forth here in full, including but not limited to the allegations as to breaches of state implied warranties of merchantability as set forth in Count V below.

322.   Plaintiffs bring this claim on behalf of themselves and other owners of affected devices who reside in the states of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.

323.   The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

324.   The MMWA provides a cause of action for breach of warranty, including the implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1). The defendant Device Manufacturers have breached their implied warranties of merchantability - which they cannot disclaim or modify because they offered written warranties to plaintiffs with their devices, 15 U.S.C. § 2308(a)(1) - by failing to provide merchantable goods. The mobile devices at issue are not merchantable or fit for their ordinary purposes because these devices are designed and marketed for communication purposes, including for the transmittal and receipt of confidential, private, and sensitive communication, and yet plaintiffs' and proposed class members' devices do not function accordingly.

325.   Rather, these mobile devices, because they bear the Carrier IQ Software, intercept confidential communications and data, including URLs containing HTTP and HTTPS query strings

1    embedded with information such as search terms, user names, passwords, and geo-location

2    information; geo-location information apart from that transmitted in URLs; text messages;

3    telephone numbers dialed and received; other keystrokes; and application purchases and uses. Most

4    of this data is then purposefully captured and transmitted off-device as a function of the Carrier IQ

5    Software.

6         326.    Furthermore, with respect to HTC devices, and on information and belief, possibly

7    with respect to certain other devices, all such material is being captured in unencrypted, human-

8    readable form in device debug logs, or logs, such that it is being transmitted to Google and likely to

9    third-party application developers and vendors along with crash reports, and such that it is

10   vulnerable to other third-parties with potentially malicious intent or to anyone with access to the

11   logs. With respect to the allegations contained in this paragraph, plaintiffs bring them only against

12   HTC at this time.

13        327.    Additionally, the Carrier IQ Software that the Device Manufacturers secretly

14   installed on the mobile devices at issue depletes battery power and life. Battery power is the

15   lifeblood of mobile devices; without it, devices cannot fulfill their ordinary purposes. Here, battery

16   power is used for the processing and transmitting that the Carrier IQ Software performs on the

17   mobile devices. Indeed, it is plausible that the precise level of discharge can be discerned via the

18   Carrier IQ Software itself, given its reporting capabilities. Furthermore, operation of the Carrier IQ

19   Software placed on the devices reduced the utility and lifespan of device batteries because each

20   charge and use cycle diminishes a battery's storage capacity, a consequence of which is the need

21   for more frequent discharges.

22        328.    Plaintiffs and proposed class members have suffered damages as a result of the

23   Device Manufacturers', or where qualified, HTC's, breaches of their implied warranties as set forth

24   herein. Accordingly, this action lies under the MMWA. 15 U.S.C. § 2310(d)(1)-(2).

25        329.    In addition, the Device Manufacturers', or where qualified, HTC's, acts and

26   omissions in violation of the Act are "[u]nfair methods of competition in or affecting commerce,

27   and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15

28   U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

330.    The MMWA provides for "damages and other legal and equitable" relief where there has been a breach of warranty or failure to abide by the obligations that the Act imposes. 15 U.S.C. § 2310(d)(1). As set forth more fully in Count VII below, plaintiffs and prospective class members seek damages in the amount of full refunds for their mobile devices, based on the differential between the value of the goods as tendered to them and the value they would have had if they had been as impliedly warranted.

331.    In addition, or in the alternative, plaintiffs and the class they seek to represent ask for equitable relief in the form of an order against all Device Manufacturers requiring them to conform the mobile devices here at issue to the implied warranties made with respect to them by requiring cessation of the interception, reading, capturing, logging, and transmittals of personal, private, confidential, and sensitive communications and data as alleged in this complaint.

332.    The MMWA also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of lawsuits thereunder, unless the Court in its discretion determines that such an award would be inappropriate. 15 U.S.C. § 2310(d)(2). Plaintiffs and prospective class members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT V**
**VIOLATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

(Against the Device Manufacturers)

(On Behalf of Residents of the States of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming)

333.    Plaintiffs repeat and reallege every allegation above as if set forth here in full.

334.    Plaintiffs bring this claim for breach of the Uniform Commercial Code's implied warranty of merchantability on behalf of themselves and other owners of affected devices who reside in the states of Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.

335.    The defendant Device Manufacturers are merchants as defined by applicable UCC provisions.

336.    Though privity is not required under the law of the referenced states, plaintiffs and the class were in privity with the Device Manufacturers in that they purchased their mobile devices from actual or apparent agents of the Device Manufacturers, such as the Device Manufacturers' authorized dealers.

337.    Further, though privity is not required under the law of the referenced states, plaintiffs and the class were and are also in privity with the Device Manufacturers by virtue of the contractual relationship stemming from the Device Manufacturers' written warranties provided in conjunction with the purchase of their mobile devices, which are enforceable by plaintiffs and the class as against the Device Manufacturers, regardless of where, or from whom, the Device Manufacturers' products were acquired. Further, or in the alternative, plaintiffs and the class members were intended third-party beneficiaries of the Device Manufacturers' contract for sale of devices to the persons or entities from whom plaintiffs and the class ultimately purchased their mobile devices.

338.    The Device Manufacturers have breached the implied warranties of merchantability that they made to plaintiffs and the prospective class. To illustrate the Device Manufacturers' breaches, using California law as an example: the Device Manufacturers impliedly warranted to plaintiffs and prospective class members that their mobile devices were free of defects, that they were merchantable, and that they were fit for the ordinary purpose for which such goods are used. *See*, *e.g.*, Cal. Com. Code § 2314 (setting forth, as codified in California, the UCC's implied warranty of merchantability). The ordinary purpose of mobile devices such as those at issue is communication, including confidential and private communications via the Internet and with others, via telephone calls and text messages. In addition, an ordinary use of devices such as these is the purchase and use of applications. The Device Manufacturers impliedly represented to

1    plaintiffs and prospective class members that the mobile devices at issue were free of defects that

2    could impinge on these ordinary uses, that they were merchantable with respect to such uses, and

3    that they were fit for all such purposes.

4            339.    As alleged herein, however, the Device Manufacturers' sales of mobile devices

5    breached the implied warranty of merchantability because the devices were defective,

6    unmerchantable, and not fit for the ordinary purpose for which such goods are used. More

7    specifically, all mobile devices bearing the Carrier IQ Software are defective and unfit for their

8    ordinary purposes because, rather than performing as impliedly represented, these devices instead

9    intercept URLs containing HTTP and HTTPS query strings embedded with information such as

10   search terms, user names, passwords, and geo-location information; geo-location information apart

11   from that transmitted in URLs; text messages; telephone numbers dialed and received; other

12   keystrokes; and application purchases and uses. These devices then store most of this information

13   in device memory, unbeknownst to consumers, before transmitting such information, save for SMS

14   text message content and certain other keystrokes, to Carrier IQ and/or wireless carriers and/or

15   device manufacturers.

16           340.    HTC's - and, on information and belief, possibly other device manufacturers' - sales

17   of mobile devices additionally breached the implied warranty of merchantability because for other

18   important reasons, the devices were defective, unmerchantable, and not fit for the ordinary purpose

19   for which these goods are used. More specifically, HTC mobile devices bearing Carrier IQ

20   Software are defective, unmerchantable, and unfit for their ordinary purposes because they

21   intercept URLs containing HTTP and HTTPS query strings embedded with information such as

22   search terms, user names, passwords, and geo-location information; geo-location information apart

23   from that transmitted in URLs; text messages; telephone numbers dialed and received; other

24   keystrokes; and application purchases and uses, and then they store this content and information in

25   unencrypted, human-readable form in the mobile devices' debug logs, unbeknownst to consumers,

26   before transmitting all such information, including SMS text message content, to Google and

27   possibly third-party application developers and vendors, when the devices or applications crash.

28   Moreover, this unencrypted, human-readable content is vulnerable to other third-parties with

1    potentially malicious intent or to anyone with access to the logs. Investigation continues as which

2    other mobile devices are so affected.

3         341.    Additionally, the Device Manufacturers breached their implied warranties of

4    merchantability because the Carrier IQ Software secretly installed on plaintiffs' and prospective

5    class members' mobile devices depletes battery power and life. Battery power is the lifeblood of

6    mobile devices; without it, devices cannot fulfill their ordinary purposes. Here, battery power is

7    used for the processing and transmitting that Carrier IQ Software performs on the mobile devices.

8    Indeed, it is plausible that the precise level of discharge can be discerned via Carrier IQ Software

9    itself, given its reporting capabilities. Furthermore, operation of the Carrier IQ Software placed on

10   the devices reduced the utility and lifespan of device batteries because each charge and use cycle

11   diminishes a battery's storage capacity, a consequence of which is the need for more frequent

12   discharges.

13        342.    The Device Manufacturers have had reasonable and adequate notice of plaintiffs'

14   and the class's – i.e., consumers', rather than commercial parties' - claims for breach of implied

15   warranty of merchantability, including by way of the individual suits that preceded filing of either

16   consolidated amended complaint, by way of numerous reports of these breaches likely made to

17   them directly, by way of Mr. Eckhart's and other publications which preceded the filing of

18   plaintiffs' suits, and by way of the numerous press reports published before plaintiffs filed suit

19   against them. Yet then and to-date, the Device Manufacturers have demonstrated no willingness to

20   negotiate toward making the plaintiffs and the class whole. Furthermore, to the extent notice might

21   be required under any reading of applicable law, any such notice would not be required to go to the

22   Device Manufacturers, but rather, only to the direct sellers of plaintiffs' and the class's mobile

23   devices, and the direct sellers are not defendants in this action.

24        343.    Any purported modifications or limitations of the implied warranty of

25   merchantability, including by way of terms set forth in the Device Manufacturers' written

26   warranties, are invalid, void, and unenforceable per the MMWA. 15 U.S.C. § 2308(a)(1).

27        344.    As a result of the Device Manufacturers' breaches of their implied warranties of

28   merchantability, plaintiffs and other owners of affected devices who reside in the states of Alaska,

1  Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas,

2  Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,

3  Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota,

4  Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia,

5  Washington, West Virginia, and Wyoming have been injured and are entitled to the full panoply of

6  remedies provided under Article 2 of the UCC as adopted by the various states, as well as all other

7  applicable remedies. These include, including under California law specifically, monetary

8  damages. *See, e.g.*, Cal. Com. Code § 2714. Because of the defects in the mobile devices and their

9  behavior as described herein, there was no value to the goods as accepted. The value of these

10  devices had they been as warranted may be measured by their purchase prices; accordingly,

11  damages in the sums of their purchase prices, or as otherwise measured pursuant to the damages

12  provisions of Article 2 of the UCC, are warranted to plaintiffs and members of the proposed class.

13  *See*, *e.g.*, Cal. Com. Code § 2714(2).

14      345.    With regard to the states other than California, plaintiffs allege as follows:

15      346.    Plaintiffs again incorporate by reference all allegations of the preceding paragraphs

16  as though fully set forth herein.

17      347.    Defendants are and were at all relevant times merchants with respect to mobile

18  devices under Alaska Stat. § 45.02.104, Ark. Code § 4-1-2, Ala. Code § 7-2-104, Colo. Rev. Stat. §

19  4-2-104, 6 Del. Code § 2-104, D.C. Code § 28:2-104, Haw. Rev. Stat. § 490:2-104, Ind. Code Ann.

20  § 26-1-2-104, Kan. Stat. § 84-2-104, Me. Rev. Stat. § 11. 2-104, Md. Com. Law Code § 2-104,

21  Mass. Gen. laws Ch. 106, § 2-104, Mich. Stat. § 440.2104, Minn. Stat. § 336.2-104, Miss. Code

22  Ann. § 75-2-104, Vernon's Mo. Rev. Stat. § 400.2-104, Mont. Code Ann. § 30-2-104, Neb. Rev.

23  Stat. § UCC-2-104, Nev. Rev. Stat. § 104.2104, N.H. Rev. Stat. § 382-A:2-104, N.J. Stat. Ann. §

24  12A:2-104, N.M. Stat. Ann. § 55-2-104, N.D. Cent. Code § 41-02-01, Okla. Stat. tit. § 12A-2-104,

25  13 Pa. Stat. Ann. § 2104, R.I. Gen. Laws. § 6A-2-104, S.C. Code Laws § 36-2-104, S.D. Code

26  Laws § 57A-2-104, Tex. Bus. & Com. Code § 2.104, Utah Code Ann. § 70A-2-104, VA. Code

27  Ann. § 8.2-104, Wash. Rev. Code § 62A.2-104, W. Va. Code § 46-2-104, Wyo. Stat. § 34.1-2-104.

28

348.     A warranty that the mobile devices were in merchantable condition was implied by law in the instant transaction, pursuant to Alaska Stat. § 45.02.314, Ark. Code § 4-1-2, Ala. Code § 7-2-314, Colo. Rev. Stat. § 4-2-314, 6 Del. Code § 2-314, D.C. Code § 28:2-314, Haw. Rev. Stat. § 490:2-314, Ind. Code Ann. § 26-1-2-314, Kan. Stat. § 84-2-314, Me. Rev. Stat. § 11. 2-314, Md. Com. Law Code § 2-314, Mass. Gen. laws Ch. 106, § 2-314, Mich. Stat. § 440.2314, Minn. Stat. § 336.2-314, Miss. Code Ann. § 75-2-314, Vernon's Mo. Rev. Stat. § 400.2-314, Mont. Code Ann. § 30-2-314, Neb. Rev. Stat. § UCC-2-314, Nev. Rev. Stat. § 104.2314, N.H. Rev. Stat. § 382-A:2-314, N.J. Stat. Ann. § 12A:2-314, N.M. Stat. Ann. § 55-2-314, N.D. Cent. Code § 41-02-01, Okla. Stat. tit. § 12A-2-314, 13 Pa. Stat. Ann. § 2314, R.I. Gen. Laws. § 6A-2-314, S.C. Code Laws § 36-2-314, S.D. Code Laws § 57A-2-314, Tex. Bus. & Com. Code § 2.314, Utah Code Ann. § 70A-2-314, Va. Code Ann. § 8.2-314, Wash. Rev. Code § 62A.2-314, W. Va. Code § 46-2-314, Wyo. Stat. § 34.1-2-314.

349.     These mobile devices, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which mobile devices are used. Specifically, the mobile devices are inherently defective in that defendants installed the Carrier IQ Software on those mobile devices, which causes the mobile devices to intercept and transmit certain private information and data from the mobile devices. The mobile devices with the Carrier IQ Software were not adequately designed, manufactured, and tested.

350.     Defendants were provided notice of these issues by numerous complaints filed against it, including this Complaint, and by numerous individual letters, telephone calls, and other communications sent by plaintiffs and other class members before or within a reasonable amount of time after the Carrier IQ-related defects became public, as well as letters from Senator Franken.

351.     Plaintiffs and the other class members have had sufficient direct dealings with either defendants or their agents to establish privity of contract between plaintiffs and the other class members. Notwithstanding this, privity is not required in this case because plaintiffs and the other class members are intended third-party beneficiaries of contracts between defendants and their distributors, and between defendants and certain wireless carriers; specifically, they are the intended beneficiaries of defendants' implied warranties. The distributors and carriers were not

1   intended to be the ultimate consumers of the mobile devices and have no rights under the warranty

2   agreements provided with the mobile devices; the warranty agreements were designed for and

3   intended to benefit the ultimate consumers only.

4       352.    As a direct and proximate result of defendants' breaches of the warranties of

5   merchantability, plaintiffs and the other class members have been damaged in an amount to be

6   proven at trial.

7           **Breach of implied warranty under the Song-Beverly Consumer Warranty Act**

8       353.    Additionally, plaintiffs and the other class members who purchased mobile devices

9   in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b) of the Song-Beverly

10  Consumer Warranty Act.

11      354.    The mobile devices are "consumer goods" within the meaning of Cal. Civ. Code §

12  1791(a).

13      355.    Defendants are "manufacturers" of the mobile devices within the meaning of Cal.

14  Civ. Code § 1791(j).

15      356.    Defendants impliedly warranted to plaintiffs and the other class members that their

16  mobile devices were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792,

17  however, the mobile devices do not have the quality that a buyer would reasonably expect.

18      357.    Cal. Civ. Code § 1791.1(a) states:

19  "Implied warranty of merchantability" or "implied warranty that goods are merchantable"
    means that the consumer goods meet each of the following:

20  (1)    Pass without objection in the trade under the contract description.
    (2)    Are fit for the ordinary purposes for which such goods are used.

21  (3)    Are adequately contained, packaged, and labeled.

22  (4)    Conform to the promises or affirmations of fact made on the container or label.

23      358.    The mobile devices would not pass without objection in the mobile device trade

24  because of the defects in the mobile devices, specifically relating to the installation and operation

25  of the Carrier IQ Software, which cause the mobile devices to intercept and transmit private

26  information and data from the mobile devices.

27

28

359.    Because of the defects in the mobile devices which cause the mobile devices to intercept and transmit private information and data from the mobile devices, they are not secure to use and thus not fit for ordinary purposes.

360.    The mobile devices are not adequately labeled because the labeling fails to disclose the defects in the mobile devices which cause the mobile devices to intercept and transmit private information and data from the mobile devices.

361.    Defendants breached the implied warranty of merchantability by manufacturing and selling mobile devices containing defects associated with the Carrier IQ Software, consisting of the Carrier IQ Software. Furthermore, these defects have caused plaintiffs and the other class members to not receive the benefit of their bargain and have caused mobile devices to depreciate in value.

362.    As a direct and proximate result of defendants' breach of the implied warranty of merchantability, plaintiffs and the other class members received goods whose defective and dysfunctional condition substantially impairs their value to plaintiffs and the other class members. Plaintiffs and the other class members have been damaged as a result of the diminished value of defendants' products, the products' malfunctioning, and the nonuse of their mobile devices.

363.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, plaintiffs and the other class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their mobile devices, or the overpayment or diminution in value of their mobile devices.

**Louisiana**

364.    As for the claims of Louisiana residents, the Civil Code of that state provides implied warranty protections, and, as a direct and proximate result of defendants' breaches of those protections, plaintiffs and the other class members have been damaged in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief:

A.    That the Court certify the requested class, and that it appoint the named plaintiffs to be class representatives and interim co-lead counsel to be class counsel;

SECOND CONSOLIDATED AMENDED COMPLAINT
12-MD-2330-EMC

B.      That the Court award plaintiffs and the class(es) appropriate relief, to include damages, including statutory damages, as requested herein;

C.      That the Court award plaintiffs and the class(es) injunctive or other equitable or declaratory relief as requested herein and as may be appropriate otherwise under applicable state or federal law;

D.      That the Court issue such additional orders or judgments as may be necessary to prevent the practices of which plaintiffs complain and to restore to any person in interest any money or property which may have been acquired by means of state consumer protection act violations;

E.      That the Court award plaintiffs and the class(es) their costs, including expert witness costs pursuant to the MMWA and as otherwise available, as well as reasonable attorneys' fees as available under the laws cited above;

F.      That the Court award plaintiffs and the class(es) such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

# VIII.   JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  June 23, 2014.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Robert F. Lopez_____

Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

PEARSON SIMON & WARSHAW, LLP

By _____/s/ Bruce L. Simon_____

Bruce L. Simon (96241)
William J. Newsom (267643)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
wnewsom@pswlaw.com

Clifford H. Pearson (108523)
Daniel L. Warshaw (185365)
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
cpearson@pswlaw.com
dwarshaw@pswlaw.com

*Counsel for Select Plaintiffs and*
*Co-Lead Counsel for the Proposed Classes*

J. Paul Gignac
Helen Kim
ARIAS OZZELLO & GIGNAC LLP
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile: (805) 683-7401
hkim@aogllp.com
j.paul@aogllp.com

Rosemary M. Rivas
Danielle A. Stoumbos
FINKELSTEIN THOMPSON LLP
505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704
rrivas@finkelsteinthompson.com
dstoumbos@finkelsteinthompson.com

Eric D. Holland
HOLLAND GROVES SCHNELLER STOLZE LLC
300 N. Tucker Blvd., Suite 801
Saint Louis, MO 63101
Telephone: 314-241-8111
Facsimile: 314-241-5554
eholland@hgsslaw.com

Paul R. Kiesel
KIESEL LAW LLP
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
kiesel@kbla.com

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

*Executive Committee Members for the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2014, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

Dated: June 23, 2014                              /s/ *William J. Newsom*
                                                            William J. Newsom
                                                            44 Montgomery Street, Suite 2450
                                                            San Francisco, CA 94104
                                                            Telephone: (415) 433-9000
                                                            Facsimile: (415) 433-9008
                                                            wnewsom@pswlaw.com


**ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3)**

I, William J. Newsom, am the ECF User whose identification and password are being used to file this **SECOND CONSOLIDATED AMENDED COMPLAINT**. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories have concurred in this filing.