1  Steve W. Berman (*pro hac vice*)        Rodger R. Cole (CSB No. 178865)
   HAGENS BERMAN SOBOL SHAPIRO LLP          rcole@fenwick.com
2  1918 Eighth Avenue, Suite 3300          FENWICK & WEST LLP
   Seattle, WA  98101                       Silicon Valley Center
3  Telephone:  (206) 623-7292              801 California Street
   Facsimile:   (206) 623-0594             Mountain View, CA 94041
4  steve@hbsslaw.com                       Telephone:  (650) 988.8500
                                           Facsimile:   (650) 938.5200
5
   Bruce L. Simon (CSB No. 96241)
6  PEARSON SIMON & WARSHAW, LLP            Tyler G. Newby (CSB No. 205790)
   44 Montgomery Street, Suite 1200        tnewby@fenwick.com
7  San Francisco, CA 94104                 FENWICK & WEST LLP
   Telephone: (415) 433-9000               555 California Street, 12th Floor
8  Facsimile:  (415) 433-9008              San Francisco, CA 94104
   bsimon@pswlaw.com                       Telephone:  (415) 875.2300
9                                          Facsimile:   (415) 281.1350

10 *Plaintiffs' Interim Co-Lead Counsel*

11                                         *Attorneys for Defendant Carrier IQ, Inc.*

12                                         *[Additional Defense Counsel Listed Below]*

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17 In re Carrier IQ, Inc. Consumer Privacy        No. 3:12-md-2330-EMC
   Litigation
18                                                **JOINT RESPONSE TO ORDER RE
                                                  SUPPLEMENTAL BRIEFING
19                                                AND/OR EVIDENCE**

20 This Document Relates to:                      Date:  February 16, 2016
                                                  Time: 2:00 p.m.
21 ALL CASES                                      Place: Courtroom 5, 17th Floor
                                                  Judge: Hon. Edward M. Chen
22

23

24

25

26

27

28

1    In response to the Court's Order Re Supplemental Briefing and/or Evidence (Dkt. No. 408)

2  ("Order"), Plaintiffs and Defendants Carrier iQ, Inc. ("Carrier iQ"), HTC America, Inc., HTC

3  Corporation, Huawei Devices USA, Inc., LG Electronics MobileComm U.S.A, Inc., LG

4  Electronics, Inc., Motorola Mobility LLC, Pantech Wireless, Inc. ("Pantech Wireless"), Samsung

5  Electronics America, Inc., and Samsung Electronics Co., Ltd. respectfully submit this

6  memorandum, together with the Confidential Supplemental Declaration of Robert F. Lopez in

7  Response to Order Re Supplemental Briefing and/or Evidence (submitted with request for leave to

8  file under seal), the Declaration of Magnolia Mobley Regarding Financial Condition of Carrier iQ,

9  Inc. (filed under seal), the Declaration of Tyler Newby in Response to Order Re Supplemental

10  Briefing and/or Evidence, the Declaration of Daniel L. Warshaw in Response to Order Re

11  Supplemental Briefing and/or Evidence, and the Declaration of Alan Vasquez in Response to

12  Order Re Supplemental Briefing and/or Evidence.  The Parties address the Court's questions and

13  concerns *seriatim*.

14  **A.    Settlement Class Definition**

15    The Settlement Agreement defines an Authorized User as "a person authorized by name on

16  the Wireless Provider account for a Covered Mobile Device during the Class Period."  The

17  negotiated restriction was purposeful; while Defendants sought to ensure that the release covered

18  Class Members such as Mr. Laning and Mr. Sandstrom who owned phones authorized for use on

19  the Wireless Provider account of another person, Plaintiffs sought to ensure that the Settlement

20  Class did not include individuals outside the scope of the operative complaint.  For example,

21  Plaintiffs sought to ensure that the definition would not cover anyone who did not own a Covered

22  Device formally authorized for use on a Wireless Provider account (for example, the Settlement

23  Class should not include someone who was handed a Covered Device by its owner to take a

24  photograph).  Relatedly, the Parties sought to ensure that the Settlement Class and its membership

25  was readily ascertainable.

26    The Court identified specifically Named Plaintiff Dao Phong as an individual who might

27  not have been identified by name on a Wireless Provider account.  As attested in the previously

28  filed Declaration of Stephanie Miller (Dkt. No. 135), ¶ 111, Ms. Phong owned a Covered Device

1    authorized for use on a Sprint Wireless Provider account.  Furthermore, it is Ms. Phong's

2    understanding (re-confirmed by the Plaintiffs for purposes of this response) that she was

3    authorized by name to use her Covered Device on the referenced Wireless Provider account.

4         Nonetheless, in light of the Court's concern, the Parties agree to revise the definition of

5    Authorized User in the Settlement Agreement as follows (where the revision is underlined):

> "Authorized User" means a person authorized by name on the Wireless Provider
> account for a Covered Mobile Device during the Class Period.  "Authorized User"
> also means a person who, during the class period, purchased or owned a Covered
> Mobile Device identified on the Wireless Provider account of another person (such
> as the Wireless Provider account of a family member or spouse) by the telephone
> number assigned to it.

10   **B.    Notice to Settlement Class Members**

11        The Parties have filed herewith the Declaration of Tyler Newby in Response to Order Re

12   Supplemental Briefing and/or Evidence ("Newby Decl."), counsel for Defendant Carrier iQ,

13   setting forth the Parties' efforts to obtain addresses of settlement class member from the wireless

14   providers.  As stated in the Newby Decl., the wireless providers are the exclusive holders of the

15   class' contact information.  However, it is technologically infeasible to extract this information—

16   without engineering at great expense—from their respective systems to create a usable class

17   address list.  (Newby Decl., ¶¶ 4-6.)

18        With respect to whether the cost of notice may legitimately be taken into account in

19   assessing whether the proposed notice is the best notice practicable, the parties' position is as

20   follows:  In *Eisen v. Carlisle & Jacqueline*, 417 U.S., 156, 175 (1974), a class action against

21   brokerage firms for alleged violations of antitrust and securities laws, the United States Supreme

22   Court held that individual notice must be given to those class members who can be identified

23   through reasonable effort.  In that case, the names and addresses of 2,250,000 class members were

24   easily ascertainable and there was no showing that individual notice could not be mailed to each.

25   *Id*.  Instead, the plaintiff contended that providing direct notice to 2,250,000 class members would

26   end the lawsuit as a class action due to the high cost, and frustrate plaintiffs' efforts to vindicate

27   the policies underlying the antitrust and securities laws.  *Id*.  The Supreme Court rejected that

28   argument, noting, *inter alia*, that "[t]here is nothing in Rule 23 to suggest that the notice

1   requirements can be tailored to fit the pocketbooks of particular plaintiffs." *Id.* at 176. The Court

2   required that individual notice be sent to all class members who can be identified with reasonable

3   effort. *Id.*

4          Unlike *Eisen*, the addresses of settlement class members here are *not* available despite best

5   efforts to obtain them. The issue here does not relate to the cost of individual notice, but rather the

6   lack of contact information needed to provide direct notice. Absent such information, notice by

7   publication satisfies due process. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d

8   1301, 1304, n. 2 (9th Cir. 1990)*; see also  Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.

9   306, 317 (1950) (holding that constructive notice by publication was acceptable with regard to

10  parties whose whereabouts could not be ascertained by due diligence).

11         Moreover, the effectiveness of the proposed forms of notice are addressed in the

12  Declaration of Alan Vasquez in Response to Order Re Supplemental Briefing and/or Evidence

13  ("Supp. Vasquez Decl.") filed herewith and discussed *infra*.

14  **C.**     **Opt-Outs**

15         The Parties will contemporaneously file under seal, for *in camera* review, the Confidential

16  Supplemental Agreement.

17  **D.**     **Scope of Release**

18         The parties continue to discuss the release; however, given the number of plaintiffs and

19  parties, they have been unable to agree on a proposed  revision to the release by the deadline to file

20  this response. The parties will update the Court by Friday, February 2, 2016, regarding whether

21  they have reached an agreement.

22  **E.**     **Plaintiffs' Maximum Estimated Value of Case**

23         The Parties' views diverge as to "the potential recovery if plaintiffs were to prevail on each

24  of their claims." Plaintiffs set forth their calculation of the potential maximum recovery in this

25  section E. As set forth in Section F below, Defendants assigned a nuisance value to Plaintiffs'

26  claims. As for the prospects for class certification, which Defendants address below, Plaintiffs

27  reiterate their position that a class or classes could be certified in this matter given their FWA

28  claims and state law claims that are amenable to grouping as necessary.

1    Based on the claims presently in the case following the Court's order on Defendants'

2  motion to dismiss (Dkt. No. 339) ("MTD Order"), and following the amendment and re-pleading

3  of Plaintiffs' Federal Wiretap Act claim in the TCAC[1] (Dkt. No. 402), Plaintiffs' maximum

4  estimated value of the case is as follows:

5       **1.      Federal Wiretap Act**

6    Plaintiffs claimed violation of the Federal Wiretap Act ("FWA") based on allegedly

7  intentional violations of the Act by all Defendants.  If Plaintiffs' revised FWA claim were to

8  survive Defendants' promised motion to dismiss, and if it were to survive an expected motion for

9  summary judgment, and if the Court were to award statutory damages of $10,000 to each

10  Settlement Class Member pursuant to 18 U.S.C. § 2520(c)(2), then at least as to the Covered

11  Mobile Devices with the embedded version of Carrier iQ Software, maximum damages could

12  reach $470 billion (assuming some 47,000,000 devices), and this is if only one Defendant were

13  found liable.  In fact, however, both Carrier iQ and a Manufacturer Defendant could be liable to a

14  Plaintiff where each violated the statute by intentionally intercepting electronic communications as

15  alleged, such that maximum damages could reach $940 billion on Plaintiffs' FWA claim against

16  the Defendants alone, with the possibility of punitive damages per 18 U.S.C. § 2520(b)(2).

17  Additionally, the FWA provides for the recovery of attorneys' fees and costs, which Plaintiffs

18  sought.  *Id.*

19       **2.      State privacy/wiretap act claims**

20    Plaintiffs also pled claims against all Defendants under various states' privacy/wiretap

21  acts.  Per the MTD Order, Plaintiffs were allowed to proceed with their claims under Arizona,

22  California (Plaintiffs' Cal. Penal Code Sec. 632.7 claim is presently live, and one claim was

23  dismissed with leave to amend), Connecticut, Florida, Maryland, Michigan, Texas, Washington

24  (survives as to texts and numbers dialed), and Wisconsin law.  Plaintiffs and the class are entitled

25

26  [1] As Plaintiffs note in the TCAC, their amendments at this time were not to the full extent allowed
by the Court in its MTD Order.  Plaintiffs have stated that they reserve the right to amend to that
27  full extent if their Settlement with Defendants is not finally approved, or if it is otherwise
terminated.

28

1   to pursue injunctive relief and damages under the foregoing laws.[2]

2   The foregoing state privacy/wiretap acts provide for damages as follows: AZ law (Ariz.

3   Rev. Stat. Sec. 12-731 provides for the recovery of statutory damages of one hundred dollars per

4   day or $10,000, whichever is greater); CA law (Cal. Penal Code Sec. 637.2 provides for the

5   recovery of $5,000 or three times actual damages, whichever is greater); CT law (Conn. Gen. Stat.

6   Sec. 54-41r provides that plaintiffs may recover "actual damages but not less than liquidated

7   damages computed at the rate of one hundred dollars per day for each day of violation, whichever

8   is higher"); FL law (Fla. Stat. Sec. 934.10 provides that plaintiffs may recover "[a]ctual damages,

9   but not less than liquidated damages computed at the rate of $100 a day for each day of violation

10  or $1,000, whichever is higher"); MD law (Md. Cts & Jud. Pro. Code Sec. 10-410 provides that

11  plaintiffs may recover "[a]ctual damages but not less than liquidated damages computed at the rate

12  of $100 a day for each day of violation or $1,000, whichever is higher"); MI law (Mich. Stat. Sec.

13  750.539h provides for the recovery of actual and punitive damages); TX law (Tex. Code Crim.

14  Pro. Art. 18.20 provides that plaintiffs may recover "[a]ctual damages but not less than liquidated

15  damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is

16  higher"); WA law (Wash. Rev. Stat. Sec. 9.73.060 provides that plaintiffs may recover "actual

17  damages . . . or liquidated damages computed at the rate of one hundred dollars a day for each day

18  of violation, not to exceed one thousand dollars"); and WI law (Wis. Stat. Ann. Sec. 968.31

19  provides that plaintiffs may recover "[a]ctual damages, but not less than liquidated damages

20  computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher").

21  Most of these acts also provide for the recovery of punitive damages.  Additionally, each

22  of the foregoing states' laws provide for the recovery of attorneys' fees and costs.

23  Plaintiffs sought the maximum recovery on their own behalf, and on behalf of the proposed

24  class, under each of the foregoing state laws, as well as recovery of their attorneys' fees and costs.

25  Discovery has not yet revealed the number of Settlement Class Members in each of the referenced

26

27  [2] The Court's MTD Order required Plaintiffs to add as Named Plaintiffs a resident of each other
state whose laws they sought to invoke.

28

1    states.  But Plaintiffs address further the potential value of these claims in the Confidential

2    Supplemental Declaration of Robert F. Lopez ("Conf. Supp. Lopez Decl."), which they submit

3    herewith, together with a request to file it under seal.  (As Plaintiffs have advised Defendants, in

4    the event that the Court denies Plaintiffs' request to file this declaration under seal, Plaintiffs will

5    withdraw it and promptly submit a supplemental response to this section of the Court's order.)

6            **3.        MMWA/breach of the implied warranty of merchantability**

7            In its MTD Order, the Court permitted Plaintiffs to go forward with their implied warranty

8    of merchantability claims under certain states' laws.  Claims under these states' laws (with

9    corresponding Magnuson-Moss Warranty Act ("MMWA") claims for resident putative class

10   members) survived: California (Plaintiffs' Song-Beverly claim would readily survive following

11   Plaintiffs' amendment to allege more explicitly that some devices were purchased in California,

12   while the Court dismissed their U.C.C. Article 2 claim with leave to amend re: privity),

13   Mississippi, and Washington.

14           Plaintiffs were given leave to add additional plaintiffs as needed in order to re-activate

15   claims under the laws of additional states, including, but not limited to, Colorado, Kansas, Maine,

16   Massachusetts, Pennsylvania, and Virginia.  (These states are examples of jurisdictions where

17   U.C.C. Sec. 2-607 pre-suit notice to manufacturers is not required.)

18           As for Plaintiffs' MMWA claim, which is parallel to their state-law warranty claims, it

19   survived at least to the extent state claims survives.  The MMWA also provides for attorneys' fees

20   and costs, as well as expert witness fees, and Plaintiffs sought them.  *See* 15 U.S.C. § 2310(d)(2).

21           For their implied warranty/MMWA damages, Plaintiffs sought refunds of the full value of

22   their devices given the non-conforming tender (*i.e.*, that at the time of tender, they did not receive

23   the benefit of their bargain due to Defendants' breach of the implied warranty of merchantability).

24   They also sought recovery of their attorneys' fees and costs, including expert witness fees.

25           Discovery has not yet revealed the number of Settlement Class Members in each of the

26   referenced states.  But Plaintiffs address further the potential value of these claims in the Conf.

27   Supp. Lopez Decl.

28

1        **4.**      **Consumer protection/fraud acts**

2       Several of Plaintiffs' consumer protection/consumer fraud act claims survived Defendants'

3 motion to dismiss. Claims under California (two prongs survive), Florida, Maryland, Michigan,

4 and Washington (partial) law remained active. Plaintiffs' Connecticut and Texas law claims were

5 dismissed, but with leave to amend. Additional states under whose laws Plaintiffs were given

6 leave to revive their consumer protection act claims, after adding new plaintiffs, include Arkansas,

7 Delaware, Hawaii, Kansas, Missouri, Nevada, New Hampshire, New Jersey, Oklahoma, Rhode

8 Island, South Carolina, South Dakota, Vermont, and West Virginia.

9       Plaintiffs sought the full measure of monetary relief available under the foregoing statutes,

10 including damages, restitution, penalties, multiple damages, and attorneys' fees and costs.

11 Plaintiffs' requests for recompense under these statutes were based on the full value of their

12 compromised mobile devices, among other measures of damages as available.

13       Discovery has not yet revealed the number of Settlement Class Members in each of the

14 referenced states. But Plaintiffs address further the potential value of these claims in the Conf.

15 Supp. Lopez Decl.

16 **F.**     **Strength of Plaintiffs' Case**

17      **Plaintiffs' response:**

18       In light of the risk of non-approval or termination that attends any proposed class

19 settlement, such that Defendants should not see Plaintiffs' appraisal of the strength of their case,

20 Plaintiffs respond to this section of the Court's order by way of the Conf. Supp. Lopez Decl.

21 Again, as Plaintiffs have advised Defendants, in the event that the Court denies Plaintiffs' request

22 to file this declaration under seal, Plaintiffs will withdraw it and promptly submit an alternative

23 response to this section of the Court's order.

24       While theoretically the potential recovery in this matter is astronomical, and while Interim

25 Co-Lead Counsel has advocated tirelessly on behalf of Plaintiffs and the proposed Settlement

26 Class, the Court's MTD Order, as well as the Conf. Supp. Lopez Decl., help to demonstrate why

27 the Plaintiffs, Interim Co-Lead Counsel, and the Executive Committee, after much careful analysis

28 and deliberation, and following five in-person mediation sessions, can recommend the Parties'

1  Settlement Agreement.

2  **Defendants' response:**

3  The maximum potential damages calculated by Plaintiffs above exceeds *multiples* of the

4  market capitalization of all the Defendants combined and is based almost entirely on statutory

5  damages claims that would not survive a further round of motions to dismiss or summary

6  judgment.  Accordingly, Defendants assess these claims at nuisance value.

7  **1.     Federal Wiretap Act**

8  Plaintiffs' maximum potential damages calculation is driven largely by multiplying the

9  number of class members by the $10,000 statutory damage figure established by the Wiretap Act.

10  But these claims are deeply flawed and are unlikely to survive a second round of motions to

11  dismiss by the OEM Defendants or summary judgment by all defendants for three reasons: (1) the

12  OEM Defendants' installation of Carrier iQ software on devices is not an "interception" under the

13  Wiretap Act; (2) the Carrier iQ software did not intercept the contents of communications

14  contemporaneously with their transmission; and (3) class members consented to data collection by

15  Carrier iQ's software in their service agreements with the wireless carriers.

16  Under the Federal Wiretap Act, "interception" requires "aural or other acquisition of the

17  contents" of a communication.  *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d

18  1051, 1075 (N.D. Cal. 2015) (hereinafter, "Order").  The Court held that Plaintiff failed to allege

19  any "acquisition" because they could not allege that the OEMs actually received any data

20  allegedly intercepted by the Carrier IQ software.  *Id.* at 1088-89.  Allegations that the OEMs

21  provided a framework that allowed other parties – Carrier IQ and the wireless carriers – to

22  intercept communications by installing software did not constitute an allegation that the OEMs

23  themselves acquired those communications.  *Id.*  Because there is no liability for aiding and

24  abetting under the Federal Wiretap Act, Plaintiffs cannot meet the "acquisition" requirement

25  necessary for liability under the Federal Wiretap act.  *Id.*

26  Plaintiffs' new allegations in their Third Amended Complaint ("TAC") that the OEMs

27  designed and wrote the CIQ Interface to capture and redirect the content of Plaintiffs' inbound text

28  messages and outbound Internet search terms do not overcome the defect that "there are no factual

1   allegations that the Device Manufacturers *themselves* 'seized' or 'redirected' any communications

2   *themselves*." *Id.* (emphasis added).  Similarly, with respect to Plaintiffs' allegation that HTC

3   acquired certain data through the "Tell HTC" tool, even though Plaintiffs added allegations that

4   wireless carriers have stated that they did not intend to capture the content of text messages or

5   search terms, these additions still do not constitute "factual allegations suggesting that [any

6   OEM's] acquisition of communications was *intentional*" as required by the Wiretap Act.  *Id.* at

7   1088.  This is because the carriers' denial of any intentional interception does not support an

8   inference that the Defendants intended to intercept any communications (which they did not).

9   Further technical discovery is also likely to show that the Carrier iQ software did not

10   acquire the contents of communications – such as text messages and Internet search queries –

11   contemporaneously with their transmission.  Instead, evidence would show that Carrier iQ's

12   software acquired data once it was in storage on a device.  Furthermore, evidence would show that

13   only a small percentage of class members used devices that had Carrier iQ profiles that collected

14   Internet search queries, and that *no* software profiles were designed to capture text message

15   content.

16   Plaintiffs' Wiretap Act claims will also fail because Plaintiffs consented to data collection

17   through their agreements with their wireless carriers.  In their wireless service agreements,

18   Plaintiffs expressly consented to the collection of data.[3]  These terms constitute express or implied

19   consent by Plaintiffs to interception of their data by their wireless carriers via software integrated

20   by the OEMs.  *See Williams v. Poulos,* 11 F.3d 271, 281 (1st Cir. 1993) ("As we have made clear,

21

22   _____

[3]   The AT&T service agreement provides that AT&T collects location information and that

23   "other usage and performance information also obtained from our network and your Device."
     Likewise, Sprint's privacy policy informs users that the "[i]nformation we collect when we

24   provide you with Service includes when your wireless device is turned on, how your device is
     functioning, device signal strength, where it is located, what device you are using, what you have

25   purchased with your device, how you are using it, and what sites you visit."  Sprint also informs
     users that Sprint will use personal information to "[m]onitor, evaluate or improve our products,

26   Services, systems, or networks."  *Id.*  Similarly, Cricket's privacy policy informs users that it
     "may monitor the pattern of your communications over our networks (1) to satisfy any

27   governmental law, regulation, or order; (2) if necessary or appropriate to operate our businesses;
     or (3) to protect our rights or property or the rights or property of others."

28

1  consent under [the Wiretap Act] need not be explicit; instead it can be implied.").  Plaintiffs

2  consented because the wireless service agreements terms gave them "notice of the fact that [their]

3  communications would be monitored."  *Shefts v. Petrakis*, 758 F. Supp. 2d 620, 630-31 (citing

4  *United States v. Workman*, 80 F.3d 688, 693 (2d Cir. 1996)).  To the extent Plaintiffs argue that

5  they did not consent to the collection of their SMS text messages, that argument fails because the

6  diagnostic software parsed incoming SMS messages as a necessary incident to the collection of

7  other data that Plaintiffs unquestionably agreed that their wireless carriers could gather.

8              **2.       State Wiretap Act Claims**

9          Plaintiffs' State Wiretap claims fare no better.  The Court dismissed 23 of 35 state wiretap

10 claims asserted in Second Amended Complaint for lack of standing.  The Illinois Wiretap Act was

11 also dismissed with prejudice.  *Id.* at 1096-97.  If the case proceeds, Defendants intend to move to

12 dismiss Plaintiffs' remaining state wiretap claims because they suffer from the same defect as the

13 Federal Wiretap Act claim; namely, Plaintiffs do not and cannot allege an acquisition, let alone an

14 intentional one.

15         The wiretap statutes of Arizona, Delaware, Florida, Iowa, Maryland, Texas and Wisconsin

16 track the Federal Wiretap statute and require "acquisition" for a finding of interception.  *See* Ariz.

17 Rev. Stat. § 13-3001(7); 11 Del. C. § 2401(10); Fla. Stat. § 934.02(3); Iowa C. Ann. § 808B.1(6);

18 Md. Cts. & Jud. Proc. C. § 10-401(10); Tex. Crim. Proc. C. § Art. 18.20(3); Wis. Stat. §

19 968.27(9).  These states also provide that only intentional or willful interceptions trigger any

20 liability under their wiretap statutes.  *See* Ariz. Rev. Stat. § 13-3005(A)(1) (intentional); 11 Del. C.

21 § 2402(a)(1) (intentional); Fla. Stat. § 934.03(1)(a) (intentional); Iowa Code Ann. § 808B.2(1)(a)

22 (willful); Md. Cts. & Jud. Proc. Code § 10-402(a)(1) (willful); Tex. Penal Code § 16.02(b)(1)

23 (intentional); Wis. Stat. § 968.31(1)(a) (intentional).  Connecticut similarly requires that any

24 interception must have been intentional to violate its wiretap act.  Conn. Gen. Stat. 53a-187(a)(1).

25         Finally, any state wiretap claims that survive a motion to dismiss will fail at summary

26 judgment because, as with their federal Wiretap Act claims, Plaintiffs cannot establish a lack of

27 consent.

28

### 3. Magnuson-Moss Warranty Act and Breach of Implied Warranty of Merchantability Claims

The Court dismissed Plaintiffs' Maryland, Michigan and Texas claims for failure to plead pre-suit notice, the California Commercial Code claim for lack of vertical privity between Plaintiffs and the OEMs and the California Song-Beverly Act claim for failure to plead a purchase in California.[4]  Given the Court's holding that Plaintiffs do not have standing to bring claims under the laws of any state in which they do not have a named Plaintiff, only two state warranty claims remain in the case.[5]

With respect to the remaining Washington and Mississippi warranty claims, those claims will not survive summary judgment.  Plaintiffs must show that their phones did not reach a "reasonably expected minimum level of quality" and that the Carrier IQ software undermined Plaintiffs' "reasonable expectations in privacy to such a degree as to render their mobile devices unfit to perform their core functions." Order, 78 F. Supp. 3d at 1110.

Plaintiffs will not be able to make that showing.  Consumers reasonably expect that their wireless carriers have access to their communications sent over the carriers networks because the carriers disclosed in the service agreements that they would collect their consumers' data.  *See United States v. Jones*, 149 F. App'x 954, 959 (11th Cir. 2005) (under the Fourth Amendment, no reasonable expectation of privacy in text messages that reach their intended recipient); *Corsair Special Situations Fund, L.P. v. Engineering Framing Sys., Inc.*, No. 09-1201-PWG, 2011 WL

---

[4]   Plaintiffs have not cured the pleading defect for the California Song-Beverly Act claim in the TAC.  Even if Plaintiffs are given leave to cure in a Fourth Amended Complaint, the claim will not survive summary judgment for the same reasons as the Washington and Mississippi warranty claims, discussed below.  Furthermore, it will be subject to the same damages limitation as the Washington and Mississippi claims.  *See Music Acceptance Corp. v. Lofing*, 32 Cal. App. 4th 610, 620-21 (1995) (UCC remedies apply to a breach of implied warranty claim under Song-Beverly); *see also Gorman v. Tassajara Dev. Corp.*, 178 Cal. App. 4th 44, 83 (2009) ("The rule is established that the plaintiff has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act, and the extent of such damages must be proved as a fact.")

[5]   Plaintiffs assert that they were given leave to add plaintiffs as needed to "re-activate claims" that were dismissed for lack of standing.  Even if Plaintiffs can locate representatives in those states to file a Fourth Amended Complaint, the value of the resurrected claims are still *de minimus* for reasons discussed below.

1    3651821, at *3 (D. Md. Aug. 17, 2011) ("With regard to the contents of the text messages, the

2    parties have not cited, and this Court's research has not disclosed, any case law in the Fourth

3    Circuit holding that a party has a protected privacy interest in the content of text messages that the

4    party sent or received."); *see also United States v. Plunk*, 153 F.3d 1011, 1019-20 (9th Cir. 1998)

5    ("individuals possess no reasonable expectation of privacy in telephone records"), *abrogated on*

6    *other grounds by Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

7            In addition, Plaintiffs will not be able to recover the purchase price of their phones as they

8    contend.  The measure of damages on warranty claims where a plaintiff accepts the goods is not

9    the purchase price of the product, but rather the *difference* between the value of the product as

10   warranted – the purchase price – and the value of the product as delivered, *i.e.*, the actual value of

11   the product.  *See* UCC § 2-714 ("The measure of damages for breach of warranty is the difference

12   . . . between the value of the goods accepted and the value they would have had if they had been as

13   warranted"); Wash. Rev. Code § 62A.2-714 (same); Miss. Code § 75-2-714 (same).  Furthermore,

14   because Plaintiffs have the burden of proving damages, they must prove the "actual value" of their

15   phones with the Carrier IQ software installed in order to recover any damages at all.  *See Tacoma*

16   *Athletic Club, Inc. v. Indoor Comfort Sys., Inc.*, 902 P.2d 175, 181 (Wash. App. 1995) (reversing

17   jury's damages award of entire contract price for defective swimming pool because the plaintiff

18   had not shown that the value of the pool as delivered was zero); *Gast v. Rogers-Dingus Chevrolet*,

19   585 So. 2d 725, 730 (Miss. 1991) (automobile buyers could not recover damages for breach of

20   implied warranty of merchantability because they did not satisfy their burden to prove the

21   difference in value between the automobile as warranted and as delivered).

22           Plaintiffs will not be able to demonstrate a significant difference, if at all, between the

23   purchase price and the actual value of their phones.  There is no allegation that Plaintiffs ever

24   noticed any diminution in battery life or performance of their phones, or stopped using their

25   phones after they learned of the Carrier IQ software.  Indeed, they allege that they continued using

26   their phones even after filing this litigation.  (TAC ¶ 319.)  Moreover, Plaintiffs conceded that

27   their claims are based on interception for and transmittal to persons or entities other than their

28   wireless carriers.  *See* Order Denying Mot. to Compel Arbitration, Dkt. No. 251 at 21.  Thus, the

1  diminished performance and loss of battery life at issue could only be for any *incremental*

2  reduction in mobile device resources caused by interception for and transmittal to entities other

3  than the wireless carriers.  That incremental difference, if any, is necessarily both small and

4  difficult to measure – a risk that falls on the Plaintiffs because they bear the burden of proof.

5      **4.      Consumer Protection Claims**

6      Only five state consumer protection claims remained following Defendants' Motion to

7  Dismiss:  California (two of the Business & Professions Code  § 17200 prongs), Florida,

8  Maryland, Michigan and Washington (partial). Plaintiffs' remaining consumer protection claims

9  are based on allegations of deceptive conduct.  Thus, the disclosures by the wireless carriers that

10  they collect consumers' data incidental to providing network services will prove fatal to these state

11  consumer protection claims on summary judgment.  Furthermore, Plaintiffs will be unable to

12  demonstrate the requisite reliance because none of the named Plaintiffs can show that they would

13  have behaved differently if they had learned of the purported "true" facts regarding the Carrier IQ

14  software prior to purchasing their phones.  Indeed, if Plaintiffs would have behaved differently,

15  they should have tried to return their phones or sought a refund after learning about the Carrier IQ

16  software; but there is no allegation of any such action by any of the named Plaintiffs.  In fact,

17  Plaintiffs actually allege that they continued using their phones after filing the litigation.  (TAC ¶

18  319.)

19      Like the warranty claims, Plaintiffs cannot recover "recompense under these statutes . . .

20  based on the full value of their compromised mobile devices."  *See* § E.4, *supra*.  Under

21  California's UCL, "A full refund may be available in a UCL case when the plaintiffs prove the

22  product had *no* value to them."  *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015); *Brazil*

23  *v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 2466559, at *15 (N.D. Cal.

24  May 30, 2014) ("Class members may not 'retain some unexpected boon, yet obtain the windfall of

25  a full refund and profit from a restitutionary award.') (internal citations omitted).  Rather, "[t]he

26  difference between what the plaintiff paid and the value of what the plaintiff received is a proper

27  measure of restitution."  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009).  Based on

28  the allegations in the operative complaint—specifically, that Plaintiffs continued to use their

1  phones not only after learning of the alleged wrongdoing, but after filing this case (TAC ¶ 319)—

2  Plaintiffs cannot show that their phones had no value to them.

3        Plaintiffs fare no better under the only other state-law unfair competition claims the Court

4  has had the opportunity to consider.  "The measure of actual damages is the difference in the

5  market value of the product or service in the condition in which it was delivered according to the

6  contract of the parties . . . ."  *QSGI, Inc. v. IBM Global Fin.*, No. 11-80880-CIV, 2012 WL

7  1150402, at *4 (S.D. Fla. Mar. 14, 2012); *see also In re Vioxx Class Cases,* 103 Cal. Rptr. 3d 83,

8  96 (Ct. App. 2009) (restitution under Cal. Bus. & Prof. Code § 17203 is the "difference between

9  what the plaintiff paid and the value of what the plaintiff received"); *Mayhall v. A.H. Pond Co.*,

10  341 N.W. 2d 268, 271-72 (Mich. Ct. App. 1983) (measure of actual damages under Michigan

11  Consumer Protection Act is difference between value of good as sold and value of goods as

12  represented); *Hall v. Lovell Regency Homes Ltd. P'ship*, 121 Md. App. 1, 26-27 (1998) (affirming

13  trial court's grant of judgment on defendants' CPA claim because Plaintiffs failed to meet their

14  burden to establish actual loss by providing proof of legally accepted measure of damages in the

15  form of cost of repair or loss in fair market value); *King Logging Co. v. Scalzo*, 16 Wash. App.

16  918, 926 (1977) *abrogated on other grounds by Am. Nursery Products, Inc. v. Indian Wells*

17  *Orchards*, 115 Wash. 2d 217 (1990) ("When the claim involves injury or damage to personal

18  property, short of complete destruction, the measure of damages is usually expressed as being

19  limited to the difference in market value of the property before and after the injury or to the

20  reasonable cost of repairs to restore it to its former condition, and for loss of use during the period

21  of repair.")  Plaintiffs' claim that they would be entitled to the full refund of their phones is

22  unsupportable.

23        **5.**     **Procedural Hurdles to Recovery**

24        In addition to the above-described defects to their causes of action, Plaintiffs face

25  significant procedural hurdles that would prevent any recovery.

26        **(a)**     **Defendants' Pending Interlocutory Appeal Would Force Individual Arbitration**

27  Defendants have filed a pending interlocutory appeal in the Ninth Circuit that, if

28

1   successful, would force all Plaintiffs' claims to individual arbitration.  The motion argued that the

2   carriers' customers could not avoid arbitration by suing only the manufacturers of the devices they

3   obtained from their wireless carriers, and simply omitting the carriers and any mention of the

4   consumers' underlying contracts with the carriers from the MDL complaint.

5      Although the District Court denied this motion, it is very possible that the Ninth Circuit

6   will hold differently.  Notably, since the Court's ruling, the Fifth Circuit has addressed the very

7   question at issue in a case applying California law.  The Fifth Circuit concluded that the plaintiffs

8   were equitably estopped from denying an agreement to arbitrate with a non-signatory defendant.

9   *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 260-61 (5th Cir. 2014).

10   The Fifth Circuit reached this conclusion even though the plaintiffs alleged statutory (and not

11   contractual) claims.  In reasoning directly applicable here, the *Crawford* court held that the

12   statutory claims rested on whether "Defendants exceeded the scope of their permitted use of [ ]

13   information," which in turn required a showing of the scope of permitted use under the underlying

14   agreements.  *Id.* at 261.  If the Ninth Circuit follows the Fifth Circuit's analysis, all the named

15   Plaintiffs will be required to submit their individual claims to arbitration and no liability class

16   could be certified.

17      **(b)**  **Plaintiffs Will Not Be Able to Certify a Class**

18      If the case were to proceed to that stage, Plaintiffs could not obtain certification of a class

19   under the "rigorous analysis" of Rule 23.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588

20   (9th Cir. 2012).  Indeed, the Court recognized that "given the breadth of the proposed class and the

21   number of state law claims asserted on behalf of the class, there is a meaningful risk that the

22   requirements of class certification under Rule 23 may not be met."  Order, 78 F. Supp. 3d at 1074-

23   75; *see also Mazza*, 666 F.3d at 596 (where "the law of multiple jurisdiction applies . . . to any

24   nationwide class of purchasers . . . , variances in state law overwhelm common issues and preclude

25   predominance for a single nationwide class.")

26      Furthermore, issues of consent will bar certification of any remaining wiretap claims—

27   regardless whether the proposed class is nationwide—because those issues raise substantial

28   individual questions.  *See In re Google Inc. Gmail Litig.*, 2014 WL 1102660 (N.D. Cal. Mar. 18,

JOINT RESPONSE TO ORDER RE SUPPLEMENTAL BRIEFING AND/OR EVIDENCE

1   2014) (holding that issues of consent raised "substantial individual questions" where Plaintiffs

2   "received vastly different disclosures depending on with which [provider] they were affiliated.")

3       Plaintiffs' state unfair competition law claims also require individualized inquiries into

4   what disclosures regarding the mobile devices' diagnostic software were made to particular

5   plaintiffs by their carriers, and whether Plaintiffs viewed and/or relied on these disclosures, if any.

6   *See, e.g., Castro Valley Union 76, Inc. v. Vapor Sys. Tech., Inc.*, No. C 11-0299 PJH, 2012 WL

7   5199458, at * 10 (N.D. Cal. Oct. 22, 2012) (common questions did not predominate because UCL

8   claims required individualized inquiry into what representations regarding allegedly defective

9   nozzles were made to particular gas station owners, by whom those statements were made, and

10  whether station owners relied on those representations in deciding to purchase the nozzles); *cf.*

11  *Mazza*, 666 F.3d at 596 ("[E]ven if the class was restricted only to those who purchased or leased

12  their car in California, common issues of fact would not predominate in the class . . . because it

13  almost certainly includes members who were not exposed to, and therefore could not have relied

14  on, Honda's allegedly misleading advertising material.").

15      These individual issues of notice preclude class certification of the warranty claims as well

16  because they will determine whether each Plaintiff had a reasonable expectation of privacy.  *See*

17  Order, 78 F. Supp. 3d at 1110 (Plaintiffs' success on their implied warranty claims depends on the

18  extent to which their reasonable expectations to privacy were invaded).  A reasonable expectation

19  of privacy requires, as a threshold matter, an individual subjective expectation of privacy.  *See*

20  *California v. Ciraolo,* 476 U.S. 207, 211 (1986) (citing *Katz v. United States,* 389 U.S. 347, 360-

21  61 (1967) (Harlan, J., concurring)).  That subjective question is necessarily an individualized one

22  that is not suitable for class treatment.

23      Finally, whether any given class member's smartphone was rendered "unmerchantable" by

24  the CIQ software requires an individualized inquiry of how the software affected each phone,

25  which also precludes class certification.  *See Daniel v. Ford Motor Co.*, 2013 WL 3146810, at *4

26  (E.D. Cal. June 18, 2013) ("A class member's implied warranty claim would require an individual

27  determination of whether the . . . plaintiff's vehicle was fit for its ordinary purpose given the

28  defect could rendered certain vehicles more inoperable than others." (alterations and internal

1   quotation marks omitted)); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1148 (N.D. Cal. 2010)

2   (same for implied warranty claim involving washing machines).  With respect to Plaintiffs' claim

3   that they suffered injury in the form of depleted battery life and diminished performance (*see e.g.*

4   TAC ¶¶ 63, 99), each phone's battery life and performance will depend on, among other factors,

5   the number of other applications on the particular phone and the extent to which the consumer left

6   those applications open.  Thus, Plaintiffs will not be able to put forward any evidence establishing

7   that the battery and performance damages "can be feasibly and efficiently calculated once the

8   common liability questions are adjudicated," as required under *Comcast.  See Lily v. Jamba Juice*

9   *Co.*, 2014 WL 4652283, at *10 (N.D. Cal. Sept. 18, 2014).

10       For all these reasons, there are significant risks that Plaintiffs will recover nothing if they

11  were to proceed with litigation.

12  **G.       Risks of Litigation**

13       Plaintiffs necessarily took into account each Defendant's ability to satisfy a judgment

14  against it.  They had grave concerns regarding the financial condition of Carrier iQ and Pantech

15  Wireless.

16       As to the latter, Pantech Wireless's parent declared the equivalent of bankruptcy in its

17  South Korean home.  *In Re Pantech Co. Ltd.*, No. 14-70482-MHM, D.I. 39, Bankr. N.D. Ga. Dec.

18  18, 2014 .  Pantech Wireless itself pled penury in this matter.  (Dkt. No. 324, 354).

19       As to the former, Carrier iQ was a small, privately held company.  (Cite.)  Regarding

20  Carrier iQ's ability to satisfy a judgment against it, the Settlement Agreement provides as follows:

21           Class Counsel requested, and defendant Carrier iQ has provided, information
             regarding Carrier iQ's financial condition and its ability to satisfy a judgment in
22           this case, as well as its ability to contribute funds to settle this matter. Class
             Counsel reviewed and analyzed the financial data provided by Carrier iQ as part of
23           the process of reaching the Settlement memorialized hereby.

24  (Dkt. No. 404-1 Ex. A at 8, ¶ 8.)

25       In further response to Sec. G of the Court's Order, the Parties submit under seal the

26  Declaration of Magnolia Mobley Regarding Financial Condition of Carrier iQ, Inc., which

27  contains "more specific information regarding CIQ's financial condition and its ability to satisfy

28

1  and judgment and/or contribute funds to settle the case.").

2  **H.      Attorneys' Fees, Costs, and/or Expenses**

3        Plaintiffs respond to the issues raised in the Court's Order as follows: (1) Plaintiffs intend

4  to seek 25%, which is the Ninth Circuit benchmark, of the Gross Settlement Fund; (2) the amount

5  to be requested does not presently take into account the value of the injunctive relief obtained for

6  the benefit of the Settlement Class members.  However, there is value to the injunctive relief, and

7  Plaintiffs reserve the right to monetize that value in their motion for fees, costs, and expenses; (3)

8  the lodestar of Interim Co-Lead Counsel  through January 22, 2016 is $3,254,964.25.   The

9  average hourly rate is $492.82.  The total number of hours incurred is 6,604.80; (4) the number of

10 hours spent on the following categories of tasks are:  (a) Preparation of Complaints: 619.15; (b)

11 Case Management:  1,014.35; (c) Discovery: 1,862; (d) Investigation and Research: 186.90;  (e)

12 Motion to Compel Arbitration: 716.20; (f) Motion to Dismiss: 456.90; (g) Experts:  42.80; (h)

13 Motion to Stay Arbitration Decision: 191.90; (i) Work on Appeal: 96:  (j) Settlement: 935.40; and

14 (k) Motion for Preliminary Approval: 483.20.   (See Declaration of Daniel L. Warshaw Response

15 to Order Re Supplemental Briefing and/or Evidence, filed herewith, at ¶¶4-5.)

16 **I.      Settlement Administration Fees and Costs**

17       Information regarding the estimated cost of notice and administration are set forth at ¶ 14

18 of the Supp. Vasquez Decl.

19 **J.      Incentive Awards**

20       As the Court notes implicitly, the Settlement Agreement provides that Plaintiffs may

21 request for each Named Plaintiff and one Former Named Plaintiff  a "service award not to exceed

22 $5,000 [per Named Plaintiff/Former Named Plaintiff] for their time and efforts in bringing and

23 prosecuting this matter.  (Dkt. No. 404-1 at 16, ¶ 36.)  Assuming that the Court grants preliminary

24 approval to the Settlement such that the matter proceeds toward a Final Approval Hearing,

25 Plaintiffs plan to submit declarations from the prospective awardees concerning their contributions

26 to this matter on behalf of the Settlement Class, and other relevant factors; these will accompany

27 their motion for service awards.

28       With respect to the Court's order that "[t]he Parties shall cite any authority indicating that a

1    named plaintiff is entitled to a $5,000 incentive award where each class member will likely obtain

2    minimal monetary damages," *see In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947-48

3    (9th Cir. 2015) (approving $5,000 incentive awards where class members would receive $12);

4    *Weeks v. Kellogg Co.*, 2013 WL 6531177, *3, 34-37 (C.D. Cal. Nov. 23, 2013) (approving

5    incentive awards of $5,000 per named plaintiff, where settlement provided for the recovery by

6    class members of $5 per box of cereal purchased during the class period, up to a maximum of $15

7    per class member, all subject to proportional reduction if all eligible claims exceeded the

8    settlement fund); *see also Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *31-37 (N.D.

9    Cal. Apr. 1, 2011) (making $5,000 service awards to 20 named plaintiffs "where average award to

10   class members was $207.69").

11   **K.**    **Timing**

12           The Court raised several issues with the parties' proposed timeline.  In order to address

13   those timing issues, a revised proposed order complying with the Court's recommendations is

14   submitted herewith.  The revised proposed order: (1) gives class members 21 days' notice of the

15   motion for fees, costs and expenses (*see* ¶ 17); (2) requires that any responses to class member

16   objections be filed at least 14 days before the final approval hearing (*see* ¶ 20 (e)); (3) requires that

17   the settlement administrator give the parties a final declaration regarding the class members'

18   responses at least 17 days before the final approval hearing (*see* ¶ 10(d)); (4) requires that the

19   motion for final approval be filed 35 days before the final approval hearing (*see* ¶19); and (5)

20   requires that any reply brief be filed at least 14 days before the final approval hearing (*id.*).

21           To the extent that these deadlines differ from any deadlines set forth in the Stipulation of

22   Settlement, the parties agree that a change in those deadlines is not material and they desire to

23   move forward with the proposed settlement notwithstanding those changes.

24   **L.**    **Proposed Order Granting Preliminary Approval**

25           Plaintiffs apologize for any confusion caused by the cited language in Sec. L of the Court's

26   Order.  Indeed, Plaintiffs (and the Defendants as well) believe that the Stipulation provides for

27   legally and constitutionally sufficient notice.

28           But what Plaintiffs meant specifically by the cited language is that they (and the

JOINT RESPONSE TO ORDER RE SUPPLEMENTAL BRIEFING AND/OR EVIDENCE

1   Defendants as well) believe that their Settlement is sufficient to warrant an order from the Court

2   preliminarily approving the Settlement and mandating notice of it to the Settlement Class, per the

3   Parties' Notice Program.  *See*, *e.g.*, MANUAL FOR COMPLEX LITIGATION § 13.14, at 173 (4th ed.

4   2004)  ("This [approval of a settlement] usually involves a two-stage procedure.  *First, the judge*

5   *reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice*

6   and a hearing.  If so, the final decision on approval is made after the hearing.") (emphasis added).

7   **M.      Proposed Class Notices, Etc.**

8          In his declaration submitted herewith, Alan Vasquez of Gilardi & Co., LLC provides

9   additional information regarding how the media vehicles that are contemplated for notice are to be

10  implemented, and he specifically addresses the issues raised in the Court's order.  He explains that

11  only one of the online media vehicles is based on search terms relating to this matter.  That is,

12  almost all of the elements of the Notice Program do not require a Class Cember to conduct a

13  search related to Plaintiffs' claims (mobile phones, privacy, Carrier iQ, etc.) in order to receive

14  notice.  (Supp. Vasquez Decl., ¶26.)  In fact, Gilardi will actively target potential class members

15  by engaging in "social listening."  (Supp. Vasquez Decl., ¶9.)  Gilardi will actively monitor social

16  media channels by searching Tweet streams that can link to likely Class Members.  Further,

17  Gilardi will also engage in targeted social advertising where it will monitor the effectiveness in of

18  the advertising and make appropriate adjustments based upon the metrics received.  (*Id.,* ¶¶ 10-

19  11.)  This process will *proceed* during the notice period and adjust accordingly to ensure that

20  notice is disseminated to the Class Members in the most targeted and efficient manner.  (*Id.* ¶¶ 9-

21  11.*)*

22         In addition, the long and short forms of class notice, as well as the Clam Form, have been

23  revised to highlight the issues raised by the Court.  (*See* Supp. Vasquez Decl. Exs. 1 & 2.)

24  Information regarding the estimated cost of notice and administration are set forth at ¶ 14  of the

25  Supp. Vazquez Decl.

26  Dated: February 2, 2016                    By: *\_/s/ Steve W. Berman_____*
                                                   Steve W. Berman (pro hac vice)
27

28

1   Robert F. Lopez (pro hac vice)
    HAGENS BERMAN SOBOL SHAPIRO
2   LLP
    1918 Eighth Avenue, Suite 3300
3   Seattle, WA 98101
    Telephone: (206) 623-7292
4   Facsimile: (206) 623-0594
    steve@hbsslaw.com
5   robl@hbsslaw.com

6   By: /s/ Daniel L. Warshaw

7   Daniel L. Warshaw (SBN 185365)
    PEARSON SIMON & WARSHAW, LLP
8   15165 Ventura Blvd., Suite 400
    Sherman Oaks, CA 91403
9   Telephone: (818) 788-8300
    Facsimile: (818) 788-8104
10  dwarshaw@pswlaw.com

11  Bruce L. Simon (SBN 96241)
    PEARSON SIMON & WARSHAW, LLP
12  44 Montgomery Street, Suite 2450
    San Francisco, CA 94104
13  Telephone: (415) 433-9000
    Facsimile: (415) 433-9008
14  bsimon@pswlaw.com

15  *Plaintiffs' Interim Co-Lead Counsel*

16  By:     /s/ Rodger R. Cole

17  Rodger R. Cole (CSB No. 178865)
    rcole@fenwick.com
18  FENWICK & WEST LLP
    801 California Street
19  Mountain View, CA 94041
    Ph: (650) 988-8500
20  Fax: (650) 938-5200

21  Tyler G. Newby (CSB No. 205790)
    tnewby@fenwick.com
22  FENWICK & WEST LLP
    555 California Street, 12th Floor
23  San Francisco, CA 94104
    Ph: (415) 875-2300
24  Fax: (415) 281-1350

25  *Attorneys for Defendant Carrier IQ, Inc.*

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:     */s/ Rosemarie T. Ring*
Rosemarie T. Ring (SBN 220769)
Rose.Ring@mto.com
Jonathan H. Blavin (SBN 230269)
Jonathan.Blavin@mto.com
Bryan H. Heckenlively (SBN 279140)
Bryan.Heckenlively@mto.com
MUNGER, TOLLES & OLSON, LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Phone: (415) 512-4000
Fax: (415) 512-4077

Henry Weissmann (SBN 132418)
Henry.Weissmann@mto.com
MUNGER, TOLLES & OLSON, LLP
355 South Grand Avenue,
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendants HTC America, Inc.,*
*and HTC Corporation*

By:     */s/ Simon J. Frankel*
Simon J. Frankel
sfrankel@cov.com
COVINGTON & BURLING LLP
1 Front St., 35th Floor
San Francisco, CA 94111
Phone: (415) 591-6000
Fax: (415) 591-6091

*Attorneys for Defendant Huawei DeviceUSA,*
*Inc.*

By:     */s/ Wilson W. Lin*
Wilson W. Lin (SBN 302228)
wlin@park-law.com
H.C. Park & Associates, PLC
1894 Preston White Drive
Reston, VA 20191
Phone: (703) 544-9230
Fax: (703) 288-5139

*Attorneys for Defendant Pantech Wireless,*
*Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   */s/ Lance A. Etcheverry*
Lance A. Etcheverry (SBN 199916)
lance.etcheverry@skadden.com
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Phone: (213) 687-5000
Fax: (213) 687-5600

S. Sheryl Leung (SBN 238229)
sheryl.leung@skadden.com
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Phone: (650) 470-4544
Fax: (650) 798-6605

*Attorneys for Defendants Samsung*
*Electronics America, Inc. and Samsung*
*Electronics Co., Ltd.*

By:   */s/ Jeff E. Scott*
Jeff E. Scott (SBN 126308)
ScottJ@gtlaw.com
Lori Chang (SBN 228142)
ChangL@gtlaw.com
Rebekah Guyon (SBN 291037)
GuyonR@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Tel: 310-586-7700
Fax: 310-586-7800

Ian C. Ballon (SBN 141819)
Ballon@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
Tel: 650-328-8500
Fax: 650-328-8508

*Attorneys for Defendants LG Electronics*
*MobileComm U.S.A., Inc. and LG Electronics, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:     /s/ Krista M. Enns
        Christopher J. Letkewicz
        cletkewicz@winston.com
        WINSTON & STRAWN LLP
        35 W. Wacker Drive
        Chicago, IL 60601-9703
        Phone: (312) 558-5600
        Fax: (312) 558-5700

        Krista M. Enns (SBN 206430)
        kenns@winston.com
        WINSTON & STRAWN LLP
        101 California Street
        San Francisco, CA 94111-5894
        Telephone: (415) 591-1000
        Facsimile: (415) 591-1400

        *Attorneys for Defendant Motorola Mobility
        LLC*

JOINT RESPONSE TO ORDER RE SUPPLEMENTAL BRIEFING AND/OR EVIDENCE

1

## **ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3)**

2
        I, Daniel L. Warshaw, am the ECF User whose identification and password are being used

3
to file this **FURTHER JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND**

4
**NOTICE OF SETTLEMEMT**. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest

5
that all signatories have concurred in this filing.

6
Dated: February 2, 2016                                   */s/ Daniel L. Warshaw*_____

7

8

9

10

## **CERTIFICATE OF SERVICE**

11
        I hereby certify that on February 2, 2016, I electronically filed the foregoing document

12
using the CM/ECF system which will send notification of such filing to the e-mail addresses

13
registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby

14
certify that I have caused to be mailed a paper copy of the foregoing document via the United

15
States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List

16
generated by the CM/ECF system.

17
Dated: February 2, 2016                                   */s/ Daniel L. Warshaw*_____

18

19

20

21

22

23

24

25

26

27

28