Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Bruce L. Simon (CSB No. 96241)
PEARSON SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswlaw.com

*Class Counsel*
*and Counsel for Select Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | No.  C-12-md-2330-EMC |
| CARRIER IQ, INC. CONSUMER PRIVACY LITIGATION | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT** |
| This Document Relates to: | Date:    July 28, 2016 |
| ALL CASES | Time:    1:30 p.m. |
| | Judge:   Honorable Edward M. Chen |
| | Dept.:   Courtroom 5, 17th Floor |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 28, 2016, at 1:30 p.m., or as soon thereafter as may be heard in the courtroom of the Honorable Edward M. Chen, United States District Court for the Northern District of California, San Francisco Division, plaintiffs Patrick Kenny, Jennifer Patrick, Dao Phong, Daniel Pipkin, Ryan McKeen, Leron Levy, Luke Szulczewski, Michael Allan, Gary Cribbs, Bobby Cline, Shawn Grisham, Mark Laning, Clarissa Portales, Eric Thomas, Douglas White, Brian Sandstrom, and Colleen Fischer will and hereby do move the Court, pursuant to Fed. R. Civ. P. 23(e), for an order finally approving the settlement they have reached with defendants, and:

1.      Finding that the settlement is fair, reasonable, and adequate, within the meaning of Fed. R. Civ. P. 23(e)(2);

2.      Finding that the notice provided to the settlement class was directed in a reasonable manner to all class members who would be bound by the settlement, Fed. R. Civ. P. 23(e)(1); that it constitutes due, adequate, and sufficient notice; and that it comports with the requirements of due process;

3.      Finally approving the method set forth in the settlement agreement for distributing the monetary relief available thereunder;

4.      Reserving exclusive and continuing jurisdiction over the settlement and any disputes regarding it;

5.      Directing that a final judgment of dismissal be entered between the plaintiffs and defendants; and

6.      Finally appointing the foregoing named plaintiffs as class representatives and Hagens Berman Sobol Shapiro LLP and Pearson, Simon & Warshaw, LLP as class counsel.

The grounds for this motion are that the proposed settlement is fair, adequate, and reasonable; that the notice plan, which was the best plan practicable under the circumstances, has been effected per the Court's order and otherwise comports with due process and applicable law; and that the other requested relief is well-grounded in law and fact, as set forth in the attached memorandum.  This motion is based on the declarations submitted herewith, with exhibits; the

attached memorandum in support of plaintiffs' motion; the pleadings and papers on file in this action; and the oral argument of counsel to be presented at the hearing on this motion.

Dated: June 23, 2016.

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____*/s/ Steve W. Berman*_____
        Steve W. Berman
Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

PEARSON SIMON & WARSHAW, LLP


By _____*/s/ Daniel L. Warshaw*_____
        Daniel L. Warshaw
Clifford H. Pearson (108523)
Daniel L. Warshaw (185365)
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8014
cpearson@pswlaw.com
dwarshaw@pswlaw.com

Bruce L. Simon (96241)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Class Counsel and*
*Counsel for Select Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ...................................................................... 2

III.    STATEMENT OF RELEVANT FACTS ................................................................................. 2

        A.      Background facts ........................................................................................................ 2

        B.      Plaintiffs' claims ........................................................................................................ 3

        C.      Proceedings to-date ................................................................................................... 3

        D.      The settlement ............................................................................................................ 5

                1.      Mediation ...................................................................................................... 5

                2.      Settlement class definition, class period, and claims period ...................... 5

                3.      Relief to the settlement class ....................................................................... 6

                        a.      Monetary relief ................................................................................ 6

                        b.      Non-monetary relief ........................................................................ 8

                4.      Notice, opt-out procedures, and release ...................................................... 9

                5.      Service awards and attorneys' fees, costs, and expenses ........................... 11

IV.     ARGUMENT ........................................................................................................................ 12

        A.      The Court should grant final approval of the settlement. ........................................ 12

                1.      The settlement meets the standards for final approval. .............................. 13

                        a.      The settlement is the product of well-informed, vigorous,
                                and thorough arm's-length negotiation. ........................................ 13

                        b.      The settlement is fair, adequate, and reasonable. ......................... 14

        B.      The notice program was extensive, exceeded precedent, and satisfied
                applicable standards ................................................................................................. 17

        C.      The proposed class meets the requirements for certification of a settlement
                class. ......................................................................................................................... 18

                1.      The Rule 23(a) requirements are met. ........................................................ 19

                        a.      Numerosity .................................................................................... 19

                        b.      Commonality ................................................................................. 20

c.    Typicality ........................................................................ 20

d.    Adequacy ........................................................................ 21

2.    The Court should certify settlement classes pursuant to Rules
23(b)(2) and 23(b)(3) .......................................................... 22

a.    Because at least one of the defendants has acted or refused
to act on grounds that apply generally to the class, such that
class-wide settlement relief is appropriate, the Court should
certify a Rule 23(b)(2) settlement class. ............................... 22

b.    Because common questions predominate, and a class action
is the superior method to adjudicate class members' claims,
the Court also should certify a Rule 23(b)(3) settlement
class. ................................................................................ 23

(1)    Common questions predominate. ............................. 23

(2)    Class treatment is the superior method for
adjudicating claims of members of the proposed
class. ..................................................................... 24

D.    Objections ............................................................................ 24

V.    CONCLUSION ............................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Products v. Windsor*,
521 U.S. 591 (1997) ................................................................................ 18, 19

*Barefield v. Chevron U.S.A., Inc.*,
1987 WL 65054 (N.D. Cal. Sept. 9, 1987).............................................. 20

*Burden v. SelectQuote Ins. Servs.*,
2013 WL 1190634 (N.D. Cal. Mar. 21, 2013) ................................. 12, 20, 21

*Cent. States Group v. AIG Global Inv. Corp. (In re Healthsouth Corp. Secs. Litig.)*,
334 F. App'x. 248 (11th Cir. 2009)........................................................ 25

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005).................................................................. 20

*Chavez v. WIS Holding Corp.*,
2010 U.S. Dist. LEXIS 56138 (S.D. Cal. June 7, 2010) .......................... 13

*Churchill Village, L.L.C. v. GE*,
361 F.3d 566 (9th Cir. 2004) ........................................................ 13, 14, 17

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974). Notice.................................................................... 17

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015 (9th Cir. 2012)................................................................ 21

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013)................................................ 15, 16

*Franklin v. Kaypro Corp.*,
884 F.2d 1222 (9th Cir. 1989)........................................................... 12, 13

*Gallucci v. Gonzalez*,
603 F. App'x. 533 (9th Cir. 2015).......................................................... 17

*Gascho v. Global Fitness Holdings, LLC*,
2014 WL 1350509 (S.D. Ohio Apr. 4, 2014) ............................................ 7

*In re Google Referrer Header Privacy Litig.*,
2014 WL 1266091 (N.D. Cal. Mar. 26, 2014) ......................................... 18

*In re Google Referrer Header Privacy Litig.*,
87 F. Supp. 3d 1122, 1130-31 (N.D. Cal. 2015) ...................................... 15

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................. 13, 14, 19, 23

*In re High-Tech Emp. Antitrust Litig.*,
   2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) .......................................................... 17

*Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor v. I.N.S.*,
   306 F.3d 842 (9th Cir. 2002) .......................................................................... 19, 20

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund. v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ........................................................................ 23, 24

*Marilley v. Bonham*,
   2012 WL 851182 (N.D. Cal. Mar. 13, 2012) ............................................................ 20

*Morales v. Stevco, Inc.*,
   2012 WL 1790371 (E.D. Cal. May 16, 2012) ............................................................. 7

*In re Netflix Privacy Litig.*,
   2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ...................................................... 13, 15

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) .............................................................................. 14

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ........................................................................ 11, 25

*In re Pacific Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ............................................................................... 13

*Pelletz v. Weyerhaeuser Co.*,
   255 F.R.D. 537 (W.D. Wash 2009) ........................................................................ 7

*Perkins v. Linkedin Corp.*,
   2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ............................................................. 7

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ..................................................................................... 17

*Shames v. Hertz Corp.*,
   2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ............................................................. 7

*Spann v. J.C. Penney Corp.*,
   314 F.R.D. 312 (C.D. Cal. Jan. 25, 2016) .............................................................. 25

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................................................................. 17

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) .............................................................................. 14

*In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*,
    295 F.R.D. 438 (C.D. Cal. 2014) ................................................................................. 17, 18

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ............................................................................................ 24

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) ............................................................................................ 13

*In Re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ......................................................................................... 25

*Weeks v. Kellogg Co.*,
    2013 WL 6531177 (C.D. Cal. Nov. 23, 2013) ............................................................. 11, 17

*Wren v. RGIS Inventory Specialists*,
    2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) .................................................................... 11

*Zepeda v. PayPal, Inc.*,
    2015 WL 6746913 (N.D. Cal. Nov. 5, 2015) ................................................................ 22, 23

### OTHER AUTHORITIES

Conte, A. & Newberg, H., NEWBERG ON CLASS ACTIONS § 3.5 (4th ed. 2002) ............................... 20

Conte, A. & Newberg, H., NEWBERG ON CLASS ACTIONS § 11.25 (4th ed. 2002) ......................... 12

Fed. R. Civ. P. 23(a) .............................................................................................................. 19, 21

MANUAL FOR COMPLEX LITIGATION § 13.14 (4th ed. 2004) .......................................................... 12

MANUAL FOR COMPLEX LITIGATION § 21.312 (4th ed. 2004) ........................................................ 17

MANUAL FOR COMPLEX LITIGATION § 21.632 (4th ed. 2004) ........................................................ 12

# I.      INTRODUCTION

Plaintiffs move for final approval and related relief regarding their nationwide-class settlement with the defendants.

As the Court will recall, this matter concerns Carrier iQ Software, a product installed over the years on millions of U.S. mobile devices.  Consumers filed numerous suits against the instant defendants (and others) following reports that the software was operating in troubling and unexpected ways.  The J.P.M.L. consolidated all pending federal cases and transferred them to this case for pre-trial proceedings.  Plaintiffs asserted claims in this consolidated action based on alleged violations of federal and state law.

Since consolidation, the case has been hard-fought.  Throughout its pendency, the defendants have adamantly denied liability, variously arguing that the software at issue is benign; that plaintiffs misunderstood its capabilities; that plaintiffs authorized use of the software; and that in other instances, certain activity was inadvertent (and therefore un-actionable) and had caused no harm.  The defendants also contended that in any event, plaintiffs could not sue them in court because of arbitration provisions in the plaintiffs' contracts with their wireless carriers that the defendants claimed the right to invoke.

Eventually, however, following motions practice, discovery, and much research and analysis, the parties, after intense negotiations that included five all-day, in-person mediation sessions, reached a nationwide settlement of plaintiffs' claims.  This hard-fought agreement includes a $9 million cash component, which, if finally approved, would result in a cash payment of approximately $148.85 to each qualified claimant (based on current estimates, excluding untimely but otherwise valid claims—*see* Sec. III.D.3.a, *infra*).  The agreement also provides for injunctive relief that defendant Carrier iQ, Inc. implemented prior to the acquisition of its assets by AT&T Mobility IP, LLC.

Regarding notice, the parties agreed to a strong, multi-faceted publication program constructed with expert assistance for maximum reach.  This program, which the settlement administrator effected following entry of the Court's order granting preliminary approval, was designed to—and did—provide the best notice practicable under the circumstances.  It included

traditional print and intensive, targeted Internet advertising components; a dedicated settlement website; references to that website on the websites of class counsel; a joint press release; and free press as well.  Accordingly, it comported with Rule 23, other applicable law, and due process.

As plaintiffs demonstrate below, the parties' settlement is worthy of final approval.

## II.   STATEMENT OF ISSUES TO BE DECIDED

Should the Court grant final approval to the parties' settlement and:

1. Find that the settlement is fair, reasonable, and adequate, within the meaning of Fed. R. Civ. P. 23(e)(2);

2. Find that the notice provided to the settlement class was directed in a reasonable manner to all class members who would be bound by the settlement, Fed. R. Civ. P. 23(e)(1); that it constitutes due, adequate, and sufficient notice; and that it comports with the requirements of due process;

3. Approve the method set forth in the settlement agreement for distributing the monetary relief available thereunder;

4. Reserve exclusive and continuing jurisdiction over the settlement and any disputes regarding it;

5. Direct that a final judgment of dismissal be entered between the plaintiffs and defendants; and

6. Confirm the foregoing named plaintiffs as class representatives and Hagens Berman Sobol Shapiro LLP and Pearson, Simon & Warshaw, LLP as class counsel?

## III.   STATEMENT OF RELEVANT FACTS

### A.   Background facts

In November 2011 news broke in the technical and mainstream press regarding the presence of Carrier iQ software and its apparent activity on mobile devices.  (Third Consolidated Amended Complaint (Dkt. No. 402) ("TCAC"), ¶ 39.)  These reports centered on research and Internet videos published by an independent security researcher named Trevor Eckhart.  (*Id.*, ¶ 40.)  Mr. Eckhart's YouTube video focused on his HTC mobile telephone.  (*Id.*, ¶ 45.)  His video appeared to show troubling activity associated with Carrier iQ Software on his device, including

1   the interception and logging of SMS text message content and Internet search terms, among other

2   communications.  (*Id.*)

3          Concerns arose that the content of consumers' private electronic communications was being

4   captured and transmitted off users' devices to unintended third-party recipients.  (*Id.*, ¶ 46.)  Soon

5   Congress, particularly U.S. Sen. Al Franken, became involved.  (*Id.*, ¶ 47.)  On December 1, 2011,

6   Sen. Franken sent letters to defendant Carrier iQ, certain wireless carriers, and three of the device

7   manufacturers that are defendants here.  (*Id.*)  All had responded by the end of that year, providing

8   more insight into the design and workings of Carrier iQ Software.  (*Id.*, ¶¶ 51-58.)

9   **B.     Plaintiffs' claims**

10          By the end of 2011, consumers around the country had filed tens of proposed class-action

11   suits against Carrier iQ and several device manufacturers.  In April 2012 the J.P.M.L. consolidated

12   all of the federal suits in the Northern District of California and appointed the Hon. Edward M. Chen

13   as the MDL judge.  Thereafter, the Court appointed the Hagens Berman and Pearson Simon &

14   Warshaw firms as interim co-lead counsel.  (Dkt. No. 100.)  (Hereafter, plaintiffs refer to these firms

15   as class counsel, following their appointment as such in the Court's order granting preliminary

16   approval of the settlement.  (Dkt. No. 421 ("Prelim. Appr. Order"), ¶ 7.))

17          In August 2012, plaintiffs in the MDL proceedings filed their First Consolidated Amended

18   Complaint, Dkt. No. 107, alleging six counts against the instant defendants.  Plaintiffs dropped one

19   of these counts in their June 2014 Second Consolidated Amended Complaint.  (Dkt. No. 291.)  Last,

20   plaintiffs filed their Third Consolidated Amended Complaint, in which they amended and re-asserted

21   their Federal Wiretap Act ("FWA") claim against the manufacturer defendants.  The Court had

22   dismissed this claim without prejudice in January 2015.  (*See* MTD Order (Dkt. No. 339) at 41-45.)

23   **C.     Proceedings to-date**

24          In September 2012 the parties exchanged initial disclosures.  Next, in November 2012,

25   defendants filed a motion to compel arbitration.  (Dkt. No. 129.)  Each defendant (except for

26   Motorola) sought to invoke the arbitration provisions in plaintiffs' contracts with their wireless

27   carriers on a theory of equitable estoppel.  (*See generally id.*)

28

1     The Court allowed arbitration-related discovery, which was contentious but productive.  In

2 addition to serving discovery on all moving defendants, plaintiffs sought discovery from their

3 wireless carriers, as well as from Google.  (*See* Declaration of Robert F. Lopez in Support of

4 Motion for Preliminary Approval (Dkt. No. 404) ("Lopez Prelim. Appr. Decl."), ¶ 4.)  Discovery

5 proceedings involved motions practice and follow-up efforts, including a detail-oriented, in-person

6 meeting in San Francisco among counsel for the many parties.  (*Id.*, ¶ 5.)  Ultimately, all targets

7 produced material to the plaintiffs, the total of which was voluminous, and counsel reviewed and

8 analyzed it.  (*Id.*)

9     In February 2014, following the completion of arbitration-related discovery, the parties

10 completed briefing on defendants' arbitration motion.  Following a lengthy, in-depth hearing, the

11 Court on March 28, 2014, denied defendants' motion.  (Dkt. No. 251.)

12     On April 28, 2014, defendants served notices of appeal.  (Dkt. No. 261.)  Defendants then

13 moved the Court for a stay.  Following briefing and a hearing, the Court on June 13, 2014, denied that

14 motion without prejudice.  (Dkt. No. 285.)  In January 2015, defendants-appellants filed their 80-page

15 opening brief.  Though stayed by mutual agreement, their appeal remains pending.  (Lopez Prelim.

16 Appr. Decl., ¶ 6.)  If the appeal were successful, plaintiffs' claims would be referred to arbitration on

17 individual bases.

18     In July 2014, following denial of their motion to stay, all defendants moved to dismiss

19 plaintiffs' complaint.  (Dkt. No. 304.)  Briefing was completed in early September 2014, Dkt. Nos.

20 309 and 311, and a hearing was held later that month.  In January 2015, the Court issued its order

21 granting in part and denying in part defendants' motion.  (*See generally* MTD Order.)  Among the

22 claims the Court dismissed was plaintiffs' FWA claim against the manufacturer defendants.

23     Thereafter, the parties agreed to private mediation.  In advance of mediation, the Court

24 permitted plaintiffs ADR-related discovery.  Plaintiffs propounded written discovery to all

25 defendants, and all defendants responded.  Plaintiffs' counsel reviewed and analyzed the answers

26 and material that defendants produced.  (Lopez Prelim Appr. Decl., ¶ 7.)

27     In sum, during the pendency of this case, class counsel have conferred with consulting

28 experts; conducted extensive factual and legal research; and reviewed and analyzed discovery

1    answers, responses, and documents produced by the defendants and by non-parties Google, AT&T

2    Mobility, Cricket, and Sprint.  (Lopez Prelim. Appr. Decl., ¶ 8; Declaration of Daniel L. Warshaw

3    in Support of Motion for Preliminary Approval (Dkt. No. 405) ("Warshaw Prelim. Appr. Decl."), ¶

4    4.)  Additionally, class counsel requested, and defendant Carrier iQ provided, information

5    regarding Carrier iQ's financial condition and its ability to satisfy a judgment in this case, as well

6    as its ability to contribute funds to settle this matter.  Class counsel reviewed and analyzed the

7    financial data provided by Carrier iQ as part of the process of reaching the instant settlement.

8    (Lopez Prelim. Appr. Decl., ¶ 9.)

9    **D.      The settlement**

10        **1.      Mediation**

11        For their means of alternative dispute resolution, the parties agreed to JAMS mediation

12   before the Hon. James Larson (U.S.M.J. Ret.).  The first all-day mediation occurred in San

13   Francisco on November 12, 2014.  (Lopez Prelim. Appr. Decl., ¶ 10.)  Four more all-day sessions

14   occurred in San Francisco on December 16, 2014; March 17, 2015; April 27, 2015; and

15   September 28, 2015.  (*Id.*)  These sessions were conducted with the aid of mediation briefing.  (*Id.*)

16   Each mediation session was contentious, and several sessions went well beyond eight hours.  (*Id.*,

17   ¶ 11.)  During these sessions, all parties repeatedly and strongly insisted on the righteousness of

18   their positions while attempting to reach a principled and reasonable settlement.  (*Id.*)  The parties

19   continued their negotiations following each mediation session, sometimes with the aid of Judge

20   Larson.  (*Id.*)

21        **2.      Settlement class definition, class period, and claims period**

22        Plaintiffs first reached terms of a proposed nationwide settlement with defendant Carrier

23   iQ, and those parties notified the Court of their agreement on November 3, 2014.  (Dkt. No. 322.)

24        Plaintiffs and the remaining defendants reached broad agreement on a proposed nationwide

25   settlement at their September 28, 2015, mediation session.  They advised the Court of their

26   agreement on October 8, 2015.  (Dkt. No. 391.)

27

28

The parties' agreement defines the Settlement Class as:

> [a]ll persons in the United States who, during the Class Period, purchased, owned, or were an Authorized User of, any Covered Mobile Device.

(Amended Stipulation of Settlement and Release (Dkt. No. 419) ("Settlement Agr."), ¶ 2.oo.)  The Class Period is defined as "that period of time between December 1, 2007 and the date of entry of the Court's order granting preliminary approval of the Settlement."  (*Id.*, ¶ 2.o.)  The agreement defines an Authorized User as "a person authorized by name on the Wireless Provider account for a Covered Mobile Device during the Class Period."[1]  (*Id.*, ¶ 2.d.)  "Authorized User" also means "a person who, during the Class Period, purchased or owned a Covered Mobile Device identified on the Wireless Provider account of another person (such as the Wireless Provider account of a family member or spouse) by the telephone number assigned to it."  (*Id.*)  The Claims Period is defined as the "period of time that expires 60 days from the date of Class Notice."  (*Id.*, ¶ 2.i.)

### 3.    Relief to the settlement class

#### a.    Monetary relief

Plaintiffs, based on discovery and analysis, have estimated the nationwide settlement class to consist of some 79 million members—though this approximation is equal to the approximate number of covered devices.  (Lopez Prelim. Appr. Decl., ¶ 12; Declaration of Kenneth Jue on Behalf of Settlement Administrator ("Jue Settl. Admin. Decl."), ¶ 6 (explaining that, statistically speaking, the number of unique individuals in the class is presently estimated to be 30 million); Declaration of Daniel L. Warshaw in Support of Motion for Final Approval ("Warshaw Final Appr. Decl."), ¶ 3 (further explaining the same).)  The settlement provides for a gross settlement fund of $9 million in monetary relief to the proposed settlement class.  (Lopez Prelim. Appr. Decl., ¶ 13.)

The settlement agreement provides that proceeds payable to the class are net of: the cost of notice and administration; service awards, if approved, to named plaintiffs; attorneys' fees, costs,

---

[1] "Wireless Provider" means "AT&T Mobility, Cricket, Sprint, or T-Mobile."  (*Id.*, ¶ 2.qq.) "Covered Mobile Device" means "a telephone or tablet manufactured or marketed by any Manufacturer Defendant that was equipped with Carrier IQ software at the time of sale to end users of the Covered Mobile Device."  (*Id.*, ¶ 2.q.)

and expenses as specified (if approved); and any taxes.  (Settlement Agr., ¶¶ 25-27.)  (On May 13, 2016, plaintiffs filed their motion for named-plaintiff service awards and attorneys' fees, costs, and expenses.  (Dkt. No. 424.).)

With respect to the funds directly available to class members, the settlement is claims-made in nature.  (Settlement Agr., ¶ 28.)  Per the terms of the settlement agreement, and following the Court's preliminary approval order, class members submitted claims during the claims period for a pro-rated share[2] of the net settlement fund.[3]  (*Id.*)  The settlement administrator set up the mechanism by which to accept claims electronically via the settlement website, as well as via U.S. mail, fax, and email.  (Jue Settl. Admin. Decl., ¶¶ 3, 6.)  Also, the settlement administrator set up a program to answer frequently asked questions regarding the settlement.  (*Id.*, ¶ 5.)

The agreement also provides that in the event the net settlement fund were to be subscribed to the point that qualified class-member claimants would receive less than approximately $4 per claimant, then, after consultation among class counsel and defendants' counsel, and after notice to, and approval by, the Court, the entire net settlement fund would be donated in three equal shares to three *cy pres* recipients with national reach and reputations—the Electronic Frontier Foundation ("EFF"), the Center for Democracy and Technology, and CyLab Usable Privacy and Security Laboratory at Carnegie Mellon University[4]—each of which is an established guardian of, and

---

[2] "[P]ro rata distributions are 'cost-effective, simple, and fundamentally fair.'  *High-Tech* [*Employee Antitrust Litig.*], 2015 WL 5159441, at *8 [(N.D. Cal. Sept. 2, 2015)] (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997)); *see also In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 404 (D.N.J. 2006) (finding pro rata distribution 'eminently reasonable and fair to the class members')."  *Perkins v. Linkedin Corp.*, 2016 WL 613255, at *9 (N.D. Cal. Feb. 16, 2016).

[3] Courts routinely approve class action compromises that require class members to submit a claim form to obtain settlement benefits.  *See, e.g.*, *Shames v. Hertz Corp.*, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012) (courts "routinely approve claims made settlements"); *Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 544 (W.D. Wash 2009); *Morales v. Stevco, Inc.*, 2012 WL 1790371, at *4 (E.D. Cal. May 16, 2012) ("To receive a settlement share from the Net Settlement Fund, a class member was required to submit a timely and valid claim form. . . .  Settlement shares will be calculated on a pro-rata basis . . . ."); *Gascho v. Global Fitness Holdings, LLC*, 2014 WL 1350509, at *9 (S.D. Ohio Apr. 4, 2014).  The use of a claim form here is particularly appropriate because the claim form was simple to fill out and easy to submit.  *Pelletz*, 255 F.R.D. at 544.

[4] The parties have not discussed the possibility of *cy pres* donations with any of these three potential recipients, nor do the parties suggest that any of these three potential recipients endorse their Settlement.

advocate for, consumer privacy interests such as those at stake in this litigation.  (*Id.*, ¶ 28; *see also* Lopez Prelim. Appr. Decl. Ex. B.)

But in fact, the net settlement was not subscribed to the point that there is a need to seek *cy pres* distributions of the net fund.[5]  Rather, with the caveat that the settlement administrator is currently processing and determining the eligibility of claims, it is presently estimated that the amount to be distributed per eligible, timely claim is approximately $148.85.[6]  (Jue Settl. Admin. Decl., ¶ 7.)

### b.   Non-monetary relief

Additionally, Carrier iQ agreed, prior to the acquisition of its assets by AT&T Mobility IP, LLC, to provide certain injunctive relief to the proposed class.  (*Id.*; Settlement Agr., ¶¶ 18-21.)

This relief includes a revision to the way in which Carrier iQ receives instructions, such that the same port as that used for SMS text messages need not be used.  (Settlement Agr., ¶ 19.)  It also includes a revision to metrics relating to URLs, such that: (a) profiles written for the collection of URLs would truncate the collected URL to exclude query strings embedded in URLs; and (b) Carrier iQ would enable collection of HTTP URLs for its U.S. carrier customers only when one or both of the following two conditions are met: i. the device from which the data is collected is in a data session on that carrier's data network; or ii. the carrier demonstrates to Carrier iQ that consumers would receive a secondary form of notice that URL data may be collected when the device is not in a data session on the carrier's network.  (*Id.*, ¶ 20.)  And it includes guidance to device manufacturers in Carrier iQ's Integration Training and Porting Guides regarding the disablement prior to shipment of logging functions that the manufacturer might have used to debug software installations.  (*Id.*, ¶ 21.)  Finally, Carrier iQ assured that it had fully remediated a software bug "that created the potential for collection of non-human-readable, encoded SMS

---

[5] The agreement also provides that any leftover funds following payments to qualified claimants (*e.g.*, the value of uncashed checks) will be split among those three *cy pres* recipients. (Settlement Agr., ¶ 32.)

[6] As Mr. Jue explains, if 2,467 otherwise eligible but untimely claims (claims received after June 4, 2016 through June 20, 2016) are included, the dollar amount per claim would be approximately $139.53.  Again, this is a present estimate as the settlement administrator continues to work to process and validate claims.

content in level 3 radio data during certain error conditions." (*Id.*, ¶ 22.)  It also created "testing

protocols to prevent similar bugs in future deployments." (*Id.*)  As part of the settlement

agreement, Carrier iQ warranted that it had performed as agreed prior to its asset sale. (*Id.*, ¶¶ 18

and 67.b.)

Class counsel, in consultation with plaintiffs' Executive Committee, have endorsed the

value of this settlement.  (Lopez Prelim. Appr. Decl., ¶ 14; Warshaw Prelim. Appr. Decl., ¶ 6.)  So

do all named plaintiffs.  (Lopez Prelim. Appr. Decl., ¶ 14; Warshaw Prelim. Appr. Decl., ¶ 6.)

### 4.    Notice, opt-out procedures, and release

The settlement agreement provides for robust notice.  (Warshaw Prelim. Appr. Decl., ¶¶ 7-

8; Declaration of Alan Vasquez Regarding Dissemination of Notice (Dkt No. 407) ("Vasquez

Prelim. Appr. Decl."), ¶¶ 13-28 and Ex. 4.)  Given the size of the class; the fact that the parties did

not have access to direct contact information for class members; the inability to obtain such

information; and the projected cost to notify class members directly even if direct contact

information were available, the notice program upon which the parties agreed, with expert

assistance and endorsement, not only comports with due process, but is the best notice practicable

under the circumstances.  (Warshaw Prelim. Appr. Decl., ¶¶ 7-8; Declaration of Tyler Newby in

Response to Order re Supplemental Briefing and/or Evidence (Dkt. No. 411-2) ("Newby Supp.

Decl."), ¶¶ 2-6.)  Accordingly, it was approved preliminarily by the Court, which ordered that it be

effected.  Prelim. Appr. Order, ¶ 10.

As attested and discussed in the notice-implementation declaration submitted with this

memorandum, the program was in fact put into action as ordered, with real-time monitoring and

enhancements along the way.  (*See* Declaration of Alan Vasquez Regarding Implementation of

Notice Dissemination Plan[7] ("Vasquez Impl. Decl."), ¶¶ 12-21.)  It called for print notice in the

broadly circulated *USA Today* and *People* publications, in addition to intensive Internet notice via

banner ads and search-related advertising.  All avenues of publicity were selected and administered

---

[7] Prior to the final approval hearing, the settlement administrator may file a supplemental
affidavit confirming that notice has been provided as set forth in the settlement agreement and
ordered by the Court.  Prelim. Appr. Order, ¶ 18(e).

1    in consultation with class counsel by an expert notice provider (and overall settlement

2    administrator), Gilardi & Co. LLC.  (Settlement Agr. Ex. B; Warshaw Prelim. Appr. Decl., ¶ 7; *see*

3    *also* Vasquez Impl. Decl., ¶¶ 7-21.)

4         Further, the settlement administrator established a settlement website,

5    www.carrieriqsettlement.com, where notice of the settlement and key documents were made

6    available, including the long- and short-form notices.  (Jue Settl. Admin. Decl., ¶ 2.)  Additionally,

7    class counsel's websites were to, and did, include links to this website.  (Warshaw Prelim. Appr.

8    Decl., ¶ 7; Vasquez Prelim. Appr. Decl., ¶ 27; Warshaw Final Appr. Decl., ¶ 4.)  Also, the parties

9    were to, and did, issue a joint press release advising of the settlement.  (Warshaw Prelim. Appr.

10   Decl., ¶ 7; Vasquez Prelim. Appr. Decl., ¶ 26 and Ex. 8; Vasquez Impl. Decl., ¶ 20.)  This

11   engendered free media publicity for the settlement.  (Vasquez Impl. Decl. Ex. 10.)

12        The long-form notice, which was modified pursuant to the Court's order and the parties'

13   agreement prior to dissemination, set forth the material terms of the settlement and the procedures

14   that class members were to follow in order to receive settlement benefits.  (*Id.*, ¶ 10; Declaration of

15   Alan Vasquez in Response to Order re Supplemental Briefing (Dkt. No. 411-3), ¶¶ 18-19.)  The

16   notice also described the procedures for class members to exclude themselves from the settlement

17   or to provide comments in support of or in objection to it.  (Vasquez Impl. Decl., ¶ 10.)

18        Any class member who wished to be excluded from the settlement needed only to opt out

19   by making a request by June 4, 2016, in accordance with the Court's preliminary approval order.

20   (*See id.*)  The procedures for opting-out were those commonly used in class-action settlements;

21   they were straightforward and plainly described in the class notice.  As for the short-form notice, it

22   provided a summary of the foregoing.  (*Id.* Ex. 3.)

23        Additionally, the settlement agreement provides that if opt-outs were to exceed a

24   confidential number,[8] then any defendant, with the agreement of two other defendants, would have

25   the option to terminate the settlement or to continue under it with no variations to its terms.

26   (Settlement Agr., ¶ 51.)  Plaintiffs filed a confidential supplemental agreement setting forth the opt-

27   _____

28        [8] *See* n.17, *infra*.

NOTICE OF MOT. AND MOT. FOR FINAL APPROVAL – 10
Case No. C-12-md-2330-EMC
010285-11  881280 V1

1    out number under seal, as permitted by the Court. (Dkt. No. 416.) But in fact, the number of opt-

2    outs submitted by the opt-out deadline was far less than the number specified in the opt-out

3    agreement, such that defendants cannot use it to extract themselves from the settlement. (Warshaw

4    Final Appr. Decl., ¶ 5; Jue Settl. Admin. Decl., ¶ 7.)

5          Finally, if the Court grants final approval of the settlement following notice, then all class

6    members who have not properly excluded themselves from the settlement will be deemed to have

7    released all covered claims, as defined in the settlement agreement, against all defendants.

8    (Settlement Agr., ¶ 53.)

9        **5.**      **Service awards and attorneys' fees, costs, and expenses**

10          The parties agreed that named plaintiffs would receive, if plaintiffs' request were approved

11    by the Court, an award of no more than $5,000 each for his or her service in this matter.[9]  (*Id.*, ¶ 36.)

12    Again, plaintiffs moved for service awards to the named plaintiffs on May 13, 2016. (Dkt. No. 424.)

13          As for plaintiffs' attorneys' fees, costs, and expenses, the parties addressed the recovery of

14    these following negotiation of the substantive terms of the settlement. (Settlement Agr., ¶ 16.)

15    Regarding attorneys' fees specifically, the parties agreed that class counsel could request (and

16    distribute) the Ninth Circuit benchmark of 25% of the net settlement fund by way of a separate

17    motion.[10]  (Settlement Agr., ¶ 37.)  Again, plaintiffs moved accordingly, Dkt. No. 416, and in their

18    motion and supporting papers advised the Court of the significant negative multiplier to lodestar

19    that resulted from application of the 25% cap.

20

21        [9] *See*, *e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947-48 (9th Cir. 2015)

22    (approving $5,000 incentive awards where class members would receive $12); *Weeks v. Kellogg Co.*, 2013 WL 6531177, at *3, 34-37 (C.D. Cal. Nov. 23, 2013) (approving incentive awards of

23    $5,000 per named plaintiff, where settlement provided for recovery by class members of $5 per box of cereal purchased during the class period, up to a maximum of $15 per class member, all subject

24    to proportional reduction if all eligible claims exceeded the settlement fund); *see also Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *31-37 (N.D. Cal. Apr. 1, 2011) (making $5,000

25    service awards to 20 named plaintiffs "where average award to class members was $207.69").

26        Also, with respect to class relief, none of the named plaintiffs were to (or will) receive anything more from the settlement than any other class member.  Instead, they only are entitled to the same

27    relief, subject to the same conditions, as their peers in the class.  (*Id.*)

        [10] Interim co-lead counsel previously had proposed to limit their request to the 25% benchmark.

28    (Dkt. No. 108 at 5.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.      ARGUMENT

### A.       The Court should grant final approval of the settlement.

Approval of a class-action settlement proceeds through two stages: preliminary approval and final approval (with notice in-between).  *See* MANUAL FOR COMPLEX LITIGATION § 13.14, at 173 (4th ed. 2004)[11] ("This [approval of a settlement] usually involves a two-stage procedure. First, the judge reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing.  If so, the final decision on approval is made after the hearing."); *see also id*., § 21.632, at 320 ("Review of a proposed class action settlement generally involves two hearings.  First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. . . .") (footnote omitted); Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 11.25, at 38-39 (4th ed. 2002) (discussing the two-step approval process).  Now that that the Court has granted preliminary approval and the settlement administrator has disseminated notice in accordance with the Court's order, it is time to consider plaintiffs' request for final approval.

Settlements are to be encouraged in class-action lawsuits.  The Court, however, in deciding whether to approve a compromise must examine "whether [the] proposed settlement is 'fundamentally fair, adequate, and reasonable.'"  *Burden v. SelectQuote Ins. Servs.*, 2013 WL 1190634, at *2 (N.D. Cal. Mar. 21, 2013) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998))).  The instant settlement passes that test, making available millions of dollars of relief for claims that would face a myriad of credible substantive and procedural defenses if litigated to the end.  (*See generally*, *e.g.*, Joint Response to Order Re Supplemental Briefing and/or Evidence (Dkt. No. 411) ("Joint Response") at 8-17; Plaintiffs' Memorandum in Response to Court's Order of February 16, 2016 (Dkt. No. 418) ("Pls' Supp. Memo.") at 6-9.)

As the Ninth Circuit has stated, "there is an overriding public interest in settling and quieting litigation.  This is particularly true in class action suits. . . ."  *Franklin v. Kaypro Corp.*,

---

[11] Hereafter, MANUAL FOR COMPLEX LITIG.

884 F.2d 1222, 1229 (9th Cir. 1989) (citing *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976)); *see also Churchill Village, L.L.C. v. GE*, 361 F.3d 566, 576 (9th Cir. 2004); *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *3 (N.D. Cal. Mar. 18, 2013) ("The law favors the compromise and settlement of class action suits."). Settlement is desirable in class action suits because they are "an ever increasing burden to so many federal courts and [] frequently present serious problems of management and expense." *Van Bronkhorst*, 529 F.2d at 950.

Additionally, courts should give "proper deference" to a parties' settlement. "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (quotations omitted); *see also Chavez v. WIS Holding Corp.*, 2010 U.S. Dist. LEXIS 56138, at *4 (S.D. Cal. June 7, 2010) ("The Court gives weight to the parties' judgment that the settlement is fair and reasonable.") (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).

## 1. The settlement meets the standards for final approval.

### a. The settlement is the product of well-informed, vigorous, and thorough arm's-length negotiation.

In contemplating final approval of a class settlement, one of the Court's duties is to ensure that "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties . . . ." *Hanlon*, 150 F.3d at 1027 (internal quotes and citations omitted). As set forth above, the settlement in this matter was achieved only after much investigation; research; formal and informal discovery; analysis; consultation; critical motions practice; five all-day, in-person mediation sessions with a retired federal magistrate judge; and much arm's-length negotiation beyond that. (Lopez Prelim. Appr. Decl., ¶¶ 8-11.) Further, the parties in this matter were represented throughout by attorneys with extensive experience in class-action and consumer litigation. (Lopez Prelim. Appr. Decl., ¶¶ 16-17 and Ex. C; Warshaw Prelim. Appr. Decl., ¶¶ 9-15

and Ex. A; *see also* Dkt. Nos. 427-430 (Executive Committee member declarations setting forth their experience and attaching resumes).)  Again, these experienced counsel endorse the settlement reached on behalf of the class.  (Lopez Prelim. Appr. Decl., ¶ 14.)

Because of their history with this matter, and their experience, plaintiffs' counsel were well situated to evaluate the strength and weakness of plaintiffs' case.  Far from being the product of anything inappropriate, the settlement at issue is the result of long, hard-fought, and adversarial work, such that it is worthy of final approval by the Court.  *Cf. Hanlon*, 150 F.3d at 1027 (no basis to disturb settlement where there was no evidence suggesting that the settlement was negotiated in haste or in the absence of information).

### b.       The settlement is fair, adequate, and reasonable.

Rule 23(e) requires a district court to ensure that a proposed class action settlement is fair, adequate, and reasonable.  *E.g.*, *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[T]he universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable.") (citations omitted).  In assessing whether a settlement is fair, adequate, and reasonable, the court must weigh a number of factors, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Village*, 361 F.3d at 575; *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("This list is not exclusive and different factors may predominate in different factual contexts.") (citing *Officers for Justice*, 688 F.2d at 625).  Consideration of these factors supports final approval of the settlement.

*First, second, third, fifth, and sixth factors*.  Plaintiffs pled a set of claims against defendants based on state and federal wiretapping and privacy statutes; federal and state warranty acts; and state consumer protection acts.  They also engaged, and conferred with, consulting experts as needed. (Lopez Prelim. Appr. Decl., ¶ 8; Settlement Agr., ¶ 8.)  To reiterate, their counsel have extensive experience in consumer class actions, and they deployed the resources necessary to prosecute this case

1   well.  Having conducted discovery as described, and having studied and analyzed carefully the

2   material produced, including with the assistance of consultants, they were poised to proceed based on

3   the liability and damages theories they had developed.  (Lopez Prelim. Appr. Decl., ¶ 8; Joint

4   Response at 3-8.)

5          Nonetheless, all litigation bears risks, and defendants were armed with steely commitment and

6   represented by highly skilled and well-experienced counsel who repeatedly articulated what they

7   perceived as grave weaknesses in plaintiffs' case.  (Joint Response at 8-17; Pls' Supp. Memo. at 6-10.)

8   Defendants pledged repeatedly that if this matter were litigated further, there would be yet another

9   motion to dismiss; then a vigorous opposition to class certification; then dispositive motions; and

10  following that, if needed, strong defenses at trial.  (*See generally* Pls' Supp. Memo.)  This was not all

11  bluster; plaintiffs had to take into account the Court's thorough opinion on defendants' first motion to

12  dismiss.  (*E.g.*, *id.* at 5.)  They also had to take into account their own analysis of the risks attendant to

13  their flagship FWA claim, including not only as to liability but as to damages, too.  (*E.g.*, *id.* at 6-7.)

14  Additionally, they had to consider the facts as they had come to know them following their further

15  investigation, discovery, expert consultation, events following the initial reports of late 2011, and their

16  considered research and analyses.  (*See generally id.*)  They also had to consider the financial

17  conditions of two of the defendants, Carrier iQ and Pantech Wireless.  (*Id.* at 9.)  And they had to

18  factor in defendants' still-pending appeal to the Ninth Circuit of the Court's decision on defendants'

19  arbitration motion, which had the potential to kill the entire class case.  (Joint Response at 14-15.)

20         *Fourth factor*.  But with the aid of Judge Larson as mediator, and through preparation and

21  perseverance, plaintiffs achieved a settlement that offers benefits to the class well in excess of $9

22  million in value.  This is a fine real-world result when weighed against the strengths and challenges

23  of plaintiffs' case, *see generally*, *e.g.*, Pls' Supp. Memo, and one to which defendants at the

24  inception of this case would never have agreed.  *Cf.*, *e.g.*, *In re Google Referrer Header Privacy*

25  *Litig.*, 87 F. Supp. 3d 1122, 1130-31 (N.D. Cal. 2015) (granting final approval of settlement with

26  $8.5 million to 129 million member class); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7

27  (granting final approval of settlement with $9 million to 62 million class members); *Fraley v.*

28

1   *Facebook, Inc.*, 966 F. Supp. 2d 939, 949 (N.D. Cal. 2013) (granting final approval of settlement

2   with $20 million to 124 million class members).

3       *Seventh factor.*  Further, while there were no government participants in this action, the

4   U.S. attorney general, and the District of Columbia and state attorneys general, were notified of

5   this settlement,[12] and none has objected.  (Jue Settl. Admin. Decl., ¶ 2.)  This, too, speaks to the

6   fairness, reasonableness, and adequacy of the parties' settlement, especially given the notoriety of

7   this case.

8       *Eighth factor*.  As for the reaction of class members, the settlement administrator has

9   advised that it has received 57,245 timely claims (*i.e.*, claims received by the June 4, 2016 claims

10  deadline), and 3,225 untimely claims (claims received after June 4, 2016 through June 20, 2016).

11  (Jue Settl. Admin. Decl., ¶ 6.)  Including untimely claims, this works out to a claims rate of 0.08%

12  if a 79 million member class is assumed or 0.20% if a 30 million member class is assumed.[13]  (*Cf.*

13  Jue Settl. Admin. Decl., ¶ 6 *with* Warshaw Final Appr. Decl., ¶ 3.)  Both calculated claims rates are

14  well within the rates experienced in other claims-made cases.  (Jue Settl. Admin. Decl., ¶ 6.)

15       Furthermore, only four individuals opted out by the published deadline of June 4, 2016.

16  (Jue Settl. Admin. Decl., ¶ 10.)  This represents 0.000005% of the estimated class members if 79

17  million class members are assumed and 0.0000133% if 30 million class members are assumed.

18  Also, only three objections[14] were received, *id.*, ¶ 11, representing 0.0000037% of the estimated

19  class members if 79 million class members are assumed and 0.00001% if 30 million class members

20  are assumed.  (*Id.*, ¶ 8; Warshaw Final Appr. Decl., ¶ 6.)  All three objections were submitted by

21  *pro se* individuals, each of whom is an attorney (or, in the case of one of them, someone who may

22  or may not be an attorney at this time), and two of whom are serial objectors.  Plaintiffs will

23  address each objection in detail in their brief due to be filed on July 14, 2016.  Prelim. Appr. Order,

24

25      [12] Notice was provided pursuant to 28 U.S.C. § 1715(b).  (Jue Settl. Admin. Decl., ¶ 2.)

26      [13] As Mr. Jue explains in his declaration, it is statistically more likely that there were
    closer to 30 million class members, stated in terms of unique individuals, given the turnover in
    devices.  (Jue Settl. Admin. Decl., ¶ 6.)

27      [14] There is a fourth "objection" referenced at Dkt. No. 423 (and in Mr. Jue's declaration), but it
28  is not truly an objection.

¶ 18(f).  But the paucity of opt-outs and objections speaks to a positive class reaction to the settlement, further supporting its final approval.  *E.g.*, *Churchill Village*, 361 F.3d at 577 (affirming approval of settlement where 45 of 90,000 class members objected to the settlement and 500 class members opted out); *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *3 (N.D. Cal. Sept. 2, 2015) (finding indicia of approval where 11 class members out of 64,466 submitted objections and where less than 0.9% opted out).

**B.      The notice program was extensive, exceeded precedent, and satisfied applicable standards.**

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise . . . .'"  MANUAL FOR COMPLEX LITIG. § 21.312, at 293.  In order to protect the rights of absent class members, the Court must direct the best notice practicable to class members.  *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-75 (1974).  Notice by publication is the best notice practicable when parties cannot reasonably identify individual class members.  *E.g.*, *Gallucci v. Gonzalez*, 603 F. App'x. 533, 535 (9th Cir. 2015).  Parties cannot reasonably identify class members when they have no access to contact information.  *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (court approved notice by publication because defendants did not have contact lists of potential class members); *Weeks*, 2013 WL 6531177, at *11 ("Notice to class members in this case was not accomplished through direct mailings because Kellogg does not have the mailing addresses of the consumers who purchased its products through third party retailers.").

Here, the Court ordered such a plan, taking into account that neither plaintiffs nor the defendants had direct contact information for members of the class.  (*See* Newby Supp. Decl., ¶¶ 4-6.)  As the court in *In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 448-49 (C.D. Cal. 2014) (footnotes omitted), wrote:

> Because Toys does not have the mailing addresses of purchasers who used debit or credit cards during the class period, the court approved notice by means of publication and a settlement website.  The parties published notice of the settlement in USA Today on July 9 and 16, 2013.  They also established a website dedicated to the settlement, located at www.ToyrsRUsReceiptSettlement.com, and administered by a third-party settlement administrator, Class Action Administration, Inc. . . .

1

2

3

4

5

6

7

8

9

> When the court certifies a nationwide class of persons whose addresses are unknown, notice by publication is reasonable. *See Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *5-6 (S.D. Cal. Oct. 14, 2010); *see also In re Valdez*, 289 Fed. Appx. 204, 205-06 (9th Cir. 2008) (Unpub. Disp.) ("[I]nstead of requiring individual notice to all class members who can be identified through reasonable effort, [R]ule 23(d)(2) provides only that notice be given 'in a manner as the court may direct.' The sufficiency of such notice is measured 'against the broader standards of due process.' ... Newby has not shown that the district court's order, which required publication of the claims filing deadline in local newspapers for three consecutive weeks, violated due process," citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1126-27 (9th Cir.1977)); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, No. 06-02069 SBA, 2008 WL 1990806, *2 (N.D. Cal. May 5, 2008) ("[N]otice by publication is only used when the identity and location of class members cannot be determined through reasonable efforts"); *In re Tableware Antitrust Litigation*, 484 F.Supp.2d 1078, 1080 (N.D. Cal.2007) ("Because defendants do not have a list of potential class members, the court agrees with plaintiffs that notice by publication is the only reasonable method of informing class members of the pending class action and the Lenox settlement").

10

*See also, e.g., In re Google Referrer Header Privacy Litig.*, 2014 WL 1266091, at *7 (N.D. Cal.

11

Mar. 26, 2014) (approving publication notice plan where the parties did not have direct contact

12

information for class members).

13

Per the notice-implementing declaration submitted by Mr. Vasquez, the plan was

14

implemented as ordered. (*See* Vasquez Impl. Decl., ¶ 8.) To reiterate: traditional publication

15

notice included advertisements printed in the widely circulated USA Today newspaper and People

16

magazine. (*Id.*, ¶¶ 12-14.) Internet notice included text link ads via Google Adwords search-based

17

advertisements and the Google Display Network, generating over 7 million impressions. (*Id.*, ¶¶

18

13-14.) There also were website banner ads resulting in over 271 million impressions. (*Id.*, ¶

19

15.) The administrator's Twitter campaign efforts yielded approximately 2 million additional

20

impressions. (*Id.*, ¶¶ 17-19.) Further, the dedicated settlement website has been viewed by

21

approximately 250,000 visitors to-date. (*Id.*, ¶ 21.) Plaintiffs submit that the notice requirement of

22

Rule 23(3)(1)(B) has been well satisfied.

23

**C.     The proposed class meets the requirements for certification of a settlement class.**

24

In *Amchem Products v. Windsor*, 521 U.S. 591, 620 (1997), the Supreme Court of the

25

United States confirmed the propriety, and recognized the necessity, of settlement class

26

certification in matters such as this one, where class members are identifiable, and where there are

27

relatively small economic damages. As the court put it:

28

> [t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Id.* at 617 (internal quotes and citations omitted).

Here, there is one type of product at issue—mobile devices, mostly mobile telephones, an alleged course of conduct common to all class members, and only economic damages at stake; thus, this is the kind of class action endorsed in *Amchem*.  Without this class action and settlement, most class members would be "without effective strength to bring their opponents into court at all." *Id*.  In a situation such as this, where the proposed class seeks only economic damages (as distinct from a class or classes seeking individualized personal injury and future-injury damages), and where the Court, after careful consideration, already has certified the settlement class conditionally, Prelim. Appr. Order, ¶ 5, final certification of the settlement class is eminently proper.  *E.g.*, *Hanlon*, 150 F.3d at 1019-23.

### 1.    The Rule 23(a) requirements are met.

In order to merit class certification, plaintiffs must show at the outset that the class is so numerous that joinder is impracticable; questions of law or fact are common to the class; the claims of the representative plaintiffs are typical of the claims of the class; and the proposed class representatives will protect the interests of the class fairly and adequately. Fed. R. Civ. P. 23(a). Plaintiffs meet these prerequisites.

### a.    Numerosity

Based on their own investigation, discovery responses, and follow-up representations made by the defendants, class counsel has estimated the class size to be approximately 79,000,000. (Lopez Prelim. Appr. Decl., ¶ 12; *see also* Warshaw Final Appr. Decl., ¶ 3 (explaining that, statistically speaking, there may be approximately 30 million unique individuals in the class).) Accordingly, "joinder of all members is impracticable," to say the least.  Fed. R. Civ. P. 23(a)(1). Thus, the requirement of numerosity is easily satisfied here.  *See, e.g.*, *Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor v. I.N.S.*, 306 F.3d 842, 869 (9th Cir. 2002) (noting that

numerosity requirement has been satisfied in cases involving 39 class members); NEWBERG ON CLASS ACTIONS § 3.5 ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.").

### b.  Commonality

As one court summarized:

> Commonality requires the existence of questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2). Commonality focuses on the relationship of common facts and legal issues among class members. *See, e.g.*, 1 William B. Rubenstein, *Newberg on Class Actions* § 3:19 (5th ed. 2011). Courts construe this requirement permissively. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* In fact, it only takes one common question of fact or law shared between proposed class members to satisfy commonality. *Dukes*, 131 S. Ct. at 2556.

*Marilley v. Bonham*, 2012 WL 851182, at *4 (N.D. Cal. Mar. 13, 2012). The requirement of commonality is satisfied by plaintiffs' allegations.

Among the common questions raised are whether the defendants violated the Federal Wiretap Act and various state privacy laws via the Carrier iQ Software installed on plaintiffs' and settlement class members' mobile devices; whether the defendants violated state consumer fraud laws in the marketing and sale of mobile devices onto which Carrier iQ Software was installed; and whether any defect or defects in the defendants' products caused breaches of the implied warranty of merchantability. (TCAC, ¶ 88.) The Ninth Circuit cited a list of common questions including ones similar to these in *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005), where it found commonality. Plaintiffs have identified numerous questions of law and fact common to the class, such that the requirement of commonality is met.

### c.  Typicality

Typicality is met as well. Indeed, a finding of commonality ordinarily will satisfy the requirement of typicality, too. *Barefield v. Chevron U.S.A., Inc.*, 1987 WL 65054, at *5 (N.D. Cal. Sept. 9, 1987).

Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims or defenses of the class." [] "The purpose of the typicality

1    requirement is to assure that the interest of the named representative aligns with the
2    interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 408 (9th Cir. 1992).

3    *Burden*, 2013 WL 1190634, at *5 (citation omitted).  Here, the interests of the named plaintiffs and

4    class members align neatly.

5           Plaintiffs have the same claims as members of the class they seek to represent, and they

6    must satisfy the same legal elements that class members must satisfy, including with respect to

7    their FWA claims as amended and re-pled in the TCAC.  (*See* TCAC, ¶¶ 93-103.)  They share

8    identical legal theories with their fellow settlement class members, based on allegations that the

9    defendants marketed and sold products that breached their privacy and that bore defects as they

10   have identified them.  (TCAC, ¶¶ 61-74.)  Their injuries are the same, too; like others in the

11   proposed class, plaintiffs allege that their privacy was breached, or their data and communications

12   left susceptible to breach, leading to their claims for statutory damages, and they allege

13   overpayment for products that allegedly bore latent defects.  (TCAC, ¶¶ 105, 119.)  Thus, Rule

14   23(a)(3) is satisfied.

15                     **d.     Adequacy**

16          Finally, it must be determined whether the named plaintiffs "will fairly and adequately

17   represent the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "In making this determination, courts

18   must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of

19   interest with other class members and (2) will the named plaintiffs and their counsel prosecute the

20   action vigorously on behalf of the class?'"  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015,

21   1031 (9th Cir. 2012) (citation omitted).  Plaintiffs answer both of these questions in the affirmative

22   and, therefore, meet this requirement as well.

23          First, plaintiffs' claims are co-extensive with members of the putative class.  All have an

24   identical interest in establishing the defendants' liability, and each has been injured in the same

25   manner.  All assert the same legal claims, and all seek identical relief.  There is no conflict among

26   them.

27          Also, each named plaintiff agreed to assume the responsibility of representing the class, and

28   each has made him- or herself available to do so, including by way of assisting with the drafting of

complaints, helping to prepare initial disclosures, preparing declarations with counsel in opposition to defendants' motion to compel arbitration, consulting with counsel during the course of this litigation, monitoring the course of this case, and consulting with counsel regarding proposed terms of settlement.  (*See* Lopez Prelim. Appr. Decl., ¶ 15; *see also generally* Dkt. Nos. 431-447 (named plaintiff declarations).)

Second, as discussed and referenced in the declarations of counsel and as illustrated in the resumes attached thereto, plaintiffs' lawyers, including class counsel, have extensive experience and expertise in prosecuting complex class actions, including commercial, consumer, and product defect actions.  (*See* Sec. IV.A.1.a, *supra*.)  Counsel have pursued this litigation vigorously, and throughout they have remained committed to advancing and protecting the common interests of all members of the class.  (Lopez Prelim. Appr. Decl., ¶ 17; Warshaw Prelim. Appr. Decl., ¶ 19.)

Rule 23(a)(4) is satisfied.

**2.      The Court should certify settlement classes pursuant to Rules 23(b)(2) and 23(b)(3).**

Once the prerequisites of Fed. R. Civ. P. 23(a) are satisfied, the Court must determine if one of the subparts of Rule 23(b) also is satisfied.  Here, Rule 23(b)(2) and Rule 23(b)(3) are satisfied.

**a.      Because at least one of the defendants has acted or refused to act on grounds that apply generally to the class, such that class-wide settlement relief is appropriate, the Court should certify a Rule 23(b)(2) settlement class.**

As discussed at Section III.D.3.b of this memorandum, defendant Carrier iQ agreed to significant non-monetary relief that it effected prior to the sale of its assets to AT&T Mobility. (Settlement Agr., ¶¶ 18-21 and 67.b.)  Regarding this relief (monetary relief is addressed under a Rule 23(b)(3) analysis below), Rule 23(b)(2) certification is appropriate as to the proposed class.

"Certification under Rule 23(b)(2) is proper where 'class members complain of a pattern or practice that is generally applicable to the class as a whole,' even if 'some class members may have suffered no injury or different injuries from the challenged practice[.]'"  *E.g.*, *Zepeda v. PayPal, Inc.*, 2015 WL 6746913, at *7 (N.D. Cal. Nov. 5, 2015) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011)).  Further, "[u]nlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2)

1    class.  Rather, only a showing of cohesiveness of class claims is required."  *Id.*, at *7 n.7 (citing

2    *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

3           Here, the non-monetary relief gained by the plaintiffs in settlement has value particularly to

4    those many class members who may or will go on to buy new mobile device onto which Carrier iQ

5    software will be installed.  This relief provides carriers and manufacturers with the tools to avoid

6    issues such as those that gave rise to the instant case.  (*E.g.*, TCAC, ¶¶ 60-73.)  Accordingly, a

7    settlement class as defined in the settlement agreement, Settlement Agr., ¶ 2.oo, can and ought to

8    be certified pursuant to Rule 23(b)(2).[15]  *Cf. Zepeda*, 2015 WL 6746913, at *3-9 (conditionally

9    certifying Rule 23(b)(2) injunctive-relief settlement class alongside a Rule 23(b)(3) monetary-

10   claims settlement class).

11                   **b.      Because common questions predominate, and a class action is the
12                             superior method to adjudicate class members' claims, the Court also
                               should certify a Rule 23(b)(3) settlement class.**

13          Rule 23(b)(3) also is satisfied because questions common to class members predominate

14   over questions affecting only individual class members, and the class action device provides the

15   best method for the fair and efficient resolution of class members' claims.  Although defendants

16   continue to deny that common issues predominate, defendants do not oppose final class

17   certification for purposes of giving effect to the parties' settlement.  When addressing the propriety

18   of class certification, the Court should consider the fact that, in light of the settlement, trial will

19   now be unnecessary, such that the manageability of the class for trial purposes is not relevant to the

20   Court's inquiry.  *E.g.*, *Hanlon*, 150 F.3d at 1021-23.

21                           **(1)      Common questions predominate.**

22          Rule 23(b)(3) requires an examination of whether "questions of law or fact common to the

23   members of the class predominate over any questions affecting only individual members …."

24   "When common questions present a significant aspect of the case and they can be resolved for all

25   members of the class in a single adjudication," class treatment is justified.  *Local Joint Exec. Bd. of*

26   _____

27          [15] While notice is not required for classes certified pursuant to Rule 23(b)(2), *e.g.*, *Zepeda*,
     2015 WL 6746913, at *8 (citing *Dukes*, 131 S. Ct. at 2558), nonetheless, the settlement
28   administrator effected broad notice as ordered by the Court.

1    *Culinary/Bartender Trust Fund. v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).

2    Even one issue of central importance to the case and common to all class member claims can cause

3    class litigation to be appropriate.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th

4    Cir. 1996).  Here, common questions predominate.

5           Common questions include whether defendants' software is a device used to intercept

6    communications in violation of the Federal Wiretap Act; whether the defendants have violated the

7    privacy acts of various states as alleged in the operative complaint; whether the devices on which

8    the software is installed are defective, such that they violate the federal Magnuson-Moss Warranty

9    act and state warranty law as alleged in the complaint; and whether the defendants, by way of the

10   conduct alleged in the complaint, have violated the various state consumer fraud and protection

11   acts identified in the complaint.[16]  (TCAC, ¶ 89.)  These numerous common questions at the heart

12   of this matter predominate over any issues affecting only individuals.  Predominance is established.

13                  **(2)    Class treatment is the superior method for adjudicating claims of members of the proposed class.**

14           As for the requirement in Fed. R. Civ. P. 23(b)(3) that the class action be "superior to other

15   available methods for fair and efficient adjudication of the controversy," class treatment will

16   facilitate the fair and efficient resolution of all settlement class members' claims.  Given that

17   plaintiffs are aware of millions of class members sharing common issues, the class device is the

18   most efficient and fair means of adjudicating all these many claims.  Class treatment is far superior

19   to thousands upon thousands of individual suits or piecemeal litigation; in this matter, it will fulfill

20   its function of conserving scarce judicial resources and promoting the consistency of adjudication.

21   Accordingly, the superiority aspect of Rule 23(b)(3) is readily met.

22   **D.     Objections**

23           In accordance with the Court's order preliminarily approving the settlement, plaintiffs will

24   respond by July 14, 2016, to the three objections.  *See* Prelim. Appr. Order, ¶ 18(f).  As the facts

25   and authorities cited in this memorandum make plain, and as plaintiffs will demonstrate further,

---

[16] These questions persist insofar as permitted by the Court in its MTD Order, and following plaintiffs' amendment of the complaint to assert a revised FWA claim, as allowed by the Court.

1    each objection should be overruled in its entirety.  Thus, plaintiffs ask now and will ask in their

2    July 14, 2016 response that they be rejected.[17]  Also, plaintiffs may move the Court for leave to

3    depose some or all of the objectors regarding standing and other issues pertinent to their objections.

4                                   **V.      CONCLUSION**

5            For all of the foregoing reasons, plaintiffs ask respectfully that the Court grant final

6    approval of the parties' settlement and that it also grant the further relief requested herein.

7            Dated: June 23, 2016.

8                                                  HAGENS BERMAN SOBOL SHAPIRO LLP

9

10                                          By    */s/ Steve W. Berman*
                                                     Steve W. Berman
11                                          Steve W. Berman (*pro hac vice*)
                                            Robert F. Lopez (*pro hac vice*)
12                                          1918 Eighth Avenue, Suite 3300
                                            Seattle, WA  98101
13                                          Telephone:  (206) 623-7292
                                            Facsimile:   (206) 623-0594
14                                          steve@hbsslaw.com
                                            robl@hbsslaw.com
15

16

---

17        [17] For example, contrary to one of the serial objector's contentions, the parties' *in camera*
     submission of the opt-out trigger number did not render notice inadequate.  Indeed, the objector's
18   complaint is moot because the threshold was not reached.  *See In re Online DVD Rental*, 779 F.3d
     at 948 (court affirmed approval of the settlement agreement because the exact threshold was
19   withheld for "practical reasons," and fact that number of opt-outs fell beneath threshold rendered
     any effect on proper notice moot).  But even if the issue were not moot, maintaining the
20   confidentiality of the opt-out threshold is proper because it helps to ensure that settlement proceeds
     are directed to class members and not diverted to other parties.  *See, e.g.*, *Spann v. J.C. Penney
21   Corp.*, 314 F.R.D. 312, 329 (C.D. Cal. Jan. 25, 2016) (court determined that publicizing the
     threshold number could result in the failure of the settlement to become effective or result in funds
22   being unfairly channeled to parties and attorneys who would attempt to manipulate the settlement
     process for their own gain at the expense of the class) (citing *In re Skelaxin (Metaxalone) Antitrust
23   Litig.*, 2015 WL 1486709, at *2 (E.D. Tenn. Mar. 31, 2015)); *Cent. States Group v. AIG Global
     Inv. Corp. (In re Healthsouth Corp. Secs. Litig.)*, 334 F. App'x. 248, 250 n.4 (11th Cir. 2009)
24   (holding that opt-out thresholds are typically kept confidential to "encourage settlement and
     discourage third parties from soliciting class members to opt out").
25
         Furthermore, the opt-out threshold is irrelevant to class members' decision whether to opt out,
26   *e.g.*, *In Re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. 2002), as evidenced by
     the objector's inability to explain how his knowledge of the threshold would help him decide
27   whether or not to opt out.  The opt-out threshold has no bearing on the strength or weakness of any
     claim or defense in the litigation, nor does it affect the amount of money a class member will
28   receive if the settlement is finally approved.

1    PEARSON SIMON & WARSHAW, LLP

2

3    By ____/s/ *Daniel L. Warshaw*_____
          Daniel L. Warshaw
4    Clifford H. Pearson (108523)
     Daniel L. Warshaw (185365)
5    15165 Ventura Blvd., Suite 400
     Sherman Oaks, CA 91403
6    Telephone: (818) 788-8300
     Facsimile: (818) 788-8014
7    cpearson@pswlaw.com
     dwarshaw@pswlaw.com
8

9    Bruce L. Simon (96241)
     44 Montgomery Street, Suite 2450
10   San Francisco, CA 94104
     Telephone: (415) 433-9000
11   Facsimile: (415) 433-9008
     bsimon@pswlaw.com
12

13   *Counsel for Select Plaintiffs and*
     *Class Counsel for the Proposed Settlement Class*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28