STEVE W. BERMAN (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

BRUCE L. SIMON (Bar No. 96241)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA  94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswlaw.com

*Class Counsel*
*and Counsel for Select Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>CARRIER IQ, INC. CONSUMER  PRIVACY LITIGATION<br><br><br><br>This Document Relates to:<br><br>ALL CASES | No. C-12-md-2330-EMC<br><br>**PLAINTIFFS' RESPONSE TO OBJECTIONS TO CLASS SETTLEMENT**<br><br>Date:     July 28, 2016<br>Time:    1:30 p.m.<br>Judge:   Honorable Edward M. Chen<br>Dept.:    Courtroom 5, 17th Floor |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................................................1

II.  ARGUMENT ....................................................................................................2

    A.   Objectors Sweeney and Miorelli Are Professional Objectors Who Have Been Condemned by Other Courts....................................................2

    B.   The Content of the Objections Poses No Obstacle to Final Approval ......................6

        1.   The Overwhelmingly Positive Reaction to the Settlement Supports Final Approval.....................................................................6

        2.   The Settlement Is Fair, Adequate, and Reasonable.......................................7

        3.   The Requested Attorneys' Fee Award Represents the Ninth Circuit Benchmark of 25% of the Gross Settlement Fund and Is Fair and Reasonable ....................................................................10

        4.   The Requested Incentive Awards Are Also Fair and Reasonable ..............13

        5.   The Confidential Supplemental Agreement Did Not Have Any Effect on the Settlement or Class Members' Rights ...................................14

        6.   None of the Objectors' Remaining Generalized and Philosophical Arguments Warrant Rejection of the Settlement .........................................16

III. CONCLUSION ................................................................................................18

## **TABLE OF AUTHORITIES**

CASES

*Arata v. Nu Skin Int'l, Inc.*,
    1993 WL 321710 (9th Cir. Aug. 24, 1993) .................................................................. 13

*Blum v. Stenson*,
    465 U.S. 886 (1994) ........................................................................................................ 12

*Brown v. Hain Celestial Group, Inc.*,
    2016 WL 631880 (N.D. Cal. Feb. 17, 2016) ............................................................ 2, 3

*Cent. States Group v. AIG Global Inv. Corp. (In re Healthsouth Corp. Secs. Litig.)*,
    334 F. App'x. 248 (11th Cir. 2009) ............................................................................. 15

*Churchill Village, L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ......................................................................................... 6

*Custom LED, LLC v. eBay, Inc.*,
    2014 WL 2916871 (N.D. Cal. June 24, 2014) ........................................................... 11

*Destefano v. Zynga, Inc.*,
    2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ........................................................ 10, 11

*Douglas v. Western Union Co.*,
    No. 14-cv-01741 (N.D. Ill.) ............................................................................................ 4

*Fischer v. SJB-P.D. Inc.*,
    214 F.3d 1115 (9th Cir. 2000) ...................................................................................... 13

*Garcia v. Gordon Trucking, Inc.*,
    2012 WL 5364575 (E.D. Cal. Oct. 31, 2012) ............................................................ 11

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................................ 9

*Hendricks v. StarKist Co.*,
    No. 13-cv-00729 (N.D. Cal.), Dkt. No. 354 (Warshaw Obj. Decl., Ex. L).............. 5

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    281 F.R.D. 531 (N.D. Cal. 2012) ................................................................................... 3

*In re Checking Acc't Overdraft Litig.*,
    830 F.Supp.2d 1330 (S.D. Fla. 2011)............................................................................. 3

*In re Google Buzz Privacy Litig.*,
    2011 WL 7460099 (N.D. Cal. June 2, 2011) .............................................................. 17

*In re Google Referrer Header Privacy Litig.*,
    87 F.Supp.3d 1122, 1130-31 (N.D. Cal. 2015) ................................................................ 10

*In re High-Tech Emp. Antitrust Litig.*,
    2015 WL 5159441 (N.D. Cal. Sept. 2, 2015)..................................................................... 6

*In re Netflix Privacy Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ........................................................... 10, 17

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015)............................................................................... 12, 14, 15

*In re Polyurethane Foam Antitrust Litig.*,
    --- F.Supp.3d ---, 2016 WL 1452005 (N.D. Ohio Apr. 13, 2016)....................................... 3

*In re Sutter Health Uninsured Pricing Cases*,
    171 Cal.App.4th 495 (2009)............................................................................................ 13

*In re Target Corp. Customer Data Security Breach Litigation*
    No. 14-md-02522 (D. Minn.) ............................................................................................ 5

*In re TD Ameritrade Acc't Holder Litig.*,
    2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) .................................................................. 1

*In re TRS Recovery Servs., Inc. and Telecheck Servs., Inc., Fair Debt Collection Practices
Act (FDCPA) Litig.*,
    2016 WL 543137 (D. Me. Feb. 10, 2016) ......................................................................... 3

*In re UnitedHealth Group Inc. PSLRA Litig.*,
    643 F.Supp.2d 1107 (D. Minn. 2009) ................................................................................ 3

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F.Supp.2d 503 (E.D.N.Y. 2003) ................................................................................. 1

*In Re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ................................................................................... 15, 16

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ........................................................................................... 17

*Larsen v. Trader Joe's Co.*,
    2014 WL 3404531 (N.D. Cal. July 11, 2014) ................................................................... 3

*Legg v. Spirit Airlines, Inc.*,
    No. 14-cv-61978 (S.D. Fla.) ............................................................................................. 4

*Lofton v. Verizon Wireless (VAW) LLC*,
    No. 13-cv-05665 (N.D. Cal.) ............................................................................................ 4

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ............................................................................................... 16

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 1, 6

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ................................................................................ 9

*Perkins v. LinkedIn Corp.*,
    2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ...................................................... 11

*Roberts v. Electrolux Home Prods., Inc.*,
    2014 WL 4568632 (C.D. Cal. Sept. 11, 2014) .................................................... 3

*Rodriguez v. West Pub. Corp.*,
    563 F.3d 948 (9th Cir. 2009) ......................................................................... 6, 14

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ............................................................................ 16

*Spann v. J.C. Penney Corp.*,
    314 F.R.D. 312 (C.D. Cal. Jan. 25, 2016) ......................................................... 15

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ................................................................................ 1

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..................................................................... 10, 11

*Weeks v. Kellogg Co.*,
    2013 WL 6531177 (C.D. Cal. Nov. 23, 2013) .............................................. 12, 14

*Wren v. RGIS Inventory Specialists*,
    2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ..................................................... 14

*Zepeda v. PayPal, Inc.*,
    No. 10-cv-02500 (N.D. Cal.) ................................................................................ 5

## I.  INTRODUCTION

The reaction to this nationwide settlement has been overwhelmingly positive.  Out of a settlement class of some 30 million members,[1] only *four* class members opted out (0.000013% of the class) and only *three* class members objected (0.00001% of the class).  Such an infinitesimal amount of opposition to the settlement strongly supports a finding that the settlement is fair, adequate, and reasonable.  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement are favorable to the class members.").

A certain number of objections are to be expected in any class action settlement, especially one with as many class members as there are here.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 511 (E.D.N.Y. 2003).  But the mere fact that there is some opposition to a settlement "does not necessitate disapproval of the Settlement; rather, the Court must evaluate whether the objections suggest serious reasons why the proposal might be unfair."  *In re TD Ameritrade Acc't Holder Litig.*, 2011 WL 4079226, at *7 (N.D. Cal. Sept. 13, 2011).  Objectors to a class action settlement bear the burden of proving any assertions they raise challenging the reasonableness of the settlement.  *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990).

Here, only three objections were made to the proposed settlement.[2]  All three objections were made by attorneys *pro se*, two of whom are notorious "professional" objectors (Miorelli and

---

[1] Plaintiffs initially estimated that the nationwide settlement class consisted of some 79 million members—though this estimate was based on the approximate number of covered devices. (Declaration of Robert F. Lopez in Support of Motion for Preliminary Approval (Dkt. No. 404), ¶ 12.)  Based on statistics regarding mobile phone ownership, the settlement administrator later estimated that the class more accurately consisted of approximately 30 million unique individuals. (Declaration of Kenneth Jue on Behalf of Settlement Administrator (Dkt. No. 458) ("Jue Admin. Decl."), ¶ 6.)

[2] The three objections were made by Sam A. Miorelli (Dkt. No. 450), Patrick S. Sweeney (Dkt. No. 452), and Sandra Singer (Dkt. No. 454).  A fourth "objection" is referenced at Dkt. No. 423, but it is not a true objection—it is a letter complaining about "prank calls" to the individual's mobile phone.

1  Sweeney).  These two objectors have a history of sabotaging class action settlements for their own

2  financial gain, and, true to form, their objections here are largely verbatim, copy-and-paste jobs

3  from previous objections they made in other cases.  Furthermore, Sweeney attempted to claim

4  benefits for the same mobile device under his own name and that of his law firm, and the phone

5  number associated with the device he gave was one that Pamela Sweeney (his wife) swore was *her*

6  phone number in another matter.  (*See* Declaration of Daniel L. Warshaw in Support of Plaintiffs'

7  Response to Objections to Class Settlement ("Warshaw Obj. Decl."), ¶ 8 and Ex. J.)  This

8  indicates that he did not certify truthfully that the information provided with his claim was correct,

9  as required by this Court's Preliminary Approval Order.  (Dkt. No. 421.)  As a result, Sweeney

10  lacks standing to object to the settlement and his objection should be stricken.  *See Brown v. Hain*

11  *Celestial Group, Inc.*, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016).

12       The third objection (Singer) was made by someone who holds herself out as an attorney

13  and who has been called out by at least one court for making frivolous claims.  (*See* Warshaw Obj.

14  Decl., ¶¶ 3-4.)  Additionally, the settlement administrator has confirmed that Singer did not make

15  a valid claim here because she gave a spurious phone number for her purportedly covered device.

16  (*See* Supplemental Declaration of Kenneth Jue on Behalf of Settlement Administrator (Dkt. No.

17  462) ("Jue Suppl. Admin. Decl."), ¶ 5; Warshaw Obj. Decl., ¶ 5.)  As a result, Singer also lacks

18  standing to object to the settlement, and her objection should be stricken as well.  *See Brown*, 2016

19  WL 631880, at *10 (N.D. Cal. Feb. 17, 2016).

20       Substantively, all three objections variously mistake both the facts and the law and make

21  generalized and philosophical arguments against class actions that have no bearing on the

22  settlement in this case.  None of the objections presents any compelling reason to reject the

23  settlement, and as such, they should all be overruled by the Court.

24  **II.  ARGUMENT**

25  **A.**    **Objectors Sweeney and Miorelli Are Professional Objectors Who Have Been**
           **Condemned by Other Courts**

26

27       Objectors Patrick S. Sweeney and Sam A. Miorelli are both attorneys whose practice it is

28  to hijack class action settlements in an attempt to extort payoffs for dropping their objection.  Such

"professional" objectors have become increasingly common in class action litigation and have been widely denounced by courts across the country. *See, e.g., In re Checking Acc't Overdraft Litig.*, 830 F.Supp.2d 1330, 1361 n.30 (S.D. Fla. 2011) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing."); *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F.Supp.2d 1107, 1109 (D. Minn. 2009) (reprimanding professional objectors whose "goal was, and is, to hijack as many dollars for themselves as they can wrest from a negotiated settlement"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (reprimanding objector for working with attorney who "routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct"). Professional objectors do not assist the court's evaluation of a class action settlement, but only delay providing real benefits to bona fide class members.

Multiple courts in this district (and elsewhere) have specifically identified Objector Sweeney as a professional objector and overruled his meritless objections. *See, e.g., Brown*, 2016 WL 631880, at *10 (identifying Sweeney as part of a group of "professional objectors" and finding that "courts across the country (including in the Ninth Circuit) have repeatedly turned aside [his] efforts to upend settlements"); *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *7 n.4 (N.D. Cal. July 11, 2014) (stating that "attorney Patrick Sweeney also has a long history of representing objectors in class action proceedings" and overruling the objections of Sweeney and his wife and daughter in that case); *Roberts v. Electrolux Home Prods., Inc.*, 2014 WL 4568632, at *12 (C.D. Cal. Sept. 11, 2014) (noting Sweeney's history of making objections in class action proceedings and finding that his objections were "not made for the purpose of benefitting the Class" and were "meritless in all respects"); *In re TRS Recovery Servs., Inc. and Telecheck Servs., Inc., Fair Debt Collection Practices Act (FDCPA) Litig.*, 2016 WL 543137, at *6 n.16 (D. Me. Feb. 10, 2016) (ruling that Sweeney's "listed objections are without merit and appear to be a form document . . . that he has filed in other class action settlements"); *In re Polyurethane Foam*

1   *Antitrust Litig.*, --- F.Supp.3d ---, 2016 WL 1452005, at *3 (N.D. Ohio Apr. 13, 2016) (describing

2   Sweeney's objection as "pure boilerplate language, wholly untethered from the actual terms of the

3   settlement," calling his conduct "vexatious," and imposing an appeal bond on him).

4       In the last year alone, class counsel have found at least *seven* additional objections filed by

5   Sweeney, none of which have been sustained and several of which have prompted courts to rebuke

6   him for his conduct.  (*See* Warshaw Obj. Decl., Exs. B-H.)  These objections all followed

7   substantially the same format and, as recognized by some of the courts above, appeared to be form

8   objections that recycled—in many cases, word for word—the same arguments.  In fact, only a few

9   months ago, Sweeney filed an objection in *Douglas v. Western Union Co.*, No. 14-cv-01741 (N.D.

10  Ill.), that is a ***virtual copy*** of the objection he filed in this case.  (*Compare Douglas* Dkt. No. 70

11  (Warshaw Obj. Decl., Ex. E) *with* Dkt. No. 452 here.)  He did so again just a few weeks ago in

12  *Legg v. Spirit Airlines, Inc.*, No. 14-cv-61978 (S.D. Fla.), this time on behalf of his daughter—

13  who is a frequent surrogate class member for him—Kerry Ann Sweeney.  (*Compare Legg* Dkt.

14  No. 141 (Warshaw Obj. Decl., Ex. B) *with* Dkt. No. 452 here.)  These objections made the same

15  list-form boilerplate arguments found in his objection here, ***in exactly the same order***, changing

16  only the numbers where appropriate and adding a standard *cy pres* objection.  One of Sweeney's

17  recent objections filed in this district in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665,

18  has led to a motion for sanctions against him that will be heard by Judge Yvonne Gonzalez Rogers

19  approximately two weeks after the fairness hearing in this case, on August 9, 2016.  (*See* Warshaw

20  Obj. Decl., Ex. I.)  The motion details Sweeney's harassing and vexatious conduct and is further

21  evidence that his objections are meritless and designed solely to delay class action settlements for

22  his own personal gain.[3]

23      Objector Miorelli is no better than Objector Sweeney.  Like Sweeney, Miorelli is a

_____

25  [3] Moreover, as stated above, class counsel have determined that the phone number Sweeney
    provided on his claim form here was actually the same number his wife previously swore was hers
26  in another case.  (*See* Warshaw Obj. Decl., ¶ 8 and Ex. J.)  When pressed regarding his apparent
    lack of standing because of this issue, Sweeney did not directly respond.  (*Id.*)  Accordingly,
27  Sweeney's objection should also be stricken for lack of standing.

28

professional objector who holds up class action settlements for his own personal gain.  Class counsel have found at least three additional objections filed by Miorelli *just this year*, and all three follow a similar format to the one he filed here.  (*See* Warshaw Obj. Decl., Exs. K-M.)  Like Sweeney's objections, Miorelli's are largely canned, with many of the same arguments recycled over and over.  For example, many of the same sections and subsections appear in two previous objections filed by Miorelli before they are conveniently repeated here.  (*Compare Hendricks v. StarKist Co.*, No. 13-cv-00729 (N.D. Cal.), Dkt. No. 354 (Warshaw Obj. Decl., Ex. L) *and Zepeda v. PayPal, Inc.*, No. 10-cv-02500 (N.D. Cal.) (Warshaw Obj. Decl., Ex. K)[4] *with* Dkt. No. 450 here.)  And not only are the section and subsection headings the same, but the arguments within the sections are ***verbatim***, with only the numbers changed where appropriate.  *See id.*  Indeed, many of the arguments in Miorelli's previous objections are simply copied and pasted here, demonstrating a pattern of misconduct and a lack of good faith.

The Court need look no further than the Target data breach case (*In re Target Corp. Customer Data Security Breach Litigation*) to find evidence of Miorelli's true intentions.  There, lead counsel for the consumer class, Vincent J. Esades, filed a declaration supporting the plaintiffs' motion to impose an appeal bond on a number of objectors, including Miorelli.  (*See* Warshaw Obj. Decl., Ex. N)  Attached to the declaration was an email chain between Mr. Esades and Miorelli, in which Miorelli stated that he would settle his objection for "a fraction" (25%) of the "almost $9.3 million in combined costs Target faces and the millions in attorney fee reductions [Miorelli] proposed"—or $2.325 million.  (*Id.*, email chain at Ex. B)  In other words, Miorelli offered to drop his objection in exchange for a greater sum of money than he criticizes class counsel for seeking in attorneys' fees in this case.  The plaintiffs in *Target* rejected Miorelli's payoff demand, and the Eighth Circuit subsequently dismissed his appeal, finding that he lacked standing because he was not a class member.  (Warshaw Decl., ¶ 11.)

---

[4] There is no docket entry for Miorelli's objection in *Zepeda* because the court struck his objection, finding that it violated the Court's standing order.  *See* Case No. 10-cv-02500 (N.D. Cal.) (Dkt. No. 319).

As demonstrated above, Objectors Sweeney and Miorelli have a history of filing sham objections to class action settlements to achieve financial gain at the expense of the class. Their objections here are no different and should be summarily overruled (and in the case of Sweeney, his objection can be stricken). In any event, nothing in the content of their objections, nor in the invalid objection filed by Singer, compels rejection of the settlement. Accordingly, the Court should have no hesitation in granting final approval.

**B.      The Content of the Objections Poses No Obstacle to Final Approval**

       **1.      The Overwhelmingly Positive Reaction to the Settlement Supports Final Approval**

Class members' reaction to a proposed settlement is one of the key factors in determining whether the settlement is fair, adequate, and reasonable. *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004). Indeed, a court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it or opt out. *See Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529; *see also, e.g., Churchill Village*, 361 F.3d at 577 (affirming approval of settlement where 45 of 90,000 class members objected and 500 class members opted out); *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (affirming approval of settlement where "only fifty-four [class members] submitted objections" out of 376,301 who received notice); *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *3 (N.D. Cal. Sept. 2, 2015) (finding indicia of approval where 11 of 64,466 class members objected and less than 0.9% opted out).

Here, the settlement administrator received a total of 61,478 claims and determined that 42,577 were valid.[5] From a class of 30 million members, this works out to a claims rate of 0.14%

---

[5] Specifically, there were 57,266 timely claims made (*i.e.*, claims received by the June 4, 2016 claims deadline) and 4,212 untimely claims made (*i.e.*, claims received after June 4, 2016 through June 20, 2016). (Jue Suppl. Admin. Decl., ¶ 4.) After examining and validating the various claims, the settlement administrator determined that 39,458 of the timely claims were valid and, but for their tardiness, 3,119 of the late claims were valid. (*Id.*, ¶¶ 5-6.) If the Court orders that all of the valid claims made—regardless of timeliness—should be accepted, there would be a total of 42,577 payable claims.

1   (0.20% based on the original claim number), which is consistent with many other settlements in

2   similar cases.  (Jue Suppl. Admin. Decl., ¶ 7.)  In sharp contrast, only <u>four</u> class members opted

3   out of the settlement (0.000013% of the class) and only <u>three</u> class members objected (0.00001%

4   of the class).  All three objections were made by attorneys *pro se*, and, as shown above, two of

5   those attorneys are notorious professional objectors.  No objections were made by the U.S.

6   attorney general or by any of the 50 state or District of Columbia attorneys general, all of whom

7   received notice of the settlement.  (Jue Admin. Decl., ¶ 2.)

8     The extremely low number of opt-outs and objections, especially when viewed in light of

9   the enormous size of the class and the comparatively high number of claims made, supports final

10   approval of the settlement.

11      **2.**  **The Settlement Is Fair, Adequate, and Reasonable**

12     This case was hard-fought from the beginning.  At every step, defendants adamantly

13   denied liability, variously arguing that the Carrier iQ software is benign; that plaintiffs

14   misunderstood its capabilities; that plaintiffs authorized use of the software; and that in other

15   instances, certain activity was inadvertent (and therefore un-actionable) and had caused no harm.

16   Defendants also contended that in any event, plaintiffs could not sue them in court because of

17   arbitration provisions in plaintiffs' contracts with their wireless carriers that defendants claimed

18   the right to invoke.

19     Eventually, however, after three years of hotly contested litigation that featured protracted

20   motions practice, discovery, five all-day, in-person mediation sessions, and many more hours of

21   intense settlement negotiations, the parties finally reached a settlement they believed was fair

22   given the relative strengths and weaknesses of their positions.

23     The settlement created a $9 million non-reversionary fund, which, based upon updated

24   estimates, will result in a cash payment of approximately $149.28 to each qualified claimant

25   (excluding late claims) or $138.35 to each qualified claimant (including late claims).  (Jue Suppl.

26   Admin. Decl., ¶¶ 5-6.)  While the settlement agreement provided that in the event the fund were to

27   be oversubscribed (*i.e.*, where claimants would receive less than approximately $4 each), the net

28   settlement fund would be donated to three carefully and fairly selected *cy pres* recipients (Settl.

1    Agmt., ¶ 28), the fund was not subscribed to that point and no *cy pres* distribution will occur.

2    Instead, each qualified claimant will receive a substantial monetary award well in excess of any

3    "nuisance" amount referenced by some of the objectors.

4          In addition, the settlement agreement provided for injunctive relief that defendant Carrier

5    iQ implemented prior to the acquisition of its assets by AT&T Mobility IP, LLC.  This injunctive

6    relief included a revision to the way Carrier iQ receives notification messages from users'

7    handsets; a revision to metrics collected by wireless carriers relating to URLs; guidance to device

8    manufacturers in Carrier iQ's Integration Training and Porting Guides; and full error remediation

9    for a pertinent software bug as well as testing protocols to prevent similar bugs in the future.

10   (Settl. Agmt., ¶¶ 19-22.)  This injunctive relief directly addressed plaintiffs' concerns with the

11   Carrier iQ software, and Carrier iQ warranted that it had performed as agreed prior to its asset

12   sale.  (*Id.*, ¶¶ 18 and 67.b.)

13         Objectors Miorelli and Singer base a large portion of their objections on the argument that

14   class members do not receive enough money under the settlement.  (*See, e.g.,* Miorelli Obj., at 9

15   (describing the settlement as a "tiny percentage of the value of the Class' damages"); Singer Obj.,

16   at 1 (comparing the settlement to $100 million+ settlements between the government and AT&T).)

17   Miorelli takes it to the extreme and estimates that each class member's damages (assuming he or

18   she can prove every claim asserted in plaintiffs' complaint) is $11,600, giving the class total

19   damages of $545.2 *billion*.[6]  Realizing that this amount is nearly **three times** *the total market*

20   *capitalization* of all the defendants combined ($198.12 billion), Miorelli revises the class's

21   theoretical recovery to the still-ridiculous full amount of the defendants' market capitalization, or

22   $4,215.25 per class member.  He then compares the $9 million settlement fund to this imaginary

23   damages model and concludes that class members are receiving only 0.0045% of the damages

24   they "were entitled to at law."  (Miorelli Obj., at 16-17.)

25         Putting aside the preposterous damage calculations offered by Miorelli (which are baseless

26   _____

27   [6] Objector Miorelli uses a class size of 47 million members, though it's not clear how he came up
     with that number.

28

1  for myriad reasons, not the least of which is that they assume 100% liability and recoverability for

2  every single claim alleged in plaintiffs' complaint—particularly the Federal Wiretap Act claim,

3  which the Court dismissed after thorough briefing and argument), what he and Singer essentially

4  argue is that the settlement could have been "different" or "better."  However, case law in the

5  Ninth Circuit is clear that arguments about what "might have been" accomplished are improper

6  challenges to the fairness or adequacy of a settlement.  *See, e.g., Officers for Justice v. Civil Serv.*

7  *Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("The proposed settlement is not to be judged against

8  a hypothetical or speculative measure of what might have been achieved by the negotiators.");

9  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Of course it is possible, as many

10  of the objectors' affidavits imply, that the settlement could have been better.  But this possibility

11  does not mean the settlement presented was not fair, reasonable or adequate.").

12  Moreover, the objectors fail to take into account that a settlement involves compromise,

13  and that, by definition, this means the parties will not receive everything they claim they are

14  entitled to.  *See Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the

15  question we address is not whether the final product could be prettier, smarter or snazzier, but

16  whether it is fair, adequate and free from collusion.").  The compromise reached by the parties is

17  not unfair or inadequate simply because the class members' monetary recovery is less than the full

18  amount of their potential damages.  Rather, the court must weigh the various risks faced by the

19  plaintiffs against the benefits they achieved through the settlement.  And here, as detailed in

20  plaintiffs' Motion for Final Approval, the risks were significant.  (Dkt. No. 455, at 14-15.)

21  Notwithstanding the large number of claims and alleged damages in plaintiffs' complaint,

22  plaintiffs had to consider the facts as they learned them through further investigation, discovery,

23  research and analysis, and expert consultation.  Ultimately, plaintiffs and their experienced

24  counsel achieved a settlement they believed accurately reflected the strengths and challenges of

25  plaintiffs' case, and one to which defendants would never have agreed at the inception of this case.

26  The settlement here is comparable to others approved in consumer privacy and technology cases in

27

28

1   this district[7] and cannot be viewed through the lens of a "trillion dollar" case or a case brought by

2   the government against an entirely different entity.

3   **3.      The Requested Attorneys' Fee Award Represents the Ninth Circuit
         Benchmark of 25% of the Gross Settlement Fund and Is Fair and Reasonable**

4

5   All three objectors argue that the requested attorneys' fee award is too high.  They claim

6   that the fees should be paid on the settlement amount net of all costs and expenses, incentive

7   awards to the class representatives, *and* any *cy pres* awards distributed from the settlement fund.

8   (*See* Sweeney Obj., ¶¶ 4-5; Miorelli Obj., at 22-24; Singer Obj., at 2-3.)  Two of the objectors also

9   argue that the requested attorneys' fees are unreasonable given counsel's work in the case and

10   their hourly rates.  (*See* Sweeney Obj., ¶ 5 (claiming that the 449 docket entries in this case [at the

11   time of the objection] "were mostly procedural in nature" and equating the requested fees to an

12   "unfathomable" amount per entry); Singer Obj., at 3, 4 (claiming that class counsel's hourly rates

13   are too high and that they shouldn't be paid for five days of mediation because "they should have

14   known by the end of the 1st day that they were wasting time not in the benefit of the class . . . .").)

15   And two objectors argue that class counsel should have submitted detailed time records to be

16   analyzed by the class members and the Court.  (*See* Sweeney Obj., ¶ 6; Miorelli Obj., at 19-21,

17   23.)  Every single one of these arguments contravenes Ninth Circuit precedent and can be rejected

18   with very little difficulty.

19   Courts in the Ninth Circuit have discretion "to choose either the percentage-of-the-fund or

20   the lodestar method" for fee awards in common fund cases.  *E.g.*, *Vizcaino v. Microsoft Corp.*, 290

21   F.3d 1043, 1047 (9th Cir. 2002).  "Under the percentage-of-the-fund method, the court may award

22   class counsel a given percentage of the common fund recovered for the class."  *Destefano v.*

23   *Zynga, Inc.*, 2016 WL 537946, at *16 (N.D. Cal. Feb. 11, 2016) (citing *Fischel v. Equitable Life*

24   *Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002)).  "The percentage method is

25   particularly appropriate in common fund cases where "the benefit to the class is easily quantified."

26   _____

27   [7] *See, e.g.*, *In re Google Referrer Header Privacy Litig.*, 87 F.Supp.3d 1122, 1130-31 (N.D. Cal.
    2015); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013).

28

1   *Destefano*, 2016 WL 537946, at *16 (citations omitted).

2   In common fund cases in the Ninth Circuit, "the 'benchmark' award is 25 percent of the

3   recovery obtained, with 20-30 percent as the usual range."  *Id.* (citing, *inter alia*, *Vizcaino*, 290

4   F.3d at 1047).  The Ninth Circuit has approved attorneys' fee awards based on the *gross*

5   settlement amount, and district courts within the circuit have followed suit.  *See, e.g., Vizcaino*,

6   290 F.3d at 1052 App. n.6 ("We use the gross settlement fund amount, to maintain consistency

7   with other cases listed."); *Garcia v. Gordon Trucking, Inc.*, 2012 WL 5364575, at *11 (E.D. Cal.

8   Oct. 31, 2012) (awarding attorneys' fees based on 33% of the gross settlement fund); *Custom*

9   *LED, LLC v. eBay, Inc.*, 2014 WL 2916871, at *8-*9 (N.D. Cal. June 24, 2014) (awarding

10  attorneys' fees based on 25% of the gross settlement fund).  When the percentage-of-the-fund

11  method is chosen, the Ninth Circuit has also "encouraged district courts to cross-check any

12  calculations done in one method against those of another method."  *See Perkins v. LinkedIn Corp.*,

13  2016 WL 613255, at *13 (N.D. Cal. Feb. 16, 2016) (citing *Vizcaino*, 290 F.3d at 1050-51).

14  Here, class counsel seek an award of 25% of the $9 million gross settlement fund, *i.e.*,

15  $2.25 million.  As detailed in plaintiffs' Motion for Award of Attorneys' Fees, Costs, Expenses,

16  and Service Awards to Class Representatives (Dkt. No. 424) ("Attorneys' Fee Motion"), this

17  award is justified by the monetary and non-monetary benefits achieved through the settlement, the

18  risks plaintiffs faced in continued litigation, the skill required and the quality of the work

19  performed by class counsel, the contingent nature of the fee and the financial burden of the

20  litigation, and awards made in similar cases involving consumer privacy and technology issues.

21  The award is further supported by a lodestar cross-check, which at the time plaintiffs filed their

22  Attorneys' Fee Motion yielded a ***negative*** multiplier of 0.55 on counsel's lodestar of

23  $4,072,785.25.  Counsel's time spent on the case was reasonable, given the amount of effort

24  expended in investigating plaintiffs' claims, preparing multiple complaints, conducting extensive

25  discovery and review of defendants' and third parties' materials, working with experts, engaging

26  in protracted motions practice, and negotiating and implementing a nationwide settlement, among

27  other activities.  (Attorneys' Fee Motion, at 17-20.)  Counsel's hourly rates were also reasonable,

28  based on the prevailing market rates in their community and their reputation for and significant

1   experience in prosecuting complex litigation, including consumer class actions.  (*Id.*, at 15-16.)

2          Despite the fact that class counsel's requested fee award represents no more than the Ninth

3   Circuit's 25% benchmark—not to mention barely more than *half* of counsel's billed time in the

4   case[8]—the objectors ask the Court to go against controlling precedent and award a lower fee for

5   no legitimate reason.  First, there is no need to subtract necessary costs or expenses from the

6   settlement fund since all such costs and expenses (including the costs of notice and settlement

7   administration) were incurred for the benefit of the class.  *See, e.g., In re Online DVD-Rental*

8   *Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015); *Weeks v. Kellogg Co.*, 2013 WL 6531177, at

9   *29 (C.D. Cal. Nov. 23, 2013).  Second, the incentive awards are also appropriately considered a

10   benefit to the class because the class representatives are class members and the rest of the class

11   would have recovered nothing but for their efforts.  Third, any argument that a *cy pres* award does

12   not benefit the class is moot because there will be no *cy pres* distribution from the settlement fund.

13          With respect to counsel's lodestar, the objectors have failed to show that it was somehow

14   unreasonable.  The number of docket entries in the case is wholly irrelevant to the amount and

15   quality of work performed by counsel, and their hours spent trying to achieve the best possible

16   result for the class—including attending four additional all-day mediation sessions after the first

17   one proved unsuccessful—were undeniably reasonable and compensable.  Counsel's hourly rates

18   charged in this case were their customary hourly rates, which at all times were "in line with those

19   prevailing in the community for similar services by lawyers of reasonably comparable skill,

20   experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1994).  Significantly,

21   counsel's rates have been approved by other courts in this district, as evidenced in the attorney

22   declarations submitted in support of plaintiffs' Attorneys' Fee Motion.

23          Finally, the Ninth Circuit does not require counsel to submit detailed time records,

_____

25   [8] Plaintiffs' counsel have spent additional time since filing their Attorneys' Fee Motion assisting
    the settlement administrator with the claims process, drafting and filing final approval papers, and
26   drafting and filing this response to the objections.  They will also spend some additional time
    preparing for oral argument at the fairness hearing.  Class counsel are not seeking additional fees
27   for any of this time, but their lodestar is even higher now, as is the discount they are taking on it.

28

1   especially in percentage-of-the-fund cases.  *See Arata v. Nu Skin Int'l, Inc.*, 1993 WL 321710, at

2   *4 (9th Cir. Aug. 24, 1993) (stating that "it is not clear what purpose submission of time records

3   would have served" because attorneys' fees were "to be calculated as a percentage of the total

4   recovery"); *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (finding that a

5   "summary of the time spent on a broad category of tasks such as pleadings and pretrial motions"

6   met the "basic requirement" of documentation).  Courts can, and often do, accept declarations of

7   counsel setting forth the hours worked and tasks performed.  *In re Sutter Health Uninsured*

8   *Pricing Cases*, 171 Cal.App.4th 495, 511-12 (2009) ("We see no reason why [the court] could not

9   accept the declarations of counsel attesting to the hours worked, particularly as he was in the best

10  position to verify those claims by reference to the various proceedings in the case.").  Here,

11  plaintiffs' counsel submitted declarations containing narrative summaries of their time reasonably

12  expended, categorized as they were in response to the Court's order of February 26, 2016 (Dkt.

13  No. 408), with two additional categories.  Co-class counsel Daniel L. Warshaw's declaration

14  submitted with this filing also attests that counsel followed the guidelines *they themselves*

15  *proposed* to limit costs and expenses.  (*See* Warshaw Obj. Decl., ¶ 12.)

16          Plaintiffs' counsel have demonstrated that their requested attorneys' fee award is fair and

17  reasonable, and the objectors have presented no legitimate reason to lower this award.

18          **4.      The Requested Incentive Awards Are Also Fair and Reasonable**

19          Objectors Miorelli and Singer take issue with the proposed $5,000 incentive awards to

20  each of the class representatives.  Miorelli argues that the class representatives are significantly

21  better off than absent class members because they will supposedly recover "43.1% of their

22  $11,600 each [sic] damages at law and 118.6% of their maximum theoretical recovery of

23  $4,215.25 each."  (Miorelli Obj., at 17.)  Singer baselessly accuses the class representatives and

24  class counsel of "us[ing] the members of the class only to get more money for themselves while

25  the class members get nothing [and] colluding with the defendants . . . ."  (Singer Obj., at 4.)  Both

26  Miorelli and Singer misunderstand the purpose of incentive awards and fail to cogently argue that

27  they are unfair or unreasonable in this case.

28          The Ninth Circuit has held that "[i]ncentive awards are fairly typical in class action cases."

1   *Rodriguez*, 563 F.3d at 958 (citing 4 Alba Conte *et al.*, Newberg on Class Actions § 11:38 (4th ed.

2   2008)).  These awards are intended to "compensate class representatives for work done on behalf

3   of the class, to make up for financial or reputational risk undertaken in bringing the action, and,

4   sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958-59.

5         $5,000 incentive awards are presumptively reasonable in this district, even where there is

6   the prospect of minimal damages recoveries by individual class members.  *See, e.g., In re Online*

7   *DVD-Rental*, 779 F.3d at 947-48 (approving $5,000 incentive awards where class members would

8   receive $12); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *31-37 (N.D. Cal. Apr. 1,

9   2011) (approving $5,000 service awards to 20 named plaintiffs "where average award to class

10  members was $207.69"); *see also Weeks*, 2013 WL 6531177, at *3, 34-37 (approving incentive

11  awards of $5,000 per named plaintiff, where settlement provided for the recovery by class

12  members of $5 per box of cereal, up to a maximum of $15 per class member, all subject to

13  proportional reduction if all eligible claims exceeded the settlement fund).

14        Here, the class representatives devoted considerable time and effort to this case, assisting

15  counsel with counsel's investigation and analysis of their claims, preparation of pleadings,

16  discovery obligations, settlement negotiations and considerations, and review and analysis of the

17  parties' settlement papers.  (*See, e.g.,* Declaration of Robert F. Lopez in Support of Attorneys' Fee

18  Motion (Dkt. No. 425), ¶ 32 and Declarations of Class Representatives (Dkt. Nos. 431-447).)  The

19  requested incentive awards are designed to compensate the class representatives for their work on

20  behalf of the class, without whom the absent class members would have recovered nothing at all.

21  The incentive awards do not reflect a class representative's damages and should not be compared

22  to his or her potential damages recovery in the action.

23        The requested incentive awards in this case are fair and reasonable and in line with similar

24  awards granted by courts in this district.

25        **5.      The Confidential Supplemental Agreement Did Not Have Any Effect on the
                    Settlement or Class Members' Rights**

26

27        The settlement agreement provided that if the number of opt-outs exceeded a confidential

28  number agreed to by the parties, then any defendant, with the agreement of at least two other

1   defendants, would have the option to terminate the settlement.  (Settl. Agmt., ¶ 51.)  As the Court

2   knows, the parties entered into a confidential supplemental agreement setting forth the opt-out

3   trigger number and submitted it to the Court for *in camera* review, then filed it under seal with the

4   Court's permission.  (*See* Dkt. No. 408 at 2; Dkt. No. 416.)  Objector Miorelli argues that the

5   confidential supplemental agreement was somehow nefarious, referring to it as the "side deal" and

6   claiming that it rendered the class notice inadequate and created a conflict between class counsel

7   and the class.  (Miorelli Obj., at 4-9.)  But, of course, as the Court knows from reviewing the

8   agreement itself, the confidential supplemental agreement is exactly what it was represented to be

9   and nothing more.

10      In any case, Miorelli's argument is moot because the opt-out threshold was not reached.

11  *See In re Online DVD Rental*, 779 F.3d at 948 (court affirmed final approval of the settlement

12  because the exact opt-out threshold was withheld for "practical reasons" and the fact that the

13  threshold had not been met rendered any effect on proper notice moot).  And even if the issue

14  were not moot, maintaining the confidentiality of the opt-out threshold is proper because it helps

15  to ensure that settlement proceeds are directed to class members and not diverted to other parties.

16  *See, e.g.*, *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 329 (C.D. Cal. Jan. 25, 2016) (court

17  determined that publicizing the threshold number could result in the failure of the settlement to

18  become effective or result in funds being unfairly channeled to parties and attorneys who would

19  attempt to manipulate the settlement process for their own gain at the expense of the class) (citing

20  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2015 WL 1486709, at *2 (E.D. Tenn. Mar. 31,

21  2015)); *Cent. States Group v. AIG Global Inv. Corp. (In re Healthsouth Corp. Secs. Litig.)*, 334 F.

22  App'x. 248, 250 n.4 (11th Cir. 2009) (holding that opt-out thresholds are typically kept

23  confidential to "encourage settlement and discourage third parties from soliciting class members to

24  opt out").

25      Furthermore, the opt-out threshold is irrelevant to class members' decision whether to opt

26  out, *e.g.*, *In Re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. 2002), as evidenced

27  by Miorelli's inability to explain how his knowledge of the threshold would help him decide

28  whether or not to opt out.  The opt-out threshold has no bearing on the strength or weakness of any

1  claim or defense in the litigation, nor does it affect the amount of money a class member will

2  receive if the settlement is finally approved.

3        **6.**        **None of the Objectors' Remaining Generalized and Philosophical Arguments**
                **Warrant Rejection of the Settlement**

4

5        The remainder of the objectors' arguments can be categorized as generalized and

6  philosophical arguments against class actions that have no bearing on the settlement in this case.

7  For example, Objector Sweeney copies and pastes an argument from some of his previous

8  objections about withholding a portion of class counsel's fee in order to ensure adequate oversight

9  of the settlement process. (Sweeney Obj., ¶¶ 1-3.) This unintelligible argument fails at the outset

10 because the claims process is over, and class counsel already helped oversee and administer the

11 settlement by working with the settlement administrator and answering questions posed by class

12 members about the settlement.

13       Objectors Miorelli and Singer make a point about sending individualized notice to class

14 members. (*See* Miorelli Obj., at 22-23; Singer Obj., at 2.) But as the parties detailed for the

15 Court, they made efforts to obtain the addresses of class members from the third party wireless

16 providers, who are the exclusive holders of the class' contact information. (*See* Dkt. Nos. 411, at

17 2-3, and 411-2, ¶¶ 2-6.) It was technologically infeasible to extract this information—without

18 engineering at great expense—from the providers' respective systems to create a usable class

19 address list. (*Id.*) Because individualized notice was not practicable here, notice by publication

20 satisfied due process. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1304,

21 n.2 (9th Cir. 1990); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317

22 (1950). The Court correctly approved the notice based upon the inability to provide direct notice.

23       Finally, Objectors Miorelli and Singer attack the *cy pres* portion of the settlement. (*See*

24 Miorelli Obj., at 12-16; Singer Obj., at 1, 3.) Their objections are moot because there will be no

25 *cy pres* distribution from the settlement fund.[9] However, even if these objections were not moot,

26 —————————————

27 [9] On July 9, 2016, Objector Singer sent a supplement to her objection to class counsel. In this

28 supplement, she withdrew her objection to the attorneys' fee award being based on a potential *cy*
(footnote continued)

16
PLAINTIFFS' RESPONSE TO OBJECTIONS TO CLASS SETTLEMENT

1   Miorelli and Singer's personal feelings about *cy pres* remedies would not upend that portion of the

2   settlement.  *Cy pres* distributions have been expressly accepted and approved by the Ninth Circuit,

3   which has held that *cy pres* distributions are appropriate where they "account for the nature of the

4   plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class

5   members . . . ."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (quoting *Nachshin v.*

6   *AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)).

7          In *Lane*, another privacy case, the court approved a *cy pres* distribution in a $9.5 million

8   settlement because "it would be burdensome and inefficient to pay the [net settlement amount]

9   because each class member's recovery under a direct distribution would be *de minimis.*"  696 F.3d

10  at 824–25.  Other courts have found this reasoning persuasive in approving *cy pres* distributions

11  where direct payments to class members would be *de minimis*.  *See, e.g., In re Google Buzz*

12  *Privacy Litig.*, 2011 WL 7460099, at *4 (N.D. Cal. June 2, 2011) (approving *cy pres* distribution

13  in $8.5 million settlement where the settlement class was estimated to be in the tens of millions);

14  *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *7 (approving *cy pres* distribution in $9 million

15  settlement because "[g]iven the sheer size of the Class (over 62 million Netflix members) each

16  Class member would receive a *de minimis* payment in the event of a direct class cash payout").

17         For the same reasons as those articulated in the cases above, a *cy pres* distribution in this

18  case would have been reasonable had the threshold in the settlement agreement been met (*i.e.,* if

19  the fund had been oversubscribed to the point that eligible claimants would receive less than

20  approximately $4 each, making it economically unfeasible to distribute payment to them (Settl.

21  Agmt., ¶ 28)).  Because it was not, it remained economically feasible to make direct payments to

22  eligible claimants, making the *cy pres* portion of the settlement inconsequential.

23  _____

24  *pres* distribution, recognizing that the issue was moot.  Additionally, while she continued to

25  oppose the proposed incentive awards to the class representatives, she made a request for an
    incentive award herself because she noticed that the other objectors had requested them.  Plaintiffs

26  oppose Singer's request for an incentive award, and frankly, do not understand what basis she can
    possibly have for requesting one.  She has done nothing to better the settlement or the results

27  obtained on behalf of the class; if anything, her request for money illustrates the true motive of her
    objection.

28

The objectors' philosophical arguments—to attorneys' fees, to *cy pres* relief, or to any other aspect of class actions in general—do not impede final approval in this case.  Accordingly, the Court should overrule all the objections (or, in the case of Sweeney and Singer, strike them) and grant final approval of the settlement.

### III.  CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court overrule the objections, grant final approval of the parties' settlement, and grant the further relief requested in plaintiffs' Motion for Final Approval and Attorneys' Fee Motion.

Dated: July 14, 2016

PEARSON SIMON & WARSHAW, LLP

By ___/s/ *Daniel L. Warshaw*_____
       DANIEL L. WARSHAW

Clifford H. Pearson (108523)
Daniel L. Warshaw (185365)
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8014
cpearson@pswlaw.com
dwarshaw@pswlaw.com

Bruce L. Simon (96241)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP

By ___/s/ *Robert F. Lopez*_____
       ROBERT F. LOPEZ

Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
1918 Eighth Avenue, Suite 3300

1

Seattle, WA  98101
Telephone:  (206) 623-7292

2

Facsimile:   (206) 623-0594

3

steve@hbsslaw.com
robl@hbsslaw.com

4

*Class Counsel*

5

*and Counsel for Select Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28