1  STEVE W. BERMAN (*pro hac vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  1918 Eighth Avenue, Suite 3300
   Seattle, WA 98101
3  Telephone: (206) 623-7292
   Facsimile:  (206) 623-0594
4  steve@hbsslaw.com

5  BRUCE L. SIMON (Bar No. 96241)
   PEARSON, SIMON & WARSHAW, LLP
6  44 Montgomery Street, Suite 2450
   San Francisco, CA  94104
7  Telephone: (415) 433-9000
   Facsimile:  (415) 433-9008
8  bsimon@pswlaw.com

9  *Class Counsel*
   *and Counsel for Select Plaintiffs*
10

11                   UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14 | In re                              | No. C-12-md-2330-EMC
15 | CARRIER IQ, INC., CONSUMER PRIVACY  | **DECLARATION OF DANIEL L.**
   | LITIGATION                          | **WARSHAW IN SUPPORT OF**
16 |                                     | **PLAINTIFFS' RESPONSE TO**
   |                                     | **OBJECTIONS TO CLASS SETTLEMENT**
17
18 |                                     | Date:     July 28, 2016
   |                                     | Time:     1:30 p.m.
19 | This Document Relates to:           | Judge:    Honorable Edward M. Chen
   |                                     | Dept.:    Courtroom 5, 17th Floor
20 | ALL CASES

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL L. WARSHAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS
TO CLASS SETTLEMENT

1    Daniel L. Warshaw declares:

2    1.    I am an attorney duly admitted to practice before this Court.  I am a partner in the

3  firm of Pearson, Simon & Warshaw, LLP, attorneys of record for Plaintiffs and the Proposed

4  Class, and Co-Class Counsel along with Hagens Berman Sobol Shapiro LLP.

5    2.    I am the attorney principally responsible for the handling of this matter on a day-to-

6  day basis at my firm.  I am personally familiar with the facts set forth in this declaration.  If called

7  as a witness I could and would competently testify to the matters stated herein.

8    3.    Based upon my research and analysis, it is evident that Objector Sandra Singer is

9  an attorney in Massachusetts.  For example, attached hereto as Exhibit A is a true and correct copy

10  of the first page of a brief filed by Ms. Singer in which she identifies herself as an attorney and

11  uses the same address she used to make her claim in this case.  *See Singer v. Davis*, 1999 WL

12  34827373 (1st Cir.).

13    4.    At least one court has reprimanded Ms. Singer for pursuing frivolous litigation.  *In*

14  *re Estate of Sand*, 2013 WL 375575 (N.J. Super. Ct. Feb. 1, 2013).

15    5.    I communicated with Ms. Singer via email about her claim under the settlement.  I

16  informed her that her claim was incomplete because she did not provide the phone number for her

17  covered mobile device—instead she submitted a series of 1's.  The settlement administrator later

18  invalidated Ms. Singer's claim because she refused to provide a genuine phone number for her

19  covered mobile device.

20    6.    Objector Patrick S. Sweeney has filed at least seven objections—not including his

21  objection here—to class action settlements in the last year alone.  True and correct copies of those

22  seven objections are attached hereto as follows:

23    a.    Exhibit B:  Objection filed on June 20, 2016 in *Legg v. Spirit Airlines, Inc.*,

24  No. 14-cv-61978 (S.D. Fla.) (Dkt. No. 141);

25    b.    Exhibit C:  Objection filed on May 9, 2016 in *Lofton v. Verizon Wireless*

26  *LLC*, No. 13-cv-05665 (N.D. Cal.) (Dkt. No. 214);

27    c.    Exhibit D:  Objection filed on April 26, 2016 in *In re Midland Credit Mgmt,*

28  *Inc.*, No. 11-md-02286 (S.D. Cal.) (Dkt. No. 344);

DECLARATION OF DANIEL L. WARSHAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS
TO CLASS SETTLEMENT

1        d.      Exhibit E:  Objection filed on February 25, 2016 in *Douglas v. Western*

2  *Union Co.*, No. 14-cv-01741 (N.D. Ill.) (Dkt. No. 70);

3        e.      Exhibit F:  Objection filed on December 29, 2015 in *Eggnatz v. Kashi Co.*,

4  No. 12-cv-21678 (S.D. Fla.) (Dkt. No. 191);

5        f.      Exhibit G:  Objection filed on December 28, 2015 in *LaRocque v. TRS*

6  *Recovery Servs., Inc.*, No. 13-md-02426 (D. Me.) (Dkt. No. 121);

7        g.      Exhibit H:  Objection filed on November 17, 2015 in *In re Polyurethane*

8  *Foam Antitrust Litig.*, No. 10-md-02196 (N.D. Oh.) (Dkt. No. 1968).

9        7.      One of Sweeney's recent objections filed in this district in *Lofton v. Verizon*

10  *Wireless (VAW) LLC*, No. 13-cv-05665, has led to a motion for sanctions against Sweeney

11  alleging that his objection is frivolous and harassing because he is not a class member and does

12  not have standing to object.  (Dkt. No. 223-1.)  A true and correct copy of this motion for

13  sanctions is attached hereto as Exhibit I.  Judge Yvonne Gonzalez Rogers will hear the motion

14  approximately two weeks after the fairness hearing in this case, on August 9, 2016.

15        8.      The phone number Sweeney provided on his claim form was actually the same

16  number his wife, Pamela Sweeney, previously swore was hers in another case.  (*See* Objection

17  filed in *Kolinek v. Walgreen Co.*, No. 13-cv-04806 (N.D. Ill.) (Dkt. No. 115), a true and correct

18  copy of which is attached hereto as Exhibit J.)  When pressed regarding his apparent lack of

19  standing because of this issue, Sweeney did not directly respond.

20        9.      Objector Sam A. Miorelli has filed at least three objections—not including his

21  objection here—to class action settlements just this year.  True and correct copies of those three

22  objections are attached hereto as follows:

23        a.      Exhibit K:  Objection filed on May 12, 2016 in *Zepeda v. PayPal, Inc.*, No.

24  10-cv-02500 (N.D. Cal.)[1];

25  _____

26  [1] There is no docket entry for Miorelli's objection in *Zepeda* because the court struck his

27  objection, finding that it violated the Court's standing order.  *See* Case No. 10-cv-02500 (N.D. Cal.) (Dkt. No. 319).  However, I was able to locate a copy of the objection and attach it here.

28

DECLARATION OF DANIEL L. WARSHAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS
TO CLASS SETTLEMENT

1    b.    Exhibit L:  Objection filed on March 29, 2016 in *Hendricks v. StarKist Co.*,

2  No. 13-cv-00729 (N.D. Cal.) (Dkt. No. 354);

3    c.    Exhibit M:  Objection filed on January 25, 2016 in *Legg v. Lab. Corp. of*

4  *Am. Holdings*, No. 14-cv-61543 (S.D. Fla.) (Dkt. No. 214).

5    10.    Miorelli filed an objection in the Target data breach case, *In re Target Corp.*

6  *Customer Data Security Breach Litigation*.  There, lead counsel for the consumer class, Vincent J.

7  Esades, filed a declaration supporting the plaintiffs' motion to impose an appeal bond on a number

8  of objectors, including Miorelli.  A true and correct copy of that declaration is attached hereto as

9  Exhibit N.

10    11.    Attached to Mr. Esades' declaration in *Target* was an email chain between Mr.

11  Esades and Miorelli in which Miorelli stated that he would settle his objection for "a fraction"

12  (25%) of the "almost $9.3 million in combined costs Target faces and the millions in attorney fee

13  reductions [Miorelli] proposed."  (*See* Ex. B to Mr. Esades' Decl.)  The plaintiffs in *Target*

14  rejected Miorelli's payoff demand, and the Eighth Circuit subsequently dismissed his appeal,

15  finding that he lacked standing because he was not a class member.

16    12.    Miorelli argues in his objection here that class counsel have not met their "burden"

17  relating to compliance with the guidelines to limit costs and expenses (Dkt. No. 108).  As an initial

18  matter, those guidelines were proposed by class counsel, not by the Court.  Additionally, Miorelli

19  has no basis to assert that class counsel did not follow the guidelines.  In fact, I personally

20  reviewed the time entries and costs submitted by plaintiffs' counsel and ensured that they

21  complied with the guidelines.

22    I declare under penalty of perjury under the laws of the United States of America that the

23  foregoing is true and correct.

24    Executed on July 14, 2016, at Sherman Oaks, California.

25

26    */s/ Daniel L. Warshaw*
      Daniel L. Warshaw

27

28

DECLARATION OF DANIEL L. WARSHAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS
TO CLASS SETTLEMENT

# EXHIBIT A

1999 WL 34827373 (C.A.1) (Appellate Brief)

United States Court of Appeals,

First Circuit.

Sandra SINGER, Plaintiff-Appellant,

v.

Diana DAVIS, et al, Defendants-Appellees.

Nos. 99-1092, 99-1376, 99-1581.

1999.

Appeal from the District Court for the District of Massachusetts

**Brief of Appellant**

Sandra M. Singer, Esq., P.O. Box 15424, Boston, Mass. 02215.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii
STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..................... 1
STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................... 2
STATEMENT OF THE CASE ............................................................................. 10
STATEMENT OF FACTS ................................................................................. 13
SUMMARY OF THE ARGUMENT ...................................................................... 50
ARGUMENT ................................................................................................. 55
THE DISTRICT COURT ERRED IN ITS RULING THAT THE FEDERAL COURT        55
IS WITHOUT AUTHORITY TO SET ASIDE THE FINAL JUDGEMENTS OF STATE
COURTS OR TO DISREGARD THOSE FINAL JUDGEMENTS REGARDLESS OF THE
QUALITY OF THOSE PROCEEDINGS, REGARDLESS OF WHETHER THEY FAIR
PROCEEDINGS, COMPLY WITH THE CONSTITUTION, OR PROVIDE DUE PROCESS
.................................................................................................................
THE DISTRICT COURT ERRED IN ITS RULING DISMISSING THE CASE FOR AN       73
ALLEGED FINAL JUDGEMENT AS EVEN ASSUMING ARGUENDO THERE WAS A
FINAL JUDGEMENT THERE WERE ACTIONS WHICH WERE NOT PART OF THE
ALLEGED FINAL JUDGEMENT AND WHICH OCCURRED AFTER THE ALLEGED
FINAL JUDGEMENT OVER WHICH THE FEDERAL COURT HAS JURISDICTION. ....
THE DISTRICT COURT ERRED IN DISMISSING THE CASE SUA SPONTE WITH         81
NO NOTICE TO THE PLAINTIFF, NO OPPORTUNITY TO BE HEARD, AND NO
OPPORTUNITY TO AMEND ...............................................................................
THE DISTRICT COURT STATEMENT THAT CERTAIN CLAIMS WERE                    91
INSUPPORTABLE IN FACT IS INCORRECT. THE DISTRICT COURT ERRED
IN MAKING SUCH A STATEMENT AND IN MAKING SUCH A STATEMENT
WITHOUT STATING WHAT THE ALLEGED STATEMENTS THAT HE ALLEGES
WERE INSUPPORTABLE IN FACT WERE ...............................................................
THE FEDERAL DISTRICT COURT JUDGE HAS PERSONAL KNOWLEDGE THAT           93
FRAUD IS BEING PERPETRATED AND THUS SHOULD HAVE TAKEN STEPS TO
STOP IT AND CORRECT IT. ...............................................................................
CONCLUSION ............................................................................................... 102

TABLE OF AUTHORITIES

CASES

*Black v. Ryder,* 15 F.3d 573............................................... 80

# EXHIBIT B

Case 3:12-md-02330-EMC Document 464-1 Filed 07/14/16 Page 8 of 200

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN
## DISTRICT OF FLORIDA
## FORT LAUDERDALE
## DIVISION

### CASE NO. 0:14-cv-61978-JIC (*Legg*)
### CASE NO. 0:15-cv-61375-JIC (*Rosen*)

CHRISTOPHER W. LEGG,
individually and on behalf of all
others similarly situated,

                Plaintiff,

v.

SPIRIT AIRLINES, INC., a Delaware
corporation,

                Defendant.

---

JOSEPH ROSEN, individually and on
behalf of all others similarly situated,

                Plaintiff,

v.

SPIRIT AIRLINES, INC., a Delaware
corporation,

                Defendant.

---

## OBJECTION OF KERRY ANN SWEENEY TO PROPOSED SETTLEMENT AND NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING

NOW COMES, KERRY ANN SWEENEY by and through her undersigned counsel Patrick S. Sweeney, hereby files these objections to the proposed settlement in this matter.

## PROOF OF MEMBERSHIP IN CLASS

Upon information and belief and to the best of her recollection Kerry Ann Sweeney ("Objector") believes she is a member of the class as defined in that certain notice of class dated December 4, 2016 (sic) ("Notice"). She has filed a timely claim in this matter and her claim number is RJDOXFEN. Her address and is:

> Kerry Ann Sweeney
> 1223 20th Street
> Apt. 101
> Santa Monica, CA 90404

Further, all additional contact information is directed to the signature page of this document where Objector's counsel's contact information is contained. Objector hereby requests that all contract be directed at Objector's counsel.

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that neither she nor her undersigned counsel intend to appear at the Fairness Hearing presently scheduled for June 20, 2016 at 9:00 am EDT before Honorable James I. Cohn United States District Court

for the Southern District of Florida, U.S. Federal Building and Courthouse, 299

East Broward Blvd. Courtroom 203E, Fort Lauderdale, FL33301.

## REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1. Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised. The proposed settlement orders no counsel, not various class counsel attorneys nor any defense attorney, (notwithstanding the large amount of attorney fees to be earned by the numerous law firms involved in this case), to monitor the settlement process to its ultimate completion.

   It would obviously be more prudent to withhold a portion of Class Counsel's fee until the entire distribution process is complete. Furthermore, it would also be judicious to require Class Counsel   (and perhaps Defense Counsel as well) to report back to this Honorable Court with a final summary and accounting of the disbursement process (even if brief) in order to confirm that this matter has been successfully concluded and to allow this Honorable Court to "put its final stamp of approval" on the case.

   Objector is aware that this is not the "usual" procedure in Class Action proceedings.  Nonetheless, Objector submits the proposed process is an improvement to the usual procedure, which is the status quo in Class Action cases. Objector states that nothing in the above proposed procedure violates the letter or spirit of the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715, (the "Act")  Rule 23 F.R.C.P.(the "Rule") nor the body of case law developed (all three collectively referred herein as "Class Action Policy"). Accordingly, Objector hereby urges this Honorable Court to adopt such a procedure as a "best practice standard " for Class Action settlements.

2.  No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing the settlement. Objector hereby contends that the withholding of a reasonable sum of awarded attorney fees would elevate the concerns raised herein regarding Paragraphs No. 1 above.

3.  Attorney fees do not depend upon how much relief is actually paid to the Class Members. It appears that the proposed settlement will award Class Counsel its fee notwithstanding the amount of relief to Class Members. In any other area of the law when, awarding attorney fees, this practice would be considered inequitable at best and excessive at worse

4.  The Objector states that in the 140 (Legg case) and 134 (Rosen case) Docket Entries very few entries were substantive in nature. In fact, only the Plaintiff's Complaint(s), and Defendant's Answer, had any significant legal basis to its content. The remaining entries are procedural in nature. There was no Motion to Dismiss filed in this case. There were no prolonged discovery disputes to sort out. There was no Motion for Summary Judgment to be defended. There was no trial. The combined 274 Docket Entries (many were nearly duplicative between the Legg case and the Rosen case) computes to an unfathomable $9,100.00 per Docket Entry. This is hardly the record of a case justifying Class Counsel's attorney fees in the amount of $2,500,000.00 plus expenses.

    It is also notable that the Settlement was reached in principal in approximately 12 months following the commencement of this action. Furthermore, Class Counsel's Memorandum of Law in Support of the Motion for Attorney's Fees appears to be a catalogue of cases whereby other lawyers were successful in obtaining excessive fee awards and not a compelling recitation of why the fees and costs are appropriate in this specific case.

5.  The attorney fees and costs calculation is also unfair in that the percentage of the settlement amount is far too high. It is stated in the Notice that the cost and attorney fees are $2,500,000.00. That is thirty three percent per cent (33%) of the total settlement amount. This number on its face is simply too high. Moreover, if the percent is calculated as a percent of the actual dollars available to the Class Members then the percent becomes much higher. The attorney fees and costs, using this method, are sixty percent (60%) of the monies available to the Class Members. By

way of example, the Settlement Fund is $7.5 million dollars. Assuming the costs and expense of the litigation are $200,000.00 and administrative costs are $500,000.00 (the fact that Objector must make these assumptions points to the inadequate description of the Settlement in the Notice). The class representative award is $10,000.00 that means the net Settlement Funds available to the Class Members is $4,290,000.00. $2,500,000.00 is approximately 59% of the net Settlement Funds available to the Class Members.

6. No fee request is reasonable in the absence of documentation, including detailed billing records (not simply hourly rates of the professionals and hours accumulated), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request.

7. Some *cy pres* procedure needs to be articulated so that Class Members and the Court can intelligently comment, object or approve the appropriateness of the *cy pres* procedure, recipient and potential amount of the *cy pres* distribution. The *cy pres* distribution and recipient should have a direct and substantial nexus to the interests of absent class members and thus properly provide for the 'next best distribution' to the class. Whatever method is used to arrive at determining an appropriate *cy pres* procedure and recipient can be a legitimate discussion between informed parties and therefore appropriate. Allowing the process to be determined solely by the Court at a later date does not allow the Objector to be able to determine if the settlement is fair and reasonable nor consistent with Class Action Policy.

8. The Objector hereby adopts and joins in all other objections that are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for her role in improving the Settlement, if applicable.

Dated:   June 20, 2016

By: _____

Patrick S. Sweeney, Esquire
Florida Bar No. 593486
2590 Richardson Street
Madison, WI 53711
Phone: 310-339-0548
Fax: 561-395-9390
patrick@sweeneylegalgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2016, I electronically filed the foregoing, with the Clerk of the Court of the United States District Court for the Southern District of Florida by using the USDC CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the USDC CM/ECF system, to wit:

___/s/_____
Patrick S. Sweeney

EXHIBIT C

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

FILED

JOHN LOFTON, an individual, )
on his own behalf and on behalf )
of all others similarly situated, )
                       )
   Plaintiffs,         )
                       )
v.                      )
                       )
VERIZON WIRELESS LLC, )
and DOES 1-100, inclusive, )
                       )
   Defendants.        )
                       )

MAY – 9 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Case No. 13-05665 YGR

## OBJECTION OF PATRICK S. SWEENEY TO PROPOSED SETTLEMENT AND NOTICE OF INTENT NOT TO APPEAR AT FAIRNESSHEARING

NOW COMES, Pro Se Objector PATRICK S. SWEENEY, hereby files these objections to the proposed settlement in this matter.

### PROOF OF MEMBERSHIP IN THE CLASS

Upon information and belief Patrick S. Sweeney ("Objector") has reviewed that certain notice of class action and proposed settlement which is dated February 22, 2016 (the "Notice"). As a result, he believes that he is a member of the class, he has timely filed a claim and his Claim Number is 32907716

His address, e-mail address and telephone number are listed at the conclusion of this objection.

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that he does NOT intend to appear at the Fairness Hearing presently scheduled for May 24, 2016 at 2:00 p.m. PDT., at the United States District Courthouse for the Northern Division of California, 1301 Clay Street, Oakland, CA 94612.

## REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1. No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing the settlement. Objector hereby contends that the withholding of a reasonable sum of awarded attorney fees would elevate the concerns raised herein regarding Paragraphs Nos. 1 & 2 above.

2. Attorney fees do not depend upon how much relief is actually paid to the Class Members. It appears that the proposed settlement will award Class Counsel its fee notwithstanding the amount of relief. This practice would be considered inequitable at best and excessive

at worse in many other area of the law when awarding attorney fees.

3.    The fee calculation is unfair in that the percentage of the settlement amount is far too high. The Objector states that in the 212 Docket Entries very few entries were substantive in nature. Many were merely Docket Entries that were procedural in nature. This is hardly the record of a case justifying Class Counsel's requested Attorneys' Fees in the amount of $1,350,000 and related costs of almost $500,000.00.

It is also notable that the Settlement in principle was reached in less than two years following the commencement of this action. Furthermore, Class Counsel's Memorandum of Law in Support of the Motion for Attorney's Fees appears to be a catalogue of cases whereby other lawyers were successful in obtaining excessive fee awards and not a compelling recitation of why the fees and costs are appropriate in this specific case.

4.    No fee request is reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and reasonable cost incurred), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request.

5.    Some *cy pres* procedure needs to be articulated so that Class Members and the Court can intelligently comment, object or approve the appropriateness of the *cy pres* procedure, recipient and amount of the *cy pres* distribution. The *cy pres* distribution and recipient should have a direct and substantial nexus to the interests of absent class members and thus properly provide for the 'next best distribution' to the class. Whatever method is used to arrive at determining an appropriate *cy pres* procedure and recipient can be a legitimate discussion between informed parties and therefore appropriate. Allowing for no specific *cy pres* process to be determined in the Notice is not appropriate nor consistent with Class Action Policy.

6.   The Objector hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE,** This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for his role in improving the Settlement, if applicable.


Respectfully submitted,


Patrick S. Sweeney, Pro Se
1223 20th Street Apt 101
Santa Monica, Ca 90404et
424-299-6269
eb5ventures@gmail.com




## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2016, I caused to be filed the foregoing with the Class Action Clerk, United States District Court for Northern District of California, 1301 Clay Street, Oakland, CA 94612 by sending this document via U.S. First Class Mail so that this document would be postmarked within the timeframe described in the Legal Notice published in this case. In addition, when the Clerk files this document in the docket for this case all parties in this case who use the CM/ECF filing system will be noticed.

# EXHIBIT D

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA

IN RE: MIDLAND CREDIT

MANAGEMENT, INC.                    Master File No. 1:12-cv-03852-GBD

                                         CLASS ACTION

**OBJECTION OF PATRICK S. SWEENEY TO PROPOSED SETTLEMENT AND
NOTICE OF INTENT NOT TO APPEAR AT FAIRNESS HEARING**

NUNC PRO TUNC
APR 2 2 2016

FILED
APR 2 6 2016
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

NOW COMES, Pro Se Objector PATRICK S. SWEENEY and hereby files these objections to the proposed settlement in this matter.

## PROOF OF MEMBERSHIP IN THE CLASS

Upon information and belief Patrick S. Sweeney, *Pro Se* ("Objector") has reviewed that certain notice of class action and proposed settlement which is not dated. (the "Notice"). As a result, he believes that he is a member of the class, as it is defined in that Notice. He has filed a timely claim with the Settlement Administrator. His address, e-mail address and telephone number are listed at the conclusion of this objection.

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that he does NOT intend to appear at the Fairness Hearing presently scheduled for August 28, 2016 at 11:00 a.m. EST before Honorable Michael M. Anello, at the United States District Court for the Southern Division of California, in San Diego, California.92101.

# REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor adequate:

1.  Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised. The proposed settlement orders no counsel, not various class counsel nor any defense attorney (notwithstanding the large amount of attorney fees to be earned by the numerous law firms involved in this case) to monitor the settlement process to its ultimate completion.

    It would obviously be more prudent to withhold a portion of Class Counsel's fee until the entire distribution process is complete. Furthermore, it would also be judicious to require Class Counsel (and perhaps Defense Counsel as well) to report back to this Honorable Court with a final summary and accounting of the disbursement process (even if brief) in order to confirm that this matter has been successfully concluded and to allow this Honorable Court to "put its final stamp of approval" on the case.

    Objector is aware that this is not the "usual" procedure in Class Action proceedings. Nonetheless, Objector submits the suggested process is an improvement to the present procedure which is the status quo in Class Action cases. Also nothing in the above proposed procedure violates the letter or spirit of the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715,(the "Act") Rule 23 F.R.C.P.(the "Rule") nor the body of case law developed (all three collectively referred to herein as "Class Action Policy"). Objector hereby urges this Honorable Court to adopt such a procedure as a "best practice standard for Class Action settlements.

2.  No timeframe for completing administration of the monetary relief is set, so Class Members cannot know when payment would arrive. Moreover the Settlement Administrator is not held to any specific timeframe to complete the settlement process.

3.  No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing the settlement. Objector hereby contends that the withholding of a reasonable sum of awarded attorneys fees would elevate the concerns raised herein regarding Paragraphs Nos. 1 & 2 above.

4.  Attorney fees do not depend upon how much relief is actually paid to the Class Members. It appears that the proposed settlement will award Class Counsel its fee notwithstanding the amount of relief. This practice would be considered inequitable at best and excessive at worse in many other area of the law when awarding attorney fees.

5.  The fee calculation is unfair in that the percentage of the settlement amount

is far too high. After a review of the Docket there appears to be only 347 docket entries. In addition, very few entries were substantive in nature. In fact, only the Plaintiff's Complaint(s), Defendant's Answer and, Defendant's Motion to Dismiss, Plaintiff's Motion to Approve Settlement and Award Attorney's Fees had any significant legal basis to its content. The remaining docket entries were procedural in nature. Regarding the Docket entries, approximately 55 were in the form of a Notice (usually a 1 or 2 page document); 21 were in reference to letters filed with Court (usually a brief correspondence with some reference to a procedural "housekeeping" matter); 41 entries were in regard to a *pro hoc vice* request; 52 entries were documents generated by the Court in the form of an order, minute entry or a filing of a transcript and, finally 7 were merely Court or the Clerks procedural items.

6.
There was no Motion for Summary Judgment. There was no prolonged discovery dispute. There was no trial. This is hardly the record of a case justifying Class Counsel's requested Attorneys' Fees in the amount of $2,750,000.

7.     No fee request is reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and reasonable cost incurred), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the request.

8.     Some *cy pres* procedure needs to be articulated so that Class Members and the Court can intelligently comment, object or approve the appropriateness of the *cy pres* procedure, recipient and amount of the *cy pres* distribution. The *cy pres* distribution and recipient should have a direct and substantial nexus to the interests of absent class members and thus properly provide for the 'next best distribution' to the class. Whatever method is used to arrive at determining an appropriate *cy pres* procedure and recipient can be a legitimate discussion between informed parties and therefore appropriate. Allowing the process to be determined solely by Lead Class Counsel and Court overview is neither appropriate nor consistent with Class Action Policy.

9.     Attorneys' fees are disproportionate to the value of the Recovery of the Class (See Paragraphs 3, 4. 5 and 6 above).

10.    There are no estimates or caps on the amount of costs and expenses that Class Counsel intends to request to be paid or reimbursed from the Settlement Fund. Not only should the costs and expenses be estimated as closely as possible but that estimate should be itemized in as much detail as possible. Also, a ceiling needs to be articulated in order to promote efficiency in the claim process. Finally, a final accounting should submitted to the Court for final approval.

11.    The Notice is inadequate in that no alleged violated statutes are referenced, no briefing schedule is included and that an Objector's only remedy is to write a letter/brief setting forth objections. At the very least, the Settlement should require the Defendants to admit or deny certain facts regardless of

3

whether they admit to any specific violation of the Telephone Consumer Protection Act. These admissions, although not sufficient for any type of adjudication, are appropriate as a substantial penalty to the Defendant. Furthermore, identifying, articulating and admitting to the specific actions, will act as a deterrent to this Defendant and others who might contemplate committing the specified acts in the future.

12.      The Objector hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1.   Sustain these Objections;

2.   Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3.   Award an incentive fee to this Objector for his role in improving the Settlement, if applicable.

Respectfully submitted,

Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
310-339-0548
patrickshanesweeney@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for Southern District of California by sending this document via U.S. First Class Mail so that this document would be postmarked within the timeframe described in the Legal Notice published in this case. In addition,

when the Clerk files this document in the docket for this case all parties in this case who use the CM/ECF filing system will be noticed.

_____

Patrick S. Sweeney, Pro Se

2590 Richardson Street
Madison, Wisc.
53711

APR 2 6 2016
U.S. MAGISTRATE COURT
SOUTHERN DISTRICT OF CALIFORNIA
RECEIVED

Clerk of the Court
Courtroom 3A
U.S. District Court
Southern District of Calif.
221 West Broadway
San Diego, California 92101

# EXHIBIT E

*Tom*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**



FEB 2 5 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

JASON DOUGLAS, individually and on )
Behalf of all others similarly situated, )
                                 )
            Plaintiff,      )
                                 )
v.                               )
                               )
                               )
THE WESTERN UNION COMPANY, )
a Delaware corporation,       )
                               )
            Defendant.    )
                               )

Case No. 14-cv-1741
Hon. Gary Feinerman
Hon. Jeffrey Cole

## OBJECTIONS OF PATRICK S. SWEENEY AND PAMELA A. SWEENEY TO PROPOSED SETTLEMENT AND NOTICE OF INTENTION TO APPEAR AT FAIRNESS HEARING

NOW COMES, Pro Se Objectors PATRICK S. SWEENEY and PAMELA A.

SWEENEY, hereby files these objections to the proposed settlement in this matter.

# PROOF OF MEMBERSHIP IN CLASS

Upon information and belief Patrick S. Sweeney (herein referred to as "Patrick") and Pamela A. Sweeney (herein referred to as "Pamela") (herein collectively referred to, in the singular, as the "Objector") have reviewed the notice and believe that they are members of the class as defined in that certain Notice of Class Action and Proposed Settlement dated December 14, 2015 (herein referred to as the "Notice"). These representations are made under the penalty of perjury. Patrick intends to file a Claim in this matter on or before February 22, 2016 (Claim deadline according to the Notice). Pamela has already filed her Claim. Her Claim Number is **WG7NO3TK**. Pamela and Patrick's address, e-mail addresses and telephone numbers are listed at the conclusion of this objection.

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that they do **NOT** intend to appear at the Fairness Hearing

presently scheduled for April 11, 2016 at 10:30 a.m. CST before Honorable Gary Feinerman at

the Everett McKinley Dirksen United States Courthouse, Courtroom 2125, 219 South Dearborn

Street, Chicago, Illinois 60604.

## REASONS FOR OBJECTING TO THE SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable nor
adequate:

1.    Claims administration process fails to require reliable future oversight,
accountability and reporting about whether the claims process actually delivers
what was promised. The proposed settlement orders no counsel, not various
class counsel attorneys nor any defense attorney (notwithstanding the large
amount of attorney fees to be earned by the numerous law firms involved in this
case) to monitor the settlement process to its ultimate completion.

It would obviously be more prudent to withhold a portion of Class Counsel's fee
until the entire distribution process is complete. Furthermore, it would also be
judicious to require Class Counsel (and perhaps Defense Counsel as well) to
report back to this Honorable Court with a final summary and accounting of the
disbursement process (even if brief) in order to confirm that this matter has been
successfully concluded and to allow this Honorable Court to "put its final stamp
of approval" on the case.

Objector is aware that this is not the "usual" procedure in Class Action
proceedings. Nonetheless, Objector submits the suggested process is an
improvement to the present procedure which is the status quo in Class Action
cases. Also nothing in the above proposed procedure violates the letter or spirit
of the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and
1711–1715,(the "Act") Rule 23 F.R.C.P.(the "Rule") nor the body of case law
that has developed in the class action arena (all three collectively referred herein
as "Class Action Policy") Objector hereby urges this Honorable Court to adopt
such a procedure as a "best practice standard " for Class Action settlements.

2. No timeframe for completing administration of the monetary relief is set, so Class Members cannot know when payment would arrive. Moreover, the Settlement Administrator is not held to any specific timeframe to complete the settlement process.

3. No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing the settlement. Objector hereby contends that the withholding of a reasonable sum of awarded attorneys fees would alleviate the concerns raised herein regarding Paragraphs Nos. 1 & 2 above.

4. Attorney fees do not depend upon how much relief is actually paid to the Class Members. It appears that the proposed settlement will award class counsel its fee notwithstanding the amount of relief actually achieved by the Class. This practice would be considered inequitable at best and excessive at worse in many other areas of the law when awarding attorney fees.

5. The fee calculation is unfair in that the percentage of the settlement amount is far too high (it is stated in the Notice that it is 35%, which is high, but if the percent is arrived at by using monies actually awarded class members the percentage is even higher).

The Objector hereby states that, of the 68 docket entries on PACER, very few entries were substantive in nature. In fact, only the Plaintiff's Complaint, Defendant's Answer, Plaintiff's Motion to Strike Answer, Plaintiff's Motion for Preliminarily Approval of Settlement and Final Motion to Approve the Settlement and Award Attorney's Fees had any significant legal substance in its content (although the Motion to Approve Attorney's Fees did appear to have significant legal substance ). The remaining entries were mostly procedural in nature. This is hardly the type of case justifying Plaintiff's Attorneys' Fees in the amount of $2,891,000, plus an undetermined amount of fees and expenses.

It is also notable that the Settlement was reached in principal in approximately 19 months following the commencement of this action. Furthermore, Class Counsel's Memorandum of Law in Support of the Motion for Attorney's Fees appears to be a catalogue of cases whereby other lawyers were successful in obtaining excessive fee awards and not a compelling recitation of why the fees and costs are appropriate in this specific case.

6.    The fee request is not reasonable in the absence of documentation, including detailed billing records (including hourly rates of the professionals, hours accumulated and reasonable costs incurred), which can be evaluated by Class Members and the Court to determine the reasonable nature (or not) of the fee request.

7.    Some *cy pres* procedure needs to be articulated so that Class Members and the Court can intelligently comment, object or approve the appropriateness of the *cy pres* procedure, recipient and amount of the *cy pres* distribution. The *cy pres* distribution and recipient should have a direct and substantial nexus to the interests of absent class members and thus properly provide for the 'next best distribution' to the Class. Whatever method is used to determine an appropriate *cy pres* procedure and recipient should be a legitimate discussion between informed parties. Allowing the process to be determined at a later date by an undefined process is not an appropriate method nor consistent with Class Action Policy. It also gives no due process for any Class Member who might object to the *cy pres* process and result.

8.    Attorneys' fees are disproportionate to the value of the Recovery of the Class (See Paragraphs 3, 4. 5 and 6 above).

9.    The Objector herein hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.


## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for their role in improving the Settlement, if applicable.

Respectfully submitted by:

Pamela A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
310-339-0548
pam.1sweeney@gmail.com

Patrick A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
310-339-0548
patrick@sweeneylegalgroup.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 22, 2016, I caused to be filed the foregoing with the Clerk of the Court of the United States District Court for the Northern District of Illinois by sending this document via U.S. First Class Mail Delivery thus complying within the timeframe described in the Legal Notice published in this case.

I also provided a copy of these documents to the counsel for the Plaintiffs and the Defendants via e-mail on February 22, 2016. All addresses for the recipients are as described below.

PLAINTIFF'S COUNSEL
Joseph J. Siprut, Esquire
SIPRUT PC
17 North State Street190 LaSalle Street, Suite 1600
Chicago, IL 60602

DEFENDANT'S COUNSEL
Mark Master, Esquire
Kathleen P. Lilly, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611

U.S. DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
Clerk of Court's Office
EVERETT MCKINLEY DIRKSEN
UNITED STATES COURTHOUSE
219 South Dearborn Street
Chicago, IL 60604

SETTLEMENT ADMINISTRATOR
Western Union Text Message Settlement
C/O Epiq Systems, Inc.
PO Box 3145
Portland, OR 97208-3145

Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
310-339-0548
patrick@sweeneylegalgroup.com

# EXHIBIT F

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

LAURA EGGNATZ and KATRINA GARCIA,

individually, and on behalf of all others similarly situated,

Case No.: 12-21678-CIV

- LENARD/GOODMAN

> *Plaintiffs*,

vs.

KASHI COMPANY, a California Corporation,

> *Defendants.*

_____/

FILED by _PG_ D.C.

DEC 2 9 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

## OBJECTION OF PATRICK S. SWEENEY TO PROPOSED SETTLEMENT AND NOTICE OF INTENT TO APPEAR

NOW COMES, Pro Se Objector PATRICK S. SWEENEY, hereby files these objections to the proposed settlement in this matter (the "Objections").

**PROOF OF MEMBERSHIP IN CLASS**

Upon information and belief Patrick S. Sweeney believes that he is a member of the class as defined in that certain Notice of Class Action Settlement which is undated. He intends to file a claim in this matter on or before January 19, 2016. His address and telephone number are listed at the conclusion of this objection.

**NOTICE OF INTENT TO APPEAR**

Objector hereby gives notice that he does not intend to appear at the Fairness Hearing presently scheduled for January 27, 2016 at 2:30 p.m. EST before Honorable Joan A. Lenard

1

at the United States Courthouse, Courtroom 12-1, 400 North Miami Avenue, Miami, FL

33128.

## I.

Reason for Objecting to Settlement:

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable and adequate.

1. Claims administration process fails to require reliable oversight, accountability, and reporting about whether the claims process actually delivers what was promised.

2. Timeframes and deadlines benefit Defendants and Class Counsel, but not Class Members; No timeframe for completing administration of the Monetary Relief is set, so Class Members cannot know when payment would arrive.

3. No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing settlement.

4. Attorney fees do not depend upon how much relief is actually paid to the Class Members.

5. The fee calculation is unfair in that the percentage of the settlement amount is far too high. The Class may receive as little as $2,000,000.00 while the attorney's fees are fixed at $1,500,000.00. Therefore, the attorney fees are disproportionate to the value of the Recovery of the Class.

6. Fee request is not reasonable in the absence of documentation, including billing records, which can be evaluated by Class Members and the Court.

7. Notice is inadequate in that no alleged violated statutes are referenced, no briefing schedule is included and that an objector's only remedy is to write a letter setting forth Objections.

8. The Settlement Agreement lacks critical information which must be determined before final approval, such as where unclaimed funds will go.

The objector herein hereby adopts and joins in all other objections which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## II.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for her role in improving the Settlement, if applicable.

Dated:  December 22, 2015,       By: _____

Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
Telephone: (310-339-0548
Facsimile: (561)395-9093

Email:patrickshanesweeney@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2015, I filed the foregoing with the Clerk of the Court of the United States District Court for the Southern District of Florida and to Class Counsel and Defense Counsel at the addresses set forth below via U.S. First Class Mail.

By: _____

Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI

Clerk of Courts
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, FL 33128

Class Counsel

Mark A. Milstein
Gillian L.Wade
Sara D. Avila

3

MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405

Defendant's Counsel
Dean K. Panos
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, Illinois 60654-2456

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

U.S. DISTRICT COURT
PORTLAND, MAINE
RECEIVED AND FILED

2015 DEC 28  P 2: 30

DEPUTY CLERK

JEAN LaROCQUE, by and through her ) 
appointed Power of Attorney, DEIDRE ) 
SPANG, on behalf of herself and all others ) 
similarly situated, )

    Plaintiff, )

v. )

TRS RECOVERY SERVICES, INC. )

    Defendants. )

Civil Action No.  13-2426

## OBJECTION OF PATRICK S. SWEENEY TO PROPOSED SETTLEMENT AND NOTICE OF INTENT TO APPEAR

NOW COMES, Pro Se Objector PATRICK S. SWEENEY, hereby files these objections to the proposed settlement in this matter.

## PROOF OF MEMBERSHIP IN CLASS

Upon information and belief Patrick S. Sweeney, Pro Se ("Objector") has reviewed the Notice of Class Action Settlement and as a result believes that he is a member of the class as defined in that certain Notice of Class Action Settlement which is undated but is posted on the class action's website. He has timely file a claim.   His address and telephone number are listed at the conclusion of this objection.

## NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that he does not intend to appear at the Fairness Hearing presently scheduled for January 21, 2016, at 10:00 a.m. EST before Honorable Judge Hornby

at the United States Courthouse for the District of Maine, 156 Federal Street, Portland, Maine
04101.

## I.

### Reason for Objecting to Settlement:

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable and
adequate.

1. Claims administration process fails to require reliable oversight,
   accountability, and reporting about whether the claims process actually
   delivers what was promised.

2. Timeframes and deadlines benefit Defendants and Class Counsel, but not
   Class Members; No timeframe for completing administration of the
   Monetary Relief is set, so Class Members cannot know when payment
   would arrive.

3. No amount of attorney fees is to be withheld to assure Class Counsel's
   continuing oversight and involvement in implementing settlement.

4. Attorney fees do not depend upon how much relief is actually paid to the
   Class Members.

5. The fee calculation is unfair in that the percentage of the settlement amount
   is far too high.

6.
7. Any fee awarded prior to knowing the amount of relief actually paid to Class
   Members must be limited to lodestar calculation.

8. Fee request is not reasonable in the absence of documentation, including
   billing records, which can be evaluated by Class Members and the Court.

9. Attorneys' fees are disproportionate to the value of the Recovery of the
   Class. The Settlement Fund is $3,340,000 but only $2,045,000 will be
   distributed to the Class Members. Thus $1,035 of $2,045,000 is actually
   50.65 % of the amount available for distribution to the Class Members.

10. Notice is inadequate in that no alleged violated statutes are referenced, no
    briefing schedule is included and that an objector's only remedy is to write a
    letter setting forth objections.

The Objector herein hereby adopts and joins in all other objections which are based on
sufficient precedent and theories of equity and law in this case and hereby incorporates said
objections by reference as if they were fully described herein.

## II.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that

the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to
   alleviate the inherent unfairness, inadequacies and unreasonableness of the
   proposed settlement.

3. Award an incentive fee to this Objector for her role in improving the Settlement, if
   applicable.

Dated:   December 22, 2015                       By: _____

                                                     Patrick S. Sweeney, Pro Se
                                                     2590 Richardson Street
                                                     Madison, WI 53711
                                                     Telephone: (310)-339-0548
                                                     Facsimile: (561)395-9093
                                                     Email:patrickshanesweeney@gmail.com

## CERTIFICATE OF SERVICE

Dated:   December 22, 2015,                      By: _____

                                                     Patrick S. Sweeney, Pro Se
                                                     2590 Richardson Street
                                                     Madison, WI 53711
                                                     Telephone: (310-339-0548
                                                     Facsimile: (561)395-9093
                                                     Email:patrickshanesweeney@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2015, I filed the foregoing with the Clerk of the
Court of the United States District Court for the District of Maine and to Class Counsel and
Defense Counsel at the addresses set forth below via U.S. First Class Mail.

By: _____
Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711

Clerk of Courts
United States District Court
 District of Florida
156 Federal Street
Portland, Maine 04101

Class Counsel:
Francis & Mailman, P.C.
100 Broad Street
19th Floor
Philadelphia PA  19110

Defense Counsel:
Donald R. Frederico
Pierce Atwood, LLP
100 Summer Street
Suite 2250
Boston, MA 02110

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

FILED

2015 NOV 17 PM 1: 42

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

IN RE: POLYURETHANE FOAM    )    MDL DOCKET NO. 2196
ANTITRUST LITIGATION        )
                            )    INDEX NO. 10-MD-2196 (JZ)
                            )

The Document Relates to:

ALL INDIRECT PURCHASER CLASS CASES

---

### OBJECTION OF PATRICK S. SWEENEY TO PROPOSED SETTLEMENT

NOW COMES, Pro Se Objector PATRICK S. SWEENEY, hereby files these objections (the "Objections") to the proposed settlement in this matter.

### PROOF OF MEMBERSHIP IN CLASS

Upon information and belief Patrick S. Sweeney, of 2590 Richardson Street, Madison, Wisconsin 53711 asserts he is a member of the class as defined in that certain Long Form Legal Notice of Flexible Polyurethane Foam Class Action Settlement which is undated. He has filed a claim via the Settlement Web Site and has been assigned the claim number of "Claim Number 27885846". This claim was filed timely. His address and telephone number are listed at the conclusion of this Objection.

### NOTICE OF INTENT TO APPEAR

Objector hereby gives notice that, at this time, he does not intend to appear at the Fairness Hearing presently scheduled for December 15, 2015, at Ashley U. S. Courthouse, 1716 Spielbusch Avenue, Toledo, Ohio 43604.

## ITEMS PURCHASED CONTAINING FLEXIBLE POLYURETHANE FOAM

The item purchased by Patrick S. Sweeney was one Sealy mattress. The item was purchased at American TV, Madison, WI, in the year 2002. The cost of the mattress was approximately $2800.

## REASONS FOR OBJECTING TO THE PROPOSED SETTLEMENT

For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable and adequate:

1. Claims administration process fails to require reliable oversight, accountability, and reporting about whether the claims process actually delivers what was promised.
2. Timeframes and deadlines benefit Defendants and Class Counsel, but not Class Members; No timeframe for completing administration of the monetary relief is set, so Class Members cannot know when payment would arrive.
3. No amount of attorney fees is to be withheld to assure Class Counsel's continuing oversight and involvement in implementing settlement.
4. The fee calculation is unfair in that the percentage of the settlement amount is far too high.
5. Costs of litigation and attorney fees requested are not reasonable in the absence of documentation, including billing records, which can be evaluated by Class Members and the Court.
6. Attorneys' fees are disproportionate to the value of the recovery of the Class.
7. This Objector herein hereby adopts and joins in all other objections, if any, which are based on sufficient precedent and theories of equity and law in this case and hereby incorporates said objections by reference as if they were fully described herein.

## CONCLUSION

**WHEREFORE**, This Objector, for the foregoing reasons, respectfully requests that the Court, upon proper hearing:

1. Sustain these Objections;

2. Enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

3. Award an incentive fee to this Objector for his role in improving the Settlement, if applicable.

Dated:   November 11, 2015

By: _____
Patrick S. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711
Telephone: (310)-339-0548
Facsimile: (561)395-9093
Email: patrickshanesweeney@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2015, I caused to be filed, this Objection, via U. S. Mail with the Clerk of the Court of the United States District Court for the Northern District of Ohio with a copy sent by U.S. Mail and electronically to Class Counsel, Marvin A. Miller, Miller Law Firm, 115 LaSalle Street, Suite 2910, Chicago, Illinois

# EXHIBIT I

David C. Parisi (162248)
Suzanne Havens Beckman (188814)
PARISI & HAVENS LLP
212 Marine Street, Suite 100
Santa Monica, California 90405
(818) 990-1299 (telephone)
(818) 501-7852 (facsimile)
dcparisi@parisihavens.com
shavens@parisihavens.com

Ethan Preston (263295)
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
(972) 564-8340 (telephone)
(866) 509-1197 (facsimile)
ep@eplaw.us

*Attorneys for Plaintiff John Lofton, on his own behalf, and behalf of all others similarly situated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN LOFTON, an individual, on his own behalf and on behalf of all others similarly situated,

               Plaintiff,

      v.

VERIZON WIRELESS (VAW) LLC, and DOES 1-100, inclusive,

               Defendants.

No. C 13-05665 YGR

Honorable Yvonne Gonzalez Rogers
Honorable Jacqueline Scott Corley

**PLAINTIFF JOHN LOFTON'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING HIS MOTION TO SANCTION PATRICK SWEENEY UNDER RULE 11 AND UNDER THE COURT'S INHERENT AUTHORITY**

Date:       August 9, 2016
Time:       2:00 p.m.
Location:  Courtroom 1
             Ronald V. Dellums Federal Bldg.
             1301 Clay Street
             Oakland, California 94612

# **TABLE OF CONTENTS**

I.     Introduction ..................................................................................................1

II.    Sweeney's Objection Contains Sanctionable Misstatements ...............................5

    A.    Sweeney's Objection Violates Rule 11 .................................... 7

    B.    The Court Can Sanction Sweeney Under Its Inherent Authority .......................... 9

III.    The Court Should Sanction Sweeney to Compensate Lofton and to Deter Future Misconduct.................................................................................11

    A.    Monetary Sanctions Are Appropriate Here ......................... 11

    B.    A Vexatious Litigant Order Is Also Appropriate Here ....................... 12

IV.    Conclusion ...................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*In Re Avon Townhomes Venture*,
 433 B.R. 269 (Bankr. N.D. Cal. 2010) ................................................................10

*Bank Melli Iran v. Pahlavi*,
 58 F.3d 1406 (9th Cir. 1995) ...........................................................................6

*Brandt v. Schal Assocs., Inc.*,
 960 F.2d 640 (7th Cir. 1992) .........................................................................12

*Brown v. Hain Celestial Grp., Inc.*,
 No. 11-03082, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016) .................................3

*Bruzzone v. Intel Corp.*,
 No.14-01279, 2014 WL 4090470 (N.D. Cal. Aug. 19, 2014) ...............................14

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
 498 U.S. 533 (1991) ......................................................................................8

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters, Inc.*,
 892 F.2d 802 (9th Cir. 1989), *aff'd*, 498 U.S. 533 (1991) ...................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 281 F.R.D. 531 (N.D. Cal. 2012) .....................................................................2

*Chambers v. NASCO, Inc.*,
 501 U.S. 32 (1991) ..............................................................................8, 9, 11, 12

*In re Checking Account Overdraft Litig.*,
 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................4

*Chimeno-Buzzi v. Hollister Co.*,
 No. 14-23120 (S.D. Fla. Mar. 7, 2016), ECF No. 136 ........................................5

*Christian v. Mattel, Inc.*,
 286 F.3d 1118 (9th Cir. 2002) .........................................................................9

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*,
 944 F.2d 1525 (9th Cir. 1991) .........................................................................6

*Corder v. Howard Johnson & Co.*,
 53 F.3d 225 (9th Cir.1994) ..............................................................................10

1    *De Long v. Hennessey,*
        912 F.2d 1144 (9th Cir. 1990) ..............................................12, 13, 16
2
3    *Farguson v. MBank Houston, N.A.,*
        808 F.2d 358 (5th Cir.1986) ..............................................12
4
     *Feder v. Elec. Data Sys. Corp.,*
5       248 Fed. App'x 579 (5th Cir. 2007) ..............................................6
6    *Fink v. Gomez,*
        239 F.3d 989 (9th Cir. 2001) ..............................................9, 10
7
8    *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.,*
        33 F.3d 29 (9th Cir. 1994) ..............................................5
9
10   *G.C. & K.B. Invs., Inc. v. Wilson,*
        326 F.3d 1096 (9th Cir. 2003) ..............................................8
11   *Galeska v. Duncan,*
        894 F. Supp. 1375 (C.D. Cal. 1995) ..............................................12, 14
12
13   *In re Gen. Elec. Co. Sec. Litig.,*
        998 F. Supp. 2d 145 (S.D.N.Y. 2014) ..............................................2
14
15   *Green v. Blitz U.S.A., Inc.,*
        No. 07-372, 2011 WL 806011 (E.D. Tex. Mar. 1, 2011), *vacated per*
16      *settlement*, 2014 WL 2591344 (E.D. Tex. June 10, 2014) ..............................................15
17   *Glass v. UBS Fin. Servs., Inc.*
        No. 06-4068, 2007 WL 221862 (N. D. Cal. Jan. 26, 2007) ..............................................5
18
19   *Haeger v. Goodyear Tire & Rubber Co.,*
        813 F.3d 1233 (9th Cir. 2016) ..............................................15
20
21   *Havensight Capital LLC v. Nike, Inc.,*
        No 14-7153, 2015 WL 3544111 (C.D. Cal. Apr. 22, 2015) ..............................................14
22   *Hudson v. Moore Bus. Forms, Inc.,*
        836 F.2d 1156 (9th Cir. 1987) ..............................................8
23
24   *Islamic Shura Council of S. California v. FBI,*
        278 F.R.D. 538 (C.D. Cal. 2011), *rev'd on other grounds*, 725 F.3d 1012 (9th
25      Cir. 2013) ..............................................9
26   *In re Itel Securities Litigation,*
        791 F.2d 672 (9th Cir. 1986) ..............................................10
27
28

*Knickerbocker v. Corinthian Colleges*,
  298 F.R.D. 670 (W.D. Wash. 2014) ...................................................................12

*Larsen v. Trader Joe's Co.*,
  No. 11-05188, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ................................3

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  733 F. Supp. 2d 997 (E.D. Wis. 2010) ...............................................................5

*Lipsig v. National Student Marketing Corp.*,
  663 F.2d 178 (D.C.Cir.1980) ...........................................................................10

*Lofton v. Verizon Wireless (VAW) LLC*,
  308 F.R.D. 276 (N.D. Cal. 2015) ......................................................................10

*Mayfield v. Barr*,
  985 F.2d 1090 (D.C. Cir. 1993) ..........................................................................5

*Mercury Serv., Inc. v. Allied Bank of Texas*,
  117 F.R.D. 147 (C.D. Cal. 1987) ........................................................................9

*Molski v. Evergreen Dynasty Corp.*,
  500 F.3d 1047 (9th Cir. 2007) .................................................................. *passim*

*Molski v. Mandarin Touch Rest.*,
  347 F. Supp. 2d 860 (C.D. Cal. 2004) ..........................................................14, 15

*Morning Star Baptist Church v. James City Cty. Police*,
  480 F. Supp. 2d 853 (E.D. Va. 2007) ...............................................................14

*Myers v. Sessoms & Rogers, P.A.*,
  781 F. Supp. 2d 264 (E.D.N.C. 2011) ...............................................................15

*In re Nelson*,
  503 B.R. 466 (Bankr. C.D. Cal. 2013)...............................................................15

*O'Brien v. Alexander*,
  101 F.3d 1479 (2d Cir. 1996)..............................................................................9

*O'Keefe v. Mercedes-Benz USA, LLC*,
  214 F.R.D. 266 (E.D. Pa. 2003).........................................................................1

*In re Omnitrition Int'l, Inc. Sec. Litig.*,
  No. 965, 1995 WL 626529 (N.D. Cal. Feb. 21, 1995) .......................................15

*Ortman v. Thomas*,
  99 F.3d 807 (6th Cir. 1996) .............................................................................16

*In re Polyurethane Foam Antitrust Litigation*,
No. 10-2196, 2016 WL 1452005 (N.D. Ohio Apr. 13, 2016) ...................................3

*Rentz v. Dynasty Apparel Indus., Inc.*,
556 F.3d 389 (6th Cir. 2009) ..................................................................................12

*Ringgold-Lockhart v. City of Los Angeles*,
761 F.3d 1057 (9th Cir. 2014) ...............................................................................16

*Roberts v. Electrolux Home Prods., Inc.*,
No. 13-2339, 2014 WL 4568632 (C.D. Cal. Sept. 11, 2014) ..................................3

*Shek v. Children Hosp. Research Ctr. in Oakland*,
No. 13-02017, 2013 WL 6512650 (N.D. Cal. Dec. 12, 2013), aff'd, 592 F.
App'x 575 (9th Cir. 2015) .......................................................................................16

*Snell v. Allianz Life Ins. Co. of N. Am.*,
No. 97-2784, 2000 WL 1336640 (D. Minn. Sept. 8, 2000).......................................2

*In re Thomas*,
508 F.3d 1225 (9th Cir. 2007) ...............................................................................16

*Townsend v. Holman Consulting Corp.*,
929 F.2d 1358 (9th Cir. 1990) ..................................................................................7

*In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection
Practices Act (FDCPA) Litig.*,
No. 13-2426, 2016 WL 543137 (D. Me. Feb. 10, 2016) ......................................3, 6

*Truesdell v. S. California Permanente Med. Grp.*,
293 F.3d 1146 (9th Cir. 2002) ..................................................................................7

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
643 F. Supp. 2d 1107 (D. Minn. 2009)......................................................................2

*In re Vitamins Antitrust Class Actions*,
215 F.3d 26 (D.C. Cir. 2000) ....................................................................................6

*In re Wachovia Corp. "Pick-A-Payment" Mortgage Mktg. & Sales Practices
Litig.*,
No. 09- 2015, 2011 WL 1877630 (N.D. Cal. May 17, 2011)....................................5

*Wood v. Santa Barbara Chamber of Commerce, Inc.*,
705 F.2d 1515 (9th Cir. 1983) ...............................................................................16

*Zuniga v. United Can Co.*,
812 F.2d 443 (9th Cir. 1987) ....................................................................................8

**State Cases**

*In re Checking Account Overdraft Litigation,*
No. 09-MD-02036 ............................................................................................................4

*In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation,*
No. 08-MD-01999 ............................................................................................................5

**Federal Statutes**

All Writs Act (28 U.S.C. § 1651) ............................................................................................12

**Rules**

Fed. R. Civ. P. Rule 11 ...................................................................................... *passim*

Fed. R. Civ. P. 11(a) ..........................................................................................7, 9, 12

Fed. R. Civ. P. 11(b) .................................................................................................1, 7

Fed. R. Civ. P. 11(b)(1) ................................................................................................8

Fed. R. Civ. P. 11(b)(2) ................................................................................................8

Fed. R. Civ. P. 11(b)(3) ................................................................................................8

Fed. R. Civ. P. 11(c) ....................................................................................................7

Fed. R. Civ. P. 11(c)(2) ...........................................................................................1, 9

Fed. R. Civ. P. 11(c)(4) ..............................................................................................11

Fed. R. Evid. 602 ..........................................................................................................6

**Other Authorities**

*Arthur v. Sallie Mae, Inc.,*
No. 10-0198 ..............................................................................................................3, 4

Brian T. Fitzpatrick, *The End of Objector Blackmail?,* 62 Vand. L. Rev. 1623,
1624 (2009) .................................................................................................................1

*Colon v. Jaguar Land Rover North America, LLC,*
No. 06-075163 ..............................................................................................................4

John E. Lopatka & D. Brooks Smith, *Class Action Professional Objectors: What
to Do About Them?,* 39 Fla. St. U. L. Rev. 865, 865-66 (2012)..............................1

Plaintiff John Lofton ("Lofton") hereby submits his Memorandum of Points and Authorities in support of his Motion to Sanction Patrick Sweeney ("Sweeney") under Federal Rule 11(b). Consistent with Rule 11, Lofton served this motion on Sweeney more than twenty-one (21) days before filing it. *Cf.* Fed. R. Civ. P. 11(c)(2). (*See also* Preston Decl. ¶10.)

## I.    Introduction

This motion is about taking appropriate measures to curb "professional" or serial objectors to class action settlements. Courts have generally taken a dim view of these objectors' interference with the class action settlement process. "Federal courts are increasingly weary of professional objectors[,]" *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) (collecting cases), because "[o]bjections may be motivated by self-interest rather than a desire to win significant improvements in the class settlement." Manual for Complex Litigation § 21.643 (4th ed. 2004). The basic problem is this: professional objectors use objections to extract money from class counsel by threatening to abuse the appellate process to delay class counsel's fees:

> When the [parties] agree to settle a federal class action, subject to approval of the district court, any member of the class may object. If the district court approves the settlement the objector may appeal. Appeals take time, and time is money—class counsel and, often, nonobjecting class members incur costs during the pendency of the appeal because attorneys' fees typically are not payable and settlements are not implemented until the legal process has run its course. The prospect of financial loss caused by delay in implementation of a class settlement has given rise to a cottage industry of so-called professional objectors: attorneys who oppose settlements on behalf of nonnamed class members and threaten to file meritless appeals of the final judgment merely to extract a payoff.

John E. Lopatka & D. Brooks Smith, *Class Action Professional Objectors: What to Do About Them?*, 39 Fla. St. U. L. Rev. 865, 865-66 (2012) (Judge Smith sits on the Third Circuit).[1]

---

[1]    If objectors appeal the settlement, however, the final resolution of the settlement will be delayed during the time it takes the court of appeals to decide the appeal, which can be years. Not only does the appeal delay final resolution of the settlement, but, more importantly for the blackmail problem, it also delays the point at which class counsel can receive their fee awards, which are contingent upon the settlement. As class counsel are eager to receive these fees, they are willing to pay objectors out of their own pockets to drop the appeals. This, it is thought, has led class members to file wholly frivolous objections and appeals for no other reason than to induce these side payments from class counsel. These appeals are what courts and commentators refer to as objector "blackmail."
Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1624 (2009).

"Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements. The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal)." *In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d 145, 152 (S.D.N.Y. 2014) (citation omitted). *See also Snell v. Allianz Life Ins. Co. of N. Am.*, No. 97-2784, 2000 WL 1336640, *9 (D. Minn. Sept. 8, 2000) ("'professional objectors' . . . are a pariah to the functionality of class action lawsuits, [because they] extort the parties . . . into ransoming a settlement that could otherwise be undermined by a time-consuming appeals process"). These sorts of objections are both an unfair tax on class counsel and a completely unjustified waste of the federal courts' resources:

> Professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 n.3 (N.D. Cal. 2012) (citation, punctuation omitted).[2]

In this case, on April 14, 2016, Plaintiff John Lofton ("Lofton") filed a motion for final approval of a proposed settlement agreement (the "Agreement") with Defendant Verizon Wireless (VAW) LLC ("Verizon"), the Plan of Allocation which proposes how the settlement proceeds will be distributed, and an application for an attorneys' fee award to Parisi & Havens LLP and Preston Law Offices (together, "Class Counsel"), and an incentive award to Lofton. (*See* Ex. 1 to Parisi Decl., ECF No. 210-1, Apr. 14, 2016 (cited as "Agreement" hereinafter); Ex. 2 to Parisi Decl., ECF No. 210-2, Apr. 14, 2016 (cited as "Plan" hereinafter). *See also* ECF Nos. 207, 208 (motion for final approval and fee application.))

On May 9, 2016, Sweeney filed an objection to the Agreement, the Plan, and the fee

---

[2] These objectors have contributed nothing. . . . And nothing is the quantity of assistance they have provided to the Court and the class. Their goal was, and is, to hijack as many dollars for themselves as they can wrest from a negotiated settlement. . . . Objectors' request and their motion ill-befit attorneys admitted to the bar. Accordingly, the Court holds, as a matter of fact and law, objectors have conferred no benefit whatsoever on the class or on the Court.
*In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009)

1    application (the "Objection"). (ECF No. 214.) The Objection is subject to sanction under Rule 11

2    and the Court's inherent authority because Sweeney is not a class member, and he does not have

3    standing to object. (*Cf.* Peters-Stasiewicz Decl. ¶32, ECF No. 215-2, May 13, 2016 (Sweeney

4    does not appear in Collecto's call data).)

5          Rather, this Court has specifically identified Sweeney by name as a "'professional'

6    objector[]; courts across the country (including in the Ninth Circuit) have repeatedly turned aside

7    [his] efforts to upend settlements." *Brown v. Hain Celestial Grp., Inc.*, No. 11-03082, 2016 WL

8    631880, *10 (N.D. Cal. Feb. 17, 2016) (citations omitted). *Cf. In re Polyurethane Foam Antitrust*

9    *Litigation*, No. 10-2196, 2016 WL 1452005, *3 (N.D. Ohio Apr. 13, 2016) (finding Sweeney's

10    "objections amount to pure boilerplate language, wholly untethered from the actual terms of the

11    settlement"); *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection*

12    *Practices Act (FDCPA) Litig.*, No. 13-2426, 2016 WL 543137, *6 n.16 (D. Me. Feb. 10, 2016)

13    (Sweeney's "listed objections are without merit and appear to be a form document . . . that he has

14    filed in other class action  settlements"); *Roberts v. Electrolux Home Prods., Inc.*, No. 13-2339,

15    2014 WL 4568632, *12 (C.D. Cal. Sept. 11, 2014) (noting that objections were "filed by counsel

16    who routinely files objections to class settlements," finding Sweeney's objections were "not

17    made for the purpose of benefitting the Class [and were] meritless in all respects"); *Larsen v.*

18    *Trader Joe's Co.*, No. 11-05188, 2014 WL 3404531, *1, *7 n.4 (N.D. Cal. July 11, 2014) (noting

19    that "Sweeney also has a long history of representing objectors in class action proceedings,"

20    finding that "the objections are not meritorious and should not undermine this successful

21    settlement"). Sweeney filed a notice of appeal in the *Larsen* case, but withdrew it after three

22    months. (Preston Decl. ¶8.) Sweeney also filed a notice of appeal in the *In re Polyurethane Foam*

23    case in mid-February 2016—just over three months ago. (*Id.*)

24          Sweeney has a long history of objecting to class actions—much of which cannot be found

25    on Westlaw. As far as Lofton is aware, however, none of his objections have ever been affirmed

26    by a trial court nor has Sweeney ever completed an appeal on any of his objections. (*See* Preston

27    Decl. ¶9.) In *Arthur v. Sallie Mae, Inc.*, No. 10-0198, Sweeney objected to the class settlement

28    before the court in the Western District of Washington, where he was represented by Darrell

1   Palmer.[3] The court in that case found that "these objections are meritless and they are hereby

2   overruled."[4] Sweeney objected to the class action settlement in *Colon v. Jaguar Land Rover*

3   *North America, LLC*, No. 06-075163, before the Superior Court of California for Santa Clara

4   County; the court granted approval of the settlement implicitly overruling Sweeney's objections.[5]

5   While Sweeney filed a notice of appeal in the *Colon* case, he filed an abandonment of the appeal

6   two months later.

7           Sweeney also frequently acted as an attorney for objectors. Sweeney represented

8   objectors to the class settlement in *In re Checking Account Overdraft Litigation*, No. 09-MD-

9   02036, in the Southern District of Florida.[6] In that case, the court "denie[d] the objections and

10  rejects the arguments of Objectors in all respects, and finds that they are both completely

11  unsupported in the record (no Objector having submitted even a single affidavit to provide facts

12  or expert opinions supporting their positions) and unpersuasive as to the substance of their

13  complaints." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1336 (S.D. Fla.

14  2011). Sweeney's clients filed a notice of appeal, but dismissed the appeal six months later.

15  (Preston Decl. ¶5.) Sweeney was counsel for objectors in the class settlement in *Kardonick v. JP*

16  *Morgan Chase & Co.*, No. 10-23235, in the Southern District of Florida, whose objections were

17  all overruled.[7] Again, Sweeney's clients filed a notice of appeal but dismissed the appeal seven

18  months later. (Preston Decl. ¶4.) Finally, Sweeney was counsel for objectors in the class

19  _____

20  [3]   (Objection of Patrick Sweeney and Sasha McBean, *Arthur v. Sallie Mae, Inc.*, No. 10-0198
          (W.D. Wash. Dec. 13, 2010), ECF No. 67; Preston Decl. ¶3.)

21  [4]   (Settlement Order and Final Judgment, *Arthur v. Sallie Mae, Inc.*, No. 10-0198 (W.D. Wash.
          Sept. 17, 2012), ECF No. 266; Preston Decl. ¶3.) The court in that case also revoked Mr.

22       Palmer's pro hac vice admission. (Minute Order, *Arthur v. Sallie Mae, Inc.*, No. 10-0198
          (W.D. Wash. Sept. 14, 2012), ECF No. 264.)

23  [5]   (Objection to Proposed Class Action Settlement, *Colon v. Jaguar Land Rover North*
          *America, LLC*, No. 06-075163 (Cal. Sup. Ct., Cty. Santa Clara, Nov. 7, 2013), Filing No. G-

24       58270; Order Granting Final Approval of Class Action Settlement, *Colon v. Jaguar Land*
          *Rover North America, LLC*, No. 06-075163 (Cal. Sup. Ct., Cty. Santa Clara, Nov. 8, 2013),

25       Filing No. G-58301; Preston Decl. ¶6.)
     [6]   (Notice of Objection of Class Members David Wantz and Ryan Curtis, *In re Checking*

26       *Account Overdraft Litig.*, No. 09-MD-02036 (S.D. Fla. Apr. 24, 2013, ECF No. 3440;
          Preston Decl. ¶5.)

27  [7]   (Objection of Tom Blanchard, *Kardonick v. JP Morgan Chase & Co.*, No. 10-23235 (S.D.
          Fla. Aug. 23, 2011), ECF No. 360; Final Judgment and Order of Dismissal, *Kardonick v. JP*

28       *Morgan Chase & Co.*, No. 10-23235 (S.D. Fla. Sept. 16, 2011), ECF No. 384; Preston Decl.
          ¶4.)

settlement in *In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation*, No. 08-MD-01999, in the Eastern District of Wisconsin.[8] That court also overruled Sweeney's objections. *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997 (E.D. Wis. 2010). Again, Sweeney's client filed a notice of appeal, but dismissed the appeal six months later. (Preston Decl. ¶2.)

Indeed, just two months ago, Sweeney filed a virtually verbatim objection to a proposed class action settlement and sought a fee for that objection in the Southern District of Florida— and withdrew that objection only fifteen days later, ostensibly because "after meeting and conferring with Plaintiffs' counsel, Sweeney now believes the Settlement is in the best interest of the class." (Sweeney Objection, *Chimeno-Buzzi v. Hollister Co.*, No. 14-23120 (S.D. Fla. Mar. 7, 2016), ECF No. 136; Stipulation, *Chimeno-Buzzi v. Hollister Co.*, No. 14-23120 (ECF No. 144). *See also* Parisi Decl. ¶¶2, 3, ECF No. 215-1, May 13, 2016.) This abrupt change of position suggests Sweeney may have received compensation for withdrawing his objection on the *Hollister* settlement: the question of whether Sweeney received compensation for withdrawing objections or appeals is highly relevant to his motives in each of the class action settlement objections identified above.

## II.    Sweeney's Objection Contains Sanctionable Misstatements

The basis for the sanctions sought herein is the Objection's material misstatement that Sweeney "believes that he is a member of the class." (ECF No. 214 at 2.) This statement is material because only "an aggrieved class member" has standing to object to a settlement. *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994). "Those who are not class members, because they are outside the definition of the class . . . lack standing to object to settlement agreements . . . " *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993) (cited with approval by *Glass v. UBS Fin. Servs., Inc.*, No. 06-4068, 2007 WL 221862, *8 (N.D. Cal. Jan. 26, 2007)).[9] Without standing, Sweeney has no right to be heard on the Objection at

---

[8]    (Objections of Rosalie Borgardts et al., *In re Lawnmower Engine Horsepower Marketing & Sales Practices Litig.* No. 08-MD-01999 (E.D. Wi. June 4, 2010), ECF No. 52; Preston Decl. ¶2.)

[9]    "Because [Sweeney] is not a class member, [he] has no standing to raise objections . . ." *In re Wachovia Corp. "Pick-A-Payment" Mortgage Mktg. & Sales Practices Litig.*, No. 09- 2015,

all—either before the Court or before the Ninth Circuit.

At the outset, Sweeney's mere claim he *believes* he is a class member is not sufficient to sustain the Objection or a subsequent notice of appeal. Sweeney's mere belief is insufficient, certainly where he failed to detail the basis of that belief. *Cf. Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991) (where "declaration is not based on personal knowledge, but on information and belief, [it] does not raise a triable issue of fact").[10] *Cf. Feder v. Elec. Data Sys. Corp.*, 248 Fed. App'x 579, 581 (5th Cir. 2007) ("Allowing someone to object to settlement in a class action based on this sort of weak, unsubstantiated evidence would inject a great deal of unjustified uncertainty into the settlement process").

Moreover, the Objection's assertion that Sweeney is a class member is knowingly false (or recklessly false, at the very least). Again, the Agreement specifically excludes Verizon subscribers from either class certified under the Agreement. (*Cf.* Agreement, Art. II(18), (36) (excluding "any person which Verizon's records identify as a current or past Verizon subscriber" from the IPA or TCPA Classes).) Further, the settlement notice and the claims form gave clear notice that Verizon subscribers are not included within the class definitions. (Ex. B to Peters-Stasiewicz Decl. at 1, 3, ECF No. 215-2; Ex. A to Plan, ECF No. 210-2.) Nonetheless, the telephone number Sweeney listed on the Objection ((424) 299-6269) appears to be assigned to Verizon. (Parisi Decl. ¶5, ECF No. 215-1, May 13, 2016.) Further, the claim form referenced in Sweeney's Objection *also* indicated he is or was a Verizon subscriber, and (dispositively) the telephone number on his claims form does not appear in any of the Collecto call logs. (*Cf.* Peters-Stasiewicz Decl. ¶32, ECF No. 215-2, May 13, 2016.) It is significant that this is not the first case where Sweeney has objected to class settlements without "furnish[ing any] basis to conclude that he is even a class member," and where "his claim to membership is based only 'on belief.'" *In re TRS*, 2016 WL 543137, at *6 n.16. (*See also* Parisi Decl. ¶3, ECF No. 215-1, May

---

2011 WL 1877630, *6 (N.D. Cal. May 17, 2011) (citing *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000)).

[10] *See also* Fed. R. Evid. 602 ("witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995) (declaration based on "information and belief [is] entitled to no weight because the declarant [does] not have personal knowledge").

13, 2016 (evidence Sweeney was not a class member in *Hollister* case); Plaintiffs' and Class

Counsel's Response to Objections Notice of Objection of Class Members Martin Carapia and

Fatima Dorego, *In re Checking Account Overdraft Litigation*, No. 09-MD-02036 (S.D. Fla. May

3, 2013), ECF No. 3456; Preston Decl. ¶5 (one of Sweeney's clients in the *In re Checking*

*Account* case was not a class member).)

### A.      Sweeney's Objection Violates Rule 11

Sweeney's objection violates Rule 11(b) because Sweeney is a Verizon subscriber, is not

a class member, and so has no standing to object. Rule 11 requires that every paper filed with the

Court "must be signed . . . by a party personally if the party is unrepresented." Fed. R. Civ. P.

11(a).

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)      it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)      the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3)      the factual contentions have evidentiary support . . .

Fed. R. Civ. P. 11(b). In the Ninth Circuit, these provisions are disjunctive: "sanctions must be

imposed on the signer of a paper *if either* a) the paper is filed for an improper purpose, or b) the

paper is frivolous," meaning that "a filing that is both baseless and made without a reasonable

and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.

1990) (italics added). "Either the improper purpose or frivolousness ground is sufficient to

sustain a sanction[.]" *Id. See also Truesdell v. S. California Permanente Med. Grp.*, 293 F.3d

1146, 1153 (9th Cir. 2002) (reaffirming that "Rule 11(c) allows sanctions if a filing suffers from

either of those defects"). While these factors "are separate and distinct, they will often overlap

since evidence bearing on frivolousness or non-frivolousness will often be highly probative of

purpose." *Townsend*, 929 F.2d at 1362. Under the totality of the circumstances, it is reasonable to

infer that Sweeney presented the Objection to extract payment from Lofton by delaying the

1    finalization of the settlement. *Cf.* Fed. R. Civ. P. 11(b)(1). Moreover, Sweeney has no legal

2    standing to bring the Objection because he is not a class member; any legal argument to the

3    contrary is frivolous. *Cf.* Fed. R. Civ. P. 11(b)(2). Finally, there is no evidentiary support for the

4    notion that Sweeney is a class member—indeed, all the evidence available to Lofton indicates

5    that Sweeney is a Verizon subscriber and *not* a class member. *Cf.* Fed. R. Civ. P. 11(b)(3).

6         The Objection suggests that Sweeney sought to buy himself some wiggle-room by

7    equivocating and stating only that Sweeney "*believes* that he is a member of the class." (ECF No.

8    214 at 2 (italics added).) Sweeney's equivocation does not protect him. Sweeney had reasonable

9    notice from the class notice and claims form that he was not a class member, but filed the

10   Objection anyways. Rule 11 "imposes an objective standard of reasonable inquiry which does

11   not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) (citing

12   *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 548-49 (1991)). The 1983

13   amendments to Rule 11 "rejected the requirement of establishing the subjective bad faith . . .

14   prior to imposing sanctions." *Hudson v. Moore Bus. Forms, Inc.*, 836 F.2d 1156, 1159 (9th Cir.

15   1987) (citing *Zuniga v. United Can Co.*, 812 F.2d 443, 452 (9th Cir. 1987) (after 1983

16   amendments, "counsel can no longer avoid the sting of Rule 11 sanctions by operating under the

17   guise of a pure heart and empty head"). "The subjective intent of the movant to file a meritorious

18   document is of no moment. The standard is reasonableness. The 'reasonable man' against which

19   conduct is tested is a competent attorney admitted to practice before the district court." *G.C. &

20   K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003) (citation, punctuation omitted).

21   Further, it is irrelevant that Sweeney appears here as an unrepresented pro se party to the action

22   (although he is in fact also an attorney): "it is settled that pro se litigants are held to an objective

23   standard of reasonableness under Rule 11." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters,

24   Inc.*, 892 F.2d 802, 811 (9th Cir. 1989), *aff'd*, 498 U.S. 533 (1991). A reasonable attorney would

25   have concluded Sweeney was not a class member because he was a Verizon subscriber, and

26   would not have filed the Objection.

27        Hence, the Court should reject any effort by Sweeney to evade sanctions by claiming he

28   was confused by the notice or claims form. Courts have rejected efforts to explain away

1    sanctionable misstatements as a "misunderstanding stem[ming] from a disagreement . . .

2    regarding the interpretation of the term[s]" used in the papers at issue. *Islamic Shura Council of*

3    *S. California v. FBI*, 278 F.R.D. 538, 545 (C.D. Cal. 2011), *rev'd on other grounds*, 725 F.3d

4    1012 (9th Cir. 2013) *and* 757 F.3d 870 (9th Cir. 2014). Counsel cannot "knowingly and

5    deliberately provided misinformation to the Court" and then evade sanctions by "recast[ing] [its

6    conduct] simply as a 'misunderstanding' or a legal disagreement." *Id*. Rather, because "Rule 11

7    imposes an objective standard of conduct," the Court should "based[] . . . sanctions upon the

8    objective meaning of the words used rather than the attorney's creative *post hoc* explanation."

9    *O'Brien v. Alexander*, 101 F.3d 1479, 1490 (2d Cir. 1996). This is particularly true where Rule

10    11 mandates a safe harbor that provides the signing party advance notice of exactly how their

11    representations are construed by others. *Cf*. Fed. R. Civ. P. 11(c)(2).

12           Finally, the goal of Rule 11 is to deter baseless or misleading filings. Fed. R. Civ. P.

13    11(a) advisory committee's note on 1993 amendments ("purpose of Rule 11 sanctions is to deter

14    rather than to compensate"). Hence, violations of Rule 11 do not require delay, expense, or cost

15    to opposing parties. The Court may sanction "the filing of a paper that lacks factual foundation

16    and is intended to mislead the Court and opposing parties" under Rule 11, "even if the paper

17    does not significantly delay proceedings, because of the disrespect shown to judicial process."

18    *Mercury Serv., Inc. v. Allied Bank of Texas*, 117 F.R.D. 147, 156 (C.D. Cal. 1987).  *See also*

19    *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) ("a finding of significant delay or

20    expense is not required under Rule 11").

21        **B.    The Court Can Sanction Sweeney Under Its Inherent Authority**

22           The Court can also sanction Sweeney for the Objection under its inherent authority. The

23    Court has the inherent authority to impose sanctions "if [it] specifically finds bad faith or

24    conduct tantamount to bad faith." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001). Unlike

25    sanctions under Rule 11, bad faith is a prerequisite for sanctions under the Court's inherent

26    authority. *Cf. Chambers*, 501 U.S. at 47. However, bad faith "includes a broad range of willful

27    improper conduct." *Fink*, 239 F.3d at 992.

28           Sanctions are available for a variety of types of willful actions, including

recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose. Therefore, we hold that an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under a court's inherent power.

*Id*. at 994. Similar to sanctions under Rule 11, however, the bases for sanctions under the Court's inherent authority are independent and disjunctive. *Fink* relied heavily on *In re Itel Securities Litigation*, 791 F.2d 672 (9th Cir. 1986), which bears helpful similarities to this case. *See id*. at 992. In *Itel*, the Ninth Circuit affirmed sanctions against an attorney who objected to a class action settlement for the purpose of obtaining concessions on attorneys' fees in another case—even though the district court did not find that the objections were meritless:

Bader's admission that he filed objections to the *Itel Securities Litigation* to exact fee concessions in an action pending before another court is alone sufficient to support a finding of bad faith. For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith "does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar the assessment of attorney's fees." *Lipsig v. National Student Marketing Corp.*, 663 F.2d 178, 182 (D.C.Cir.1980)[.]

*Itel*, 791 F.2d at 675. *Fink* restated *Itel*'s holding: "*Itel* teaches that sanctions are justified when a party acts for an *improper purpose*—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Fink*, 239 F.3d at 992 (italics in original).

The Court's inherent authority certainly extends to Sweeney, as it applies to non-parties who never appeared before the Court. "'The [C]ourt's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses.'" *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015) (quoting *In Re Avon Townhomes Venture*, 433 B.R. 269, 304 (Bankr. N.D. Cal. 2010); citing *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir.1994) ("court may impose attorneys' fees against a nonparty as an exercise of the court's inherent authority to impose sanctions to curb abusive litigation tactics").

In light of *Fink* and *Itel*, the record heavily supports sanctions against Sweeney under the

Court's inherent authority as well as under Rule 11.[11] Sweeney's assertion that he is a class member is at least reckless given the contrary information from the class notice and even the very claims form he submitted. The Objection is independently sanctionable because Sweeney has filed the Objection for an improper purpose. Absent adequate deterrence, Sweeney will file a notice of appeal based on his Objection but will not litigate that appeal to a decision on the merits by the Ninth Circuit. Sweeney did not file the Objection with the subjective intent to improve the settlement's benefits to the classes, but to extract payment from Lofton by delaying the settlement.

## III.    The Court Should Sanction Sweeney to Compensate Lofton and to Deter Future Misconduct

There is a wide array of sanctions available under these circumstances, but the Court should tailor its sanctions to address the specific harm here: a notice of appeal of a baseless objection, which is only filed to extract payment from Lofton by delaying the settlement. "A primary aspect of [the Court's] discretion [over sanctions] is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Rule 11 is expressly geared toward deterrence:

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4). Below, Lofton divides the sanctions sought into monetary and non-monetary relief. While money relief serves an important compensatory and deterrent role, it cannot provide complete relief for the particular harm posed here.

### A.    Monetary Sanctions Are Appropriate Here

Attorneys' fees are one of the most traditional forms of sanctions under the Court's inherent authority. "Upon a finding of bad faith, courts can levy an assortment of sanctions under their inherent power, including monetary awards, attorneys' fees, adverse inference jury

---

[11] *See Chambers*, 501 U.S. at 46 ("no basis [to hold] that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for . . . bad-faith conduct").

1   instructions, and even dismissal of claims [or default]." *Knickerbocker v. Corinthian Colleges*,

2   298 F.R.D. 670, 677 (W.D. Wash. 2014) (citation omitted). *See Chambers*, 501 U.S. at 45

3   ("assessment of attorney's fees is undoubtedly within a court's inherent power as well").

4         Lofton contends compensation in the form of attorneys' fees is "warranted for effective

5   deterrence" under Rule 11 here. Compensation is necessary to incentivize deterrence:

6           [While it is] clear that . . . "the purpose of Rule 11 sanctions is to deter rather than
   to compensate," . . . compensating the victim and deterring the perpetrator of Rule
7           11 violations are not mutually exclusive. "If compensation was not a recognizable
   basis for Rule 11 awards, aggrieved litigants would have little incentive to pursue
8           sanctions thus diminishing the important deterrent effect of Rule 11."

9   *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 400 (6th Cir. 2009) (quoting Fed. R. Civ. P.

10  11(a) advisory committee's note on 1993 amendments; *Brandt v. Schal Assocs., Inc.*, 960 F.2d

11  640, 646 (7th Cir. 1992)). "[E]ffective deterrence sometimes requires compensating the victim

12  for attorney fees arising from abusive litigation." *Id*. Lofton spent a not-insignificant amount of

13  attorney time responding to the objection and preparing this motion, which seeks a long-term

14  solution to the problem posed by the Objection. (Preston Decl. ¶10.) Lofton should be

15  compensated for that effort.

16        **B.**    **A Vexatious Litigant Order Is Also Appropriate Here**

17        Lofton also seeks a vexatious litigant order as relief on this motion. While there is

18  authority for such a sanction under Rule 11, it appears the analysis is the same whether the Court

19  bases the order on Rule 11, its inherent authority, or the All Writs Act (28 U.S.C. § 1651).[12]

20  There are four requirements for such an order:

21          [(1)] the litigant must be given notice and a chance to be heard before the order is
   entered[; (2)] the district court must compile "an adequate record for review"[;
22          (3)] the district court must make substantive findings about the frivolous or
   harassing nature of the plaintiff's claims[; and (4)] the vexatious litigant order
23          "must be narrowly tailored to closely fit the specific vice encountered."

24  *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (quoting *De Long v.*

25  *Hennessey*, 912 F.2d 1144, 1146 (9th Cir. 1990)). "The first two requirements, (1) notice and an

26  opportunity to be heard and (2) the creation of an adequate record, are procedural

27

28    [12]  *See Galeska v. Duncan*, 894 F. Supp. 1375, 1381 (C.D. Cal. 1995) (citing *Farguson v.*
   *MBank Houston, N.A.*, 808 F.2d 358, 359-60 (5th Cir.1986)).

considerations[.]" *Id*.

> The latter two factors, requiring (3) findings of frivolousness or harassment and (4) that the order be narrowly tailored to prevent the litigant's abusive behavior, are substantive considerations—that is, the factors help the district court define who is, in fact, a "vexatious litigant" and construct a remedy that will stop the litigant's abusive behavior while not unduly infringing the litigant's right to access the courts.

*Id*. at 1058. The record here meets each of these factors.

**Notice and Opportunity to be Heard:** The first requirement is simply met through the service of this motion on Sweeney, the Court's briefing schedule under its Local Rules, and the hearing sought by Lofton. Sweeney has received "fair notice of the possibility that he might be declared a vexatious litigant and have a pre-filing order entered against him because [Lofton filed this motion] and served on [Sweeney]. Also, [Sweeney] had the opportunity to oppose the motion, both in writing and at a hearing." *Id*.

**Adequate Record for Review:** This motion provides an adequate record for review, which encompasses "a listing of all the cases and motions that led the district court to conclude that a vexatious litigant order was needed." *Id*. at 1059 (quoting *De Long*, 912 F.2d at 1147). In Section I, this motion provides citations to many judicial decisions finding Sweeney's objections to lack merit, and finding Sweeney himself to be a professional objector. The declaration supporting this motion cites still more such judicial decisions implicitly or explicating finds Sweeney's objections to merit. The Court's decision does not need to "list every [objection] filed by [Sweeney]." *Id*.

**Frivolous and Harassing Objections:** The question of whether Sweeney's objections are frivolous or harassing "gets to the heart of the vexatious litigant analysis[.]" *Id*. The Court has to "look at both the number and content of the filings as indicia of the frivolousness of the litigant's claims." *Id*. (quoting *De Long*, 912 F.2d at 1148). "An alternative to the finding of frivolousness is [finding] a pattern of harassment." *De Long*, 912 F.2d at 1148. To support a conclusion of an intent to harass, the Court cannot rely only the fact that "particular types of actions [are] filed repetitiously," but needs to "discern whether the filing of several similar types of actions constitutes an intent to harass the defendant or the court." *Id*. at 1148 n.3 (citation,

punctuation omitted). "Although litigiousness alone is insufficient to justify a restriction on filing activities, . . . it is a factor the Court considers indicative of an intent to harass." *Molski v. Mandarin Touch Rest.*, 347 F. Supp. 2d 860, 865 (C.D. Cal. 2004) (citations omitted).

Hence, it significant that Lofton has found no evidence that any of those objections has ever been successful, Sweeney has frequently objected to class action settlements (both pro se and as counsel). (Preston Decl. ¶9.) [13] However, Lofton does not rely on the volume or meritless of Sweeney's objections alone. The Court should also consider the virtual identical language used in many of Sweeney's objections, which the courts have uniformly found to be meritless. "Another consideration is the textual and factual similarity of the [objections] filed by [Sweeney]. [This factor also indicates] an intent to harass, as it suggests that [Sweeney] is filing boilerplate [objections]." *Molski*, 347 F. Supp. 2d at 865 (citations, punctuation omitted). Most importantly, however, is the fact that, while Sweeney has often filed a notice of appeal, there is no evidence that he has ever resolved any of those appeals on their merits—the appeals have all been withdrawn within a few months (i.e., around the time an opening brief would have been due). (Preston Decl. ¶¶2-8.) The most reasonable inference from these facts is that Sweeney's objections fit squarely into the scheme identified in the Lopatka and Smith article: they are not made for their intrinsic merit, but for the sake of filing a notice of appeal which delays payment to class counsel. Sweeney uses the threat of this delay to extract money from class counsel, who may be more sensitive to delay in payment because they work on a contingency basis. *Cf. Molski*, 500 F.3d at 1060 (affirming finding that plaintiff's "litigation strategy evidenced an intent to harass businesses into cash settlements" by using, e.g., delay in filing claims to increase damages," and "fact that [plaintiff] had tried on the merits only one of his roughly [hundreds of]

---

[13]   *Cf. Bruzzone v. Intel Corp.*, No.14-01279, 2014 WL 4090470, *6 (N.D. Cal. Aug. 19, 2014) (basing vexatious litigant order on "two state actions and four federal actions (including this one) against Intel Corporation based on many of the same underlying facts"); *Havensight Capital LLC v. Nike, Inc.*, No 14-7153, 2015 WL 3544111, *6 (C.D. Cal. Apr. 22, 2015) (vexatious litigant order premised on two cases in which plaintiff filed many baseless motions); *Galeska*, 894 F. Supp. at 1382, 1383 (C.D. Cal. 1995) (vexatious litigant order based on "a total of nine federal habeas petitions over the course of five and one half years" and "five petitions before the California Supreme Court," asserting "the same or similar legal arguments"). *See also Morning Star Baptist Church v. James City Cty. Police*, 480 F. Supp. 2d 853, 861-62 (E.D. Va. 2007) (finding basis for vexatious litigant order where "eight known actions that [plaintiff] filed, six of them, including this one, are duplicative").

cases and . . . targeted ethnic restaurants viewed as easy prey for coercive claims"). *See also Molski*, 347 F. Supp. 2d at 866 (inferring intent to harass from fact that of "not one [of plaintiff's cases] has ever been litigated on the merits," which "suggests that [plaintiff] does not even have a reasonable expectation (or intention) of litigating the suit on the merits"). Together with Sweeney's repeated objections where his membership in the class is contested, this record supports a finding that Sweeney repeated uses class action objections to harass class counsel.

**Proposed Injunction Is Narrowly-Tailored:** Lastly, "a pre-filing order must be narrowly tailored to the vexatious litigant's wrongful behavior." *Molski*, 500 F.3d at 1061. Here, Lofton seeks two interrelated remedies. First, Lofton seeks an order requiring Sweeney to attach to every objection to a class action settlement which he files on behalf of himself or a client:

> (1)   a copy of the Court's order (with appropriate findings and the necessary summary of Sweeney's prior objections); and
>
> (2)   a declaration which discloses every instance where he has requested or received compensation for withdrawing an objection to a class action settlement or notice of appeal related to such objection.

This relief ensures that future courts have notice of the facts pertinent to the Court's order—facts which are pertinent to assessing Sweeney's objections, and that no future class counsel will have to repeat the same work Lofton performed on here in tracking all Sweeney's objections. It is well-established that the Court may impose mandatory disclosures under its inherent authority. *See Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1252-54 (9th Cir. 2016) (where defendant concealed evidence related to defect from discovery, affirming sanctions order requiring defendant to file copy of order in any case involving such defect initiated after the date of order); *In re Nelson*, 503 B.R. 466, 482-83 (Bankr. C.D. Cal. 2013) (requiring law firm to disclose sanctions order to various groups that were reasonably likely to oppose law firm on regular basis; "sunlight is the best disinfectant").[14]

---

[14]   *See In re Omnitrition Int'l, Inc. Sec. Litig.*, No. 965, 1995 WL 626529, *4 (N.D. Cal. Feb. 21, 1995) (requiring law firm to disclose of forgery by attorney-employee in all pending cases in which that attorney was counsel of record). *See also Myers v. Sessoms & Rogers, P.A.*, 781 F. Supp. 2d 264, 272 (E.D.N.C. 2011) (disclosure of sanctions order to client and various attorneys); *Green v. Blitz U.S.A., Inc.*, No. 07-372, 2011 WL 806011, *11 (E.D. Tex. Mar. 1, 2011), *vacated per settlement*, 2014 WL 2591344 (E.D. Tex. June 10, 2014) (ordering disclosure of sanctions order in first pleading of every case defendant appears for five years).

Second, Lofton seeks an order that requires Sweeney, prior to filing a notice of appeal of an order overruling an objection to a class action settlement, to obtain an order from the trial court finding that the notice of appeal is not being used to harass class counsel. The Court has authority to enter an order which "subjects [Sweeney's filings] to an initial screening review by a district judge." *Molski*, 500 F.3d at 1061. The Court plainly "possesses the power to enjoin the filing of related lawsuits in other federal courts"; it is intuitive that such power extends to objections as well. *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1523 (9th Cir. 1983). *See also Shek v. Children Hosp. Research Ctr. in Oakland*, No. 13-02017, 2013 WL 6512650, *3 (N.D. Cal. Dec. 12, 2013), aff'd, 592 F. App'x 575 (9th Cir. 2015) (imposing pre-filing review on complaints *and* notices of appeal).[15] A vexatious litigant order should "cover[] only the type of claims [Sweeney has] been filing vexatiously"; Lofton's proposed relief is limited to the professional objector's gambit (objections to class action settlements and related notices of appeal). *Molski*, 500 F.3d at 1061. The proposed pre-filing restriction directly prevents the specific harm identified here—Sweeney's use of the notice of appeal to harass class counsel—while permitting Sweeney to continue to make objections (which may or may not be valid) to the district courts in the future. *Molski* limits vexatious litigant orders "to type of claims [Sweeney has] been filing vexatiously," but this still provides the Court the ability effectively prevent Sweeney from employing the professional objector's gambit. For instance, the Sixth Circuit has

> permanently enjoined [one plaintiff] from filing any civil lawsuit alleging or asserting factual or legal claims based upon or arising out of the legal or factual claims alleged in [the subject] action or any of the actions underlying it without first obtaining certification from a United States Magistrate Judge that the claim or claims asserted are not frivolous and that the suit is not brought for any improper purpose.

*Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996). Here, Lofton's proposed pre-filing restriction is tailored to the specific scheme at issue: using notices of appeal to delay settlements

---

[15]  The standard for orders imposing pre-filing restrictions regarding appellate filings is the same as set forth above. *In re Thomas*, 508 F.3d 1225, 1227 (9th Cir. 2007) (citing *De Long*, 912 F.2d at 1149). Further, the Court retains the jurisdiction to enter a vexatious litigant order even after a notice of appeal. *See Ringgold-Lockhart v. City of Los Angeles*, 761 F.3d 1057, 1062 (9th Cir. 2014).

(which provides the leverage he needs to extract money from class counsel).

**IV.     Conclusion**

   The Court should sanction Sweeney for filing and maintaining the Objection. Sweeney was never a class member and did not have standing to object to the settlement. The Court should compensate Lofton to the time incurring addressing Sweeney's improper Objection, and should impose an appropriate vexatious litigant order that precludes Sweeney from using the professional objector scheme again.

Dated: June 23, 2016   By:_____/s/David C. Parisi_____
             David C. Parisi (162248)
             Suzanne Havens Beckman (188814)
             PARISI & HAVENS LLP
             212 Marine Street, Suite 100
             Santa Monica, California 90405
             (818) 990-1299 (telephone)
             (818) 501-7852 (facsimile)
             dcparisi@parisihavens.com
             shavens@parisihavens.com

             Ethan Preston (263295)
             PRESTON LAW OFFICES
             4054 McKinney Avenue, Suite 310
             Dallas, Texas 75204
             (972) 564-8340 (telephone)
             (866) 509-1197 (facsimile)
             ep@eplaw.us

             *Attorneys for Plaintiff John Lofton,*
             *on his own behalf, and behalf of all*
             *others similarly situated*

# EXHIBIT J



# Legal Document

Illinois Northern District Court
Case No. 1:13-cv-04806
**Kolinek v. Walgreen Co.**

Document 115



**View Document**



**View Docket**

A joint project of Think Computer Corporation and Think Computer Foundation.
Cover art © 2015 Think Computer Corporation. All rights reserved.
Learn more at http://www.plainsite.org.



**FILED**

JUL 1 6 2015 DC

OBJECTION

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

I object to the settlement in Kolinek vs Walgreen co. Case number 13-cv-04806. My name is Pamela Sweeney and I received calls on my cell phones , numbers-424-299-6269 and 608-695-3961. I am a member of the class and respectfully object to the attorney's fees as they are excessive. I reside at 2590 Richardson street, Madison Wisconsin 53711.

36% awarded to the attorneys represent too large a percentage of the amount allocated for the class.

This large percentage shows class counsels arrogance and dismissal of the class member. Given the size of the class the court should intervene to protect the rights of all class members whether absent or not.Class counsel has a duty to fairly and accurately protect the interests of the class.

Class counsel has neglected its fiduciary duties to the class by asking for a disportinately large award. I object to these attorney fees.

Respectfully

Pamela Sweeney
Pamela Sweeney

PRO SE

# EXHIBIT K

FILED

MAY 12 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

1  Sam A. Miorelli, E.I., Esq. (*Pro Se*)
764 Ellwood Avenue
2  Orlando, FL 32804
Telephone: (352) 458-4092
3  E-Mail: sam.miorelli@gmail.com

4
## UNITED STATES DISTRICT COURT
5
### NORTHERN DISTRICT OF CALIFORNIA – OAKLAND BRANCH
6

7
8  MOISES ZEPEDA, MICHAEL SPEAR, RONYA ) Case No.: 10-CV-02500-SBA
OSMAN, BRIAN PATTEE, CASEY CHING, )
DENAE ZAMORA, MICHAEL LAVANGA, and ) **OBJECTION TO CLASS ACTION**
9  GARY MILLER, on behalf of themselves and all ) **SETTLEMENT OF SAM A. MIORELLI**
others similarly situated, )
10                                                    )
            Plaintiff,              ) Date:       July 13, 2016
11                                                    ) Time:       1:00 p.m.
      v.                            ) Courtroom:  1
12                                                    ) Judge:      Hon. Saundra Brown Armstrong
PAYPAL, INC., a Delaware Corporation, )
13                                                    )
            Defendant.             )
14 _____ )



15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION TO CLASS ACTION SETTLEMENT OF SAM A. MIORELLI

# TABLE OF CONTENTS

I.   Sam Andrew Miorelli is a class member and intends to appear at the fairness hearing. ......... 1

II.  The Court has a fiduciary duty to the unnamed members of the class. .................................. 2

III. The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class member either sold out the absent class members or that the case is a meritless vehicle for the procurement of legal fees and incentive payments. ....................................................................................... 4

   A.   The total recovery is a fraction of the class' injury. ..................................................... 4

   B.   The evidence of collusion between PayPal and Class Counsel is shown by Class Counsel's participation in two prior attempts to settle the case for a handsome legal fee, fat incentive awards, and zero monetary recovery for the absent class members. ................................................................................................. 6

IV.  The release is overbroad for the monetary recovery obtained for Claims Class members. ........................................................................................................................ 7

V.   The injunctive relief is illusory. .................................................................................... 8

VI.  A class action settlement should not be approved when the primary beneficiaries are the class representatives and class counsel. .......................................................................... 9

   A.   A large disparity between the recovery of the representative class member and the absent class members is not permitted under Ninth Circuit precedent. .......... 9

VII. Class Counsel should not get more than 25% in a contingent fee-based attorneys' fee. ............................................................................................................................... 11

   A.   The Court should follow the Ninth Circuit's 25% benchmark. ................................. 11

   B.   The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments. ........................................................... 12

   C.   Class Counsel has not submitted any evidence of the resume information of a large number of lawyers for whom he claims a lodestar. This makes it impossible to evaluate their lodestar and as a result, they should be excluded entirely from a lodestar cross check. .......................................................................... 13

   D.   The *Laffey* Matrix should be used to evaluate the hourly rates claimed by Class Counsel for the attorneys for whom resumes are provided and for the support staff. .............................................................................................................. 15

VIII.   The silence of the class should not be construed as endorsement of any terms of the Proposed Settlement, including Class Counsel's fee and incentive payment requests.......... 17

IX.     CONCLUSION.................................................................................................................. 19

OBJECTION TO CLASS ACTION SETTLEMENT OF SAM A. MIORELLI

1

**TABLE OF AUTHORITIES**

2 **Cases**

3    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................... 2, 3

4    *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ........................................................... 3

5    *Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) ........................... 3

6    *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) ............................. 18

7    *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) ......................... 18

8    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................................... 3

9    *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ...................................... 10

10    *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) ..................................... 10

11    *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ............. 3, 11, 13

12    *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ...................... 18

13    *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ...... 18

14    *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d.
       Cir. 1995) ...................................................................................................................... 2, 18

15    *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005) ............................. 2

16    *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL

17       3396829 (N.D. Cal. May 26, 2015) ................................................................................ 12

18    *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .................................. 2

19    *In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ................. 4

20    *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467 (N.D.Cal. Aug. 25, 1994) ........................ 13

21    *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir.

22       1987) ............................................................................................................................... 18

23    *Miles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 (N.D. Cal.

24       Nov. 12, 2014) ................................................................................................................ 13

25    *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ................................................................... 3

26    *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ........................................... 5

27    *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) ......................... 11

28

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982).............................................................. 9, 10

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) .............................................................. 10

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) ....................... 9, 10

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ............................................................. 13

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ........................................................ 2

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992)..................................................................................... 3

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ................................................................................... 3

*True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010)................................................. 3

*Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013).................................................. 9, 10

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)..................................................... 4, 11, 12

**Statutes**

California Civil Code § 1770............................................................................................................. 4

California Civil Code § 1780.......................................................................................................... 4, 7

**Other Authorities**

American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010)........................ 3

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class*

 *Action Settlements*, 59 Fla. L. Rev. 71 (2007). ........................................................................ 17, 18

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002). ...................................... 3

**INTRODUCTION**

Sam Andrew Miorelli, E.I., Esq., a longtime customer of PayPal, for the reasons stated herein, objects to the Proposed Settlement Agreement (Dkt 275-2). During the class period of April 19, 2006 to November 5, 2015, Mr. Miorelli made many sales on the eBay platform which resulted in funds being transferred by PayPal. A significant number of those transfers resulted in holds or reserves on Mr. Miorelli's PayPal account. Mr. Miorelli was damaged by these actions of PayPal, however, for reasons set forth herein, the method of paying this settlement will afford Mr. Miorelli significantly less relief than his damages. Mr. Miorelli filed a Basic Claim online, claim # TMVJ9VK5, as the cost of documenting his actual damages for holds over a decade-long period would be far more than the $2,000 maximum payment from such a process.

Mr. Miorelli's contact information, including his e-mail address which is associated with his PayPal account, is at the top of the first page of this objection and is incorporated herein for purposes of compliance with the requirements of Section 9.4 of the Proposed Settlement Agreement. By signing his Objection below, Mr. Miorelli confirms, under penalty of perjury, that he is a Settlement Class Member, as he was noticed of such by e-mail from PayPal. The remaining content of this Objection and its Exhibits satisfies the remaining procedural requirements of Section 9.4 of the Proposed Settlement Agreement.

The Proposed Settlement Agreement has significant problems. First, the monetary recovery is insufficient for the breadth of the release and the value of the legal claims being given up. Either the monetary recovery must be increased or the release significantly narrowed. Second, the injunctive relief is illusory as PayPal has already implemented the so-called relief years ago. Third, the proposed legal fee is excessive. For these and other reasons set forth herein, Mr. Miorelli respectfully objects to the Proposed Settlement Agreement.

**I.     Sam Andrew Miorelli is a class member and intends to appear at the fairness hearing.**

Sam Andrew Miorelli, who resides at 764 Ellwood Avenue, Orlando, FL 32804, is a member of the Claims Class. During the relevant time period, Mr. Miorelli made multiple sales on the eBay platform which conducted the funds transfer portion of the transaction through PayPal. A significant

1    number of those transfers resulted in holds or reserves on Mr. Miorelli's PayPal account. Mr. Miorelli
2    filed a Basic Claim online, claim # TMVJ9VK5, and intends to appear at the Fairness Hearing, where
3    he asks to be heard by the Court.

4    　　　　To the extent that other class members file objections which are not inconsistent with the
5    objections raised herein, Mr. Miorelli reserves the right to adopt those objections and address them at
6    the Fairness Hearing as well. To the extent that any objector participates in discovery relating to the
7    Proposed Settlement, Mr. Miorelli joins their motion to do so and requests equal access to such
8    proceedings. Mr. Miorelli also hereby requests the opportunity to depose and cross-examine any
9    witness presenting evidence in support of the Proposed Settlement. In the event the number of claims
10   results in a *pro rata* reduction of the settlement payment to Claims Class Members, Mr. Miorelli
11   reserves the right to supplement his objection regarding that particular issue should it arise.

12   **II.    The Court has a fiduciary duty to the unnamed members of the class.**

13   　　　　A district court must act as a "fiduciary for the class who must serve as a guardian of the rights
14   of absent class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).
15   "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the
16   important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to
17   final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360
18   F.Supp.2d 166, 192-94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v. Windsor*, 521 U.S.
19   591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair
20   settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *Reynolds v.*
21   *Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the
22   highest degree of vigilance in scrutinizing proposed settlements of class actions").

23   　　　　"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the
24   rights of absent class members . . . [T]he court cannot accept a settlement that the proponents have
25   not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pickup Truck Fuel Tank*
26   *Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) ("*GM Pickup Truck*") (internal quotation and
27   citation omitted). "A trial court has a continuing duty in a class action case to scrutinize the class
28   attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg &

-2-

1 | Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class representative and the
2 | courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697,
3 | 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir.
4 | 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty
5 | toward the absent class members").

6 | There should be no presumption in favor of settlement approval: "[t]he proponents of a
7 | settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d
8 | 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord*
9 | American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) ("*ALI*
10 | *Principles*").

11 | "Where the court is '[c]onfronted with a request for settlement-only class certification,' the
12 | court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953
13 | (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal
14 | class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification
15 | settlement agreements require that we carefully review the entire settlement, paying special attention
16 | to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of
17 | self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis*
18 | *v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th
19 | Cir. 2003)). "These concerns warrant special attention where the record suggests that settlement is
20 | driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon*
21 | *v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*,
22 | 654 F.3d 935, 946 (9th Cir. 2011).

23 | It is insufficient that the settlement happened to be at "arm's length" without express collusion
24 | between the settling parties. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). Because of
25 | the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as
26 | well. *Id.* "Because in common fund cases the relationship between plaintiffs and their attorneys turns
27 | adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a
28 | common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino*

1 v. *Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power*

2 *Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely

3 scrutinized." *Id.*

4 **III.  The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class member either sold out the absent class members or that the case is a meritless vehicle for the procurement of legal fees and incentive payments.**

5

6

7 A.  The total recovery is a fraction of the class' injury.

8 The Claims Class consists of approximately 10.5 million people. (Dkt 275 at 2:13). There is

9 no information available in the record of the case regarding the amount of money that PayPal illegally

10 withheld from its customers, but Class Counsel claims that $1,840,000 is more money than the

11 amount of interest which would have accrued to the illegally held funds at market interest rates. (Dkt

12 275 at 4:7-10). Assuming Class Counsel means an interest rate of approximately 3% per year, this

13 would mean that PayPal held something in the vicinity of $61,333,333 for the equivalent of one year.

14 However, we know that PayPal held funds for a maximum of 180 days, meaning that it is likely that

15 at least $122,666,666.67 of Claims Class funds were affected by PayPal's activities. Even assuming

16 the Claims Class could only recover treble damages across the multitude of claims, the value of the

17 release to PayPal is likely in the vicinity of $5,520,000 plus attorneys' fees and costs.

18 However, a key component of the claims released in this case sound in the California

19 Consumer Legal Remedies Act, California Civil Code § 1770. The CLRA provides extensive

20 remedies, including an individualized minimum recovery of $1,000 per harmed consumer. Cal. Civ.

21 Code § 1780(a)(1). Additionally, attorneys' fees are available for a prevailing plaintiff. *Id.* at §

22 1780(d).

23 This means that the *minimum value* of the claims being settled in the Proposed Settlement

24 Agreement is $1.5 billion. Put another way, Class Counsel, having in 2013 asked this Court to settle

25 the case for zero financial recovery to the Claims Class (*see* Dkt 166, 264 at 4:22-5:10), now calls

26 "fair" a settlement for 0.1227% of the minimum value of the claims being settled in the Proposed

27 Settlement Agreement. That is, one penny for every $10 in claim value.

28

1     This one-penny-per-ten-dollars-in-claim-value settlement is either a sell out by Class Counsel
2  or a nuisance settlement whose only purpose is the generation of legal fees.

3     Basic economic theory teaches that rational actors settling litigation matters agree to an
4  amount of money approximating their estimation of the amount of their damages discounted by their
5  probability of success at trial. Either this Proposed Settlement Agreement is the veiled admission of
6  Class Counsel that the case is frivolous, with a 99.88% chance of failure at trial, or, more likely, Class
7  Counsel seeks only a nuisance settlement to justify his outrageous fee and PayPal eagerly agrees to
8  resolve more than $1.5 billion in exposure for roughly half of one day's free cash flow.[1]

9     Meanwhile, the "class representatives" will each receive a $2,500 service award, 833 times
10 more money than most of the Claims Class members will likely receive.

11    The Seventh Circuit addressed a situation just like this in *Murray v. GMAC Mortg. Corp.*, 434
12 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant and class representative
13 proposed to settle the case for single-digit percentage of the value of their damages in payments that
14 similarly were in the range of $1 per absent class member, while the lawyers received enormous fees
15 and the representative plaintiff received thousands of times more money than the absent class
16 members. *Id.* Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that
17 all class members must receive [full compensation]; risk that the class will lose should the suit go to
18 judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* at 952.
19 However,

20          if the chance of success really is only 1%, shouldn't the suit be
           dismissed as frivolous and no one receive a penny? If, however, the
21          chance of success is materially greater than 1%, as the proposed
           payment [of an incentive award to representative plaintiff] Murray
22          implies, then the failure to afford effectual relief to any other class
           member makes the deal look like a sellout.
23

24 *Id.* This Proposed Settlement Agreement is much the same as that rejected in *Murray*. Just as in
25 *Murray*, here the lawyers will receive a huge fee while absent class members receive single-digit

26

27 ───────────────

28 [1] PayPal, Inc.'s free cash flow for the first quarter of 2016 was $605 million. That means PayPal generated roughly
   $6.72 million in free cash flow per day for the first quarter of 2016, roughly double the $3.4 million this Proposed
   Settlement would cost them. *See* Exhibit E.

OBJECTION TO CLASS ACTION SETTLEMENT OF SAM A. MIORELLI

1  dollar amounts. Also, just as in *Murray*, the class representatives will receive thousands of dollars
2  while most absent class members get $3.

3       It is impossible to imagine any rational actor pursuing millions of dollars in litigation which
4  they and their lawyers all agreed had less than 0.1227% chance of success on the merits.
5  Consequently, some other motivation must be present in the pursuit of the litigation and this Proposed
6  Settlement Agreement. As the only obvious beneficiaries of this Proposed Settlement Agreement (at
7  least, in proportion to the value of the claims being settled) are Class Counsel and the class
8  representatives, it seems highly likely that the entire purpose of this litigation all along has not been
9  to vindicate $1.5 billion in rights for the absent class members, but rather use the threat of such to
10  extract a nuisance settlement or sell out the absent class members when the litigation lingered. For
11  the purposes of this Objection, Mr. Miorelli believes it is unnecessary to take a position as to whether
12  the Proposed Settlement Agreement is a sellout or nuisance settlement. Most likely, it is both a sellout
13  and also a nuisance settlement, and it falls well outside the discretion of this Court to approve.

14       B.  The evidence of collusion between PayPal and Class Counsel is shown by Class
            Counsel's participation in two prior attempts to settle the case for a handsome legal
15          fee, fat incentive awards, and zero monetary recovery for the absent class members.

16       The past behavior of Class Counsel in this case strongly suggests the very collusion which
17  would be at the heart of a Class Counsel sellout.

18       The Proposed Settlement Agreement is the third time Class Counsel has come to the Court
19  with a settlement agreement and represented that he is presenting a "fair, reasonable and adequate"
20  settlement of the claims at issue in the case. (Dkt 112, 166, 275). The prior two attempts provided for
21  zero monetary recovery for absent class members. (Dkt 264 at 4:22-5:10). Those attempts were
22  rejected by the Court for, *inter alia*, "the questionable benefit of the settlement to the class members."
23  In his prior attempts, Class Counsel defended a non-recovery for absent class members as "damages
24  were never the predominate focus of the lawsuit." (Dkt 166 at 10). The Court saw through this ploy
25  at the time, noting the thirteen paragraphs of the Second Amended Complaint that sought damages
26  on the basis of wrongful retention of interest accrued on improperly held funds. (Dkt 205 at 11:12-
27  14).

28

1    This third attempt is better, but Class Counsel has already shown his hand: the purpose of this
2    third settlement is his legal fee and the incentive payments. Everything else is just the vehicle to that
3    end. If the real issues in this case are non-monetary, then the monetary matters in the release should
4    be removed so that the payment received by the Claims Class members matches the legal claims they
5    are releasing. Class Counsel uses the monetary recovery in this Proposed Settlement Agreement to
6    support a near-doubling of his legal fee from the previous submissions. A tiny cash payment to a sub-
7    class has not doubled the value of Class Counsel's services since the last time he tried to settle.

8    **IV.    The release is overbroad for the monetary recovery obtained for Claims Class**
9         **members.**

10   As discussed *supra*, Class Counsel has previously justified zero-dollar recovery for Claims
11   Class members on the theory that this case was not about monetary recovery in the first place. In
12   support of the Proposed Settlement Agreement, Class Counsel represents (without citing any
13   authority, discovery materials, expert opinion, or anything else) that "the payment amount exceeds
14   any potential recovery through litigation." (Dkt 275 at 6:25-7:1). The only possible way Class
15   Counsel's assertion to the Court could be true is if (a) the total number of claims exceeds 166,667,
16   the number of claims of $3 each which would exhaust a $500,000 statutory damage recovery for the
17   EFTA claims and (b) the CLRA count of the Third Amended Complaint is completely meritless.

18   Since there have been more than 166,667 claims to-date, Mr. Miorelli here focuses on the
19   question of whether Class Counsel, in his Motion for Preliminary Approval of Amended Class Action
20   Settlement, has admitted that Count 5 of the Third Amended Complaint is wholly without merit.

21   As discussed, *supra*, the minimum recovery for an injured plaintiff under the CLRA is $1,000.
22   Cal. Civ. Code § 1780(a)(1). Attorneys' fees are also awarded to a prevailing plaintiff. *Id.* at §
23   1780(d). Class Counsel believes the total value of each absent Claims Class member's injury is less
24   than their scheduled recovery under the Proposed Settlement Agreement. (Dkt 275 at 6:25-7:1). If
25   that is the case, then none of the Basic Claim-making Claims Class members (the vast majority of the
26   class), could have a meritorious CLRA claim in Class Counsel's opinion since all recovery on the
27   schedule is less than the CLRA $1,000 minimum. In other words, by Class Counsel saying the
28   Proposed Settlement Agreement gives every Claims Class member a better result than litigating alone,

1  he implicitly admits that those Claims Class members would have no chance of recovery under a
2  CLRA cause of action since the CLRA cause of action alone would award at least $1,000 each and
3  most Claims Class members will only recover $3.

4      Since Class Counsel apparently no longer believes the CLRA claims are meritorious and has
5  not recovered any money to compensate for CLRA claims, inclusion of CLRA claims in the Proposed
6  Settlement Agreement's release makes that release overbroad. The Court should require that the
7  monetary recovery of the absent Claims Class members be increased to at least $1,000 each to comply
8  with the CLRA. However, if the Court is persuaded by Class Counsel's representation of the
9  sufficiency of the Proposed Settlement Agreement, then the Court should order that CLRA-based
10  claims for PayPal's conduct at issue in this case should be carved out of the release so that the recovery
11  will match the claims released.

12  **V.     The injunctive relief is illusory.**

13      As far as Mr. Miorelli can tell, there is no real benefit to the Injunctive Relief Class whatsoever
14  in consideration for their release. The Proposed Settlement Agreement provides that PayPal will make
15  four changes to its business practices and make a very slight modification to its telephone service
16  practices. (Dkt 275-2 at 58). PayPal also agrees not to change these modifications for at least two
17  years. *Id.* Nevertheless, by its own terms, the parties to the Proposed Settlement Agreement agree that
18  PayPal will actually make *zero* changes to its business practices as a direct result of the Proposed
19  Settlement Agreement, as the current state of its business practices are agreed by the parties to be
20  compliant with the Proposed Settlement Agreement. *Id.* In fact, as of the date of this Objection, PayPal
21  has already maintained a compliant condition on its website longer than 2 years as these terms of the
22  Proposed Settlement Agreement are essentially unchanged from how they appeared in the First
23  Proposed Settlement Agreement Dkt 112-1 ¶ 3.3, which was filed with the Court on October 18, 2012
24  – almost four years prior to the Final Fairness hearing on this Proposed Settlement Agreement.

25      Since PayPal already made these changes almost four years ago, there is no actual
26  consideration being paid to the Injunctive Relief Class in exchange for their broad release of PayPal.
27  The Claims Class similarly realizes zero value from the supposed injunctive relief.

28

1

2

## VI.   A class action settlement should not be approved when the primary beneficiaries are the class representatives and class counsel.

3

4

5

Under the Proposed Settlement Agreement and Class Counsel's Fee Motion, while class members will get about $3 each, the class representatives will each receive $2,500. This is an outrageous disparity of 833X between the class representative and absent class members.

6

### A.   A large disparity between the recovery of the representative class member and the absent class members is not permitted under Ninth Circuit precedent.

7

8

9

10

11

12

13

14

15

16

Courts around the country, including the Ninth Circuit, while often approving incentive awards to class representatives, regularly reverse when those awards represent a large disparity when compared to the absent class members. In *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), the Ninth Circuit reversed an approved settlement due to a 6.67-192.3 times disparity between class representatives' recovery and that of absent class members. The Ninth Circuit reasoned that "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 in incentive awards." *Id.*

17

18

19

20

21

22

23

The Sixth Circuit has also rejected a large disparity between the named plaintiffs and absent class members' treatment in *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013). In *Vassalle*, the settlement provided for absent class members to receive $17.38 each while the named plaintiffs would be paid $2,000 each plus, in the case of one named plaintiff, have $4,516.57 in debt forgiven. *Id.* at 755-56. In total, this resulted in named plaintiffs receiving approximately 374 times as much benefit from the settlement as absent class members. The Sixth Circuit found the settlement was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

24

25

26

27

The Second Circuit also is skeptical of the fairness of incentive payments. In *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the Second Circuit affirmed the Southern District of New York's denial of a proposed class action settlement where absent class members received $1,000 each while the four representative class members received between $8,500 and $17,500 each. The

28

1    district court held that "where representative plaintiffs obtain more for themselves by settlement than
2    they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as
3    to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441-42
4    (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

5          The Eleventh Circuit directly cited that same district court language in *Plummer* when it
6    rejected a class settlement which allocated approximately 6.25% of a lump sum settlement to the eight
7    representative class members, while the absent class members each received, on average,
8    approximately 0.42% of the settlement. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1146, 1148
9    (11th Cir. 1983). The court found the 14.75 times disparity between representative and absent class
10   member recovery was facially unfair and reversed the district court's approval of the settlement. *Id.*
11   at 1151.

12         In *Radcliffe* the disparity between the class representatives and the absent members of the
13   class was about 6 to 192 times, in *Vassalle* it was 374 times, in *Plummer* it was 8.5 to 17.5 times, and
14   in *Holmes* the disparity was 14.75 times. In each of those cases, the appellate court rejected the
15   settlement as unfair.

16         This Court has also expressed concern about other proposed settlement agreements recently
17   before it which suggested large-multiple incentive awards. In *Lifelock*, this Court noted with caution
18   that "Plaintiffs, thus far, have provided no explanation for why the named Plaintiffs deserve an award
19   100 times greater than the settlement value of the other Class Members." *Lifelock*, 2016 WL 234364
20   at *7.

21         In this case the disparity is about 833X. That disparity is vastly above the levels which the
22   Ninth, Second, and Eleventh Circuits have all rejected. This Court would invite error to approve this
23   much-worse disparity. Class certification is not appropriate when the class representative and class
24   counsel bring a lawsuit to benefit not the class, but themselves. *See In re Aqua Dots Prod. Liab. Litig.*,
25   654 F.3d 748, 752 (7th Cir. 2011). This Proposed Settlement Agreement, with its enormous attorneys'
26   fee and thousands of times difference in recovery between the class representative and absent class
27   members appears to be just such a self-serving case and should be rejected.

28

**VII.    Class Counsel should not get more than 25% in a contingent fee-based attorneys' fee.**

A.   The Court should follow the Ninth Circuit's 25% benchmark.

In the Ninth Circuit, the 25% benchmark for calculating a contingent attorneys' fee in a class action is settled law. *Bluetooth*, 654 F.3d at 942 (*citing Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989) (establishing that 25% of the fund is the "benchmark" award that should be given in common fund cases)). While the Ninth Circuit has set forth an analytical framework for consideration of an upward departure in *Vizcaino*, such a departure requires more than the puffery Class Counsel offers.

As explained *supra*, there is nothing extraordinary about a recovery amounting to less than 0.1% of the class members' statutory damage minimum. Additionally, Class Counsel himself has actually not claimed that his recovery is extraordinary except for saying such in the title to a paragraph that includes legal citation to three cases but zero explanation or discussion of how those cases might apply to Class Counsel's performance in this case. Having actually *said* nothing about his performance other than a header to a paragraph, the Court should treat Class Counsel's fee motion as though he has not made a claim of exceptional results for the absent class members.

Compared to *Vizcaino*, Class Counsel faced significantly less risk. The class lawyers in *Vizcaino* pursued their case with zero supporting precedents and agreements signed by the class members waiving the very benefit the class sought to vindicate in spite of the written agreements! *Vizcaino*, 290 F.3d at 1048. *Vizcaino* approved the district court calling a case extremely risky where the plaintiffs had lost once on the merits and a second time on the class definition yet both times managed to revive the case. *Id.* at 1048.

In this case, first, Class Counsel's own motion (which seems to conflate the second and fourth *Vizcaino* factors) identifies no risk, other than the normal risk of any contingent fee attorney of non-payment if they lose the case. Class Counsel makes no claim or showing that any of the firms in this case forewent any other paying client or took significant financial risks for their firm in the prosecution of the case. Other than reciting the risk that all contingent-fee attorneys take in litigating cases and asserting that there was a "sizeable risk," Class Counsel has made no showing on this

1 second *Vizcaino* factor and beyond asserting that the case was contingent-fee, has made zero showing

2 of a financial burden as a result of the representation to support the fourth *Vizcaino* factor either.

3 Class Counsel's claim that they litigated this case "so effectively and efficiently by virtue of

4 their considerable skill and experience in this area of the law" is ridiculous. (Dkt 297 at 18). This case

5 will have lingered on the docket for more than six years before it is resolved, even if this Proposed

6 Settlement Agreement is approved. In that time, the most notable activity in the case has been the

7 battle between Class Counsel and the ridiculous lawyers from the *Fernando* case. Almost negotiating

8 a settlement only to have it blow up in acrimony at the last minute is not a sign of "considerable skill

9 and experience," it is the typical difficulty of civil litigation no different from a mundane discovery

10 dispute or any other settlement negotiation. The second most notable thing that has happened in this

11 case is the two times the Court has rejected prior attempts of Class Counsel to settle the case. Another

12 example which contradicts Class Counsel's claim of effective and efficient litigation. Further, Class

13 Counsel himself provides no examples from the progress of the case to support his naked claim of

14 effective and efficient litigation. Consequently, Class Counsel's argument on the third *Vizcaino* factor

15 fails as well.

16 In an apparent admission that his ask for a departure above the benchmark is a stretch, Class

17 Counsel does not even attempt to address the fifth *Vizcaino* factor.

18       B.   The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments.

19

20 The Court should award attorneys' fees on the basis of net class recovery. Also, while the

21 incentive payments proposed are illegal under binding precedent, to the extent that any incentive

22 payments are awarded, they should also be excluded from Class Counsel's contingent fee calculation.

23 The Northern District of California "has had a longstanding preference for using the net" when

24 calculating a contingent fee award in class action settlements. *In re Transpacific Passenger Air*

25 *Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *1 (N.D. Cal. May 26, 2015)

26 (J. Charles R. Breyer) ("*Transpacific*"). Judge Breyer is not alone in this preference for net-based

27 calculations. The Northern District of California has approved net-based calculations for decades not

28 only in consumer class actions, but also in securities cases and in employment class actions. *In re*

-12-

1 | *Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D.Cal. Aug. 25, 1994); *Miles v. AlliedBarton*
2 | *Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 at *5 (N.D. Cal. Nov. 12, 2014).

3 |      In addition to the frequently-reported preference of the Northern District of California for a
4 | net-based analysis, the Seventh Circuit <u>requires</u> a net-based analysis. *Redman v. RadioShack Corp.*,
5 | 768 F.3d 622, 633 (7th Cir. 2014) ("Those [administrative] costs are part of the settlement but not
6 | part of the value received from the settlement by the members of the class. The costs therefore shed
7 | no light on the fairness of the division of the settlement pie between class counsel and class
8 | members.")

9 |      Subtracting notice costs of $400,000, Class Counsel's costs of $39,203.80,[2] and the proposed
10 | incentive awards of $20,000 reduces the basis for the attorneys' fee from $3.2 million to
11 | $2,740,796.20. Applying the Ninth Circuit's 25% benchmark results in an attorneys' fee of
12 | $685,199.05.

13 |      On the basis of the filings on the docket to-date, it appears highly unlikely that claims
14 | necessitating the optional $800,000 will be made. Even if some are, the fact that the unused portion
15 | of the optional $800,000 reverts to PayPal means that only the amount, if any, actually awarded to
16 | Claims Class members should factor into any ultimate attorneys' fee. To the extent any of the optional
17 | $800,000 is paid and the Court credits that paid amount toward the net recovery in line with the
18 | calculation in the prior paragraph, Mr. Miorelli does not object to an increase in the fee in line with
19 | the same calculation as above in that limited circumstance.

20 |      C. <u>Class Counsel has not submitted any evidence of the resume information of a large</u>
       <u>number of lawyers for whom he claims a lodestar. This makes it impossible to</u>

21
22
23
24

_____

25 | [2] Mr. Miorelli further objects to this amount. Over $33,000 of the amount comes from an entirely-perfunctory table
26 | submitted by Quantum Legal LLC with no basis for absent class members to evaluate its accuracy or whether the items
billed for are actually chargeable to absent class members. (Dkt 297-6). Additionally, Class Counsel calls a $305 fee for
27 | *Pro Hac Vice* admission an out-of-pocket expense chargeable to the absent class members. (Dkt 297-2 at 3). This
should not be accounted against the absent class member recovery because it was a necessary cost for the lawyer
himself to be eligible to represent the class. The firms in this case did not have to hire lawyers not admitted to this Court
28 | and there is no reason they should be compensated not only for their time but also for their admission fees. Should the
class pay their business licensing fees and home-state bar fees as well?

1

<u>evaluate their lodestar and as a result, they should be excluded entirely from a
lodestar cross check.</u>

2

3       Class Counsel has submitted billing data but zero resume information for the following

4  lawyers who he claims worked on the case:

| TABLE 1 | | |
|---|---|---|
| **Timekeeper** | **Rate** | **Total Number of Hours** |
| Abigail Blodgett | $400 | 0.2 |
| Jennie Romer | $400 | 16.6 |
| Jamie S. Weiss | $745 | 3.2 |
| Grant Y. Lee | $700 | 34.8 |
| Angela N. Aineros | $350 | 64.7 |
| George K. Lang | $635 | 3.8 |
| Julie D. Miller | $570 | 278.1 |
| Paul Y. Cho | $550 | 3.5 |
| Rebecca E. Duggan | $425 | 10.5 |
| Zachary A. Jacobs | $570 | 5.6 |
| Ross N. Alexander | $535 | 56 |
| Paul M. Weiss | $720 | 88.4 |
| Jonathan Shub | $750 | 25 |
| Scott A. George | $725 | 0.8 |
| Steve Jaffe | $700 | 22.6 |
| Seth Lehrman | $650 | 4.2 |
| Mark Fistos | $650 | 0.3 |

This lack of information on these lawyers makes it impossible for an absent class member or the Court

to evaluate whether the work and billing rates of these lawyers is appropriate for this case. Further,

as no biographical information or firm information whatsoever was provided about Seeger Weiss LLP

or Jaffee Weissing, Edwards, Fistos & Lehrman, P.L., their paralegal/admin time should also not be

counted toward the cross-check as that time is only useful to an absent class member to the extent

they support the work of an effective attorney. As no absent class member has properly been presented

even a scintilla of evidence that any of the attorneys from these outside firms provided needed services

in this case, their support staff should also be excluded from the lodestar.

       As a result, none of their billing should be included in a lodestar cross-check as this omission

by Class Counsel has made it impossible for the absent class members to evaluate their performance

or object to their billings. This should reduce Class Counsel's lodestar by $358,301.50 (hours times

1  rate from each person above). This also cannot be remedied by Class Counsel at this point without

2  requiring new notice to the class and a new period of time to object.

3        D.  The *Laffey* Matrix should be used to evaluate the hourly rates claimed by Class
            Counsel for the attorneys for whom resumes are provided and for the support staff.

4

5         One of the most common ways to determine the reasonability of an attorney's declared hourly

6  rate is by comparison of it with that year's *Laffey* Matrix and then adjusted to local geographic cost

7  of living. *See Chanel, Inc. v. Doan*, 2007 WL 781976, *6-7 (N.D. Cal. 2007) (citing *Laffey v.*

8  *Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds,

9  746 F.2d 4 (D.C. Cir. 1984)). Following the *Chanel* method, the Judicial Salary Plan effective January

10  11, 2016 includes a 25.44% locality pay for Chicago-Naperville (home to the offices of Quantum

11  Legal, LLC), a 35.75% locality pay for San Jose-San Francisco-Oakland (home to the offices of

12  Lexington Law Group), and a 24.78% locality pay for Washington, D.C. (Exhibits A-D). This means

13  that converting the *Laffey* Matrix to Chicago-Naperville rates is accomplished by adding 0.53% to

14  the Washington, D.C. rate[3] and the San Jose-San Francisco-Oakland rate is achieved by adding 8.79%

15  to the Washington, D.C. rate.[4]

16         For the lawyers which Class Counsel provided resume information, we can evaluate whether

17  the rate charged is reasonable. Using the *Laffey* Matrix, the table can be updated to include a

18  geographic-specific reasonable fee rate for each:

| TABLE 2 | | | |
|---|---|---|---|
| **Timekeeper** | **Laffey Matrix Rate (years experience)** | **Locality Adjustment** | **Reasonable Hourly Rate** |
| Mark N. Todzo | $520 (22 years) | 8.79% | $538.41 |
| Eric S. Somers | $520 (26 years) | 8.79% | $538.41 |
| Howard Hirsch | $460 (19 years) | 8.79% | $500.43 |
| Lisa Burger | $370 (10 years) | 8.79% | $383.10 |
| Lucas Williams | $300 (6 years) | 8.79% | $310.62 |
| Jeffrey Leon | $520 (24 years) | 0.53% | $522.76 |
| John Banister | $150 (Paralegal/Law Clerk) | 8.79% | $155.31 |
| Casey Fisher | $150 (Paralegal/Law Clerk) | 8.79% | $155.31 |
| Patrick Carey | $150 (Paralegal/Law Clerk) | 8.79% | $155.31 |
| Tom McClurg | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Leo Aguilar | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |

19
20
21
22
23
24
25
26
27
28

[3] Following the math from *Chanel* at fn 1 and 2: (125.44 − 124.78) / 124.78 = 0.0053 or 0.53%
[4] Following the math from *Chanel* at fn 1 and 2: (135.75 − 124.78) / 124.78 = 0.0879 or 8.79%

| Anthony C. Ball | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Deborah Y. Searls | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Georgiana M. Tieman | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Greg E. Mueller | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Jane F. Kennedy | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Sherrie J. Hall | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| Vincent R. Francone | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |
| David Sorensen | $150 (Paralegal/Law Clerk) | 0.53% | $150.80 |

Now the adjusted rates can be applied to the hours billed so that the claimed lodestar can be compared to the lodestar which Class Counsel has provided some evidence to support in his Motion for Fees:

| TABLE 3 | | | |
|---|---|---|---|
| Timekeeper | Reasonable Hourly Rate | Number of Hours | Amount Billable |
| Mark N. Todzo | $538.41 | 314.9 | $169,545.31 |
| Eric S. Somers | $538.41 | 5.1 | $2,745.89 |
| Howard Hirsch | $500.43 | 53.8 | $26,923.13 |
| Lisa Burger | $383.10 | 25.3 | $9,692.43 |
| Lucas Williams | $310.62 | 54.2 | $16,835.60 |
| Jeffrey Leon | $522.76 | 258 | $134,872.08 |
| John Banister | $155.31 | 43.6 | $6,771.52 |
| Casey Fisher | $155.31 | 38.2 | $5,932.84 |
| Patrick Carey | $155.31 | 11 | $1,708.41 |
| Tom McClurg | $150.80 | 5.1 | $769.08 |
| Leo Aguilar | $150.80 | 117.6 | $17,734.08 |
| Anthony C. Ball | $150.80 | 8 | $1,206.40 |
| Deborah Y. Searls | $150.80 | 76.9 | $11,596.52 |
| Georgiana M. Tieman | $150.80 | 0.7 | $105.56 |
| Greg E. Mueller | $150.80 | 22.6 | $3,408.08 |
| Jane F. Kennedy | $150.80 | 2.8 | $422.24 |
| Sherrie J. Hall | $150.80 | 2.1 | $316.68 |
| Vincent R. Francone | $150.80 | 449.5 | $67,784.60 |
| David Sorensen | $150.80 | 12.4 | $1,869.92 |
| | **TOTAL:** | **1501.8** | **$480,240.38** |

Evaluating the total on Table 4 versus the amount claimed by Class Counsel in his Motion for Fees shows Class Counsel has inflated the amount he claims he is owed. Class Counsel contends that four firms related to the case have worked 2,136.4 hours, yet has only provided the bare-minimum billing information about 1,501.8 hours, having not included detailed bills for almost all billings and not included any biographical information for a large number of lawyers and the staff who support them. (Dkt 297-1, 297-3, 297-4, 297-5).

1        Class Counsel claims his lodestar to be $1,015,233.50, yet when lawyers and support staff for

2   lawyers whose time cannot be evaluated because Class Counsel has provided absent class members

3   insufficient information is removed, Class Counsel's lodestar reduces to $656,932.00. When Class

4   Counsel's inflated and unreasonable rates are adjusted using the well-resepected *Laffey* Matrix, the

5   lodestar reduces finally to $480,240.38.

6        The difference between Class Counsel's claim of over $1 million and what his documents

7   prove to be less than half that is an enlightening view of Class Counsel's proclivity to look out for

8   himself at the detriment of his clients, even when working out hourly bills.

9        When the fixed lodestar is compared to the net recovery of the common fund, the multiplier

10  is not negative as Class Counsel suggested, but positive: 1.427 this cross-check confirms that a net

11  calculation is most reasonable and that the *Laffey* Matrix along with exclusion of un-supported billing

12  statements results in a fair legal fee of $685,199.05 for Class Counsel. The Court, in awarding such a

13  fee, would also show its care for its fiduciary duty to the absent class members by increasing their

14  total recovery, compared to Class Counsel's request, by likely a few dollars per absent class member.

15  **VIII.  The silence of the class should not be construed as endorsement of any terms of the
       Proposed Settlement, including Class Counsel's fee and incentive payment requests.**

16

17       In his Motion for Fees, Class Counsel makes a common argument raised by plaintiffs' lawyers

18  and corporate defendants in settlements such as this: that a low number of absent class members

19  opting out or objecting to the settlement shows the absent class members support, acquiesce, or

20  endorse the Proposed Settlement Agreement and its terms. (Dkt 297 at 18:21-19:5). This argument

21  has been thoroughly criticized in the academy and this Court should pay it no heed.

22       No matter how outrageous the terms of the Proposed Settlement Agreement are, very few

23  class members will object. In a case such as this, where the individual losses are small and hard to

24  prove on a per-class-member basis in individual cases (which is precisely the reason for allowing

25  class actions in the first place), the economic incentive to opt-out of the settlement to pursue a case

26  independently is unlikely to exist for almost all absent class members in almost all class actions

27  alleging consumer harm. Christopher R. Leslie, *The Significance of Silence: Collective Action

28  Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007). "[M]ost likely, silence is a

-17-

rational response to any proposed settlement even if that settlement is inadequate." *Id.* The incentives for objectors are particularly bad because they must spend significant time and effort to attempt to improve the settlement for millions of their fellow class members, with a gain for themselves that, in this case, likely would only be a few dollars at best. *Id.*

Class Counsel argues that the large number of claimants (and thus, low number of objectors as a percentage) proves that the absent class members have a "highly positive response to the Settlement." (Dkt 297 at 18:26-27). This is wrong because,

> There may be many reasons why class members in this case didn't register their concerns about the settlement: lack of interest, time, information, etc. Like the Third Circuit in the *General Motors* case, the Court is unwilling to automatically equate class silence with a showing of "overwhelming" support for the settlement. Therefore, the fact that statistically few people bothered to opt-out or file an objection ultimately counts little in the Court's overall fairness analysis.

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing GM Pickup Truck*, 55 F.3d at 812.

"Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli.*" *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-81 (7th Cir. 1987). "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *GM Pickup Truck.*, 55 F.3d at 812, *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007).

No matter what reaction the class has to the Proposed Settlement Agreement, the Court remains the fiduciary for all class members whether they signed up, opted out, objected via counsel,

1   or handwrote their objection on notebook paper. PayPal and Class Counsel must show that the

2   Proposed Settlement Agreement follows the law, is fundamentally fair, adequate, and reasonable.

3   They would bear that burden even if Mr. Miorelli did not file this Objection.

4   **IX.    CONCLUSION**

5          This third attempt to settle the case is only better than the last in that it no longer sells out the

6   claims of absent class members for $0, it sells them out for almost-$0, while potentially giving the

7   lawyers about 2X more money. Class Counsel's burden is to prove that the Proposed Settlement

8   Agreement follows the law, is fundamentally fair, adequate, and reasonable. On this Proposed

9   Settlement Agreement, with these terms, and especially in light of Class Counsel's Motion for Fees,

10  they cannot meet their burden. Therefore, Mr. Miorelli prays this honorable court:

11         (a) Reject the Proposed Settlement Agreement; or,

12         (b) If the Court chooses to approve the Proposed Settlement Agreement, to:

13              i.    Reduce the attorneys' fees to $685,199.05;

14              ii.   Award the class representatives a single-digit multiple of the average cash absent

15                    class member's recovery; and

16              iii.  Reserve jurisdiction to grant incentive awards to Mr. Miorelli.

17  DATED: May 10, 2016

18

19                                          Sam A. Miorelli, E.I., Esq. (*pro se*)
                                            764 Ellwood Avenue
20                                          Orlando, FL 32804
                                            Telephone: 352-458-4092
21                                          E-Mail: sam.miorelli@gmail.com

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        The undersigned certifies that the foregoing Objection and Exhibits were mailed via U.S.

3   Certified Mail to:

4   Class Action Clerk
    United States District Court for the Northern District of California
5   1301 Clay Street
    Oakland, CA 94612
6

7                                        Sam A. Miorelli, E.I., Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
Exhibit A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# LAFFEY MATRIX – 2014-2015

Years (Rate for June 1 – May 31, based on prior year's CPI-U)

| Experience | 14-15 |
|---|---|
| 20+ years | 520 |
| 11-19 years | 460 |
| 8-10 years | 370 |
| 4-7 years | 300 |
| 1-3 years | 255 |
| Paralegals & Law Clerks | 150 |

*Explanatory Notes:*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act). The matrix does **not** apply to cases in which the hourly rate is limited by statute. *See* 28 U.S.C. § 2412(d).

2.  This matrix is based on the hourly rates allowed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The various "brackets" in the column headed "Experience" refer to the years following the attorney's graduation from law school, and are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). Thus, the "1-3 years" bracket is generally applicable to attorneys in their first, second, and third years after graduation from law school, and the "4-7 years" bracket generally becomes applicable on the third anniversary of the attorney's graduation (*i.e.*, at the beginning of the fourth year following law school). *See Laffey*, 572 F. Supp. at 371; *but cf. EPIC v. Dep't of Homeland Sec.*, No. 11-2261, ___ F. Supp. 2d ___, 2013 WL 6047561, *6 -*7 (D.D.C. Nov. 15, 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp.2d 56, 60-61 (D.D.C. 2013) (same).

3.  The hourly rates approved in *Laffey* were for work done principally in 1981-82. The matrix begins with those rates. *See Laffey*, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured  by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4.  Use of an updated Laffey Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of

prevailing market rates for litigation counsel in the Washington, D.C. area. *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). Most lower federal courts in the District of Columbia have relied on the United States Attorney's Office Matrix, rather than the so-called "Updated Laffey Matrix," as the "benchmark for reasonable fees" in this jurisdiction. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *see, e.g., Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 40-49 (D.D.C. 2011); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 150 (D.D.C. 2007). *But see Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 14-15 (D.D.C. 2000). The United States Attorney's Office does not use the "Updated Laffey Matrix" to determine whether fee awards under fee shifting statutes are reasonable.

1                                          Exhibit B
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JUDICIARY SALARY PLAN**
**Washington-Baltimore-Arlington, DC-MD-VA-WV-PA - Table DCB**
**24.78% Locality Payment Included**
**Effective January 11, 2016**

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $22,888 | $23,653 | $24,414 | $25,172 | $25,933 | $26,378 | $27,131 | $27,890 | $27,920 | $28,626 |
| 2 | $25,733 | $26,346 | $27,198 | $27,920 | $28,236 | $29,068 | $29,899 | $30,730 | $31,561 | $32,392 |
| 3 | $28,078 | $29,014 | $29,950 | $30,886 | $31,821 | $32,757 | $33,693 | $34,629 | $35,565 | $36,501 |
| 4 | $31,521 | $32,571 | $33,622 | $34,673 | $35,723 | $36,774 | $37,825 | $38,875 | $39,926 | $40,977 |
| 5 | $35,265 | $36,441 | $37,616 | $38,792 | $39,967 | $41,142 | $42,318 | $43,493 | $44,669 | $45,844 |
| 6 | $39,311 | $40,621 | $41,931 | $43,241 | $44,551 | $45,862 | $47,172 | $48,482 | $49,792 | $51,102 |
| 7 | $43,684 | $45,140 | $46,597 | $48,053 | $49,509 | $50,965 | $52,421 | $53,878 | $55,334 | $56,790 |
| 8 | $48,378 | $49,991 | $51,603 | $53,215 | $54,827 | $56,439 | $58,051 | $59,664 | $61,276 | $62,888 |
| 9 | $53,435 | $55,215 | $56,996 | $58,776 | $60,557 | $62,338 | $64,118 | $65,899 | $67,679 | $69,460 |
| 10 | $58,844 | $60,805 | $62,767 | $64,728 | $66,690 | $68,651 | $70,613 | $72,575 | $74,536 | $76,498 |
| 11 | $64,650 | $66,805 | $68,960 | $71,115 | $73,270 | $75,425 | $77,579 | $79,734 | $81,889 | $84,044 |
| 12 | $77,490 | $80,073 | $82,656 | $85,238 | $87,821 | $90,404 | $92,987 | $95,570 | $98,153 | $100,736 |
| 13 | $92,145 | $95,217 | $98,289 | $101,361 | $104,433 | $107,505 | $110,578 | $113,650 | $116,722 | $119,794 |
| 14 | $108,887 | $112,517 | $116,146 | $119,776 | $123,406 | $127,036 | $130,666 | $134,296 | $137,926 | $141,555 |
| 15 | $128,082 | $132,352 | $136,622 | $140,892 | $145,162 | $149,432 | $153,702 | $157,971 | $160,300 ** | $160,300 ** |
| 16 | $150,215 | $155,223 | $160,230 | $165,237 | $170,245 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 17 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 18 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |

* Rate limited to the rate for Level III of the Executive Schedule.
** Rate limited to the rate for Level IV of the Executive Schedule.

1        Exhibit C
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JUDICIARY SALARY PLAN
## San Jose-San Francisco-Oakland, CA - Table SF
## 35.75% Locality Payment Included
## Effective January 11, 2016

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $24,901 | $25,733 | $26,561 | $27,385 | $28,213 | $28,698 | $29,516 | $30,341 | $30,374 | $31,142 |
| 2 | $27,996 | $28,662 | $29,589 | $30,374 | $30,719 | $31,623 | $32,527 | $33,431 | $34,335 | $35,239 |
| 3 | $30,546 | $31,565 | $32,583 | $33,601 | $34,619 | $35,637 | $36,655 | $37,673 | $38,691 | $39,710 |
| 4 | $34,292 | $35,435 | $36,578 | $37,721 | $38,864 | $40,007 | $41,150 | $42,293 | $43,436 | $44,579 |
| 5 | $38,366 | $39,644 | $40,923 | $42,202 | $43,481 | $44,759 | $46,038 | $47,317 | $48,596 | $49,875 |
| 6 | $42,767 | $44,192 | $45,617 | $47,043 | $48,468 | $49,894 | $51,319 | $52,744 | $54,170 | $55,595 |
| 7 | $47,525 | $49,109 | $50,693 | $52,277 | $53,862 | $55,446 | $57,030 | $58,614 | $60,198 | $61,783 |
| 8 | $52,632 | $54,386 | $56,139 | $57,893 | $59,647 | $61,401 | $63,155 | $64,909 | $66,663 | $68,417 |
| 9 | $58,132 | $60,069 | $62,007 | $63,944 | $65,881 | $67,818 | $69,755 | $71,692 | $73,629 | $75,567 |
| 10 | $64,017 | $66,151 | $68,285 | $70,419 | $72,553 | $74,687 | $76,821 | $78,955 | $81,089 | $83,223 |
| 11 | $70,333 | $72,678 | $75,022 | $77,367 | $79,711 | $82,055 | $84,400 | $86,744 | $89,089 | $91,433 |
| 12 | $84,302 | $87,112 | $89,922 | $92,732 | $95,542 | $98,352 | $101,162 | $103,972 | $106,782 | $109,592 |
| 13 | $100,246 | $103,588 | $106,930 | $110,272 | $113,615 | $116,957 | $120,299 | $123,641 | $126,983 | $130,325 |
| 14 | $118,460 | $122,408 | $126,357 | $130,306 | $134,255 | $138,204 | $142,153 | $146,102 | $150,051 | $154,000 |
| 15 | $139,342 | $143,987 | $148,633 | $153,278 | $157,923 | $160,300 ** | $160,300 ** | $160,300 ** | $160,300 ** | $160,300 ** |
| 16 | $163,421 | $168,869 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 17 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 18 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |

* Rate limited to the rate for Level III of the Executive Schedule.
** Rate limited to the rate for Level IV of the Executive Schedule.

1

Exhibit D

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JUDICIARY SALARY PLAN**
**Chicago-Naperville, IL-IN-WI - Table CHI**
**25.44% Locality Payment Included**
**Effective January 11, 2016**

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $23,009 | $23,778 | $24,544 | $25,305 | $26,070 | $26,518 | $27,274 | $28,037 | $28,067 | $28,777 |
| 2 | $25,869 | $26,485 | $27,342 | $28,067 | $28,386 | $29,221 | $30,057 | $30,892 | $31,728 | $32,563 |
| 3 | $28,227 | $29,167 | $30,108 | $31,049 | $31,990 | $32,931 | $33,871 | $34,812 | $35,753 | $36,694 |
| 4 | $31,687 | $32,744 | $33,800 | $34,856 | $35,912 | $36,968 | $38,025 | $39,081 | $40,137 | $41,193 |
| 5 | $35,452 | $36,633 | $37,815 | $38,997 | $40,178 | $41,360 | $42,542 | $43,723 | $44,905 | $46,087 |
| 6 | $39,519 | $40,836 | $42,153 | $43,470 | $44,787 | $46,104 | $47,421 | $48,738 | $50,056 | $51,373 |
| 7 | $43,915 | $45,379 | $46,843 | $48,307 | $49,771 | $51,235 | $52,699 | $54,162 | $55,626 | $57,090 |
| 8 | $48,634 | $50,255 | $51,876 | $53,496 | $55,117 | $56,738 | $58,358 | $59,979 | $61,600 | $63,221 |
| 9 | $53,717 | $55,507 | $57,297 | $59,087 | $60,877 | $62,667 | $64,457 | $66,247 | $68,037 | $69,827 |
| 10 | $59,155 | $61,127 | $63,099 | $65,071 | $67,043 | $69,015 | $70,986 | $72,958 | $74,930 | $76,902 |
| 11 | $64,992 | $67,158 | $69,324 | $71,491 | $73,657 | $75,823 | $77,990 | $80,156 | $82,323 | $84,489 |
| 12 | $77,899 | $80,496 | $83,093 | $85,689 | $88,286 | $90,883 | $93,479 | $96,076 | $98,672 | $101,269 |
| 13 | $92,632 | $95,721 | $98,809 | $101,897 | $104,986 | $108,074 | $111,162 | $114,251 | $117,339 | $120,427 |
| 14 | $109,463 | $113,112 | $116,761 | $120,410 | $124,059 | $127,708 | $131,357 | $135,006 | $138,655 | $142,304 |
| 15 | $128,759 | $133,052 | $137,344 | $141,637 | $145,929 | $150,222 | $154,514 | $158,807 | $160,300 ** | $160,300 ** |
| 16 | $151,010 | $156,044 | $161,078 | $166,111 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 17 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 18 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |

* Rate limited to the rate for Level III of the Executive Schedule.
** Rate limited to the rate for Level IV of the Executive Schedule.

1          Exhibit E
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



April 27, 2016

# PayPal Reports Strong First Quarter Results

### 23% FX-Neutral growth in Revenue

### GAAP EPS increased 43% to $0.30 and non-GAAP EPS 28% on a pro forma basis to $0.37

SAN JOSE, Calif.--(BUSINESS WIRE)-- Global technology platform and payments leader PayPal Holdings, Inc. (Nasdaq: PYPL) today announced results for the first quarter ended March 31, 2016. For the quarter, PayPal gained market share, expanded its customer base, deepened engagement with merchants and consumers and delivered on its financial commitments.

### Financial highlights for the first quarter include:

- Revenue growth of 19% to $2.544 billion, or 23% on a foreign currency neutral (FX-neutral) non-GAAP pro forma basis
- GAAP operating margin of 16%, up 90 basis points, non-GAAP operating margin of 21%, down 70 basis points on a pro forma basis
- GAAP earnings per diluted share (EPS) growth of 43% to $0.30, non-GAAP EPS growth of 28% on a pro forma basis to $0.37
- Operating cash flow of $738 million, free cash flow of $605 million
- Repurchased 17 million shares of common stock at an average price of $35

### Operating highlights for the first quarter include:

- 4.5 million active customer accounts added, ending the quarter with 184 million
- 1.4 billion transactions processed, up 26%
- 28 payment transactions per active account on a trailing twelve month basis, up 12%
- $81 billion in total payment volume (TPV), up 31% on an FX-neutral basis

"Our first quarter results continue to demonstrate the power of our global payments platform to attract and engage consumers, increasing our global scale and in turn attracting new merchants and partners to PayPal," said Dan Schulman, President and CEO of PayPal. "Our focus on payments and ability to innovate for merchants and consumers continues to differentiate PayPal and drive our growth in a dynamic and competitive environment."

### Gaining Market Share and New Merchant Customers

In the first quarter, PayPal gained market share and extended its leadership position. PayPal processed $81 billion in TPV, representing FX-neutral growth of 31%, which was faster than the growth rate of e-commerce. Merchant services TPV growth accelerated to 39% on an FX-neutral basis, and represented 82% of overall TPV for the quarter. PayPal processed $21 billion in mobile payment volume, up 54%, representing 26% of TPV for the quarter. Venmo, the company's social payments platform, processed $3.2 billion of TPV, up 154% year-over-year.

PayPal added powerful new merchants to the platform, ending the quarter with more than 14 million active merchant accounts. The list of leading brands choosing PayPal now includes Air France, Crate and Barrel, Fresh Direct, Panera Bread, Sephora, and Woolworths in Australia. PayPal extended its partnership with Alibaba Wholesaler during the quarter to include new countries and additional merchants.

### Expanding PayPal's Customer Base and Deepening Engagement

As PayPal continues to grow larger and more relevant in customers' daily lives, the company demonstrated another strong quarter of customer acquisition, adding new consumers and merchants to the platform. The company grew its active account base by 4.5 million in the first quarter, ending the quarter with 184 million active customer accounts.

Consumers and merchants are engaged at higher levels than ever before. In the first quarter, the company processed 1.4 billion payment transactions, which translates to 28 payment transactions per active account, an increase from 25 transactions per active account in the same period last year.

**Launching Innovative Products**

PayPal continues to roll out the Pay with Venmo pilot. Early customer feedback has validated the demand for Venmo as a way to pay in apps that millennials use, and PayPal plans to make the product more available to merchants and consumers later this year.

PayPal expanded its One Touch product to an additional 121 markets, making it available in 144 markets. One Touch is one of the most rapidly adopted products launched by PayPal, with approximately 21 million consumers having opted-in globally and over 1 million merchants having enabled One Touch.

The company launched PayPal Commerce, a set of contextual commerce tools, which are currently in beta, that allows merchants to securely sell across email, social shares, blogs, articles, ads, in-page, in-app and anywhere consumers are online or on their mobile devices.

PayPal launched its new mobile app simultaneously in 145 markets with a simpler and more personal experience for consumers. The company celebrated the tenth anniversary of PayPal revolutionizing and transforming mobile payments. Over the past decade, PayPal processed $175 billion in mobile TPV, demonstrating the company's role as a driving force in making money more available and accessible via mobile devices.

**Extending Our Global Reach**

PayPal continued integrating Xoom into its payments platform, accelerating growth in the global remittances market. Xoom has expanded its services to 11 more countries, with two additional countries coming soon. The 13 new countries will include markets like Haiti, Nigeria and Slovakia. Xoom also announced an integration with M-Pesa in Kenya. Xoom is a leader in mobile remittances with more than two-thirds of transactions happening on mobile devices.

PayPal announced a partnership during the quarter with one of Europe's largest mobile carriers, Vodafone, that will allow millions of PayPal's European customers to fund payments on Android smartphones at Visa contactless terminals using the Vodafone Wallet. The experience is now live in its first market, Spain.

**First Quarter 2016 Financial Highlights**

| (presented in millions, except per share data and percentages) | First Quarter | | | | FX-Neutral YoY |
|---|---|---|---|---|---|
| | **2016** | **2015** | **YoY Growth** | | **Growth** |
| Total Payment Volume (TPV) | $81,056 | $63,021 | $18,035 | 29% | 31% |
| **GAAP** | | | | | |
| Net revenues | $2,544 | $2,137 | $407 | 19% | 23% |
| Net income | $365 | $255 | $110 | 43% | N/A |
| Earnings per diluted share | $0.30 | $0.21 | $0.09 | 43% | N/A |
| **Non-GAAP Pro Forma** | | | | | |
| Net revenues | $2,544 | $2,134 | $410 | 19% | 23% |
| Net income | $452 | $353 | $99 | 28% | N/A |
| Earnings per diluted share | $0.37 | $0.29 | $0.08 | 28% | N/A |

**Other Selected Financial and Operational Results**

**Operating Margin** - GAAP operating margin for the first quarter of 2016 increased to 16.0%, compared to 15.1% for the same period last year. Non-GAAP operating margin decreased to 21.1%, compared to non-GAAP pro forma operating margin of 21.8% for the same period last year.

**Taxes** - The GAAP effective tax rate for the first quarter of 2016 was 13.5%, compared to 20.6% for the first quarter of 2015. The non-GAAP effective tax rate was 18.1%, compared to the non-GAAP pro forma effective tax rate of 23.9% for the first quarter of 2015.

**Cash Flow** - PayPal generated $738 million of operating cash flow and $605 million of free cash flow during the first quarter of 2016.

**Cash and Cash Equivalents and Investments** - PayPal's cash and cash equivalents and investments totaled $6.4 billion at March 31, 2016.

## 2016 Financial Guidance

### Full Year 2016

- PayPal reiterates full year 2016 guidance.

- PayPal expects net revenues to grow 16% - 19% on an FX-neutral basis, and 14% - 16% at current spot rates to a range of $10.5 to $10.7 billion. PayPal anticipates that currency will be an approximate 3 point headwind on net revenues.

- PayPal expects GAAP earnings per diluted share in the range of $1.09 - $1.14 and non-GAAP earnings per diluted share in the range of $1.45 - $1.50.

- Estimated non-GAAP amounts above for the twelve months ending December 31, 2016, reflect adjustments of approximately $585 - $615 million in the aggregate that primarily exclude estimates of the following items: stock-based compensation expense, employer payroll taxes on stock-based compensation, and amortization of acquired intangible assets.

### Second Quarter 2016

- PayPal expects net revenues to grow 16% - 18% on an FX-neutral basis, and 12% - 14% at current spot rates to a range of $2.570 to $2.620 billion. PayPal anticipates that currency will be an approximate 4 point headwind on net revenues. As previously disclosed, PayPal expects an approximate 6 point decline in revenue growth from the first quarter to the second quarter of 2016, primarily as a result of the revenue recognized in the second quarter of 2015 from the sale of a portion of its credit receivables and its amended agreement with Synchrony Financial in 2015.

- PayPal expects GAAP earnings per diluted share in the range of $0.25 - $0.27 and non-GAAP earnings per diluted share in the range of $0.34 - $0.36.

- Estimated non-GAAP amounts above for the three months ending June 30, 2016, reflect adjustments of approximately $150 - $170 million in the aggregate that primarily exclude estimates of the following items: stock-based compensation expense, employer payroll taxes on stock-based compensation, and amortization of acquired intangible assets.

Guidance net revenue growth rates represent year-over-year comparisons versus non-GAAP pro forma measures. Please see "Non-GAAP Financial Measures" and "Non-GAAP Measures of Financial Performance" for important additional information.

### Quarterly Conference Call and Webcast

PayPal Holdings, Inc. will host a conference call to discuss first quarter 2016 results at 2:00 p.m. Pacific Time today. A live webcast of the conference call, together with a slide presentation that includes supplemental financial information and reconciliations of certain non-GAAP and non-GAAP pro forma measures to their most directly comparable GAAP measures, can be accessed through the company's Investor Relations website at https://investor.paypal-corp.com. In addition, an archive of the webcast will be accessible for 90 days through the same link.

PayPal Holdings, Inc. uses its Investor Relations website at https://investor.paypal-corp.com, its PayPal Stories Blog https://www.paypal.com/stories/us, Twitter handle (@PayPal) and LinkedIn page https://www.linkedin.com/company/paypal as a means of disclosing information about the company and for complying with its disclosure obligations under Regulation FD. The information we post through these channels may be deemed material. Accordingly, investors should monitor these channels in addition to PayPal's press releases, SEC filings, public conference calls and webcasts.

### About PayPal

At PayPal (Nasdaq:PYPL), we put people at the center of everything we do. Founded in 1998, we continue to be at the forefront of the digital payments revolution. PayPal gives people better ways to manage and move their money, offering them choice and flexibility in how they are able to send money, pay or get paid. We operate an

open, secure and technology agnostic payments platform that businesses use to securely transact with their customers online, in stores and increasingly on mobile devices. In 2015, 28% of the 4.9 billion payments we processed were made on a mobile device. With our 184 million active customer accounts, PayPal is a truly global payments platform that is available to people in more than 200 markets, allowing customers to get paid in more than 100 currencies, withdraw funds to their bank accounts in 57 currencies and hold balances in their PayPal accounts in 26 currencies. For more information on PayPal, visit https://www.paypal.com/about. For PYPL financial information, visit https://investor.paypal-corp.com.

### Presentation

All growth rates represent year-over-year comparisons, except as otherwise noted. FX-neutral results are calculated by translating the current period's local currency results by the prior period's exchange rate. FX-neutral growth rates are calculated by comparing the current period's FX-neutral results by the prior period's results, excluding the impact from hedging activities. All amounts in tables are presented in U.S. dollars, rounded to the nearest millions, except as otherwise noted. As a result, certain amounts may not sum or recalculate using the rounded dollar amounts provided.

### Non-GAAP Financial Measures

This press release includes the following financial measures defined as "non-GAAP financial measures" by the Securities and Exchange Commission (SEC): non-GAAP net income, non-GAAP earnings per diluted share, non-GAAP operating margin, non-GAAP effective tax rate and free cash flow. In addition, the company has included certain pro forma adjustments in its presentation of non-GAAP net revenue, non-GAAP net income, non-GAAP earnings per diluted share, and non-GAAP operating margin in this presentation (collectively referred to as "non-GAAP pro forma measures"). These adjustments reflect items that are factually supportable, directly attributable to the separation of the company from eBay Inc. on July 17, 2015, and expected to have a continuing impact on the company's results of operations. The company has included these pro forma adjustments because management believes that they help to facilitate comparisons of the company's operating results between periods. In discussing year-over-year comparisons, including guidance net revenue growth rates, the company has chosen to present non-GAAP pro forma measures because it believes that these measures provide investors a consistent basis for reviewing the company's performance across different periods. For an explanation of the foregoing non-GAAP measures, please see "Non-GAAP Measures of Financial Performance" included in this press release. These measures may be different from non-GAAP financial measures used by other companies. The presentation of this financial information, which is not prepared under any comprehensive set of accounting rules or principles, is not intended to be considered in isolation of, or as a substitute for, the financial information prepared and presented in accordance with generally accepted accounting principles (GAAP). For a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP measures, see "Non-GAAP Measures of Financial Performance," "Reconciliation of GAAP Operating Margin to Non-GAAP Operating Margin," "Reconciliation of GAAP Net Income to Non-GAAP Net Income, GAAP Diluted EPS to Non-GAAP Diluted EPS and GAAP Effective Tax Rate to Non-GAAP Effective Tax Rate," "Reconciliation of Operating Cash Flow to Free Cash Flow," "Reconciliation of GAAP Operating Margin to Non-GAAP Pro Forma Operating Margin, GAAP Net Income to Non-GAAP Pro Forma Net Income, and GAAP Diluted EPS to Non-GAAP Pro Forma Diluted EPS," and "Reconciliation of GAAP Net Revenues by Type to Non-GAAP Pro Forma Net Revenues by Type, and GAAP Net Revenues by Geography to Non-GAAP Pro Forma Net Revenues by Geography" included in this press release.

### Forward-Looking Statements

This press release contains forward-looking statements relating to, among other things, the future performance of PayPal Holdings, Inc. and its consolidated subsidiaries that are based on the company's current expectations, forecasts and assumptions and involve risks and uncertainties. These statements include, but are not limited to, statements regarding expected financial results for second quarter and the full year 2016 and future growth in the company's businesses. Actual results could differ materially from those predicted or implied and reported results should not be considered as an indication of future performance. Factors that could cause or contribute to such differences include, but are not limited to: changes in political, business and economic conditions, including any regional general economic downturn or crisis and any conditions that affect e-commerce growth; fluctuations in foreign currency exchange rates; the competitive, regulatory, payment card association-related and other risks specific to the company's PayPal, PayPal Credit, Braintree, Venmo, Xoom and Paydiant products, especially as PayPal continues to expand geographically and introduce new products and as new laws and regulations related to payments and financial services come into effect; the company's ability to successfully react to the increasing importance of mobile payments and mobile commerce; the company's ability to deal with the increasingly competitive environment for its businesses, including competition for consumers and merchants; the company's need and ability to manage other regulatory, tax and litigation risks as its products and services are offered in more jurisdictions and applicable laws become more restrictive; changes to the company's capital allocation or management of operating cash; the company's need to manage an increasingly large enterprise with a broad range of businesses of varying degrees of maturity and in many different geographies; the effect of management changes and business initiatives; any changes the company may make to its product offerings; the company's ability to timely upgrade and develop its technology systems, infrastructure and customer service capabilities at reasonable cost; the company's ability to maintain stability and performance of its Payment Platform while adding new products and features in a timely fashion; and the company's ability

to profitably integrate, manage and grow businesses that have been acquired or may be acquired in the future. The forward-looking statements in this release do not include the potential impact of any acquisitions or divestitures that may be announced and/or completed after the date hereof.

More information about factors that could affect the company's operating results is included under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the company's annual report on Form 10-K, and subsequent quarterly reports on Form 10-Q, copies of which may be obtained by visiting the company's Investor Relations website at https://investor.paypal-corp.com or the SEC's website at www.sec.gov. All information in this release is as of April 27, 2016. Undue reliance should not be placed on the forward-looking statements in this press release, which are based on information available to the company on the date hereof. The company assumes no obligation to update such statements.

## PayPal Holdings, Inc.
### Unaudited Condensed Combined and Consolidated Balance Sheet

| | March 31, 2016 | | December 31, 2015 |
|---|---|---|---|
| | (In millions, except par value) | | |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 2,583 | $ | 1,393 |
| Short-term investments | 2,184 | | 2,018 |
| Accounts receivable, net | 159 | | 137 |
| Loans and interest receivable, net | 4,224 | | 4,184 |
| Funds receivable and customer accounts | 12,232 | | 12,261 |
| Prepaid expenses and other current assets | 586 | | 655 |
| Total current assets | 21,968 | | 20,648 |
| Long-term investments | 1,661 | | 2,348 |
| Property and equipment, net | 1,345 | | 1,344 |
| Goodwill | 4,071 | | 4,069 |
| Intangible assets, net | 320 | | 358 |
| Other assets | 105 | | 114 |
| Total assets | $ 29,470 | $ | 28,881 |
| **LIABILITIES AND EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 158 | $ | 145 |
| Funds payable and amounts due to customers | 13,032 | | 12,261 |
| Accrued expenses and other current liabilities | 1,145 | | 1,179 |
| Income taxes payable | 27 | | 32 |
| Total current liabilities | 14,362 | | 13,617 |
| Deferred tax liability and other long-term liabilities | 1,510 | | 1,505 |
| Total liabilities | 15,872 | | 15,122 |
| Equity: | | | |
| Common stock, $0.0001 par value; 4,000 shares authorized; 1,208 and 1,224 outstanding | — | | — |
| Treasury stock at cost, 17 shares as of March 31, 2016 | (596) | | — |
| Additional paid-in-capital | 13,188 | | 13,100 |
| Retained earnings | 1,033 | | 668 |
| Accumulated other comprehensive (loss) income | (27) | | (9) |
| Total equity | 13,598 | | 13,759 |
| Total liabilities and equity | $ 29,470 | $ | 28,881 |

## PayPal Holdings, Inc.
### Unaudited Condensed Combined and Consolidated Statement of Income

**Three Months Ended March 31,**

| | 2016 | | 2015 | |
|---|---|---|---|---|
| | **(In millions, except per share amounts)** | | | |
| Net revenues | $ | 2,544 | $ | 2,137 |
| Operating expenses: | | | | |
|    Transaction expense | | 752 | | 575 |
|    Transaction and loan losses | | 255 | | 178 |
|    Customer support and operations[1] | | 296 | | 249 |
|    Sales and marketing [1] | | 233 | | 222 |
|    Product development [1] | | 195 | | 185 |
|    General and administrative [1] | | 231 | | 217 |
|    Depreciation and amortization [1] | | 175 | | 141 |
|    Restructuring | | — | | 48 |
|       Total operating expenses | | 2,137 | | 1,815 |
| Operating income | | 407 | | 322 |
| Other income (expense), net | | 15 | | (1) |
| Income before income taxes | | 422 | | 321 |
| Income tax expense | | 57 | | 66 |
| Net income | $ | 365 | $ | 255 |
| Net income per share: | | | | |
|    Basic | $ | 0.30 | $ | 0.21 |
|    Diluted | $ | 0.30 | $ | 0.21 |
| Weighted average shares: | | | | |
|    Basic | | 1,216 | | 1,218 |
|    Diluted | | 1,225 | | 1,224 |

[1] Includes stock-based compensation as follows:

| | 2016 | | 2015 | |
|---|---|---|---|---|
|    Customer support and operations | | 18 | | 13 |
|    Sales and marketing | | 16 | | 13 |
|    Product development | | 33 | | 29 |
|    General and administrative | | 27 | | 22 |
|    Depreciation and amortization | | 1 | | 2 |
| | $ | 95 | $ | 79 |

**PayPal Holdings, Inc.**
**Unaudited Condensed Combined and Consolidated Statement of Cash Flows**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2016 | | 2015 | |
| | **(In millions)** | | | |
| Cash flows from operating activities: | | | | |
|    Net income | $ | 365 | $ | 255 |
|    Adjustments: | | | | |
|       Transaction and loan losses | | 255 | | 178 |
|       Depreciation and amortization | | 174 | | 141 |
|       Stock-based compensation | | 95 | | 79 |
|       Deferred income taxes | | 22 | | 49 |
|       Excess tax benefits from stock-based compensation | | (1) | | (8) |
|       Gain on sale of principal loans receivable held for sale | | (6) | | — |
|    Changes in assets and liabilities: | | | | |
|       Accounts receivable | | (22) | | 12 |
|       Receivable from eBay | | — | | (38) |

| | | |
|---|---:|---:|
| Principal loans receivable held for sale, net | 6 | — |
| Accounts payable | 13 | 13 |
| Payable to eBay | — | (113) |
| Income taxes payable | (5) | 42 |
| Other assets and liabilities | (158) | (66) |
| Net cash provided by operating activities | 738 | 544 |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (133) | (194) |
| Changes in principal loans receivable, net | (120) | (19) |
| Purchases of investments | (4,091) | (2,361) |
| Maturities and sales of investments | 4,196 | 2,570 |
| Acquisitions, net of cash acquired | (19) | — |
| Funds receivable and customer accounts | 492 | (527) |
| Notes and receivable from eBay | — | (56) |
| Net cash provided by (used in) investing activities | 325 | (587) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock | 6 | — |
| Purchases of treasury stock | (596) | — |
| Excess tax benefits from stock-based compensation | 1 | 8 |
| Contribution from (to) eBay | — | 17 |
| Tax withholdings related to net share settlements of restricted stock units and restricted stock awards | (15) | — |
| Borrowings (repayments) under financing arrangements | (21) | (119) |
| Funds payable and amounts due to customers | 738 | 333 |
| Net cash provided by financing activities | 113 | 239 |
| Effect of exchange rate changes on cash and cash equivalents | 14 | (32) |
| Net increase in cash and cash equivalents | 1,190 | 164 |
| Cash and cash equivalents at beginning of period | 1,393 | 2,201 |
| Cash and cash equivalents at end of period | $    2,583 | $    2,365 |
| Supplemental cash flow disclosures: | | |
| Cash paid for interest | $          1 | $          7 |
| Cash paid for income taxes | $        24 | $          5 |

**PayPal Holdings, Inc.**
**Unaudited Summary of Combined and Consolidated Net Revenues**

We earn revenue from the following types of transactions:

- Transaction revenues: Net transaction fees charged to consumers and merchants based on the volume of activity processed through our Payments Platform, including our PayPal, PayPal Credit, Venmo, Braintree and Xoom products.

- Other value added services: Net revenues derived principally from interest and fees earned on our PayPal Credit loans receivable portfolio, subscription fees, gateway fees, gain on sale of participation interest in certain consumer loans receivable, revenue share we earn through partnerships, interest earned on certain PayPal customer account balances, fees earned through our Paydiant products and other services that we provide to consumers and merchants.

| Net Revenues by Type | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2016 | December 31, 2015 | September 30, 2015 | June 30, 2015 | March 31, 2015 |
| | (In millions, except percentages) | | | | |
| Transaction revenues[1] | 2,238 | 2,262 | 1,982 | 1,966 | 1,911 |
| *Current quarter vs prior quarter* | *(1)%* | *14%* | *1%* | *3%* | *(3)%* |
| *Current quarter vs prior year quarter* | *17%* | *15%* | *13%* | *15%* | *14%* |

| | March 31, 2016 | December 31, 2015 | September 30, 2015 | June 30, 2015 | March 31, 2015 |
|---|---|---|---|---|---|
| Percentage of total | 88% | 88% | 88% | 86% | 90% |
| | | | | | |
| **Other value added services**[1] | 306 | 294 | 276 | 327 | 223 |
| Current quarter vs prior quarter | 4% | 7% | (16)% | 47% | (1)% |
| Current quarter vs prior year quarter | 37% | 30% | 25% | 21% | 12% |
| Percentage of total | 12% | 12% | 12% | 14% | 10% |
| | | | | | |
| **Total net revenues**[1] | $ 2,544 | $ 2,556 | $ 2,258 | $ 2,293 | $ 2,134 |
| Current quarter vs prior quarter | —% | 13% | (2)% | 7% | (3)% |
| Current quarter vs prior year quarter | 19% | 17% | 15% | 16% | 14% |

[1] Q1'15 - Q2'15 net revenues are presented on a non-GAAP pro forma basis to reflect the impact of lower transaction revenues from payment services provided by PayPal to eBay as the result of the terms of certain commercial agreements negotiated between the parties that stipulate lower transaction fees than those historically charged to eBay. For a reconciliation to GAAP net revenues, please see "Reconciliation of GAAP Net Revenues by Type to Non-GAAP Pro Forma Net Revenues by Type, and GAAP Net Revenues by Geography to Non-GAAP Pro Forma Net Revenues by Geography" included in the press release.

| Net Revenues by Geography | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2016 | December 31, 2015 | September 30, 2015 | June 30, 2015 | March 31, 2015 |
| | (In millions, except percentages) | | | | |
| **U.S. net revenues**[1][2] | $ 1,343 | $ 1,302 | $ 1,138 | $ 1,167 | $ 1,028 |
| Current quarter vs prior quarter | 3% | 14% | (2)% | 14% | (1)% |
| Current quarter vs prior year quarter | 31% | 25% | 20% | 19% | 14% |
| Percent of total | 53% | 51% | 50% | 51% | 48% |
| | | | | | |
| **International net revenues**[1][2] | 1,201 | 1,254 | 1,120 | 1,126 | 1,106 |
| Current quarter vs prior quarter | (4)% | 12% | (1)% | 2% | (4)% |
| Current quarter vs prior year quarter | 9% | 9% | 9% | 13% | 14% |
| (FXN) Current quarter vs prior year quarter | 15% | 18% | 17% | 18% | 20% |
| Percent of total | 47% | 49% | 50% | 49% | 52% |
| | | | | | |
| **Total net revenues**[1][2] | $ 2,544 | $ 2,556 | $ 2,258 | $ 2,293 | $ 2,134 |
| Current quarter vs prior quarter | —% | 13% | (2)% | 7% | (3)% |
| Current quarter vs prior year quarter | 19% | 17% | 15% | 16% | 14% |
| (FXN) Current quarter vs prior year quarter | 23% | 21% | 19% | 19% | 17% |

[1] Net revenues are attributed to U.S. and international geographies primarily based upon the country in which the merchant is located, or in the case of a cross border transaction, may be earned from each of the respective countries in which the consumer and merchant reside. Net revenues earned from value added services are typically attributed to the country in which either the consumer or the merchant reside.

[2] Q1'15 - Q2'15 net revenues are presented on a non-GAAP pro forma basis to reflect the impact of lower transaction revenues from payment services provided by PayPal to eBay as the result of the terms of certain commercial agreements negotiated between the parties that stipulate lower transaction fees than those historically charged to eBay. For a reconciliation to GAAP net revenues, please see "Reconciliation of GAAP Net Revenues by Type to Non-GAAP Pro Forma Net Revenues by Type, and GAAP Net Revenues by Geography to Non-GAAP Pro Forma Net Revenues by Geography" included in the press release.

**PayPal Holdings, Inc.**
**Unaudited Supplemental Operating Data**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2016 | December 31, 2015 | September 30, 2015 | June 30, 2015 | March 31, 2015 |
| | (In millions, except percentages) | | | | |
| Active customer accounts[1] | 184 | 179 | 173 | 169 | 165 |
| *Current quarter vs prior quarter* | *2%* | *4%* | *2%* | *2%* | *2%* |
| *Current quarter vs prior year quarter* | *11%* | *11%* | *10%* | *11%* | *11%* |
| **Number of payment transactions[2]** | 1,414 | 1,428 | 1,216 | 1,161 | 1,123 |
| *Current quarter vs prior quarter* | *(1)%* | *17%* | *5%* | *3%* | *(2)%* |
| *Current quarter vs prior year quarter* | *26%* | *25%* | *25%* | *25%* | *22%* |
| **Payment transactions per active account[3]** | 28.4 | 27.5 | 26.9 | 26.1 | 25.2 |
| *Current quarter vs prior quarter* | *3%* | *2%* | *3%* | *3%* | *3%* |
| *Current quarter vs prior year quarter* | *12%* | *12%* | *12%* | *11%* | *9%* |
| **Total Payment Volume[4]** | $ 81,056 | $ 81,523 | $ 69,738 | $ 67,482 | $ 63,021 |
| *Current quarter vs prior quarter* | *(1)%* | *17%* | *3%* | *7%* | *(5)%* |
| *Current quarter vs prior year quarter* | *29%* | *23%* | *20%* | *19%* | *17%* |
| *(FXN) Current quarter vs prior year quarter* | *31%* | *29%* | *27%* | *27%* | *25%* |
| Transaction Expense Rate[5] | 0.93% | 0.92% | 0.93% | 0.94% | 0.91% |
| Transaction and Loan Loss Rate[6] | 0.31% | 0.30% | 0.29% | 0.29% | 0.30% |
| **Transaction Margin[7]** | **60.4%** | **61.1%** | **62.3%** | **63.8%** | **64.2%** |

[1] An active customer account is a registered account that successfully sent or received at least one payment or payment reversal through our Payments Platform, excluding transactions processed through our gateway and Paydiant products, in the past 12 months.

[2] Payment transactions is the total number of payments, net of payment reversals, successfully completed through our Payments Platform, excluding transactions processed through our gateway and Paydiant products.

[3] Number of payment transactions per active customer account reflects the total number of payment transactions within the previous 12 month period, divided by active customer accounts at the end of the period.

[4] Total Payment Volume or "TPV" is the value of payments, net of payment reversals, successfully completed through our Payments Platform, excluding transactions processed through our gateway and Paydiant products.

[5] Transaction expense rate is calculated by dividing transaction expense by TPV.

[6] Transaction and loan loss rate is calculated by dividing transaction and loan loss by TPV.

[7] Transaction margin is total revenue less transaction expense and transaction and loan loss, divided by total revenue.

Q1'15 - Q2'15 transaction expense rate, transaction and loan loss rate, and transaction margin include the impact of pro forma adjustments directly attributable to the separation of the company from eBay Inc. on July 17, 2015 had they existed historically.

## PayPal Holdings, Inc.
## Non-GAAP Measures of Financial Performance

To supplement the company's condensed consolidated financial statements presented in accordance with generally accepted accounting principles, or GAAP, the company uses non-GAAP measures of certain components of financial performance. These non-GAAP measures include non-GAAP net income, non-GAAP earnings per diluted share, non-GAAP operating margin, non-GAAP effective tax rate and free cash flow. In addition, the company has included certain pro forma adjustments in its presentation of non-GAAP net revenue, non-GAAP net income, non-GAAP earnings per diluted share, and non-GAAP operating margin in this presentation (collectively referred to as "non-GAAP pro forma measures"). These adjustments reflect items that are factually supportable, directly attributable to the separation of the company from eBay Inc. on July 17, 2015, and expected to have a continuing impact on the company's results of operations. The company has included these pro forma adjustments because management believes that they help to facilitate comparisons of the company's operating results between periods. In discussing year-over-year comparisons, the company has chosen to present non-GAAP pro forma measures because it believes that these measures provide investors a consistent basis for reviewing the company's performance across different periods.

These non-GAAP measures are not in accordance with, or an alternative to, measures prepared in accordance with GAAP and may be different from non-GAAP measures used by other companies. In addition, these non-GAAP measures are not based on any comprehensive set of accounting rules or principles. Non-GAAP measures have limitations in that they do not reflect all of the amounts associated with the company's results of operations as determined in accordance with GAAP. These measures should only be used to evaluate the company's results of operations in conjunction with the corresponding GAAP measures.

Reconciliation to the most directly comparable GAAP measure of all non-GAAP measures included in this press release can be found in the tables included in this press release.

These non-GAAP measures are provided to enhance investors' overall understanding of the company's current financial performance and its prospects for the future. Specifically, the company believes the non-GAAP measures provide useful information to both management and investors by excluding certain expenses, gains and losses, as the case may be, that may not be indicative of its core operating results and business outlook. In addition, because the company has historically reported certain non-GAAP results to investors, the company believes that the inclusion of non-GAAP measures provides consistency in the company's financial reporting.

For its internal budgeting process, and as discussed further below, the company's management uses financial measures that do not include stock-based compensation expense, employer payroll taxes on stock-based compensation, amortization or impairment of acquired intangible assets, impairment of goodwill, significant gains or losses from the disposal/acquisition of a business, certain effects of the separation from eBay, certain gains and losses on investments, restructuring-related charges and the income taxes associated with the foregoing. In addition to the corresponding GAAP measures, the company's management also uses the foregoing non-GAAP measures in reviewing the financial results of the company.

The company excludes the following items from non-GAAP net income, non-GAAP earnings per diluted share, non-GAAP operating margin and non-GAAP effective tax rate:

*Stock-based compensation expense and related employer payroll taxes.* This consists of expenses for equity awards under our equity incentive plans. We exclude stock-based compensation expense from our non-GAAP measures primarily because they are non-cash expenses that management does not believe are reflective of ongoing operating results. The related employer payroll taxes are dependent on our stock price and the timing and size of exercises and vesting of equity awards, over which management has limited to no control, and as such management does not believe it correlates to the operation of our business.

*Amortization or impairment of acquired intangible assets, impairment of goodwill, and transaction expenses from the acquisition or disposal of a business.* We incur amortization or impairment of acquired intangible assets and goodwill in connection with acquisitions and may incur significant gains or losses from the acquisition or disposal of a business and therefore exclude these amounts from our non-GAAP measures. We exclude these items because management does not believe they are reflective of our ongoing operating results.

*Restructuring.* These consist of expenses for employee severance and other exit and disposal costs. The company excludes significant restructuring charges primarily because management does not believe they are reflective of

ongoing operating results.

*Other certain significant gains, losses, or charges that are not indicative of the Company's core operating results.* These expenses are significant gains, losses, or charges during a period that are the result of isolated events or transactions which have not occurred frequently in the past and are not expected to occur regularly or be repeated in the future. The company excludes these amounts from its results primarily because management does not believe they are indicative of its current or ongoing operating results.

*Separation.* These are significant expenses related to the separation of PayPal from eBay Inc. into an independent publicly traded company. These consist primarily of third-party consulting fees, legal fees, employee retention payments and other income and expenses incurred to complete the separation.

*Tax effect of non-GAAP adjustments.* This amount is used to present stock-based compensation and the other amounts described above on an after-tax basis consistent with the presentation of non-GAAP net income.

The company also uses free cash flow, a non-GAAP measure. Free cash flow represents operating cash flows less purchases of property and equipment. The company considers free cash flow to be a liquidity measure that provides useful information to management and investors about the amount of cash generated by the business after the purchases of property, buildings, and equipment, which can then be used to, among other things, invest in the company's business, make strategic acquisitions, and repurchase stock. A limitation of the utility of free cash flow as a measure of financial performance is that it does not represent the total increase or decrease in the company's cash balance for the period.

In addition to the non-GAAP measures discussed above, the Company also analyzes certain measures, including revenue and operating expenses, on an FX-neutral basis to better measure the comparability of operating results between periods. The Company believes that changes in foreign currency exchange rates are not indicative of the Company's operations and evaluating growth in revenue and operating expenses on an FX-neutral basis provides an additional meaningful and comparable assessment of these measures to both management and investors. FX-neutral results are calculated by translating the current period's local currency results by the prior period's exchange rate. FX-neutral growth rates are calculated by comparing the current period's FX-neutral results by the prior period's results, excluding the impact from hedging activities.

**PayPal Holdings, Inc.**
**Reconciliation of GAAP Operating Margin to Non-GAAP Operating Margin**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| | (In millions, except percentages) | | | |
| | (unaudited) | | | |
| GAAP operating income | $ | 407 | $ | 322 |
| Stock-based compensation expense and related employer payroll taxes | | 96 | | 82 |
| Separation | | — | | 5 |
| Restructuring | | — | | 48 |
| Amortization of acquired intangible assets | | 34 | | 16 |
| Total non-GAAP operating income adjustments | | 130 | | 151 |
| Non-GAAP operating income | $ | 537 | $ | 473 |
| *Non-GAAP operating margin* | | *21.1%* | | *22.1%* |

**Reconciliation of GAAP Net Income to Non-GAAP Net Income,**
**GAAP Diluted EPS to Non-GAAP Diluted EPS,**
**and GAAP Effective Tax Rate to Non-GAAP Effective Tax Rate**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| | (In millions, except percentages) | | | |
| GAAP income before income taxes | $ | 422 | $ | 321 |
| GAAP provision for income taxes | | 57 | | 66 |
| GAAP net income | | 365 | | 255 |

| Non-GAAP adjustments to net income: | | |
|---|---|---|
| Non-GAAP operating income adjustments (see table above) | 130 | 151 |
| Tax effect of non-GAAP adjustments | (43) | (46) |
| Non-GAAP net income | $ 452 | $ 360 |
| | | |
| Non-GAAP net income per diluted share | $ 0.37 | $ 0.29 |
| Shares used in non-GAAP diluted share calculation[1][2] | 1,225 | 1,224 |
| | | |
| GAAP effective tax rate | 14% | 21% |
| Tax effect of non-GAAP adjustments to net income | 4% | 3% |
| Non-GAAP effective tax rate | 18% | 24% |

[1] Non-GAAP net income per diluted share for the three months ended March 31, 2015 is based on the number of shares of PayPal common stock outstanding on July 17, 2015, the distribution date from eBay.

[2] Non-GAAP net income per diluted share for the three months ended March 31, 2016 is based on the weighted average number of common shares outstanding for the period.

## Reconciliation of Operating Cash Flow to Free Cash Flow

| | Three Months Ended March 31, | |
|---|---|---|
| | 2016 | 2015 |
| | (In millions/unaudited) | |
| Net cash provided by operating activities | $ 738 | $ 544 |
| Less: Purchases of property and equipment | (133) | (194) |
| Free cash flow | $ 605 | $ 350 |

## PayPal Holdings, Inc.
### Reconciliation of GAAP Operating Margin to Non-GAAP Pro Forma Operating Margin, GAAP Net Income to Non-GAAP Pro Forma Net Income, and GAAP Diluted EPS to Non-GAAP Pro Forma Diluted EPS

| | GAAP | Non-GAAP Entries | | Non-GAAP | Pro Forma Adjustments | | Non-GAAP Pro Forma |
|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended March 31, 2015 | | | |
| | | | | (In millions, except percentages and per share amounts/unaudited) | | | |
| Net revenues | $ 2,137 | — | | $ 2,137 | $ (3) | (g) | $ 2,134 |
| Operating expenses: | | | | | | | |
| Transaction expense | 575 | — | | 575 | — | | 575 |
| Transaction and loan losses | 178 | — | | 178 | 10 | (h) | 188 |
| Customer support and operations | 249 | (13) | (a) | 235 | 3 | (h)(i)(j) | 238 |
| | | (1) | (f) | | | | |
| Sales and marketing | 222 | (13) | (a) | 209 | (13) | (l) | 196 |
| Product development | 185 | (29) | (a) | 156 | — | | 156 |
| General and administrative | 217 | (22) | (a) | 188 | 1 | (h) | 189 |
| | | (3) | (b) | | | | |
| | | (4) | (f) | | | | |
| Depreciation and amortization | 141 | (2) | (a) | 123 | 4 | (k) | 127 |
| | | (16) | (c) | | | | |
| Restructuring | 48 | (48) | (e) | — | — | | — |
| Total operating expense | 1,815 | (151) | | 1,664 | 5 | | 1,669 |

| | | | | | |
|---|---|---|---|---|---|
| Operating income | 322 | 151 | 473 | (8) | 465 |
| Other income (expense), net | (1) | — | (1) | — | (1) |
| Income before income taxes | 321 | 151 | 472 | (8) | 464 |
| Income tax expense | 66 | 46 (d) | 112 | (1) (m) | 111 |
| Net income (loss) | $ 255 | $ 105 | $ 360 | $ (7) | $ 353 |
| | | | | | |
| Net income (loss) per share: | | | | | |
| Basic | $ 0.21 | | $ 0.30 | | $ 0.29 |
| Diluted | $ 0.21 | | $ 0.29 | | $ 0.29 |
| | | | | | |
| Weighted average shares: | | | | | |
| Basic | 1,218 (n) | | 1,218 (n) | | 1,218 (n) |
| Diluted | 1,224 (n) | | 1,224 (n) | | 1,224 (n) |
| | | | | | |
| Operating margin | 15% | 7% | 22% | —% | 22% |
| Effective tax rate | 21% | 3% | 24% | —% | 24% |

Notes

(a) Stock-based compensation expense

(b) Employer payroll taxes on stock-based compensation

(c) Amortization of acquired intangible assets

(d) Income taxes associated with certain non-GAAP entries

(e) Restructuring charges

(f) Separation related

(g) Reflects the impact of lower transaction revenues from payment services provided by PayPal to eBay as the result of the terms of certain commercial agreements negotiated between the parties that stipulate lower transaction fees than those historically charged to eBay.

(h) Reflects the effect of the Protection program losses and service costs that were historically reimbursed to PayPal by eBay for the administration of eBay's customer protection programs. Following the distribution, this program is no longer being administered by PayPal, and therefore these costs will not be reimbursed by eBay. PayPal's customer protection programs have been extended to its customers' purchases on eBay, and therefore PayPal expects to incur incremental costs associated with its customer protection programs.

(i) Reflects the impact of additional costs for shared data centers and information technology facilities, except for the facilities in Phoenix, Arizona, and Denver, Colorado, that will continue to be managed by eBay after the separation pursuant to the colocation services agreements.

(j) Reflects the reversal of historically allocated amounts from eBay to PayPal related to data center facilities in Phoenix, Arizona, and Denver, Colorado, pursuant to the colocation services agreements.

(k) Reflects depreciation expense related to data center facilities in Phoenix, Arizona, and Denver, Colorado, pursuant to the colocation services agreements.

(l) Reflects the net reduction of costs charged to PayPal by eBay for referral services and user penetration.

(m) Reflects the tax effect of pro forma adjustments using the respective statutory tax rate for the quarter ended March 31, 2015.

(n) The weighted average number of common shares outstanding for basic and diluted earnings per share for the period is based on the number of shares of PayPal common stock outstanding as of July 17, 2015, the distribution date from eBay.

**Reconciliation of GAAP Net Revenues by Type to Non-GAAP Pro Forma Net Revenues by Type, and GAAP Net Revenues by Geography to Non-GAAP Pro Forma Net Revenues by Geography**

| Net Revenues by Type | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | March 31, 2016 | December 31, 2015 | September 30, 2015 | June 30, 2015 | March 31, 2015 |
| | (In millions/unaudited) | | | | |
| Transaction revenues | $ 2,238 | $ 2,262 | $ 1,982 | $ 1,970 | $ 1,914 |
| Pro forma adjustment[1] | — | — | — | (4) | (3) |

| | March 31, 2016 | | December 31, 2015 | | September 30, 2015 | | June 30, 2015 | | March 31, 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Pro forma transaction revenues | | 2,238 | | 2,262 | | 1,982 | | 1,966 | | 1,911 |
| Other value added services | $ | 306 | $ | 294 | $ | 276 | $ | 327 | $ | 223 |
| Pro forma adjustment[1] | | — | | — | | — | | — | | — |
| Pro forma other value added services | | 306 | | 294 | | 276 | | 327 | | 223 |
| Total net revenues | $ | 2,544 | $ | 2,556 | $ | 2,258 | $ | 2,297 | $ | 2,137 |
| Pro forma adjustment[1] | | — | | — | | — | | (4) | | (3) |
| Total pro forma net revenues | | 2,544 | | 2,556 | | 2,258 | | 2,293 | | 2,134 |

[1] Reflects the impact of lower transaction revenues from payment services provided by PayPal to eBay as the result of the terms of certain commercial agreements negotiated between the parties that stipulate lower transaction fees than those historically charged to eBay.

## Net Revenues by Geography

| | Three Months Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2016 | | December 31, 2015 | | September 30, 2015 | | June 30, 2015 | | March 31, 2015 |
| | (In millions/unaudited) | | | | | | | | | |
| U.S. net revenues | $ | 1,343 | $ | 1,302 | $ | 1,138 | $ | 1,170 | $ | 1,030 |
| Pro forma adjustment[1] | | — | | — | | — | | (3) | | (2) |
| Total pro forma U.S. net revenues | | 1,343 | | 1,302 | | 1,138 | | 1,167 | | 1,028 |
| International net revenues | $ | 1,201 | $ | 1,254 | $ | 1,120 | $ | 1,127 | $ | 1,107 |
| Pro forma adjustment[1] | | — | | — | | — | | (1) | | (1) |
| Total pro forma International net revenues | | 1,201 | | 1,254 | | 1,120 | | 1,126 | | 1,106 |
| Total net revenues | $ | 2,544 | $ | 2,556 | $ | 2,258 | $ | 2,297 | $ | 2,137 |
| Pro forma adjustment[1] | | — | | — | | — | | (4) | | (3) |
| Total pro forma net revenues | | 2,544 | | 2,556 | | 2,258 | | 2,293 | | 2,134 |

[1] Reflects the impact of lower transaction revenues from payment services provided by PayPal to eBay as the result of the terms of certain commercial agreements negotiated between the parties that stipulate lower transaction fees than those historically charged to eBay.

View source version on businesswire.com: http://www.businesswire.com/news/home/20160427006534/en/

**PayPal**
Investor Relations Contacts
Gabrielle Rabinovitch
Senior Director, Investor Relations
grabinovitch@paypal.com
or
Tracey Ford
Senior Director, Investor Relations
tford@paypal.com
or
Media Relations Contact
Martha Cass, 416-860-6213
Senior Director, Corporate Communications
mcass@paypal.com

Source: PayPal Holdings, Inc.

# EXHIBIT L

**Law Office of Sam Miorelli, P.A.**
Sam A. Miorelli (Florida Bar No. 99886, *Pro Hac Vice*)
764 Ellwood Avenue
Orlando, FL 32804
Telephone: (352) 458-4092
E-Mail: sam.miorelli@gmail.com

AARON DAWSON (SBN 283990)
1901 Harrison St., Suite 1100
Oakland, CA 94612
Telephone: (415) 534-5346
Fax: (888) 301-5076
E-Mail: adawson@alectolaw.com

*Attorneys for Objector Lindberg*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>STARKIST CO.,<br><br>     Defendant. | Case No.: 13-CV-00729-HSG<br><br>**RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG**<br><br>Date:   April 21, 2016<br>Time:   2:00 p.m.<br>Courtroom: 10, 19th Floor<br>Judge:   Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

I.    Eric Michael Lindberg is a class member and intends to appear at the fairness hearing through his counsel. ................................................................................. 2

II.   The Court has a fiduciary duty to the unnamed members of the class. ................... 3

III.  The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class member either sold out the absent class members or that the case is a meritless vehicle for the procurement of legal fees and incentive payments. ................................................................ 5

      A.    The total recovery is a fraction of the class' injury. ................................... 5

      B.    This eight-cents-on-the-dollar settlement is either a sell out by Class Counsel or a nuisance settlement whose only purpose is the generation of legal fees. ............ 7

      C.    The evidence of collusion between StarKist and Class Counsel is shown by Class Counsel's participation in the attempt to expand the release behind the back of the absent class members. ................................................................ 8

IV.   The individual class member recovery is materially different from the recovery promised in the Class Notice and renders that notice ineffectual. ........................... 9

      A.    The Class Notice clearly creates the expectation of a $25 cash or $50 coupon for settling class members ................................................................ 9

      B.    The *pro rata* dilution of the payments is enormous, largely hidden from the class members, and unreasonable. ................................................................ 10

      C.    Adequate notice in terms ordinary people can understand is one of the oldest and most important rules in class action litigation ................................... 11

V.    A class action settlement should not be approved when the primary beneficiaries are the class representatives and class counsel. ................................................. 13

      A.    A large disparity between the recovery of the representative class member and the absent class members is not permitted under Ninth Circuit precedent. ........ 14

      B.    There is no basis in law for payment of incentive awards in a class action settlement to class members who were not named class representatives in the case being settled. ................................................................ 15

VI.   The "vouchers" are coupons under the Class Action Fairness Act (CAFA). ........ 16

VII.  As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of any value to the $4 million in coupons in the Second Proposed Settlement and also prohibits use of the lodestar method to determine the attorneys' fee award. ................................ 19

      A.    CAFA section 1712(a) prohibits assignment of any value to coupons for the purposes of determining a contingent attorneys' fee award until after the coupons are redeemed. ................................................................ 19

B.    CAFA section 1712(b) does not permit an award of contingent or lodestar-based attorneys' fees for the Proposed Settlement because there is no equitable relief. ........................................................................... 21

C.    CAFA section 1712(c) does not permit contingent fee or lodestar-based attorneys' fee awards arising out of the coupon portion of the settlement due to the lack of equitable relief in the Proposed Settlement. ......................... 21

VIII.   Class Counsel should not get more than 25% in a contingent fee-based attorneys' fee. ........................................................................................................................... 22

A.    The Court should follow the Ninth Circuit's 25% benchmark. .................. 22

B.    The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments. ........................................... 26

C.    Even if the Court decides that the "vouchers" are not coupons under CAFA, the fee should be less than even the amount suggested by StarKist. ........................ 28

IX.   The silence of the class should not be construed as endorsement of any terms of the Proposed Settlement, including Class Counsel's fee and incentive payment requests. ......... 31

X.    CONCLUSION ................................................................................................... 33

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................ 3, 4

*Careathers v. Red Bull North America, Inc.*, Case No. 1:13-CV-00369 (S.D.N.Y. May 12, 2015) ....................................................................................................................... 24

*CLRB Hanson Industries, LLC. v. Google, Inc.*, No. 12-cv-01546 (N.D. Cal. Dec. 12, 2013) ........ 18

*Davis v. Cole Haan, Inc.*, No. 11-cv-01826-JSW, 2015 WL 7015328 (N.D. Cal. Nov. 12, 2015) ................................................................................................................ 17, 19

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) .................................................... 4

*Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) ........................ 3

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) ......................... 33

*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) ............................... 9, 12

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) ....................... 33

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................... 4

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ................................ 15

*Howerton v. Cargill, Inc.*, 2014 WL 6976041 (D. Hawaii Dec. 8, 2014) ........................ 19

*In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) ................................. 15

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig*, MDL No. 1967, Master Case No. 08-1967, 2011 WL 1790603 (W.D.Mo. May 10, 2011) ............................. 18

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .............. 4, 22, 28

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ..................... 33

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ........... 33

*In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d. Cir. 1995) ............................................................................................... 3, 33

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ................................ passim

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) ..................... 12

*In re Online DVD-Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ...................... 17, 18, 27

*In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005) ......................... 3

1  *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL
2      3396829 (N.D. Cal. May 26, 2015) ....................................................................... 27
3  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)................................. 3
4  *In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ............... 4
5  *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467 (N.D.Cal. Aug. 25, 1994)........................ 27
6  *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir.
7      1987) .................................................................................................................. 33
8  *Miles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 (N.D. Cal.
9      Nov. 12, 2014) ..................................................................................................... 27
10 *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ............................................................ 4
11 *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)........................................ 7
12 *Napoleon Ebarle, et. al. v. Lifelock, Inc.*, 2016 WL 234364 (N.D. Cal. Jan. 20, 2016)........... 6, 7, 15
13 *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) ......................... 22
14 *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982)........................................ 14, 15
15 *Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) ...................................... 14
16 *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) .............. 14, 15
17 *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ....................................... 27
18 *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ................................... 3
19 *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972) ............................. 12
20 *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992)........................................................... 3
21 *Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990)............... 26
22 *Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ......................................................... 4
23 *True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010)............................ 4
24 *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013) ............................. 14, 15
25 *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)................................... passim
26 *Young v. Polo Retail, LLC*, No. C-02-4546, 2006 WL 3050861 (N.D. Cal. 2006)............. 18
27 **Statutes**
28 28 U.S.C. § 1712(a) (2005)................................................................... 20, 21, 22

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... 9

**Other Authorities**

American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) ...................... 4

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class*

   *Action Settlements*, 59 Fla. L. Rev. 71 (2007). ....................................................... 32, 33

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002). ................................. 3, 4

**INTRODUCTION**

Once again Eric Michael Lindberg, a frequent consumer of StarKist tuna and a member of the putative Class, asks this Honorable Court to reject the latest attempt to sell out the absent class members to line the pockets of Class Counsel, Class Counsel's favored individuals, and cheaply absolve StarKist's long history of defrauding its customers.

This Court recently protected the absent class members from Class Counsel and StarKist's obviously collusive effort to slip an overbroad release behind the backs of the absent class members from whose losses Class Counsel seeks to profit handsomely. Nevertheless, Class Counsel has read the Court's silence on the many other deficiencies of the First Settlement Agreement and the Amended First Settlement Agreement as an endorsement. Just because it did not attract the howls of armies of plaintiffs' lawyers seeking profitable litigation for StarKist's other consumer wrongs does not mean the unchanged portions of the Second Settlement Agreement[1] are any less malodorous.

Class Counsel settled the case with StarKist for about 9% of the losses of their purported clients, even after they had tremendous expert proof of the means, methods, and quantum of the losses. This, combined with Class Counsel's attempts to expand the release behind the backs of the absent class members and ferocious defense of the same at the First Final Fairness Hearing, provides yet more evidence of the collusion between Class Counsel and StarKist which Mr. Lindberg flagged to the Court in his First Objection. (Dkt 294 at 6-7).

Bursting with pride, Class Counsel promised class members more than ten-times what they will actually get to stay in the settlement – a cold reality most will only realize when the check arrives and their claims are forever released. Absent class members will recover single-digit percentages of the amount they were promised in the Class Notice, possibly the biggest *pro rata* reduction in class action settlement history. Yet again, this un-corrected deception inures directly to

---

[1] While Class Counsel characterizes the instant agreement before the Court as merely a yet-again-amended version of the First Settlement Agreement, Mr. Lindberg believes that each time the release materially changes, especially after the First Settlement Agreement was rejected, renders the new agreement, no matter how captioned, a new agreement. The new objection period further confirms that view of the posture of the case. Regardless of which characterization the Court prefers, the legal analysis and deficiencies of the document (however it is characterized) before the Court, is largely the same, save for Mr. Lindberg's motion to remove Class Counsel from the case set forth *infra*, which arose due to Class Counsel's behavior between the filing of the PSP Plaintiffs' objections and the Court's rejection of the first attempt to settle the case.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1  the profit of Class Counsel (who avoids the delay in recovery of his fee) and StarKist (which avoids

2  the future litigation risk of masses opting-out in outrage) at the cost of absent class members. If this

3  is not sufficient evidence of collusion, it is hard to imagine how else an absent class member could

4  show collusion. Certainly it at least makes the notice insufficient and should prevent this Court from

5  granting final approval.

6       Class Counsel also illegally grabs at fees on coupons which he seeks to bamboozle the Court

7  into believing are not-coupons just because Class Counsel and StarKist named them "vouchers." To

8  add insult to injury, Class Counsel parades forward individuals who never even appeared in the case

9  claiming entitlement to incentive awards for a case they never even joined. They join Plaintiff

10  Hendricks, who seeks thousands of times more money than his supposedly-equivalent absent class

11  members will get.

12       As if this parade of pre-certification class action settlement horribles could not get worse,

13  Class Counsel's *coup de grace* is a grab for 33% of the gross settlement. Of course, Class Counsel

14  would get this pay before he even completes the litigation of the case and long before an absent

15  class member sees a check for a fraction of what they expect. Even StarKist, the company who

16  tricked their customers out of millions of dollars for many years, called foul!

17       Mr. Lindberg humbly requests that the Court reject the unfair Second Settlement

18  Agreement.

19  **I.    Eric Michael Lindberg is a class member and intends to appear at the fairness**

20          **hearing through his counsel.**

21       Eric Michael Lindberg, who resides at 764 Ellwood Avenue, Orlando, FL 32804, is a

22  member of the class. (Dkt 294-1). During the relevant time period, Mr. Lindberg purchased

23  significant numbers of 5 oz. cans of StarKist Solid White Tuna in Water. *Id*. This was and remains

24  his favorite brand and package size for the purchase of canned tuna. *Id.* Mr. Lindberg filed a claim

25  using the website, requested the cash payment option, and intends to appear, through his counsel by

26  telephone, if granted leave to do so by the Court, at the Second Fairness Hearing, where he asks to

27  be heard by the Court. *Id.*

28

To the extent that other class members file objections which are not inconsistent with the objections raised herein, Mr. Lindberg reserves the right to adopt those objections and address them at the Second Fairness Hearing as well. To the extent that any objector participates in discovery relating to the Second Proposed Settlement, Mr. Lindberg joins their motion to do so and requests equal access to such proceedings. Mr. Lindberg also hereby requests the opportunity to depose and cross-examine any witness presenting evidence in support of the Second Proposed Settlement.

## II.    The Court has a fiduciary duty to the unnamed members of the class.

A district court must act as a "fiduciary for the class who must serve as a guardian of the rights of absent class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) ("*GM Pickup Truck*") (internal quotation and citation omitted). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co*., 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) ("*ALI Principles*").

"Where the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention where the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). Because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. *Id.* "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Id.*

**III.    The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class member either sold out the absent class members or that the case is a meritless vehicle for the procurement of legal fees and incentive payments.**

    A.   The total recovery is a fraction of the class' injury.

Class Counsel proudly trumpeted the First and Second Proposed Settlements as a "world record". (Dkt 262-1 at ¶ 65; 347 at § II.C.). However, while this litigation may have gotten an extraordinary number of claimants, the total recovery for StarKist's 2.5 million injured customers is paltry.

Class Counsel's own expert, Colin Weir, estimated the total sale value of the under-filled tuna cans during the relevant time period to be $1,217,048,619.13. (Dkt 261-3 at Table 1). Using Class Counsel's data from the 2013 rounds of NOAA testing, we know that StarKist Chunk Light Tuna in Water was underfilled 16.7%, StarKist Chunk Light Tuna in Oil was underfilled by 4.5%, StarKist Solid White Tuna in Water was underfilled by 7.9%, and StarKist Solid White Tuna in Oil was underfilled by 4.9%. (Dkt 262-1 at ¶ 10). Expanding Table 1 from Mr. Weir's Declaration to include these percentages of underfilling makes it easy to calculate the loss to the class for each of the tuna varieties at issue in this case:

| TABLE 1 | | | | |
|---|---|---|---|---|
| **StarKist Tuna Variety** | **Dollar Sales** | **Unit Sales** | **Percentage Underfilled** | **Loss to Class** |
| Solid White, Oil | $ 43,332,791.68 | 32,168,972 | 16.61% | $ 7,197,141.87 |
| Solid White, Water | $ 315,876,068.24 | 233,666,639 | 4.50% | $ 14,208,958.09 |
| Chunk Light, Water | $ 662,168,768.09 | 765,602,733 | 7.90% | $ 52,329,446.72 |
| Chunk Light, Oil | $ 195,670,991.12 | 224,677,628 | 4.86% | $ 9,515,914.46 |
| **TOTAL SALES:** | **$ 1,217,048,619.13** | | **TOTAL LOSS:** | **$ 83,251,461.14** |

The simple math in Table 1 shows that the total loss according to Class Counsel's testing and Mr. Weir's research is approximately $83.25 million. Additionally, since several of the causes of action which survived StarKist's motion to dismiss are consumer protection statutes which provide for attorneys' fees and costs, the $83.25 million loss is most comparable in evaluating this Second Proposed Settlement against the *net* class recovery after attorneys' fees, costs, incentive awards, and notice costs are all deducted. If a jury believed Class Counsel at trial, the class

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1  members could expect to recover the entirety of the $83.25 million as the relevant causes of action

2  would result in attorneys' fees and costs being added on top of the class recovery.

3      If Class Counsel's Motion for Attorneys' Fees, Costs and Expenses ("Class Counsel's

4  Motion for Fees") is accepted, even assuming 100% face value for the coupon portion of the

5  settlement (the relevant value of such to calculating a percentage fee under CAFA is addressed

6  *infra*), the net class recovery will be $7,161,050.78. *See* Dkt 262 at § III.A Calculation Box

7  (combining $4 million "Total Voucher Fund" and $3,161,050.78 subtotal from the "Total Cash

8  Fund). This means that Class Counsel's "world-record" (Dkt 262 at §§ I, V.A.3.a, and V.C.2.c)

9  Second Proposed Settlement discounts the value of the absent class members' losses by 91.4%,

10 *recovering just 8.6 cents for every actual dollar lost by absent class members*.

11     Nevertheless, these "best results ever accomplished in any class action in history" (Dkt 262

12 at § V.C.2.c) would reward Class Counsel with a bonanza of fees almost three times the rate he sees

13 fit to bill his hourly clients and four times what a "reasonable" rate would be under a *Laffey*

14 analysis. *See* Dkt 262 at § V.B and *infra* at § VII.C. Put another way, it's not surprising Class

15 Counsel is so enthusiastic about the Second Proposed Settlement as his outcome is <u>34.5 times better</u>

16 <u>than that of his absent clients</u>. If Class Counsel is correct that an 8.6% absent class member

17 recovery combined with an unconscionable incentive award and enormous attorneys' fees is the

18 "best results ever accomplished in any class action in history" (Dkt 262 at § V.C.2.c) then it is hard

19 to imagine any proper public purpose for the class action legal device.

20     The impact of this tiny settlement compared to the amount of money absent class members

21 lost means that many absent class members, including Mr. Lindberg, will receive significantly less

22 than the "<u>full recovery</u>" Class Counsel claims. (Dkt 325 at 16, emphasis as in original). In fact, on

23 average, the 2.5 million class members lost about $33.16 each (i.e. $83,251,461.14 divided by

24 2,510,725 class members). That means that most class members will *not* receive "full recovery."

25 Rather, they'll receive, on a cash basis, 5.9% recovery – a pittance.

26     It is also illustrative to compare this case to another which was recently before the Court. In

27 *Napoleon Ebarle, et. al. v. Lifelock, Inc.*, 2016 WL 234364 (N.D. Cal. Jan. 20, 2016), the Court

28 reviewed carefully before preliminarily approving a proposed settlement which, according to the

Federal Trade Commission and the defendant, may have only been worth $10 million, but yet settled for $68 million. *Id.* at 7. Compare that to the less-than-9% recovery of known, ascertainable losses which Class Counsel and StarKist endorse in the Second Proposed Agreement.

> B. <u>This eight-cents-on-the-dollar settlement is either a sell out by Class Counsel or a nuisance settlement whose only purpose is the generation of legal fees.</u>

Basic economic theory teaches that rational actors settling litigation matters agree to an amount of money approximating their estimation of the amount of their damages discounted by their probability of success at trial. Either this Second Proposed Settlement is the veiled admission of Class Counsel that the case is frivolous, with a 91.4% chance of failure at trial, even after defeating most of StarKist's motion to dismiss, or, more likely, Class Counsel seeks only a nuisance settlement to justify his outrageous fee and StarKist eagerly agrees to resolve more than $83 million in exposure for 8 cents on the dollar.

The Seventh Circuit addressed a situation just like this in *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant and class representative proposed to settle the case for single-digit percentage of the value of their damages in payments that similarly were in the range of $1 per absent class member, while the lawyers received enormous fees and the representative plaintiff received thousands of times more money than the absent class members. *Id.* Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that all class members must receive [full compensation]; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* at 952. However,

> if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment [of an incentive award to representative plaintiff] *Murray* implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Id.* This Second Proposed Settlement is much the same as that rejected in *Murray*. Just as in *Murray*, here the lawyers will receive a huge fee while absent class members receive single-digit

dollar amounts. Also, just as in *Murray*, the class representative (and perhaps "Interested Parties") will receive thousands of dollars while absent class members get less than $2.

It is impossible to imagine any rational actor pursuing millions of dollars in litigation which they and their lawyers all agreed had less than 9% chance of success on the merits. Certainly it seems unlikely that StarKist's lawyers would have advised their clients that, having lost most of their motion to dismiss, they still had more than a 91% chance of success should this case proceed to trial. For the purposes of this Objection, Mr. Lindberg believes it is unnecessary to take a position as to whether the Second Proposed Settlement is a sellout or nuisance settlement. It certainly must be one of the two, and whichever it is, it falls well outside the discretion of this Court to approve.

C. The evidence of collusion between StarKist and Class Counsel is shown by Class Counsel's participation in the attempt to expand the release behind the back of the absent class members.

While Mr. Lindberg does not take a position as to whether the Proposed Settlement is a sellout or a nuisance settlement, the behavior of Class Counsel in response to the *Packaged Seafood Products Antitrust Litigation* ("PSP") Plaintiffs' Objections strongly suggests the very collusion which would be at the heart of a Class Counsel sellout.

The timeline of the PSP Litigation is important. Class Counsel and StarKist agreed to the First Proposed Settlement Release on or about May 14, 2015. (Dkt. 183-1). Subsequently, between August and September, 2015, StarKist was sued in many cases alleging antitrust violations. (Dkt. 293 at 1). After the PSP Plaintiffs objected in this case, StarKist and Class Counsel, rather than amending the release as proposed now, expanded the release to include the PSP Litigation claims with no additional remuneration for class members! Had this succeeded, the real "world record" would have been StarKist's escape from the PSP Plaintiffs (of whom Mr. Lindberg is likely a class member) for free.

Despite the PSP Plaintiffs' continued objection, Class Counsel became the chief co-defender of their collusive deal with StarKist at the expense of absent class members. At the December 17, 2015 Fairness Hearing, Class Counsel repeatedly argued in agreement with StarKist against the existence of antitrust claims. (Dkt 333 at 21, 23-25, 50-51). Specifically, StarKist argued "there

wasn't evidence of [a conspiracy with other PSP manufacturers], it wasn't brought up." (Dkt 333 at 21). Later in the same hearing, Class Counsel argued in agreement with StarKist that "the claim does not exist." (Dkt 333 at 51). In other words, at the Fairness Hearing, Class Counsel was arguing StarKist's side of StarKist's case against the now-present PSP Objectors who were Class Counsel's supposed clients. The Court also noted that "counsels' statement at the final fairness hearing [raises] further cause for concern." (Dkt 336 at 6). Clearly this behavior demonstrates just the collusion Mr. Lindberg has warned against since his First Objection.

## IV. The individual class member recovery is materially different from the recovery promised in the Class Notice and renders that notice ineffectual.

Notice is the due process basis of the entire class action mechanism. "It sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected." *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) (*citing In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977)). "[T]he court must direct to class members the best notice that is practicable under the circumstances," and "[t]he notice must clearly and concisely state in plain, easily understood language . . . (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

### A. The Class Notice clearly creates the expectation of a $25 cash or $50 coupon for settling class members.

In the notice sent to the class for the First Proposed Settlement, and remaining in effect for the Second Proposed Settlement, Section 8's heading asks "What does the Proposed Settlement provide if I submit a claim?" and answers the question thus:

> The settlement provides that StarKist will pay $8 million in cash and $4 million in vouchers redeemable for StarKist tuna products. You may submit a claim for either (a) a cash payment of $25, or (b) $50 in product vouchers redeemable for StarKist tuna products. You may choose to claim the cash payment or the product vouchers, whichever you prefer. These claim amounts may be subject to pro rata dilution if the total amount of claims exceeds the available settlement funds.

(Class Notice ¶ 8). The clear implication of these four simple sentences is that class members are free to choose "either (a) a cash payment of $25 or (b) $50 in product vouchers redeemable for

1    StarKist tuna products." *Id.* Nothing could be more simple about the first three sentences. The

2    fourth sentence returns to legalese, using a Latin phrase to say in entirely contingent terms that, in

3    fact, your $25 cash or a $50 coupon election may not actually get you $25 cash or a $50 coupon.

4              B.    The *pro rata* dilution of the payments is enormous, largely hidden from the class
5                    members, and unreasonable.

6         If it turned out that the payments of one or both categories were slightly reduced due to this

7    *pro rata* dilution, Mr. Lindberg would not have a problem with this notice. However, Mr. Lindberg

8    was shocked when he learned from undersigned counsel after having filed his claim online that his

9    actual recovery would be about $2, not $25. (Dkt 294-1 at 2). The actual payout will be less than

10   one-tenth of the amount promised in Section 8 of the Class Notice for absent class members no

11   matter which recovery option they picked. (Dkt 262 § III.A). Imagine the surprise of class members

12   when instead of a check for $25 they receive $1.97 (or less) or instead of coupons for $50 in

13   StarKist tuna they receive $4.43 in coupons (or less). These are dramatic 92% and 91% respective

14   differences between a class member's actual relief and the relief presented in the Class Notice.

15        Such a wide disparity between the individualized amounts promised in the Class Notice and

16   the actual amounts which would be paid under the Proposed Settlement creates a significant due

17   process problem with the notice. The overwhelming majority of the more than 2.5 million absent

18   class members who have made a claim do not know that they will receive less than 10% of what

19   they expect. *See, e.g.* Dkt 294-1 at 2, Declaration of Sam Andrew Miorelli at 2. The only way for an

20   absent class member (who, like the vast majority of absent class members, likely does not use

21   PACER), to know that his or her recovery will be so low is to navigate to the Court Documents

22   page of the notice website, download the fifth document (whose 25-word title "Plaintiff's Notice of

23   Motion and Motion for an Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards

24   for the Class Representative and Interested Parties" is the sort of impenetrable marvel only a lawyer

25   could appreciate) from a bulleted list of eight documents (each with a name more riddled with legal

26   jargon than the last), and read through to pages 12 and 13 of the 33-page document.[2] Amazingly,

27   _____

28   [2] Mr. Lindberg notes that the PACER option to access Docket Entry 262 is even less attractive to the absent class
     member. A skilled PACER user must navigate to the Court's CM/ECF page, login, run a "Docket Report" which costs
     $3, read more than 30 pages of entries to find Docket Entry 262 with its 25-word title or in the shorter period to object

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1    even with a 25-word document title, Class Counsel's Fee Motion title gives no hint that buried

2    within is news that your recovery has declined 92.12%. Further, while Mr. Lindberg does not know

3    when this document was placed on the settlement website, it certainly could not have been posted

4    prior to its October 30, 2015 filing date, by which time 2,359,877 claims had already been filed,

5    which constitute 94% of the total number of claims. *See* Dkt 262 § III.A *and* 325-1 at 2-3. For 2.3

6    million of the 2.5 million total claimants, there was no way at all to know about the dramatic

7    oversubscription and, even with the Second Proposed Settlement, no further way to opt out.

8          In preparing this renewed Objection, Mr. Miorelli attempted to contact two absent class

9    members who wrote letters to the Court regarding the settlement to see if they were aware of the

10   reduction. (Declaration of Sam Andrew Miorelli at 2). Mr. Miorelli was able to reach Ms. Amanda

11   Andoline by telephone and asked her how much money she expected to receive from the settlement.

12   *Id*. Ms. Andoline said she expected $25. *Id.* Mr. Miorelli told her that she actually was likely to

13   receive less than $2 if the Court approved the settlement. *Id*. Ms. Andoline responded by asking Mr.

14   Miorelli "why would they say that then?" *Id.* After that she immediately hung up the phone and did

15   not respond to further attempts to contact her. *Id.* This matches the expectation Mr. Lindberg had

16   prior to discussing the *pro rata* reduction with undersigned counsel and seems likely to be the

17   expectation of most of the other 2.5 million class members.

18         C.   Adequate notice in terms ordinary people can understand is one of the oldest and
                most important rules in class action litigation.
19

20         The quality of notice required under Rule 23 has been a stable point of class action law for

21   decades. As the Fifth Circuit held in 1977,

22              Absentee class members will generally have had no knowledge of the
                suit until they receive the initial class notice. This will be their
23              primary, if not exclusive, source of information for deciding how to
                exercise their rights under rule 23. Although absentee class members
24              are customarily encouraged to make inquiry of the clerk of the district
                court where the case is filed if they have further questions, this
25              worthwhile advice cannot justify omitting material information. This

26   ────────────────────────────────────────────────────────

27   to the Second Proposed Settlement, to find Docket Entry 325-1, with its 46-word title (which was not posted for free on
     the settlement website), and finally pay an additional $3 to download either file. The total PACER cost to *find out* that
28   your recovery will be $1.97 instead of $25 is roughly *three times* the total amount of money a class member will receive
     in the Second Proposed Settlement.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

is particularly plain in a case such as the one at bar where class members are numerous and widely dispersed. Not only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action. The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). This rule has been adopted across the country and no Circuit Court of Appeal has ever disagreed with this formulation of the Rule 23 notice requirements. *See Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1082 (7th Cir. 1972) ("The purpose of the mandatory notice and disclosure requirements of Rule 23(c)(2) is to advise all class members of their rights and privileges under the close supervision of the court."); *Erhardt*, 629 F.2d at 846.

Clearly where, as here, a notice misleads the absent class members into believing they will receive more than ten times more than their actual recovery, this is not providing "information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class." *In re Nissan*, 522 F.2d at 1105. This is not a case where a formula is provided to class members upon which they can calculate their likely recovery. Most of the class members at the time they filed their claim had no way to know that the recovery would be 91% or 92% less than suggested by the Class Notice. Class members who do not use the internet would have absolutely no way to know about the reduction in their claim's value.[3]

Mr. Lindberg specifically does not argue that all Class Notices must inform each class member with absolute precision what their recovery will be in a settlement. However, when the amount specified in plain language in the Class Notice is more than ten times greater than the actual

---

[3] The Pew Research Center reports that in 2015, 16% of American adults do not use the internet, with higher fractions of people who do not use the internet found in older age demographics, persons with lower household income, black and Hispanic ethnic groups, and residents of rural communities. Andrew Perrin & Maeve Duggan, *Americans' Internet Access: 2000-2015*, Pew Research Center, 2-9 (June 26, 2015), http://www.pewinternet.org/files/2015/06/2015-06-26_internet-usage-across-demographics-discover_FINAL.pdf. This means that this particular class notice defect likely harms people commonly associated with economic disadvantages more than class members like Mr. Lindberg, who is a young, white man with high-quality internet access living in a major metropolitan area.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1   amount class members will receive, that difference is material and unacceptably confusing.

2   Consequently, the Class Notice is fundamentally flawed and the Second Proposed Settlement

3   should not be approved without a new, more accurate notice sent to all class members who filed

4   claims, as well as similar public notice efforts as were expended for the Second Proposed

5   Settlement, and a renewed opportunity for Class Members to opt-out, object, or decide whether they

6   prefer the cash or coupon payment option.

7       It is also illustrative to compare this case to another which was recently before this Court. In

8   *Napoleon Ebarle, et. al. v. Lifelock, Inc.*, 2016 WL 234364 (N.D. Cal. Jan. 20, 2016), the Court

9   reviewed carefully before preliminarily approving a proposed settlement which, even assuming

10  100% subscription to the settlement funds, would still recover to absent class members no worse

11  than 25% of the estimated recovery to be presented in the Class Notice. Such a restriction in this

12  case would require an increase in the size of the settlement to accommodate payments of $6.25 per

13  class member and $12.50 in coupons per each. This means the *Lifelock* settlement is, on this point at

14  least, 3-4 times better for absent class members than the Second Proposed Settlement.

15  **V.   A class action settlement should not be approved when the primary beneficiaries
        are the class representatives and class counsel.**

16

17      Under the Second Proposed Settlement and Class Counsel's Fee Motion, while class

18  members will get about $1.97 cash each, the class representative will receive $5,000 cash and eight

19  Class Counsel-picked people, who never even filed a lawsuit and never joined this case will receive

20  $1,000 cash each. This is an outrageous disparity of 2,538X between the Class Representative and

21  absent class members. Further, the eight "Interested Parties" each will receive 507X more than

22  absent class members even though these "Interested Parties" had no cognizable involvement in this

23  case. These incentive awards are also purely conditional – they are only paid if the settlement with

24  all of its many fatal defects is approved. (Dkt 183-1 ¶ 3.2). That conditionality makes the incentive

25  awards even more odious.

26

27

28

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

### A. <u>A large disparity between the recovery of the representative class member and the absent class members is not permitted under Ninth Circuit precedent.</u>

Courts around the country, including the Ninth Circuit, while often approving incentive awards to class representatives who are <u>actually named in the case</u>, regularly reverse when those awards represent a large disparity when compared to the absent class members. In *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), the Ninth Circuit reversed an approved settlement due to a 6.67-192.3 times disparity between class representatives' recovery and that of absent class members. The Ninth Circuit reasoned that "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 in incentive awards." *Id.*

The Sixth Circuit has also rejected a large disparity between the named plaintiffs and absent class members' treatment in *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013). In *Vassalle*, the settlement provided for absent class members to receive $17.38 each while the named plaintiffs would be paid $2,000 each plus, in the case of one named plaintiff, have $4,516.57 in debt forgiven. *Id.* at 755-56. In total, this resulted in named plaintiffs receiving approximately 374 times as much benefit from the settlement as absent class members. The Sixth Circuit found the settlement was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

The Second Circuit also is skeptical of the fairness of incentive payments. In *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the Second Circuit affirmed the Southern District of New York's denial of a proposed class action settlement where absent class members received $1,000 each while the four representative class members received between $8,500 and $17,500 each. The district court held that "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441-42 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

The Eleventh Circuit directly cited that same district court language in *Plummer* when it rejected a class settlement which allocated approximately 6.25% of a lump sum settlement to the eight representative class members, while the absent class members each received, on average, approximately 0.42% of the settlement. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1146, 1148 (11th Cir. 1983). The court found the 14.75 times disparity between representative and absent class member recovery was facially unfair and reversed the district court's approval of the settlement. *Id.* at 1151.

In *Radcliffe* the disparity between the class representatives and the absent members of the class was about 6 to 192 times, in *Vassalle* it was 374 times, in *Plummer* it was 8.5 to 17.5 times, and in *Holmes* the disparity was 14.75 times. In each of those cases, the appellate court rejected the settlement as unfair.

This Court has also expressed concern about other proposed settlement agreements recently before it which suggested large-multiple incentive awards. In *Lifelock*, this Court noted with caution that "Plaintiffs, thus far, have provided no explanation for why the named Plaintiffs deserve an award 100 times greater than the settlement value of the other Class Members." *Lifelock*, 2016 WL 234364 at *7.

In this case the disparity is about 2,538X. That disparity is vastly above the levels which the Ninth, Second, and Eleventh Circuits have all rejected. This Court would invite error to approve this much-worse disparity. Class certification is not appropriate when the class representative and class counsel bring a lawsuit to benefit not the class, but themselves. *See In re Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748, 752 (7th Cir. 2011). This Second Proposed Settlement, with its enormous attorneys' fee and thousands of times difference in recovery between the class representative and absent class members appears to be just such a self-serving case and should be rejected.

B. There is no basis in law for payment of incentive awards in a class action settlement to class members who were not named class representatives in the case being settled.

Regardless of Class Counsel's claims that the "Interested Parties" provided efforts which "greatly enhanced the settlement value," (Dkt 262 at § VII) they are legally no different from any other absent class member settling their claims and releasing StarKist in the Second Proposed

Settlement. They were never named a class representative in the litigation, they never filed a case related to StarKist's conduct, and their own lawyers agreed to never have their intervention motions heard by the Court.

Class Counsel's Motion for Fees cites no law supporting the proposition that the "Interested Parties" should be treated differently than any other absent class member. All of the cases cited in the incentive award section of Class Counsel's Motion for Fees relate to incentive awards to named class representatives, not last-minute not-quite-present-interlopers like the "Interested Parties."

The Court should not award anything beyond their recovery as an ordinary absent class member. Any preferential treatment for them would invite error as well as a barrage of similar frivolous motions to intervene in every other pending class action in the Northern District of California.

## VI. The "vouchers" are coupons under the Class Action Fairness Act (CAFA).

The Second Proposed Settlement creates a fund of "$8 million in cash and $4 million in vouchers redeemable for StarKist tuna products." (Class Notice at ¶ 8). The Second Proposed Settlement does not provide any other benefit for the absent class members other than the cash and "vouchers." (Stipulation of Settlement at ¶ 2.1). Neither the cash nor the "vouchers" would be paid until after the "Final Settlement Approval Date." *Id.* at ¶ 2.3.d, ¶ 2.4.d. The meaning of "Final Settlement Approval Date" is actually the later of either 35 days after entry of an un-appealed order approving the Second Proposed Settlement or after all appeals have been exhausted.[4] *Id.* at ¶ 1.13.

The "vouchers" will also have significant restrictions on their use, which may be determined by StarKist at its own discretion, and such restrictions have not been notified to the Class or the Court. *Id.* at § 2.4.c. Additionally, the "vouchers" shall be "subject to retailer policies" which are also completely open-ended and undefined but potentially highly damaging to any putative value of the "voucher." *Id.* These "vouchers" clearly are coupons within the ambit of Section 3 of CAFA, codified at 28 U.S.C. § 1712.

---

[4] The impact of this is that Class Counsel will likely be paid months or years before any absent class members since Class Counsel gets paid 30 days after the Proposed Settlement is approved, regardless of any appeals.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1    Just days before Mr. Lindberg filed his First Objection, this District Court reiterated that

2  "[t]he fact that Plaintiffs have labelled this benefit as a voucher is not dispositive." *Davis v. Cole*

3  *Haan, Inc.*, No. 11-cv-01826-JSW, 2015 WL 7015328, at \*3 (N.D. Cal. Nov. 12, 2015). Judge

4  Jeffrey S. White held that a "voucher" for \$20 off any merchandise purchase was a coupon for the

5  purposes of CAFA. *Id.* at \*5. Additionally, Judge White held that "if the Court were to conclude

6  that this is not a coupon settlement, it could incentivize counsel in future cases to add a non-coupon

7  option that provides some minimal benefit to class members so that counsel can receive fees using

8  the lodestar method." *Id.*

9    The Ninth Circuit, in *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ("*HP*

10  *Inkjet Printer*") addressed a very similar factual circumstance as the Proposed Settlement and its

11  holding in *HP Inkjet Printer* was extensively relied upon in *Davis*. In *HP Inkjet Printer*, the class

12  received "e-credits" which would not issue until after all appeals were resolved in the case. *Id.* at

13  1176. The court held that "e-credits" was "a euphemism for coupons." *Id.*

14    The Second Proposed Settlement also has an *HP Inkjet Printer*-like provision in that the

15  "vouchers" will not be issued to class members until after all appeals are resolved in the case. In the

16  Second Proposed Settlement, the restrictions on the "vouchers" are undefined and potentially much

17  more onerous than those in *Davis* and *HP Inkjet Printer* which, at least, were defined at the time of

18  settlement and appeal. This makes the "vouchers" in the Second Proposed Settlement even more

19  clearly CAFA coupons than the "voucher" in *Davis* and the "e-credit" in *HP Inkjet Printer*.

20    The "vouchers" in the Second Proposed Settlement are not the same as the *gift cards*

21  contemplated in *In re Online DVD-Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ("*Online DVD*").

22  Class Counsel's analysis of *Online DVD* goes off the rails in its second sentence he asserts that

23  *Online DVD* "unambiguously held that gift cards or vouchers should be valued at 100 cents on the

24  dollar for purposes of calculating attorneys' fees under the percentage-of-the-benefit method." (Dkt.

25  262 at 6). The matter at issue in *Online DVD* was a <u>gift card</u>, not a voucher, much less a coupon,

26  and was called a "gift card" by the class counsel, the defendant, and the Ninth Circuit. *Online DVD*,

27  799 F.3d at 940. "Gift card" was an appropriate phrase there because that's exactly what class

28  members got in *Online DVD* – a gift card to WalMart for \$12. *Id.* at 941.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

*Online DVD* only uses the word "voucher" five times in its 21 pages in the Federal Reporter. In the Ninth Circuit's five mentions of "voucher" in *Online DVD*, three of them are in the context of pointing out the differences between *Online DVD*'s gift cards and "vouchers" which were held to be coupons under CAFA by courts or which were specifically mentioned by the Senate Judiciary Committee as the type of settlement against which CAFA was aimed.[5] *Online DVD*'s gift cards had almost no restrictions and were useable at the largest retailer in the world both in store and online. *Online DVD* 799 F.3d at 951. "Vouchers" for cans of tuna with unknown restrictions redeemable at unknown grocers for only four different products are not at all similar to a WalMart gift card. If *Online DVD* teaches anything about tuna "vouchers," it is that, unlike a gift card to the world's biggest retailer, a "tuna voucher" is the same thing and has the same ordinary meaning as a "tuna coupon."

The Google AdWords credits in *CLRB Hanson Industries, LLC. v. Google, Inc.*, No. 12-cv-01546 (N.D. Cal. Dec. 12, 2013) are also not the same as the "vouchers" in this case. In *CLRB*, an absent class member who was a current Google AdWords customer with a pending account balance awaiting invoicing from Google would have their portion of the settlement agreement credited against that current account balance. (Dkt 325-1 at 14). If a class member no longer had a Google AdWords account with a current balance or if they made an election in the claims process, they would receive a cash payment. *Id.* Critically, whichever choice an absent class member made, they received the same amount of money which was worth exactly the same as cash whether (a) paid

---

[5] The first mention of "voucher" is in the context of citing the Senate Judiciary Committee's Report on CAFA that "cites and criticizes coupon settlement awards that provide class members with . . . 'a $5 to $10 voucher good for future purchases of particular computer hardware or software products.'" *Online DVD* at 950. The second and third mentions were in a citation to *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig,* MDL No. 1967, Master Case No. 08-1967, 2011 WL 1790603 (W.D.Mo. May 10, 2011) ("*BPA MDL*") discussing a case where class members who had purchased products that used BPA, including baby bottles and sippy or training cups could receive a *transferrable* voucher toward the purchase of another product manufactured by Philips Electronics. *Online DVD* at 951, *see also BPA MDL* at *4 and* http://www.kellersettlements.com/BPA.html. The fourth mention compares *Online DVD*'s gift cards to the "vouchers" in *Young v. Polo Retail, LLC*, No. C-02-4546, 2006 WL 3050861, at *3-5 (N.D. Cal. 2006) and points out that the WalMart gift cards are unlike *Young*'s "vouchers" which were ruled to be coupons under CAFA because they gave former Polo Retail employees who were complaining about having to buy Polo clothing a Polo Retail gift card which could only be used to purchase more Polo clothing! "[W]hy would former employees, who allegedly were forced to buy a great deal of unwanted Polo products, desire product vouchers so that they could purchase even more clothes?" *Online DVD* at 952. The final mention of "voucher" comes in footnote 11 which refers to the internally-cited *Young* case and points out that the *Online DVD* gift cards can be used to purchase a wide variety of things unlike the *Young* gift cards. *Online DVD* at 952 fn 11.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1 against an invoice the class member would have had to pay to Google within the next billing cycle

2 or (b) paid in cash. *Id.* If anything, *CLRB* should weigh in favor of showing the "vouchers" in this

3 case are coupons: StarKist "vouchers" can only be redeemed by buying *more* StarKist and, in fact,

4 by buying at least one can of StarKist more than the "voucher" will cover. In *CLRB* the difference

5 in the payment options would only affect whether the cash arrived by a check in the mail or a credit

6 against the next invoice in an ongoing business relationship. The amount received was the same

7 either way and there was no incentive to spend more money with Google or need to do so to realize

8 the full settlement benefit.

9 *Howerton v. Cargill, Inc.*, 2014 WL 6976041 (D. Hawaii Dec. 8, 2014) is closer to the

10 circumstance in this case than *Google*, but still is different in a way that shows how clearly the

11 "vouchers" in this case are just CAFA coupons. In *Cargill*, absent class members could choose

12 between cash or a "voucher" which was evenly divisible into the Truvia-brand units of sale for

13 replacement product and "no cash is required to redeem a Voucher for an Eligible Voucher Product,

14 as the Voucher covers the entire purchase price of the Eligible Voucher Product." *Cargill*, 2014 WL

15 6976041 *20. The "value" of the "voucher" was presumed in calculating attorneys' fees as being

16 the MSRP for the voucher product, but at no point did any *Cargill* customer have to give Cargill

17 any money to realize the full value of their "voucher." *Id.* Every coupon-electing absent class

18 member in this case will have to give StarKist more money to realize the full value of their coupon.

19 Just like *Davis*'s shoe "vouchers" and *HP Inkjet Printer*'s "e-credits," the "vouchers" for

20 cans of tuna are actually coupons. Consequently, the settlement relating to these coupons should be

21 analyzed under CAFA.

22 **VII.** **As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of any value to the $4 million in coupons in the Second Proposed Settlement and also prohibits use of the lodestar method to determine the attorneys' fee award.**

24 A. CAFA section 1712(a) prohibits assignment of any value to coupons for the purposes of determining a contingent attorneys' fee award until after the coupons are redeemed.

26 Section 1712(a) of CAFA requires,

27 If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to

-19-
RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

> class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

28 U.S.C. § 1712(a) (2005). The Ninth Circuit held "an attorney's fees award is 'attributable to' an award of coupons where the attorneys' fees award is a 'consequence' of the award of coupons." *HP Inkjet Printer,* 716 F.3d at 1181.

The Second Proposed Settlement, Class Counsel's Motion for Fees, and StarKist's Response to Plaintiff's Motion for Attorneys' Fees ("StarKist Opposition") all agree that the attorneys' fees contemplated in this case are "attributable to" or "a consequence of" the award of coupons. The Second Proposed Settlement defines the "Settlement Fund" as "the total cash and food voucher commitment of StarKist for purposes of this settlement . . . with a total value of $12 million, comprised of two distinct parts – the 'Cash Settlement Fund' and the 'Voucher Settlement Fund.'" (Dkt 183-1 ¶ 1.25). Class Counsel's Motion for Fees "necessarily values the $4 million in product vouchers at their face value" to reach a Settlement Fund valuation of $12 million. (Dkt 262 § V.A.2). "The total value of the Settlement Fund is $12 million, comprising $8 million in cash and $4 million in product vouchers." *Id.* at § V.A.1. The StarKist Opposition also agrees. (Dkt 285 at 1, line 15-18). Consequently, the evaluation of whether to award a contingent attorneys' fee for the $4 million in coupons must begin with section 1712(a).

*HP Inkjet Printer* holds that the only legal basis for an award of attorneys' fees under section 1712(a) is the "redemption value of the coupons." *HP Inkjet Printer*, 716 F.3d at 1186. However, just as in *HP Inkjet Printer*, Class Counsel seeks to have their attorney fee awarded prior to the redemption of the StarKist coupons. (Dkt 262 at § 1.13, § 2.4.d).

> Because the settlement agreement specifies that no coupons may issue until after entry of a final judgment, it would have been impossible for the district court to calculate the redemption value of the coupons as required by § 1712(a). By structuring the settlement in this way, the parties essentially invited the error here.

*HP Inkjet Printer*, 716 F.3d at 1186. The structure of the issuance of the coupons in the Second Proposed Settlement is absolutely identical to the structure rejected in *HP Inkjet Printer*. The Ninth Circuit also prohibits district courts from making an estimate of the value of the coupons for

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

purposes of granting a contingent attorneys' fee in cases such as this where the coupons have not yet been redeemed. *Id*. This means it is impossible to grant a contingent fee award under section 1712(a) with regard to the $4 million in coupons because the redemption value of those coupons is impossible to determine since they have not been issued yet.

### B. CAFA section 1712(b) does not permit an award of contingent or lodestar-based attorneys' fees for the Proposed Settlement because there is no equitable relief.

*HP Inkjet Printer* is emphatic that the language of sections 1712(a) and (b) are not permissive: a settlement can only award attorneys' fees on the basis of coupons according to one of these provisions or their hybrid in section 1712(c) if the requirements of the respective section are met. *Id*. at 1183. With regard to section 1712(b), the Ninth Circuit held,

> [I]f class counsel wants to be paid 'any' fees, and the 'recovery of the coupons is not used to determine' those fees, the entirety of the payment 'shall be' calculated 'based upon the amount of time class counsel reasonably expended working on the action,' *i.e.*, using the lodestar method.

*Id*. Additionally, "[s]ection 1712(b) . . . can only come into play when a settlement contains both coupon relief and equitable relief." *Id*. at 1185.

As discussed *supra* in Section VII.A of this Objection, the only recovery for the class in the Proposed Settlement is $8 million in cash and $4 million in coupons. There is no equitable relief in this Settlement Agreement. Since there is no equitable relief, *HP Inkjet Printer* holds that section 1712(b) cannot be used to award a lodestar-based attorneys' fee for the Proposed Settlement.

### C. CAFA section 1712(c) does not permit contingent fee or lodestar-based attorneys' fee awards arising out of the coupon portion of the settlement due to the lack of equitable relief in the Proposed Settlement.

*HP Inkjet Printer* explained the applicability and purpose of CAFA section 1712(c) as:

> subsection (c) applies whenever a settlement provides both coupon and equitable relief. In such "mixed" settlements, § 1712(c) serves to ensure that class counsel get paid for all of the benefits they secure for the class. Specifically, the statutory language in § 1712(c), which in part incorporates the standard of § 1712(a), establishes this general rule: If a settlement gives coupon and equitable relief and the district court sets attorneys' fees based on the value of the entire settlement, and not solely on the basis of injunctive relief, then the district court must use the value of the coupons redeemed when determining the value of the coupons part of the settlement.

-21-

*Id.* at 1184. However, this settlement does not provide any equitable relief, it only provides cash and coupons. *See supra*, Section VII.A. Much like section 1712(b), section 1712(c) only allows a lodestar method for analyzing the value of an attorney's equitable recovery, and there is no equitable recovery to evaluate in this case. *Id.* Further, section 1712(c), like section 1712(a), only allows a contingent fee recovery based on the value of redeemed coupons, and no coupons have been redeemed in this case since they have not been issued yet. *Id.*

The result is that the three provisions of CAFA, as interpreted by the Ninth Circuit in *HP Inkjet Printer*, prohibit this Court from assigning any value to the coupon portion of the Second Proposed Settlement for the purposes of determining an attorneys' fee award. Additionally, CAFA restricts the use of a lodestar analysis of the attorneys' fee requested pursuant to a coupon-containing settlement to only apply in cases where there is also equitable relief for the class. Since the Second Proposed Settlement has no equitable relief, CAFA, as interpreted by *HP Inkjet Printer*, prohibits the use of the lodestar method to evaluate the attorneys' fee award request altogether.

With the CAFA analysis complete, the $8 million in cash forms the singular basis of an attorneys' fee which must be determined exclusively on a percentage fee basis since a lodestar-based fee is specifically prohibited by CAFA and *HP Inkjet Printer*.

**VIII. Class Counsel should not get more than 25% in a contingent fee-based attorneys' fee.**

    A.  The Court should follow the Ninth Circuit's 25% benchmark.

In the Ninth Circuit, the 25% benchmark for calculating a contingent attorneys' fee in a class action is settled law. *Bluetooth*, 654 F.3d at 942 (*citing Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989) (establishing that 25% of the fund is the "benchmark" award that should be given in common fund cases)). While the Ninth Circuit has set forth an analytical framework for consideration of an upward departure in *Vizcaino*, such a departure requires more than the puffery Class Counsel offers. On this point, Mr. Lindberg agrees generally with the StarKist Opposition, but the absurdity of Class Counsel's aggrandizement is actually much worse than StarKist described.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1    As explained *supra*, there is nothing extraordinary about a recovery amounting to just 8.6%

2  of the class members' injuries. Further, far from being novel, this claim is merely a rehash of the

3  claims brought on August 2, 2012 by the district attorneys of Riverside, Marin, and San Diego

4  Counties. *See* Dkt 262 at § V.A.3.b. Class Counsel cannot reasonably say that there was no guiding

5  precedent: the facts of the district attorney case were a public record by the time this case was filed

6  and the Class defeated most of StarKist's motion to dismiss. *See* Dkt 57.

7    A comparison to the upward departure from the 25% benchmark approved in *Vizcaino* is

8  instructive. The class lawyers in *Vizcaino* pursued their case with zero supporting precedents and

9  agreements signed by the class members waiving the very benefit the class sought to vindicate <u>in</u>

10 <u>spite of the written agreements!</u> *Vizcaino*, 290 F.3d at 1048. Compared that to here: an already-

11 settled district attorney case on exactly the same facts and law, scientific findings from government

12 laboratories supporting their case theory, and a mostly-victorious outcome against StarKist's motion

13 to dismiss. This case was a walk in the park compared to *Vizcaino*.

14   Compared to *Vizcaino*, Class Counsel faced significantly less risk. *Vizcaino* approved the

15 district court calling a case extremely risky where the plaintiffs had lost once on the merits and a

16 second time on the class definition yet both times managed to revive the case. *Id.* at 1048. In this

17 case, Class Counsel defeated most of StarKist's arguments in its motion to dismiss, caught StarKist

18 red-handed paying off witnesses, had colorable claims StarKist's attorneys were abusing attorney-

19 client privilege to cover up the witness payoffs, and were literally hours away from a hearing where

20 they were likely to be allowed to add class representatives from multiple additional states. (Dkt 57;

21 142; 169; and 174 at 3-4). Class Counsel did not settle this case from a position of procedural or

22 strategic weakness. Class Counsel's claims to the contrary are yet more puffery.

23   Class Counsel's example of bringing "additional benefit beyond the cash settlement fund"

24 for *Vizciano*'s third factor is more aptly called "doing its job as a diligent attorney." There's nothing

25 about soliciting bids from several suppliers before spending your clients' money which is either

26 remarkable or a benefit beyond the value of the underlying recovery fund used to determine a

27 contingent attorneys' 25% benchmark fee. Using ordinary procurement practices is the bare

28 minimum standard of care an ethical attorney should use when spending his clients' money.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1   Following basic fiduciary duty rules is not an un-compensated additional benefit to the class for

2   which Class Counsel should get extra fees – fees which themselves will come from the absent class

3   members' pockets!

4       Particularly in light of Class Counsel's turncoat behavior toward his clients at the December

5   17, 2015 Fairness Hearing, this is further proof of Class Counsel's low opinion of the duties of a

6   lawyer toward his absent client that Class Counsel believes soliciting multiple bids before selecting

7   a large-dollar-contract-vendor is above-and-beyond work. *See supra*, § III.D. Class Counsel's

8   comparison to *Alexia Foods*, where apparently the cost to administer the claims was enormous, does

9   not *ipso facto* prove that they achieved some monument of procurement in their deal with KCC.

10  Barring evidence that Class Counsel negotiated a deal with KCC which is expressly better than any

11  other KCC deal (i.e. with a most favored nations provision), then there is nothing to Class Counsel's

12  claim on this point.

13      *Alexia Foods* is an interesting case though, as it awarded a 25% fee based on net recovery,

14  instead of 33% of the gross recovery as Class Counsel asks here. *In re Alexia Foods, Inc. Litig.*, No.

15  12-cv-01546 (N.D. Cal. Dec. 12, 2013) (Hamilton, J.). If the Court were to follow *Alexia Foods*, it

16  would result in a similar outcome to the one StarKist requests, not the outcome Class Counsel does.

17  *Id.* at *3.

18      *Careathers v. Red Bull North America, Inc.*, Case No. 1:13-CV-00369 (S.D.N.Y. May 12,

19  2015) also shows how uncommon a 33% fee award is in a large common fund case such as this,

20  even in Circuits which do not have the strong 25% benchmark. In *Red Bull*, class counsel was

21  awarded a 26% fee and both the fee and the incentive awards were paid independently from the

22  common fund, so they did not diminish the absent class members' recovery. (Dkt 325-1 at 110, 120,

23  121). In the present case, every dollar the incentive awards or attorneys' fees are increased is a

24  dollar directly out of the pockets of the absent class members.

25      Again, compare Class Counsel's puffery with the facts of the departure approved of in

26  *Vizcaino*. During the *Vizcaino* litigation, defendant Microsoft re-hired 3,000 class members as

27  normal employees and changed other HR practices, a benefit worth $101.48 million which was not

28  captured in the value of the common fund in the *Vizcaino* settlement. *Id.* at 1049. This is the sort of

"additional benefit beyond the cash settlement fund" the Ninth Circuit allows benchmark departures to compensate, not soliciting four bids for settlement administration and picking the cheapest one.

By the time Class Counsel reaches the fourth *Vizcaino* factor in Class Counsel's Motion for Fees, his self-congratulatory claims have become ridiculous. Class Counsel seems to believe he has navigated a new sea for class action plaintiff lawyers with this "first-ever private-plaintiff case concerning the under-filling of canned tuna." (Dkt 262 at § V.3.d). To the extent that the facts of this case are likely to be the punchline of a class-actions-gone-wild law review article in the future, Class Counsel may have a point regarding novelty. Nevertheless, there is nothing novel about the self-serving settlement Class Counsel asks this Court to approve: enormous attorneys' fees, absent class member claims settled at pennies on the dollar, and a class representative sailing into the sunset 2,538 times better off than the 2.5 million people he supposedly represents.

Regardless of Class Counsel's self-congratulation, the fourth *Vizcaino* factor does not even turn on "novelty, complexity and difficulty" (Dkt 262 at § V.3.d) of litigating the case; it turns on whether there is independent evidence that the market would value this representation at more than the benchmark. *Vizcaino.* 290 F.3d at 1049. In *Vizcaino*, at least, there was a contract specifying a fee of 30% of the overall recovery between the class representatives and their lawyers. *Id.* The Ninth Circuit approved the district court using that as a basis to depart above the benchmark as part of an overall analysis of the market rate for such work. *Id.* However, the key factor in *Vizcaino* was that there was a prevailing rate above the benchmark in that particular area of the law – employment law. *Id.* Since this is the "first-ever private-plaintiff case concerning the under-filling of canned tuna," (Dkt 262 at § V.3.d) Class Counsel cannot claim there is any prevailing market rate for under-filled canned tuna plaintiffs' lawyers, and thus, cannot rely on this factor as a basis for departure from the benchmark.

The fifth *Vizcaino* factor, if anything, would confirm the benchmark award in this case, not support a departure. The Ninth Circuit in *Vizcaino* approved an upward departure when the contingency work lasted for eleven years, incurred hundreds of thousands of dollars in expenses, and where the plaintiff firm actually showed a decline in its annual income as a result. *Id.* at 1050 (citing *Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990)

-25-

1   (where the litigation lasted more than thirteen years)). In this case, Class Counsel has litigated only

2   for two and a half years, expended costs valued at a little over a month's worth of Mr. Bursor's

3   billable time, and made no showing of any significant financial impact on Bursor & Fisher, P.A.

4   because of this case. Consequently the fifth *Vizcaino* factor actually supports a benchmark-only

5   award.

6           Finally, Class Counsel's proposed sixth factor is nothing more than self-congratulation and

7   backhanded compliments for StarKist's legal team. They cite no legal authority for their proposition

8   that doing good work against big corporate law firms entitles plaintiff's lawyers to more of their

9   absent clients' money. In fact, doing good work is exactly the basis for Class Counsel's entitlement

10  to *any* money under the Ninth Circuit 25% benchmark. If successfully negotiating a settlement that

11  sells your clients' claims for pennies on the dollar, recovers a huge attorneys' fee, and treats the

12  class representative 2,538 times better than the absent class members is grounds for an upward

13  departure from the benchmark, then the benchmark is a dead letter. This Court should take Class

14  Counsel's proposed sixth factor as a tacit admission that their entire *Vizcaino*-based argument for

15  33% instead of 25% is a meritless grab at absent class members' wallets.

16          B.  <u>The basis for a contingent fee should exclude costs of class notice, Class Counsel's</u>

17             <u>costs, and any incentive payments.</u>

18          Mr. Lindberg and StarKist agree that the baseline recovery to calculate any contingent fee

19  should exclude the costs of class notice and Class Counsel's costs. *See* StarKist Opposition at 2.

20  However, Mr. Lindberg also believes that, while the incentive payments proposed are illegal under

21  binding precedent (see discussion, *supra*), to the extent that any incentive payments are awarded by

22  the Court, they should also be excluded from Class Counsel's contingent fee calculation.

23          The Northern District of California "has had a longstanding preference for using the net"

24  when calculating a contingent fee award in class action settlements. *In re Transpacific Passenger*

25  *Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *1 (N.D. Cal. May 26,

26  2015) (J. Charles R. Breyer) ("*Transpacific*"). Judge Breyer considered *Online DVD* yet pointed

27  out in *Transpacific* that "[p]laintiffs cite no authority *requiring* the Court to use the gross." *Id.*

28  (emphasis as in original). Judge Breyer is not alone in this preference for net-based calculations.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

The Northern District of California has approved net-based calculations for decades not only in consumer class actions, but also in securities cases and in employment class actions. *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D.Cal. Aug. 25, 1994); *Miles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 at *5 (N.D. Cal. Nov. 12, 2014).

In fact, while Judge Phyllis J. Hamilton's 2010 decision to award an attorney's fee based on the gross recovery in *Online DVD* is much celebrated by Class Counsel, it appears to be an outlier in the Northern District of California. The Northern District of California ruling in *Online DVD* is not reported in the Federal Supplement or the Westlaw electronic database. While the Northern District of California's holding in *Online DVD* was unusual, the Ninth Circuit's holding in *Online DVD* is unremarkable. *Online DVD* simply reaffirmed the rule that district court judges are free to use either the net or gross method so long as the result is reasonable. *Online DVD*, 779 F.3d at 953.

Nothing in *Online DVD* endorses or recommends, much less requires the use of gross instead of net in any case. *Id.* In addition to the frequently-reported preference of the Northern District of California for a net-based analysis, the Seventh Circuit <u>requires</u> a net-based analysis. *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("Those [administrative] costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.")

As explained above, CAFA and *HP Inkjet Printer* require this Court to evaluate the attorneys fee exclusively on a percentage-of-the-fund basis and only using the value of the $8 million in cash as the starting place. Subtracting notice costs, Class Counsel's costs, and the proposed incentive awards reduces the basis for the attorneys' fee to $7,161,050.78. Applying the Ninth Circuit's 25% benchmark results in an attorneys' fee of $1,790,262.70.

Even if this Court were inclined to use the gross method of calculating fees, if it were to also accept Class Counsel's argument for a 33% award, the resulting fee (applied to a constructive fund of $8 million as required by CAFA) would be $2,666,666.67. Using a net-based analysis, such a fee would be 37.2% of the net class recovery. A 37.2% fee would be far above the 25% Ninth Circuit benchmark. In *Bluetooth*, the Ninth Circuit reversed a gross-calculated attorney's fee, in part,

because the fee, when calculated on a net basis, resulted in an attorneys' fee award far greater than the 25% benchmark. *Bluetooth*, 654 F.3d at 943.

This analysis shows that the Court must use particular caution in calculating the attorneys' fee award in this case. The impact of CAFA, as interpreted by *HP Inkjet Printer*, means that a much smaller fee should be awarded if the Proposed Settlement is approved. That reduction also, simply as a matter of mathematics, requires this Court, especially if it applies a gross fee calculation method, to use a percentage much closer to the benchmark than Class Counsel requests or the award will almost certainly be overturned on *Bluetooth* grounds.

Mr. Lindberg proposes that the Court, if it chooses to approve the Proposed Settlement despite its many flaws detailed in this Objection, award an attorneys' fee of $1,790,262.70. This reduction from Class Counsel's request would yield more than $1 per absent class member in increased recovery, which would be more than 50% improvement for each absent class member.

C. <u>Even if the Court decides that the "vouchers" are not coupons under CAFA, the fee should be less than even the amount suggested by StarKist.</u>

The same analysis from Section VIII.B of this Objection would still apply even if the Court determines that the "vouchers" are not coupons under CAFA. In that event, the better analysis of the benefit to the class would still be based on the net recovery to the class instead of the gross. Under a net analysis, the $12 million overall amount reduces to a $11,161,050.78 net benefit to the absent class members. As StarKist also proposes, awarding 25% of that net benefit would result in a total attorneys' fee of $2,790,262.70. The reduction of this fee compared to Class Counsel's request would result in approximately a 25% improvement to the recovery of each absent class member.

Such a decision that CAFA does not apply (despite Mr. Lindberg's contention that it does) would also allow consideration of a lodestar cross-check. That hypothetical cross-check shows even more problems with Class Counsel's fee request. One of the most common ways to determine the reasonability of an attorney's declared hourly rate is by comparison of it with that year's *Laffey* Matrix and then adjusted to local geographic cost of living. *See Chanel, Inc. v. Doan*, 2007 WL 781976, *6-7 (N.D. Cal. 2007) (citing *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984)). Following the

*Chanel* method, the Judicial Salary Plan effective January 11, 2016 includes a 29.20% locality pay for New York (home to the offices of Mr. Bursor, Ms. Annick M. Persinger, Mr. Neal J. Deckant, Mr. Yeremey O. Krivoshey, Ms. Julia A. Luster, and Ms. Debbie Schroeder[6]), a 35.75% locality pay for San Jose-San Francisco-Oakland (home to the Walnut Creek, CA offices of Mr. L. Timothy Fisher, Mr. Joseph I. Marchese, Mr. Joshua D. Arisohn, Mr. Yitzchak Kopel, Mr. Frederick J. Klorczyk, III, and Mr. Philip L. Fraietta), and a 24.78% locality pay for Washington, D.C.[7] (Declaration of Sam Andrew Miorelli at Exhibits A-D). This means that converting the *Laffey* Matrix to New York rates is accomplished by adding 3.54% to the Washington, D.C. rate[8] and the San Jose-San Francisco-Oakland rate is achieved by adding 8.79% to the Washington, D.C. rate.[9] Analyzing the 38 pages of billing reports provided by Bursor & Fisher, P.A., yields the following aggregate billing data:

| TABLE 2 | | |
|---|---|---|
| Timekeeper | Rate | Total Number of Hours |
| Scott A. Bursor | $850 | 558.2 |
| L. Timothy Fisher | $680 | 234.3 |
| Joseph J. Marchese | $680 | 79.7 |
| Annick M. Persinger | $390 | 64.9 |
| Neal J. Deckant | $375 | 1055.1 |
| Yitzchak Kopel | $350 | 45.50 |
| Yeremy O. Krivoshey | $300 | 46.7 |
| Julia A. Luster | $300 | 351.5 |
| Frederick J. Klorczyk | $300 | 55.8 |
| Philip Fraietta | $300 | 75.9 |
| Debbie Schroeder | $180 | 177.5 |
| Amanda Gonzales | $180 | 73.5 |
| Christine Patruno | $180 | 52.6 |

(Dkt. 262-1 at 45-83). Note that the billing records submitted include 11.7 hours billed at $180 per hour for "DLD," 3.2 hours billed at $180 per hour for "KSS," 6.9 hours billed at $180 per hour for "RIA," 3.6 hours billed at $180 per hour for "RSR," 8.7 hours billed at $400 per hour for "SNW,"

---

[6] Ms. Schroeder's office was determined from her LinkedIn profile available here: https://www.linkedin.com/in/debbie-schroeder-96548347
[7] Data for which attorneys work at the various Bursor & Fisher, P.A. offices collected from http://www.bursor.com/team/.
[8] Following the math from *Chanel* at fn 1 and 2: (129.20 - 124.78) / 124.78 = 0.0354 or 3.54%
[9] Following the math from *Chanel* at fn 1 and 2: (135.75 – 124.78) / 124.78 = 0.0879 or 8.79%

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

and 0.2 hours billed at $180 per hour for "SVG." None of the initials DLD, KSS, RIA, RSR, SNW, or SVG correspond to an individual named in the "B & F Hourly Rates" table provided. (Dkt 262-1 at 45). Consequently, none of these hours or billings have been established by Class Counsel and should be excluded from consideration of a hypothetical lodestar cross check.

Since Class Counsel provided the number of years of experience of each of its lawyers, we can evaluate whether the rate charged is reasonable. Using the *Laffey* Matrix, the table can be updated to include a geographic-specific reasonable fee rate for each:[10]

| TABLE 3 | | | | |
|---------|------|-------------------------------------|----------------------|------------------------|
| Timekeeper | Rate | Laffey Matrix Rate (years experience) | Locality Adjustment | Reasonable Hourly Rate |
| Scott A. Bursor | $850 | $460 (19 years) | 3.54% | $476.29 |
| L. Timothy Fisher | $680 | $460 (19 years) | 8.79% | $500.43 |
| Joseph J. Marchese | $680 | $460 (14 years) | 8.79% | $500.43 |
| Annick M. Persinger | $390 | $300 (6 years) | 3.54% | $310.62 |
| Neal J. Deckant | $375 | $300 (5 years) | 3.54% | $310.62 |
| Yitzchak Kopel | $350 | $300 (4 years) | 8.79% | $326.37 |
| Yeremy O. Krivoshey | $300 | $255 (3 years) | 3.54% | $264.03 |
| Julia A. Luster | $300 | $255 (3 years) | 3.54% | $264.03 |
| Frederick J. Klorczyk | $300 | $255 (2 years) | 8.79% | $277.42 |
| Philip Fraietta | $300 | $255 (1 year) | 8.79% | $277.42 |
| Debbie Schroeder | $180 | $150 (Paralegal/Law Clerk Rate) | 3.54% | $155.31 |
| Amanda Gonzales | $180 | $150 (Paralegal/Law Clerk Rate) | 8.79% | $163.19 |
| Christine Patruno | $180 | $150 (Paralegal/Law Clerk Rate) | 8.79% | $163.19 |

Now the adjusted rates can be applied to the hours billed so that the claimed lodestar can be compared to the lodestar which Class Counsel has provided some evidence to support in his Motion for Fees:

---

[10] Mr. Lindberg has ascertained the geographic location of everyone from Class Counsel's office who billed time except Amanda Gonzales and Christine Patruno, so out of an abundance of caution, they are assumed to work in the higher-paid California market.

| TABLE 4 | | | |
|---|---|---|---|
| **Timekeeper** | **Reasonable Hourly Rate** | **Number of Hours** | **Amount Billable** |
| Scott A. Bursor | $476.29 | 558.2 | $ 265,865.08 |
| L. Timothy Fisher | $500.43 | 234.3 | $ 117,250.75 |
| Joseph J. Marchese | $500.43 | 79.7 | $ 39,884.27 |
| Annick M. Persinger | $310.62 | 64.9 | $ 20,159.24 |
| Neal J. Deckant | $310.62 | 1055.1 | $ 327,735.16 |
| Yitzchak Kopel | $326.37 | 45.5 | $ 14,849.84 |
| Yeremy O. Krivoshey | $264.03 | 46.7 | $ 12,330.20 |
| Julia A. Luster | $264.03 | 351.5 | $ 92,806.55 |
| Frederick J. Klorczyk | $277.42 | 55.8 | $ 15,480.04 |
| Philip Fraietta | $277.42 | 75.9 | $ 21,056.18 |
| Debbie Schroeder | $155.31 | 177.5 | $ 27,567.53 |
| Amanda Gonzales | $163.19 | 73.5 | $ 11,994.47 |
| Christine Patruno | $163.19 | 52.6 | $ 8,583.79 |
| | **TOTAL:** | **2,871.2** | **$ 975,563.10** |

Evaluating the total on Table 4 versus the amount claimed by Class Counsel in his Motion for Fees shows yet again, Class Counsel has inflated the amount he claims he is owed. Class Counsel contends that his firm has worked 2,900.5 hours on the case, yet has only provided the bare-minimum billing information about 2,871.2 hours, having not included the billing rates of six sets of initials appearing in the detailed bills. (Dkt 262 at 25). Additionally, Class Counsel claims his lodestar to be $1,344,720, yet when his inflated and unreasonable rates are reduced using the well-resepected *Laffey* Matrix, the lodestar reduces to $975,563.10.

Just on billing rates and hours, Class Counsel has inflated his bill by $369,156.90, or 37.8%. It seems likely that similar padding would be found in the "expenses" and even in the individual hourly billings if those were analyzed in the same level of detail.

These updated fees reflect that the actual lodestar, were such a method used, would be 4.1, not 2.97. A more reasonable award, as Mr. Lindberg proposes, of $1,790,262.70, results also in a more-reasonable hypothetical lodestar multiple of 1.84.

## IX. The silence of the class should not be construed as endorsement of any terms of the Proposed Settlement, including Class Counsel's fee and incentive payment requests.

In his Motion for Fees, Class Counsel implies a common argument raised by plaintiffs' lawyers and corporate defendants in settlements such as this: that a low number of absent class members opting out or objecting to the settlement shows the absent class members support,

1   acquiesce, or endorse the Second Proposed Settlement and its terms. (Dkt 262 at 1). This argument

2   has been thoroughly criticized in the academy and this Court should pay it no heed.

3          No matter how outrageous the terms of the Second Proposed Settlement are, very few class

4   members will object. In a case such as this, where the individual losses are small and hard to prove

5   on a per-class-member basis in individual cases (which is precisely the reason for allowing class

6   actions in the first place), the economic incentive to opt-out of the settlement to pursue a case

7   independently is unlikely to exist for almost all absent class members in almost all class actions

8   alleging consumer harm. Christopher R. Leslie, *The Significance of Silence: Collective Action*

9   *Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007). "[M]ost likely, silence is a

10  rational response to any proposed settlement even if that settlement is inadequate." *Id.* The

11  incentives for objectors are particularly bad because they must spend significant time and effort to

12  attempt to improve the settlement for millions of their fellow class members, with a gain for

13  themselves that, in this case, likely would only be a few dollars at best. *Id.*

14         Class Counsel argues that the large number of claimants (and thus, low number of objectors

15  as a percentage) proves that the Second Proposed Settlement is the ideal solution to underfilled cans

16  of tuna. (Dkt 325 at 16). This is wrong because,

17              There may be many reasons why class members in this case didn't
18              register their concerns about the settlement: lack of interest, time,
                information, etc. Like the Third Circuit in the *General Motors* case,
19              the Court is unwilling to automatically equate class silence with
                a showing of "overwhelming" support for the settlement. Therefore, the
20              fact that statistically few people bothered to opt-out or file an
21              objection ultimately counts little in the Court's overall fairness
                analysis.

22  *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing GM Pickup*

23  *Truck*, 55 F.3d at 812.

24         "Acquiescence to a bad deal is something quite different than affirmative support." *In re*

25  *General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing

26  approval of settlement). "[W]here notice of the class action is, again as in this case, sent

27  simultaneously with the notice of the settlement itself, the class members are presented with what

28  looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

F.2d 677, 680-81 (7th Cir. 1987). "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *GM Pickup Truck.*, 55 F.3d at 812, *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007).

No matter what reaction the class has to the Proposed Settlement, the Court remains the fiduciary for all class members whether they signed up, opted out, objected via counsel, or handwrote their objection on notebook paper. StarKist and Class Counsel must show that the Proposed Settlement follows the law, is fundamentally fair, adequate, and reasonable. They would bear that burden even if Mr. Lindberg did not file this Objection.

## X.     CONCLUSION

This second attempt to settle the case is only better than the first in that it no longer sells out antitrust claims of absent class members in addition to the claims actually litigated in the case. Obviously that's no endorsement to be proud of and there are multiple reasons to reject the Second Proposed Settlement as well as Class Counsel's Motion for Fees, as explained herein. Class Counsel's burden is to prove that the Second Proposed Settlement follows the law, is fundamentally fair, adequate, and reasonable. On this Second Proposed Settlement, with these terms, and especially in light of Class Counsel's Motion for Fees, they cannot meet their burden. Therefore, Mr. Lindberg prays this honorable court:

(a) Reject the Second Proposed Settlement; or,

(b) Grant the relief requested in Mr. Lindberg's simultaneously-filed Motion; or,

(c) Order new notice be made to the class on the same terms and effort as the initial notice, this time pointing out to absent class members the reduced per-person recovery; or,

(d) If the Court chooses to approve the Second Proposed Settlement, to:

　　i.     Reduce the attorneys' fees to $1,790,262.70;

ii.   Refuse to award any incentive payment to the "interested parties" and award the class representative a single-digit multiple of the cash absent class member recovery; and

iii.   Reserve jurisdiction to grant incentive awards to Mr. Lindberg and reasonable attorney's fees to his counsel.

DATED: March 29, 2016

/s/ Sam A. Miorelli
Sam A. Miorelli, E.I., Esq.
Florida Bar # 99886 (*pro hac vice*)
Law Office of Sam Miorelli, P.A.
764 Ellwood Avenue
Orlando, FL 32804
Telephone: 352-458-4092
E-Mail: sam.miorelli@gmail.com

/s/ Aaron Dawson
Aaron Dawson
State Bar No. 283990
1901 Harrison Street, Suite 1100
Oakland, CA 94612
Telephone: (415) 534-5346
Fax: (888) 301-5076
E-Mail: adawson@alectolaw.com

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Objection was electronically filed via the CM/ECF system for the Northern District of California, thus effecting service on all attorneys registered for electronic filing.

Additionally, he caused to be mailed via U.S. Certified Mail two courtesy copies of the foregoing Renewed Objection and the Declaration of Sam Andrew Miorelli to:

Hon. Haywood S. Gilliam, Jr.
United States District Court
450 Golden Gate Avenue
Courtroom 15 – 18th Floor
San Francisco, CA 94102

/s/ Sam A. Miorelli
Sam A. Miorelli, E.I., Esq.

RENEWED OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

# EXHIBIT M

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-61543-CIV-ROSENBERG/BRANNON

CHRISTOPHER W. LEGG, individually and
on behalf all others similarly situated,

      Plaintiff,

              v.

LABORATORY CORPORATION OF
AMERICA HOLDINGS, a Delaware corporation,

      Defendant.

## OBJECTION TO CLASS ACTION SETTLEMENT OF SAM A. MIORELLI

Case 3:12-md-02330-EMC  Document 464-1  Filed 07/14/16  Page 171 of 200

## **CONTENTS**

I.    INTRODUCTION ..................................................................................................... 5

II.    Objector Miorelli is a member of the Class and intends to appear at the fairness hearing.. 6

III.    The court has a fiduciary duty to the unnamed members of this class. .............................. 7

    A.    Additional scrutiny is required for settlement-only class certification. ........................... 8

    B.    An arm's length settlement negotiation and the lack of direct collusion are not in and of themselves sufficient bases to approve a pre-certification settlement. ...................................... 9

IV.    Class Counsel's failure to notice the class of the basis and amount of attorney's fees and costs sought violates Rule 23(h). ............................................................................................... 11

V.    The small amount of the settlement raises several fairness and adequacy concerns which cannot fully be evaluated due to the insufficiency of the information filed in the Court's record relating to class notice plans, costs, and attorneys' fees. ............................................................ 13

VI.    The Class Notice violates the due process rights of the absent class members. ................ 14

    A.    Even Class Counsel seems to expect inadequate notice or broad class rejection-by-silence of the Settlement Agreement. ....................................................................................... 14

    B.    The Class Notice is hopelessly vague and does not adequately appraise absent class members of their recovery for releasing their claims against LabCorp................................... 15

VII.    The total amount of the recovery is woefully inadequate considering the amount of statutory damages available and number of class members. ....................................................... 17

VIII.    The Settlement Agreement should not be certified because there is an enormous disparity of recovery between the class representative and absent class members. ..................... 20

IX.    CONCLUSION ....................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ....................................................... 13

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2nd Cir. 2001) ................................................................ 8

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ..................................................................... 8

*Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977) ............................................................... 9

*Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) .................................... 7

*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) .......................................... 16, 17

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) .................................................................. 10

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ......................................... 9

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ................................................. 7

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................................. 9

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ................................................ 21

*In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216 (2d Cir. 1987) .......................................... 11

*In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) ................................................ 22

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................... 9

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ....................................................... 10

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir.
1995) ........................................................................................................................................ 10

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d. Cir. 1995) ................. 7

*In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010) ................................ 11

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) .................................. 17

*In re Relafen Antitrust Litig.*, 360 F.Supp.2d 166 (D. Mass. 2005) .............................................. 7

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ........................................... 7

*In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ......................... 9

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ............................................................................ 8

3

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)............................................ 18, 19

*Piambino v. Bailey,* 610 F.2d 1306 (5th Cir. 1980)................................................................ 13

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982)...................................................... 20

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982)
............................................................................................................................................ 21

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) .................... 20

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) .................................................... 9

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) .............................................. 7

*Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972) ....................................... 17

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992)........................................................................ 7

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ...................................................................... 8

*Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844 (5th Cir. 1998) ...................................... 10

*Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013)............................................ 20

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .................................................... 9

**Statutes**
15 U.S.C. § 1681 .................................................................................................................. 5

**Rules**
Fed. R. Civ. P. 23 ............................................................................................................ 11, 16

**Other Authorities**
American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010).................. 8

*Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (Oct. 8, 1985) ................................................................................................................................ 11

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002)............................. 7, 8

Notes of Advisory Committee on 2003 Amendments to Rule 23 ............................................. 12

COMES NOW, class member Sam A. Miorelli, E.I., Esq., appearing for himself *pro se*, who hereby objects to the proposed settlement of the above-captioned case, and requests an opportunity to be heard at the Fairness Hearing before this Honorable Court.

## I.    INTRODUCTION

Plaintiff Christopher Legg filed suit against Laboratory Corporation of America Holdings ("LabCorp") alleging LabCorp had violated 15 U.S.C. § 1681, *et seq*., the Fair and Accurate Credit Transaction Act ("FACTA") on July 6, 2014. (Dkt 1). Plaintiff Legg filed his First Amended Class Action Complaint ("FACAC") on August 25, 2014. (Dkt 17). LabCorp's motion to dismiss was denied by the Court on October 23, 2014. (Dkt 34). Two days after a hearing on, *inter alia*, LabCorp's motion for summary judgment, Plaintiff Legg's motion for class certification, and LabCorp's motion for additional discovery of Plaintiff Legg relating to his relationship with Class Counsel, Plaintiff Legg and LabCorp (the "Settling Parties") agreed to the Settlement Agreement and moved for its approval on October 26, 2015. (Dkt 205). The Settlement Agreement defines the Class as

> All individuals in the U.S. who: (i) made a payment at a LabCorp patient service center or equivalent (ii) using a debit or credit card, and (iii) for which LabCorp printed a point of sale receipt (iv) that displayed the card expiration date (v) between July 6, 2012 and the Preliminary Approval Date.

(Dkt 205-1 at 4-5). The Class Notice as published on the claims administration website defines the closing date for the class as November 4, 2015. The Settlement Agreement provides for class certification "for settlement purposes only." (Doc 205-1 at 8-9).

The Settling Parties assert the Settlement Class contains approximately 665,000 members, however they provide no sworn statements or other discovery available in the public record of the case or the settlement website to support this assertion. (Dkt 205 at 4). The Settlement Agreement provides for a single common fund of $11 million from which is first deducted an "incentive

award" of $10,000 to Plaintiff Legg, administration fees (of a total amount which is unknown to absent class members, but of which up to $1 million will be paid from the fund prior to any claims being paid), and attorneys' fees of $3,666,667 plus undisclosed costs will be distributed prior to a *pro rata* distribution to Class Members. (Dkt 205 at 5, 46, 52; Dkt 205-1 at 11). While this leaves a significant amount of uncertainty due to the lack of documentation on the record of the case at this time, it appears likely that absent class members will receive less than $6.3 million total.

As of the date of this Objection, no papers were filed with the Court supporting any attorney's fee, attorney's cost(s), or defining the number of claims, the amount of the administration costs, or the number of opt-outs.

**II.   Objector Miorelli is a member of the Class and intends to appear at the fairness hearing.**

Objector Miorelli is a member of the bar of this Court but appears herein for himself *pro se* as he is a member of the Class. Objector Miorelli purchased the services of LabCorp numerous times during the period of July 6, 2012 and November 4, 2015. Each time, Objector Miorelli used either a debit or credit card. Objector Miorelli used his available credit and debit card transaction records as the basis for the certifications set forth in his claim form.

Objector Miorelli filed a claim #600022203001 on January 13, 2016. (Exhibit A). As of the date of Objector Miorelli's signature below, no notification of disallowance has been received from the Claims Administrator. Consequently, Objector Miorelli is a member of the Class.

Objector Miorelli intends to appear at the fairness hearing but does not plan to call any witnesses. Objector Miorelli joins any objections filed by other class members which are not inconsistent with his objections raised herein. Objector Miorelli reserves the right to make use of any document entered on the docket of the instant case and to cross examine any witness who testifies in support of the Settlement Agreement at the fairness hearing. Objector Miorelli requests

leave of the Court to supplement this Objection within two weeks of the filing of any document in response to this Objection or any document filed in support of approval of the Settlement Agreement or an award of attorneys' fees, costs, administration costs, or incentive awards.

### III. The court has a fiduciary duty to the unnamed members of this class.

A district court acts as a "fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 ( 8th Cir. 1975); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 ( 3d Cir. 2004). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litig.*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005) (citing, *inter alia*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) (internal quotation and citation omitted). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 ( 9th Cir. 1989) ("The

district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010).

## A. Additional scrutiny is required for settlement-only class certification.

This settlement requires particular judicial scrutiny as it is a pre-certification class action settlement. The Supreme Court held that, where there is a request for a settlement-only class certification, there must be "undiluted, even heightened, attention in the settlement context." *Amchem,* 521 U.S. at 620. "Where the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620).

"[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2nd Cir. 2001) ("When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness.") "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention where the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the

settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 ( 9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

    **B.**    **An arm's length settlement negotiation and the lack of direct collusion are not in and of themselves sufficient bases to approve a pre-certification settlement.**

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties. *Bluetooth*, 654 F.3d at 948 (requiring that, because collusion may not always be facially evident in a settlement, district courts must be "particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.") Because of the danger of conflicts of interest, third parties, such as this Court, must monitor the reasonableness of the settlement as well with an eye toward protecting absent class members. *Id.* In fact, "basing confidence in the fairness of the settlement on its having been based on 'arms-length negotiations by experienced counsel'" is "naïve." *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 ( 7th Cir. 2014). Pre-certification class action settlement negotiations are particularly concerning because the conflict of interest of class counsel "may warp the outcome of the negotiations." *Id.*

"Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Id. See also, Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977) *and Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 51-53 (2d Cir. 2000). Settlements such as the one at issue herein are particularly concerning because the fees and the class award were

negotiated simultaneously, which means that the class members' relationship with Class Counsel was adversarial throughout the settlement discussions.

Class counsel's conflict of interest is particularly concerning in a pre-certification case such as this because,

> in class-action settlements, the adversarial process – or what the parties here refer to as their 'hard fought' negotiations – extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members. For the economic reality is that a settling defendant is concerned only with its total liability and thus a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense.

*In re Dry Max Pampers Litig.*, 724 F.3d 713, 717 (6th Cir. 2013) ("*Pampers*") (emphasis in original, internal citations and quotations omitted) (quoting *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) and *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995)).

The conflict of class counsel's interest in such pre-certification settlements is also made more problematic because "[c]lass actions are the brainchildren of the lawyers who specialize in prosecuting such actions, and in picking class representatives they have no incentive to select persons capable or desirous of monitoring the lawyers' conduct of the litigation." *Eubank v. Pella Corp.*, 753 F.3d 718, 719-20 (7th Cir. 2014). Clearly LabCorp was also concerned about whether Plaintiff Legg was adequately representing absent class members as it sought and was granted access by the Court to inquire into Plaintiff Legg's other referral and fee-generating relationship(s) with Class Counsel.

While any outcome of that deposition, if it happened at all, is unclear from the Court's record, "[t]he concern is not necessarily in isolating instances of major abuse, but rather is for those situations short of actual abuse, in which the client's interests are somewhat encroached upon by

10

the attorney's interests." *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir. 1987) (internal quotations omitted) (quoting *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 266 ( Oct. 8, 1985)). Here it appears that LabCorp was concerned about abuse in this litigation too, which should additionally raise red flags for the Court. Having neither the class representatives nor the defendant to constrain class counsel's behavior, an absent class member's only protection is the exacting scrutiny of the district court.

### IV.    Class Counsel's failure to notice the class of the basis and amount of attorney's fees and costs sought violates Rule 23(h).

The timeline agreed by the Settling Parties and endorsed by the Court requires objections be filed on or before January 25, 2016 and allows Class Counsel an additional week before they are required to file their motion for attorneys' fees on February 1, 2016. ( Dkt 210 ¶ 17). This timeline plainly violates the requirements of Federal Rule of Civil Procedure 23(h). Rule 23(h)(1) requires a claim for an award of attorney's fees in a class action must be "served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Additionally, Rule 23(h)(2) allows a class member to object to such a motion.

Clearly the intent of Rule 23(h) is that class counsel must move for their fees well before objections are due so that class members have a full and fair opportunity to evaluate them. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 933 (9th Cir. 2010). The absence of notice is *per se* insufficient notice that violates Rule 23(h). "The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed." *Id.* Rule 23(h) requires class members have "an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed." *Id.* at 993-94. This particular formulation of Rule 23(h) arose in the 2003 amendments to the rule, at that time the Advisory Committee noted,

For motion by class counsel in cases subject to court review of a
proposed settlement under Rule 23(e), it would be important to
require the filing of at least the initial motion in time for inclusion
of information about the motion in the notice to the class about the
proposed settlement that is required by Rule 23(e). . . . Besides
service of the motion on all parties, notice of class counsel's motion
for attorney fees must be "directed to the class in a reasonable
manner." Because members of the class have an interest in the
arrangements for payment of class counsel whether that payment
comes from the class fund or is made directly by another party,
notice is required in all instances. In cases in which settlement
approval is contemplated under Rule 23(e), notice of class counsel's
fee motion should be combined with notice of the proposed
settlement, and the provision regarding notice to the class is parallel
to the requirements for notice under Rule 23(e).

Notes of Advisory Committee on 2003 Amendments to Rule 23. The mere provision of a raw sum

of attorney's fees sought in the class notice is not enough to satisfy Rule 23(h). As the Advisory

Committee noted, notice "of class counsel's fee motion" should be combined with the settlement

notice, not just notice of the gross amount of class counsel's then-non-existent fee motion.

Without any basis for seeking its attorney's fee award, there is no way for Objector Miorelli

or any other absent class member to evaluate a lodestar, hourly rates, or amount of costs sought.

The Advisory Committee specifically noted that "the court should provide sufficient time after the

full fee motion is o file to enable potential objectors to examine the motion." *Id.* Having provided

no basis for more than $3.6 million in attorneys' fees sought, Objector Miorelli and the rest of the

class has no ability to consider the fairness of the overall amount of fees or the propriety of the

attorney's fee itself.

The Court should not excuse this breach of Rule 23(h). It has made it objectively impossible

for a class member to accurately evaluate the fairness of the compensation they are to receive as

part of the settlement, which is key to the due process protection this Court must provide absent

class members. Additionally, excusing this breach of Rule 23(h) would remove any incentive for

transparency of class counsel to their supposed clients, the absent class members, in future class action settlements such as this one.

Excusing this breach of Rule 23(h) also invites error on appeal. The Fifth Circuit held that,

> [i]f the agreement leaves attorneys' fees to be fixed by the Court then, [t]he district court must set and conduct a hearing in the full sense of the word . . . counsel must offer relevant evidence and must be available for cross-examination. The court should enter findings of fact and conclusions of law setting out the basis for the fee award and adequately presenting the issue for further appellate review should this be necessary. If [the Court] has not done so, then he must require that notice be given to the class of the proposed attorneys' fees as w ell as t he rest of the settlement agreement and afford anyone who objects an opportunity to be heard.

*Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir. 1980) (internal citations and quotations omitted). As *Piambino* was decided prior to the creation of the United States Court of Appeals for the Eleventh Circuit on October 1, 1981, it is binding precedent for this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981). At the fairness hearing, this Court, like the district court overruled in *Piambino*, will be asked to set an attorneys' fee which has not had the Rule 23(h) required notice provided to the class in advance with time for the class to review it and object. This Court must follow *Piambino* and reject approval of the Settlement Agreement on this basis and require new notice be sent to the entire class of any eventually-filed class counsel attorney fee motion.

**V.    The small amount of the settlement raises several fairness and adequacy concerns which cannot fully be evaluated due to the insufficiency of the information filed in the Court's record relating to class notice plans, costs, and attorneys' fees.**

The failure of Class Counsel to file their motion for fees prior to the objection deadline, in violation of Rule 23(h), has other knock-on effects to absent class members' ability to evaluate the fairness and adequacy of the relief obtained in the Settlement Agreement. As of writing this objection, class members do not have any information about (a) the notice plan for which KCC

will be paid approximately $1 million, (b) the amount of the attorneys' costs which will be sought, or (c) the basis for the attorneys' fee request. This makes it impossible to have any certainty as a class member in evaluating whether the actual recovery a class member will receive is fair and adequate since those three matters directly affect the amount of money which each class member will receive as well as how many class members will ultimately file claims.

Nevertheless, and as explained below, using the scant details available, Objector Miorelli is able to discern certain broad facts about the ultimate recovery for absent class members, each of which strongly suggest that, upon investigation of all of the facts, it will become clear the proposed Settlement Agreement is unfair, inadequate, and likely has had a legally-insufficient class notice process as well.

### VI. The Class Notice violates the due process rights of the absent class members.

There are two serious due process problems with the class notice: (1) it appears likely that Class Counsel does not even believe himself that many of the absent class members will receive notice and elect to complete the claim form, and (2) it is impossible for absent class members to evaluate on the basis of the class notice, how much they will recover by remaining in the settlement.

#### A. Even Class Counsel seems to expect inadequate notice or broad class rejection-by-silence of the Settlement Agreement.

Class Counsel, in the Class Notice, represents that he expects the amount of the cash award to be around $200. (Dkt 205-1 at 52). While it is impossible to know the final class recovery, it is obvious already (even with almost no filings on the record showing the amount of administration costs, amount of attorneys' costs, or the basis for an attorney's fee award) that the Settling Parties contemplate the absent class members to receive less than $6.3 million. Assuming $200 per claim in recovery, that would mean approximately 31,500 class members would be paid out of a total

14

class which supposedly includes approximately 665,000 persons. In other words, Class Counsel reveals in the Class Notice that he expects less than 5% of the absent class members will receive payment under this Settlement Agreement which extinguishes 100% of the absent class member claims. That is a shocking statistic which should, *ipso facto*, prove that the Settlement Agreement is unfair to absent class members and that their lawyer *knew it was unfair to absent class members* at the time the Settlement Agreement was signed. There could be many underlying reasons why Class Counsel believed only 5% of his absent clients would be paid, such as due to a fatally flawed class notice plan, unreasonably-difficult claims procedures, unreasonably stringent claims approval standards, or an enormous number of opt-outs. Since there is no further evidence about the KCC notice and administration plan in the record and no updates on the claim administration status thus far in the record, it is impossible for Objector Miorelli to opine which cause is at play in this case. Nevertheless, one of them must be for Class Counsel to make such an estimate at the time of settlement and place it in the Class Notice, and any one of them is sufficient to deny settlement approval.

### B. The Class Notice is hopelessly vague and does not adequately appraise absent class members of their recovery for releasing their claims against LabCorp.

The class notice is so vague that an absent class member cannot actually know what they will receive if they do not opt-out, which makes the notice inadequate under binding Eleventh Circuit precedent. There is no way for an absent class member to know what they will get in exchange for the release. Class Counsel's "estimate" of $200 is immediately disclaimed by two bold and underlined sentences that make it clear that the "estimate" is just a wild guess. (Dkt 205-1 at 52). Perhaps the recovery will be less than $9.50 per absent class member if Class Counsel's

representation that there are 665,000[1] class members is believed. There is also no way for an absent

class member even to know the size of the pool of money their check will come from, let alone

how many class members they may share the fund with.

Notice is the due process basis of the entire Rule 23 class action mechanism. "It sets forth

an impartial recital of the subject matter of the suit, informs members that their rights are in

litigation, and alerts them to take appropriate steps to make certain their individual interests are

protected." *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) (*citing In re*

*Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977)). "[T]he court must direct to class

members the best notice that is practicable under the circumstances," and "[t]he notice must clearly

and concisely state in plain, easily understood language . . . (vii) the binding effect of a class

judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

The quality of notice required under Rule 23 has been a stable point of class action law for

decades. As the Fifth Circuit held in 1977,

> Absentee class members will generally have had no knowledge of
> the suit until they receive the initial class notice. This will be their
> primary, if not exclusive, source of information for deciding how to
> exercise their rights under rule 23. Although absentee class members
> are customarily encouraged to make inquiry of the clerk of the
> district court where the case is filed if they have further questions,
> this worthwhile advice cannot justify omitting material information.
> This is particularly plain in a case such as the one at bar where class
> members are numerous and widely dispersed. Not only must the
> substantive claims be adequately described but the notice must also
> contain information reasonably necessary to make a decision to
> remain a class member and be bound by the final judgment or opt

---

[1] Note that the 665,000 person class size posited with no evidentiary support by the motion to
approve the settlement is not available to absent class members on the class notice website,
meaning an absent class member could only find it if they created a PACER account, looked up
the case, paid $3 for a docket sheet, and then were lucky and downloaded just the right one of
over 200 documents available in this case's docket, each one of which requires payment to view.
For all of that work and expense, all an absent class member learns is that Class Counsel
suggests there may be 665,000 class members but provides no evidence to support such..

> out of the action. The standard then is that the notice required by
> subdivision (c)(2) must contain information that a reasonable
> person would consider to be material in making an informed, intelligent
> decision of whether to opt out or remain a member of the class and
> be bound by the final judgment.

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). This rule has been adopted across the country and no Circuit Court of Appeal has ever disagreed with this formulation of the Rule 23 notice requirements. *See Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1082 (7th Cir. 1972) ("The purpose of the mandatory notice and disclosure requirements of Rule 23(c)(2) is to advise all class members of their rights and privileges under the close supervision of the court."); *Erhardt*, 629 F.2d at 846. As discussed previously, this Fifth Circuit precedent is binding in the Eleventh Circuit as it pre-dates the Eleventh Circuit. *Bonner*, 661 F.2d at 1209.

Compare then, the vague Class Notice with the extremely detailed release, which requires more than two full pages of text to define with extreme, and very broad certainty. (Dkt 205-1 at 7-8 and 20). The release, but not any of the relevant information to determine the value an absent class member gets in exchange for the release, is posted on the class notice website. Clearly this is not the sort of notice required by due process, Rule 23(c), or binding Eleventh Circuit precedent. Even if there was not such a deep well of law showing the illegality of this administration of class notice, this Court's fiduciary obligation to the absent class members would be sufficient to reject the settlement on the basis of the vague class notice alone.

## VII. The total amount of the recovery is woefully inadequate considering the amount of statutory damages available and number of class members.

FACTA provides for statutory damages of $100 to $1,000 per consumer as well as attorney's fees, costs, and punitive damages. 15 U.S.C. § 1681n(a). Assuming *arguendo*, the class actually consists of 665,000 LabCorp customers, then the sum of the statutory damages owed to

the class is no less than $66,500,000 plus attorney's fees and costs. The statutory damages portion could reach as high as $665,000,000 with eligibility for a punitive damage multiplier that could take the value of the claims being released in the Settlement Agreement into the billions of dollars.

And yet, Class Counsel seeks to settle these claims for around $6.3 million in recovery for the class. When comparing the statutory damage eligibility to the Settlement Agreement, it is important to only look at the *net* the absent class members will receive, because were this case to succeed at trial, any attorney's fees and costs would be additive to the jury award and thus not reduce the recovery of absent class members. Comparing on this apples-to-apples basis, the best one could say for Class Counsel is that he has settled the claims of the absent class members for 9.5% of their *minimum* value, and potentially for less than 1% of their maximum value.

Basic economic theory teaches that when settling litigation, rational plaintiffs accept an amount of money approximating their estimation of their probability of success on the merits times their estimation of the amount of their legal entitlement. Evaluated under that simple framework, then either this Proposed Settlement is the veiled admission of Class Counsel that the case is frivolous, with at best a 90.5% chance of failure at trial, or, more likely, Class Counsel seeks a nuisance settlement only to justify his fee. The Seventh Circuit addressed a situation just like this in *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant and class representative proposed to settle the case for single-digit percentage of the value of their damages in payments that similarly were in the range of $1 per absent class member, while the lawyers received enormous fees and the representative plaintiff received thousands of times more money than the absent class members. *Id.* Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that all class members must receive [full compensation]; risk

that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* at 952. However,

> if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment [of an incentive award to representative plaintiff] Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Id.* This Proposed Settlement is much the same as that rejected in *Murray*. Just as in *Murray*, here the lawyers will receive a huge guaranteed fee while class members receive unknown, perhaps very small amounts. Also, just as in *Murray*, the class representative will receive thousands of dollars while absent class members recover a small fraction of the class representative's amount.

It is impossible to imagine any rational actor pursuing millions of dollars in litigation which they and their lawyers all agreed had less than 9.5% chance of success on the merits. Certainly it seems unlikely that LabCorp's lawyers, having lost their motion to dismiss and facing potentially billions of dollars in statutory damages, punitive damages, attorney's fees, and costs would have advised their client that they still had more than a 90.5% chance of success should this case proceed to trial.

For the purposes of this Objection, Objector Miorelli believes it is unnecessary to take a position as to whether the Proposed Settlement is a sellout or nuisance settlement. However, it certainly must be one of the two just based on the simple math presented here. Whichever this case is, it falls well outside the discretion of this Court to approve either a sellout or a nuisance settlement.

**VIII.   The Settlement Agreement should not be certified because there is an enormous disparity of recovery between the class representative and absent class members.**

While absent class members are entitled to perhaps $200 (but maybe less than $10) out of the fund, Plaintiff Legg will be paid $10,000 – equivalent to the value of 50 to 1,000 times the absent class member's recovery!

When the incentive award is many times the award that other members of the class can receive, the Circuit Courts of Appeal regularly overturn approved Settlement Agreements. The Ninth Circuit has recently rejected such a disparity in *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013). The Ninth Circuit reasoned that "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 in incentive awards." *Id.*

The Sixth Circuit has also recently rejected a large disparity between named and unnamed class members' treatment under a settlement in *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013). In *Vassalle*, the settlement provided for unnamed plaintiffs to receive $17.38 each while the named plaintiffs would be paid $2,000 each plus, in the case of one named plaintiff, have $4,516.57 in debt forgiven. *Id.* at 755-56. In total, this resulted in named plaintiffs receiving approximately 374 times as much benefit from the settlement as u nnamed class members. Consequently, the Sixth Circuit found the settlement was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

The Second Circuit also is skeptical of the fairness of incentive payments. In *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the court affirmed the district court's rejection of a settlement where unnamed class members received $1,000 each while the four named plaintiffs

received between $8,500 and $17,500 each. The district court held that "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441-42 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

The Eleventh Circuit directly cited that same district court language in *Plummer* when it rejected a class settlement which allocated approximately 6.25% of a lump sum settlement to the eight named plaintiffs, while the unnamed plaintiffs each received, on average, approximately 0.42% of the settlement. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1146, 1148 (11th Cir. 1983). The court found this 14.75 times disparity between named and unnamed plaintiff recovery was facially unfair and reversed the district court's approval of the settlement. *Id.* at 1151. This Court should treat *Holmes* as binding precedent holding that a 14.75 times disparity between named class members and absent class members' recoveries is illegal.

In *Radcliffe* the disparity between the class representatives and the members of the class was about 6 to 192 times, in *Vassalle* it was 374 times, in *Plummer* it was 8.5 to 17.5 times, and in *Holmes* the disparity was 14.75 times. In each of those cases, the appellate court rejected the settlement as unfair. In this case the disparity is at least 50 times but due to other deficiencies in the record at this time which were discussed *supra*, that disparity could prove to be over 1,000 times. Even a 50 times disparity is vastly above the levels which the Eleventh Circuits has rejected as binding precedent in *Holmes* and which the Second, Sixth, and Ninth Circuits all have rejected in previous cases. Class certification is not appropriate when the class representative and class counsel bring a lawsuit to benefit not the class, but themselves. *See In re Aqua Dots Prod. Liab.*

*Litig.,* 654 F.3d 748, 752 (7th Cir. 2011) (Easterbrook, J.). This settlement appears to be just such a case as far as the class representative is concerned and should be rejected.

## IX.    CONCLUSION

This settlement cannot be approved because it violates Rule 23(h). The class notice is also so vague as to be inadequate notice which, independent of the Rule 23(h) problem, makes approval of the Settlement Agreement improper. The total recovery for the class also strongly suggests that Class Counsel pursued the litigation and the Settlement Agreement more with an eye to his own fee than the actual interests of absent class members. Finally, the class representative incentive payment is unreasonably large when compared to the probable value which the class members will receive. As a result, the settlement, as proposed, cannot be approved and Objector Miorelli respectfully requests this Court deny final approval.

Dated: January 25, 2016

*/s/ Sam A. Miorelli*
Sam A. Miorelli, E.I., Esq.
Florida Bar # 99886 (appearing *pro se*)
sam.miorelli@gmail.com
Law Office of Sam Miorelli, P.A.
764 Ellwood Avenue
Orlando, FL 32804
352-458-4092

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 25, 2016, I electronically filed the foregoing and attached Exhibit(s) with the document with the Clerk of the Court using the CM/ECF filing system which effectuated service on all counsel of record, who are registered users of CM/ECF for electronic service, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

In addition, I have, in compliance with the Class Notice, caused the following parties to receive a copy of the foregoing and attached Exhibit(s) via U.S. Certified Mail:

Steven F. Barley, Esq.                          Michael S. Hilicki, Esq.
Hogan Lovells US LLP                            Keogh Law, Ltd.
100 International Drive, Suite 2000             55 West Monroe St., Suite 3390
Baltimore, MD 21202                             Chicago, IL 60603


                                                /s/ Sam A. Miorelli
                                                Sam A. Miorelli, E.I., Esq.

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Target Corporation Customer Data Security Breach Litigation<br><br>This Document Relates to:<br><br>All Consumer Cases | MDL No. 14-2522 (PAM/JJK) |

## DECLARATION OF VINCENT J. ESADES IN SUPPORT OF CONSUMER PLAINTIFFS' MOTION FOR APPEAL BOND

I, Vincent J. Esades, declare:

1.     I am an attorney licensed to practice before the courts of Minnesota and North Dakota. I have the privilege of serving as the Court-appointed Lead Counsel on behalf of Plaintiffs in the Consumer Cases in this litigation. I am a partner in the firm Heins Mills & Olson, P.L.C. I submit this Declaration in support of Consumer Plaintiffs' Motion for Appeal Bond. I have knowledge of the facts presented in this Declaration.

2.     On December 9, 2015, Objector Jim Sciaroni filed a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit from this Court's Memorandum and Order filed November 17, 2015, ECF No. 645. On December 15, 2015, Objector Leif A. Olson filed a Notice of Appeal to the Eighth Circuit from ECF No. 645. Objector Lindsay Gibson filed a Notice of Appeal from ECF No. 645 on December 16, 2015. Objector Sam A. Miorelli appealed the Court's Memorandum and Order on December 17, 2015.

109685

3.      Plaintiffs' estimated costs on appeal for copying and binding Plaintiffs/Appellees' brief and appendix, and for copies of the court reporter's transcripts of the preliminary approval hearing conducted March 19, 2015 and the final fairness hearing conducted on November 10, 2015, will total at least $2,284 for these four appeals.

4.      The administrative costs that will be reasonably incurred by the Claims Administrator as a result of the appeals are set forth in the Declaration of Amy Lake Regarding Settlement Administration Costs During the Appeal Process.

5.      Attached as Exhibit A is a true and correct copy of my email dated December 17, 2015, to Objector Lindsay Gibson, together with a copy of Lindsay Gibson's December 17, 2015 reply email.

6.      Attached as Exhibit B is a true and correct copy of the email I received from Sam A. Miorelli on December 7, 2015, my reply email to Mr. Miorelli on December 8 and his email to me on December 8, 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of December, 2015, in Minneapolis, Minnesota

s/ *Vincent J. Esades*
Vincent J. Esades

# EXHIBIT A

**Subject:** Re: Target Consumer Privacy Breach Settlement - Appeal

**Date:** Thursday, December 17, 2015 at 11:18:26 AM Central Standard Time

**From:** Lindsay Gibson <gibsonlindsay14@gmail.com>

**To:** Vincent J. Esades <vesades@heinsmills.com>

Hi,

I have not employed any attorney. If you wish to discuss anything about the case please contact my father, Dennis Gibson, who is an attorney. His email address is gibson@lawgibson.com and his phone number is 214-292-6627.

Lindsay Gibson

On Dec 17, 2015, at 9:41 AM, Vincent J. Esades <vesades@heinsmills.com> wrote:

> Lindsey: We are in receipt of your notice of appeal. Could you provide with me the contact
> information for your lawyer with whom you have been working so I can deal with them directly.
> Thanks.
>
> **Vincent J. Esades**
> Heins Mills & Olson, P.L.C.
> 310 Clifton Avenue
> Minneapolis, MN 55403
>
> <B1F10563-85F9-4F6C-8D61-28E49B5D5333[32].png>
> www.heinsmills.com
> Phn: (612) 338-4605
> Fax: (612) 338-4692
>
> ***Privilege and Confidentiality Notice***
>
> The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of
> the named recipient only. You are hereby notified that any disclosure, copying or distribution of this communication, or the taking of
> any action based on it, is strictly prohibited. If you have received this communication in error, please immediately notify the sender
> by replying to this electronic e-mail or call us at (612) 338-4605. Thank you.

# EXHIBIT B

**Subject:** Re: Sealed Objection

**Date:** Tuesday, December 8, 2015 at 1:36:20 PM Central Standard Time

**From:** Sam Miorelli <sam.miorelli@gmail.com>

**To:** Vincent J. Esades <vesades@heinsmills.com>

Mr. Esades,

Thank you for your excellent description of the sealed filing process in the District of Minnesota and your prompt reply.

You correctly inferred that I intend to appeal the order of the District Court in this case. Nevertheless, unlike CCAF, I am not pursuing a political vendetta. Rather, I sincerely disagree with Target's self-serving certification, particularly in light of public reports suggesting their systems were vulnerable to attack MONTHS after the magic December dates. On top of that, I believe the District Court got the legal analysis with regard to my other objections wrong too.

As I said weeks prior to the fairness hearing, I remain open to settling my objection, however today my terms would be monetary instead of the various low and no-cost changes which you would not even discuss with me in early November.

I'm sure you are aware that my objections to the notice are ones that only I have preserved for appeal. Should I succeed in convincing the appellate court that the notice was defective, Target would face millions in costs to re-notice the class. That's just one of many legitimate bases for the appellate court to find error in the settlement, but that is one which I alone am positioned to litigate.

If class counsel and/or Target would rather pay me than risk I win, I think a good negotiating starting place would be a fraction of the almost $9.3 million in combined costs Target faces and the millions in attorney fee reductions I also proposed. As I said in my objection to your fee, I think 25% is the appropriate fraction. But, I'm a reasonable man open to reasonable counteroffers or discussions.

I expect you may disagree with most of this email. Perhaps you and Target would rather defend my appeal. I started my career as a criminal federal and state appellate litigator: I'm used to an uphill battle. CCAF and I don't agree on everything, but for this appeal there would be much room for collaboration. I'm confident I would be successful and expect a fruitful working relationship with CCAF's excellent team.

Either way, it was very nice to meet you and Mr. Heins in St. Paul. I look forward to any future discussions.

Sincerely,

Sam Miorelli
352-458-4092

Dear Mr. Miorelli:

As you know, the court ordered consumer plaintiffs to file all the objections under seal (even yours which you had been previously sent to the court). In Minnesota federal district court, documents that are filed under seal are still filed in paper copy at the clerk's office. Documents to be filed under seal cannot be filed via ECF in Minnesota. A document to be sealed must be placed in an envelope and sealed by the filer. The placeholder, and ECF notice of filing the placeholder, must be attached to the envelope. The document is then filed at the clerk's office. All we have access to on Pacer is the placeholder. Attached is the filed placeholder for your objection. It shows the placeholder is filed at ECF No. 643-3 and that the objection was filed under seal pursuant to court order. Your objection was filed with the court exactly as it was received in this office.

Based on your email, it appears you intend to appeal the court's ruling that you are not a Class Member (and despite the uncontroverted record that you were not a victim of the Target Data Breach - confirmed by Target's declaration filed with the court). Even setting aside this legal standing problem, what is it you intend to gain by pressing an appeal given you have nothing at stake? You must understand that an appeal means we cannot pay people (over 200,000 people) who actually suffered harm and many who are in desperate need of compensation. I hope you will think of these people who stand to benefit from this settlement and set aside any purely political mileage you hope to gain at their expense.

**Vincent J. Esades**
Heins Mills & Olson, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403

# HEINS MILLS & OLSON, P.L.C.

www.heinsmills.com
Phn: (612) 338-4605
Fax: (612) 338-4692

***Privilege and Confidentiality Notice***

The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of the named recipient only. You are hereby notified that any disclosure, copying or distribution of this communication, or the taking of any action based on it, is strictly prohibited. If you have received this communication in error, please immediately notify the sender by replying to this electronic e-mail or call us at (612) 338-4605. Thank you.

**From:** Sam Miorelli <sam.miorelli@gmail.com>
**Date:** Monday, December 7, 2015 at 8:57 PM
**To:** Vincent Esades <vesades@heinsmills.com>
**Subject:** Sealed Objection

Mr. Esades,

I notice you have filed the objections on the docket but they are sealed. Since I am a pro se litigant in the Target matter, I do not have access to the filed version of my objection on PACER.

In order to avoid unnecessary motion practice regarding unsealing the objections, would you be so kind as to provide me a copy of the PACER-marked version of my objection and its supporting materials so I can verify that it was fully filed and also to confirm the pagination PACER used?

Thank you,

Sam Miorelli