1  Steve W. Berman (*pro hac vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  1918 Eighth Avenue, Suite 3300
   Seattle, WA 98101
3  Telephone: (206) 623-7292
   Facsimile:  (206) 623-0594
4  steve@hbsslaw.com

5  Bruce L. Simon (SBN 96241)
   PEARSON SIMON & WARSHAW, LLP
6  44 Montgomery Street, Suite 2450
   San Francisco, CA 94104
7  Telephone: (415) 433-9000
   Facsimile:  (415) 433-9008
8  bsimon@pswlaw.com

9  *Plaintiffs' Interim Co-Lead Counsel*

RODGER R. COLE (CSB No. 178865)
rcole@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:  650.988.8500
Facsimile:  650.938.5200

TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
ANNASARA G. PURCELL
(CSB No. 295512)
apurcell@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile:  415.281.1350

*Attorneys for Defendant
Carrier iQ, Inc.*

10

11

12

13

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                       SAN FRANCISCO DIVISION

17

18  *In re Carrier IQ, Inc. Consumer Privacy
    Litigation*

19

20  [This Document Relates to All Cases]

21

22

Case No. C-12-md-2330-EMC

**DECLARATION OF ALAN VASQUEZ
RESPONDING TO QUESTIONS
REGARDING DISSEMINATION OF
NOTICE**

23

24

25

26

27

1.    I am a Vice President of Legal Notification Services at Gilardi & Co. LLC ("Gilardi"), a KCC Class Action Services ("KCC") company.  In my role, I oversee Gilardi's in-house advertising division specializing in the design and implementation of legal notice plans to reach unknown class members in class action litigation.  Throughout Gilardi's 30+ years of industry experience in notice planning, our firm has employed industry-recognized tools of media measurement to quantify the adequacy of paid media notice programs for the courts.  The research, data and other information Gilardi uses for notice planning purposes is the type reasonably relied upon in the fields of advertising, media, and communications.

2.    I submit this declaration at the request of counsel in the above-referenced litigation in order to respond to questions raised by the Court at the July 28, 2016 fairness hearing regarding the notice plan and notice services in this matter.  More specifically, this declaration will address the definition of "reach" as used in media planning, how reach was calculated for the notice plan implemented in this matter, and whether additional notice would affect the claims filing rate.  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would testify competently thereto.

3.    In my professional opinion, the Court-approved notice program was and is in compliance with Rule 23(b)(3) of the Federal Rules of Civil Procedure and provided reasonable and adequate notice to members of the Settlement Class.  Further, in my professional opinion, given the implementation of a notice program that already reached 80+% of class members, additional notice likely would provide only minimal benefits while at the same time increasing the delay that qualified claimants will experience in receiving settlement benefits.

**REACH DEFINITION**

4.    As defined in advertising, reach[1] is the number of unique individuals who have an opportunity to see a given advertising message during a specific period of time.  This definition is

---

[1] Reach is the number or percent of different homes or persons exposed at least once to an advertising schedule over a specific period of time. *E.g.*, https://www.srds.com/frontMatter/sup_serv/calculator/grp_trp/grps_trps.html.

provided by Standard Rate & Data Services, a division of Kantar Media,[2] which is the parent company to some of the world's leading research, data, and insight companies.  Although wording may vary slightly from source to source, in my professional experience, this is the generally accepted definition of the term used by all media planners.  Reach is not a measurement of exactly how many individuals actually see or read the message, nor a measurement of those who acted on the advertising by clicking through to the website.  It is a measurement of the unique individuals exposed to the message.  The data used to calculate reach is based on consumer responses to a national consumer survey from an adequately sized sample. The responses are then extrapolated or projected to the U.S. adult population.

**PRINT PUBLICATION REACH**

5.     The lawsuit involved allegations that mobile software developer Carrier IQ designed and developed the smartphone software that collected and transferred sensitive data off consumer's phones.  Manufacturers included in the Settlement were Samsung, HTC, Huwei, Motorola, LG, and Pantech.

6.     The reach and frequency estimates for the print publication portion of the notice program were calculated using the most current Experian Simmons National Consumer Study[3]. Gilardi used Simmons survey data to develop a Target Audience of U.S. Adults who own smartphones manufactured by any of the companies listed above.  Once the Target Audience was developed, Gilardi cross-referenced it against *USA Today* and *People* using the Simmons Oneview reach & frequency planning tool.  Exhibit 1 outlines the steps taken to calculate the

---

[2] http://www.kantarmedia.com/us/about/about-kantar

[3] The Simmons National Consumer Study was the first syndicated national consumer survey launched in the United States. Fortune 500 companies, major advertising agencies and media companies partner with Experian® Simmons to access a deep reservoir of more than 60,000 data variables to analyze, including usage behavior for all major media, more than 500 product categories and more than 8,000 brands.  In addition, the study provides in-depth demographics and consumer behavior from more than 600 psychographics, lifestyles, attitudes and opinions. The study uses a patented multi-frame sample design, continuous measurement and quarterly delivery of results from more than 25,000 adults surveyed, with results projected to the U.S. adult population.   The Simmons National Consumer Study is a Media Rating Council– accredited survey.

reach and frequency using the Simmons tool.  The estimated reach calculated by Gilardi using the Simmons Reach and Frequency planning tool for two insertions in *USA Today* was approximately 7.58%.   The estimated reach calculated by Gilardi using the Simmons Reach and Frequency planning tool for one insertion in People magazine was approximately 8.64%.  The combined, unduplicated reach of the three insertions was calculated using the Simmons Reach and Frequency planning tool and was determined to be approximately 15.3%.  The Simmons Reach and Frequency planning tool is able to calculate unduplicated reach because the underlying data used for the calculation is from a national consumer survey.  The consumer survey questions include what print media respondents consume and whether the respondent reads both *USA Today* and *People,* or just one of the publications.  The answers from the respondents are then projected to the national population in a similar way that a political poll might project what the national population believes from the answers provided by a large sample of citizens.

**ONLINE ADVERTISING REACH**

7.      Reach for the online portion of the notice program was calculated by placing a frequency cap on impressions served.  An impression is one instance of the advertisement showing up on a webpage, providing the viewer with an opportunity to click and be directed immediately to the notice.  Frequency capping is a tactic used in online advertising to limit exposure of the banner advertisement by IP address.  The frequency cap limits the number of times a banner advertisement is served to each IP address, helping to ensure that a high percentage of unique individuals are exposed to the notice.  Though there are limitations to capping such as users who may clear their cookies regularly, at this time it is one of the best methodologies for determination of unique individuals exposed.

8.      Gilardi worked with Xaxis to serve banner impressions for the notice program because of its reputation for quality website inventory and above-the-line[4] placements of the

---

[4] Above-the-line placements refer to banners displayed without the viewer having to scroll down on the screen when they land at a website.

DECLARATION OF ALAN VASQUEZ
RESPONDING TO QUESTIONS
REGARDING DISSEMINATION OF NOTICE

3

Case No. C-12-md-2330-EMC

banner advertisements.  Xaxis has partnerships with some of the highest traffic websites on the Internet, and above-the-line placement ensures that when a user lands on a webpage, he or she does not have to scroll in order to be exposed to the banner.

9.     As stated above, reach is a statistical estimation of the number of unique individuals exposed to an advertising message.  Measurement of the number of unique individuals exposed to the banner advertising portion of the notice program was done by limiting the banner exposure by IP address, that is, by frequency capping, as described in paragraph 7 above.   An IP address is a unique string of numbers that identifies each computer using the Internet Protocol to communicate over a network.  Given that courts have held that notice plans estimated to reach a minimum of 70%[5] of the settlement class are adequate and thus comply with Fed. R. Civ. P. 23, Gilardi worked with Xaxis to serve banner ad impressions to a minimum of 70% of U.S. mobile phone owners, an audience inclusive of the Target Audience used to calculate reach for the print publication portion of the plan.  The impressions were served with a frequency cap of 2x per unique IP address.

10.     By using a minimum goal of 70% reach, this approach ensured that regardless of the combined reach calculation for print and online media, the online advertising portion of the notice program could stand on its own as adequate notice to the settlement class.  The number of impressions served in the Xaxis banner portion of the campaign was in in excess of 270 million, and all impressions were targeted to individuals known to own mobile phones.  By frequency

---

[5] *See Wilson v. Airborne, Inc.*, 2008 WL 3854963, at *4 (C.D. Cal. Aug. 13, 2008) ("The measurements used to estimate the reach of the print and Internet advertisements suggest that 80 percent of adults learned of the settlement. . . .  The Court finds these notice procedures provided 'the best notice that is practicable under the circumstances.'  Fed.R.Civ.P. 23(c)(2)(B)."); *see also Morales v. Conopco, Inc.*, 2016 WL 3688407, at *6 (E.D. Cal. July 12, 2016) (granting preliminary approval to class settlement and noting: "Because defendant does not have records showing who purchased its products, KCC used class demographics to develop a notice plan that it estimates will reach over 70% of the class members. . . .  KCC will place month-long banner advertisements on websites that class members are likely to visit, an advertisement in *People* magazine for one week's issue, and a four-week advertisement in the *Sacramento Bee*. . . .  Further, KCC will provide ongoing toll-free telephone support and a dedicated class action website where class members can obtain additional information and fill out online claim forms.").

DECLARATION OF ALAN VASQUEZ
RESPONDING TO QUESTIONS
REGARDING DISSEMINATION OF NOTICE

4

Case No. C-12-md-2330-EMC

capping at 2x per unique IP address, it ensured a minimum of 135 million unique mobile phone owners were reached by the banner ad portion of the notice program.  This matter involved a product that is ubiquitous to almost every U.S. adult, and cell phone users are known to switch carriers and phones fairly often.  Accordingly, Gilardi believes serving the banners to an audience of U.S. adult cell phone owners was the best approach to ensure the broadest reach such that we would be sure to reach members of the settlement class.

11.    Since no media planning tool exists with the ability to accurately or reliably determine audience duplication[6] between online ads and print publication, to estimate overall reach of the notice program, Gilardi used Random Media Combination ("RMC"), a statistical formula which has been accepted as an adequate approach in the absence of industry standard tools. RMC assumes the combined reach of one media schedule (*e.g.* print publication) and another media schedule (*e.g.* online advertising) is calculated on the probability that neither reached the target.  For example, if one media vehicle in a schedule has 30% reach of the target, then that vehicle has a .30 probability of reaching the target and a .70 probability of not reaching the target.  If the other media vehicle in the schedule has 60% reach, then that vehicle has a .60 probability of reaching the target and .40 probability of not reaching the target.  To calculate the combined reach, notice professionals multiply the probability that they do not reach the audience, .70 x .40, which results in .28.  Subtract .28 from 1 to get the approximate reach of the two combined mediums at 72% (1 - .28 = .72).  Exhibit 2 provides more detail about RMC, and the table below illustrates the calculation for this notice program.

| | | | |
|---|---|---|---|
| USA Today | 1- | 0.0758= | 0.9242 |
| People | 1- | 0.0864= | 0.9136 |
| Banners | 1- | 0.7790= | 0.2210 |
| **Overall Reach:** | **1** | **0.1866** | **81.3%** |

**.9242 x .9136 x .2210 = .1866**

12.    The estimated combined reach of the print publication and the banner

---

[6] Audience duplication is occurrence of those who have seen and/or heard an advertisement via more than one advertising medium (*e.g.*,., saw notice in both print and online).

advertisements in this campaign using RMC is approximately 81%.  This does not take into account additional notice efforts undertaken by Gilardi which cannot be combined with other media to determine overall reach.  Although the print publication and Xaxis banner advertising were the only media vehicles used for the estimated reach calculation in the table above, Gilardi provided additional notice through paid social media advertising, search-based advertising on Google, display network advertising on Google, staff outreach through social media, and a party-neutral press release.  Though these vehicles are not included in the overall reach calculation, Gilardi believes they were effective at driving traffic to the website and should be an important part of any notice program being implemented at this time in the media landscape.  The additional paid efforts generated over 7.2 million impressions and nearly 20,000 additional visits to the case website. Staff outreach on social media included tweeting to influentials in the field of electronic privacy on Twitter.com and posting the case website URL in the comment sections of YouTube videos related to electronic privacy concerns.  Last, the press release appeared on 195 websites[7] and generated 106 views from media outlets.

13.     With significant print circulation decline and yearly increases of online ad spending by major national advertisers, it is critical that notice be provided through the same channels that consumers use to purchase and discuss the products involved in litigation.  In this matter, that meant providing notice primarily through electronic media since the class by definition is made up of individuals with devices that have the ability to connect to the Internet. Gilardi holds a firm belief that notice programs should be analyzed based on how each media vehicle works together to provide adequate notice to the class.  The instant plan included a mix of electronic media that provided multiple ways for prospective class members to be directed to the

---

[7] *E.g.*, http://finance.yahoo.com/news/hagens-berman-sobol-shapiro-llp-222700268.html; http://www.marketwatch.com/story/hagens-berman-sobol-shapiro-llp-and-pearson-simon-warshaw-llp-announce-proposed-settlement-of-carrier-iq-inc-consumer-privacy-litigation-2016-04-05; and http://www.bizjournals.com/washington/prnewswire/press_releases/Georgia/2016/04/05/SF61681?ana=prnews.

website where they could view their rights or file claims.

**POSSIBLE ADDITIONAL NOTICE**

14.     Gilardi's notice efforts drove in excess of 250,000 unique individuals to the case website, and Gilardi has received approximately 50,000 timely unverified claims.   Given the nature of the product at issue in the litigation, we believe the notice efforts were effective at creating awareness of the case and driving traffic to the website.   Again, the reach already has been approximately 81% of the settlement class.   While Gilardi cannot definitively state what explains the claims rate in any given case, the traffic generated by the notice program we implemented is consistent with other cases we have administered.

15.     Gilardi recently reviewed a number of consumer class action settlements where the notice provided to class members relied entirely on publication rather than direct notice.   These settlements included products such as toothpaste, children's clothing, heating pads, gift cards, an over-the-counter medication, a snack food, a weight loss supplement and sunglasses.   The claims rate in these cases ranged between .002% and 9.378, with a median rate of .023%.   Exhibit 3 provides a list of these cases.   Here, to reiterate, the claims rate for all eligible claims was .5%.

16.     Based on the foregoing and our general experience of over 30 years in class action claims administration, Gilardi does not believe that additional notice, atop the already comprehensive program we have implemented, would impact the filing rate significantly.   In addition, it would delay payment for those who filed valid timely and otherwise eligible claims during the Court-ordered claims period.

17.     Given the nationwide scope of the initial notice and volume of impressions delivered to owners of mobile phones, it is likely that any additional notice provided would be reaching the same individuals and create diminishing returns on the paid advertising efforts. Also, since the class is made up of smartphone users, it is unlikely that using alternative media vehicles such as television, radio, or outdoor would be effective since research suggests the demographics of the class made them most likely to be reached through online advertising.

**CLAIMANT QUESTIONS**

18.     In my role, I work closely with the Gilardi case administration team and have been made aware of questions regarding potential claims filed by two individuals, Sean Riker and Scott Culp.  The case manager has informed me that the claim submitted by Sean Riker did not include an eligible phone and no claim was received from Scott Culp.

**SUMMARY**

19.     The objective of the notice plan was to provide the best notice practicable, consistent with the requirements set forth in Rule 23(c)(2), to reach a large percentage of the settlement class while meeting or exceeding the requirements of due process and other applicable law.

20.     Gilardi believes it is critical to examine each notice program individually and to provide notice through the same channels by which the defendant marketed the products to the consumer.  Courts have held that notice plans estimated to reach a minimum of 70% of the settlement class are adequate and sufficient and thus comply with Rule. 23.  Gilardi's calculations estimate reach in this case to be approximately 81% for the implemented plan.  Beyond the reach standard, Gilardi staff made genuine effort to supplement the paid notice efforts and direct likely class members to the case website, and these efforts, in my professional opinion, and as set forth herein, were successful.

21.     In my opinion, the notice program as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 4th day of August, 2016 at San Rafael, California.


_____

Alan Vasquez

DECLARATION OF ALAN VASQUEZ
RESPONDING TO QUESTIONS                          8                    Case No. C-12-md-2330-EMC
REGARDING DISSEMINATION OF NOTICE

# EXHIBIT – 1

**STEPS FOR CALCULATING REACH IN SIMMONS ONEVIEW**

1.  **Defining the Audience**



The image above defines an audience of "Smartphone Users."  Simmons estimates 175 million nationwide.

2. **Selecting Publications for Cross-tabulation**



**Simmons tracks National Newspapers and most popular magazines nationwide.**

3.  **Send to the Reach & Frequency Planner**



Once the Target is defined and publications are selected, you move to the planner.

4.  **Calculate Reach based on number of Insertions**



# EXHIBIT – 2

**NOTICE CAMPAIGN MEDIA VEHICLE REACH**

| Media | Unit | Insertions | Reach |
|---|---|---|---|
| People | 1/3pg | 1 | 8.64% |
| USA Today | 1/4pg | 2 | 7.58% |
| Xaxis | Varying sizes | 60 days | 77% |
| **Minimum Estimated Reach:** | | | **80%** |

The combined reach of one media schedule and another media schedule (for example print and online) is calculated on the probability that neither reached the target. For example, if one media vehicle in a schedule has 30% reach of the target, then that vehicle has a .30 probability of reaching the target and .70 probability of not reaching the target. If the other media vehicle in the schedule has 60% reach, then that vehicle has a .60 probability of reaching the target and .40 probability of not reaching the target. To calculate the combined reach, multiply the probability that they do not reach the audience, .70 x .40 which results in .28. Subtract .28 from 1 to get the approximate reach of the two combined mediums at 72% (1 - .28 = .72). The table below illustrates the above formula applied to the suggested media plan:

| | | | |
|---:|---|---|---|
| USA Today | 1- | 0.0758= | 0.9242 |
| People | 1- | 0.0864= | 0.9136 |
| Banners | 1- | 0.7790= | 0.2210 |
| **Overall Reach:** | **1** | **0.1866** | **81.3%** |

**.9242 x .9136 x .2210 = .1866**

# EXHIBIT – 3



| Case Name | Case No. | Court | Product Involved | Estimated Class Size | # of Claims Filed | Claims Filing % |
|---|---|---|---|---|---|---|
| Leowardy v Oakley, Inc. | SACV 07-53 CJC (ANx) | C.D. Cal. | Sunglasses | 198,200 | 4 | **0.002%** |
| LaRosa v. Nutramerica Corp. ("TrimSpa") | BC 309427 | Sup. Ct. Cal., L.A. Cnty | Weight Loss Formula | 8,127,000 | 1,263 | **0.016%** |
| In re TSIC, Inc. f/k/a Sharper Image Corporation | No. 08-10322 | U.S. Bankruptcy Court, District of Delaware | Giftcards to Retail Store | 7,500,000 | 1,755 | **0.023%** |
| Coalition for Elders' Independence, Inc., et al. v. Biovail Corporation, et al. (consumers only) | | | Antidepresant Drug | 2,000,000 | 593 | **0.030%** |
| Zeisel v. Diamond Foods, Inc. | No. 3:10-cv-1192 | N.D. Cal. | Snack Food/Walnuts | 4,563,000 | 30,677 | **0.672%** |
| Zeller v. E. & J. Gallo Winery and Constellation Brands, Inc., et al. (French Pinot Noir Cases) | No. BC432711 | Sup. Ct. Cal., L.A. Cnty | Wine | Unknown | 3,470 | **N/A** |
| In Re PRK/LASIK CONSUMER LITIGATION | CV 772894 | Sup. Ct. Cal., Santa Clara Cnty | Eye Surgery | Unknown | 9,543 | **N/A** |
| Montanez v. Gerber Childrenswear, LLC | 2:09-cv-07420 | C.D. Cal. | Baby Clothing | 2,000,000 | 2,704 | **0.135%** |
| Rossi v The Procter & Gamble Company | 11cv-7238 | D. N.J. | Toothpaste | 5,220,000 | 15,854 | **0.304%** |
| Beck-Ellman v. Kaz Inc. | No. 10-cv-2134 | S.D. Cal. | Heating Pads | 1,900,000 | 4,109 | **0.216%** |
| Delarosa v. Boiron USA, Inc. | No.10-cv-1569 | C.D. Cal. | Over-the-Counter Medication | 50,000 | 4,689 | **9.378%** |