UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE

CARRIER IQ, INC., CONSUMER
PRIVACY LITIGATION.

Case No. 12-md-02330-EMC

**ORDER GRANTING PLAINTIFFS'
MOTION FOR FINAL APPROVAL AND
GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION FOR
AWARD OF ATTORNEYS' FEES, ETC.**

Docket Nos. 424, 455

Currently pending before the Court are (1) Plaintiffs' motion for final approval and (2) Plaintiffs' motion for an award of attorneys' fees, costs, expenses, and service awards.  For the reasons discussed below, the Court **GRANTS** the first motion and **GRANTS** in part and **DENIES** in part the second motion.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Pre-Settlement Litigation and Settlement

The cases making up this MDL were initiated in 2011 and 2012.  In April 2012, the case was made a MDL action and assigned to this Court.  *See* Docket No. 1 (transfer order).  In June 2012, the Court appointed lead counsel.  *See* Docket No. 100 (order).  In August 2012, a first consolidated amended complaint ("FCAC") was filed.  *See* Docket No. 107 (FCAC).  In March 2014, the Court denied Defendants' motion to compel arbitration.  *See* Docket No. 251 (order).  Defendants appealed that motion, *see* Docket No. 261 (notice of appeal); that appeal is technically still pending.  In June 2014, a second consolidated amended complaint ("SCAC") was filed.  *See* Docket No. 291 (SCAC).

In November 2014, Plaintiffs reached a settlement with one of the defendants, *i.e.*, Carrier iQ ("CIQ").  *See* Docket No. 455 (Mot. at 5).  Subsequently, in January 2015, the Court granted in

part and denied in part the remaining defendants' motion to dismiss the SCAC.  *See* Docket No.
339 (order); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051 (N.D. Cal.
2015).  As to the dismissed claims, only a few were dismissed with prejudice.  Plaintiffs were
given leave to file a third consolidated amended complaint ("TCAC").

Plaintiffs did not immediately file a TCAC because of settlement discussions with the
remaining defendants.  In September 2015, Plaintiffs and the remaining defendants reached a
settlement.  *See* Docket No. 455 (Mot. at 5).  Plaintiffs subsequently filed a TCAC, in part to
conform the complaint with the settlement.  *See* Docket No. 402 (TCAC).  As indicated in the
preliminary approval motion, because of the settlement, Plaintiffs decided to replead (out of the
dismissed claims) only the Federal Wiretap Act claim.

The claims asserted in the TCAC are as follows:

- Violation of the Federal Wiretap Act.
- Violation of state privacy acts.
- Violation of state consumer protection acts.
- Violation of the Magnuson-Moss Warranty Act.
- Violation of the implied warranty of merchantability.

B.   Settlement Terms[1]

As reflected in the settlement submitted for the Court's consideration, the parties are
asking for certification of (1) a Rule 23(b)(3) settlement class and (2) a Rule 23(b)(2) settlement
class.  *See* Sett. Agmt. ¶ 13 ("The Parties . . . agree that this Action shall be certified and proceed
as a class action solely for purposes of settlement under Fed. R. Civ. P. 23(e), in accordance with
the requirements of Fed. R. Civ. P. 23(b)(3) as to all Defendants and, as to Carrier iQ only, also
under Fed. R. Civ. P. 23(b)(2).").  For both the Rule 23(b)(3) and the Rule 23(b)(2) classes, the
class is defined as follows: "[A]ll persons in the United States who, during the Class Period,
purchased, owned, or were an Authorized User of, any Covered Mobile Device."  Sett. Agmt. ¶
2(oo).

---

[1] The Settlement Agreement can be found at Docket No. 404 (Exhibit A to the Lopez declaration).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

A Rule 23(b)(2) class has been put into issue because of the injunctive relief provided by CIQ only (and not the device manufacturers).  Injunctive relief is specified in the Settlement Agreement at ¶¶ 18-22.  Injunctive relief includes CIQ changing its software.  *See, e.g.*, Sett. Agmt. ¶ 19 ("Carrier iQ developed the technical ability to offer all wireless carrier customers in the United States the capability to limit iQ Agent notification messages – messages that are sent to provide instructions to the Carrier iQ software embedded on handsets – to a specific destination port on cellular devices.  When this capability is embedded, the iQ Agent would receive notification messages only from the destination port designated by the wireless carrier.  This port would be separate from the port used when a consumer sends text messages via SMS.").

The Rule 23(b)(3) class is with respect to all Defendants – *i.e.*, both CIQ and the device manufacturers.  For purposes of the Rule 23(b)(3) class, there is a gross settlement fund of $9 million.  *See* Sett. Agmt. ¶ 2(x).  That fund has been established for the benefit of approximately 30 million unique individuals.  *See* Docket No. 458 (Jue Decl. ¶ 6); *see also* Docket No. 455 (Mot. at 6) (noting that there are approximately 79 million covered devices which translates to about 30 million unique individuals).

Various amounts will be subtracted from the gross settlement fund to get a net settlement fund.  See Sett. Agmt. § 2(z).  These amounts are as follows:

- Incentive awards of $85,000 – more specifically, $5,000 each for 17 named Plaintiffs.  *See* Sett. Agmt. ¶ 36.

- Attorney's fees of $2.25 million (*i.e.*, 25% of the gross settlement fund).

- Litigation costs and expenses totaling $108,933.72.  *See* Docket No. 424 (Mot. at 20).

- Settlement administration fees and costs estimated at $655,500.  *See* Docket No. 462 (Jue Supp. Decl. ¶ 8).  This cost includes the cost of notice which, at the time of preliminary approval at least, was expected to be $532,000.  *See* Docket No. 407 (Vasquez Supp. Decl. ¶ 31).

Based on the above, the net settlement fund will be approximately $5.9 million, with deductions still to be made for taxes.

Distribution of the net settlement fund is, in principle, to be made to claiming settlement

class members.  As noted above, there are approximately 30 million people who meet the

settlement class definition.  This would suggest that, if all 30 million people were to make claims,

then each person would get approximately 20 cents (*i.e.*, $5.9 million ÷ 30 million people).

However, that is not what actually happens under the settlement.  Under the settlement,

> [a]s soon as reasonably practicable following establishment of the Net Settlement Fund, and in accordance with the terms of this Settlement Agreement, the Settlement Administrator shall distribute the proceeds of the Net Settlement Fund to Eligible Claimants on a *pro rata* basis; *provided, however*, that if the pro-rated amount to be distributed to each Eligible Claimant would be economically unfeasible to distribute due to the high volume of eligible claims and the cost to process and mail the corresponding volume of checks to Eligible Claimants, then instead, subject to approval by the Court after notice by Class Counsel, the entire Net Settlement Fund shall be distributed in three equal portions to the following three *cy pres* recipients: the Electronic Frontier Foundation, the Center for Democracy and Technology, and CyLab Usable Privacy and Security Laboratory at Carnegie Mellon University.  The determination that it would be economically unfeasible to distribute settlement funds to Eligible Claimants shall be made by Class Counsel and Defendants' counsel in consultation with the Settlement Administrator, if the Settlement Administrator determines and advises them at the conclusion of the Claims Period that the pro-rated amount to be distributed to each Eligible Claimant would be less than approximately Four U.S. Dollars ($4.00) due to the high volume of eligible claims and the cost to process and mail the corresponding volume of checks to Eligible Claimants.  In the event of any such *cy pres* distribution, Eligible Claimants shall not receive any proceeds from the Net Settlement Fund.

Sett. Agmt. ¶ 28.  In no event shall any of the net settlement fund shall revert back to Defendants.

*See* Sett. Agmt. ¶¶ 25, 32.

In exchange for settling, the settlement class shall agree to the following release:

> any and all past, present or future claims . . . that have been, may be, or could be asserted in the Action . . . . that are based upon, arise out of, or are related to or connected with, directly or indirectly, in whole or in part, the facts, activities, or circumstances alleged in the Third Consolidated Amended Complaint, any claims asserted against Defendants relating to this Action, or any other purported occurrence relating to or arising from the presence or operation of Carrier iQ software on any Covered Mobile Device (the "Released Claims") during the Class Period.

Sett. Agmt. ¶ 53.

C.   Preliminary Approval

In January 2016, Plaintiffs moved for preliminary approval.  *See* Docket No. 403 (motion).

4

**United States District Court**
For the Northern District of California

1   The Court asked for supplemental briefing on the motion, *see* Docket No. 408 (order), and

2   subsequently granted preliminary approval.  *See* Docket No. 421 (order).  As indicated in its order

3   granting preliminary approval, the Court approved of the notice means proposed by Plaintiffs

4   which included publication notice and notice through electronic media.

5          In response to an inquiry from the Court at the final approval hearing, Plaintiffs provided a

6   declaration from the settlement administrator regarding the "reach" of the publication and

7   electronic media notice.  *See generally* Docket No. 477 (Vasquez Decl.).  That declaration

8   explains that the publication notice (*USA Today* and *People*) and banner advertisement notice

9   likely reached 81.3% of the class.  *See* Docket No. 477 (Vasquez Decl. ¶ 11).  *See, e.g.*, Docket

10  No. 477 (Vasquez Decl. ¶ 10) (stating that the banner advertisement notice generated more than

11  270 million impressions which translates to exposure to 135 million unique mobile phone

12  owners).  The declaration also notes that notice was additionally given through "paid social media

13  advertising, search-based advertising on Google, display network advertising on Google, staff

14  outreach through social media, and a party-neutral press release" that ultimately "appeared on 195

15  websites and generated 106 views from media outlets."  Docket No. 477 (Vasquez Decl. ¶ 12).

16  D.     Class Response

17         In response to the notice of the proposed settlement, only 4 persons objected and only 5

18  persons opted out.[2]  *See* Docket No. 462 (Jue Supp. Decl. ¶¶ 9-10).  In addition, 57,266 timely

19  claims and 4,212 untimely claims were submitted.  *See* Docket No. 462 (Jue Supp. Decl. ¶ 4).

20         Of the timely claims, some were invalidated because "patently invalid telephone numbers"

21  were provided (*e.g.*, "numbers with invalid area codes, or series of consecutive numbers (*i.e.*, 12-

22  456-7890), or series of the same numbers (*i.e.*, 555-555-5555)").  Docket No. 462 (Jue Supp.

23  Decl. ¶ 5).  Other timely claims were removed as duplicates (*i.e.*, "claimants submitting multiple

24  claims for the same device").  Docket No. 462 (Jue Supp. Decl. ¶ 5).  After elimination of invalid

25  claims, this left a total of 39,458 valid timely claims.  *See* Docket No. 462 (Jue Supp. Decl. ¶ 5).

26  As for untimely claims, after eliminating invalid claims, there is a total of 3,119 valid untimely

27

28  ---

    [2] At the final approval hearing, the parties agreed that Mr. Hoffman (Docket No. 466) should be
    deemed an opt-out.

1   claims.  *See* Docket No. 462 (Jue Suppl. Decl. ¶ 6).

2       The response rate, counting both timely and untimely claims, is 0.14% (*i.e.*, 42,577 claims

3   ÷ 30 million people).  The settlement administrator states that, "in our experience, the claims rate

4   in this settlement is consistent with many other settlement administrations with similar class

5   characteristics."  Docket No. 462 (Jue Supp. Decl. ¶ 7); *see also* Docket No. 458 (Jue Decl. ¶ 6)

6   (stating that, "[i]n an analysis of settlements administered by KCC where notice relied on media

7   notice exclusively, the claims rate ranged between 0.002% and 9.378%, with a median rate of

8   0.023%").

9       If the Court counts only timely claims, then the average claim is worth $149.28.  If the

10  Court counts both timely and untimely claims, then the average claim is worth $138.35.  *See*

11  Docket No. 462 (Jue Supp. Decl. ¶¶ 5-6).  Either way, the cy pres provision (described above0 is

12  not triggered.[3]

## II.    DISCUSSION

13

14  A.    Motion for Final Approval

15      Pursuant to Federal Rule of Civil Procedure 23(e), this Court is required to ensure that the

16  proposed settlement of this case is fair, adequate, and reasonable.  *See* Fed. R. Civ. P. 23(e).  In

17  making this assessment, the Court considers factors such as:

18              (1) the strength of the plaintiffs' case; (2) the risk, expense,
                complexity, and likely duration of further litigation; (3) the risk of
19              maintaining class action status throughout the trial; (4) the amount
                offered in settlement; (5) the extent of discovery completed and the
20              stage of the proceedings; (6) the experience and views of counsel;
                (7) the presence of a governmental participant; and (8) the reaction
21              of the class members to the proposed settlement.

22  *Churchill Village, L.L.C. v. GE*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Torrisi v. Tucson*

23  *Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (stating that "[t]his list is not exclusive and

24  different factors may predominate in different factual contexts").

25      The Court previously found that the first seven factors weighed in favor of preliminary

26  approval, and nothing has been submitted to the Court to adequately support a contrary

27

28  [3] Because the cy pres provision has not been triggered, objections to the settlement based on the cy pres component are now moot.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    conclusion.  For example, Plaintiffs faced a significant risk given the Court's rulings in its order

2    on the device manufacturers' motion to dismiss.  That risk was compounded by the financial

3    condition of CIQ.  Also, this is not a case that has settled early in the proceedings; rather, this case

4    has been contentiously litigated, with Plaintiffs rigorously defending against a significant motion

5    to compel arbitration and then a significant motion to dismiss.

6          The eighth factor, which the Court may now consider on final approval, also weighs in

7    favor of approval of the settlement.  The number of objections and opt-outs is small, which

8    indicates that the class largely supports the settlement.  While the number of claims is also small,

9    this cannot be said to be the result of inadequate notice.  The Vasquez declaration, filed on August

10   4, 2016, *see generally* Docket No. 477 (Vasquez Decl.), adequately demonstrates that a substantial

11   portion of the settlement class were likely exposed to the multi-faceted notice provided by the

12   administrator.  Additionally, ad campaigns are not likely to be productive.  The suggestion by one

13   objector that notice could also have been given through cell phone billing statements does not

14   demonstrate that the notice given here was inadequate.  That specific means of notice was

15   considered by the Court at preliminary approval but deemed impractical because that would

16   require the cooperation of the cell phone service providers who are not parties to this lawsuit.

17         As for the merits of the objections, those too do not detract from final approval.  For

18   example, Ms. Campbell (Docket No. 423) is not really an objector as she wants the settlement to

19   go through; she simply wants to be compensated on the same scale as the named Plaintiffs but she

20   fails to explain why.  Ms. Singer (Docket No. 453-54, 467) lacks standing to object as she

21   submitted an invalid claim, *see* Docket No. 464-1 (Warshaw Decl. ¶ 5) (noting that Ms. Singer did

22   not provide a genuine cell phone number), but, even if she had standing, her objections lack merit.

23   For example, contrary to her suggestion, class members could not be informed of the precise

24   amounts they would be awarded because the amounts depended on the claims filed.  Moreover,

25   class members were adequately warned that a high volume of claims could result in small-value

26   cash payments.  *See, e.g.*, Docket No. 411-4 (Vasquez Decl., Ex. 1) (short-form notice).  Mr.

27

28

1    Sweeney is a serial objector,[4] and, apparently, he lacks standing as well because the phone number

2    he "provided on his claim form was actually the same number his wife, Pamela Sweeney,

3    previously swore was hers in another case.  When pressed regarding his apparent lack of standing

4    because of this issue, [Mr.] Sweeney did not directly respond."  Docket No. 464-1 (Warshaw Decl.

5    ¶ 8).  As for Mr. Miorelli (Docket Nos. 450 460), putting aside credibility issues,[5] the so-called

6    confidential "side deal" (pursuant to which Defendants could opt out if a certain threshold were

7    reached) was reviewed by the Court prior to preliminary approval, and the Court was not troubled

8    by it.  Indeed, those kind of opt-out deals are not uncommon as they are designed to ensure that an

9    objector cannot try to hijack a settlement in his or her own self-interest.  Also, the sealing of the

10   attorney billing records was not an impediment to Mr. Miorelli's ability to object, especially as

11   Plaintiffs' counsel's public declarations provided detailed information about the fees charged –

12   *e.g.*, categorizing how much time was spent on major tasks in the litigation and providing

13   information about billing rates.

14         Accordingly, the Court hereby grants final approval of the proposed class action

15   settlement.[6]

16

17   [4] *See, e.g.*, *Roberts v. Electrolux Home Prods., Inc.*, No. SACV12-1644-CAS(VBKx), 2014 U.S.
     Dist. LEXIS 130163, at *34 (C.D. Cal. Sep. 11, 2014) (overruling Mr. Sweeney's objections and

18   noting his "long history of representing objectors"); *Larson v. Trader Joe's Co.*, No. 11-cv-05188-
     WHO, 2014 U.S. Dist. LEXIS 95538, 2014 WL 3404531, at *22 (N.D. Cal. July 11, 2014)

19   (overruling objections and recognizing that "attorney Patrick Sweeney also has a long history of
     representing objectors in class action proceedings"); *see also* Docket No. 464-1 (Warshaw Decl.

20   ¶¶ 6-7) (noting that Mr. Sweeney "has filed at least seven objections – not including his objection
     here – to class action settlements in the last year alone"; adding that one his objections "has led to

21   a motion for sanctions against [him] alleging that his objection is frivolous and harassing because
     he is not a class member and does not have standing to object").

22   [5] *See* Docket No. 464-1 (Warshaw Decl., Ex. N) (e-mail from Mr. Miorelli to plaintiffs' counsel in
     a different case) ("I remain open to settling my objection, however today my terms would be

23   monetary instead of the various low and no-cost changes which you would not even discuss with
     me in early November. . . . If class counsel and/or Target would rather pay me than risk I win, I

24   think a good negotiating starting place would be a fraction of the almost $9.3 million in combined
     costs Target faces [if Target had to re-notice the class] and the millions in attorney fee reductions I

25   also proposed.  As I said in my objection to your fee, I think 25% is the appropriate fraction.  But,
     I'm a reasonable man open to reasonable counteroffers or discussions.").

26

27   [6] For clarity of the record, the Court notes that Mr. Riker (Docket No. 449) did not submit a valid
     claim.  *See* Docket No. 477 (Vasquez Decl. ¶ 18) (noting that Mr. Riker did not submit an eligible

28   phone number).  Also, no claim was received from Mr. Culp (Docket No. 451).  The Court notes
     for Mr. Culp's benefit (he is proceeding pro se) that, if he wishes to seek relief based on alleged

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

B.      Motion for Attorneys' Fees, Costs, Etc.

As noted above, Plaintiffs contemplate that various amounts will be deducted from the

gross settlement fund before there is distribution to the class:

- Incentive awards of $85,000 – more specifically, $5,000 each for 17 named Plaintiffs.  *See*

    Sett. Agmt. ¶ 36.

- Attorney's fees of $2.25 million (*i.e.*, 25% of the gross settlement fund).

- Litigation costs and expenses totaling $108,933.72.  *See* Docket No. 424 (Mot. at 20).

- Settlement administration fees and costs estimated at $655,500.  *See* Docket No. 462 (Jue

    Supp. Decl. ¶ 8).

The Court deems the litigation costs and expenses, as well as the settlement administration

fees and costs, reasonable.  Regarding the latter, the Court acknowledges that the amount is

significant but that is largely a result of the cost of notice, and the cost of notice was high because

of the unique circumstances in this case (*e.g.*, 30 million class members who were primarily

reached through various kinds of electronic media notice).

The Court also finds the attorney's fees reasonable.  The Court recognizes that some of the

objectors challenge the fee amount, arguing that the percentage method should be based on the net

settlement fund rather than the gross.  While some courts have taken this approach, *see, e.g.*, *In re*

*Ikon Office Solns. v. Stuart*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (stating that "[t]he percentage

will be based on the net settlement fund after deducting the costs of litigation, as this approach

increases the incentives for cautious expenditure and, again, helps align the interests of the class

more closely with those of counsel"); *Williams Foods, Inc. v. Eastman Chem. Co.*, No. 99C16680,

2001 U.S. Dist. LEXIS 27030, at *19 (D. Kan. Aug. 8, 2001) (awarding fees in the amount of one-

third of the net settlement fund), the Ninth Circuit clearly allows basing the percentage method on

the gross settlement fund.  *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, App. n.14 (9th

Cir. 2002) (looking at fee awards in other cases based on the gross settlement fund); *cf. Lee v.*

*Enter. Leasing Co-W.*, No. 3:10-CV-00326-LRH-WGC, 2015 U.S. Dist. LEXIS 64027, at *26-27

collusion between Defendants and the FBI and/or federal probation, he must file a *new* lawsuit as
the underlying conduct at issue in this case covers different conduct by Defendants.

(D. Nev. May 15, 2015) (noting that attorney's fees may be based on the gross settlement fund available to the class and not, *e.g.*, the amount actually claimed or recovered by the class).  The Ninth Circuit has also stated that "whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015) (adding that "the reasonableness of attorneys' fees is not measured by the choice of the denominator") (internal quotation marks omitted).[7]

Here, the end result is reasonable.  The Court does agree with some of the objectors that the lodestar claimed by Plaintiffs ($4 million) is questionable.  Although Plaintiffs' counsel represents that he reviewed all billing records, *see* Docket No. 464-1 (Warshaw Decl. ¶ 12) (stating that "I personally reviewed the time entries and costs submitted by plaintiffs' counsel and ensured that they complied with the guidelines [provided for in Docket No. 110]"), the Court cannot say with confidence that billing judgment was in fact entirely and reasonably exercised.  In this regard, the Court notes that, for just the two main law firms (Hagens Berman and Pearson Simon who incurred approximately $3.5 million in fees), more than 1,800 hours were spent on discovery; more than 720 hours on the motion to compel arbitration; almost 500 hours on the motion to dismiss; and more than 425 hours on the preliminary approval motion.  *See* Docket No. 425-3 (Lopez Decl., Ex. 3) (chart) (reflecting 963.10 hours for discovery; 368.90 hours for motion to compel arbitration; 162.70 hours for motion to dismiss; and 202.50 hours on preliminary approval motion); Docket No. 426 (Warshaw Decl. ¶ 12) (chart) (reflecting 909.50 hours for discovery; 361.30 hours for motion to compel arbitration; 325.10 hours for motion to dismiss; and 234.10 hours for preliminary approval).  To be clear, the Court has no reason to doubt that these hours were in fact incurred and acknowledged the motions were complex, but it does have concern as to whether these hours were reasonably necessary.

That being said, even if the claimed lodestar ($4 million) were to be cut by one-third to

---

[7] While the wisdom of basing fees on gross rather than net settlement fund may be questioned (*e.g.*, since counsel's interests would be more closely aligned with that of the class and there would be a financial incentive to ensure effective notice procedures if fees were based on actual distribution), the Ninth Circuit has yet to reconsider its rule.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    address the billing judgment problem, that would put the lodestar at approximately $2.67 million,

2    which still exceeds the attorney's fees requested here (*i.e.*, $2.25 million).  Thus, even the adjusted

3    lodestar cross-check sufficiently establishes that the fees requested are reasonable.

4            Finally, the Court addresses the request for incentive awards – namely, $5,000 per named

5    Plaintiff.  The Court acknowledges case law from this District indicating that "a $5,000 payment is

6    presumptively reasonable."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal.

7    2015) (also stating that "[i]ncentive awards typically range from $2,000 to $10,000").  But

8    ultimately, "[a] class representative must justify an incentive award through 'evidence

9    demonstrating the quality of plaintiff's representative service,' such as 'substantial efforts taken as

10   class representative to justify the discrepancy between [his] award and those of the unnamed

11   plaintiffs.'"  *Id.*  Here, the Court concludes that $5,000 is an inflated award given the

12   circumstances of this case.  Almost one-third of the named Plaintiffs spent fewer than 26 hours on

13   this case (over the course of four years).  *See* Levy Decl. ¶ 3 (approximately 15 hours); McKeen

14   Decl. ¶ 3 (approximately 20 hours); Patrick Decl. ¶ 3 (approximately 6 hours); Phong Decl. ¶ 3

15   (approximately 25 hours); Portales Decl. ¶ 3 (approximately 24 hours).  While the remaining

16   named Plaintiffs spent more time – with a few even spending 70 or more hours – the time spent

17   seems excessive given the underlying facts in this case.  *See, e.g.*, Allan Decl. ¶ 4 (testifying, *inter*

18   *alia*, that 8.5 hours were spent working with counsel on issues related to potential evidence in the

19   case, including preservation; 10.10 hours were spent on consulting with lawyers about arbitration-

20   related discovery; and 24.6 hours were spent on preparing a declaration opposing the motion to

21   compel arbitration).  Moreover, this is not a case where, *e.g.*, the named Plaintiffs would face

22   retaliation for participating in the lawsuit.  Taking into account all of the circumstances, the Court

23   concludes that an incentive award of $3,000 for those named Plaintiffs who spent fewer than 26

24   hours on the case (see above).  The amount of the incentive payment not awarded shall not revert

25   to Defendants but rather shall be redistributed to the claiming class members.  As to the remaining

26   named Plaintiffs, the Court approves the incentive award of $5,000.

27                            **III.    CONCLUSION**

28           For the foregoing reasons, the Court grants the motion for final approval and grants in part

                                                    11

and denies in part the motion for attorney's fees, costs, expenses, and service awards.  The Court

shall forthwith sign the proposed orders at Docket Nos. 424-1 and 455-1, but with modifications

as necessary.

This order disposes of Docket Nos. 424 and 455.


**IT IS SO ORDERED**.


Dated: August 25, 2016

_____
EDWARD M. CHEN
United States District Judge